## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-2989-MDL-ALTONAGA/Torres

IN RE:

**JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION**

_____/

This Document Relates to:

ALL ANTITRUST ACTIONS

### <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiffs Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling (collectively, "Plaintiffs"), on behalf of themselves and others similarly situated, appeal to the United States Court of Appeals for the Eleventh Circuit from the final Order entered on May 13, 2022 [ECF No. 470], which grants Defendants Robinhood Markets, Inc., Robinhood Financial LLC, Robinhood Securities, LLC and Citadel Securities LLC's Motion to Dismiss the Amended Antitrust Tranche Complaint [ECF No. 456], and dismisses Plaintiffs' Amended Consolidated Class Action Complaint [ECF No. 451] with prejudice. A copy of the order is attached as Exhibit A hereto.

Dated: June 1, 2022

By:      /s/ *Joseph R. Saveri*
          Joseph R. Saveri

Joseph R. Saveri (CA SBN 130064)
Steven N. Williams (CA SBN 175489)
Christopher K.L. Young (CA SBN 318371)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
cyoung@saverilawfirm.com

Respectfully Submitted,

By:      /s/ *Frank R. Schirripa*
          Frank R. Schirripa

Frank R. Schirripa (NY SBN 4103750)
Kathryn Hettler (NY SBN 5126065)
Seth Pavsner (NY SBN 4969689)
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Ave, 10th Floor
New York, New York 10016
Tel: (212) 213-8311
fschirripa@hrsclaw.com
khettler@hrsclaw.com
spavsner@hrsclaw.com

*Co-Lead Counsel for the Antitrust Tranche*

# Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## CASE NO.  21-2989-MDL-ALTONAGA/Torres

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**
_____/

This Document Relates to the Antitrust Actions

## ORDER

**THIS CAUSE** came before the Court on Defendants'[1] Motion to Dismiss the Amended Antitrust Tranche Complaint [ECF No. 456], filed on February 18, 2022.  Plaintiffs[2] filed a Response [ECF No. 459], to which Defendants filed a Reply [ECF No. 463].  The Court has carefully considered the Amended Consolidated Class Action Complaint (the "Am. Compl.") [ECF No. 451], the parties' written submissions, the record, and applicable law.  For the following reasons, the Motion is granted.

## I.      INTRODUCTION

The Amended Complaint is Plaintiffs' third attempt at pleading an antitrust conspiracy claim arising from the January 2021 short squeeze.  The Court dismissed Plaintiffs' Corrected Consolidated Class Action Complaint (the "CCAC") last fall, giving Plaintiffs the opportunity to amend.  (*See generally* Nov. 17, 2021 Order [ECF No. 438]).  They did so.  What has changed with the latest pleading?  Not much.

---

[1] The Defendants are Robinhood Markets, Inc.; Robinhood Financial LLC; Robinhood Securities, LLC; and Citadel Securities LLC.  (*See* Am. Compl. ¶¶ 42–49).

[2] The Plaintiffs are Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling.  (*See* Am. Compl. ¶¶ 23–41).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

The CCAC described a wide-ranging conspiracy purportedly orchestrated by a market maker and involving over a dozen Defendants, including introducing brokerages, self-clearing brokerages, and clearinghouses.  Plaintiffs alleged the market maker, Citadel Securities, pressured the other Defendants to halt trading in certain stocks that had undergone rapid and historic price increases due to a retail trading frenzy.  According to Plaintiffs, Citadel Securities held significant short positions in the affected stocks, rendering it especially vulnerable to the retail-induced short squeeze.

Plaintiffs adequately pleaded parallel conduct among the Defendants.  But there were no additional factual allegations supporting a plausible inference of a conspiracy — except for references to a few vague and ambiguous emails that were exchanged between a brokerage, Robinhood,[3] and its market maker, Citadel Securities.  The Court dismissed the CCAC in its entirety because a few questionable emails between two firms in an otherwise lawful business relationship were not enough to support a plausible inference of an unlawful conspiracy.

This third time around, Plaintiffs only allege collusion between Robinhood and Citadel Securities; they have dropped every other Defendant from the suit.  While Plaintiffs profess to have bolstered their factual allegations as to Robinhood and Citadel Securities, the allegations of conspiracy are in substance the same and thus inadequate.  In addition, Plaintiffs fail to plausibly allege an unreasonable restraint of trade because their garbled market theory does not conform to the alleged facts.  The Court explains.

---

[3] The Court refers to Robinhood Markets, Inc.; Robinhood Financial LLC; and Robinhood Securities, LLC, collectively, as "Robinhood[.]"  Robinhood Financial LLC and Robinhood Securities, LLC are wholly-owned subsidiaries of Robinhood Markets, Inc.  (*See* Am. Compl. ¶¶ 42–45).

2

CASE NO.  21-2989-MDL-ALTONAGA/Torres

## II.      BACKGROUND

This putative class action is brought on behalf of individual investors (the "Retail Investors") who suffered losses as a result of Defendants' response to a "short squeeze" — a situation in which stocks or other assets rise sharply in value, distressing short positions.[4]  (*See* Am. Compl. ¶¶ 12, 15–16).  This short squeeze occurred in late January 2021, as the Retail Investors purchased the Relevant Securities *en masse* over a short period of time,[5] exposing those with short positions in the Relevant Securities — such as Citadel Securities — to large potential losses.  (*See id.* ¶¶ 7, 11–12, 64–66).  According to Plaintiffs, Citadel Securities pressured Robinhood to restrict trading on its platform, which "artificially constricted the price appreciation of the Relevant Securities[,]" in violation of the Sherman Act, 15 U.S.C. § 1.  (Am. Compl. ¶ 16 (alteration added); *see id.* ¶¶ 13, 67, 403–415).

*Parties.*

*Defendants.*    Robinhood Markets is the corporate parent of Robinhood Financial and Robinhood Securities.  (*See id.* ¶ 42).  Robinhood Financial is an introducing broker: it provides financial services through an electronic trading platform, or application, where individual investors can trade financial assets.  (*See id.* ¶ 43).  Robinhood Securities is a clearing broker: it handles the execution, clearing, and settling of trades placed on Robinhood Financial's application.  (*See id.* ¶¶ 44, 83).    Collectively, Robinhood restricted the Retail Investors' ability to purchase the

---

[4] A "short" seller borrows a security from a lender, believing the price of the security will decrease.  (*See* Am. Compl. ¶ 108).  It then sells the borrowed security to a buyer.  (*See id.*).  If the price of the security drops, the short seller buys the security back at a lower price and returns it to the lender.  (*See id.*).  The difference between the sell price and the buy price is the short seller's profit.  (*See id.*).  Conversely, the short seller loses money if the price of the security increases.  (*See id.*).

[5] The "Relevant Securities" are certain stocks the Retail Investors believed would increase in price: GameStop (GME), AMC Entertainment (AMC), Bed Bath & Beyond (BBBY), BlackBerry (BB), Express (EXPR), Koss (KOSS), Nokia (NOK), Tootsie Roll Industries (TR), and Trivago NV (TRVG).  (*See* Am. Compl. ¶ 7).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Relevant Securities between January 28, 2021, and February 4, 2021 (the "Class Period").  (*See id.* ¶¶ 46, 55).

Citadel Securities is a market maker: it acts as a market participant by providing bid and ask prices for securities, maintaining an inventory of securities from its own trading, and matching incoming buy and sell orders to fill those orders.  (*See id.* ¶¶ 48, 85).  Citadel Securities took short positions in the Relevant Securities during the period in question.  (*See id.* ¶ 49).

*Plaintiffs.*  The named Plaintiffs are four individual investors who were subject to trading limitations imposed on the Relevant Securities during the Class Period.  (*See id.* ¶¶ 23–41).  Each Plaintiff held shares of one or more of the Relevant Securities at the close of the stock market on January 27, 2021.  (*See id.* ¶¶ 23, 28, 33, 38).  The next day, January 28, 2021, they were all prohibited from purchasing the Relevant Securities on Robinhood's trading platform.  (*See id.* ¶¶ 24, 29, 34, 39).

That same day, Guzman and Miller applied for accounts with Charles Schwab, Fidelity, and TD Ameritrade — these did not prohibit customers from purchasing the Relevant Securities — but Guzman and Miller were unable to complete purchases due to the amount of time required to set up the accounts.  (*See id.* ¶¶ 25, 35).  Minahan successfully applied for an account with Fidelity and was able to purchase a share of GameStop stock that day.  (*See id.* ¶ 30).  Each Plaintiff then sold his or her shares of the Relevant Securities on Robinhood between January 28, 2021, and February 4, 2021.  (*See id.* ¶¶ 26–27, 31–32, 36–37, 40–41).

<u>*Injury and proposed class.*</u>  According to Plaintiffs:

> As a direct and intended result of Defendants [sic] contract, combination, agreement and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities.  Robinhood deactivated the buy option on its platform and left Plaintiffs and Class members with no option but to sell or hold shares of the stocks on their platforms.  Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the

Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination, agreement and restraint of trade. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

(*Id.* ¶ 410 (alterations added)).

Plaintiffs seek to certify the following class:

All persons or entities in the United States that held shares of stock or call options through Robinhood in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Nokia Corp. (NOK), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) as of the close of market on January 27, 2021, and sold the above-listed securities from January 28, 2021 up to and including February 4, 2021 (the "Class Period").

(*Id.* ¶ 55).

### *Alleged facts.*

*Mechanics of securities trading on Robinhood.* Individual investors' market share of U.S. equity trading has steadily increased since 2019 and has recently accounted for a third of all U.S. stock market trading. (*See id.* ¶¶ 92–93). When individual investors make investments on their own behalf, they execute their personal trades through websites, apps, and trading platforms provided by brokerage firms or other investment service providers. (*See id.* ¶ 6).

Robinhood Financial provides one such trading application to individual investors. (*See id.* ¶¶ 6, 43, 68). Robinhood Financial is one of the largest retail brokers in the United States — the trading demand of its over 31 million users substantially influences the movements of stock prices. (*See id.* ¶¶ 70–72).

Once a trade is placed on Robinhood Financial's application, the customer's cash and securities are custodied by Robinhood Financial's clearing broker, Robinhood Securities. (*See id.* ¶ 83). Robinhood Securities services the customer's account by executing, clearing, and settling the trade order. (*See id.*).

Although individual investors historically had to pay a fee or commission to their brokerages for executing personal trades, today most brokerages do not charge their investors a fee per transaction.  (*See id.* ¶ 8).  Rather, in exchange for routing the order to a market maker, brokerages earn revenue through rebates, kickbacks, and other payments — known collectively as payment for order flow ("PFOF").  (*See id.* ¶¶ 8, 73).

Robinhood Securities typically routes a customer's trade order to a large market maker like Citadel Securities.  (*See id.* ¶¶ 74, 84).  As a market maker, Citadel Securities fills these orders from its own inventory, by routing the order to an exchange, or by taking the other side of a transaction (*e.g.*, selling a security short in response to receiving an order to buy the security).  (*See id.* ¶¶ 85–86).  Once an order is filled, the market makers pocket the difference between the bid and ask prices; this is known as the "spread."  (*Id.* ¶¶ 74, 85).  While the spreads may be small, they are significant in the aggregate due to the large volume of orders filled.  (*See id.*).

 After an order is filled, the details of the executed order are sent to the National Securities Clearing Corporation ("NSCC") for clearinghouse and settling services.  (*See id.* ¶ 87).  Because trades do not settle immediately, there is a risk that a party to a transaction may default before the trade is completed.  (*See id.* ¶¶ 87–88).  The NSCC clears cash transactions by netting securities deliveries and payments among NSCC's clearing members and guaranteeing the completion of trades, even if one party to the transaction defaults.  (*See id.* ¶ 88).  Thus, if a clearing member such as Robinhood defaults on its settlement obligations, the NSCC guarantees the delivery of cash and securities to its non-defaulting members.  (*See id.*).

