## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
### Case No. 22-11873

ANGEL GUZMAN, et al.,

      Appellants,

v.

ROBINHOOD MARKETS, INC., et al.,

      Appellees.

---

Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:21-md-02989-CMA

---

### APPELLANTS' BRIEF

---

JOSEPH R. SAVERI
California Bar No. 130064
CHRISTOPHER K.L. YOUNG
California Bar No. 318371
ABRAHAM A. MAGGARD
California Bar No. 339949
JOSEPH SAVERI LAW FIRM,
LLP
601 California Street, Suite 1000
San Francisco, California 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
Email: jsaveri@saverilawfirm.com
    cyoung@saverilawfirm.com
    amaggard@saverilawfirm.com

FRANK R. SCHIRRIPA
New York Bar No. 4103750
KATHRYN A. HETTLER
New York Bar No. 5126065
HACH ROSE SCHIRRIPA & CHEVERIE
LLP
112 Madison Avenue, 10th Fl.
New York, New York 10016
Tel: (212) 213-8311
Fax: (212) 779-0028
Email: fschirripa@hrsclaw.com
    kh@hrsclaw.com

STEVEN L. BRANNOCK
Florida Bar No. 319651
SAMUEL J. SALARIO, JR.
Florida Bar No. 83460
BRANNOCK HUMPHRIES
   & BERMAN
1111 W. Cass Street, Suite 200
Tampa, Florida 33606
Tel: (813) 223-4300
Fax: (813) 262-0604
Email:  sbrannock@bhappeals.com
          ssalario@bhappeals.com

*Counsel for Appellants Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling*

*Guzman et al. v. Robinhood Markets, Inc.*
Case No. 22-11873

## <u>CERTIFICATE OF INTERESTED PERSONS AND</u>
## <u>APPELLATE RULE 26.1 CERTIFICATION</u>

I certify that, to the best of my knowledge, the following is a complete list of all persons and entities known to have an interest in the outcome of this appeal. Pursuant to 11th Cir. R. 26.1-4, Appellants' amendments are noted below.

1.     Altonaga, Cecilia M. (U.S. District Judge)

2.     Bartlit Beck LLP

3.     Brannock Humphries & Berman (added)

4.     Brannock, Steven L. (added)

5.     Burck, William A.

6.     Castellanos Alvarado, María

7.     Citadel Securities, LLC

8.     Cravath, Swaine & Moore LLP

9.     Danon, Samuel A.

10.     Fountain, Peter H.

11.     Furst, Rachel W.

12.     Grossman Roth Yaffa Cohen, P.A.

13.     Guzman, Angel

14.     Hach Rose Schirripa & Cheverie LLP

15.     Hettler, Kathryn

*Guzman et al. v. Robinhood Markets, Inc.*
Case No. 22-11873

16.    Hoeflich, Adam L.

17.    Hunton Andrews Kurth LLP

18.    Huynh, Andrew D. (added)

19.    Joseph Saveri Law Firm, LLP

20.    Kercher, Christopher D.

21.    LeBuhn, MacGregor (added)

22.    Maggard, Abraham A.

23.    Membiela, Gusatvo Javier (deleted)

24.    Miller, Christopher

25.    Minahan, Burke

26.    Orsini, Kevin J.

27.    O'Sullivan, John F.

28.    Pavsner, Seth (deleted)

29.    Quinn Emanual Urquhart & Sullivan, LLP

30.    Robinhood Financial LLC

31.    Robinhood Markets, Inc. (HOOD)

32.    Robinhood Securities, LLC

33.    Robinson, Dawson

34.    Ryan, Antony L.

35.    Salario, Samuel J. (added)

*Guzman et al. v. Robinhood Markets, Inc.*
Case No. 22-11873

36.    Saveri, Joseph R.

37.    Schirripa, Frank R.

38.    Sterling, Terell

39.    Sukiennik, Brittany L.

40.    Williams, Steven N.

41.    Young, Christopher K.L.

Appellants certify that they are not a subsidiary or affiliate of a publicly owned corporation and that they are not aware of any publicly owned corporation, not a party to the litigation, that has a financial interest in the outcome of this case or appeal.

JOSEPH R. SAVERI
California Bar No. 130064
CHRISTOPHER K.L. YOUNG
California Bar No. 318371
ABRAHAM A. MAGGARD
California Bar No. 339949
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, California 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
Email: jsaveri@saverilawfirm.com
        cyoung@saverilawfirm.com
        amaggard@saverilawfirm.com

**/s/Steven L. Brannock**
FRANK R. SCHIRRIPA
New York Bar No. 4103750
KATHRYN A. HETTLER
New York Bar No. 5126065
HACH ROSE SCHIRRIPA & CHEVERIE LLP
112 Madison Avenue, 10th Fl.
New York, New York 10016
Tel:  (212) 213-8311
Fax: (212) 779-0028
Email:  fschirripa@hrsclaw.com
        kh@hrsclaw.com

*Guzman et al. v. Robinhood Markets, Inc.*
Case No. 22-11873

STEVEN L. BRANNOCK
Florida Bar No. 319651
SAMUEL J. SALARIO, JR.
Florida Bar No. 83460
BRANNOCK HUMPHRIES
   & BERMAN
1111 W. Cass Street, Suite 200
Tampa, Florida 33606
Tel: (813) 223-4300
Fax: (813) 262-0604
Email: sbrannock@bhappeals.com
       ssalario@bhappeals.com

*Counsel for Appellants Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants [1] request oral argument. This appeal presents important questions concerning (1) the proper pleading requirements for sufficiently alleging a conspiracy claim under Section 1 of the Sherman Act, 15 U.S.C. § 1; and (2) the proper pleading requirements for showing an unreasonable restraint of trade.

---

[1] Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling. Appellants are referred to hereinafter as "Plaintiffs."

# <u>TABLE OF CONTENTS</u>

Certificate of Interested Parties and Corporate Disclosure Statement ................... C1

Statement Regarding Oral Argument ....................................................................... iii

Table of Contents.................................................................................................... iv

Table of Citations .................................................................................................. vi

Statement of Jurisdiction ...................................................................................... xiii

Statement of the Issues ........................................................................................ xiv

Introduction ............................................................................................................. 1

Statement of the Case ............................................................................................. 5

    I.      Statement of the Facts.............................................................................. 5

           A.    Citadel and Robinhood.................................................................. 5

           B.    The January 2021 Short Squeeze ................................................. 6

           C.    Defendants' Anticompetitive Agreement..................................... 7

           D.    Communications and Conduct Producing the Anticompetitive Scheme.......................................................................................... 9

           E.    Antitrust Injury and Standing ................................................... 11

           F.    Defendants' Respective Markets............................................... 12

                 i.    PFOF Market.................................................................. 12

                 ii.    No-Fee Brokerage Trading App Market......................... 13

                 iii.    The Interlocking Markets Enabled the Conspiracy ....... 15

    II.     Procedural History ................................................................................ 15

III.    Standard of Review ................................................................ 16

Summary of the Argument .................................................................. 16

Argument ............................................................................................ 18

    I.    The district court erred in finding Plaintiffs failed to plausibly allege the existence of an agreement between Defendants to restrict trade .. 18

        A.    Under Rule 8's liberal pleading requirement, Plaintiffs are only required to plausibly allege that Defendants conspired to restrict trading in the Relevant Securities .................................. 18

        B.    Plaintiffs plausibly allege an agreement between Defendants to restrict trade. .......................................................................... 22

            1.    The Amended Complaint plausibly alleged the who, what, where, when, how and why of the conspiracy. .............. 22

            2.    Although it was not required to, the Amended Complaint alleged ample "plus factors" plausibly establishing a conspiracy ........................................................................ 26

    II.    The district court erred in finding Plaintiffs failed to plausibly allege an unreasonable restraint of trade. ...................................................... 40

        A.    Plaintiffs were the target of the conspiracy .............................. 40

        B.    Plaintiffs have pleaded the remaining element of antitrust standing .................................................................................... 50

Conclusion .......................................................................................... 51

Certificate of Compliance .................................................................... 53

Certificate of Service ........................................................................... 53

v

## <u>TABLE OF CITATIONS</u>

**Cases**

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010)....................................................... 16, 20

\*_Amey, Inc. v. Gulf Abstract & Title, Inc._,
  758 F.2d 1486 (11th Cir. 1985).................................................. 43, 45, 48

\*_Anderson News, L.L.C. v. Am. Media, Inc._,
  680 F.3d 162 (2d Cir. 2012)............................................ 20, 26, 29, 35

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987)........................................................... 29

*Arrington v. Burger King Worldwide, Inc.*,
  47 F.4th 1247 (11th Cir. 2022) ....................................................... 21

\*_Ashcroft v. Iqbal_,
  556 U.S. 662 (2009) ................................................................ 20, 27

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ..................................................................... 41

\*_Bell Atl. Corp. v. Twombly_,
  550 U.S. 544 (2007) ................................................................ passim

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
  974 F.2d 1358 (3d Cir. 1992)......................................................... 22

\*_Blue Shield of Va. v. McCready_,
  457 U.S. 465 (1982) ................................................................ passim

*Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*,
  429 U.S. 477 (1977) ................................................................ 43, 50

*Brunswick Corp. v. Riegel Textile Corp.*,
  752 F.2d 261 (7th Cir. 1984).......................................................... 41

*Carrier Corp. v. Outokumpu Oyj*,
  673 F.3d 430 (6th Cir. 2012)......................................................................22

*ChoiceParts, LLC v. Gen. Motors Corp.*,
  203 F. Supp. 2d 905 (N.D. Ill. 2002) .......................................................33

*\*Constr. Aggregate Transp. Inc. v. Fla. Rock Indus. Inc.*,
  710 F.2d 752 (11th Cir 1983)........................................................45, 46, 47

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ...........................................................................21, 28, 39

*DeLong Equip. Co. v. Wash. Mills Abrasive Co.*,
  887 F.2d 1499 (11th Cir. 1989)..............................................................19, 31

*DM Research, Inc. v. Coll. of Am. Pathologists*,
  170 F.3d 53 (1st Cir. 1999) .......................................................................42

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ...................................................................................44

*Ekbatani v. Cmty. Care Health Network, LLC*,
  No. 21-12322, 2022 WL 31793 (11th Cir. Jan. 4, 2022)...............43, 48

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir.2012).......................................................................26

*\*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013) ..............................................................passim

*Fed. Trade Comm'n v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) ...................................................................................41

*Gamm v. Sanderson Farms, Inc.*,
  944 F.3d 455 (2d Cir. 2019).......................................................................19

*Gulf States Reorg. Grp., Inc. v. Nucor Corp.*,
  466 F.3d 961 (11th Cir. 2006)....................................................................41

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
   806 F.3d 162 (3rd Cir. 2015) ................................................................. 45

*Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*,
   818 F.2d 1530 (11th Cir. 1987) ............................................................ 19

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*,
   425 U.S. 738 (1976) ............................................................................. 19

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   733 F. Supp. 2d 1348 (N.D. Ga. 2010) ................................................ 33

*In re Disposable Contact Lens Antitrust, Litig.*,
   215 F. Supp. 3d 1272 (M.D. Fla. 2016) ............................................... 29

*In re EpiPen Direct Purchaser Litig.*,
   No. 20-cv-0827, 2021 WL 147166 (D. Minn. Jan. 15, 2021) ....... 41, 42

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) ............................................................ 37, 39

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ............................................................... 38

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ................................................................ 38

*In re McCormick & Co., Inc.*,
   217 F. Supp. 3d 124 (D.D.C. 2016) ..................................................... 33

*In re Pub'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012) ................................................................... 32

*In re Urethane Antitrust Litig.*,
   No. 04-1616, 2013 WL 2097346 (D. Kan. May 15, 2013) .................. 32

*\*Inform Inc. v. Google LLC*,
   No. 21-13289, 2022 WL 3703958 (11th Cir. Aug. 26, 2022) ............... 5

*Int'l Const. Prods. LLC v. Ring Power Corp.*,
    No. 5:20-cv-226, 2021 WL 6755717 (N.D. Fla. Dec. 23, 2021) ........................ 29

*Jackson v. Wal-Mart Stores, Inc*.,
    753 F. App'x 866 (11th Cir. 2018) .................................................................... 20

*Kendall v. Visa USA, Inc*.,
    518 F.3d 1042 (9th Cir. 2008) ........................................................................... 22

*Laumann v. Nat'l Hockey Leagu*e,
    907 F. Supp. 2d 465 (S.D.N.Y. 2012) ............................................................... 49

*\*Loeb Industries, Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ................................................................ 46, 47, 48

*Lowell v. Am. Cyanamid Co.*,
    177 F.3d 1228 (11th Cir. 1999) .................................................................. 39, 49

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) .......................................................................................... 19

*Mw. Waffles, Inc. v. Waffle House, Inc.*,
    734 F.2d 705 (11th Cir. 1984) .......................................................................... 42

*Nietzke v. Williams*,
    490 U.S. 319 (1989) .......................................................................................... 36

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*,
    838 Fed. App'x 231 (9th Cir. 2020) .................................................................. 45

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ...................................................................................... 40

*Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*,
    604 F.3d 1291 (11th Cir. 2010) ..................................................................... 5, 50

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
    917 F.3d 1249 (11th Cir. 2019) ........................................................................ 21

*Randall v. Scott*,
610 F.3d 701 (11th Cir. 2010)................................................................ 21

*Rebel Oil Co., Inc. v. Atl. Richfield Co*.,
51 F.3d 1421 (9th Cir. 1995)................................................................. 41

*\*SD3 LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (1st Cir. 2015) .........................................................passim

*Sentry Data Sys., Inc. v. CVS Health*,
361 F. Supp. 3d 1279 (S.D. Fla. 2018) ................................................ 50

*SmileDirectClub, LLC v. Tippins*,
31 F.4th 1110 (9th Cir. 2022)............................................................... 26

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
803 F.3d 1084 (9th Cir. 2015)......................................................... 29, 37

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
No. 1:09-CV-00560, 2013 WL 595122 (E.D. Cal. Feb. 15, 2013) ..................... 37

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010)....................................................21, 27, 31

*Swierkiewivz v. Sorema N.A.*,
534 U.S. 506 (2002) ............................................................................. 20

*Texas v. Allan Construction Co., Inc.*,
851 F.2d 1526 (5th Cir. 1988).............................................................. 33

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp*.,
346 U.S 537 (1954) .............................................................................. 19

*Todorov v. DCH Healthcare Auth.*,
921 F.2d 1438 (11th Cir. 1991)............................................................ 51

*Toys "R" Us, Inc. v. Fed. Trade Comm'n*,
221 F.3d 928 (7th Cir. 2000)................................................................ 41

x

*United States v. Curtis*,
    635 F.3d 704 (5th Cir. 2011)...................................................................... 32

*United States v. Evans*,
    572 F.2d 455 (5th Cir. 1978)...................................................................... 33

*United States v. Falstaff Brewing Corp.*,
    410 U.S. 526 (1973) .................................................................................... 19

*United States v. Gacnik*,
    50 F.3d 848 (10th Cir. 1995)...................................................................... 32

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus. Inc.*,
    648 F.3d 452 (6th Cir. 2011)...................................................................... 21

*Wilkerson v. Grinnell Corp.*,
    270 F. 3d 1314 (11th Cir. 2001) .................................................................... 5

## Statutes

15 U.S.C. § 1 ..........................................................................................passim

15 U.S.C. § 78u-4(b)(2)(A) ......................................................................... 31

15 U.S.C. § 15(a) ........................................................................................ xiii

15 U.S.C. § 22 ............................................................................................. xiii

28 U.S.C. § 1291 ......................................................................................... xiii

28 U.S.C. § 1331 ......................................................................................... xiii

28 U.S.C. § 1337 ......................................................................................... xiii

28 U.S.C. § 1407 ........................................................................................... 15

## Rules

11th Cir. R. 26.1-4 ...................................................................................... C1

Fed. R. Civ. P. 8.................................................................................passim

Fed. R. Civ. P. 9.......................................................................................35

Fed. R. Civ. P. 12(b)(6) ..............................................................xiii, 16, 29, 36

## <u>STATEMENT OF JURISDICTION</u>

The United States District Court for the Southern District of Florida had federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiffs' Amended Consolidated Class Action Complaint (the "Amended Complaint") was brought under Section 1 of the Sherman Act, 15 U.S.C. § 1. *See* 15 U.S.C. §§ 15(a), 22.

On May 13, 2022, the United States District Court for the Southern District of Florida dismissed the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). Plaintiff timely filed a Notice of Appeal on June 1, 2022. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final judgment.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in concluding that Plaintiffs did not, under Rule[2] 8(a)(2) of the Federal Rules of Civil Procedure, plausibly allege an agreement between Defendants to prohibit purchases of the Relevant Securities[3] in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.     Whether the district court erred in concluding that Plaintiffs did not plausibly allege that Defendants' collusive behavior was an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

---

[2] All Rule references are to the Federal Rules of Civil Procedure unless otherwise indicated.

[3] The Relevant Securities include: GameStop (GME), AMC Entertainment (AMC), Bed Bath & Beyond (BBBY), BlackBerry (BB), Express (EXPR), Koss (KOSS), Nokia (NOK), Tootsie Roll Industries (TR), and Trivago NV (TRVG).

## **INTRODUCTION**

On January 28, 2021, Robinhood[4] imposed unprecedented trading restrictions across its platform cutting off the ability of its retail investor customers to purchase certain stocks (the "Relevant Securities"). At that time, Robinhood retail investor customers had purchased significant quantities of those securities, thereby increasing their prices. The decision to limit trading was the product of an illegal agreement between Robinhood and its chief business partner, Citadel Securities, LLC ("Citadel Securities" or "Citadel") (Robinhood and Citadel collectively, "Defendants"). By their agreement, Robinhood and Citadel drove prices down and forced investors to sell at a loss. This lawsuit challenges Defendants' conduct under the Sherman Act, 15 U.S.C. §1, and seeks to obtain redress for the losses sustained by Plaintiffs and other Robinhood customers as a result of that agreement.

Citadel and Robinhood's agreement was designed to restrain competition in furtherance of their own respective economic interests. Citadel had purchased hundreds of millions of dollars in short positions in the Relevant Securities. The rising prices of the Relevant Securities threatened Citadel with virtually limitless losses; a classic short squeeze. To solve this problem, Citadel turned to Robinhood, over which it had substantial leverage. Robinhood is a brokerage firm that built a billion-dollar business on offering commission-free brokerage services to customers. Robinhood's business

---

[4] Robinhood Markets, Inc., Robinhood Financial LLC, and Robinhood Securities, LLC.

1

model depends on the practice of Payment for Order Flow ("PFOF"), which allows market makers (like Citadel) and brokerage firms (like Robinhood) to combine to split the profit made on trades from retail customers. Citadel paid Robinhood hundreds of millions of dollars for PFOF so that orders from Robinhood would be sent to them so that Citadel can operate the other side of the transaction, either selling or buying the security and pocketing any profit from the spread between the order and resultant price (i.e., the bid-ask spread). The arrangement between Robinhood and Citadel had become so successful that, by February 2021, Robinhood was on the verge of an initial public stock offering, which would make its founders very rich and would garner hundreds of millions of dollars for Robinhood's financial backers. Threats to Robinhood's PFOF arrangement would threaten those plans.

In order to stop the market from functioning and to artificially reduce the price of the Relevant Securities, Citadel leveraged its power over and relationship with Robinhood to extract an agreement whereby Robinhood would prevent its users from purchasing the Relevant Securities, allowing Citadel to recoup its potentially massive short positions. The agreement allowed Robinhood to insure its source of lucrative PFOF revenue and its impending IPO. Pursuant to that agreement, Robinhood restricted the purchases of the Relevant Securities on its platform. Because its customers could not purchase those securities and, given the consequences of supply and demand, the market

price dropped precipitously. Citadel then exited its short positions. This lawsuit challenges that agreement under the federal antitrust laws. 15 U.S.C. § 1.

Plaintiffs allege with specificity and in detail the who, what, where, when, how and why of Defendants' anticompetitive scheme to restrict trading in the Relevant Securities. Those allegations are supported by well pleaded factual allegations, presenting strong evidence of concerted action. That evidence includes a telling statement from Robinhood to Citadel that "We are on board"—smoking gun evidence that Robinhood reached agreement and acceded to Citadel's demands. At the same time, top executives engaged in suspect trading of their own shares, evidencing their insider knowledge of the agreement. This evidence, coupled with other communications between top executives at Robinhood and Citadel prior to and directly after the imposition of the trading restrictions give rise to the inference of concerted conduct.

But instead of determining whether that inference was plausible—the only task of the district court at the motion-to-dismiss stage—the district court analyzed the allegations under a heightened pleading standard, committing error. It dismissed Plaintiffs' complaint because it identified competing inferences that could be drawn from the allegations and determined that they were more plausible than the inference of conspiracy. But antitrust claims are no different from any other civil claim—they are subject to the same liberal pleading standard under Rule 8. *Twombly*[5] only requires that

---

[5] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (hereinafter "*Twombly*")*.

a plaintiff plead facts which plausibly—not probably—show an agreement. Rule 8 and a long line of authority require that trial courts must assume plaintiffs' allegations to be true and not to resolve competing inferences against them. The district court did neither, and this Court should reverse.