The NSCC collects clearing fund contributions, or margin, from clearing members at the start of each day and intraday in volatile markets.  (*See id.* ¶ 90).  The margin protects the NSCC and all market participants against clearing member defaults, and margin requirements must be

6

CASE NO.  21-2989-MDL-ALTONAGA/Torres

met by clearing members on a timely basis.  (*See id.*).  Margin requirements are largely based on risk and market volatility.  (*See id.*).  The rules for calculating the contribution requirements and the timing of the collection of contributions are known to every clearing member; and the NSCC provides reporting tools, calculators, and documentation to allow the members to monitor their risk in near real-time and estimate clearing fund contribution requirements.  (*See id.*).

*January 2021 market volatility.*  Retail Investors often exchange investment information via online discussion forums like Facebook, TikTok, and, most relevant here, the WallStreetBets financial discussion forum on Reddit.  (*See id.* ¶¶ 64, 95, 127–28).  WallStreetBets is characterized by a particular culture centered around the discussion of financial investments and memes; many of its users are sophisticated and shrewd individual investors.  (*See id.* ¶ 128).

Beginning in 2019, the Retail Investors, through these online discussion forums, hypothesized that shares of GameStop's stock were significantly undervalued, trading at much lower prices than they should have been, based on GameStop's publicly available financial disclosures and prospects.  (*See id.* ¶¶ 95–96).  The Retail Investors saw similar investment opportunities in the other Relevant Securities.  (*See id.* ¶¶ 97–98).

One such Retail Investor, the popular Reddit and YouTube user, Roaring Kitty, deduced that GameStop was undervalued for a variety of reasons, including substantial short positions that large financial institutions had taken against the stock.  (*See id.* ¶¶ 96, 127).  Roaring Kitty continuously published his investments on WallStreetBets, such as his initial purchase of $50,000 of GameStop; he also posted an in-depth analysis of GameStop's stock on his YouTube channel in August 2020.  (*See id.* ¶¶ 127, 129).

Leading up to January 27, 2021, the Retail Investors purchased long positions in the Relevant Securities — primarily through Robinhood — with the expectation that the stocks would

increase in value. (*See id.* ¶¶ 7, 64, 101). As more investors purchased the Relevant Securities and "out of the money" call options[6] in the Relevant Securities, the market prices for the stocks rose due to supply and demand. (*Id.* ¶¶ 99, 114). The Relevant Securities started appreciating to "unprecedented levels." (*Id.* ¶ 15).

To illustrate this rapid growth, a share of GameStop stock traded for as low as $2.00 a share in 2019 (*see id.* ¶ 130); $43.03 on January 21, 2021 (*see id.* ¶ 132); $76.79 on January 25, 2021 (*see id.*); $147.98 on January 26, 2021 (*see id.* ¶ 135); and $380.00 on January 27, 2021 (*see id.* ¶ 137). GameStop's stock price reached a closing high of $347.51 on January 27, 2021 — a 134.84% increase from the previous day. (*See id.*). Other Relevant Securities experienced similar surges; for example, AMC's and Express's share prices increased over 300% and 200%, respectively. (*See id.*).

As Retail Investors increased long positions in the Relevant Securities, those who held short positions in the Relevant Securities, such as Citadel Securities (*see id.* ¶¶ 11, 141–42), were caught in a short squeeze. (*See id.* ¶¶ 114–15). Investors with these short positions faced a rapid increase in the shorted assets' values, exposing short sellers to even greater losses because the short sellers must at some point buy back the stocks to return them to their lenders. (*See id.* ¶¶ 12, 115).[7]

---

[6] A call option gives the holder the right to buy the asset at a stated fixed price or the "strike price." (Am. Compl. ¶ 114). An "in the money" option has a favorable strike price because it is *lower* than the market price of a stock (*id.* ¶ 119), while an "out of the money" option has an unfavorable strike price because it is *higher* than market price for the underlying asset (*id.* ¶ 120). If an option expires while out of the money, the contract becomes valueless. (*See id.* ¶¶ 119–120, 140, 294).

[7] Another phenomenon known as a "Gamma squeeze" occurred as the prices of the Relevant Securities increased. (Am. Compl. ¶¶ 114, 116). Options are priced based on a variety of risk variables, including one called "Gamma," which increases as the option nears its expiration date or as the option approaches its strike price (*i.e.*, "being in the money"). (*Id.* ¶¶ 121, 123–26). When a security experiences a sharp price increase, the Gamma increases; stated differently, options that were previously unlikely to reach their strike prices before expiration become more likely to do so. (*See id.* ¶¶ 124–26). As the Gamma increases, market makers hedge by purchasing more of the underlying security, which further drives the price of the security

8

Around 5:00 p.m. on January 27, 2021, the SEC released a statement indicating it was "aware of and actively monitoring the on-going market volatility in the options and equities markets[.]" (*Id.* ¶ 144 (alteration added; quotation marks omitted)).  It declined to step in and restrict trading, however. (*See id.*).

***Events of January 28, 2021.*** Right before markets opened on January 28, 2021, analytics captured a significant volume of GameStop short transactions.  (*See id.* ¶ 156).  Retail brokers generally do not allow individual investors to engage in after-hours trading to the same extent as institutional investors, so this increase in short volume was likely the result of institutional investors, like Citadel Securities, taking new short positions.  (*See id.* ¶ 157).  Additionally, failure to delivers ("FTDs"), which occur when one of two transacting parties fails to meet its obligations in a securities trade, rose dramatically in the period leading up to January 28, 2021, a phenomenon consistent with increasing short interest by market makers like Citadel Securities.[8]  (*See id.* ¶¶ 161, 165).

This increase in short positions baffled some observers.  (*See id*. ¶ 175).  The dominant view in many financial discussion forums reflected a high degree of excitement and motivation among Retail Investors.  (*See id.*).  Many announced plans to increase long positions in the Relevant Securities on January 28, 2021.  (*See id.*).

Around 1:00 a.m. EST on January 28, 2021, Robinhood informed its users that in the face of unprecedented volatility surrounding GameStop and AMC stock, all GameStop and AMC options with expirations of January 29, 2021 would be set to closing transactions only.  (*See id.*

---

higher and creates a feedback loop as even deeper out of the money options approach their strike price. (*See id.* ¶ 126).

[8] FTDs can be strong indicators of naked short selling, which occurs when a short seller does not actually possess the security it is supposed to borrow, or of market makers taking on more short positions.  (*See* Am. Compl. ¶¶ 162–63).

¶ 176). Apparently, the restrictions would help Robinhood reduce risk. (*See id*.). For the immediate future, customers could close out their positions in GameStop and AMC but could not make new investments. (*See id.*).

At 5:11 a.m. EST, Robinhood received an email from the NSCC titled "NSCC Daily Margin Statement" advising Robinhood had a collateral requirement deficit of over $3 billion. (*Id.* ¶ 178). At 8:00 a.m. EST, Gretchen Howard, Robinhood's COO, messaged internally that Robinhood had a "major liquidity issue" and was moving the Relevant Securities to Position Close Only ("PCO"), meaning Robinhood users could sell the Relevant Securities but could not buy them. (*Id.* ¶¶ 179–80 (quotation marks omitted)). Around that same time, David Dusseault, Robinhood Financial's President and COO, said in another internal message, "we will navigate through this [NSCC] issue[,]" and "we are to [sic] big for them to actually shut us down[.]" (*Id.* ¶ 182 (alterations added)). Robinhood negotiated with the NSCC to significantly reduce its margin requirements and was subsequently able to meet its revised NSCC deposit requirement shortly after 9:00 a.m. EST. (*See id.* ¶¶ 183–185).

Robinhood moved the Relevant Securities to PCO by the time the markets opened on January 28, 2021. (*See id.* ¶¶ 179–180). To their surprise, Robinhood users were no longer able to purchase the Relevant Securities — the "buy" button was deactivated as a feature, leaving users with no option but to sell or hold their securities. (*See id.* ¶¶ 186–88). Further, Robinhood blocked users on its web platform and mobile app from searching for the Relevant Securities' ticker symbols. (*See id.* ¶ 190). Robinhood also canceled overnight purchase orders of the Relevant Securities placed on January 27, 2021, which were queued to move forward when the markets opened on January 28, 2021. (*See id.* ¶ 188).

Customers were not given advance notice of the switch to PCO for the Relevant Securities. (*See id.* ¶ 185). Robinhood announced the news via Twitter on January 28, 2021, stating it was restricting the Relevant Securities to PCO due to market volatility. (*See id.* ¶¶ 192–94).

Other brokerages also restricted trading, adjusted margin requirements, or restricted trading strategies.[9] (*See id.* ¶¶ 195, 365–67). On January 28, 2021, Ally, Dough, Public.com, SoFi, Stash, Tastyworks, and WeBull restricted purchases of two or three of the Relevant Securities;[10] E*Trade restricted purchases of GameStop and AMC; and Interactive Brokers restricted trading on options. (*See id.*). Charles Schwab and TD Ameritrade did not halt trading but instead adjusted margin requirements for certain securities and restricted certain strategies usually employed by advanced traders. (*See id.* ¶ 365).

The broad prohibition on buying the Relevant Securities spawned a massive sell-off, which sent prices of the Relevant Securities tumbling. (*See id.* ¶ 197). For example, on January 28, 2021, GameStop shares reached an intraday peak of $483.00 before dropping down to a closing price of $193.60 — a staggering 44.29% drop from the prior day's closing price of $347.51. (*See id.* ¶ 198). Similarly, AMC shares dropped 56.63%, EXPR shares fell 50.79%, and BBBY shares declined 36.40%. (*See id.*). The Retail Investors who wanted to take advantage of the price drops to buy more shares of the Relevant Securities were unable to do so due to the prohibition on purchasing. (*See id.*).

While individual investors were prohibited from purchasing the Relevant Securities, institutional investors were not. (*See id.* ¶ 209). Large investment firms and market makers such

---

[9] Internal Robinhood documents show Robinhood actively monitored the actions of other broker-dealers. (*See* Am. Compl. ¶ 196).

[10] Many of these brokerages reported that their clearing firm, Apex, was responsible for implementing the restrictions. (*See* Am. Compl. ¶ 195). Apex only imposed restrictions on January 28, 2021. (*See id.*).

as Citadel Securities were able to purchase the Relevant Securities at artificially reduced prices because they had access to private stock exchanges known as "dark pools."[11]  (*Id.*).  As the Retail Investors sold their shares in the Relevant Securities because of the trading restrictions, firms like Citadel Securities bought the Relevant Securities at artificially reduced prices to close out their short positions.  (*See id.* ¶¶ 209–10).

*Events after January 28, 2021.*  When the market opened on January 29, 2021, Robinhood lifted its trading restrictions and permitted individual investors to open new long positions in the Relevant Securities; even so, Robinhood continued to heavily restrict such purchases.  (*See id.* ¶¶ 249–51).  For example, Robinhood placed limitations on the number of new positions its users could open in the Relevant Securities, restricting purchases of GameStop stock to two shares and then to one share.  (*See id.* ¶¶ 253–55).  It maintained trading limitations on certain securities through February 4, 2021 (*see id.* ¶ 261); further suppressing the value of the Relevant Securities and pressuring investors to sell, rather than buy or hold (*see id.* ¶¶ 251, 255–56).

On January 31, 2021, Vlad Tenev, Robinhood's CEO, explained in an opinion piece published in USA TODAY that Robinhood maintained trading restrictions because clearinghouse-mandated deposit requirements were "increased ten-fold."  (*Id.* ¶ 262 (quotation marks omitted)).  Two days earlier, Robinhood had announced that it raised more than $1 billion to help meet rising demands for cash and shore up its balance sheet.  (*See id.* ¶ 261).  Robinhood raised this money on top of $500 million it accessed through credit lines to ensure it had sufficient capital to allow its clients to trade the Relevant Securities.  (*See id.*).  On February 1, 2021, Robinhood announced

---

[11] Private stock exchanges are known colloquially as "dark pools" or "dark exchanges" because they do not disseminate public quotations of securities prices.  (Am. Compl. ¶¶ 104–07).  Through these private exchanges, institutional investors can discreetly buy or sell securities in large blocks, mitigating some of the price impacts that their buying or selling activity would otherwise have on a "lit," or public, national securities exchange.  (*Id.* ¶ 106).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

it had raised an additional $2.4 billion in funding above the $1 billion it had already raised.  (*See id.*).  Weeks later, Tenev testified before the U.S. House Committee on Financial Services that Robinhood had met its revised deposit requirements a little after 9:00 a.m. on January 28, 2021. (*See id.* ¶ 264).