Plaintiffs also plausibly allege an unreasonable restraint of trade. The Amended Complaint details how Defendants collusively used their market power to restrain competition and harm Robinhood customers, precisely the type of conduct that modern antitrust law aims to prohibit. The district court did not question that Plaintiffs had properly defined the contours of the relevant markets, and that Citadel and Robinhood had power in those markets. Nor did the district court question that Plaintiffs were injured by Defendants' conduct. Instead, the district court found a "gap" between the relevant markets and the alleged injury. The conclusion that such a "gap" would be fatal to Plaintiffs' claims has no reliable basis in antitrust law.

Even if this were valid—and it is not—there is no such "gap." Plaintiffs were customers in the No-Fee Brokerage Market—the very market defined by the Amended Complaint—and they were the targets the conspiracy. The direct and foreseeable—indeed intended—consequence of the agreement was the restriction of trading, lowering of securities prices, and losses to Robinhood customers. Stopping Plaintiffs and those similarly situated from purchasing the Relevant Securities was the point—Citadel could not avoid the massive losses it stood to face in light of its massive short positions unless

Robinhood acceded to Citadel's demands to prohibit its users from purchasing the Relevant Securities. Antitrust caselaw is replete with cases successfully challenging conduct by businesses in one part of a market with the intent of damaging those who participate in another connected market. Many cases, including those in this Circuit, involve challenges to conduct "upstream" in a market with intended effects "downstream." The district court's erroneous conclusions should be reversed.[6]

## STATEMENT OF THE CASE

### I.    STATEMENT OF FACTS

#### A.    Citadel and Robinhood

Citadel is a leading market maker. ¶ 48.[7] As a market maker, Citadel is responsible for fulfilling trade orders that are routed to it. ¶ 85. Citadel earns a profit by exploiting the difference between the price of the directed orders and the actual price of the transaction, which is known as the bid-ask spread. ¶ 9. Citadel also invests its own money

---

[6] The district court did not reach the issue as to whether Plaintiffs' antitrust claims were precluded by federal securities laws. Doc 470 (Order granting motion to dismiss Amended Complaint) (the "Order") at 23. Because this Court "ordinarily prefer[s] that district courts address issues in the first instance," the argument is one for the district court to consider on remand. *Inform Inc. v. Google LLC*, No. 21-13289, 2022 WL 3703958, at *6 (11th Cir. Aug. 26, 2022) (citing *Wilkerson v. Grinnell Corp.*, 270 F. 3d 1314, 1322 n.4 (11th Cir. 2001)); *see also Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1306, n.15 (11th Cir. 2010) ("we likewise may exercise our discretion to decline to do so when appellate review would benefit from reasoned deliberation from the district court").

[7] "¶ __ " citations are to the Amended Complaint (Doc 451).

buying or selling securities, including more complex transactions such as taking long or, as here, short positions, in publicly traded securities. ¶ 10.

Robinhood is a brokerage that offers "no-fee" services to retail investors through its app-based platform. ¶¶ 68-69. Robinhood is able to offer its brokerage services commission-free because of its relationships with market makers, primarily Citadel, who compensate Robinhood for preferential access to its order flow (i.e., payment for order flow or "PFOF"). ¶ 73. PFOF is Robinhood's primary source of revenue and Citadel is by far Robinhood's leading market maker. ¶¶ 4-5. Robinhood derived as much as 80% of its revenue from PFOF, and Citadel was responsible for approximately 43% (or over $141 million) of Robinhood's PFOF revenue in the first quarter of 2021 alone. ¶¶ 4-5, 75, 80. Reduction of Robinhood's PFOF revenue by Citadel would have been disastrous to Robinhood's business. *See* ¶¶ 4-5.

### B.    The January 2021 Short Squeeze

Leading up to January 28, 2021, retail investors, primarily through Robinhood, purchased long positions in the Relevant Securities because they believed that these securities were undervalued and would serve as good investments. ¶¶ 7, 95-98, 101. Investors purchase long positions in securities with the expectation that the securities' share prices will rise in value, thus earning a profit by eventually selling the securities for more than they paid for them. ¶ 100.

By contrast, Citadel did not agree with the retail investors' assessment and bet against them, acquiring large short positions in the Relevant Securities. ¶¶ 11, 108, 141. Short sellers borrow shares of a company they believe will reduce in price in the hope that if the share price falls, they buy the shares back at a reduced price and return them to the lender for a profit. ¶ 108. If the share price increases, short sellers must buy back the shares at the higher share price if they wish to exit their short positions, thus incurring a loss. *Id.* The more a stock price increases, the greater the loss to the short seller. ¶ 109. In essence, short sellers make bets that a security's share price will decrease. ¶¶ 108-09.

As more retail investors purchased the Relevant Securities through Robinhood, Robinhood routed those orders to Citadel, who, as Robinhood's market maker, took the other side of those buy orders to facilitate the trade. ¶ 11. Citadel also acquired massive short positions in the Relevant Securities. *Id*. As a result, Citadel Securities was exposed to potentially billions of dollars in losses if the share prices of the Relevant Securities were to rise—which is exactly what happened. ¶ 12. It was a classic "short squeeze." *Id.*

### C.    Defendants' Anticompetitive Agreement

The resulting short squeeze exposed Citadel to massive losses. ¶ 132. Desperate to avoid those losses, Citadel leveraged its relationship with Robinhood to obtain an agreement with Robinhood to cut off its customers' ability to purchase the Relevant Securities. ¶ 13. The agreement was in place by January 27, 2021, if not earlier. ¶¶ 13,

227-246. As intended, the Relevant Securities' prices dropped, allowing Citadel to cover its short positions. ¶ 15.

Based on that agreement and in furtherance of that scheme, late on January 27, 2021, Citadel executed additional short trades in the Relevant Securities in the after-hours trading session. ¶¶ 14, 155-56. Citadel executed these trades to develop even larger short positions in the Relevant Securities, knowing the price of the Relevant Securities would decline once Robinhood implemented the purchasing restrictions. *Id.*

On January 28, 2021, Robinhood moved the Relevant Securities to position close only ("PCO"), meaning that customers could only sell shares of the Relevant Securities and were foreclosed from buying them, causing their share prices to plummet.[8] ¶¶ 179, 197-208. Robinhood offered shifting explanations for its decision. It first attributed its decision to PCO the Relevant Securities to market volatility. ¶¶ 192, 194. Later it stated that the reason was due to increased collateral requirements imposed by the NSCC, the risk-management organization that guarantees the delivery of cash and securities to all its members including Robinhood. *See* ¶¶ 87-90, 181. Internally, however, Robinhood cited a "major liquidity issue" as the reason for the company's decision to impose trading restrictions. ¶ 180.

---

[8] Following Robinhood's lead, other brokerages implemented trading restrictions on January 28—but these restrictions paled in comparison (in size, scope, and impact) to Robinhood's. ¶ 195.

On January 29, 2021, Robinhood lifted its purchasing restriction but continued to restrict trading through February 4, 2021, long after any possible issues with collateral requirements, liquidity, or volatility had resolved themselves. ¶¶ 249-54. In fact, Robinhood imposed these restrictions despite securing more than $1.5 billion in funding in the days prior to January 29, 2021, and raising an additional $2.4 billion by February 1, 2021. ¶ 261. Despite the true state of affairs, Robinhood kept the trading restrictions in place, benefitting Citadel.

**D.    Communications and Conduct Producing the Anticompetitive Scheme**

Top executives and other high-level management of Robinhood and Citadel directly communicated with one another in the lead up to, during, and immediately after the trading restrictions were imposed on January 28, 2021. ¶¶ 226-46, 257-60. On January 20, 2021, Citadel's Head of Execution Services contacted Josh Drobnyk, Robinhood's Vice President of Corporate Relations with a proposal, which Plaintiffs allege to be the imposition of the trading restrictions. ¶¶ 227-28. On January 25, 2021, a mere three days before the trading restrictions, Drobnyk, after conferring with Robinhood in-house lawyers, affirmed Robinhood's agreement and responded to Citadel's proposition by saying "[w]e are on board." ¶¶ 228, 230. Citadel and Robinhood continued to communicate, and in light of the frequency and timing, it is more than reasonable to infer that the subject was the impending restriction of trading the Relevant

9

Securities to arrest the short squeeze and save Citadel from catastrophic losses. ¶¶ 231-33.

On January 26, 2021, as Robinhood and Citadel executives were communicating about effectuating the agreement, Jim Swartwout, Robinhood Securities's President and Chief Operating Officer, and 30-year industry veteran, internally alerted other Robinhood employees that he "sold [his] AMC today," and that Robinhood was moving GME to 100% margin the next day. ¶ 234. Given that the price of AMC, one of the Relevant Securities, was still skyrocketing, Swartwout's decision to sell his shares and to inform others he was going to do so was illogical unless had advanced knowledge of the forthcoming restrictions. *Id.*

On the evening of January 27, 2021, prior to the trading restrictions, Gretchen Howard, Robinhood's Chief Operating Officer, alerted Vlad Tenev, Robinhood's Chief Executive Officer, to a 5:00 p.m. phone call that she, Daniel Gallagher (Robinhood's chief legal officer) and Swartwout would be having with Citadel that day. ¶ 237. Notably, Howard told Tenev that she and other Robinhood executives believed that Citadel would demand limiting PFOF "across the board" during the call. ¶¶ 237, 239. The fact that Robinhood acknowledged and understood Citadel was threatening its PFOF revenue is revealing, and crucial. Given the significance of Citadel's relationship to Robinhood's revenues, any limitation on PFOF would threaten a fundamental aspect of Robinhood's no-commission business structure and upcoming initial public offering. In turn, Tenev

responded that "this would be a good time" for him to chat with Ken Griffin, Citadel's owner. ¶ 239.

Shortly thereafter, on January 27, 2021, Swartwout reported on the call and described it as a "total mess." ¶ 241. Then, Swartwout emailed a Citadel employee looking for "new Citadel numbers," but is told that they are "[f]irming up" in light of a follow up conversation between other executives of the firms, indicating the two parties had reached a resolution to maintain Robinhood's PFOF revenue. ¶ 242. Minutes later, Swartwout received an email from Citadel's Vice President of Business Development asking if Tenev wanted to have a call with Citadel's head of business that night. ¶ 243. One can easily infer that Citadel executed its leverage, and while Robinhood may have resisted, it acquiesced, and Citadel got its way.

Once the restrictions were in place, Citadel and Robinhood continued to communicate in order to maintain a common narrative about their illicit scheme. On January 30, 2021, *after* the trading restrictions were imposed, Citadel's Head of Execution Services reached out to Drobnyk again to "coordinate messaging" after the trading restrictions, copying Citadel's general counsel "for privilege" to shield the communications from prying eyes. ¶¶ 258-60.