Publicly available data reveal short interests[12] in the Relevant Securities climbed steadily in the weeks leading up to January 28, 2021 (*see id.* ¶¶ 269–70, 284); and then decreased because of the trading restrictions imposed during the Class Period, with the sharpest and most significant decreases occurring after the restrictions imposed on January 28, 2021 (*see id.* ¶¶ 265, 269–72). FINRA data show significant increases in dark pool trading activity for each of the Relevant Securities on and around January 28, 2021, during the period when restrictions were first placed on the Relevant Securities.  (*See id.* ¶¶ 273–79).  Institutions dominate trading in dark pools and dark exchanges, which are generally beyond the reach of individual investors, so this activity indicates high institutional investor trading activity consistent with the exiting of short positions. (*See id.* ¶ 280).

The scale of Citadel Securities's business also indicates that the bulk of the activity captured by this FINRA data can be attributed to Citadel Securities.  (*See id.* ¶¶ 281–84).  Because Citadel Securities accounts for about 50% of dark trading activity, a large shift in the percentage of sales represented by short trades is likely to be caused by a shift in Citadel Securities's position from long to short or vice versa.  (*See id.* ¶ 283).

***Collusion between Defendants.***  Plaintiffs allege that Robinhood and Citadel Securities colluded to limit buy-side trading in the Relevant Securities so that Citadel Securities could recoup

---

[12] "Short interests" are defined as the number of shares of a security that have been sold short but have not yet been covered or closed out.  (Am. Compl. ¶ 268).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

losses in its short positions caused by the rise of the Relevant Securities' prices. (*See id.* ¶ 154 (alterations added)).

*Motive to collude.* According to Plaintiffs, "Robinhood and Citadel Securities shared a common motive to conspire — to protect their individual self-interest over the welfare of Robinhood's users. Robinhood restricted competition on its platform to protect itself and Citadel from hemorrhaging losses totaling potentially billions of dollars." (*Id.* ¶ 393). Further, "in light of its planned 2021 IPO, Robinhood simply could not run the risk that its 'transaction-based revenue would be impacted negatively' should Citadel Securities terminate its relationship with Robinhood." (*Id.* ¶ 401; *see also id.* ¶¶ 318, 400).

PFOF is Robinhood's primary source of revenue. (*See id.* ¶¶ 5, 75, 316). Market makers such as Citadel Securities pay more for Robinhood's order flow than they do for Robinhood's competitors. (*See id.* ¶¶ 76, 402). Today, Robinhood derives somewhere between 60% to 70% of its revenue from selling PFOF to market makers like Citadel Securities. (*See id.* ¶¶ 73–75). Citadel Securities alone was responsible for 29% of Robinhood's revenue in 2019, 34% in 2020, and 43% of Robinhood's PFOF revenue in the first quarter of 2021. (*See id.* ¶¶ 5, 78, 80, 318). Indeed, Citadel Securities is Robinhood's primary source of revenue. (*See id.* ¶ 5).

In its Form S-1, Robinhood stated:

> For the three months ended March 31, 2021, 59% of our total revenues came from four market makers. If any of these market makers, or any other market makers with whom we do business, were unwilling to continue to receive orders from us or to pay us for those orders (including, for example, as a result of unusually high volatility), we may have little to no recourse and, if there are no other market makers that are willing to receive such orders from us or to pay us for such orders, or if we are unable to find replacement market-makers in a timely manner, our transaction-based revenue would be impacted negatively.

14

(*Id.* ¶ 81; *see also id.* ¶ 317 ("As set forth in Robinhood's Registration Statement, Robinhood's 'PFOF . . . arrangements with market makers are not documented under binding contracts.'" (alteration in original)).

Citadel Securities possessed significant short positions in the Relevant Securities during the period in question. (*See id.* ¶ 394). As the prices of the Relevant Securities increased, Citadel Securities was exposed to "potentially infinite" losses. (*Id.*). As of December 31, 2020, Citadel Securities reported $57.5 billion in "securities sold, not yet purchased, at fair value" — which are "likely representative of Citadel Securities's short position." (*Id.* ¶ 395 (quotation marks omitted)).

Plaintiffs conclude that Citadel Securities used its relationship with Robinhood to pressure the company into restricting trading in the Relevant Securities so it could buy the stocks at an artificially reduced price to close out its short positions. (*See id.* ¶¶ 400–02).

According to Plaintiffs, Defendants' public attempt to attribute the motivation for its trading restrictions to market volatility and the resulting NSCC margin call was pretextual. (*See id.* ¶¶ 357–69). In other words, Robinhood was not innocently responding to increased volatility; it was trying to keep its most important customer happy, to the detriment of the Retail Investors. Plaintiffs allege that restricting trading was *against* Robinhood's self-interest because Robinhood's profits are based on the volume of transactions on its application. (*See id.* ¶¶ 358–60). Further, Plaintiffs claim Robinhood could have either used its lines of credit instead of restricting trading to meet its margin requirements, or it could have imposed less restrictive measures like other brokerages did. (*See id.* ¶¶ 363–69).

*Communications among Defendants.*  In the run up to, during, and after January 28, 2021, high-level executives of Citadel Securities communicated with high-level executives of Robinhood.  (*See id.* ¶ 226).

On January 20, 2021, the Citadel Securities Head of Execution Services extended an unknown proposition to Josh Drobnyk, Robinhood's Vice President of Corporate Relations and Communications, who conferred with Daniel Gallagher and Lucas Moskowitz, Robinhood's Chief Legal Officer and Deputy General Counsel, respectively.  (*See id.* ¶¶ 227–28).  The Citadel Securities executive and Drobnyk had a relationship because Drobnyk previously worked at FINRA.  (*See id.* ¶ 227).  On January 25, 2021, Drobnyk replied via email that "[w]e are on board" and Moskowitz would be the central point of contact for Robinhood.  (*Id.* ¶ 230 (alteration added; quotation marks omitted)).  The Citadel Securities executive responded to Moskowitz with an offer to chat, emphasizing the "strong relationship between the firms[.]"  (*Id.* ¶ 231 (alteration added; quotation marks omitted)).  The details of the ensuing January 26, 2021 phone call have not been disclosed.  (*See id.* ¶¶ 232–33).

On January 26, 2021, during the short squeeze, Jim Swartwout, President and CEO of Robinhood Securities, alerted other Robinhood executives through an internal chat that Robinhood "was moving GameStop to 100% margin the next day, stating 'I sold my AMC today. FYI — tomorrow we are moving GME to 100% — so you are aware.'"  (*Id.* ¶ 234).

On January 27, 2021, the day before the trading restrictions were implemented, Citadel Securities and Robinhood executives exchanged several communications.  (*See id.* ¶ 235).  In an internal conversation around 4:40 p.m., Robinhood COO Howard informed Tenev that she, along with Gallagher and Swartwout, would be joining "a call with Citadel" at 5:00 p.m. that day.  (*Id.* ¶ 237 (quotation marks omitted); *see id.* ¶ 239).  Howard said she believed Citadel Securities

would make demands on limiting PFOF. (*See id.* ¶¶ 237, 239). Tenev responded that "[m]aybe this would be a good time for me to chat with Ken [G]riffin[,]" the CEO of Citadel Securities, and told Howard, "[y]ou guys can mention that." (*Id.* ¶ 239 (quotation marks omitted; alterations added)). Tenev noted he had not previously met Griffin. (*See id.*).

Shortly thereafter, around 6:25 p.m., Swartwout messaged in an internal chat that he was aware of "anecdotal evidence that several 'very large' firms [were] having really bad nights too." (*Id.* ¶ 240 (alteration adopted; alteration added; quotation marks omitted)). Swartwout replied, "everyone is. [Y]ou wouldnt [sic] believe the conv[ersation] we had with Citadel. [T]otal mess." (*Id.* ¶ 241 (alterations added); *see id.* ¶ 240–41). At 8:16 p.m., Swartwout updated a Citadel Securities employee that he was looking for "new Citadel numbers." (*Id.* ¶ 242 (quotation marks omitted)). The Citadel Securities employee responded that the numbers were "firming up right now in light of the follow up [sic] conversation between Gallagher and [redacted.]" (*Id.* (alteration adopted; alterations added; quotation marks omitted)).

At 8:29 p.m. that evening, the Citadel Securities Vice President of Business Development notified Swartwout that one of Citadel Securities's executives, whom Tenev had previously met, was available to speak to Tenev that night. (*See id.* ¶¶ 243, 245). Swartwout replied, "[b]ecause of our partnership, Vlad would like to have a discussion with Ken [Griffin] at some point, just given our relationship. Not specific to this crazy issue." (*Id.* ¶ 244 (first alteration added; second alteration in original; quotation marks omitted); *see id.* ¶ 245). Swartwout emailed in the same chain later that night that he was "beyond disappointed in how this went down[,]" and it was "difficult to have a partnership when these kind[s] of things go down this way." (*Id.* ¶ 245 (alterations added; quotation marks omitted)).

17

CASE NO.  21-2989-MDL-ALTONAGA/Torres

On January 30, 2021, a Citadel Securities executive emailed Drobnyk, stating he "wanted to generally coordinate messaging." (*Id.* ¶ 258 (quotation marks omitted); *see id.* ¶ 260). The Citadel Securities executive also introduced Drobnyk to someone who was "running point on this narrative for [them]" and copied company lawyers "for privilege." (*Id.* ¶ 258 (alteration added; quotation marks omitted); *see id.* ¶ 260).

***Market definitions.*** Plaintiffs define two relevant product markets "within the distribution of securities trading services" — the upstream market in which Citadel Securities operates and the downstream one in which Robinhood operates.[13] (*Id.* ¶ 305). Plaintiffs define these as the "PFOF Market" and the "No-Fee Brokerage Trading App Market[,]" respectively. (*Id.* ¶¶ 306, 312 (alteration added)).

<u>*The PFOF Market.*</u> Citadel Securities competes with other market makers in the upstream PFOF Market, which Plaintiffs geographically limit to the United States. (*See id.* ¶¶ 306, 311). Plaintiffs allege Citadel Securities accounts for approximately 27% of the U.S. equities volume and executes approximately 37% of all U.S.-listed retail volumes, making it a "relative behemoth[,]" with the largest market share of any wholesale market maker in the PFOF Market. (*Id.* ¶¶ 306–07 (alteration added)). The firm has garnered approximately 40% of all PFOF in the United States for the past two years, more than its next three competitors combined. (*See id.* ¶ 307).

Citadel Securities paid brokers roughly $1.1 billion for their order flows in 2020, more than any other market maker and nearly equal to its four largest competitors combined. (*See id.* ¶ 308). From January 2021 through June 2021, Citadel Securities paid nearly $1.5 billion to brokers for their order flow, more than any other market maker. (*See id.* ¶ 309).

---

[13] "Upstream" here refers to an earlier stage in the production or distribution chain, while "downstream" refers to a later stage. (Am. Compl. ¶ 305).

*No-Fee Brokerage Trading App Market.*   Robinhood competes with other brokerages in the downstream or consumer-facing No-Fee Brokerage Trading App Market, which is also geographically limited to the United States.  (*See id.* ¶¶ 312–13, 315).  Brokerages in this market offer no-fee transactions on their trading applications because they receive PFOF from market makers in the upstream market.  (*See id.* ¶¶ 312–13).