### E.    Antitrust Injury and Standing

The scheme had its intended effect—Robinhood's customers, the target of the scheme, were foreclosed from the market which led to a massive sell-off, resulting in a

11

sharp decline in the share prices of the Relevant Securities which allowed Citadel Securities to exit its short positions and mitigate any potential losses. ¶ 197. For example, at the close of the market on January 28, 2021, the share price of GME had dropped 44.29% from the previous day. ¶ 198. Further, publicly available transparency data is consistent with Citadel maintaining large short positions in the Relevant Securities immediately prior to the trading restrictions. ¶¶ 265-84. The data shows that short interest sharply declined after the restrictions, indicating that Citadel had exited its positions and avoided the massive losses it otherwise would have incurred. ¶ 284.

### F.    Defendants' Respective Markets

Given the interdependency of Robinhood and Citadel, Plaintiffs described each of the separate markets in which Defendants operate, as well as how the markets are interlocked in such a way to make the conspiracy a success. ¶¶ 305-15.

### i.    PFOF Market

Citadel operates in the Payment for Order Flow market ("PFOF Market"), which consists of market makers within the U.S. that pay brokerage firms, such as Robinhood, to route their clients' trades to that market maker. ¶¶ 306, 311. As the top wholesale market maker, Citadel wields enormous market power in the PFOF Market, accounting for approximately 27% of U.S. equities volume and executing approximately 37% of *all* U.S.–listed retail volume. ¶ 307. In fact, for about two years, Citadel has garnered approximately 40 percent of all PFOF in the U.S., more than its next three largest

competitors *combined*. *Id*. From January 2021 through June 2021, Citadel paid approximately $1.5 billion to brokers for order flow, the most of any market maker. ¶ 309. According to publicly available transparency data, Citadel was responsible for the bulk of trading activity during the week of the trading restrictions. ¶¶ 281-84.

### ii.    No-Fee Brokerage Trading App Market

The direct and foreseeable target of Citadel and Robinhood's agreement was the consumer market where Robinhood promoted and sold its no-fee brokerage trading services. Robinhood operates in the No-Fee Brokerage Trading App Market,[9] the consumer-facing relevant product market within the U.S. that consists of zero account-minimum, no-fee brokerages that (1) offer a user-friendly mobile app to retail investors to place orders to buy and sell stocks, exchange-traded funds and other securities or investments strategies such as trading on margin or using options strategies, and (2) receive payment for order flow from market makers instead of fees from retail investors. ¶¶ 312-13, 315. Plaintiffs, in turn, are the customers in this No-Fee Brokerage Market, who trade on apps like Robinhood's. ¶ 314. In antitrust or economic terms, this can be considered a "downstream" market because this linked market is closer to consumers in the distribution chain.

Robinhood is by far the most popular trading app in the world. ¶ 326. Robinhood has done extremely well in the No-Fee Brokerage Market, growing from fewer than

---

[9] Hereinafter, the "No-Fee Brokerage Market."

500,000 users in 2015 to over 31 million users in 2021. ¶ 71. As such, Robinhood possesses significant market power. ¶¶ 324-36. In fact, Robinhood claims to have opened nearly 50% of all retail brokerage accounts in the past five years, boasting an industry-leading 12.5 million online accounts by the end of 2020 and adding another 3 million during the month of January 2021. ¶ 325. As of March 31, 2021, Robinhood had 18.0 million funded accounts, with 17.7 million monthly active users. *Id*.

Robinhood also boasts the highest daily average revenue trades. ¶ 328. In June 2020, Robinhood reported approximately a half-million more trades than the next highest broker dealer. *Id*. Robinhood's market dominance is further demonstrated by the number of times its app is downloaded—3 million times in January 2021 alone. ¶ 332. By comparison, the next highest number of downloads by a competitor within the same time period was 800,000. *Id*. Even after the events of January 28, 2021, Robinhood is still widely known as the "only game in town." ¶ 335. Robinhood's power over the market is amplified by the fact that its customers, including Plaintiffs, are "captive" for significant periods of time. ¶¶ 158, 337-46. If Robinhood imposes a purchasing restriction, for example, it is difficult for its customers to switch to other brokerage platforms in time to respond to rapidly changing market conditions. *Id.* Thus, Robinhood's customers (and thus the market itself) are particularly susceptible to trading restrictions. Clamping down on Robinhood customers' ability to purchase securities will almost certainly result in a corresponding decline in their share prices as shown by what happened here.

### iii.  The Interlocking Markets Enabled the Conspiracy

The interlocking nature of the two markets is obvious and well-pleaded. Citadel was able to leverage its market power in the PFOF Market to secure Robinhood's agreement to shut down trading in the No-Fee Brokerage Market for long enough to cause prices to plummet—to the substantial detriment of the Robinhood's customers and to the substantial benefit of Citadel (which protected its short positions) and Robinhood (which protected its PFOF income stream and its lucrative IPO plans). ¶¶ 211, 318.

## II.  PROCEDURAL HISTORY

After the imposition of trading restrictions, numerous lawsuits were filed against Defendants and other entities alleging various claims arising under several theories and statutes. Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation transferred the suits to the Southern District of Florida. *In re Jan. 2021 Short Squeeze Trading Litig.*, Case No. 1:21-md-02989-CMA. The district court divided the litigation into three "tranches" of claims. At issue here are the antitrust claims, i.e., the "Antitrust Tranche." Discovery was stayed with the exception that the district ordered defendants to produce any records already produced to Congress and other government entities.[10] No other discovery has been taken.

The initial antitrust complaint, which alleged a violation of Section 1 of the Sherman Act (15 U.S.C. § 1), was filed on July 27, 2021. Defendants moved to dismiss

---

[10]  *See* Doc 323, ¶ 6.

on August 30, 2021, and on November 17, 2021, the district court granted Defendants' motion to dismiss with leave to amend. Plaintiffs filed the Amended Complaint on January 20, 2022. It asserts a single Section 1 claim against Robinhood and Citadel.

On February 18, 2022, Defendants moved to dismiss the Amended Complaint on three grounds: (1) Plaintiffs fail to sufficiently plead that Defendants agreed to conspire; (2) Plaintiffs fail to sufficiently plead the remaining elements of a Sherman Act Section 1 claim; and (3) Plaintiffs' antitrust theory is precluded by federal securities laws. On May 13, 2022, the district court granted Defendants' motion to dismiss the Amended Complaint, dismissing all claims with prejudice. Specifically, the district court found that dismissal was warranted under the first two grounds but made no mention of the third suggested ground for dismissal. Plaintiffs appeal.

## III.  STANDARD OF REVIEW

A district court's order granting a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted is subject to *de novo* review. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010).

## <u>SUMMARY OF ARGUMENT</u>

The district court erred in finding that Plaintiffs failed to plausibly allege an agreement between Defendants to restrict purchases of the Relevant Securities and thereby drive down their share price. The Amended Complaint provides detailed allegations of a *quid pro quo* where Robinhood would halt purchases of the Relevant

16

Securities and save Citadel from the crushing losses it would otherwise have suffered. Citadel meanwhile would continue providing the PFOF revenue that was central to Robinhood's business model and upcoming IPO. Robinhood and Citadel had powerful economic motives to conspire, had every opportunity to conspire, and engaged in a suspicious pattern of conduct and communication that strongly indicate that they conspired. The district court, however, did not accept these allegations as true, did not draw all inferences from them in Plaintiffs' favor, and did not view them as a whole. Instead, and in violation of its obligations under Rule 8 and *Twombly*, the district court improperly assessed the credibility of Plaintiffs' allegations, erroneously drew competing inferences from those allegations and held them against Plaintiffs, and incorrectly parsed the allegations narrowly and not in the context of the Amended Complaint as a whole. By incorrectly applying a heightened pleading standard, the district court ordered dismissal of the Amended Complaint when a straightforward application of *Twombly*'s plausibility standard required the opposite.

The district court further erred in finding that Plaintiffs failed to plausibly allege an unreasonable restraint of trade. The district court did not dispute that Plaintiffs alleged a relevant market, alleged that Defendants had market power in their respective markets, and alleged that Plaintiffs were injured as a result of the Defendants' misconduct. Instead, the district court found that Plaintiffs had not alleged antitrust injury in the relevant market, erroneously concluding there was a "curious gap" between the alleged antitrust

injury and the relevant market which was "detrimental" to Plaintiffs' antitrust standing. The district court, however, misunderstood Plaintiffs' allegations. Plaintiffs were the consumers in the No-Fee Brokerage Market alleged in the complaint, and this consumer injury, caused by the Defendants' misuse of their market power in that market, is antitrust injury by any definition. Indeed, Plaintiffs were the foreseeable target of Defendants' anticompetitive scheme, which is enough to demonstrate antitrust injury. The fact that Citadel also operates in the separate PFOF Market is irrelevant. Citadel used its power in the PFOF Market to secure Robinhood's agreement to the conspiracy, taking advantage of Robinhood's market power in the No-Fee Brokerage Market. The Amended Complaint sufficiently alleges how these two markets were inextricably intertwined to allow the anticompetitive scheme to succeed to the substantial benefit of Defendants at the expense of the Plaintiffs.

## **ARGUMENT**

**I.    THE DISTRICT COURT ERRED IN FINDING PLAINTIFFS FAILED TO PLAUSIBLY ALLEGE THE EXISTENCE OF AN AGREEMENT BETWEEN DEFENDANTS TO RESTRICT TRADE.**

> **A.    Under Rule 8's liberal pleading requirement, Plaintiffs are only required to plausibly allege that Defendants conspired to restrict trading in the Relevant Securities.**

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade . . . ." 15 U.S.C. § 1. To plead a conspiracy, a plaintiff need only present "direct or circumstantial evidence that reasonably tends to prove that

18

the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1535 (11th Cir. 1987) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)). "'[T]he crucial question' is whether the challenged anticompetitive conduct 'stems from an independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553 (citing *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S 537, 540 (1954)).

Even circumstantial evidence that an agreement existed is more than enough to cut the mustard under Rule 8. That is because "[c]onspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators." *DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989) (citations omitted). Thus, a plaintiff is not required to show a conspiracy with direct evidence and may instead "present circumstantial facts supporting the inference that a conspiracy existed." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (citation omitted); *see also United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973) ("circumstantial evidence is the lifeblood of antitrust law"). In antitrust cases, "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976).

It follows that a district court evaluating a complaint's allegations of a Sherman Act conspiracy may not apply a heightened pleading standard and must instead apply Rule 8(a)'s liberal pleading requirement of a "short and plain statement" of facts supporting a plausible claim. Fed. R. Civ. P. 8(a); *see Twombly*, 550 U.S. at 554-55, 569 n.14, 570. As it must in virtually any other civil case, the district court must "accept[ ] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Am. Dental Ass'n*, 605 F.3d at 1288; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, a court "must assume the truth of all well-pleaded allegations except legal conclusions, regardless of whether evidence may ultimately support them." *Jackson v. Wal-Mart Stores, Inc.*, 753 F. App'x 866, 869 (11th Cir. 2018); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) ("Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.") (citation omitted).