Based on monthly active users, Robinhood is far and away the most popular electronic trading application in the world and is responsible for a significant number of daily trades.  (*See id.* ¶¶ 326, 333).  In January 2021, Robinhood had nearly three-times as many users as then second-place brokerage Fidelity Investments (*see id.* ¶ 334); in July 2021, Robinhood had nearly three-times as many users as then second-place brokerage WeBull (*see id.* ¶ 336).

*Structure and characteristics of the markets.*   According to Plaintiffs, the "structure and characteristics of the market for securities, and in particular the lack of disclosure of short interest positions at any given time, make it conducive to collusion and anticompetitive conduct."  (*Id.* ¶ 370).

*High barriers to entry.*   An entrant to the No-Fee Brokerage Trading App Market would need specialized knowledge, licenses, and memberships, including memberships in organizations such as FINRA.  (*See id.* ¶ 373).  The cost of compliance with applicable industry and regulatory standards is substantial.  (*See id.*).  Entrants would need significant cash on hand to deposit at clearinghouses such as the DTCC as collateral.  (*See id.* ¶ 374).  And entrants would need to have the necessary technological infrastructure and expertise to navigate the digital market.  (*See id.* ¶¶ 375–76).  An entrant to the PFOF Market would also need extensive infrastructure and significant mathematical expertise to design the sophisticated algorithms that are necessary to compete in the high-frequency trading market.  (*See id.* ¶¶ 377–78).

*High fixed costs and low variable costs.* Both relevant markets are defined by high fixed costs and low variable costs, and participants in these markets benefit greatly from scale. (*See id.* ¶ 379). Online broker-dealers participating in the No-Fee Brokerage Trading App Market require significant IT infrastructure, software, and data security infrastructure to develop and maintain the applications through which investors trade. (*See id.* ¶ 380). Market makers participating in the PFOF Market require similar infrastructures and software to facilitate the digital clearing and custodial services they provide to online broker-dealers. (*See id.* ¶ 381). Market makers — high frequency trading market makers, in particular — must invest significant effort and resources to increase the speed of trading technology to maximize their profits. (*See id.* ¶¶ 382–83).

*Captive market.* In the short run, retail investors in the securities market are locked into the broker-dealers they already invest with. (*See id.* ¶¶ 158, 387). The process to open a trading account with a broker-dealer may take several days. (*See id.* ¶ 388). If a broker-dealer like Robinhood imposes short-term trading restrictions, retail investors may not have the opportunity to switch or change broker-dealers before the restrictions are lifted. (*See id.* ¶ 392).

If Robinhood users wish to transfer or withdraw funds from their Robinhood accounts to their personal bank accounts, they will not have access to their funds for three-to-five days after initiating a request. (*See id.* ¶¶ 159, 389). During the week of January 25, 2021, Robinhood users experienced additional delays or errors when attempting to transfer or withdraw funds or close accounts. (*See id.* ¶¶ 160, 391). Robinhood also charges users a $75 fee to transfer their assets to another brokerage, thereby compounding the difficulties associated with switching. (*See id.* ¶ 389).

*Antitrust injury.* Plaintiffs allege the Retail Investors suffered "a reduction in the quality of their trades" because of Citadel Securities's and Robinhood's collusive behavior. (*Id.* ¶ 350;

*see id.* ¶ 351).  According to Plaintiffs, Robinhood's prohibition on purchases of the Relevant Securities imposed transaction costs on the Retail Investors, forcing them to pay "a higher quality-adjusted price as a result of Defendants' conduct."  (*Id.* ¶¶ 350, 353).  In exchange for allowing Robinhood to route their trades to market makers like Citadel Securities, Robinhood users expect efficient execution of intended trades.  (*See id.* ¶ 350).  By blocking the efficient execution of trades of the Relevant Securities, the quality of user experience significantly decreased, effectively increasing the price of trading on Robinhood.  (*See id.* ¶¶ 350–51).

Further, the trading restrictions reduced the number of buy orders for the Relevant Securities, artificially decreasing their price and harming the Retail Investors who held positions.  (*See id.* ¶ 353).  Plaintiffs also allege harm to the companies whose securities the Retail Investors wanted to purchase by reducing the output of their stock.  (*See id.* ¶¶ 355–56).

***Amended Complaint and Defendants' Motion.***  Plaintiffs assert a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, against Defendants.  (*See* Am. Compl. ¶¶ 403–415).  Defendants move to dismiss the Amended Complaint, arguing: (1) Plaintiffs fail to sufficiently plead that Defendants agreed to conspire; (2) Plaintiffs fail to sufficiently plead the remaining elements of a Sherman Act section 1 claim; and (3) Plaintiffs' antitrust theory is precluded by federal securities laws.  (*See generally* Mot.; Reply).

## III.    STANDARD

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation." *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555).

Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). "[O]nly

a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S.

at 679 (alteration added; citing *Twombly*, 550 U.S. at 556).

  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* at 678 (alteration added; citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant

acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*,

578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad*

*v. Palestinian Auth.*, 566 U.S. 449 (2012). When considering a motion to dismiss, a court must

construe the complaint in the light most favorable to the plaintiff and take its factual allegations as

true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)

(citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

## IV.   ANALYSIS

  Plaintiffs assert one claim under section 1 of the Sherman Act, 15 U.S.C. § 1. (*See* Am.

Compl. ¶¶ 403–15). Section 1 of the Sherman Act provides "[e]very contract, combination . . . ,

or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations,

is declared to be illegal." 15 U.S.C. § 1 (alterations added). Section 1 claims require two or more

parties agreeing on a restriction; "wholly unilateral" conduct is the exclusive province of section

2. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (quotation marks and

citations omitted). "Despite the different terminology, there is no magic unique to each term in

[section] 1; the terms 'contract,' 'combination,' and 'conspiracy' are used interchangeably to

capture the concept of concerted action, that is an 'agreement.'" *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1233 (11th Cir. 2021) (alteration added; some quotation marks and citation omitted).

"The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334–35 (7th Cir. 2012) (citation omitted). "[T]he Supreme Court has long concluded that Congress intended only to prohibit 'unreasonable' restraints on trade." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (alteration added; citation omitted). Thus, section 1 "prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade." *Id.* (citation omitted).

Defendants attack the sufficiency of the allegations directed at the first requirement — that Plaintiffs adequately plead a conspiracy among the Defendants. (*See* Mot. 19–28).[14] Defendants also dispute whether Plaintiffs adequately plead the alleged agreement unreasonably restrained trade. (*See id.* 28–34). Lastly, Defendants assert that Plaintiffs' antitrust theory is precluded by federal securities laws. (*See id.* 34–42). Because Plaintiffs fail to plausibly allege the existence of an agreement — let alone one that unreasonably restrains trade — the Court declines to reach the third suggested ground for dismissal.

***Defendants' Relationship.*** "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) (footnote call number omitted). As an initial matter, it is necessary to determine whether Plaintiffs have alleged a vertical or horizontal restraint on trade.

---

[14] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

Plaintiffs insist Defendants have a horizontal relationship (*see* Resp. 30 n.26) — likely because "virtually all vertical agreements now receive a traditional rule-of-reason analysis" rather than straightforward *per se* condemnation. *In Re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 318 (3rd Cir. 2010) (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007); other citation and footnote call number omitted). Contrary to Plaintiffs' position, the relationship in question is obviously vertical.

The agreement alleged in the Amended Complaint is among firms at different levels of distribution. For Plaintiffs to argue otherwise is surprising, given the Amended Complaint explicitly alleges that Defendants "operate at two different levels within the distribution of securities trading services." (Am. Compl. ¶ 305). Citadel Securities competes in the "upstream product market consist[ing] of market makers that pay brokerage firms to route their clients' trades to that market maker[.]" (*Id.* ¶ 306 (alterations added)). Robinhood competes in the "downstream or consumer-facing relevant product market consist[ing] of zero account-minimum, no-fee brokerages[.]" (*Id.* ¶ 312 (alterations added)).

According to Plaintiffs, "'upstream' refers to an earlier stage in the production or distribution chain" than the "downstream" stage. (*Id.* ¶ 305). It does not get any more vertical than "up" and "down." *See Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 344 (6th Cir. 2006) ("In analyzing the economics of any given restraint, and determining thereby which kind of legal treatment it merits, it is vital to distinguish between horizontal restraints that involve direct competitors at a given level of the market, and *vertical restraints that typically involve entities that are upstream or downstream of one another*." (emphasis added)).

Tellingly, Plaintiffs also allege that Citadel Securities is Robinhood's "real client[.]" (Am. Compl. ¶ 402 (alteration added)). Much of the Amended Complaint is devoted to showing how

24

dependent Robinhood is on Citadel Securities for PFOF revenue. (*See, e.g.*, *id.* ¶¶ 316–23). As Plaintiffs describe this relationship, "it is actually the Retail Investors who are Robinhood's product; a product for which Citadel Securities is paying Robinhood a premium." (*Id.* ¶ 402). In other words, Plaintiffs' own description of Citadel Securities and Robinhood's arrangement does not illustrate an agreement to "eliminate competition between two entities that provide the same product," but instead "a vertical agreement between parties that provide very different services, in which each party profits solely from a different level of the chain of commerce." *Cates v. Crystal Clear Techs., LLC*, No. 3:16-cv-08, 2016 WL 4379220, at *10 (M.D. Tenn. Aug. 17, 2016).

In their Response, Plaintiffs insist Citadel Securities is "on the same horizontal level of distribution as clearing entities such as Robinhood Securities (Robinhood's clearing entity)." (Resp. 30 n.26). Yet, according to their Amended Complaint, customers place trades on Robinhood Financial's application, Robinhood Securities takes custody of the customer's cash and securities, and then "Robinhood Securities typically routes the trade to a market maker, predominately Citadel." (Am. Compl. ¶¶ 83–84). All three entities thus operate at different distribution levels: Robinhood Securities (clearinghouse) acts in between Robinhood Financial (introducing brokerage) and Citadel Securities (market maker).[15]

Even if there are horizontal elements to Citadel Securities and Robinhood's relationship, the focus of Plaintiffs' allegations is the vertical relationship between them. *See AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3rd Cir. 2006) (concluding an alleged restraint was vertical despite the defendants having a relationship with "horizontal elements" because the relationship

---

[15] Other courts have also held that restraints involving securities trading platforms and market makers are vertical, not horizontal. *See, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, No. 16-mc-2704, 2018 WL 2332069, at *12 n.8 (S.D.N.Y. May 23, 2018) ("Tradeweb was not a horizontal competitor of the Dealers, as it was a provider of electronic trading platforms, not a market maker. The label 'naked restraint,' which antitrust law uses in connection with horizontal competitors, therefore, does not fit." (quotation marks and citation omitted)).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

"was primarily vertical"). Where predominantly vertical firms enter into a vertical restraint of trade, rule of reason analysis is appropriate "[e]ven though in some ways the companies may have operated in similar lines of business[.]" *Generac Corp. v. Caterpillar, Inc.*, 172 F.3d 971, 977 (7th Cir. 1999) (alterations added). So, the Court will analyze whether Plaintiffs plausibly allege an unlawful *vertical* restraint on trade. But first, the Court analyzes whether Plaintiffs plausibly allege an agreement at all.

**_Conspiracy._** "The first inquiry[] in any section 1 claim . . . is to locate the agreement that restrains trade." *Tidmore Oil Co., Inc. v. BP Oil Co./Gulp Prods. Div., a Div. of BP Oil Co.*, 932 F.2d 1384, 1388 (11th Cir. 1994) (alterations added). Adequately stating a section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. The "crucial question" with regard to a conspiracy claim under section 1 "is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express[.]" *Id.* at 553 (alteration added; other alteration adopted; quotation marks and citation omitted).

To allege an antitrust conspiracy, the plaintiff "should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (alteration added; quotation marks and citations omitted). "Standing alone, parallel conduct is inconclusive, as it is consistent with an unlawful conspiracy, as well as rational and competitive business strategy prompted by common perceptions of the market." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1258–59 (S.D. Fla. 2021) (citing *Twombly*, 550 U.S. at 554).