Notably, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556; *accord Iqbal*, 556 U.S. at 678. Thus, "to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012);

*see also Watson Carpet & Floor Covering, Inc. v. Mohawk Indus. Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage."). Moreover, a district court cannot dismiss a cause of action simply because it rests on inferences—it is mandated to take those inferences in the light most favorable to the plaintiff. *See Arrington v. Burger King Worldwide, Inc.*, 47 F.4th 1247, 1250 n.1 (11th Cir. 2022) (citing *Randall v. Scott*, 610 F.3d 701, 507 (11th Cir. 2010)); *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("For cases governed only by Rule 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.").

Nor can a district court evaluate a plaintiff's allegations of conspiracy by "dismembering [them] and viewing [their] separate parts, but only by looking at [them] as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (citation omitted). "[A]ntitrust plaintiffs [should] receive 'the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1263 n.15 (11th Cir. 2019) (quoting *Cont'l Ore*, 370 U.S. at 699). Put differently, "[w]hile each of [plaintiff's] allegations of circumstantial agreement standing alone may not be sufficient to imply agreement, taken together, they

provide a sufficient basis to plausibly contextualize the agreement necessary for pleading a § 1 claim." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 47 (1st Cir. 2013); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc*., 974 F.2d 1358, 1365 (3d Cir. 1992) (district court "inappropriately compartmentalized" plaintiffs' evidence of a conspiracy).

### B.    Plaintiffs plausibly allege an agreement between Defendants to restrict trade.

In this case, the district court incorrectly applied a pleading standard far more exacting than that imposed by Rule 8 and *Twombly*, failed to consider the totality of Plaintiffs' allegations, and improperly weighed and resolved competing inferences in favor of Defendants. As a result, the district court erroneously found that Plaintiffs failed to plausibly allege the existence of an agreement to restrain trade.

### 1.    The Amended Complaint plausibly alleged the who, what, where, when, how and why of the conspiracy.

To begin, an antitrust complaint generally will be found sufficient when it alleges the who, what, where, when, how and why of the conspiracy. *See SD3 LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 430 (1st Cir. 2015); *see also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 445 (6th Cir. 2012); *Kendall v. Visa USA, Inc*., 518 F.3d 1042, 1048 (9th Cir. 2008). Here, the Amended Complaint pleads exactly those details, which the district court ignored. Plaintiffs alleged that Robinhood and Citadel were the parties to the agreements. *See* ¶ 67. Plaintiffs alleged the clear motive for the conspiracy:

22

Citadel stood to lose billions of dollars from its short position if the market could not be wrestled back down. ¶ 12. Citadel could accomplish this because of Robinhood's market power in the No-Fee Brokerage Market and its leverage over Robinhood. ¶¶ 324-36, 352. If Robinhood agreed to impose purchasing restrictions, the market would reverse its steep ascent. ¶¶ 347-48. For its part, Robinhood stood to lose its primary means of income and its opportunity to go public if it did not sign on the conspiracy. ¶ 401. In short, the "who" and "why" of the conspiracy are clear and compelling.

The "how" and "when" of the agreement are also plausibly alleged. The agreement was reached via telephone and email communications over the course of several days in January 2021, resulting in the restriction on trading of the Relevant Securities implemented on January 28, 2021. ¶¶ 179, 226-46, 258-59. Furthermore, Robinhood and Citadel committed overt acts in furtherance of the conspiracy thereafter. Plaintiffs provided direct evidence of an agreement. They alleged that, after a series of undisclosed or clandestine communications, just three days before it imposed the unprecedented and illegal trading restrictions, Robinhood confirmed in an email to Citadel that "**we are on board**." ¶¶ 227-30 (emphasis added). This statement does not merely suggest an agreement—it confirms one. There is no other reasonable inference to be made but a meeting of the minds. This allegation, which must be taken as true, is flatly inconsistent with conduct that could be explained as "natural, unilateral reaction" by Defendants. *See Twombly*, 550 U.S. at 566. And, as further alleged, that communication of assent was

followed by a clear—and unprecedented—change in their business practices, namely, the January 28, 2021, trading restrictions. ¶ 179.

And if that was not enough, the Amended Complaint complemented those specific allegations of an agreement with additional evidence that the parties continued to work together to save Citadel from the short squeeze. Robinhood and Citadel engaged in a flurry of communications the night before the trading restrictions were imposed. These included communications about the PFOF Robinhood received from Citadel, from which, given their timing and frequency, can reasonably be inferred involved the agreement to prohibit Robinhood's customers from purchasing the Relevant Securities. ¶¶ 237, 239-45. These communications were described as a "total mess." ¶¶ 240, 246. Ultimately, they left Robinhood Securities' President and COO "beyond disappointed," evidencing Citadel's leveraging of its position to strong-arm Robinhood, and Robinhood's acquiescence to the scheme. ¶¶ 245-46. Later that same night, Citadel reached out to inquire if Tenev, Robinhood's CEO, wanted to have a call—which one can reasonably infer was in furtherance of the scheme. ¶¶ 243-45. And *after* the trading restrictions were imposed, many of the same individuals from Citadel and Robinhood communicated in order to "coordinate messaging" leading to an inference that they sought to coordinate pretextual explanations for the unprecedented restrictions. ¶¶ 258-60.

In addition, the Amended Complaint alleges Defendants' overt acts in furtherance of the agreement. Perhaps the most compelling evidence is that Robinhood's executives sold their own shares just before the purchasing restrictions went into effect and the price fell as a consequence of the restrictions. ¶ 234. They knew that the market's steep ascent was about to end because they had agreed with Citadel to impose purchasing restrictions on Robinhood's customers, and they knew the impact it would have on market prices. *Id.*

These are far from conclusory allegations. Under *Twombly*, and a long line of antitrust cases, such well-pleaded allegations are sufficient to state a claim under Section 1 of the Sherman Act. *See Twombly*, 550 U.S at 560, n.6, 565, nn.10, 11 (finding complaint insufficient where plaintiffs proceeded "exclusively via allegations of parallel conduct" and the complaint offered no "specific time, place, or person involved in the alleged conspiracies," alleging only that "some illegal agreement may have taken place between unspecified persons at different [carriers] . . . at some point over seven years.").

Here, the district court confused the *Twombly* plausibility standard and improperly weighed competing inferences that could be drawn from the facts alleged in the complaint. *See SD3*, 801 F.3d at 425 ("When a court confuses probability and plausibility, it inevitably begins weighing the competing inferences that can be drawn from the complaint."). The district court failed to credit Plaintiffs' inference regarding Robinhood and Citadel's manifestation of assent. Order at 32. The court also provided

its own interpretation of the allegations that Robinhood's COO liquidated his own stock holdings in advance of the restriction. Order at 39. And the district court alternatively concluded, at odds with the allegations themselves and the court's order in a related case, that Robinhood's Howard "misspoke" when internally discussing explanations for the restrictions. Order at 40; *see also* Doc 503 (the "Securities Order") at 49. By failing to accept Plaintiffs' allegations as true, and indeed, by finding the allegations improbable, the district court erroneously applied an impermissible heightened pleading standard. This error in applying *Twombly* to antitrust cases is one that the circuit courts have been frequently called on to correct. *E.g.*, *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1118 (9th Cir. 2022); *SD3*, 801 F.3d at 425; *Evergreen*, 720 F.3d at 50; *Erie Cnty., Ohio v. Morton Salt, Inc*., 702 F.3d 860, 868–69 (6th Cir.2012); *Anderson News*, 680 F.3d at 189.

### 2. Although it was not required to, the Amended Complaint alleged ample "plus factors" plausibly establishing a conspiracy.

The district court incorrectly interpreted Plaintiffs' allegations as allegations of parallel conduct or a "naked assertion of conspiracy in a § 1 complaint." *See Twombly*, 550 U.S. at 557.[11] That is obviously not the case. In such a case, however, *Twombly* indicates that a plaintiff is required to allege something more: namely "some setting suggesting the agreement" and other "factual enhancement[s]." *Id.* at 557. According to

---

[11] *Twombly* was a case where the only allegations of conspiracy involved parallel conduct. *Id.* at 564.

*Twombly*, "a conclusory allegation of agreement at some identified point" must supply facts to show illegality. . . . they must be placed in a context that raises a suggestion of a preceding agreement." *Id*. at 556-57. *Twombly* identified additional facts—referred to and described below as "plus factors"—which may indicate collusion when plaintiffs do not have details of the agreement. *Id.* at 553. *Twombly* teaches that such behavior would "probably not result from chance, coincidence, independent response to common stimuli or mere interdependence unaided by an advance understanding among the parties." *Id*. at 556 n.4. But importantly, *Twombly* does not impose a probability standard at the motion to dismiss stage. *Iqbal*, 556 U.S. at 678 (2009). Allegations that plausibly suggest concerted conduct suffice.

Courts generally regard a common motive to conspire, interfirm communications, a pattern of concealment, pretextual explanations for coordinated conduct, market structure and market behavior as "plus factors" that imply a conspiracy. *See Evergreen*, 720 F.3d at 47. Plus factors should be examined holistically and a court should be "wary of placing too much significance on the presence or absence of 'plus factors' at the pleadings stage." *Evergreen*, 720 F.3d at 47; *accord SD3*, 801 F.3d at 424; *see also Swanson*, 614 F.3d at 404 ("For cases governed only by Rule 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences"). Plus factors are not required—"[w]hile [plus factors] are certainly helpful in guiding a court in its assessment

of the plausibility of an agreement in a § 1 case, other, more general allegations informing the context of an agreement may be sufficient. This is particularly true given the increasing complexity and expert nature of 'plus factor' evidence, which would not likely be available at the beginning stages of litigation." *Evergreen*, 720 F.3d at 47.

Here, the Amended Complaint contains ample allegations of "plus factors" that, when taken together as a whole, demonstrate that Defendants conspired to impose unprecedented restrictions on the Relevant Securities. *See Cont'l Ore*, 370 U.S. at 699.

*Interfirm communications.* Plaintiffs alleged direct interfirm communications between high-level employees of Citadel and Robinhood leading up to the imposition of the January 28 trading restrictions. These allegations included direct evidence that Robinhood was "on board" with imposing the restrictions to save Citadel from massive losses if the short squeeze continued unabated. ¶¶ 227-46. The district court concluded that the allegations were "supportive of a conspiracy." Order at 34. But it incorrectly denied Plaintiffs the favorable and plausible inference that flows from that evidence— namely that the parties had reached an illicit agreement—stating instead that the communications only demonstrated "an opportunity to conspire." Order at 34-36.