In the November 17 Order dismissing the CCAC, the Court found Plaintiffs failed to allege

26

direct evidence of an agreement among Defendants.  (*See* Nov. 17, 2021 Order 27–31).

Defendants contend the Amended Complaint is similarly devoid of such allegations.  (*See* Mot.

21).  Plaintiffs do not argue otherwise and instead focus on whether there is circumstantial evidence

of an agreement.  (*See* Resp. 14–16).  The Court thus examines whether Plaintiffs plausibly allege

a conspiracy through circumstantial evidence, concluding they do not.

***Allegations of circumstantial evidence of an agreement.***  Direct evidence of an antitrust

conspiracy is "extremely rare[.]"  *Am. Chiropractic Ass'n v. Trigon Healthcare*, 367 F.3d 212, 226

(4th Cir. 2004) (alteration added; citation omitted).  As an alternative, a plaintiff "may present

circumstantial facts supporting the inference that a conspiracy existed."  *Gamm v. Sanderson

Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (quotation marks and citation omitted).  The plaintiff

must allege "claimed facts that collectively give rise to a plausible inference that an agreement

existed."  *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021)

(quotation marks and citation omitted).  Whether the plaintiff alleges a horizontal or vertical

conspiracy, the focus is similar: do the allegations plausibly suggest an agreement was made?  *See

Stewart Glass & Mirror, Inc. v. U.S.A. Glas*, 17 F. Supp. 2d 649, 653 (E.D. Tex. 1998).

When deciding a dispositive motion in an antitrust conspiracy suit, a court will first "look

for evidence of interdependence or, put another way, that the defendants have an economic motive

to behave in concert."  *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp.

2d 991, 998 (N.D. Ill. 2011) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 596–97 (1986)).  The court then "looks to all the evidence suggesting agreement, or 'plus

factors,' which can be in the form of economic or non-economic evidence."  *Id.* (citing *In re High

Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002); *In re Baby Food Antitrust*

*Litig.*, 166 F.3d 112, 122 (3d Cir. 1999)).[16]

"[A]ny showing by [plaintiffs] that tends to exclude the possibility of independent action can qualify as a plus factor." *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003) (alterations added; other alteration adopted; quotation marks and citation omitted); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017) ("There is no finite list of potential plus factors."). Plaintiffs argue the existence of several plus factors: motive to collude, interfirm communications, Defendants' pattern of concealment and pretextual explanations, and the structural characteristics and behavior of the market. (*See* Resp. 16–25).[17] The Court examines each.

*Common motive to conspire.* In the absence of direct evidence and parallel conduct allegations, it is important for Plaintiffs to establish a plausible common motive to conspire. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d at 998 (citing *Matsushita*, 475 U.S. at 596–97); *see also Quality Auto Painting Ctr. of Roselle, Inc.*, 917 F.3d at 1263 n.14 ("[The common motive] plus factor is more properly invoked in contexts where the

---

[16] In the November 17 Order dismissing the CCAC, the Court first examined whether Plaintiffs alleged parallel conduct between Defendants. (*See* Nov. 17, 2021 Order 32–35). This analysis was necessary because Plaintiffs previously alleged a "hub-and-spoke conspiracy" involving horizontal relationships between multiple clearinghouses and brokerages. (*Id.* 34). Now, Plaintiffs have narrowed the Defendants to Robinhood and Citadel Securities, who are alleged to be important partners in a vertical relationship rather than competitors. As such, Plaintiffs no longer rely on allegations of parallel conduct, which require "'plus factors' to make the parallel conduct 'more probative of conspiracy than of conscious parallelism.'" *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (citation omitted).

Still, "[a] plus-factor analysis provides a way to organize circumstantial evidence that, in the plaintiff's view, reduces the probability that defendants were acting independently." *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-864, 2022 WL 199274, at *14 (N.D. Ill. Jan. 21, 2022) (alteration added). The Court thus continues to use the plus-factor framework to analyze Plaintiffs' allegations of circumstantial evidence.

[17] Plaintiffs no longer rely on several other plus factors the Court previously rejected, such as actions against unilateral self-interest (*see* Nov. 17, 2021 Order 38–39), the opportunity to coordinate and collude (*see id.* 39–40), and government investigations (*see id.* 47–48). (*See* Resp. 14–25).

motive is unique and specific to the alleged conspirators." (alteration added; citation omitted)). Parties with "independent reasons" for conspiring can still be "interdependent" for section 1 purposes. *United States v. Apple, Inc.*, 791 F.3d 290, 317–18 (2d Cir. 2015) (citation and quotation marks omitted). "Antitrust law has never required identical *motives* among conspirators when their independent reasons for joining together lead to collusive action." *Id.* (emphasis in original; citation and quotation marks omitted).

According to Plaintiffs, a common motive stemmed from "Defendants' lucrative self-styled PFOF 'partnership[.]'" (Resp. 22 (alteration added; quoting Am. Compl. ¶ 244)). Plaintiffs' theory is that, during the trading frenzy in January 2021, Citadel Securities was at risk of incurring substantial losses because of its short positions in the Relevant Securities,[18] so Robinhood restricted trading to benefit Citadel Securities in the hopes of preserving their PFOF relationship. (*See id.* 22–24).

The Court rejected Plaintiffs' prior, similar motive theory as implausible. (*See* Nov. 17, 2021 Order 35–38). While Plaintiffs adequately explained why Citadel Securities would orchestrate the trading restrictions, the Court was unconvinced as to why the other Defendants would agree to implement the unlawful restrictions. (*See id.* 38). More specifically, the Court found that (1) "[t]he mere fact that Citadel Securities is an important business partner of the other Defendants d[id] not provide sufficient motive to conspire" (*id.* 37 (alteration added)), and (2) "the CCAC provide[d] an 'obvious alternative explanation' for imposing the trading restrictions" — the "increased collateral requirements caused by market volatility" (*id.* (alteration added; quoting *Iqbal*, 556 U.S. at 682)). Given that Plaintiffs rely on the same general theory, the

---

[18] "That Citadel Securities held short interests in the Relevant Securities is a reasonable inference to be drawn in Plaintiffs' favor." (Nov. 17 2021 Order 36 (citing *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 n.1 (11th Cir. 2004))).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

question now is whether they have sufficiently bolstered their allegations to render their motive theory plausible.

In the Amended Complaint, Plaintiffs shift their focus to Robinhood and Citadel Securities' relationship, dropping every other Defendant. In doing so, Plaintiffs add allegations expanding upon the lucrative PFOF relationship between Robinhood and Citadel Securities. (*See, e.g.*, Am. Compl. ¶¶ 316–323). The Court previously determined this relationship alone did not provide sufficient motive to conspire considering Plaintiffs did not allege that Citadel Securities threatened or suggested it would end the relationship or explain why Robinhood would not simply use a different market maker if it did. (*See* Nov. 17, 2021 Order 37). In other words, Plaintiffs failed to explain why Robinhood would agree to an illegal demand to restrict trading.

Plaintiffs have added a new wrinkle that warrants consideration. In the Amended Complaint, Plaintiffs state that Robinhood filed for an initial public offering ("IPO") in March 2021 and went public on July 29, 2021. (*See* Am. Compl. ¶ 82). Plaintiffs allege that Robinhood acquiesced to an anticompetitive agreement with Citadel Securities because Robinhood — which was anticipating filing for an IPO — "simply could not run the risk that its 'transaction-based revenue would be impacted negatively' should Citadel Securities terminate" their relationship. (*Id.* ¶ 401; *see id.* ¶¶ 318–19). This theory finds some support from Howard's internal message on January 27, 2021 informing Tenev that she believed Citadel Securities would make some demands on limiting PFOF, although this message does not indicate what, if anything, Citadel Securities was asking for in return. (*See id.* ¶¶ 237, 239).

According to Plaintiffs, Robinhood "could not rely on the possibility that other market makers, such as Virtu Americas, were standing by willing and able to pay Robinhood for order flow that Citadel would have otherwise accepted[,]" considering how much more PFOF Citadel

Securities typically purchased than the others. (*Id.* ¶ 319 (alteration added); *see id.* ¶ 318; Resp. 23 n.17). This conclusion is supported by Robinhood's Form S-1, where Robinhood disclosed that its "transaction-based revenue would be impacted negatively" if any of its four biggest market maker relationships ended and it could not find a replacement market maker in a timely manner. (*Id.* ¶ 81 (quotation marks omitted)).

Still, the alleged motive for Robinhood is somewhat speculative and conclusory. There are no factual allegations supporting the notion that Robinhood restricted trading with its forthcoming IPO in mind. Plaintiffs essentially ask the Court to infer that Robinhood was motivated to agree to unlawfully restrict trading simply because of the timing of its forthcoming IPO. (*See id.* ¶ 318). Plaintiffs also ask the Court to infer that Citadel Securities wielded its influence as Robinhood's largest purchaser of PFOF to make anticompetitive demands. (*See id.* ¶¶ 318–19). And Plaintiffs ask the Court to infer that Robinhood could not and would not find replacement buyers for PFOF because Citadel Securities was Robinhood's largest purchaser of PFOF. (*See id.*). Plaintiffs' proffered motive theory thus rests on a series of inferences.

Taken together, Plaintiffs plausibly allege economic motives for why Citadel Securities and Robinhood might have entered into an anticompetitive agreement, although Robinhood's motive tenuously rests upon a series of inferences. Plaintiffs' motive allegations weakly support an inference of a conspiracy.

*Interfirm communications.* "[E]vidence of a high level of interfirm communications" may constitute a plus factor. *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (alteration added; footnote call number, quotation marks, and citation omitted). In dismissing the CCAC, the Court examined Plaintiffs' allegations of interfirm communications and concluded they weakly support an inference of a conspiracy between Robinhood and Citadel

Securities. (*See* Nov. 17, 2021 Order 44). The Amended Complaint does not add any new allegations of communications between the two entities. (*Compare* CCAC ¶¶ 296–313, 332–35, 452–53, 455, 461–63, *with* Am. Compl. ¶¶ 226–235, 239–46, 257–60, 320–22). The Court examines these allegations once more.

Embedded in the Amended Complaint are several vague and ambiguous emails between high-level executives of Robinhood and Citadel Securities and internal Robinhood emails discussing external conversations with Citadel Securities. Given their timing and overall context, these communications could be inferred to relate to the trading restrictions imposed on January 28, 2021.

On January 20, 2021, Citadel Securities's Head of Execution Services emailed Josh Drobnyk, Robinhood's Vice President of Corporate Relations and Communications, stating he was happy they "will be working together" and asking Drobnyk to "let [him] know if [they are] interested and who the main contact should be." (Am. Compl. ¶ 229 (alterations added; quotation marks omitted)). On January 25, 2021, Drobnyk replied "[w]e are on board" and copied Lucas Moskowitz, Robinhood's Deputy General Counsel, who was "going to be [Robinhood's] central point of contact[.]" (*Id.* ¶ 230 (alterations added)). Moskowitz and the Citadel Securities executive then arranged a call for the morning of January 26, 2021, the details of which are unknown. (*See id.* ¶¶ 231–33). Considering the Amended Complaint admits the details of this agreement or discussion are unknown, these emails are only relevant given their timing and participants.

Around 4:40 p.m. EST on January 27, 2021, Howard, Robinhood's COO, messaged Tenev, Robinhood's CEO, that she, along with Daniel Gallagher and Jim Swartwout, Robinhood's Chief Legal Officer and Robinhood Securities' President and CEO, respectively, would be joining "a

call with Citadel" at 5:00 p.m. that day. (*Id.* ¶ 239; *see id.* ¶ 237). Howard told Tenev she believed Citadel Securities would "make some demands on limiting [payment for order flow] across the board" but that they "won't agree to anything[.]" (*Id.* ¶ 239 (alterations added)). Tenev told Howard that although he had never met Ken Griffin, the CEO of Citadel Securities, she could mention on the call that "this would be a good time for [Tenev] to chat with [] [G]riffin[.]" (*Id.* (alterations added)). The request from a market maker to limit the order flow sent to it is not equivalent to a demand to restrict trading in certain securities; however, the timing and the involvement of high-level executives render these emails relevant.