Ignoring Plaintiffs' well-pleaded allegations, the district court incorrectly offered its own admittedly "alternative explanation[s]" for Defendants' communications— namely, the potential impact that the short squeeze may have on Defendants' PFOF relationship and "each party's ability to fulfill its obligations." Order at 36-37. To support

28

its improper invention of "alternative explanations" for the communications, the district court erroneously relied upon three summary judgment cases to find that Defendants' communications "create an 'equally plausible inference of mere interdependent behavior.'" Order at 36-37 (citing *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1093 (9th Cir. 2015); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987); *Int'l Const. Prods. LLC v. Ring Power Corp.*, No. 5:20-cv-226, 2021 WL 6755717, at *8 (N.D. Fla. Dec. 23, 2021)). And therein lies the legal problem: we are at the motion to dismiss stage, not the summary judgment stage, and "alternative explanations" are not a proper consideration. *See Evergreen*, 720 F.3d at 45 *see also Anderson News*, 680 F.3d at 185 ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."). The district court's use of such explanations to justify dismissal was legal error. *See SD3*, 801 F.3d at 426 (reversing where district court "erroneously looked to summary judgment cases to define the relevant standards" on motion to dismiss antitrust conspiracy claim).

*Common motive to conspire.* Plaintiffs alleged facts showing Defendants had a clear motive to conspire as well as a way to accomplish their intended objective. Citadel needed a way out of the short squeeze, and Robinhood's power over its customers provided Citadel the perfect escape. *See, e.g.*, *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1298 (M.D. Fla. 2016) (finding allegations showing motive

to "make more money" and that defendants "worked closely" was sufficient to infer agreement). Due to Citadel's immense potential losses, and Robinhood's financial dependence on Citadel, especially in light of Robinhood's upcoming IPO, Defendants had ample motive to conspire. ¶¶ 211-20, 316-23. Notably, the district court agreed—it found that "Plaintiffs plausibly allege economic motives for why Citadel Securities and Robinhood might have entered into an anticompetitive agreement." Order at 31.

Rightfully so. It is more than reasonable to infer that Citadel wielded significant influence over Robinhood given the fact Robinhood derived as much as 80% of its revenue from PFOF and that Citadel was responsible for approximately 43% of Robinhood's PFOF revenue in the first quarter of 2021 alone. ¶¶ 75, 80. It is also reasonable to infer that Robinhood would not be able to replace Citadel should Citadel have cut off its relationship with Robinhood. Robinhood admitted as much in its IPO filings with the Securities and Exchange Commission, stating:

> For the three months ended March 31, 2021, 59% of our total revenues came from four market makers. If any of these market makers, or any other market makers with whom we do business, were unwilling to continue to receive orders from us or to pay us for those orders (including, for example, as a result of unusually high volatility), *we may have little to no recourse* and, if there are no other market makers that are willing to receive such orders from us or to pay us for such orders, or if we are unable to find replacement market-makers in a timely manner, *our transaction-based revenue would be impacted negatively.*

¶ 81 (emphasis added). And there would have been no way Robinhood could have brought the IPO to fruition if Citadel withdrew its valuable PFOF revenue. Further,

publicly available data revealed that the bulk of trading activity during the week of January 25, 2021, was attributable to Citadel, i.e., that Citadel was the most active market maker during the trading restrictions. ¶ 281. Publicly available transparency data indicates that Citadel maintained large short positions in the Relevant Securities prior to the restrictions, and that Citadel exited its short positions afterwards, demonstrating that the scheme accomplished its goals. ¶¶ 265-84.

Despite finding that Plaintiffs plausibly alleged a common motive to conspire, the district court then improperly weighed the evidence, found the allegations were "somewhat speculative and conclusory," and rejected them because they "tenuously rest[] upon a series of inferences" Order at 31. This is not the test—the test is whether the inferences are reasonable.[12] *See Delong*, 887 F.2d at 1505; *see also Swanson*, 614 F.3d at 404 ("the court will ask itself *could* these things have happened, not *did* they happen").

---

[12] Indeed, the district court, relying on similar allegations such as Swartwout's advance selling of AMC stock and Howard's internal statements identifying Robinhood's pretextual explanations for the restrictions, determined that the Securities Complaint "allege[d] with particularity that Robinhood knew its restrictions would artificially depress the Affected Stocks, sought to do so, and benefitted from its efforts," and supported a finding of motive or opportunity suggesting scienter under the heightened pleading standards of the Private Securities Litigation Reform Act (PSLRA). Securities Order at 28. The district court's conclusion that the very same allegations "state[d] with particularity facts giving rise to a strong inference" of scienter as required by the PSLRA, 15 U.S.C. § 78u-4(b)(2)(A), but only a weak inference of conspiracy under Rule 8 confirm that the district court improperly applied a heightened pleading standard to Plaintiffs' allegations of conspiracy.

*Acts of concealment.* "[A]cts of concealment are circumstantial evidence of a conspiracy's existence[.]" *In re Urethane Antitrust Litig.*, No. 04-1616, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (alterations added; citing *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011)); *see also United States v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995) ("the act of concealment may be taken as evidence of a conspiracy"). This is so because evidence of concealment serves as evidence of knowledge of wrongful conduct commitment to a common scheme, and of overt actions in furtherance of that scheme. *See id.*

Defendants were purposefully vague in written email discussions, limited substantive discussions of the agreement to telephone calls that were not memorialized, and copied attorneys on emails in order to hide their communications behind the cloak of attorney-client privilege. ¶¶ 228-33, 259-60. Plaintiffs allege specific communications, and that Defendants even communicated *after* the imposition of the trading restrictions to "coordinate messaging." ¶¶ 257-60. A reasonable inference can be drawn from these allegations that Defendants knew that they were engaging in illicit activity and coordinated to provide pretextual explanations. *See In re Pub'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012) ("private phone calls and meetings—for which no social or personal purpose has been persuasively identified" suggested conspiratorial communications).

The district court ignored and misinterpreted these factual allegations, limiting their probative value to the fact that Defendants used the telephone to communicate. Order at 38. In so doing, the district court relied erroneously on *Texas v. Allan Construction Co., Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988), for the proposition that Plaintiffs must allege that Defendants "engaged in some affirmative 'trick or contrivance tending to exclude suspicion and prevent inquiry.'" Order at 37-38. This is incorrect. There is no such requirement—to require allegations of the defendants' state of mind would set the pleading bar so high, that no plaintiff challenging an antitrust conspiracy could ever meet it. To the contrary, circumstantial evidence of this type supports an inference of an agreement without more. *See United States v. Evans*, 572 F.2d 455, 468 (5th Cir. 1978) ("the objective and observable acts of the conspirators are relevant and competent circumstantial evidence from which the jury may draw the inference of the existence of the agreement or common purpose").

    *Concerted pretextual explanations.* Pretextual statements constitute circumstantial evidence of a conspiracy. Like concealment, pretextual statements demonstrate both an acknowledgment of wrongdoing, commitment to a common scheme, and acts in furtherance of the scheme. *See In re McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016); *ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905, 910 (N.D. Ill. 2002); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d

1348, 1360 (N.D. Ga. 2010) ("unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices").

Plaintiffs allege Robinhood made a number of inconsistent statements at odds with the true state of affairs. Robinhood first stated that the reason for restricting trading in the Relevant Securities was due to increased volatility (¶¶ 176, 192, 194), then shifted to blame increased NSCC collateral requirements. ¶ 181. This was demonstrably untrue. Robinhood was in fact able to negotiate down and meet its collateral requirement before the markets opened on January 28, 2021. *Id*. Meanwhile, Robinhood executives internally sang a different tune, attributing the restriction to liquidity problems, which they addressed through the injection of billions of dollars of capital. ¶¶ 180, 261. Further, Robinhood continued to restrict purchases of the Relevant Securities for the entirety of the trading day and continued to impose trading limitations through February 4, 2021, long after any issues regarding volatility, collateral requirements, or liquidity had ended. ¶¶ 183-85, 261, 264.

The district court nonetheless found that "the fact that Robinhood continued to impose restrictions after meeting its collateral requirements is of no moment because the trading restrictions 'reduce[d] the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC.'" Order at 41 (citing Nov. 17, 2021, Order (Doc 438) at 46) (alteration in original). These facts are found nowhere in the Amended Complaint. Indeed, they are at odds with the allegations and facts pleaded. The

34

district court stated "[i]t [was] not suspicious for Robinhood to strive to avoid higher collateral requirements." *Id.* (alterations added). This is not only untrue, but also at odds with the specific allegations of the Amended Complaint. In fact, Robinhood knew it was in no serious threat of being shut down by the NSCC (¶¶ 181-82), and it continued to impose the trading restrictions even *after* it was able to secure $3.9 billion in funding. ¶ 261. The district court also neglected Plaintiffs' allegations on this point that Robinhood's decision was arbitrary because Robinhood, through PFOF, actually **stood to earn larger profits from increased market volatility**. ¶¶ 358-59. Once again, the district court "confused the motion-to-dismiss standard with the standard for summary judgment." *See SD3*, 801 F.3d at 426; *Anderson News*, 680 F.3d at 184.[13]

---

[13] The district court's finding is at odds with its order in the Securities Tranche. There, the district court found that Robinhood's conflicting statements as to its rationale for imposing the trading restrictions created a "particularized inference that Robinhood steered the public spotlight toward market volatility to avoid scrutiny." Securities Order at 49. Notably, the Securities Tranche Complaint alleges violations of Section 9(a) and 10(b) of the Exchange Act and is thus subject to a heightened pleading standard under the PLSRA and Rule 9(b). Plaintiffs here, likewise, allege that Robinhood made conflicting statements as to its rationale for imposing the trading restrictions, which constitutes circumstantial evidence supporting the inference of conspiracy. ¶¶ 180-81, 192, 194. Yet, under the more liberal Rule 8 pleading standard governing Plaintiffs' Sherman Act claim, the district court found otherwise, ascribing two different meanings to the same allegations. In essence, the court found the allegations meet the more stringent standard under Rule 9 but not the more liberal Rule 8 standard. *See SD3*, 801 F.3d at 426 (district court erred at motion to dismiss stage by making explicit findings of fact plainly contradicted by terms of complaint). Further, when discussing Robinhood's internal statement blaming the restrictions on a liquidity problem, the district court stated, "the more compelling explanation for Howard's statement was that she simply misspoke and conflated market volatility and liquidity." Securities Order at 49 (citing Order at 47).