Roughly two hours later, Swartwout received an internal message stating there was "[a]necdotal evidence that several 'very large' firms are having really bad nights too"; to which Swartwout replied, "everyone is. [Y]ou wouldnt [sic] believe the conv[ersation] we had with Citadel. [T]otal mess[.]" (*Id.* ¶ 240 (alterations added)). At 8:16 p.m., Swartwout updated a Citadel Securities employee that he was looking for "new Citadel numbers"; the employee responded that the numbers were "firming up right now in light of the follow up [sic] conversation between Gallagher and [redacted.]" (*Id.* ¶ 242 (alteration adopted; alterations added; quotation marks omitted)). Around 8:30 p.m. that night, Swartwout emailed Citadel Securities's Vice President of Business Development to offer to set up a call that night with Tenev and mentioned Tenev would like to have a discussion with Griffin at some point, given their relationship, but "[n]ot specific to this crazy issue[.]" (*Id.* ¶ 245 (alterations added); *see id.* ¶¶ 243–44). After the Citadel Securities executive asked Swartwout if Tenev would like to have the call that night, Swartout declined and said:

> Just looking for your dictated schedule and caps. I have 20 minutes until batch so whatever it is we are not going to be able to address it tomorrow given the notice. I have to say I am beyond disappointed in how this went down. It's difficult to have a partnership when these kind [sic] of things go down this way.

(*Id.* ¶ 245 (alteration added)). Again, these emails are vague and ambiguous, and they are only relevant considering the timing and those involved.

Lastly, on January 30, 2021, a Citadel Securities executive informed Drobnyk that he "wanted to generally coordinate messaging" and copied on the email Robinhood's "[General Counsels] as an FYI and for privilege." (*Id.* ¶ 260 (alteration added); *see id.* ¶¶ 257–58). The two then arranged an "[u]rgent" phone call. (*Id.* ¶ 260 (alteration added)). Given the context of the preceding communications and the fact that this request to coordinate messaging occurred even as Robinhood continued to restrict trading in the Relevant Securities, these emails — while vague and ambiguous — do lend some credence to Plaintiffs' conspiracy theory.

Of course, Defendants must frequently communicate given their business relationship. *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 56–57 (1st Cir. 2016) (explaining that companies operating in the same market can have legitimate business reasons to communicate, and those communications do not themselves establish a plausible antitrust conspiracy). But given the timing, the players involved, and the fact that each of these emails could be inferred to relate to the trading restrictions imposed on January 28, 2021, Plaintiffs' allegations of interfirm communications are supportive of a conspiracy.

But the support is thin. Plaintiffs cite *In re Salmon*, No. 19-21551-Civ, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021), where the undersigned found interfirm and intrafirm communications supported a reasonable inference of conspiracy. (*See, e.g.*, Resp. 14). There, the plaintiffs "point[ed] to bilateral and multilateral agreements not to compete and a high level of communications among [d]efendants," including complete details of multiple meetings, such as who was in attendance, when the meetings occurred, and the contents of those communications. *In re Salmon*, 2021 WL 1109128, at *15 (alterations added). Here, Plaintiffs concede they do not

know what was discussed during the several calls between the Robinhood and Citadel Securities executives.

This is not necessarily fatal, for Plaintiffs do not have to plead the *contents* of the interfirm communications to move the needle closer to plausibility. Interfirm communications can help Plaintiffs establish an "opportunity to conspire," even if "such opportunity alone is insufficient to support an inference that a conspiracy actually happened." *Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 322 (S.D.N.Y. 2018).

Plaintiffs have alleged a sufficiently high level of interfirm communications to demonstrate an opportunity to conspire. Allegations of *occasional* interfirm communications typically do not establish the plus factor. *See Mayor & Council of Balt.*, 709 F.3d at 140. Plaintiffs must allege a "high level" of interfirm communications. *Id.* (quotation marks omitted). A "high level" of interfirm communications contemplates multiple meetings, emails, phone calls, or other communications taking place over time. *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015) ("[T]he complaint describes phone calls, meetings, and discussions among the various conspirators." (alteration added)); *Hendershot v. S. Glazer's Wine & Spirits of Oklahoma, LLLP*, No. 20-cv-0652, 2021 WL 3501523, at *8 (N.D. Okla. Aug. 9, 2021) ("[D]efendants communicated frequently via an industry group they created[.]" (alterations added)); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 318 (S.D.N.Y. 2021) ("Defendants share close business relationships, including common founders, interlocking membership in organizations, attending the same meetings, and promotion of each other's products and activities[.]" (alterations added and citations omitted)); *Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 169 (W.D.N.Y. 2020) (finding a "high level of interfirm communications" where the amended complaint alleged the defendants participated in

"three meetings during the Class Period that always coincided with price increase announcements").

Plaintiffs meet this standard here. According to the Amended Complaint, at least two phone calls between Citadel Securities and Robinhood executives took place in the days leading up to January 28, 2021, the day Robinhood curtailed trading on the Restricted Securities. (*See* Am. Compl. ¶¶ 232, 237). The parties also exchanged numerous emails between January 20 and January 28, indicating Robinhood and Citadel Securities kept frequent contact throughout the short squeeze. (*See id.* ¶¶ 227–233, 235). In other words, Plaintiffs allege not just "isolated discussions" but "a 'high level' of interfirm communications." *Mayor & Council of Balt.*, 709. F.3d at 140.

But Plaintiffs must allege more than that Robinhood and Citadel Securities communicated. Plaintiffs have only alleged an *opportunity* to conspire; they have not connected that opportunity to a plausible inference of an actual antitrust conspiracy. Interfirm communications, under the right circumstances, can help give rise to a plausible conspiracy claim, but not when those allegations have an "obvious alternative explanation." *Twombly*, 550 U.S. at 567. The Court cannot take allegations of communications, followed by allegations of a restriction, and simply fill in the blanks for Plaintiffs, particularly where it "is just as plausible, if not more so," that the communications did not form the basis of an antitrust conspiracy. *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1093 (9th Cir. 2015).

Here, the retail-driven short squeeze, driven in part by Robinhood users, had set the financial world ablaze: "several 'very large' firms [were] having really bad nights[.]" (Am. Compl. ¶ 240 (alterations added)). Given the PFOF relationship between Robinhood and Citadel Securities, it would be understandable for employees — even executive-level employees — at a broker and a market maker to communicate about what impact the squeeze might have on each

party's ability to fulfill its obligations. *See, e.g.*, *Int'l Constr. Prod. LLC v. Ring Power Corp.*, No. 5:20-cv-226, 2021 WL 6755717, at *8 (N.D. Fla. Dec. 23, 2021) (holding that interfirm conversation between defendant companies' "high-level executives" about plaintiff and its business partner did not give rise to a boycott conspiracy because plaintiff and its partner "injected an entirely new business model into the industry[,]" which was worthy of conversation (alteration added)). Plaintiffs' revisions to the Amended Complaint do little to advance the theory that when Robinhood and Citadel Securities communicated, they conspired to stop purchases of the Restricted Securities.

Certainly, interfirm communications between executives are a plus factor, and the communications Plaintiffs allege are relevant. But in this instance, the messages *at best* create an "equally plausible inference of mere interdependent behavior" that nevertheless "fall[s] short of a tacit agreement" to restrict trading. *Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 254 (2d Cir. 1987) (alteration added and citation omitted). The Court thus "find[s] it difficult" to infer an antitrust conspiracy. *Id.* (alteration added).

In sum, Plaintiffs' allegations of vague and ambiguous communications between Defendants only support a weak inference of a conspiracy, which does not, by itself, advance Plaintiffs' theory from possible to plausible.

*Pattern of concealment.* "[A]cts of concealment are circumstantial evidence of a conspiracy's existence[.]" *In re Urethane Antitrust Litig.*, No. 04-1616, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (alterations added; citing *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011)). To establish concealment, Plaintiffs must allege that Robinhood or Citadel Securities engaged in some affirmative "trick or contrivance tending to exclude suspicion and prevent inquiry." *Texas v. Allan Constr. Co., Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988) (quotation marks,

CASE NO.  21-2989-MDL-ALTONAGA/Torres

citation, and footnote call number omitted).  Plaintiffs argue they have plausibly alleged that Defendants engaged in a pattern of concealment, as evidenced by Defendants' vague and ambiguous emails and reliance on oral communications.  (*See* Resp. 21–22).

The Court previously rejected this same argument because it "is not unusual for two firms in an ongoing business relationship to have conversations over the phone; and Plaintiffs admit they do not know the substance of these conversations."  (Nov. 17, 2021 Order 45).  The Court distinguished *In re Urethane Antitrust Litigation*, 913 F. Supp. 2d 1145, 1154–56 (D. Kan. 2012), a case Plaintiffs previously relied upon, given (1) the case included numerous, detailed facts suggesting concealment such as document destruction, and (2) the oral communications in that case were suspicious because the conspirators were *direct competitors*.  (*See* Nov. 17, 2021 Order 44–45).  Here, in contrast, Plaintiffs describe a handful of vague and ambiguous emails between a firm and its client.  Plaintiffs have not provided any new allegations of concealment and instead rehash the same argument with new, inapt case citations.[19]  (*See* Resp. 21–22).

As before, "[t]he Court will not infer a conspiracy simply because two business partners chose to use phones to communicate."  (Nov. 17, 2021 Order 45 (alteration added)).  Plaintiffs do not make out a plus factor here.

_Pretextual explanations._   Pretextual statements may constitute circumstantial evidence of a conspiracy.  *See In re McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016).  Plaintiffs

---

[19] Plaintiffs' cited cases do not provide support here.  (*See* Resp. 21–22 (citing *United States v. Siegler*, 990 F.3d 331, 339 (4th Cir. 2021) (upholding inference that the defendant knowingly participated in a drug distribution conspiracy because of the familiarity between the coconspirators and the coded language they used); *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (holding the destruction of documents may be evidence of a conspiracy); *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011) (finding statements imploring one not to go to the authorities were highly probative of a conspiracy); *Belcher v. Atl. Cap. Realty, LLC*, No. 6:08-cv-1989, 2010 WL 11507399, at *5 (M.D. Fla. Sept. 17, 2010) (no discussion of concealment); *United States v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995) (finding the concealment of explosives was evidence of a conspiracy to manufacture explosives).

renew their previously rejected contention that they have plausibly alleged that Robinhood made pretextual statements to explain the trading restrictions. (*Compare* Resp. 25, *with* Nov. 17, 2021 Order 45–47). They allege that Robinhood used the NSCC's $3 billion dollar margin call on January 28, 2021 as a pretext to impose trading restrictions to benefit Citadel Securities. (*See* Resp. 25; Am. Compl. ¶ 178). Plaintiffs offer the following three facts in support of this argument: (1) "Robinhood's executives were selling their own shares of the Relevant Securities" before the margin call; (2) "Robinhood and Citadel were engaged in heated discussions regarding the degrading market conditions" before the margin call; and (3) "Robinhood met its capital requirements" before and after January 28, 2021. (Resp. 25). The Court examines each in turn.

To start, Plaintiffs point to a January 26, 2021 internal chat where Swartwout informed another Robinhood executive "that Robinhood was moving GameStop to 100% margin the next day, stating 'I sold my AMC today. FYI — tomorrow we are moving GME to 100% — so you are aware.'" (Am. Compl. ¶ 234). There are two problems with this point. First, Swartwout's message related to *margin requirements*, not trading positions. Second, the allegation undermines Plaintiffs' position: that Swartwout and other Robinhood executives knew they would impose margin requirements on January 26, 2021 — before "the heated discussions" with Citadel Securities occurred on January 27, 2021 — *reinforces* the notion that Robinhood was in fact concerned about meeting the NSCC's daily margin calls. (Reply 25; *see* Am. Compl. ¶¶ 234–35).