The district court also discredited Plaintiffs' allegation that Robinhood executives' conduct supports the inference that Robinhood had prior knowledge of the restrictions and therefore its purported explanation was pretextual. Order at 39. On January 26, 2021, Swartwout, Robinhood Securities's President and COO, alerted Robinhood employees that he "sold [his] AMC today," and that Robinhood was moving GME to 100% margin the next day. ¶ 234. The district court improperly measured and weighed this allegation to conclude that Swartwout's message related to margin requirements, not trading positions. Order at 39. The quoted language does not say this. Swartwout says he sold his AMC stock in advance of the restrictions, without qualification. *Twombly*, 550 U.S. at 556 ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.") (quoting *Nietzke v. Williams*, 490 U.S. 319, 327 (1989)). Whether Robinhood would ultimately raise margin requirements is irrelevant. In determining whether a complaint states a claim that is plausible, the district court is required to proceed "on the *assumption that all the [factual] allegations in the complaint are true.*" *Id.* at 555 (emphasis added).

*Market structure.* Plaintiffs allege that the structural characteristics of the market in which Defendants operate, including high barriers to entry, high fixed and low variable costs, payment for order flow, and a captive short-term market, render it "ripe for

---

Weighing the statement's credibility was error. *Twombly*, 550 U.S. at 555 (complaint just to be judged "on the assumption that all allegations in the complaint are true (even if doubtful in fact)").

collusion."[14] ¶¶ 221-25, 370-92. Such factual allegations constitute widely accepted circumstantial evidence which makes collusion more likely and an inference of agreement more reasonable in many—if not all—cases. The district court misunderstood the significance of the economic evidence describing Plaintiffs' theory of anticompetitive conduct as "novel." Order at 41-42. There is nothing novel about coconspirators exercising their market power to hamstring market functions and to influence prices, as Robinhood and Citadel did.

Brokerages within the No-Fee Brokerage Market, including Robinhood, are only able to offer their services "commission-free" because market makers, such as Citadel, compensate these brokerages for routing orders to them for execution, i.e., payment for order flow. ¶ 8. In fact, Citadel Investment Group, LLC, the precursor entity to Citadel LLC, which is an affiliate entity of Citadel Securities, called for this "anticompetitive" practice to be banned because it creates a "substantial conflict of interest between broker-dealers and their customers," namely, because brokers have a conflict between routing a customer's order to the market maker with the highest bid for their order flow rather the one with the best price for their customers. ¶¶ 223-24.

---

[14] "Examples of plus factors include evidence of a market structure that is conducive to collusion . . . ." *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. 1:09-CV-00560, 2013 WL 595122, at *11 (E.D. Cal. Feb. 15, 2013), *aff'd*, 803 F.3d 1084 (9th Cir. 2015); *see also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (noting that market structure made collusion more likely).

Further, customers in the No-Fee Brokerage Market are "locked in" to their respective brokerages in the short term. ¶¶ 337-46. When Robinhood set the Relevant Securities to position close only on January 28, 2021, a typical Robinhood customer could not simply withdraw or transfer her funds and open a new account elsewhere because of the time and resources required to do so. *Id.* This provided Defendants with a form of market power. Defendants were able to capitalize on this market characteristic as evidenced by the far-reaching effect that the trading restrictions had. *See*, *e.g.*, ¶ 198. These characteristics rendered the market ripe for collusion.

*Market behavior.* Economic evidence that the market behaved inconsistently with competition can be relied on to infer the existence of an agreement. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002). Robinhood's trading restrictions suspended the operation of supply and demand within the No-Fee Brokerage Market, driving down the share prices of the Relevant Securities. ¶ 354. The district court found in a related case that "Robinhood placed its thumb on the scale of supply and demand when it restricted the sales of the Affected Stocks." Securities Order at 43. But here, the district court reasoned that "Plaintiffs must do more than simply allege that 'market behavior is interdependent and characterized by conscious parallelism.'" Order at 42 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010)). Because Robinhood was not the only brokerage to implement purchasing restrictions on January 28, 2021, the district court found that "the trading restrictions

themselves d[id] not warrant the application of a plus factor." Order at 43 (alteration added).

This misses the point. Robinhood, because of its extensive customer base, had the power to disproportionately impact the overall market. The district court failed to consider Plaintiffs' allegations regarding the scope and timing of the other brokerages' purchasing restrictions, as well as the behavioral characteristics of Robinhood's 17.7 million monthly active customers. *See* ¶¶ 366-67 (other brokerages restricted two or three of the Relevant Securities for a few hours); *see also* ¶ 347 ("Robinhood customers drove 10% of the variation in returns from stocks in the second quarter of 2020, despite holding only about 0.2% of the aggregate U.S. market capitalization.); ¶ 348 ("one out of every 25 shares traded on all U.S. markets in January 2021 traded on Robinhood's platform").

Having set forth the facts individually, when viewed as a whole, the evidence is more than sufficient to infer an agreement. *See Cont'l Ore*, 370 U.S. at 699; *In re Flat Glass Antitrust Litig.*, 385 F.3d at 369 ("A court must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence."). It was error for the district court to not evaluate the evidence holistically and to offer its own alternative explanations for Plaintiffs' well-pleaded allegations. *See Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1229 (11th Cir. 1999).

## II.    THE DISTRICT COURT ERRED IN FINDING PLAINTIFFS FAILED TO PLAUSIBLY ALLEGE AN UNREASONABLE RESTRAINT OF TRADE.

### A.    Plaintiffs were the target of the conspiracy.

The district court's error does not end with its analysis of Plaintiffs' allegations of an anticompetitive agreement. It also erred in finding "[e]ven if Plaintiffs plausibly alleged a conspiracy, they fail to allege an 'unreasonable restraint on competition[.]'" Order at 45 (citation omitted). To the contrary, Plaintiffs have plausibly alleged an unreasonable restraint of trade.[15] Under the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms *consumers* in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (emphasis added). This is precisely what Plaintiffs have alleged.

Before proceeding to a discussion of what the district court found wrong with the Amended Complaint, it is important to emphasize what Defendants and the court did not dispute. Significantly, neither quarreled with Plaintiffs' defined markets, the fact of Defendants' market power in those markets, or that Plaintiffs suffered injury at the hands of the Defendants.

Nor could they. Defendants' conspiracy excluded Plaintiffs from the No-Fee Brokerage Market and reduced output in that market. Both are classic forms of antitrust

---

[15] Plaintiffs assume for the purposes of this appeal that the district court's conclusion that the rule of reason standard applies. Plaintiffs continue to maintain that whether a restraint is viewed as per se illegal or analyzed under the rule of reason is a matter best left for after factual development.

injury. Market exclusion is a paradigmatic antitrust injury. *See Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984) ("Exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs[.]"); *accord Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 967-68 (11th Cir. 2006) ("exclusion from the market [ ] denies consumers the benefit of [competitive] pressure"); *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions"). Reduction of output also results in antitrust injury. *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (evidence of restricted output is "direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power."); *accord Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000) (defendant's ability to restrict output proof of market power); *see also Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (using direct evidence to conclude challenged conduct "impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them").[16]

---

[16] Citadel's leveraging of Robinhood can also be considered bribery, another classic form of antitrust injury. *See*, *e.g.*, *In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827, 2021

41

Instead, the court focused on what it described as a "curious gap between Plaintiffs' defined markets and the injury alleged, which is detrimental to Plaintiffs' antitrust standing." Order at 48. According to the district court, the injury suffered by Plaintiffs was not "antitrust injury" because "the alleged harm to competition occurred in an entirely separate market from the markets Plaintiffs define." *Id*. at 51. From this mistaken premise, the court determined that the Amended Complaint failed to set forth a restraint of trade. *Id*. at 52.

The district court's erroneous finding of a "gap" is rooted in a misunderstanding of Plaintiffs' allegations. Plaintiffs alleged two interlocking relevant markets, the PFOF market and the consumer-facing No-Fee Brokerage Market. ¶¶ 305-15. Plaintiffs are consumers in the No-Free Brokerage Market, i.e., the very market in which the injury took place. ¶¶ 23-41. Thus, contrary to the district court's conclusion, there is no "gap" between the injury suffered and the relevant antitrust market. And Plaintiffs' injury occurred as a direct result of Defendants' anticompetitive agreement and exercise of their market power. Preventing such consumer injury is at the very heart of the antitrust laws. *See*, *e.g.*, *Mw. Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 721 (11th Cir. 1984) ("The antitrust laws are designed to protect the consumer interest in competition.")

---

WL 147166, at \*24-25 (D. Minn. Jan. 15, 2021). Bribery can reduce or eliminate market functions and thereby cause anticompetitive harm. In particular, "bribery can be anticompetitive when it 'rob[s] the ultimate purchaser of the opportunity to choose [a] product.'" *Id*. (citation omitted); *see also DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 58 (1st Cir. 1999).

(citation omitted); *see also Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 486 n.10 (1977) (noting that treble damages remedy under the federal antitrust laws was designed to be a remedy for consumers).

Even if there were a "gap"—and there is not—it would be irrelevant here. What matters is not whether there is a connection between the defined markets and where the harm occurred, but whether Plaintiffs were the target of the anticompetitive conduct. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) ("'The [Clayton] Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.'") (citation omitted). "All that is required is that the plaintiff be in the sector of the economy which is the target of the antitrust violation" or a "foreseeable victim of the anti-competitive conduct." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1494 (11th Cir. 1985) (citations omitted). They were.

There is no question that Plaintiffs were the target of Defendants' scheme to prevent them and other consumers from purchasing the Relevant Securities. Indeed, prohibiting consumers from purchasing the Relevant Securities was the point. As this Court has acknowledged, the targets of anticompetitive conduct at the hands of conspirators with market power have suffered competitive injury and have standing to sue. *See Amey*, 758 F.2d at 1494; *see also Ekbatani v. Cmty. Care Health Network, LLC*, No. 21-12322, 2022 WL 31793, at *2 (11th Cir. Jan. 4, 2022) (finding a plaintiff can

establish antitrust standing if injury is "a necessary component of the alleged anticompetitive purpose.") (internal quotation marks omitted) (citing *McCready*, 457 U.S. at 479).

In any event, the two markets alleged here are inextricably intertwined because Citadel is a market maker that pays Robinhood for its order flow, and Robinhood could not offer commission-free trading without Citadel's PFOF revenue. ¶¶ 2, 4, 73. Citadel's leverage over Robinhood in the PFOF Market is what enabled Citadel to extract an agreement from Robinhood to suspend market functions in the No-Fee Brokerage Market. ¶¶ 221-22. Thus, the conspiracy was successful only because both Citadel had power over Robinhood, and Robinhood had power over the consumers in its market. ¶¶ 324-36, 352. It takes two to tango, so to speak.

Put another way, Plaintiffs' interlocking market definitions reflect the market as consumers experience it, as described by Defendants themselves. Robinhood is able to offer no-fee brokerage services only because of the PFOF income it received from Citadel. ¶¶ 2, 4, 312, 351. Customers input their trades on Robinhood's app, and do not interact in the PFOF Market. And the PFOF Market is directly intertwined with the No-Fee Brokerage Market as it is necessary for brokerages to be able to sustain a no-fee transaction business model. *Id*. Consumers never deal directly with market makers such as Citadel but must transact through Robinhood. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992).