Next, Plaintiffs emphasize the "heated discussions" themselves. (Reply 25). As a brief recap, on January 27, 2021, Howard informed Tenev that she was joining a call that evening with Swartwout and Citadel Securities, and she believed Citadel Securities would "make some demands on limiting PFOF across the board." (Am. Compl. ¶ 239). A few hours later, Swartwout emailed a Citadel Securities executive again, stating:

Just looking for your dictated schedule and caps. I have 20 minutes until batch so whatever it is we are not going to be able to address it tomorrow given the notice. I have to say I am beyond disappointed in how this went down. It's difficult to have a partnership when these kind [sic] of things go down this way.

(*Id.* ¶ 245 (alteration added)).

Crucially, these communications do not indicate whether Citadel Securities and Robinhood executives discussed trading on January 27, 2021. A market maker's demand to reduce its purchases of PFOF from a broker is not equal to a demand that the broker impose trading restrictions on certain stocks for all retail investors. To infer that Robinhood used the January 28, 2021 margin call as pretext to impose trading restrictions on behalf of Citadel Securities is a leap.

This inference is also not reasonable because the Amended Complaint provides several indications that Robinhood was legitimately concerned about meeting its collateral requirements. As stated, Robinhood executives discussed raising margin requirements for the Relevant Securities *before* the discussions with Citadel Securities on January 27, 2021. (*See* Am. Compl. ¶ 234). And on the morning of January 28, 2021, shortly after the NSCC sent Robinhood a $3 billion margin call (*see id.* ¶ 178), Howard, Robinhood's COO, "messaged *internally* that Robinhood ha[d] a 'major liquidity issue'" (*id.* ¶ 180 (alteration and emphasis added)). In another *internal* message on January 28, 2021, Dusseault, Robinhood Financial's President and COO, said "we will navigate through this [NSCC] issue[.]" (*Id.* ¶ 182 (alteration added)). Further, other brokerages *not alleged to be part of this conspiracy* adjusted margin requirements or imposed trading restrictions on January 28, 2021. (*See id.* ¶¶ 195, 365–367). These facts render it implausible that the margin call was used as pretext simply because Robinhood and Citadel Securities engaged in some unknown discussion about PFOF — the subject of their otherwise lawful business relationship — on January 27, 2021.

Finally, Plaintiffs contend the margin call was used as pretext because Robinhood

continued to impose some trading restrictions even after it met its capital requirements. (*See* Resp. 25). As the Court previously stated, however, "the fact that Robinhood continued to impose restrictions after meeting its collateral requirements is of no moment because the trading restrictions 'reduce[d] the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC.'" (Nov. 17, 2021 Order 46 (alteration in original)). "It is not suspicious for Robinhood to strive to avoid higher collateral requirements." (*Id.*).[20]

In short, Plaintiffs fail to make out a plus factor here. Further, an examination of the Amended Complaint's allegations reveals an "obvious alternative explanation" for the trading restrictions: the increased collateral requirements imposed by the NSCC in response to unprecedented market volatility. *Twombly*, 550 U.S. at 567.

*Market structure.* Plaintiffs renew their argument that structural characteristics of the markets Defendants operate in render the markets "ripe for collusion." (Resp. 24 (footnote call number omitted)). The Court previously rejected this argument because Plaintiffs failed to coherently define the market and because the case law Plaintiffs relied on "involve[s] price-fixing conspiracies [where] the defendants utilized their market power to raise the prices of goods they sold." (Nov. 17, 2021 Order 49 (alterations added; citations omitted)).

Plaintiffs now define two markets: an upstream market maker market and a downstream brokerage market. (*See* Am. Compl. ¶¶ 306, 312). They allege these markets are "defined by high barriers to entry, high fixed costs, and low variable costs[;]" and the brokerage consumers "are locked-in in the short run[.]" (Resp. 24 (alterations added; citing Am. Compl. ¶¶ 370–92)). The

[20] Plaintiffs argue "the decision to implement restrictions on purchasing only was arbitrary" because "[v]olatility is caused by both increases and decreases in a stock price." (Resp. 25 n.20 (alteration added; emphasis omitted); *see also* Am. Compl. ¶¶ 361–62). Why, then, would "other broker-dealers, including Ally, Dough, Public.com, SoFi, Stash, Tastyworks and Webull implement[] purchasing restrictions" but not sales restrictions? (Am. Compl. ¶ 195 (alteration added)).

41

Court remains unconvinced that a plus factor exists here.

Plaintiffs once more rely on *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, in arguing that a plus factor exists under these market characteristics. (Resp. 24). Yet, as the Court previously stated, *In re High Fructose Corn Syrup Antitrust Litigation* involved price fixing among competitors. (*See* Nov. 17, 2021 Order 49). Plaintiffs present a different anticompetitive theory: a brokerage allegedly restricted output to lower prices for securities it did not buy or sell for its own accounts, all for the benefit of its market maker client. Plaintiffs have made no effort to address the distinction between this case and the price-fixing case they rely on, nor do they otherwise provide legal authority supporting the application of this plus factor to their novel anticompetitive theory. (*See* Resp. 24).

Even if the Court was convinced that this plus factor applies to Plaintiffs' novel anticompetitive theory and that Plaintiffs do not merely describe a legal oligopoly, Plaintiffs define the wrong markets, as discussed below.

*Market Behavior.* Also in reliance on *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, Plaintiffs argue for the application of a plus factor based on "evidence that the market behaved in a noncompetitive manner." (Resp. 24 (capitalization omitted)). But Plaintiffs must do more than simply allege that "market behavior is interdependent and characterized by conscious parallelism." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 322 (citations and footnote call number omitted). Here, they maintain the trading restrictions imposed by Robinhood were anticompetitive because retail customers were unable to purchase the Relevant Securities despite their desire to do so. (*See* Resp. 24–25).

This clearly falls short. Robinhood was not the only firm in the brokerage market that implemented purchasing restrictions — Ally, Dough, Public.com, SoFi, Stash, Tastyworks,

Webull, E*Trade, and Interactive Brokers all implemented purchasing restrictions on January 28, 2021; and none of these brokerages is alleged to be part of the conspiracy. (*See* Am. Compl. ¶¶ 195, 366–67). Therefore, the trading restrictions themselves do not warrant the application of a plus factor here.

* * *

To recap, Plaintiffs successfully advance two plus factors, each providing only weak support for a plausible inference of a conspiracy. The first plus factor is the common motive to conspire. Plaintiffs allege economic motives that explain why Citadel Securities and Robinhood might have conspired to restrict trading in the Relevant Securities in January 2021. Citadel Securities is alleged to have held substantial short positions in the Relevant Securities in January 2021, subjecting it to potentially massive losses considering the unprecedented increases in the stocks' prices caused by a retail trading frenzy.

Further, Robinhood allegedly acquiesced because it could not risk sustaining revenue losses right before its forthcoming IPO. The plausibility of Robinhood's motive is tenuous, however, because it rests on a series of unsubstantiated inferences. Plaintiffs ask the Court to infer that Robinhood was motivated by the forthcoming IPO simply based on the timing of the IPO, that Citadel Securities wielded its influence as Robinhood's most important client to pressure the brokerage to restrict trading, and that Robinhood could not simply turn to another market maker because Citadel Securities accounts for a large portion of Robinhood's PFOF revenue. While Plaintiffs do not bolster this theory with concrete allegations linking Robinhood's decision to impose restrictions and the IPO, they nevertheless allege economic motivations that *could* justify why both firms would benefit from an agreement to restrict trading, so this plus factor provides some support for Plaintiffs.

43

The second plus factor is the communications between Defendants.  High-level executives at these firms exchanged several vague and ambiguous emails immediately before and after Robinhood imposed trading restrictions on the Relevant Securities on January 28, 2021.  These emails set up telephone discussions between the executives, the substance of which is unknown to Plaintiffs.  Certainly, these emails may be somewhat suspicious given the participants and their timing, and they indicate Defendants had an *opportunity* to conspire.  But a few vague and ambiguous emails between two firms in an otherwise lawful, ongoing business relationship only provide thin support for Plaintiffs.

So, Plaintiffs have tenuously alleged conditions under which Defendants may have agreed to restrict trading.  Is it conceivable that Robinhood restricted trading on January 28, 2021 at Citadel Securities's direction?  Sure.  But do Plaintiffs' allegations "nudge[] their claims across the line from conceivable to plausible[?]"  *Twombly*, 550 U.S. at 570 (alterations added).  No.

What's more, the Amended Complaint provides "an obvious alternative explanation" for the trading restrictions: the increased collateral requirements imposed by the NSCC in response to unprecedented market volatility.  *Id.*  at 567.  Even before the allegedly contentious discussions between Robinhood and Citadel Securities on January 27, 2021, in internal messages, Robinhood executives discussed imposing margin requirements on the Relevant Securities.  And on January 28, Robinhood executives sent internal messages expressing concern about the NSCC margin call and liquidity problems.  Further, Ally, Dough, Public.com, SoFi, Stash, Tastyworks, Webull, E*Trade, and Interactive Brokers all imposed trading restrictions on January 28; and none of these firms is alleged to have done so on behalf of Citadel Securities.

Altogether, Plaintiffs have not plausibly alleged an agreement between Robinhood and Citadel Securities to restrict trading on January 28, 2021.  For this reason, the Amended Complaint

is due to be dismissed.

　　　*Unreasonable restraint on trade.*  Even if Plaintiffs plausibly alleged a conspiracy, they fail to allege an "unreasonable restraint on competition[.]"  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (alteration added; citation omitted).  "An unreasonable restraint of trade is one that harms competition in general, rather than the plaintiff, or any other competitor."  *Bitmain*, 530 F. Supp. 3d at 1266 (citing *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1069).  "In assessing whether an agreement unreasonably restrains trade such that it violates [section 1], courts generally apply one of three modes of antitrust analysis: (1) the *per se* rule, for obviously anticompetitive restraints; (2) the quick look approach, for those restraints with some procompetitive justification; or (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine."  *In re Terazosin Hyrdochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1310–11 (S.D. Fla. 2005) (alteration added; citations omitted).  "The presumption in cases brought under section 1 of the Sherman Act is that the rule-of-reason standard applies."  *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991) (citation omitted).[21]

　　　As explained, the Amended Complaint alleges a vertical relationship between Defendants and thus a vertical restraint on trade.  "Typically only 'horizontal' restraints — restraints 'imposed by agreement between competitors' — qualify as unreasonable *per se*."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018) (citation omitted).  By contrast, "nearly every . . . vertical

---

[21] Plaintiffs insist "it is premature for the Court to determine whether the *per se* or the rule of reason test applies at the motion[-]to[-]dismiss stage."  (Resp. 13 (alterations added); *see also id.* 28–29).  Not so.  Courts routinely determine which test applies at the motion-to-dismiss stage.  *See, e.g.*, *Quality Auto Painting Ctr. of Roselle, Inc.*, 917 F.3d at 1271–72; *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333–36 (11th Cir. 2010); *In re Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d 1186, 1191–93 (9th Cir. 2015); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205–206 (4th Cir. 2002); *cf. PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417–20 (5th Cir. 2010) (using the rule of reason test at motion-to-dismiss stage); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434–37 (6th Cir. 2008) (analyzing under both the *per se* and rule of reason tests at motion-to-dismiss stage).

restraint . . . should be assessed under the rule of reason." *Id.* at 2284 (citations omitted).  In half-heartedly arguing the *per se* rule applies here, Plaintiffs ignore well-established Supreme Court precedent establishing that "virtually all vertical agreements now receive a traditional rule-of-reason analysis." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 318 (citing *Leegin*, 551 U.S. 877; other citation and footnote call number omitted).  The Court is thus unconvinced the *per se* rule applies.

Nor is the Court convinced it should evaluate the alleged agreement under the quick look approach.  The quick look approach "fills in the continuum between *per se* analysis and the full rule of reason." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 510 (4th Cir. 2002) (citation omitted).  It only applies when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999) (citation omitted).  That is clearly not the case here.