44

The Supreme Court has long recognized that cognizable injuries on consumers can be inflicted by a single antitrust conspiracy where participants operate in distinct levels of distribution. *See McCready*, 457 U.S. at 474-75 (finding antitrust standing for a consumer alleging her costs were increased due to a conspiracy between an insurance provider and psychiatrists). In *McCready*, the plaintiff was a consumer that purchased psychotherapy services. *Id.* at 468. The plaintiff challenged the agreement between psychiatric providers and a health insurer, alleging an unlawful conspiracy to exclude psychologists from receiving compensation under certain health insurance plans. *Id.* Defendants challenged the complaint on the grounds that the plaintiff was not a participant in the market where the restraint occurred. *Id.* at 470-71. The Supreme Court rejected this argument and held that plaintiff was still the target of the anticompetitive harm and suffered antitrust injury due to the foreseeable consequence stemming from the lack of reimbursement for health care beneficiaries. *Id.* at 474-75. This Court has readily applied *McCready* to determine plaintiffs have antitrust standing to vindicate their claims. *See*, *e.g.*, *Amey*, 758 F.2d at 1494 (applying *McCready*); *Constr. Aggregate Transp. Inc. v. Fla. Rock Indus. Inc.*, 710 F.2d 752, 764 (11th Cir 1983) (same). Other circuits have also accepted that antitrust standing can be found when the Defendants' restraints are in another market but target consumers in an intertwined market. *See*, *e.g.*, *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 Fed. App'x 231, 235-36 (9th Cir. 2020) (applying *McCready*); *Hanover 3201 Realty, LLC v. Village*

45

*Supermarkets, Inc*., 806 F.3d 162, 173-74 (3rd Cir. 2015). Thus, harm can be shown by market power and anticompetitive conduct involving concerted action by firms at or in different levels of distribution, e.g., in upstream and downstream markets, that affect the consumers of those markets. *See Constr. Aggregate Transp.*, 710 F.2d at 763. And Plaintiffs here have alleged sufficient facts to establish standing to pursue such claims.

*Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002), is also instructive. In *Loeb*, buyers of copper and copper products brought, *inter alia*, antitrust claims on the basis that Sumitomo, a trading corporation, conspired with copper merchants to restrict the supply of the copper market. *Id.* at 477-78. Sumitomo entered into sham long term contracts with the copper merchants that purportedly required it to purchase large amounts of copper and which Sumitomo justified as a "hedge." *Id.* At the same time, Sumitomo "began to call in shorts in order to raise copper demand to inflated levels and reap the profits from its sales." *Id.* at 477. This served to disrupt the copper market, distorting supply and demand. *Id.* When the contracts came due, copper traders were forced to cover their short future positions by acquiring copper at inflated prices because the quantity of copper was suppressed due to the Sumitomo's illegal accumulation of copper. *Id.* Relying on *McCready*, the circuit court found that the copper traders who purchased copper at inflated prices alleged their injuries in the proper market, even though Sumitomo and the merchants were on different levels of distribution. *See id.* at 481-84 ("we conclude that damage from the defendants' conduct was felt in two

46

separate markets: the futures market and the physical copper market"). These facts were no impediment to antitrust standing because the plaintiffs were directly injured by anticompetitive conduct. *See id.*

Similarly, in *Construction Aggregate Transport Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752 (11th Cir. 1983), defendants claimed the plaintiff's market definition was wrong because defendants were in the business of aggregate production of stone and not aggregate hauling. *Id*. at 763. Plaintiff was an aggregate hauler of stone, and defendants argued that plaintiff had no standing because they were not engaged in any anticompetitive activity targeting the market in which plaintiff operated. *Id*. In other words, because plaintiff was downstream of defendants, there was no harm to competition in the market where plaintiff operated. *See id.* This Court disagreed:

> In our view, FRI characterizes CAT's allegations much too narrowly. The complaint clearly alleges that FRI attempted to eliminate competition from CAT in the aggregate hauling industry. According to the complaint, therefore, one area of the market that would be adversely affected by the alleged conduct of FRI would be the aggregate hauling industry. CAT clearly operated within this market; examination of the complaint thus demonstrates CAT's standing to challenge FRI's alleged anticompetitive behavior.

*Id*.; *see also id.* at 764 ("the Supreme Court recently sanctioned an analysis of [antitrust] standing which expressly recognizes that different areas of the market may be so closely related that both may be targets of the same anticompetitive act.") (citing *McCready*, 457 U.S. 465).

47

As *McCready*, *Loeb*, and *Construction Aggregate Transport* hold, that conspirators operate separately in upstream and downstream markets is no bar to finding that their concerted actions caused antitrust injury and that plaintiffs have standing under the antitrust laws to pursue their claims. Here, Citadel, who operated in the upstream PFOF Market conspired with Robinhood, who operated in the downstream No-Fee Brokerage Market to restrict consumers of Robinhood from purchasing the Relevant Securities and thereby preventing the market from functioning. There is no meaningful difference than the facts in *Loeb*, where the downstream copper merchants conspired with Sumitomo, the upstream purchaser of trading contracts, to disrupt market functions and to distort prices in the separate copper futures market, causing copper traders to pay inflated prices. *See Loeb*, 306 F.3d at 482 ("the alleged conspiracy operated in the separate but related futures market, through which it sought directly to manipulate the price of copper the plaintiffs were buying"); *see also McCready*, 457 U.S. at 480 ("McCready does not allege a restraint in the market for group health plans. Her claim of injury is premised on a concerted refusal to reimburse under a plan that was, in fact, purchased and retained by her employer for her benefit . . ."). That the district court failed to recognize this is error.

This brings us back to our simple and threshold point—Plaintiffs are the necessary and foreseeable targets of the anticompetitive scheme, which this Court has recognized is sufficient to allege antitrust injury. *Amey*, 758 F.2d at 1494; *see also Ekbatani*, 2022

WL 31793, at *2 (finding plaintiff can establish antitrust standing "if its injury is inextricably intertwined with the injury the conspirators sought to inflict on the market") (citation and internal quotation marks omitted, cleaned up). The injury suffered by Plaintiffs is precisely what Defendants set out to cause through their scheme. ¶¶ 1-2, 154, 197. Citadel and Robinhood's scheme would not work unless Plaintiffs, who are Robinhood users and consumers of the No-Fee Brokerage Market, were foreclosed from purchasing the Relevant Securities. ¶¶ 393-97, 400. "Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations . . . would be likely to cause." *McCready*, 457 U.S. at 479 (internal quotation marks omitted). And this remains true where coconspirators operated on different levels of distribution to harm consumers. *See generally*, *e.g.*, *Laumann v. Nat'l Hockey Leagu*e, 907 F. Supp. 2d 465, 474 (S.D.N.Y. 2012) (holding that agreements to eliminate competition in distribution of baseball and hockey between upstream and downstream market constituted injury to consumers); *see also Apple, Inc. v. Pepper*, 139 S. Ct.1514, 1521-24 (2019) (finding standing for downstream purchasers of mobile apps through defendant's app store); *Lowell*, 177 F.3d at1232 (finding antitrust standing in vertical agreement antitrust case where plaintiff brought "claims directly against a conspiring party in the chain of distribution"). Any other result would run counter to long established precedent and would frustrate

fundamental principles of private enforcement of the antitrust laws. *See*, *e.g.*, *McCready*, 457 U.S. at 475.

**B.      Plaintiffs have pleaded the remaining element of antitrust standing.**

While Plaintiffs have plainly demonstrated that the district court's determination of a "gap" between the alleged injury and defined markets was error, Plaintiffs meet the remaining element of antitrust standing. This was not in dispute below. This Court has "instructed the district courts to employ a two-prong test for antitrust standing. First, the plaintiff must allege both a violation of the antitrust laws resulting in 'antitrust injury,' defined as an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'" *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1287 (S.D. Fla. 2018) (citing *Brunswick Corp.*, 429 U.S. at 489). "Second, the plaintiff must allege facts sufficient to show that it is an "efficient enforcer" of the antitrust laws." *Id.* (citing *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010)).

As explained in Section II.A, *supra*, Plaintiffs were injured by the conspiracy in the very relevant market alleged in the complaint and were the target of Defendants' conspiracy. Thus, Plaintiffs do not belabor the point—they have suffered paradigmatic antitrust injuries as consumers in the relevant market defined in the Amended Complaint, the No-Fee Brokerage Market.

50

As to the second prong test, neither Defendants nor the district court denied that Plaintiffs, assuming they alleged anticompetitive injury, are efficient enforcers of that antitrust injury. Defendants did not raise this point below and the district court's order made no suggestion to the contrary. Indeed, Plaintiffs are directly injured by the anticompetitive conspiracy and are the best situated to vindicate the harm. *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1451 (11th Cir. 1991).

In summary, Plaintiffs have sufficiently alleged that they suffered an antitrust injury and have standing to seek redress for that injury.

## **CONCLUSION**

For the foregoing reasons, the judgment below should be reversed.

JOSEPH R. SAVERI
California Bar No. 130064
CHRISTOPHER K.L. YOUNG
California Bar No. 318371
ABRAHAM A. MAGGARD
California Bar No. 339949
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, California 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
Email: jsaveri@saverilawfirm.com
        cyoung@saverilawfirm.com
        amaggard@saverilawfirm.com

**/s/Steven L. Brannock**
FRANK R. SCHIRRIPA
New York Bar No. 4103750
KATHRYN A. HETTLER
New York Bar No. 5126065
HACH ROSE SCHIRRIPA & CHEVERIE LLP
112 Madison Avenue, 10th Fl.
New York, New York 10016
Tel:  (212) 213-8311
Fax: (212) 779-0028
Email:  fschirripa@hrsclaw.com
        kh@hrsclaw.com

STEVEN L. BRANNOCK
Florida Bar No. 319651
SAMUEL J. SALARIO, JR.
Florida Bar No. 83460
BRANNOCK HUMPHRIES
  & BERMAN
1111 W. Cass Street, Suite 200
Tampa, Florida 33606
Tel: (813) 223-4300
Fax: (813) 262-0604
Email: sbrannock@bhappeals.com
       ssalario@bhappeals.com

*Counsel for Appellants Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling*

## CERTIFICATE OF COMPLIANCE

**Type-Volume**: This brief complies with the type-volume limits of FRAP 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by FRAP 32(f) and 11th Cir. Rule 32-4, this document contains 12,933 words.

**Typeface and Type-Style**: This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

**/s/Steven L. Brannock**
STEVEN L. BRANNOCK
Florida Bar No. 319651

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on October 14, 2022, a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served on counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

**/s/Steven L. Brannock**
STEVEN L. BRANNOCK
Florida Bar No. 319651