First, while Plaintiffs may emphasize that Robinhood Securities and Citadel Securities operate at the same level of distribution (s*ee* Resp. 30 n.26), the restraint alleged is vertical, for its participants are Citadel Securities, the upstream market maker, and Robinhood, the downstream broker-dealer (*see* Am. Compl. ¶¶ 305–06, 312).  Vertical restraints do not become horizontal restraints just because one of the participants operates several lines of business, one of which is similar to that of the other participant. *See Generac Corp.*, 172 F.3d at 977.  As this is a vertical restraint, the rule of reason analysis should apply, not the quick look. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 318 (holding that the quick look analysis applies to horizontal restraints, while vertical restraints are evaluated using the rule of reason); *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 770 (N.D. Ill. 2015) (declining to apply the quick look because a

"reasonable fact finder could not infer a horizontal agreement from these facts" (citation omitted));

*Acton v. Merle Norman Cosms., Inc.*, No. 88-cv-7462, 1995 WL 441852, at *8 (C.D. Cal. May 16,

1995) ("The 'quick look' approach . . . has not been judicially approved for analyzing the vertical

nonprice restraints raised in this case[.]" (alterations added; citation omitted)).

Second, the restraint here involves a complicated scheme where one participant allegedly

shut down purchases of the Restricted Securities to mitigate the other's losses, all in the face of a

largely unforeseen short squeeze orchestrated by retail investors on the Internet. In other words,

this is an unusual antitrust case. Courts do not use the quick look approach in unusual cases.

Where "the circumstances of the restriction are somewhat complex," *Cal. Dental Ass'n*, 526 U.S.

at 775 n.12, or the "features of the arrangement" are "unique[,]" *Cal. ex rel. Harris*, 651 F.3d 1118,

1137 (9th Cir. 2011) (alteration added), the quick look approach is inappropriate. Accordingly,

the rule of reason applies here.

***Rule of reason.*** In applying the rule of reason, a court must ask whether the defendant

"has shown that the alleged restraint has had an anticompetitive effect on the market." *Procaps

S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016). "[C]ourts usually cannot properly

apply the rule of reason without an accurate definition of the relevant market." *Am. Express Co.*,

138 S. Ct. at 2285 (alteration added; citation and footnote call number omitted). "Without a

definition of the market there is no way to measure the defendant's ability to lessen or destroy

competition." *Id.* (alterations adopted; citations and quotation marks omitted). The Amended

Complaint therefore "must 'identify the relevant market in which the harm occurs.'" *Bitmain*, 530

F. Supp. 3d at 1256 (citing *Jacobs*, 626 F.3d at 1336). It does not.

Plaintiffs define two relevant product markets: the upstream PFOF Market where Citadel

Securities competes with other market makers (*see* Am. Compl. ¶ 306), and the downstream No-

Fee Brokerage Trading App Market where Robinhood competes with other brokerages (*see id.* ¶ 313). The downstream No-Fee Brokerage Trading App Market is the "consumer-facing relevant product market[.]" (*Id.* ¶ 312 (alteration added). Competitors in the No-Fee Brokerage Trading App Market, such as Robinhood Financial, "offer[] brokerage services to Retail Investors." (*Id.* ¶ 68 (alteration added); *see also id.* ¶¶ 69, 305, 350–51).

According to Plaintiffs, Defendants harmed Plaintiffs "[b]y forcing the Retail Investors to sell their Relevant Securities at lower prices than they otherwise would have sold[.]" (*Id.* ¶ 16 (alterations added)). More specifically, Plaintiffs allege that "Defendants artificially constricted the price appreciation of the Relevant Securities and reduced the price of the Relevant Securities that Retail Investors either sold or held below the prices that they would have otherwise obtained in a competitive market free of collusion." (*Id.*; *see also id.* ¶¶ 407). In other words, Plaintiffs allege that Defendants caused antitrust injury by reducing the number of trades in the Relevant Securities, thereby distorting the supply and demand for the stocks and leading to their rapid price decline. (*See id.* ¶ 354).

There is a curious gap between Plaintiffs' defined markets and the injury alleged, which is detrimental to Plaintiffs' antitrust standing. "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (quotation marks and citation omitted). Antitrust standing requires that Plaintiffs sustain "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Antitrust law is supposed to prevent injury to competition. *See id.* at 488 (citation omitted).

Competition is injured if a defendant's conduct, like entering into a conspiracy to restraint trade, generates anticompetitive effects in that relevant market. *See Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1071 (citation omitted). This can involve "adverse effects on the price, quality, or output of the relevant good or service." *N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006).

Importantly, there should be a "direct[]" connection between Plaintiffs' antitrust injury and the "alleged restraint in the relevant market[.]" *Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994) (alterations added; citation omitted). Put another way, the harm should take place in the relevant market the plaintiff has defined. *See Am. Express Co.*, 138 S. Ct. at 2285 (citation omitted). Here emerges the critical issue: in which market did Robinhood and Citadel Securities effectuate an unlawful restraint, and did Plaintiffs' injury flow from anticompetitive effects *in that market*?

This alleged antitrust injury certainly did not stem from any anticompetitive effects in the PFOF Market, where Citadel Securities competes to provide market maker services. Plaintiffs do not describe any connection between Defendants' alleged agreement and competition in the PFOF market, much less that any anticompetitive effects there caused the prices of the Restricted Securities to fall.

Nor did the alleged restraint impose any anticompetitive effects in the No-Fee Brokerage Trading App Market, where Robinhood competes to provide retail brokerage services. Plaintiffs cannot plausibly argue a restraint harmed competition there, for the agreement between Robinhood and Citadel Securities, as alleged, did not concern price, quality, or output for any other broker-dealer's services. Plaintiffs allege Robinhood curtailed purchases of the Relevant Securities on its own platform to appease Citadel Securities. That harmed Robinhood users.

49

CASE NO. 21-2989-MDL-ALTONAGA/Torres

But to trigger the antitrust laws, a restraint must harm *competition*. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). Defendants' alleged agreement left Ally, Dough, Public.com, SoFi, Stash, Tastyworks, Webull, E*Trade, Interactive Brokers, and any other brokerage free to adopt or eschew any policy they desired with respect to the Restricted Securities — or anything else, for that matter. Further, it imposed no further restrictions on Retail Investors' ability to trade with any of Robinhood's competitors. (*See, e.g.*, Am. Compl. ¶ 30). Plaintiffs thus may not hedge their antitrust claim on anticompetitive effects in the No-Fee Brokerage Trading App Market.

The alleged anticompetitive injury occurred in entirely separate markets: the markets for the Relevant Securities. The products in question are the Relevant Securities, the prices of which were negatively affected by the trading restrictions. Plaintiffs, however, do not center their market definition around the sales of the Relevant Securities. This is not surprising, as there is an extensive body of persuasive case law holding "that transactions in a particular stock do not fall within [section] 1" of the Sherman Act. *Kalmanovitz v. G. Heileman Brewing Co., Inc.*, 769 F.2d 152, 156 (3rd Cir. 1985) (alteration added; citing *Bucher v. Shumway*, 452 F. Supp. 1288 (S.D.N.Y. 1978), *aff'd*, 622 F.2d 572 (2d Cir. 1980), *cert. denied*, 449 U.S. 841 (1980); *Schaefer v. First Nat'l Bank*, 326 F. Supp. 1186 (N.D. Ill. 1970), *appeal dismissed*, 465 F.2d 234 (7th Cir. 1972)).[22]

---

[22] The Supreme Court has stated that "the Sherman Act applies only to a 'restraint upon commercial competition in the marketing of goods or services.'" *Kalmanovitz*, 769 F.2d at 156 (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 495 (1940)). And lower courts have "observed that the purchase or sale of stock by investors does not fit easily within the definition of goods or services as used by the antitrust laws." *Id.* (footnote call number omitted; citing *Bucher*, 452 F. Supp. 1288). The court in *Kalmanovitz* held the sale of stock of a single company within the context of a takeover battle did not fall within the definition of section 1 of the Sherman Act. *See id.* In its reasoning, the *Kalmanovitz* court relied on two other lower court opinions: in *Bucher*, the court held an agreement to effectuate a tender offer was not an unreasonable restraint of trade even though it fixed the price of the company's shares to the shareholders' detriment, 452 F. Supp. at 1289; and in *Schaefer*, the court concluded the common law interpretation of "restraint of trade" never encompassed stock market manipulation and accordingly dismissed the plaintiffs' Sherman Act suit, 326 F. Supp. at 1191–92. *See Kalmanovitz*, 769 F.2d at 156. While the *Kalmanovitz* court noted "a number of cases in which the antitrust laws have been applied to the securities industry[,]" *id.* at 157 (alteration

CASE NO. 21-2989-MDL-ALTONAGA/Torres

Plaintiffs continue to reject a market definition based on the Relevant Securities in their Response but do so in vain. (*See* Resp. 38).

That Plaintiffs do not define the relevant market is fatal to their rule of reason analysis. "Regardless of whether the plaintiff alleges actual or potential harm to competition . . . , he must identify the relevant market in which the harm occurs." *Jacobs*, 626 F.3d at 1336 (alteration added; citing *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986)). This remains true even where, unlike here, a plaintiff "rel[ies] exclusively on direct evidence" of "anticompetitive effects[.]" *Am. Express Co.*, 138 S. Ct. at 2284–85 (alterations added; footnote call number omitted). Unfortunately, the Amended Complaint's failure to plausibly do so leaves Plaintiffs with little more than a garbled market theory that ignores a crucial fact: the alleged harm to competition occurred in an entirely separate market from the markets Plaintiffs define. And Plaintiffs do not even attempt to define that third, relevant market. That fatal flaw renders Plaintiffs' theory of harm unworkable.

Accordingly, the Amended Complaint is due to be dismissed.

## V. CONCLUSION

The Amended Complaint fails for two reasons. One, Plaintiffs fail to plausibly allege the existence of an agreement to restrict trade between Defendants. Sure, Citadel Securities would have economically benefited given its short positions. But Robinhood's supposed incentive depends on the assumptions that it was motivated by its forthcoming IPO, that Citadel Securities threatened to cut off its relationship with Robinhood in exchange for the trading restrictions, and that Robinhood was unwilling to find another market maker. Plaintiffs do not plausibly allege that Robinhood had such a motivation here, and even if they had done so, economic incentive is not in

---

added; collecting cases), *Kalmanovitz*, *Bucher*, and *Schaefer* caution against the creation of a market defined by the sale of certain stocks to investors.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

itself enough for the Court to infer that Defendants actually had an unlawful agreement to restrain trade.

The only additional evidence plausibly alleged by Plaintiffs consists of vague and ambiguous emails between two entities in an otherwise lawful business relationship that, while suspicious given their timing, do little to bolster the strength of Plaintiffs' allegations. And juxtaposed with the compelling alternative explanation for the trading restrictions — the increased collateral requirements imposed by the NSCC in response to historic market volatility — Plaintiffs' theory is speculative and implausible.

Two, even if Plaintiffs did plausibly allege an agreement, they fail to plausibly allege an unreasonable restraint of trade. Plaintiffs allege a vertical restraint of trade, which must be evaluated under a rule of reason analysis and thus requires an accurate market definition — something they do not provide. Indeed, Plaintiffs ignore the reality of their suit: they allege that Defendants caused harm to the market for Relevant Securities, but they neglect to define that market. And because they do not define the market for Relevant Securities, their claim fails.

Defendants request that the Court dismiss the Amended Complaint with prejudice. (*See* Mot. 42–43). As the Court stated in the November 17 Order dismissing the CCAC, the Amended Complaint would be Plaintiffs' final opportunity. (*See* Nov. 17, 2021 Order 50). Plaintiffs do not insist otherwise, and the Court sees no reason to give Plaintiffs a fourth attempt to plead.

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Amended Antitrust Tranche Complaint **[ECF No. 456]** is **GRANTED**. The Amended Consolidated Class Action Complaint **[ECF No. 451]** is **DISMISSED**.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

**DONE AND ORDERED** in Miami, Florida, this 12th day of May, 2022.

_____

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record; *Pro Se* Plaintiffs