# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
### Case No. 22-11873

ANGEL GUZMAN, et al.,

     Appellants,

v.

ROBINHOOD MARKETS, INC., et al.,

     Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:21-md-02989-CMA

_____

## APPENDIX TO APPELLANTS' BRIEF
## VOLUME III OF III

_____

JOSEPH R. SAVERI
California Bar No. 130064
CHRISTOPHER K.L. YOUNG
California Bar No. 318371
ABRAHAM A. MAGGARD
California Bar No. 339949
JOSEPH SAVERI LAW FIRM,
LLP
601 California Street, Suite 1000
San Francisco, California 94108
Tel:  (415) 500-6800
Fax: (415) 395-9940
Email: jsaveri@saverilawfirm.com
    cyoung@saverilawfirm.com
    amaggard@saverilawfirm.com

FRANK R. SCHIRRIPA
New York Bar No. 4103750
KATHRYN A. HETTLER
New York Bar No. 5126065
HACH ROSE SCHIRRIPA & CHEVERIE
LLP
112 Madison Avenue, 10th Fl.
New York, New York 10016
Tel:  (212) 213-8311
Fax: (212) 779-0028
Email:  fschirripa@hrsclaw.com
    kh@hrsclaw.com

STEVEN L. BRANNOCK
Florida Bar No. 319651
SAMUEL J. SALARIO, JR.
Florida Bar No. 83460
BRANNOCK HUMPHRIES
   & BERMAN
1111 W. Cass Street, Suite 200
Tampa, Florida 33606
Tel: (813) 223-4300
Fax: (813) 262-0604
Email:  sbrannock@bhappeals.com
       ssalario@bhappeals.com

*Counsel for Appellants Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling*

## APPELLANTS' APPENDIX TO BRIEF
## VOLUME I

| Docket No. | Description | Date |
|---|---|---|
| --- | Docket | 10/18/22 |
| 446 | Consolidated Class Action Complaint (related to all actions involving federal securities laws) | 11/30/21 |

## APPELLANTS' APPENDIX TO BRIEF
## VOLUME II

| Docket No. | Description | Date |
|---|---|---|
| 451 | Amended Complaint | 1/20/22 |
| 456 | Motion to Dismiss | 2/18/22 |

## APPELLANTS' APPENDIX TO BRIEF
## VOLUME III

| Docket No. | Description | Date |
|---|---|---|
| 459 | Antitrust Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint | 3/11/22 |
| 463 | Defendants' Reply in Support of Their Motion to Dismiss the Amended Antitrust Tranche Complaint | 3/25/22 |
| 470 | Order granting motion to dismiss amended antitrust tranche complaint | 5/12/22 |
| 503 | Order denying motion to dismiss federal securities tranche complaint | 8/11/22 |

Filed this 21st day of October 2022.

/s/Steven L. Brannock

JOSEPH R. SAVERI
California Bar No. 130064
CHRISTOPHER K.L. YOUNG
California Bar No. 318371
ABRAHAM A. MAGGARD
California Bar No. 339949
JOSEPH SAVERI LAW FIRM,
LLP
601 California Street, Suite 1000
San Francisco, California 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
Email: jsaveri@saverilawfirm.com
        cyoung@saverilawfirm.com
        amaggard@saverilawfirm.com

STEVEN L. BRANNOCK
Florida Bar No. 319651
SAMUEL J. SALARIO, JR.
Florida Bar No. 83460
BRANNOCK HUMPHRIES
   & BERMAN
1111 W. Cass Street, Suite 200
Tampa, Florida 33606
Tel: (813) 223-4300
Fax: (813) 262-0604
Email: sbrannock@bhappeals.com
        ssalario@bhappeals.com

FRANK R. SCHIRRIPA
New York Bar No. 4103750
KATHRYN A. HETTLER
New York Bar No. 5126065
HACH ROSE SCHIRRIPA & CHEVERIE
LLP
112 Madison Avenue, 10th Fl.
New York, New York 10016
Tel:  (212) 213-8311
Fax: (212) 779-0028
Email:  fschirripa@hrsclaw.com
        kh@hrsclaw.com

*Counsel for Appellants Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling*

# Doc 459

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

IN RE:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to:

ALL ANTITRUST ACTIONS

**ANTITRUST PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................... 2

    A.   The January 2021 Short Squeeze .................................................... 3

    B.   Robinhood's Unprecedented Trading Restrictions ......................... 4

III. STANDARD OF REVIEW ...................................................................... 4

IV.  ARGUMENT ......................................................................................... 5

    A.   Plaintiffs Plausibly Allege an Anticompetitive Agreement .................. 7

        i.    Defendants' Communications and Conduct Support the Inference of a Conspiracy ............................................................. 9

        ii.   Defendants' Pattern of Concealment Infers a Conspiracy ...................... 14

        iii.  Additional Circumstantial Evidence of the Scheme ............................... 15

        iv.   Defendants' Proffered Alternative Explanations Create a Factual Dispute And Do Not Suggest Plaintiffs' Allegations Are Implausible ................... 18

    B.   Plaintiffs Plausibly Plead an Unreasonable Restraint on Trade ........................... 21

        i.    The Court Should Not Determine at the Motion to Dismiss Stage Whether to Apply *Per Se* or Rule of Reason Treatment ......................................... 21

        ii.   Alternatively, the Court Should Find that the Agreement Qualifies for *Per Se* Treatment .................................................. 22

        iii.  Plaintiffs Have Established a Conspiracy Under the "Quick Look" Approach and the Rule of Reason .......................................... 23

        iv.   Plaintiffs' allegations suffice under the rule of reason .......................... 24

V.   Plaintiffs' Claims Are Not Preempted by the Federal Securities' Law ........................ 32

    A.   Dodd-Frank Act's Antitrust Savings Clause Applies to Plaintiffs' Claims ........... 32

    B.   The *Billing* Factors Weigh Against Preclusion of Plaintiffs' Claims ................... 34

        i.    The Underlying Conduct at Issue Is Not Central to the Functioning of Well-Regulated Capital Markets ........................................ 35

        ii.   The SEC Is Not Authorized to Regulate the Activities in Question ........ 36

        iii.  The SEC Is Not Exercising its Authority over the Conduct at Issue ........ 37

        iv.   There is No Conflict Between Antitrust and Securities Laws ................ 38

VI.  CONCLUSION ...................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126 (D.D.C. 2018) ...................................................................................................31

*Albrecht v. Herald*, 390 U.S. 145 (1968) ...................................................................13

*Andrx Pharms., Inc. v. Elan Corp.*, 421 F.3d 1227 (11th Cir. 2005)............................5

*Apple, Inc. v. Pepper*, 139 S. Ct. 1514 (2019) ..............................................................27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...........................................................................5

*Associated News, Inc. v. Curtis Circulation Co., Inc.,* Civ. A. No. H-80-1201, 1986 WL 13791 (S.D. Tex. Dec. 4, 1986) .................................................................8

*Battle v. Lubrizol Corp.*, 673 F.2d 984 (8th Cir. 1982) ...........................................7, 23

*Belcher v. Atl. Capital Realty, LLC*, 2010 WL 11507399 (M.D. Fla. Sep. 17, 2010) ...........................................................................................................................14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................... *passim*

*In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172 (N.D. Ala. 2014) ...........................................................................................................................21

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988)....................................22

*Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756 (1999).............................23, 24

*ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905 (N.D. Ill. 2002)..........18

*City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730 (N.D. Ill. 2019) ..................9, 21

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ...................1, 7

*Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 3:15-cv-734-J-20JRK, 2015 WL 9987969 (M.D. Fla. Nov. 4, 2015)........................... *passim*

*In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ..........................................................................34

*Credit Suisse Securities (USA) LLC v. Billing,* 551 U.S. 264 (2007) ................... *passim*

*Dahl v. Bain Capital Partners, LLC*, 589 F. Supp. 2d 112 (D. Mass. 2008)................37

*In re Dealer Mgmt. Sys. Antitrust Litig.*, MDL 2817, 2022 WL 199271 (N.D. Ill. Jan. 21, 2022) ........................................................................................15

*DeLong Equip Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499 (11th Cir. 1989)........................7

*In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348 (N.D. Ga. 2010) ........................................................................................8, 9, 18

*In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272 (M.D. Fla. 2016) ........................................................................................ *passim*

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128 (2d Cir. 2009)................ *passim*

*In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827, 2021 WL 147166 (D. Minn. Jan. 15, 2021) ........................................................................................30

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs., & Antitrust Litig.*, 336 F. Supp. 3d 1256 (D. Kan. 2018)........................................................................................22

*Erickson v. Pardus*, 551 U.S. 89 (2007) ........................................................................................4

*ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547 (8th Cir. 1991) ................................................33

*Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986) ................................28, 29

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)..........................24

*Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659 (1975) ................................................................34

*California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118 (9th Cir. 2011)..................................23

*Helicopter Support Sys. Inc., v. Hughes Helicopter, Inc.*, 818 F.2d 1530 (11th Cir. 1987) ........................................................................................8

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ..........................17

*In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..................21, 22

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738 (1976) ................................................5, 7

*Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214 (S.D. Ohio 2019)..............................21

*In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017)........................34

*Interstate Cir., Inc. v. United States*, 306 U.S. 208 (1939)..........................................................11

*Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158 (7th Cir. 1987)........................................12, 13

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698 (7th Cir. 1984) ........................19

*Jackson v. Wal-Mart Stores, Inc.*, 753 F. App'x 866 (11th Cir. 2018)...........................................5

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010)............................2, 25, 28, 29

*Kalmanovitz v. G. Heilman Brewing Co.*, 769 F.2d 152 (3d Cir. 1985)........................27, 35, 36

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit.*, 507
    U.S. 163 (1993)..........................................................................................................5, 25, 27

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) .............................21

*Lucasys Inc. v. PowerPlan, Inc.*, No. 20-cv-2987, 2021 WL 5279391 (N.D. Ga.
    Sep. 30, 2021) ..................................................................................................................24

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002)......................31, 32

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, Nos. 08-cv-7746 (BSJ), 08-
    cv-7747 (BSJ), 2010 WL 430771 (S.D.N.Y. Jan. 26, 2010) ..........................................38

*In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124 (D.D.C. 2016) ......................................18

*In re Mid-Atl. Toyota Antitrust Litig.*, 560 F. Supp. 760 (D. Md 1983) .................................8

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)...........................................8, 13

*In re NASDAQ Mkt-Makers Antitrust Litig.*, 172 F.R.D. 119 (S.D.N.Y. 1997) ....................30, 35

*Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038 (9th Cir. 2008)...................................25

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ...........................................24, 26, 28

*Palm Beach Golf Ctr-Boca, Inc. v. Sarris*, 781 F.3d 1245 (11th Cir. 2015) ...............................27

*Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016) .............................................21, 22

*Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*, 917 F3d 1249
    (11th Cir. 2019)..................................................................................................................6

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995).....................................28

*In re Salmon*, Case No. 19-21551-CIV-ALTONAGA/Louis, 2021 WL 1109128
    (S.D. Fla. Mar. 23, 2021) ...................................................................................... *passim*

*Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555 (11th Cir. 1991) ......................................7

*Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183 (11th Cir. 2004)..........................5

*Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns.*, 376 F.3d 1065 (11th
    Cir. 2004) ..................................................................................................................24, 25

*Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001) ......................................................................................................13, 14

*Stewart Glass & Mirror, Inc. v. U.S.A. GLAS, Inc.*, 17 F. Supp. 2d 649 (E.D. Tex. 1998) ........................................................................................................................15

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)............................................5, 25, 27

*In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp 2d 1279 (S.D. Fla. 2005) ........................................................................................................................22

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ....................................................25

*Tops Mkts. Inc. v. Quality Mkts. Inc.*, 142 F.3d 90 (2d Cir. 1998) ............................24

*Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928 (7th Cir. 2000) ...................28

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986 (11th Cir. 1993) ...................25

*United Am. Corp. v. Bitmain, Inc.*, No. 18-CV-25106, 2021 WL 1807782 (S.D. Fla. Mar. 31, 2021) ...........................................................................................7

*United States v. Alex. Brown & Sons*, 963 F. Supp. 235 (S.D.N.Y. 1997) ...................31

*United States v. Container Corp. of Am.*, 393 U.S. 333 (1969)....................................11

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ......................................7

*United States v. Gacnik*, 50 F.3d 848 (10th Cir. 1995)...............................................14

*United States v. Microsoft Corp.*, 253 F.3d 34 ...........................................................28

*United States. v. Parke, Davis & Co.*, 362 U.S. 29 (1960)....................................11, 13

*United States v. Seigler,* 990 F.3d 331 (4th Cir. 2021)................................................15

*Univ. Express, Inc. v. U.S. Sec. Exchange Comm'n*, 177 F. App'x 52 (11th Cir. 2006) ........................................................................................................................38

*Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755-RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) .....................................................................................32

*In re Urethane Antitrust Litig.*, 2013 WL 2097346 (D. Kan. May 15, 2013) ...............14

*Vernon v. Med. Mgmt. Assocs. of Margate, Inc.*, 912 F. Supp. 1549 (S.D. Fla. 1996) ...................................................................................................................27, 31

*Williamson Oil Co., Inc. v. Phillip Morris, USA*, 346 F.3d 1287 (11th Cir. 2003) .......15

## Statutes

Clayton Act, 15 U.S.C. § 12 ................................................................33, 34

Dodd-Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1376 ................. *passim*

Securities Exchange Act of 1934, 15 U.S.C. § 78o ............................................. *passim*

Sherman Act, 15 U.S.C. § 1 .................................................................. *passim*

## Other Authorities

2 AREEDA & HOVENKAMP, ANTITRUST LAW 264 ¶ 305(e) ....................................21, 23

17 C.F.R. §§ 240.15a-1 to 240.15c6-1 .....................................................37, 39

17 C.F.R. §§ 242.100 to -105 ..............................................................37, 39

156 CONG. REC. E1347-01 (2010) ..............................................................33

SEC. SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021),
    https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-
    trading-based-socialmedia-investor-alert ..............................................39

SEC Staff Report, *SEC, Staff Report on Equity and Options Market Structure
    Conditions in Early 2021* (October 14, 2021), available at
    https://www.sec.gov/files/staff-report-equity-options-market-struction-
    conditions-early-2021.pdf. .....................................................32, 38, 40

*Shortening the Securities Transaction Settlement Cycle*, Release No. 34-94196
    (issued February 9, 2022) (publication in Federal Register forthcoming) (to be
    codified at 17 C.F.R. pts. 232, 240, and 275), available at
    https://www.sec.gov/rules/proposed/2022/34-94196.pdf ......................................37

## I.    INTRODUCTION

Plaintiffs' Amended Consolidated Class Action Complaint (the "Amended Complaint")[1] alleges with requisite specificity that Defendants entered into an agreement, culminating in never-before-seen trading restrictions that eliminated the ability of ordinary Retail Investors' ability to purchase the Relevant Securities. Pursuant to that agreement, Defendants restrained Retail Investors' ability to purchase shares in the Relevant Securities, in a scheme to suppress the stock prices of the Relevant Securities in order to protect Citadel Securities's exposed short position. Defendants' restraint resulted in significant decreases in the price of the Relevant Securities resulting in unfathomable losses to the stock holdings of ordinary Retail Investors.

Defendants challenge the sufficiency of the Amended Complaint on three incorrect grounds.[2] ***First***, Defendants argue that the ample allegations of fact contained in the Amended Complaint amount only to ordinary business communications between two business partners and that their conduct was otherwise innocent. This is wrong. Plaintiffs plausibly allege specific actions of Defendants' executives before and after the trading restrictions, a pattern of suspicious communications before and after the imposition of the trading restrictions, and the unprecedented nature of the restraints, which when viewed as a whole, without dismembering it into parts, a jury can support the inference of an anticompetitive agreement. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (illegal agreement "not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole") (internal quotation marks omitted). As before, Plaintiffs allege facts that show market conditions made the market susceptible to anticompetitive and unlawful collusion; that Defendants had a motive to collude, and that the market behaved in an anticompetitive manner. Plaintiffs also detail Defendants' pretextual explanations and mischaracterizations of their conduct. Defendants' alternative explanations of their conduct with facts outside the Amended Complaint only serve to identify factual disputes, inappropriate to resolve at this juncture.

***Second***, Defendants assert that Plaintiffs have failed to set forth the remaining elements of a Section 1 claim. Defendants' request that the Court determine at this juncture that the rule of

---

[1] "¶ __" citations are to the Amended Complaint unless otherwise indicated.

[2] Defendants' motion to dismiss largely rehashes the arguments levied against Plaintiffs initial consolidated class action complaint. Plaintiffs have heard the Court's concerns and addressed them in the Amended Complaint. *See* ECF No. 438 (the "MTD Order"). Defendants seem to largely ignore Plaintiffs' new allegations.

reason applies to Plaintiffs' claim is premature given the fact-bound nature of the inquiry. Nonetheless, the Amended Complaint sets forth a paradigmatic anticompetitive agreement with the purpose and effect to reduce output and degrade quality—that is a *per se* violation. Even were the rule of reason to apply, Plaintiffs' allegations should be sustained. Plaintiffs allege the anticompetitive effects of the agreements through facts which constitute direct and indirect proof. The Amended Complaint sets forth the geographic market and product features of the market in which Defendants operate. Further, the Amended Complaint sets forth that Defendants have market power in the relevant market and that Defendants wielded that market power to effectuate actual detrimental effects in the relevant market. And Rule 12 dismissals are disfavored when predicated on fact-intensive relevant market grounds. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010).

*Third*, Defendants argue that regardless of whether the Amended Complaint sets forth a cognizable antitrust claim, the Amended Complaint cannot continue because Plaintiffs' claims are preempted by the securities' law. This argument also falls short. There is no repugnancy between antitrust law and securities law here. Even assuming *arguendo* that there were, Congress has already determined that Plaintiffs' antitrust claims should move forward by embedding into the Dodd-Frank Act an expansive savings clause applicable to Plaintiffs' claims. 12 U.S.C. § 5503 (2012). Further, Defendants mischaracterize what investigation has occurred, and lean heavily on a report prepared by the SEC's staff, which by its own terms, is of limited precedential value and does not purport to be the conclusive results of an investigation.

## II.    FACTUAL BACKGROUND

Robinhood provides commission-free securities trading services for consumers through a commission-free app-based platform. ¶ 43, 68-69, 305. By pioneering commission-free trading and offering an easy-to-use investment mobile app, Robinhood was able to capture millions of Retail Investors. ¶ 324. Instead of receiving a commission, Robinhood earns revenue by routing its customer trade orders to market makers (e.g., Citadel) in exchange for a fee, a process known as payment for order flow ("PFOF").[3]

---

[3] As set forth in the Amended Complaint, this comprises the Relevant Services Market, i.e., the market for securities trading services. ¶ 305. This market is defined by a downstream consumer-facing market comprised of no-fee brokerage trading applications and an upstream market comprised of market makers that pay brokerage firms for order flow. ¶¶ 306-15.

Citadel is a leading market maker; it fills orders it receives from brokers from its available inventory or routes the order to an exchange or off-exchange. ¶¶ 8-10, 48. Indeed, PFOF revenue, particularly the PFOF revenue that Robinhood receives from Citadel, is Robinhood's lifeblood; Robinhood derives as much as 80% of its revenues from PFOF. ¶ 75. In the first quarter of 2021 alone, Citadel was responsible for approximately 43%, or over $141 million, of Robinhood's PFOF revenue. ¶ 80. Robinhood's relationship with Citadel is so close that it has been repeatedly described as a "partnership." ¶ 244-45. Given that Robinhood was planning on an initial public offering ("IPO") in 2021, Citadel's PFOF was critical to Robinhood's growth. ¶¶ 82, 318.

As recognized by the SEC, PFOF creates conflicts of interest because of the tension between maximizing PFOF and routing customer orders to the best markets. ¶ 223. Citadel itself once advocated that PFOF should be "banned" because it was "anti-competitive." ¶ 224.

### A.    The January 2021 Short Squeeze

Leading up to January 27, 2021, Retail Investors such as Plaintiffs, based on their research and observations, invested in the Relevant Securities primarily on the Robinhood platform, and, as a result, the price of the Relevant Securities surged resulting in a "short squeeze." ¶¶ 23-41, 92-101, 127-43; *see also* ¶¶ 108-26 (describing short squeezes and gamma squeezes). Meanwhile, Citadel's short positions exposed it to massive losses if the price of the Relevant Securities continued to rise—which is exactly what happened. ¶¶ 12, 199-208.

Rather than allow the market and competitive forces to operate, Defendants hatched an anticompetitive scheme whereby Robinhood would agree to restrain trade and Citadel would protect its short position. In exchange, Citadel would execute trades on the threat of ceasing PFOF to Robinhood. During the same period, Robinhood executives also sold positions in the Relevant Securities In the week prior to restricting trading, Citadel Securities and Robinhood engaged in a series of communications. On Monday, January 25, 2021, in an email exchange between Robinhood executives and Citadel's Head of Execution Services, Robinhood informs Citadel that, "We are on board" and took steps to further the arrangement. ¶ 230-233. On January 26, Robinhood Securities President and COO James Swartwout alerted other high-level Robinhood employees that he had sold his own shares of AMC, one of the Relevant Securities, further evidencing advance knowledge of the restriction on trading. ¶ 234. On January 27, Citadel Securities "requested to speak that evening" with Robinhood. ¶ 237. In internal

messages, Robinhood executives indicated they believed that Citadel Securities would make demands regarding PFOF. *Id.* While no one documented what was said, it is evident that Robinhood and Citadel Securities communicated that evening, and Robinhood's Swartwout described internally that the discussions were a "total mess." ¶ 241. The communications continued into the night. When Robinhood's Swartwout asked for new "numbers," a Citadel employee revealed that those numbers were "[f]irming up" in light of a "follow up" conversation between Robinhood's Chief Legal Officer Dan Gallagher and Citadel. ¶ 242.

### B.   Robinhood's Unprecedented Trading Restrictions

On January 28, 2021, Robinhood implemented a historic and unprecedented restriction on purchasing the Relevant Securities on its platform. Robinhood moved the Relevant Securities to position close only ("PCO"), meaning that Robinhood users could sell, but were foreclosed from purchasing the Relevant Securities. ¶ 179. In public statements, Robinhood attributed this unprecedented move to the NSCC collateral call it received at 3:00 a.m., but made no mention of the communications and understandings between itself and Citadel. ¶ 181. The NSCC, however, *reduced* Robinhood's capital requirements and Robinhood was able to meet its revised deposit requirement shortly after 9:00 a.m., *before the markets opened*. ¶ 181, 185. Nonetheless, Robinhood continued to impose purchasing restrictions on the Relevant Securities for the entirety of the trading day. ¶ 264. Despite raising $3.4 billion in the days to follow, Robinhood continued to limit the number of positions in the Relevant Securities its users could acquire through February 4, 2021. ¶ 261, 264. Notably, throughout this time, Citadel and Robinhood continued to communicate. ¶ 258. On January 30, while Robinhood's trading limitations were still in place, Citadel reached out to Robinhood to "coordinate messaging." *Id.*

Robinhood's unprecedented restrictions had their intended effect. They led to a massive sell-off of the Relevant Securities, causing hundreds of millions of dollars in losses to consumers. ¶¶ 197-208. The restrictions were successful as planned. Citadel Securities was able to cover its short position by purchasing the Relevant Securities at artificially reduced prices. ¶ 209.

### III.   STANDARD OF REVIEW

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8(a)(2) requires only a short and plain statement of a claim for relief to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89,

93 (2007) (quoting *Twombly*, 550 U.S. at 555); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'"). There are no "heightened" pleading standards for antitrust cases. *Twombly*, 550 U.S. at 570; *see also Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 513 (2002); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit.*, 507 U.S. 163, 168 (1993); *Andrx Pharms., Inc. v. Elan Corp.*, 421 F.3d 1227, 1234-35 (11th Cir. 2005) (view that heightened pleading requirements apply to antitrust claims has been rejected in favor of applying Rule 8(a)'s notice pleading standard); *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1300 (M.D. Fla. 2016) ("*Twombly* does not impose a heightened pleading requirement on antitrust complaints.").

Under Rule 12(b)(6) "[w]hen reviewing a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and takes the factual allegations as true." *In re Salmon*, Case No. 19-21551-CIV-ALTONAGA/Louis, 2021 WL 1109128, at *9 (S.D. Fla. Mar. 23, 2021) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)); *accord Jackson v. Wal-Mart Stores, Inc.*, 753 F. App'x 866, 869 (11th Cir. 2018) ("*Iqbal* tells us we must assume the truth of all well-pleaded allegations except legal conclusions, regardless of whether evidence may ultimately support them."). "A motion to dismiss is granted only when the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1187 (11th Cir. 2004) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In antitrust cases, where "'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (citation omitted). Accordingly, a complaint's allegations need only nudge the conspiracy claims "across the line from conceivable to plausible" and "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Disposable Contact Lens*, 215 F. Supp. 3d at 1306 (citation omitted).

## IV.    ARGUMENT

Section 1 of the Sherman Act provides "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (alterations added). Section 1 "prohibits (1) conspiracies that (2)

unreasonably (3) restrain interstate or foreign trade." *Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*, 917 F3d 1249, 1260 (11th Cir. 2019) (citation omitted).

Defendants' fundamental challenge to Plaintiffs' Section 1 claim is that Plaintiffs' have failed to plead an agreement between Citadel Securities and Robinhood in violation of the antitrust laws. ECF No. 456 (the "MTD") at 12. Defendants are wrong. Under *Twombly*, Plaintiffs must provide a complaint "with enough factual matter (taken as true) to suggest that an agreement was made." *Salmon*, 2021WL 1109128 at *10 (quoting *Twombly*, 550 U.S. at 556). Plaintiffs allege facts showing that Robinhood and Citadel Securities entered into an agreement that Robinhood would restrict trading on or about January 28, 2021, and that the restraint was imposed. ¶¶ 14, 185-89. Plaintiffs allege, in copious detail, facts showing an agreement, and Plaintiffs offer ample evidence, when taken together, from which an agreement can be plausibly inferred. As acknowledged by Robinhood and Citadel Securities themselves, the two firms had a close relationship, which they described as a "partnership." ¶¶ 244-45. Further, Robinhood and Citadel Securities engaged in numerous communications immediately before the imposition of the trading restrictions—communications that this Court has already determined are "supportive of a conspiracy" due to their timing and participants. MTD Order at 43. Those communications presaged a complex and historically unprecedented restraint—a broad restriction on Retail Investors' ability to purchase the Relevant Securities.[4] These allegations, along with the ample circumstantial evidence, infer an anticompetitive agreement in violation of the antitrust laws.

Defendants next argue that Plaintiffs fail to allege the necessary elements to plead a Section 1 claim under the rule of reason. MTD at 12. This argument also fails. For the reasons set forth in Part IV.B.i., *infra*, it is premature for the Court to determine whether the *per se* rule or the rule of reason applies at the motion to dismiss stage. Regardless, Plaintiffs have pleaded sufficient facts to sustain their Section 1 claim under the rule of reason – the relevant product market, Defendants' market power and the paradigmatic antitrust injuries that occurred in the relevant market and which

---

[4] In particular, the Amended Complaint sets forth that Robinhood engaged in unprecedented trading restrictions, i.e., broad ranging restrictions on Retail Investors' ability to purchase securities, which was a marked departure from its, or indeed, any broker-dealer's, prior practice. ¶ 143. The actions of Robinhood's executives suggested that this departure was planned. For example, Robinhood's Swartwout sold his shares in AMC, which he would only do if he expected the price of AMC to drop. ¶ 234. Further, there are no facts (nor do Defendants offer any) that Citadel Securities was surprised when Robinhood imposed its unheard-of trading restrictions.

stemmed from Defendants' conspiracy. Finally, Defendants argue that Plaintiffs' antitrust claim is precluded by the federal securities laws. MTD at 27-35. This argument likewise fails. There is no repugnancy between antitrust law and securities law for the conduct at issue here.

### A.      Plaintiffs Plausibly Allege an Anticompetitive Agreement

To allege an antitrust conspiracy, a plaintiff need only "present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Salmon*, 2021 WL 1109128, at *10 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Notably, plaintiffs are not required to allege an explicit agreement. *See DeLong Equip Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989). Nor are Plaintiffs required to allege the specific discussions participants had. *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 3:15-cv-734-J-20JRK, 2015 WL 9987969, at *14 (M.D. Fla. Nov. 4, 2015) ("At the motion to dismiss stage, '[p]laintiffs need not allege the existence of collusive communications in "smoke filled rooms"' . . . in order to state a § 1 Sherman Act claim.") (quoting *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010)). In antitrust cases, where "'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (citation omitted), 425 U.S. 738, 746 (1976) (citation omitted). In fact, "[c]onspiracies are rarely evidenced by explicit agreements and must always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators."[5] *DeLong*, 887 F.2d at 1515 (citations omitted); *see also United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 536 n.13 (1973) ("circumstantial evidence is the lifeblood of antitrust law.").

"(T)he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore*, 370 U.S. at 699

---

[5] Courts recognize that direct evidence in antitrust cases is "rare." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991); *United Am. Corp. v. Bitmain, Inc.*, No. 18-CV-25106, 2021 WL 1807782, at *10 (S.D. Fla. Mar. 31, 2021) (citing *DeLong*, 887 F.2d at 1515) ("Direct evidence of a § 1 conspiracy is rare, and most antitrust conspiracies are proved by circumstantial evidence."); *see also Battle v. Lubrizol Corp.*, 673 F.2d 984, 992 (8th Cir. 1982) ("we think that it is most unlikely that antitrust plaintiffs, like any other plaintiffs alleging conspiracy, will have direct evidence").

(citation omitted, alteration in original); *Associated News, Inc. v. Curtis Circulation Co., Inc.,* Civ. A. No. H-80-1201, 1986 WL 13791, *6 (S.D. Tex. Dec. 4, 1986) (combined weight of circumstantial evidence was "sufficient to raise a genuine issue of fact as to an alleged vertical conspiracy" at summary judgment). Plaintiffs need not rebut legitimate reasons Defendants may offer for their suspicious conduct. *Salmon*, 2021 WL 1109128, at *15; *see also id.* at *9 ("When reviewing a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and takes the factual allegations as true."). Plaintiffs' allegations at this juncture need not exclude the possibility of unilateral conduct. *See, e.g.*, *Helicopter Support Sys. Inc., v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1534 (11th Cir. 1987) (Plaintiffs must "adduce positive evidence which *tends* to exclude the possibility of unilateral action") (italics added). Accordingly, Plaintiffs need only allege facts sufficient to infer the existence of a conspiracy. *See In re Mid-Atl. Toyota Antitrust Litig.*, 560 F. Supp. 760, 780 (D. Md 1983) (holding "that sufficient circumstantial evidence exists to raise a genuine issue about a tacit agreement among defendants"). Plaintiffs have sufficiently done so here.

   Plaintiffs have alleged with specificity that Robinhood imposed historically unprecedented trading restrictions on the Relevant Securities, which resulted in a significant decrease in their share prices. That these restrictions were imposed as part of "a common scheme" is well supported by Plaintiffs' allegations. *See Monsanto*, 465 U.S. at 764 ("Circumstances must a reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'"). The Amended Complaint is replete with allegations of direct communications between Citadel Securities and Robinhood before and after the imposition of the highly irregular and unprecedented restraint. ¶¶ 227, 230-241. Given the "partnership" between Defendants, these communications are highly revealing in and of themselves. Moreover, the communications' timing, context, and the players involved support a reasonable inference that the restrictions were the result of Defendants' concerted action. *See* MTD Order at 41 (timing and overall context of communications between Defendants' high-level executives could be inferred to relate to January 28 trading restrictions); *id.* at 43 (timing and context of Defendants' communications lends credence to Plaintiffs' conspiracy theory); *see also Delta/AirTran*, 733 F. Supp. 2d at 1360 ("unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices").

The Amended Complaint contains additional circumstantial evidence from which collusion may be inferred. It sets forth economic evidence of Defendants' collusion, e.g., Citadel Securities' short positions in the Relevant Securities. ¶¶11, 14, 142, 211, 398. It details how Defendants' executives acted in ways consistent with advanced knowledge of the conspiracy, such as selling their own shares of the Relevant Securities ahead of the purchasing restrictions. ¶ 234. The Amended Complaint contains detailed allegations about how Robinhood relies on the revenue that it receives from Citadel Securities for its survival, and how Robinhood's reliance on Citadel Securities provided motive to collude in light of Robinhood's pending IPO and the fact that Citadel Securities could easily terminate its relationship with Robinhood at any time. ¶¶ 316-23. The Amended Complaint also sets forth structural evidence, including market characteristics that demonstrate that the market is susceptible to collusion. ¶¶ 307-11, 324-46.

These allegations lead to the inference that Robinhood and Citadel Securities colluded—and that is enough at this stage of the litigation. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 749 (N.D. Ill. 2019) ("The court anticipates that further discovery will shed light on [Citadel's] knowledge of and role in the [trading restrictions], if any. But at [motion to dismiss], the court draws all reasonable inferences from the complaint in favor of plaintiffs and taking the [Amended Complaint] as a whole finds that plaintiffs have sufficiently alleged a conspiracy."); *Costco Wholesale Co., v. Johnson & Johnson Vision Care Inc.*, 15-cv-734-J-20JRK, 2015 WL 9987969, at *18 (M.D. Fla. Nov. 4, 2015).

### i.    Defendants' Communications and Conduct Support the Inference of a Conspiracy

Plaintiffs have alleged with particularity communications and conduct between Robinhood and Citadel Securities that preceded the January 28, 2021 restriction in trading. These communications strongly suggest the decision to restrict trading was pursuant to a common understanding and course of conduct reached during these communications. *Delta/AirTran*, 733 F. Supp. 2d at 1360. Plaintiffs specifically allege repeated communications between Robinhood and Citadel Securities which resulted in the January 28, 2021 trading restrictions. ¶¶ 227–33. Plaintiffs specifically allege that high level executives of Robinhood and Citadel communicated and made an express agreement to restrict trading. *Id.*

For example, on January 25, 2021, Citadel Securities' Head of Executive Services had discussions with Robinhood's Vice President of Corporate Relations and Communications, Josh Drobnyk. ¶ 227. While the substance of the communications is undisclosed—and Plaintiffs have

not been provided a record of them—Drobnyk wrote afterwards that Robinhood was "on board." ¶ 230. This indicates, at a minimum, a request and Drobynk's communication of assent and agreement to that request. These messages and emails in turn refer to other undocumented private conversations, telephone calls and other written communications, the substance of which have never been revealed. Logically, there are likely many other communications that have not come to light.[6]

Subsequent acts provide further support for the plausible inference that an agreement to restrict trading was reached during those communications. Defendants knew in advance that the trading restriction was going to be imposed, as evidenced by top Robinhood executives—who knew of the discussions with Citadel Securities—sold their own shares of the Relevant Securities to avoid damages to their own stock portfolios that eventually befell class members who were the target of the agreement. ¶ 234. Robinhood's Swartwout sold his shares of AMC in the days leading up to the restrictions and encouraged others at Robinhood to do the same. *Id*. Given the continued excitement around the Relevant Securities, and the continued upward momentum of the share price, Swartwout's choice to sell made little economic sense unless he knew about the unlawful agreements to stop trading and to drive down prices in advance.

Moreover, the evening before Robinhood announced the trading restrictions, Robinhood and Citadel executives again communicated. ¶ 235-41. Robinhood believed Citadel would make demands regarding PFOF. ¶ 321. Robinhood depended on PFOF from Citadel Securities. PFOF was crucial—the life blood—of Robinhood's business model as it provided the revenue necessary to offer commission-free brokerage services to its customers. ¶¶ 4-5, 13, 75, 77-78, 81, 306, 316, 319, 323, 400. It was against Robinhood's economic interest to restrict trading because it would, among other things, cut off a vital source of income. ¶ 237. These contentious conversations were described as a "total mess" and left Robinhood "beyond disappointed,"

---

[6] Defendants continue to criticize the sufficiency of the Amended Complaint on the basis that Plaintiffs had access to some documents that Defendants produced to certain government regulators, only after the Court ordered them to be produced. ECF No. 323. There has been no formal discovery, and indeed the Court has stayed discovery pending resolution of the attacks on the pleadings. That is not the standard under Rule 8—the Amended Complaint should be judged on its face, and it is of no moment that Plaintiffs have obtained access to a smattering of documents, whether through their own investigation and in the context of this case. There has been no formal discovery, and indeed the Court has stayed discovery pending resolution of the attacks on the pleadings.

indicating the discussions were regarding matters against Robinhood's economic self-interest. ¶ 241. Nonetheless, a meeting of the minds was reached because, as confirmed by communications, "numbers" were "[f]irming up" in advance of the trading restrictions. ¶ 242. At a minimum, these conversations demonstrate an "acquiescence or agreement, and that this was sought.'" *Costco*, 2015 WL 9987969, at *14 (quoting *Monsanto*, 465 U.S. at 764 & n.9). This is the essence of a meeting of the minds and proof of agreement under the antitrust laws. *See United States. v. Parke, Davis & Co*., 362 U.S. 29, 43 (1960) ("whether this conspiracy and combination was achieved by agreement or acquiescence . . . is immaterial").[7]

Defendants' conduct after the trading restrictions were imposed provide further evidence of the agreement and bolster the plausibility of Plaintiffs' claims. Citadel Securities was hardly surprised with news of the trading restrictions—nor do Defendants argue to the contrary—even though Robinhood's actions were significant and unprecedented. Far from it. After the trading restrictions were imposed, top executives of Robinhood and Citadel acted in concert to coordinate explanations regarding the restrictions.[8] ¶ 258. These coordinated efforts constitute additional overt acts in furtherance of the conspiracy. Moreover, the explanations themselves were incomplete, misleading, and untrue. *See* Part IV.A.ii., *infra*. They did not reflect or disclose that the decision was the result of communications between Defendants or that it was made to protect Citadel Securities's positions in the Relevant Securities. ¶¶ 14, 185-89. Further, these communications evidence a shared motive to conceal the true nature of the agreement and the cause for the restrictions. The Court has already determined that the communications between Robinhood and Citadel Securities are "supportive of a conspiracy." MTD Order at 43.

Defendants counter these factual allegations with their own explanations and justifications. Defendants say their conduct merely reflects the "normal" course of conduct between them. MTD at 16. This argument is not well taken. As an initial matter, additional arguments regarding Defendants' conduct are improper on a Rule 12 motion; Defendants are

---

[7] *See also Interstate Cir., Inc. v. United States*, 306 U.S. 208, 227 (1939) ("elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators"); *United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969) ("[W]hen a defendant requested and received price information it was affirming its willingness to furnish such information").

[8] Notably, the participants copied Citadel Securities' "GCs," i.e., general counsel, and explicitly noted they were doing so "for privilege." ¶ 258. As evidenced in Part IV.A.ii., *infra*, attempts to conceal communications is circumstantial evidence inferring conspiracy and collusion.

bound by the allegations in the complaint—which are presumed to be true—and additional counterfactual assertions merely frame factual disputes to be resolved by the trier of fact. *See, e.g., Disposable Contact Lens*, 215 F. Supp. at 1279 (on "motion to dismiss, 'the court is limited to what appears on the face of the complaint.'") (citing *Jacobs*, 626 F.3d at 1340).

Moreover, Defendants' attempt to recharacterize this conduct as "normal" is itself far-fetched and implausible. First, the nature of the restrictions themselves was unprecedented. Never had a broker-dealer enacted such wide-ranging prohibitions on trading. *See Disposable Contact Lens*, 215 F. Supp. 3d at 1295 (complex and historically unprecedented changes may support inference of conspiracy).

Second, the communications themselves indicate they were far from ordinary to those actually involved in them. The participants described these conversations as a "total mess" and were left "beyond disappointed" in how they "went down." ¶¶ 241, 245.

Third, that Defendants' executives were dumping their stock in advance of the imposition of the restrictions is not "normal," and Defendants do not contend otherwise —Robinhood executives would have no reason to sell their own shares of the Relevant Securities unless they had advance knowledge of the trading restrictions. Likewise, Defendants' after-the-fact cooperation to manufacture common pretextual explanations is not normal either.

Whether or not Robinhood's agreement to restrict trading resulted from coercion by Citadel Securities is of no moment. Even if it were so, this does not defeat an antitrust claim or show there was no meeting of the minds. Agreements obtained through coercion are actionable.[9] *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1164 (7th Cir. 1987) (Posner, J.), is instructive. In *Isaksen*, a dealer complained that his supplier coerced him into an agreement to raise the prices for stoves in violation of Section 1 of the Sherman Act. *Id.* at 1161-63. The plaintiff offered proof, consistent with settled antitrust authorities, that the plaintiff had been coerced into the

---

[9] The communications between Defendants on January 27 before purchasing prohibitions were placed strongly suggest Citadel Securities leveraged its relationship with Robinhood. Even before Defendants communicated that day, Robinhood executives already suspected that Citadel Securities was going to make demands regarding PFOF. ¶ 237. Evidently those demands were issued, and it is apparent that Robinhood was left displeased. The discussions between Citadel Securities and Robinhood prompted Vlad Tenev, Robinhood's CEO, to seek to improve the relationship by speaking directly to Ken Griffin at Citadel. Nevertheless, what is clear is that Robinhood and Citadel Securities had a meeting of the minds, and "numbers" were "firmed up" as a result of an unrecorded conversation between them. ¶ 242.

agreement.[10] After the jury returned a verdict in favor of the dealer, the lower court granted the supplier's motion for judgment notwithstanding the verdict. *Id.* at 1161. The Seventh Circuit reversed, finding that there was a vertical agreement between the dealer and the supplier in violation of the antitrust laws. *See id.* at 1163-64.[11]

As the *Isaksen* court explained, "the motives for the dealer's adhering to a suggested list price are irrelevant. If (but only if) he *agrees* to adhere (having been asked to), there is an agreement, no matter how unwilling he is; but it does not follow that his agreement to adhere can never be implicit or signified by conduct in lieu of promissory language." 825 F.2d at 1164. Courts in this Circuit apply and follow this settled authority. *E.g.*, *Costco*, 2015 WL 9987969, at *18 (M.D. Fla. 2015) (citing *Isaksen*, 825 F.2d at 1164, with approval). As in *Isaksen*, the tense conversations between Robinhood and Citadel Securities evidence a similar course of dealings here: Robinhood, who had already suspected Citadel Securities would make demands on PFOF, was asked to restrict trading or Citadel Securities would not route its orders, denying Robinhood the precious profits and revenue from payment for order flow. Robinhood ultimately acquiesced.[12] *See Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001) ("Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when they have been enticed or coerced to share in an anticompetitive scheme, there is still a combination within

---

[10] As Judge Posner recognized, parties "knuckling under to pressure" can be found to violate the antitrust law and explained "[t]he fact that [the plaintiff] may have been coerced into agreeing is of no moment; an agreement procured by threats is still an agreement for purposes of section 1." 825 F.2d at 1163; *see also Albrecht v. Herald*, 390 U.S. 145, 150 n. 6 (1968); *Parke, Davis & Co.*, 362 U.S. at 45. "[A] conspiracy is no less sinister because some its members are intimidated, rather than bribed, into doing it." *Isaksen*, 825 F.2d at 1163.

[11] In doing so, the Seventh Circuit analyzed the Supreme Court's precedent in *Monsanto*, 465 U.S. 752 (1984) and exclaimed: "[W]e do not think the [*Monsanto*] Court intended to go so far as to rule that if a supplier telephones a dealer and tells him, 'Raise your price by next Thursday, or I'll ship you defectives goods,' and the dealer merely grunts, but complies, this is not actionable as an agreement to fix the dealer's resale price. If it were not, there would be very little left of the rule against vertical price-fixing, which the Court in *Monsanto* decided not to reexamine." *Isaksen*, 825 F.2d at 1164 (citing *Monsanto*, 465 U.S. at 761, n.7).

[12] This is apparent as Robinhood's Chief Legal Officer Dan Gallagher had further unrecorded conversations with Citadel Securities's executives which resulted in the two firms firming up numbers. ¶ 242. Citadel Securities also continued to route orders on January 28, 2021 in the symbols that Robinhood did not restrict, evidencing that whatever threats that may have been made need not have been carried out.

the meaning of the Sherman Act."); *see also id.* at 220 ("even reluctant participants have been held liable for conspiracy [under the antitrust law]").

### ii.     Defendants' Pattern of Concealment Infers a Conspiracy

The steps Defendants took to conceal the facts of the agreement and their communications regarding it constitute additional circumstantial evidence of agreement. "[A]cts of concealment are circumstantial evidence of a conspiracy's existence." *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (citing *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011)); *see also United States v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995) ("the act of concealment may be taken as evidence of a conspiracy"). Courts routinely rely on such acts as evidence of a conspiracy even at later stages of litigation. *See, e.g.*, *Belcher v. Atl. Capital Realty, LLC*, 2010 WL 11507399, at *5 (M.D. Fla. Sep. 17, 2010) ("Although this is merely circumstantial evidence of a conspiracy, such evidence is sufficient to *avoid summary judgment* so long as it "reasonably support[s] an inference [of a] shared . . . conspiratorial objective.") (citation omitted, italics added).

The written records that Plaintiffs have obtained indicate that the executives and corporate representatives involved in the communications between Robinhood and Citadel Securities did not accurately report or record—at least in writing—the communications regarding the decisions to restrict trading. Drobynk's indication of assent is vague—purposefully so—as to the specific discussions which produced that agreement. ¶ 230. Robinhood also was careful to make clear that communications were to be channeled through Lucas Moskowitz, Robinhood's general counsel. *Id.* Indeed, the Amended Complaint alleges with specificity affirmative steps Defendants' executives undertook to cloak their suspicious communications through the use of attorneys as intermediaries, hoping to take advantage of the attorney client privilege. As alleged, Citadel Securities emails sent to Robinhood specifically indicate that they were sent with Citadel's "GC's" copied for "privilege." ¶ 258. The emails make clear that inside counsel were purposefully included to protect the communication from subsequent disclosure.

The fact that communications between the two companies, involving many hundreds of millions of dollars, were conducted only in person, via telephone, or through lawyers with no written record indicates a lack of transparency and reveals an effort to conceal the nature and

scope of the agreement reached.[13] *See United States v. Seigler,* 990 F.3d 331, 339 (4th Cir. 2021) (jury may infer existence of vertical conspiracy based on circumstantial evidence including "familiarity" of conversation among defendants where they used "coded and circumlocutory language").

### iii.   Additional Circumstantial Evidence of the Scheme

Plaintiffs also plead additional circumstantial evidence that "tends to exclude the possibility of independent action."[14] *Williamson Oil Co., Inc. v. Phillip Morris, USA,* 346 F.3d 1287, 1301 (11th Cir. 2003).

*Motive to Collude.* The motive to collude is additional circumstantial evidence sufficient to infer an agreement*. See Disposable Contacts Lens*, 215 F. Supp. 3d at 1298 (finding anticompetitive agreement where conspirator had motive to "make more money" and "worked closely" with coconspirator). Plaintiffs have alleged facts that demonstrate Defendants' strong motive to collude. Defendants' lucrative self-styled PFOF "partnership" (*see* ¶ 244) provided ample motive for Defendants to collude.

Robinhood bases its entire business model on payments for order flow from Citadel Securities. Robinhood derives 80% of its revenues from payment for order flow in general. ¶ 316. Indeed, without Citadel's payment for order flow, Robinhood would not be able to economically support providing no fee brokerage transactions. ¶¶ 324-329. Moreover, Citadel Securities was the single largest contributor to Robinhood's payment for order flow revenue. *See*, *e.g.*, ¶ 5. (43% of Robinhood's PFOF revenue in the first quarter of 2021 alone). Citadel

---

[13] Plaintiffs do not ask the Court to infer conspiracy merely because Defendants communicated over the phone. *See* MTD Order at 44-45. Rather, the Amended Complaint sets forth a pattern of concealment between Robinhood and Citadel Securities that leads to an inference of conspiracy.

[14] "Plus factors" refer to an organizational framework of understanding circumstantial evidence that supports an inference of a conspiracy; it is of no moment whether the conspiracy is horizontal or vertical. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, MDL 2817, 2022 WL 199271, at *14 (N.D. Ill. Jan. 21, 2022) ("A plus-factor analysis provides a way to organize circumstantial evidence that, in the plaintiff's view, reduces the probability that defendants were acting independently."). Such plus factors can be relied on for a plausible inference of a conspiracy, regardless of whether the agreement is between horizontal competitors, suppliers and distributors, or other market participants. *See Stewart Glass & Mirror, Inc. v. U.S.A. GLAS, Inc.*, 17 F. Supp. 2d 649, 653 (E.D. Tex. 1998) ("Whether the plaintiff alleges a horizontal conspiracy among competitors, or a vertical conspiracy between a manufacturer/seller and a distributor/buyer, the focus remains the same: is there sufficient evidence to create a reasonable inference of concerted action to engage in illegal conduct?").

Securities recognized how valuable Robinhood's order flow was, and pays a premium for Robinhood's order flow as compared with other brokerages who sold their order flows. ¶ 76. Citadel Securities was (and is) Robinhood's most important market maker—Robinhood's revenue from Citadel Securities more than doubles that of its next highest revenue source.[15]

Critically, the payment for order flow relationship was terminable by either party at any time. ¶ 317. In other words, Citadel Securities, Robinhood's single biggest commercial partner, possessed the ability turn off its most important source of income and thereby possessed the power to make or break the company. This was particularly true the week of January 25, 2021, the week of the trading restrictions, shortly before Robinhood's IPO. During that time, Citadel Securities constituted the great majority of Robinhood's trading activity.[16] ¶ 281. By cooperating with Citadel, Robinhood protected the *sine qua non* of its business model, and avoided the existential threat posed by Citadel Securities if Citadel had not been able to avoid the short squeeze. Preserving its PFOF relationship with Citadel Securities provided Robinhood ample motive to collude.[17]

In addition, as of January 2021, Citadel Securities had accrued massive short positions. ¶¶ 276, 280, 283-84. As the Court previously recognized, "[t]hat Citadel Securities held short interests in the Relevant Securities is a reasonable inference to be drawn in Plaintiffs' favor." MTD Order at 36. Citadel had the economic incentive to obtain Robinhood's agreement to stop trading in the Relevant Securities in order to exit its short positions, thereby avoiding a short

---

[15] Employees of both firms recognized the strength and significance of the relationship. For example, Citadel's Head of Execution Services stated to Robinhood's Moskowitz that the two firms "obviously have a strong relationship." ¶ 232.

[16] During the week of January 25, 2021, according to FINRA OTC transparency data, Citadel Securities's trading activity was more than double that of Virtu Americas's, the next most active institutional participant. ¶ 281 (Citadel Securities accounted for 50% of trading by volume in GME as compared to 12% for Virtu Americas, and 56% of trading activity in AMC as compared to 25% for Virtu Americas).

[17] The claim that Robinhood could have routed orders to the public exchanges in the event Citadel Securities terminated its relationship with Robinhood, ignores the fundamental nature of its business. Had Robinhood done so, Robinhood would have received no payment for order flow. Indeed, its public offering was based on the maintenance of this structure. ¶318. Given Citadel Securities's position as Robinhood's foremost PFOF partner by far, preserving that relationship was paramount. Additionally, as trading activity volume indicates, other market makers were *not* handling orders to the extent Citadel Securities was, Citadel Securities handled more than double the transactions as the next market maker. ¶307. This left Robinhood with few, if any, actual alternatives.

squeeze and the hundreds of millions of dollars in losses that would have resulted. By driving the prices of the Relevant Securities down, Citadel stood to benefit by recouping the shares it sold short, avoiding or mitigating its losses. ¶ 396. Citadel was acutely aware that it possessed leverage over Robinhood to obtain agreement, even if Robinhood faced business losses as a result.

Further the executives, officers, and managers of Citadel and Robinhood also possessed their own motive to collude because they were also exposed to financial ruin in the event of a short squeeze. Indeed, they acted in accord, selling stock in advance of the restriction. ¶ 234.

*The Structure of the Market Render It Susceptible to Collusion.* Plaintiffs have provided extensive detailed allegations regarding the characteristics that made it possible for Robinhood and Citadel Securities to collude. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (recognizing that economic evidence of the structure of market making collusion feasible can be relied on to infer existence of an agreement*).* As the Court has previously acknowledged, Plaintiffs have identified "the existence of several characteristics that each tend to make a market susceptible to anticompetitive conduct and unlawful collusion[.]" MTD Order at 48. These allegations include that the market in which Defendants operate is defined by high barriers to entry, high fixed costs, and low variable costs. ¶¶ 370-84. Additionally, consumers using no-fee trading apps such as Robinhood's platform are locked-in in the short run.[18] ¶¶385-92. These market characteristics render the market ripe for collusion.[19]

*Evidence that the Market Behaved in a Noncompetitive Manner*. Plaintiffs' allegations show that the market behaved in a noncompetitive manner. *See High Fructose Corn Syrup*, 295 F.3d at 655 (recognizing that economic evidence that market behaved in a noncompetitive manner can be relied on to infer existence of an agreement). Plaintiffs allege that the trading restriction stopped, suspending the operation of supply and demand, and driving prices down. *See* Part IV.B.iv.b.2., *infra*. If Robinhood had not intervened, its customers would have been able

---

[18] Consumer lock-in was particularly pronounced because Robinhood makes withdrawing or transferring funds difficult, typically requiring days-long waiting periods and restricting users from selling securities they already own if they initiated a withdrawal. ¶¶ 389-90. These delays were exacerbated for Robinhood users during the time Robinhood maintained the restrictions on purchasing the Relevant Securities. ¶ 391.

[19] Plaintiffs have acknowledged the Court's prior criticism and have now provided a clearer picture of the relevant market, i.e., the market for securities trading services. *See* Part IV.B.iv.a., *infra*.

to increase their positions in the Relevant Securities, prices would have continued to rise, and the prospect of the nascent short squeeze would become more likely. As Citadel itself long ago recognized when it sought to have payment for order flow banned, the practice is rife with conflicts of interest and "anti-competitive." ¶ 224. Now, Citadel seeks to capitalize from the noncompetitive market conditions it caused. *Id.*

*Defendants' Pretextual Explanations.* Defendants offer dubious pretextual explanation and mischaracterizations for their conduct. Such pretextual statements support an inference of an illegal conspiracy. *See In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016) (considering pretext as supporting evidence); *ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905, 910 (N.D. Ill. 2002) (same); *see also Delta/AirTran*, 733 F. Supp. 2d at 1360 (N.D. Ga. 2017) ("unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices"). Defendants assert that it was necessary for Robinhood to meet its capital requirements as set by the NSCC. That the trading restrictions were the result of regulatory order or fiat is untrue. As alleged, even before there was any margin call, Robinhood and Citadel were engaged in heated discussions regarding the degrading market conditions. Meanwhile, Robinhood's executives were selling their own shares of the Relevant Securities—well before Robinhood received any notification from the NSCC regarding its capital requirements. ¶¶ 234-46. In fact, Robinhood was quickly able to negotiate down its $3 billion dollar margin call from the NSCC to $1.4 billion. ¶¶ 178, 181, 183. Robinhood met its capital requirements before the markets opened and trading restrictions imposed on January 28, 2021. ¶ 185. Even afterwards, Robinhood continued to satisfy its capital requirements by accessing credit and raising capital, while continuing the trading restrictions. Nonetheless, Robinhood maintains the capital requirements as the reason for the unprecedented trading restrictions.[20] ¶¶ 194, 262.

iv.   **Defendants' Proffered Alternative Explanations Create a Factual Dispute And Do Not Suggest Plaintiffs' Allegations Are Implausible**

Defendants hang their hat on three counterfactual allegations that they claim defeat an inference of motive for conspiracy: (1) Robinhood's customers could have left Robinhood's

---

[20] As set forth in the Amended Complaint, the decision to implement restrictions on purchasing only was arbitrary. Robinhood through its PFOF relationship, stood to earn larger profits from increased market volatility. ¶¶ 358-59. Volatility is caused by both increases *and* decreases in a stock price. The latter certainly occurred as a result of the trading restrictions. ¶¶ 199-208.

platform for another broker dealer; (2) Robinhood could have shifted order flow to other market makers; and (3) Citadel Securities could have asked other retail broker dealers with which it had a similar PFOF relationship to restrict trading. MTD at 21. Reliance on additional facts outside the four corners the complaint is contrary to hornbook pleading principles and Rules 8 and 12. Plaintiffs "need not rebut [Defendants' asserted] reasons to defeat a motion to dismiss." *Salmon*, 2021 WL 1109128, at *15. In any event, each of Defendants' proffered alternative explanations are speculative and without factual support. Moreover, they fly in the face of Plaintiffs' well pleaded facts, which the Court must take as true. *Id.*, at *9.[21]

The assertion that Retail Investors could have avoided the losses by trading on other brokerages is at odds with allegations that the vast majority of Robinhood users were unable to switch brokerages and locked in.[22] ¶¶ 344-45. As Robinhood acknowledges, even if a customer had set up another trading account—which is unrealistic and rare—funds transfers take days to complete. ¶ 344. In addition, during the period in which the trading restrictions were imposed, Robinhood users were able to deposit money into their Robinhood accounts, but were prohibited from selling the securities they held in their Robinhood accounts and transfer the proceeds to other platforms, further exacerbating the anticompetitive effects. ¶ 345. Robinhood customers who had an account with another brokerage company and were able to transfer funds were the rare exception.[23]

---

[21] Whether the restraint was innocent or not is a question of fact for the trier of fact to decide—otherwise regular activity can still run afoul of the antitrust laws if done for an anticompetitive result. *See Disposable Contact Lens*, 215 F. Supp. 3d at 1300 (*Twombly* does not "create a presumption in favor of defendants acting in their lawful economic self-interest which Plaintiffs' allegations must overcome in order to survive a motion to dismiss"); *see also Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 709-10 (7th Cir. 1984) (conspiracies are unlawful "if the conspirators used unlawful means to a lawful end *or* lawful means to an unlawful end") (citation omitted, italics added).

[22] Indeed, Defendants' first claim is at odds with their own arguments. Defendants assert that other broker-dealers also "imposed similar restrictions" but now claim consumers could have gone elsewhere to avoid the trading restrictions. In reversing themselves, Defendants at least recognize that Robinhood's restrictions were different and far more wide-ranging than those imposed by other brokerages; indeed, Robinhood solely prohibited purchases for the full day on January 28, 2021, and continued restrictions for days afterwards. ¶¶ 195, 368.

[23] Retail Investors who were able to switch from Robinhood to another brokerage trading platform (like Plaintiff Minahan) were only able to do so because of their remarkably high credit

The assertion that Robinhood could have routed transactions away from Citadel to other market makers—found nowhere in the Amended Complaint—fares no better. There is no claim—and no allegation in the Amended Complaint—that Robinhood attempted to do so or did so. Moreover, this claim disregards other allegations that Citadel Securities is the dominant market maker, accounting for a significant portion of all trades, thereby reducing the possibility of alternatives. ¶¶ 48, 307-10. As demonstrated by publicly available data from the week of January 25, 2021, the majority of dark pool transactions during the week of the restrictions were attributable solely to Citadel Securities. ¶ 281. Simply put, other alternative market makers did not have the capacity to route orders had Citadel Securities refused. Further, as discussed above, routing away to other sources made little economic sense. Had Robinhood availed itself of alternatives to Citadel, Robinhood would have foregone PFOF revenue, jeopardized its "partnership" with Citadel Securities, and threatened the success of its impending IPO. ¶¶ 75, 82, 318.

Third, Defendants make the hypothetical assertion that Citadel Securities could have coerced other broker dealers with similar PFOF relationships. This allegation—also not found anywhere in the Amended Complaint—is grasping at straws. It is entirely speculative, and again, it discounts and ignores the fact that Robinhood was particularly vulnerable to Citadel Securities's demands.[24] ¶ 75 (Robinhood relied on PFOF to sustain its business model). It is far more plausible that Citadel Securities would be more effectively able to leverage its relationship with Robinhood as opposed to other broker dealers than the reverse, upon which Defendants rely.[25]

---

scores and their liquidity which enabled them to transfer thousands of dollars to their new accounts. ¶ 342. As noted, the median Robinhood user has $240 in her account, ¶ 343, a far cry from the amounts needed to switch platforms rapidly enough to avoid or mitigate the damages caused by the trading restrictions.

[24] This was particularly true during the time in question as Robinhood was preparing for a highly publicized initial public offering. A decrease in revenue would likely impact its IPO. ¶ 401.

[25] Defendants' claim also goes too far. Plaintiffs never claimed Citadel Securities wanted to restrict *all* trading. Nor did Citadel Securities need to; it would (and did) substantially benefit by reducing trading from Robinhood.

**B.      Plaintiffs Plausibly Plead an Unreasonable Restraint on Trade**

**i.      The Court Should Not Determine at the Motion to Dismiss Stage Whether to Apply *Per Se* or Rule of Reason Treatment**

The rule of reason is the basic standard for determining violations of the Sherman Act's restraint of trade provision. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). (citation omitted). Under this rule, the factfinder, considering such factors as the restraint's history, nature and effect, "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* at 885-86 (citations omitted). But the "rule of reason does not govern all restraints," *id.* at 886, some types of agreements are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016) (citation omitted). These agreements "'are deemed unlawful *per se*.'" *Leegin*, 551 U.S. at 886 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1957)).

Determination of the standard to be applied to a restraint depends on the facts. Sometimes, there are "numerous factual questions underpinning that purely legal decision." *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1186 (N.D. Ala. 2014). To decide upon "[t]he true test of legality . . . the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." *Id.*, citing *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 n. 15 (1977). No "bright line separates *per se* from rule of reason analysis." *Id. at* 1185 (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104, n.26 (1984)) (internal punctuations omitted); *see also In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1115 n.16, 1122 (N.D. Cal. 2012) ("the court need not decide now whether *per se* or rule of reason analysis applies. Indeed, that decision is more appropriate on a motion for summary judgment."); 2 Areeda & Hovenkamp, Antitrust Law 264 ¶ 305(e) ("Often, however, the decision about which rule is to be employed will await facts that are discovered only in discovery."). "Discovery will elucidate whether the purported conspiracy as a whole is patently anticompetitive 'such as would always or almost always tend to restrict competition and decrease output.'" *Mallinckrodt ARD*, 360 F. Supp. 3d at 754 (citations omitted).

Therefore, the issue of whether the *per se* rule or rule of reason treatment will apply is not ripe for consideration on a Rule 12(b)(6) motion. *See, e.g.*, *Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214, 222 (S.D. Ohio 2019) (declining to determine which standard applies at

motion to dismiss stage). Indeed, "the court just needs to determine whether the class plaintiffs have alleged a plausible conspiracy under the antitrust laws." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs., & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1297, n.8 (D. Kan. 2018). "[T]he court need not decide what rule to apply to analyze the reasonableness of the alleged restraints of trade supporting the class plaintiffs' conspiracy claims" at the pleading stage. *Id.* Plaintiffs have alleged a plausible conspiracy under the antitrust laws. At this early stage of litigation, the Court should defer making a determination as to whether the *per se* rule or the rule of reason standard applies to the instant claim until after the facts can be more fully developed in discovery. *See High-Tech Emp*, 856 F. Supp. 2d at 1115 n.9, 1122 (application of *per se* or rule of reason standard more appropriate at summary judgment).

> ii.     **Alternatively, the Court Should Find that the Agreement Qualifies for** ***Per Se*** **Treatment**

Under Section 1 of the Sherman Act, the *per se* rule applies to agreements "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Procaps*, 845 F.3d at 1083 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). To evaluate whether conduct is properly analyzed under the *per se* framework, the court "must inquire into whether the restraint, on its face, is a naked restraint of trade that always or almost always tends to restrict output, or an ancillary restraint that results in an efficiency enhancing integration among the parties to the agreement." *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp 2d 1279, 1314 (S.D. Fla. 2005) (citations omitted). Here, the agreement between Citadel Securities and Robinhood was a naked restraint that, *inter alia*, reduced output and a degradation of brokerage services. "By colluding to prohibit Retail Investors from purchasing (but not selling) the Relevant Securities, Defendants harmed the very competitive mechanism that sets the market price through the forces of supply and demand . . . ." ¶ 354. This is a textbook restriction on output susceptible to *per se* treatment.

"Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). "With limited exceptions, horizontal agreements are per se unlawful, whereas vertical restraints are unlawful only if an assessment of market effects, known as the

'rule of reason' analysis, reveals that the vertical agreements unreasonably restrain trade." [26]

*Disposable Contact Lens*, 215 F. Supp. at 1291 (citing *Leegin*, 551 U.S. at 885-86, 907).

### iii.    Plaintiffs Have Established a Conspiracy Under the "Quick Look" Approach and the Rule of Reason

Even if the Court were to find that the restraint here is not illegal *per se*, Plaintiffs' claims should be evaluated under the "quick look" approach. Under the "quick look" approach the court inquires whether defendants' conduct is of the type that, while not *per se* illegal, appears so likely to have anticompetitive effects that it is unnecessary for a court to apply the full rule of reason analysis.[27] An alleged restraint, "while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011) (en banc) (quoting *Cal. Dental Ass'n*, 526 U.S. at 763) (the rule of reason analysis can be applied "'in the twinkling on an eye'"). Here, Plaintiffs allege that Defendants entered into an unprecedented agreement to restrict Retail Investors from purchasing shares of the Relevant Securities resulting in, *inter alia*, a reduction in output and a degradation in quality in brokerage services. ¶¶ 350-56. Plaintiffs have alleged in detail the anticompetitive effects of this restraint with specificity in the no-commission securities services market. On the other hand, Defendants' motion is devoid of any contention that the trading restrictions were procompetitive. Even if Defendants' agreement to foreclose Retail Investors from purchasing the Relevant Securities is

---

[26] Citadel Securities is in the business of taking routed orders and settling them. Citadel Securities is therefore on the same horizontal level of distribution as clearing entities such as Robinhood Securities (Robinhood's clearing entity). This horizontal relationship is of equal-or-greater significance than other aspects which may be considered vertical in nature. In any event, the difficulty of classifying the relationships as one or the other—or both—reinforces Plaintiffs' position that it is premature to determine whether the *per se* rule or rule of reason applies. *Cf. Battle,* 673 F.2d at 990 ("(H)orizontal plurality is not the real determinant of per se unreasonableness. The essence of a violation of section 1 of the Sherman Act is agreement to pursue illegal conduct. A combination to cut a retailer off from a source of supply is not any less an illegal agreement because only one, rather than a plurality, of the parties is on the affected level.") (citation omitted).

[27] *See Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 770 (1999) ("[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets"); *see also* Areeda & Hovenkamp, ¶ 1911a ("What [the 'quick-look'] term is intended to connote is that a certain class of restraints, while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive.").

not *per se* unlawful, it can readily be determined unlawful under the "quick look" analysis. *Cal. Dental Ass'n*, 526 U.S. at 770.

### iv.     Plaintiffs' allegations suffice under the rule of reason

Even if the Court were to determine that the restraint should be evaluated under the rule of reason, Plaintiffs' allegations are sufficient to state a claim. In the Eleventh Circuit, in addition to the proof of agreement, causation and damages, a plaintiff must ordinarily prove "(1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification."[28] *Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns.*, 376 F.3d 1065, 1071 (11th Cir. 2004) (citing *Levine*, 72 F.3d at 1551). Once a plaintiff shows anticompetitive effect, the burden shirts to the defendant to show procompetitive justifications. *Lucasys Inc. v. PowerPlan, Inc.*, No. 20-cv-2987, 2021 WL 5279391, at *11 (N.D. Ga. Sep. 30, 2021) (citing *Amex*, 138 S. Ct. at 2284). At the pleading stage, however, it is typically sufficient that the plaintiff plausibly alleges anticompetitive effects—pleading the lack of procompetitive benefits is not required. *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.,* 386 F.3d 485, 506-507 (2d Cir. 2004) Plaintiffs do not bear the burden of pleading the absence of defenses to their claims.

Plaintiffs have satisfied their pleading burden of anticompetitive effects by pleading facts which constitute both direct and indirect proof of anticompetitive effects. It is settled law that Plaintiffs can show anticompetitive effects by either means. *Amex*, 138 S. Ct. at 2284 ("The plaintiffs can make this showing directly or indirectly.") (citations omitted). Direct proof of anticompetitive effects includes "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* Plaintiffs may also establish anticompetitive effects indirectly by showing that the defendant has "sufficient market power to cause an adverse effect on competition." *Tops Mkts. Inc. v. Quality Mkts. Inc.*, 142 F.3d 90, 96 (2d Cir. 1998). Plaintiffs plead sufficient facts as to both.

---

[28] While Plaintiffs dispute that the relationship between Defendants is a vertical restraint. Such a restraint "imposed by agreement between firms at different levels of distribution" are typically assessed under the rule of reason. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("*Amex*") (quoting *Bus. Elecs. Corp.*, 485 U.S. at 730).

a.       **The Amended Complaint Defines a Relevant Market**

Generally, establishing the parameters of a relevant market requires a fact intensive analysis unsuitable for resolution on a Rule 12(b)(6) motion. *Id.*; *see also Spanish Broad. Sys.*, 376 F.3d at 1070 ("Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases."); *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."). There is no requirement that the market definition elements of an antitrust claim be pled with specificity. *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *see also Swierkiewicz*, 534 U.S. at 513 (Rule 8 does not require heightened pleading standard); *Leatherman*, 507 U.S. at 168 (same).

Plaintiffs plead sufficient facts regarding the relevant market in which the anticompetitive harm occurred. *See Jacobs*, 626 F.3d at 1336. Under *Twombly*, a plaintiff must simply allege enough information to "plausibly suggest the contours of the relevant geographic and product markets." *Id.* (citations omitted). Plaintiffs have alleged the relevant geography and features with requisite specificity.[29] Plaintiffs allege—and Defendants do not challenge—that the relevant geographic market is the United States. *See* ¶¶ 310–311, 315. Plaintiffs allege that the relevant product market is the market for securities trading services. ¶¶ 305–15. The Amended Complaint provides ample detail of the features of the market which plausibly suggest its contours.

The business relationships and economic intentions of participants in the market for securities trading services is complex. It has two significant features, as understood by

---

[29] Defendants challenge the relevant market by contending that it fails to consider interchangeability. MTD at 25, n.19 (citing *Jacobs*, 626 F.3d at 1337-38). Specifically, Defendants argue that Plaintiffs cannot contend that "retail brokers who do not have a 'user-friendly' mobile app[,]' […] have account minimums or charge commissions do not compete with those in [the] "No-Fee Brokerage Trading App Market." *Id.* But the unique characteristics of the relevant market and the type of users it attracts speaks volumes. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993) (relevant product market can exist as distinct subset of larger product market, the boundaries of which may be determined by product's characteristics and distinct customers). Given the fact that the "median Robinhood customer holds an account balance of approximately $240 (¶ 314), a brokerage firm with a desktop-only application that charges a transaction fee per trade and that requires a $2,000 account minimum is no substitute for a brokerage firm that requires no account minimum and that allows users to trade for free by simply tapping a button on their cell phone.

economists. There is a market which consumers directly experience, which for ease of reference Plaintiffs refer to as the "No-Fee Brokerage Trading App Market"[30] *See* ¶¶ 312-14.

Brokerages, like Robinhood, compete to attract customers to their platform. The No-Fee Brokerage Trading App Market can be considered a "downstream" market because it is the one where products are sold or consumed by consumers and which they experience directly. *See* ¶ 312. It is the market in which Robinhood promotes its commission-free trading services and where it competes for customers with other firms which promote and sell similar services.[31] As Plaintiffs allege, Defendants caused anticompetitive harm in two distinct ways. First, Defendants, through the restraint, eliminated trading with respect to the Relevant Securities and thereby reduced output of trading services. Second, they thereby caused a reduction in quality of those services.[32] *See* Part IV.B.iv.b., *infra*. Reduction in output and reduction in quality are each classic paradigmatic types of anticompetitive harm. *See Amex*, 138 S. Ct. at 2284.

The No-Fee Brokerage Trading App Market is linked to and directly influenced by the PFOF Market controlled by Citadel Securities. ¶ 305. This can be considered an "upstream" market because it operates apart from consumers without consumer visibility and serves to facilitate the No-Fee Brokerage Trade App Market. It is integral to Plaintiffs' claims because Robinhood's business model and ability to offer no-fee trades is contingent on PFOF, and Citadel Securities is Robinhood's most important business partner with respect to PFOF. ¶ 5. Citadel Securities, the largest market maker, provides revenue to Robinhood for directing order flow to

---

[30] Particularly today, consumers buying or selling securities rely on brokerages and other market participants to conduct securities transactions and to provide related services. Consumers directly buy and sell publicly traded securities from other consumers through brokerages like Robinhood. When securities are traded electronically, brokerages and other firms like Citadel deal with each other to accomplish such transactions.

[31] Indeed, Defendants admit to this market when they—wrongly—argue that Plaintiffs could have avoided the anticompetitive harm they caused by using other brokers.

[32] This is supported by Defendants' own characterizations. *See*, *e.g.*, MTD at 4 ("Robinhood Financial is a customer-facing, introducing broker-dealer through which retail investors can place commission-free trade orders").

Citadel Securities. ¶¶ 313, 316, 318. Functionally, these upstream and downstream markets operate together with respect to the trading of securities.[33] *See* ¶ 305.

Defendants' contention that Plaintiffs "gerrymandered segregated markets" is not a proper basis for a Rule 12 motion. At most, it amounts to a factual dispute, which will be the subject of discovery, expert analysis and resolution by the trier of fact. Moreover, Defendants' characterization is wrong. It ignores the facts plaintiffs allege. The two aspects of the market Plaintiffs describe are consistent with Defendants' own description of their respective business models. *See* MTD at 5. Far from being "manufacture[d]" as Defendants suggest (MTD at 25, n.19), the allegations accurately reflect the market and Defendants' roles in it.[34]

Defendants counter Plaintiffs' allegations regarding the relevant market with allegations of their own. Defendants assert the existence of another market, the "market for the Relevant Securities." MTD at 26. Here too Defendants' allegations are untethered to the Amended Complaint, and are therefore improper. *Vernon v. Med. Mgmt. Assocs. of Margate, Inc.*, 912 F. Supp. 1549, 1553 (S.D. Fla. 1996) ("analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto"). In any event, Defendants misconstrue the concepts of "upstream" and "downstream" markets in economics and antitrust law. The fact that there are downstream features of the market, which consumers directly experience, and upstream features, which they do not, does not diminish the sufficiency of the allegations for pleadings purposes. Consumers never deal directly with market makers such as Citadel Securities but must transact through consumer-facing brokerages such as Robinhood. *Cf. Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1521-24 (2019) (direct purchaser standing for downstream purchasers of apps from app store). Together, they facilitate consumer transactions in securities, and as explained *infra*, their

---

[33] These detailed allegations are sufficient for pleading purpose. They set forth in more than adequate detail the nature of the business relationships. Pleading requirements for relevant antitrust markets are generalized. Requiring plaintiffs to plead more detail would incorrectly raise the pleading requirements akin to the particularized requirements under Rule 9. There is no particularized pleading requirement for antitrust cases. *Leatherman*, 507 U.S. at 168 ("Rule 8(a)(2) requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"); *Palm Beach Golf Ctr-Boca, Inc. v. Sarris*, 781 F.3d 1245, 1260 (11th Cir. 2015) (concluding *Twombly* did not overrule *Swierkiewicz* and *Leatherman*).

[34] Defendants' citation to *Kalmanovitz v. G. Heilman Brewing Co.*, 769 F.2d 152, 156 (3d Cir. 1985) is unavailing. MTD at 26, n.20. As *Kalmanovitz* recognized, "system-wide abuses in the securities industry have been held to have antitrust implications." *Id.* at 157, n.5.

interplay enabled the injury to competition. Plaintiffs' allegations not only inform the relevant market, they demonstrate their plausibility.

### b.    Plaintiffs Sufficiently Plead Anticompetitive Effects in the Relevant Market

Anticompetitive effects can be shown in two ways. They can be shown directly by "proof of actual detrimental effects on competition." *Amex*, 138 S. Ct. at 2284 (internal quotation marks and citations omitted). They can also be shown indirectly, by "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations omitted); *see also Levine*, 72 F.3d at 1551 ("plaintiff may either prove that the defendants' behavior had an 'actual detrimental effect' on competition, or that the behavior had 'the potential for genuine adverse effects on competition.'") (citations omitted). Plaintiffs plead sufficient facts as to each.

Proof of actual detrimental effects on competition includes, but is not limited to, "reduced output, increased prices, or decreased quality in the relevant market[.]" *Amex*, 138 S. Ct. at 2284 (citations omitted); *Jacobs*, 626 F.3d at 1339 (same). Plaintiffs have adequately pled paradigmatic detrimental effects. Evidence of restricted output is "direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *see Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000) (defendant's ability to restrict output proof of market power).[35] First, Robinhood, pursuant to its agreement with Citadel, reduced output. ¶¶ 254, 264. Indeed, that was the very purpose—and actual result—of the agreement. It was Robinhood's business to provide brokerage services free of commissions. ¶ 8. By restricting trading, the agreement denied customers those services.[36] ¶ 354. Second, it also subverted consumer choice by inhibiting consumers' ability to trade the Relevant Securities, thereby diminishing the quality of the transactions. ¶ 350. Third, Defendants' actions

---

[35] *See also Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 456-57 (1986) (using direct evidence to conclude challenged conduct "impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them"); *United States v. Microsoft Corp.*, 253 F.3d 34, 57 (stating that if "evidence indicates that a firm has in fact" profitably raised prices substantially above competitive level, "the existence of monopoly power is clear").

[36] This meant that the price at which the Relevant Securities could be sold no longer reflected the actual, competitive market price set through supply and demand. ¶ 354. By restricting output (brokerage services), there was a reduced supply of willing buyers of the Relevant Securities, resulting in reduced prices in the Relevant Securities.

distorted the pricing of the Relevant Securities. Rather than permitting the price discovery that would have occurred through the operation of supply and demand, Defendants interfered with the functioning of the market. In addition to benefiting them directly—by allowing Citadel Securities exit their short positions—this was a detriment to both competition and consumers. ¶¶ 350–56. These are actual detrimental effects on competition that the antitrust law prohibits. *See Ind. Fed'n of Dentists*, 476 U.S. at 460 ("'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power") (quoting 7 Areeda, Antitrust Law ¶ 1511, p.429 (1986)); *Costco*, 2015 WL 9987969, at *11 (actual competitive effects include but are not limited to reduction of output, increase in price, or deterioration in quality) (citing *Jacobs*, 626 F.3d at 1339).

### 1.   Robinhood and Citadel Securities Possess Power in the Relevant Market

Plaintiffs adequately allege market power in the relevant market.[37] ¶¶ 307–10, 324–36. Plaintiffs allege Robinhood possesses a high market share. Robinhood pioneered the No-Fee Brokerage Trading App Market and it remains the market leader in terms of market share. ¶ 324. Robinhood maintains 18 million online accounts that are part of the No-Fee Trading App Market, and Robinhood boasts a 50% market share of all new brokerage accounts. ¶¶ 325, 327. *See Jacobs*, 626 F.3d at 1339 (market share frequently used interchangeably with market power.); *see also Costco*, 2015 WL 9987969, at *13 (43% control of market sufficient market power for rule of reason analysis). Indeed, Robinhood reports more daily online trades and more daily active users than any of its largest rivals combined. ¶¶ 328–30. Further, few Robinhood users defected even after Robinhood implemented the trading restrictions, underscoring its market power. ¶ 336.

Robinhood's market power is also apparent due to the lock-in that consumers faced. Indeed, it should be obvious that, if Robinhood did not have such power, the prohibition on selling would have been unsuccessful, as consumers could have evaded it by trading elsewhere. As Plaintiffs allege, many consumers, with few exceptions, were unable to switch brokerages during the trading restrictions is strong evidence of Robinhood's market power. *See* ¶¶ 337-42.

---

[37] Tellingly, Defendants do not directly challenge Plaintiffs' allegations of market power. Defendants only make the conclusory claim that should Plaintiffs' claims proceed beyond the pleadings—and they should—that Plaintiffs will be unable to prove market power. MTD at 22, n.17. Ultimately, that is a question for the trier of fact, not Defendants.

Robinhood's market power was further buttressed by Citadel Securities's market power in the upstream market. Citadel Securities pays more to brokers for PFOF than any other market maker. ¶ 308-10. Citadel Securities accounts for 27% of all U.S. equities volume and executing nearly 37% of all U.S. listed retail securities trading volume (resulting in almost 40% of all PFOF transactions in the United States) and transacts more PFOF orders than Robinhood's three other largest market maker competitors combined. ¶ 307. The fact that Citadel Securities accounted for over half of the dark pool activity in the Relevant Securities during the week of January 25, 2021 is further support for these allegations. ¶ 282.

## 2. Plaintiffs Have Shown Defendants Harmed Competition in the Relevant Market

Plaintiffs further allege that Defendants' conduct caused harm to competition. Through their conduct, enabled by the market power they possessed and wielded, Defendants harmed competition by restraining consumer choice and artificially influencing the price of the Relevant Securities. In so doing, they divorced the price of the Relevant Securities from the fundamental economics of supply and demand. As described above, under conditions of competition, absent collusion, the laws of supply and demand would have operated, allowing prices to rise. As a result of Defendants' collusion, these laws were distorted, supply from willing sellers was reduced, and prices went down. Further, the scheme also had the detrimental effect of reducing the output of trades and reducing the quality of transactions. ¶¶ 350–56; *see* Part IV.B.iv.b, *supra*.

In addition, as Plaintiffs allege, Robinhood relied on PFOF from Citadel Securities, and Robinhood could not jeopardize that revenue stream, particularly given the imminent deadlines associated with its IPO. Exercising such leverage to obtain a restriction in trading is a form of bribery, prohibited by the antitrust laws. *See In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827, 2021 WL 147166, at *24-25 (D. Minn. Jan. 15, 2021). Harm resulting from such bribery is harm to competition. Bribery can reduce or eliminate market functions and thereby cause anticompetitive harm. In particular, "bribery can be anticompetitive when it 'rob[s] the ultimate purchaser of the opportunity to choose [a] product.'" *Id.* (citation omitted); *see also id.* (collecting cases). Here, as Plaintiffs allege, Citadel Securities used its market power and control of Robinhood's PFOF to pressure Robinhood into acting against both its own interest and the interest of consumers. This conduct by Defendants was inherently anticompetitive. ¶ 352.

Plaintiffs further allege that Defendants' conduct led to a rise in transaction costs, even if the underlying security's value went down in price, ¶ 353. *In re NASDAQ Mkt-Makers Antitrust*

*Litig.*, 172 F.R.D. 119, 125-26 (S.D.N.Y. 1997) ("common proof that the conspiracy" "did have a general effect on the transactions costs borne by institutional investors."); *see also United States v. Alex. Brown & Sons*, 963 F. Supp. 235, 237 (S.D.N.Y. 1997) (higher transaction costs for investors due to Defendants' collusion).

Defendants do not dispute that these allegations plausibly allege harm to competition. In fact, Defendants appear to concede that Plaintiffs' allegations constitute competitive harm. *See, e.g.,* MTD at 26 (allegations that Retail Investors sold below prices they would have otherwise obtained "is an allegation of harm in the market [ ] for trading the Relevant Securities.").

Instead, Defendants attempt to misdirect the focus instead on competition between Robinhood and the other brokerage services for customers or between Citadel Securities and other market makers. MTD at 25. First, this is inconsistent with the basic focus of the antitrust laws. *See 2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 137 (D.D.C. 2018) ("the antitrust laws 'were enacted for the "protection of *competition*, not *competitors*"'") (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 4298 U.S. 477, 489 (1977)) (italics in original).

Second, Defendants do so based on a third, entirely separate product market divorced from the allegations. MTD at 26. This is improper for pleading purposes. *See Vernon*, 912 F. Supp. at 1553. It ignores Plaintiffs' specific allegations of the relevant market. *See* Part IV,B.iv.a, *supra*. Defendants' attempt to analyze anticompetitive harm in a third market is of their own design is an attempt to muddy the waters. Defendants wrongfully contend that Plaintiffs alleged harm is "all premised on a decline in the price of the Relevant Securities." MTD 26. As explained above, this is incorrect.[38] *See* Part IV.B.iv.b., *supra*; *see also* ¶¶ 350–356. When the prices of the Relevant Securities dropped due to Defendants' scheme, Retail Investors sold the Relevant Securities at lower prices—the precise result Defendants desired.[39] ¶¶ 27, 32, 37, 41.

---

[38] The harm Plaintiffs incurred took the form of reduced brokerage services which is what Robinhood offered to consumers. The harm can be estimated by the amount lost when Plaintiffs were unable to sell the Relevant Securities due to the trading restrictions.

[39] Defendants' reliance on *Maris* misses the mark. MTD at 27 (citing *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002). In *Maris*, the Eleventh Circuit upheld the district court's decision that Anheuser-Busch's market share in beer manufacturing (a separate market) could not imputed to the relevant market. *Id.* at 1210, 1224. But nowhere in the *Maris*

Defendants finally contend that "the markets in which Citadel Securities and Robinhood operate are not within the area of effective competition between the defendant and plaintiff'" such that there are "no allegations that the conduct at issue here harmed competition in either of the relevant markets." MTD at 27 (citing *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999)). Defendants' argument is puzzling. Plaintiffs are purchasers of securities trading services. They do not contend they compete with Defendants, nor do they need to.

## V.    Plaintiffs' Claims Are Not Preempted by the Federal Securities' Law

Plaintiffs' antitrust claims are not preempted, *see Credit Suisse Securities (USA) LLC v. Billing,* 551 U.S. 264 (2007), because the Dodd-Frank Act's Antitrust Savings Clause applies to Plaintiffs' claims. All of Defendants' citations to support preclusion predate Dodd-Frank's passage into law. Further, Defendants' reliance on the SEC Staff Report[40] is misplaced.

### A.    Dodd-Frank Act's Antitrust Savings Clause Applies to Plaintiffs' Claims

In passing the Dodd-Frank Act, Congress amended the Securities Exchange Act of 1934 by adding provisions regarding, *inter alia*, short sales. Congress included an expansive Antitrust Savings Clause making clear that antitrust claims with respect to the matters addressed in the legislation were not precluded. Section 6 of the Dodd-Frank Act, 12 U.S.C. § 5303, states that "nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified" (the "Antitrust Savings Clause"). This is fatal to Defendants' preclusion argument.[41]

---

opinion is a discussion or analysis of an antitrust injury occurring *in* the defined market. Further, *Maris* recognized that market power only as a means to "indirectly" show proof of anticompetitive effects—the plaintiff was permitted to show a jury "direct[ ]" proof of *actual* anticompetitive effects. *Id.* at 1212. Here, Plaintiffs adequately allege proof of anticompetitive effects both directly and indirectly. ¶¶ 307–11, 324–46, 350–56. Defendants' citation to *Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755-RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012), is likewise off target. MTD at 27. The section on which Defendants rely involves a Section 2 claim against a noncompetitor. *Id.*, at *8-9. No such issue is before the Court.

[40] *SEC, Staff Report on Equity and Options Market Structure Conditions in Early 2021* (October 14, 2021), available at https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf. (the "SEC Staff Report").

[41] "In attempting to elaborate on the effect of an antitrust savings clause, it does not create a different rule, but merely reaffirms the general rule. Moreover, an antitrust savings clause is itself merely a reinforcement of the well-established principle that, because the antitrust laws are 'a

Dodd-Frank implemented broad provisions that directly touch upon issues alleged in the Amended Complaint. Section 929X of Dodd-Frank empowered the SEC to promulgate rules related to public disclosure of short positions, albeit the SEC has not promulgated any such rules. ¶¶ 302-03. Dodd-Frank amended the Exchange Act regarding certain transactions related to short sales. 1242 Stat. 1870. Dodd-Frank also has specific provisions related to market making. *E.g.*, 1242 Stat. at 1624, 1632. Defendants' conduct falls squarely within Dodd-Frank's ambit.[42] That the statute did not preclude antitrust is confirmed by the legislative history. As Representative Conyers, the Chairman of the House Judiciary Committee, stated:

> The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect. . . . First and foremost is the antitrust savings clause in section 6 of the bill. It is the standard antitrust savings clause found in other statutes. It applies to the entire Act, and all amendments made by the Act to other laws.

156 CONG. REC. E1347-01 (2010), 2010 WL 2788137 ("Conyers Remarks").

Defendants assert that the Dodd-Frank Act did not amend Section 15 of the Exchange Act. MTD at 34, n.24. Not so. Section 913(g) of the Dodd-Frank act modified "Section 15 of the Securities Exchange Act of 1934 (15 U.S.C. 78o)" by adding additional language that permits the SEC to promulgate rules regarding fiduciary standards and disclosure requirements for brokers. *See* Dodd-Frank Act § 913(g), 124 Stat. at 1828.

Moreover, Dodd-Frank preserved the applicability of the antitrust laws to matters within the scope of the Act except where "otherwise specified" and Congress expressly indicated where the antitrust laws were modified. "Dodd-Frank never mentions the Sherman Act . . . , and it explicitly modifies the Clayton Act in four provisions, none of which is relevant here. *See* 12 U.S.C. §§ 1843(k)(6)(B)(iii), 5363(b)(5), 5390(a)(1)(G)(ii), 5390(h)(11). These are the four provisions captured by the 'unless otherwise specified' exception to the antitrust savings

---

comprehensive charter of economic liberty aimed at preserving free and unfettered competition,' there is a strong presumption against their normal operation being superseded by some other statutory scheme." 156 CONG. REC. E1347-01 (2010), 2010 WL 2788137 (citations and internal quotations marks omitted).

[42] Whether the underlying conduct, here short sales, are permitted under Dodd-Frank is of no concern for antitrust purposes. *See ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 555 (8th Cir. 1991) ("The present case provides a further example of the antitrust maxim that 'even an otherwise lawful device may be used as a weapon in restraint of trade.'") (quoting *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 119 (1948)).

clause."[43] *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2014 WL 4379112, at *16 (S.D.N.Y. Sept. 4, 2014); *accord In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 497 (S.D.N.Y. 2017) (same). The legislative history indicates that Congress intended Dodd-Frank to only modify those specific provisions of the antitrust law. Conyers Remarks, at E1347 ("The phrase 'unless otherwise specified' refers only to those four specific provisions that explicitly modify the operation of those specified provisions of the antitrust laws in specified ways and is not a basis for courts to consider whether any other provision in the bill might be intended as an implicit modification of how the antitrust laws operate. The savings clause is intended to make clear that it is not."). The conclusion is inescapable that Congress intended for the antitrust laws to apply to short sales. *See Interest Rate Swaps*, 261 F. Supp. 3d at 497 ("As a matter of plain language, the exception to Dodd-Frank's clause preserving plaintiffs' right to bring antitrust claims is not implicated here.").

    *Billing* is inapposite here. *Billing* applies "[w]here regulatory statutes are silent with respect to antitrust." 551 U.S. 264 at 271 (2007) (emphasis added). Here, however, the statute is not silent. It addresses the commerce giving rise to Plaintiffs' claims and, in addition, it provides that the reach of the antitrust laws with respect to them is preserved. Further, none of the cases Defendants cite in support of preemption post-date Dodd-Frank. "When Congress has spoken, the Supreme Court stated, a court is to apply Congress's command as to the extent, if any, to which antitrust laws are abrogated." *See In re Interest Rate Swaps,* 261 F. Supp. 3d at 496-97 (citing *Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 406–07 (2004) (analyzing the antitrust savings clause of the Telecommunications Act)). As such, the Antirust Savings Clause applies, and Plaintiffs' claims under the Sherman Act are not precluded.

    **B.**    **The *Billing* Factors Weigh Against Preclusion of Plaintiffs' Claims**

    Even if *Billing* applies—and it does not—Plaintiffs' claims are not precluded by the Exchange Act. The "repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a '*plain repugnancy between antitrust and regulatory provisions will repeal be implied.*'" *Gordon v. N.Y. Stock Exch., Inc.,* 422 U.S. 659, 682 (1975) (citations omitted, emphasis added). Courts should only find the antitrust laws are precluded in narrow specific circumstances. "Repeal of the antitrust laws is to be regarded as implied only if

---

[43] The specified provisions relate to Hart-Scott-Rodino premerger review under the Clayton Act.

necessary to make the [ ] Exchange Act work, and *even then only to the minimum extent necessary*."[44] *Billing*, 551 U.S. at 271 (emphasis added, brackets and citation omitted). In *Billing*, the Supreme Court identified four factors to determine whether antitrust claims are implicitly precluded: (1) whether the action involves an area of conduct squarely within the heartland of securities regulations; (2) clear and adequate SEC authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes. *Id.* at 285. Here, there is no "clear repugnancy" between antitrust laws and securities laws. The fact that anticompetitive conduct occurred with respect to the buying and selling of securities is insufficient to warrant preclusion. Each of the *Billing* factors weighs *against* preclusion here.

### i. The Underlying Conduct at Issue Is Not Central to the Functioning of Well-Regulated Capital Markets

"To ascertain whether 'the possible conflict' between securities law and antitrust law affects 'practices that lie squarely within an area of financial market activity that the securities law seeks to regulate,' the Supreme Court looked to the broad underlying market activity." *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133 (2d Cir. 2009) (citing *Billing*, 551 U.S. at 276). In *Billing*, the Supreme Court considered how the IPO process (the underlying market activity) was "central to the proper functioning of well-regulated capital markets." *Id.*, at 276. In concluding that it was, the Supreme Court addressed numerous benefits of the IPO process, including how it "supports new firms that seek to raise capital," "helps spread ownership," and "directs capital flow." *Id.* The Court also noted that many financial experts considered the joint underwriting activity at issue "essential to the successful marketing of an IPO." *Id.* Similarly, in determining that short selling (the underlying market activity) was an "area of conduct squarely within the heartland of securities regulations," the court in *Elec. Trading Grp.*, considered the "liquidity and pricing benefit created by short sales." 588 F.3d at 133-34 (citation omitted).

Defendants argue that the underlying activity here lies at the very heart of the securities market because "[m]arket integrity" is "vital" and because brokers 0must "register with the SEC" (MTD at 29), but Defendants do not—and cannot—demonstrate how cutting off retail investors' access to the securities market by restricting trading (let alone doing so in an

---

[44] Antitrust laws have long been enforced with respect to wrongdoers in the securities market. *See*, *e.g.*, *NASDAQ Mkt-Makers*, 894 F. Supp. 703 (S.D.N.Y. 1995); *see also Kalmanovitz*, 769 F.2d at 157 (collecting cases where "antitrust laws have been applied to the securities industry").

unlawfully coordinated fashion) is "central to the proper functioning of well-regulated markets." *Billing*, 551 U.S. at 276. Thus, this factor weighs against preclusion. *See Kalmanovitz*, 769 F.2d at 156, n.5 ("abuses in the securities industry have been held to have antitrust implications").

### ii.    The SEC Is Not Authorized to Regulate the Activities in Question

The second *Billing* factor considers whether there is "clear and adequate SEC authority" to regulate the activities in question. 551 U.S. at 285. In ascertaining "'the existence of regulatory authority under the securities law to supervise the activities in question . . . the Supreme Court looked to the role of the [defendants] in the [underlying market activity].'" *Elec. Trading Grp.*, 588 F.3d at 134 (quoting *Billing*, 551 U.S. at 275-77).

The SEC does not have authority to supervise "all of the activities in question here," and in particular Robinhood's imposed limitations on trading. Defendants' reliance on general regulations concerning fraudulent practices is insufficient to close that gap. *See* MTD at 30-31 (citing *Billing*, 551 U.S. at 276). To argue otherwise is entirely misleading. In *Billing*, the Supreme Court first looked to whether the SEC possessed the power to supervise the activity in question. *Billing*, 551 U.S. at 276-77. In finding that it did, the Supreme Court cited to specific regulatory statutes governing the underwriter-defendants' acts during the IPO process (the underlying market activity), including book-building, solicitations of indications of interest, and communications between underwriting participants and their customers. *Billing*, 551 U.S. at 276-77 (citing 15 U.S.C. §§ 77(b)(a)(3), 77j, 77z-2). Only *after* the Supreme Court found that SEC regulated the activity in question did it look to buttress the conclusion.

Here, Defendants refers to several regulations which provide no evidence that the SEC has the authority to regulate the conduct at issue (i.e., Defendants' collusive agreement to restrict Retail Investors from purchasing the Relevant Securities). *See* MTD at 30 (citing 15 U.S.C. § 78o(c)(2) and 15 U.S.C. § 78j(b)).[45] The referenced regulations concern, *inter alia*, over-the-

---

[45] Defendants' citation to 15 U.S.C.§ 78o(b)(7) is also misplaced as this statute addresses registration, training and qualification requirements for brokers, all of which are irrelevant here. *See* MTD at 30.

counter markets rules, record keeping requirements,[46] standards for clearing agencies and securities offerings (i.e., IPOs). These are beside the point and irrelevant here.

Further, Defendants' reliance on the SEC's newly proposed rule regarding the settlement period[47] is misplaced. MTD at 30. The proposed rule, at best, shows the SEC has authority to supervise and mitigate risks associated with trade settlement. This is a far cry from showing the SEC has the authority to supervise all of the activities in question here, and in particular has no direct relationship with Robinhood's trading restrictions or related concerted activity.

### iii.    The SEC Is Not Exercising its Authority over the Conduct at Issue

The third *Billing* factor considers "evidence that the responsible regulatory entities exercise [their] authority." *Billing*, 551 U.S. at 275. There is no such evidence. Defendants instead refer to a handful of SEC regulations. MTD at 31. But these regulations, which are more appropriately analyzed under the second *Billing* factor as described above, provide no evidence that the SEC has been investigating or regulating the conduct at issue here (i.e., the Defendants' collusive agreement to restrict Retail Investors from purchasing the Relevant Securities). As mentioned in Part V.B.ii., *supra*, these are beside the point and irrelevant here. *See* MTD at 31; *see also* 17 C.F.R. §§ 240.15c3-1 to -5; 17 C.F.R. §§ 240.17h-1T to -2T; Regulation M, 17 C.F.R.§§ 242.100 to -105. As addressed above, Defendants' reliance on provisions of the Exchange Act is also misplaced. *See* MTD at 31.

Defendants' general reference to SEC enforcement programs (MTD at 31-32) is of no moment. These programs were not created to address the conduct at issue. Defendants have not been the target of such programs either. Defendants do not contend to the contrary. And, while true that the SEC investigated the events concerning the market activities of January 28, 2021, there is simply no evidence to suggest that the SEC investigated the claims of concerted activity

---

[46] Disclosure-like oversight does not rise to the level of exercise of authority to satisfy the elements in *Billing*. *See Dahl v. Bain Capital Partners, LLC*, 589 F. Supp. 2d 112, 116-17 (D. Mass. 2008) ("seeing that the SEC only required certain disclosures here, and that it did not substantively regulate the behavior in question, the second factor is not met.").

[47] *See Shortening the Securities Transaction Settlement Cycle*, Release No. 34-94196 (issued February 9, 2022) (publication in Federal Register forthcoming) (to be codified at 17 C.F.R. pts. 232, 240, and 275), available at https://www.sec.gov/rules/proposed/2022/34-94196.pdf (the "Proposed Rule").

at issue here.[48] *See Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, Nos. 08-cv-7746 (BSJ), 08-cv-7747 (BSJ), 2010 WL 430771, at *5 (S.D.N.Y. Jan. 26, 2010) (finding that the SEC had "actively exercised its authority" by "undertak[ing] an ongoing investigation into *the specific events at issue in this case*") (emphasis added).

Not only do Defendants mischaracterize the target of the SEC's investigation, but they intentionally gloss over the fact that the Staff Report has no precedential value. By its terms, the Staff Report expressly disclaims any legal or factual effect on its cover page:

> DISCLAIMER: This is a report of the Staff of the U.S. Securities and Exchange Commission. Staff Reports, Investor Bulletins, and other staff documents (including those cited herein) represent the views of Commission staff and *are not a rule, regulation, or statement of the Commission*. The Commission has neither approved nor disapproved the content of these documents and, like all staff statements, *they have no legal force or effect*, *do not alter or amend applicable law*, and create no new or additional obligations for any person. *The Commission has expressed no view regarding the analysis, findings, or conclusions contained herein.*

Staff Report at 1 (emphasis added). Thus, no legal conclusions can be drawn from the Staff Report, and it has no preclusive effect with respect to any factual matter at issue here.[49]

### iv.    There is No Conflict Between Antitrust and Securities Laws

The fourth *Billing* factor considers whether there is a "serious conflict between the antitrust and regulatory regimes," such that allowing "an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities market." *Billing*, 551 U.S. at 283, 385. A conflict may occur when there is either an actual conflict or a potential conflict between antitrust law and securities regulations. *Elec. Trading Grp.*, 588 F.3d at 137-38.

---

[48] SEC Chair Gary Gensler alluded to the SEC's investigative focus in his Congressional testimony. Notably, absent from Gensler's testimony was any refence to Defendants' alleged conspiratorial conduct. *Virtual Hearing – Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, 117th Cong. (May 6, 2021) (statement of Gary Gensler, SEC Chairman), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-genslerg-20210506.pdf. The Court may take judicial notice of SEC statement because it is a public record, the accuracy of which cannot be questioned. *See Univ. Express, Inc. v. U.S. Sec. Exchange Comm'n*, 177 F. App'x 52, 53 (11th Cir. 2006).
[49] To the extent that Defendants attempt to introduce the Staff Report as a means to show conflict between the Securities Exchange Act and the Sherman Act, the Staff Report does no such thing as, by its terms, it has "no legal force or effect." *Id.*

Far from creating sufficient harm, this antitrust lawsuit would create no harm at all. Defendants cite to no law that would be in conflict with or undermined were Plaintiffs' claims to succeed. In ascertaining whether an actual conflict exists, the court in *Elec. Trading Grp.* examined whether "[a]ntitrust liability would inhibit conduct that the SEC permits and that assists the efficient functioning of the [securities'] market." *Id.* at 137. No such concern pertains here. The assertion that Defendants' concerted activity is not prohibited in fact proves the reverse, namely that the conduct is not subject to regulation. Further, there is no showing that such conduct is permitted, authorized or encouraged by the SEC. Far from it.

To support their argument that an actual conflict exists because the "conduct at issue" is "permitted by the SEC," Defendants rely on an excerpted portion of an SEC investor alert, which when read in full states:

> Also, broker-dealers may reserve the ability to reject or limit customer transactions. This may be done for legal, compliance, or risk management reasons, and is typically discussed in the customer account agreement. In certain circumstances, broker-dealers may determine not to accept orders where a transaction presents certain associated compliance or legal risks.

MTD at 10. Defendants do not explain how these generalized descriptions authorize their concerted activity. Moreover, the above language "is not a rule, regulation, or statement of the [SEC]," but rather an "investor bulletin," that has not been "approved" by the SEC. SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-socialmedia-investor-alert. Such a bulletin "has no legal force or effect: it does not alter or amend applicable law, and it creates no new or additional obligations for any persons."[50] *Id.*

"In evaluating conflict, [ ] the proper focus is on the alleged anticompetitive conduct." *Elec. Trading Grp.*, 588 F.3d at 137. In *Billing*, the Court addressed the "*manner*" in which

---

[50] 17 C.F.R. §§ 240.15a-1 to 240.15c6-1 govern "Exemption of Certain OTC Derivatives Dealers (§ 240.15a-1); "Exemption of Certain Securities From Section 15(a) (§§ 240.15a-2 - 240.15a-5)"; "Registration of Brokers and Dealers (§§ 240.15a-6 - 240.15b11-1)" and "Rules Relating to Over-the-Counter Markets (§§ 240.15c1-1 - 240.15c6-1)"; 17 C.F.R. §§ 240.17Ab2-1 to -2 relate to "Registration of clearing agencies" and "Determinations affecting covered clearing agencies" respectively; §§ 240.17Ad-1 to -24 regulate clearing agencies' collateral call requirements; and Regulation M and §§ 242.100 to -105 only apply to distribution of stock as part of the IPO process. Likewise, these statutes describe permitted practices with respect to certain securities transactions, but do not concern those at issue here.

defendants effectuated their alleged anticompetitive conduct through practices such as laddering and tying. *Id.* (citing *Billing*, 551 U.S. at 278). In analyzing these practices, the Court determined that in relation to laddering and tying, only a fine line separated activity that the SEC permitted from that the SEC disallowed. *Billing*, 551 U.S. at 279-80. Relying on *Billing*, the court in *Elec. Trading Grp.*, reasoned that "[i]t is a lot to expect a broker 'to distinguish what is forbidden from what is allowed,'" such that it would "curb" permittable conduct. 588 F.3d at 137-38. The claims at issue here do not attack or seek to prohibit short selling generally.

There is no potential conflict either. A potential conflict exists when there is a possibility that the SEC will act upon its authority to regulate the conduct. *Id.* at 137. To support their argument that a "potential conflict" exists, Defendants refer to the SEC Staff Report. MTD at 33. But, once again, there is no evidence that the SEC investigated or plans to investigate Defendants' collusive behavior. And here, unlike in *Billing*, there is no fine "line-drawing" that needs to be done to distinguish permittable from permissible conduct as Defendants' actions were entirely outside the realm of the SEC's regulatory authority. *See Billing*, 551 U.S. at 279.

## VI.     CONCLUSION

For the foregoing reasons, Defendants' MTD should be denied.

Dated: March 11, 2022

By:  _____/s/ *Joseph R. Saveri*
                Joseph R. Saveri

Joseph R. Saveri (CA SBN 130064)
Steven N. Williams (CA SBN 175489)
Christopher K.L. Young (CA SBN 318371)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
cyoung@saverilawfirm.com

By:  _____/s/ *Frank R. Schirripa*
                Frank R. Schirripa

Frank R. Schirripa (NY SBN 4103750)
Kathryn Hettler (NY SBN 5126065)
Seth Pavsner (NY SBN 4969689)
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Ave, 10th Floor
New York, New York 10016
Tel: (212) 213-8311
fschirripa@hrsclaw.com
khettler@hrsclaw.com
spavsner@hrsclaw.com

*Co-Lead Counsel for the Antitrust Tranche*

# Doc 463

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-MD-2989-ALTONAGA/TORRES**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to the Antitrust Tranche

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE**
**AMENDED ANTITRUST TRANCHE COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT .................................................................................................. 3

I.     PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THAT DEFENDANTS
AGREED TO CONSPIRE............................................................................... 3

     A.    Plaintiffs Do Not Contest That They Fail to Allege Direct Evidence of an
Agreement.............................................................................................. 4

     B.    Plaintiffs Do Not Plausibly Allege Circumstantial Evidence of an
Agreement.............................................................................................. 4

II.    PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A
SECTION ONE CLAIM................................................................................. 10

     A.    Plaintiffs' Claim Does Not Qualify for Per Se or "Quick Look" Treatment
Under the Antitrust Laws......................................................................... 11

     B.    Plaintiffs Fail to State a Claim Under the Rule of Reason. ...................... 13

III.   PLAINTIFFS' ANTITRUST THEORY IS PRECLUDED BY THE FEDERAL
SECURITIES LAWS..................................................................................... 16

     A.    The Dodd-Frank Act Savings Clause Does Not Apply. .......................... 16

     B.    Plaintiffs' Antitrust Claims Are Precluded under Billing Because the
Conduct at Issue Is Regulated by the Federal Securities Laws. ............... 17

IV.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE. ..................... 20

CONCLUSION.............................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
   342 F. Supp. 3d 126 (D.D.C. 2018) ........................................14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................5

*Associated News, Inc. v. Curtis Circulation Co.*,
   Civ. A. No. H-80-1201, 1986 WL 13791 (S.D. Tex. Dec. 4, 1986) ........................................6

*Belcher v. Atlantic Capital Realty, LLC.*,
   No. 6:08-cv-1989-Orl-28DAB, 2010 WL 11507399
   (M.D. Fla. Sept. 17, 2010) ........................................6, 7

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................3, 6

*In re Blue Cross Blue Shield Antitrust Litig.*,
   26 F. Supp. 3d 1172 (N.D. Ala. 2014) ........................................12

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ........................................14

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ........................................2, 13

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988) ........................................12, 13

*Cal. ex rel. Harris v. Safeway Inc.*,
   651 F.3d 1118 (9th Cir. 2011) ........................................13

*City of Rockford v. Mallinckrodt ARD, Inc.*,
   360 F. Supp. 3d 730 (N.D. Ill. 2019) ........................................12

*Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*,
   No. 3:15-CV-734-J-20JRK, 2015 WL 9987969 (M.D. Fla. Nov. 4, 2015) ........................................16

*In re Credit Default Swaps Antitrust Litig.*,
   No. 13-md-2476, 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ........................................16

*Credit Suisse Sec. (USA) LLC v. Billing*,
   551 U.S. 264 (2007) ........................................17, 18, 19, 20

*DeLong Equip Co. v. Wash. Mills Abrasive Co.*,
    887 F.2d 1499 (11th Cir. 1989) ...................................................................6

*Dunnivant v. Bi-State Auto Parts*,
    851 F.2d 1575 (11th Cir. 1988) ...................................................................3

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs., & Antitrust Litig.*,
    336 F. Supp. 3d 1256 (D. Kan. 2018) ........................................................12

*In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*,
    No. 19-21551-CIV, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021) ............3

*In re Fla. Cement & Concrete Antitrust Litig.*,
    746 F. Supp. 2d 1291 (S.D. Fla. 2010) ...........................................5, 8, 10

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986)...................................................................................15

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ..................................................................8, 9

*In re High-Tech Emp. Antitrust Litig.*,
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) .....................................................12

*Hunter v. Booz Allen Hamilton, Inc.*,
    418 F. Supp. 3d 214 (S.D. Ohio 2019) ......................................................12

*In re Interest Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017)........................................................16

*Intergraph Corp. v. Intel Corp.*,
    195 F.3d 1346 (Fed. Cir. 1999).........................................................14, 15

*Isaksen v. Vermont Casting, Inc.*,
    825 F.2d 1158 (7th Cir. 1987) ....................................................................7

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ......................................................3, 12, 15

*Kalmanovitz v. G. Heilman Brewing Co.*,
    769 F.2d 152 (3d Cir. 1985)........................................................................18

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)................................................................................3, 4

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    172 F.R.D. 119 (S.D.N.Y. 1997) ..............................................................18

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) ............................................................12

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ............................................................ passim

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016) ............................................................12

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
    917 F.3d 1249 (11th Cir. 2019) ............................................................5, 12

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................16

*Skinner v. Legal Advocacy Center of Central Fla., Inc.*,
    No. 6:11-cv-1760-Orl-37KRS, 2013 WL 5720142 (S.D. Fla. Oct. 21, 2013) ....................4, 5

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
    376 F.3d 1065 (11th Cir. 2004) ............................................................11

*In re Terzosin Hydrochloride Antitrust Litig.*,
    352 F. Supp. 2d 1279 (S.D. Fla. 2005) ............................................................12

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ............................................................15

*United Am. Corp. v. Bitmain, Inc.*,
    530 F. Supp. 3d 1241 (S.D. Fla. 2021) ............................................................6, 14

*United States v. Gacnik*,
    50 F.3d 848 (10th Cir. 1995) ............................................................6

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ............................................................15

*United States v. Siegler*,
    990 F.3d 331 (4th Cir. 2021) ............................................................6

*In re Urethane Antitrust Litig.*,
    No. 04-1616-JWL, 2013 WL 2097346 (D. Kan. May 15, 2013) ............................................................6

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ............................................................8

**Statutes & Rules**

12 U.S.C. § 5303 ............................................................16

15 U.S.C. § 78i ...............................................................................................16, 18, 19

15 U.S.C. § 78j ...............................................................................................16, 18, 19

15 U.S.C. § 78k-1 ......................................................................................................19

15 U.S.C. § 78o ........................................................................................16, 17, 19, 20

15 U.S.C. § 78q .........................................................................................................20

15 U.S.C. § 78q-1 ......................................................................................................20

Dodd-Frank Act § 1(a) ..............................................................................................16

Dodd-Frank Act § 6 ...................................................................................................16

Dodd-Frank Act § 913(g) ..........................................................................................17

Dodd-Frank Act § 929X(a) ........................................................................................17

## Other Authorities

17 C.F.R. §§ 240.15a-1 to 240.15c6-1 ......................................................................20

17 C.F.R. § 240.15c3-5 .............................................................................................19

17 C.F.R. §§ 240.17Ab2-1 to 240.17Ab2-2 ..............................................................20

17 C.F.R. §§ 240.17Ad-1 to 240.17Ad-24 ................................................................20

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1508 (4th & 5th Eds., 2015-2021) ...............................................................................................................13

SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021* (October 15, 2021), *available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf........................................19

SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert ........................................................18, 20

<u>**PRELIMINARY STATEMENT**</u>

For more than a year, Plaintiffs have tried to manufacture an antitrust conspiracy where none exists. After suing dozens of industry participants, Plaintiffs slowly abandoned their claims against nearly all of them. What remains is their implausible theory that—despite similar restrictions from many other brokers and a well-documented multi-billion-dollar collateral call from its clearing agency—Robinhood implemented the relevant trading restrictions only because doing so would benefit one of its market-makers, Citadel Securities. But just as the core of Plaintiffs' theory remains the same, so do the fatal flaws. Plaintiffs fail to identify any new or different factual allegations in their Amended Antitrust Complaint to render this theory any less implausible than it was when Plaintiffs alleged it in the complaint ("Dismissed Antitrust Complaint" or "DAC") the Court previously dismissed (in the "Antitrust Decision"). Indeed, the Amended Antitrust Complaint contains no new material factual allegations to support Plaintiffs' theory. It instead reflects a reshuffling of old allegations and the addition of unsubstantiated conclusory assertions that still do not support a plausible inference of an agreement between Citadel Securities and Robinhood. The Amended Antitrust Complaint also fails for two additional legal reasons: Plaintiffs fail sufficiently to plead competitive harm under the rule of reason and their antitrust claims are precluded by the federal securities laws. The Amended Antitrust Complaint should be dismissed.

*First*, Plaintiffs point in the Amended Antitrust Complaint to the very same set of communications that the Court previously concluded are "vague and ambiguous emails between two firms in an otherwise lawful, ongoing business relationship" that are not "enough to nudge Plaintiffs' claims across the line from conceivable to plausible." (Antitrust Decision at 50.) Plaintiffs do not contest, or even attempt to address, the fact that they continue to rely on the same communications that the Court has already found insufficient to support an inference of conspiracy (*see* Mot. to Dismiss ("MTD") Exhibit A). Nor do Plaintiffs provide any reason to conclude that those identical communications somehow support an inference of conspiracy now, even though they did not in the prior complaint. Plaintiffs also rely on the same circumstantial evidence as before, merely adding conclusory statements in an attempt to bolster the inter-firm communications alleged in the Amended Antitrust Complaint. In the Antitrust Decision, the Court systematically analyzed those allegations of circumstantial evidence and rejected them as insufficient to further a plausible inference of conspiracy. This conclusion still holds true. Most

fundamentally, Plaintiffs cannot overcome the obvious alternative (and actual) explanation for the purchase limitations, which is itself alleged in the Amended Antitrust Complaint:  that Robinhood acted in response to the $3 billion collateral call it received from the NSCC on the morning of January 28, 2021, rather than because of some unlawful agreement with Citadel Securities.  The Court should again dismiss Plaintiffs' claim for failure to plausibly plead the existence of an unlawful agreement.  (*See infra* Section I.)

   *Second*, having now alleged a vertical (rather than horizontal) conspiracy in the Amended Antitrust Complaint, Plaintiffs fail to plead the harm to competition that the rule of reason requires for such a Section 1 claim.  Specifically, they fail to plead harm to competition in either of the two product markets that they allege—the alleged "upstream" PFOF Market in which Citadel Securities competes, or the alleged "downstream" No-Fee Brokerage Trading App Market in which Robinhood competes.  (*See* AAC ¶¶ 305-315.)  Plaintiffs' alleged harm—"that the stock prices for the Relevant Securities did not appreciate further" (*id.* ¶ 15)—concerns the trading prices of the Relevant Securities, and thus is felt in ***the supposed market for the Relevant Securities***, not either of the markets in which Plaintiffs allege Defendants compete.  In an effort to avoid application of the rule of reason, Plaintiffs now assert in their Opposition, for the first time, a newly constructed framework in which Citadel Securities and Robinhood are *horizontal* competitors in a combined "market for securities trading services."  (Opp. at 23 n.26, 25.)  This is flatly contrary to the Amended Antitrust Complaint, where Plaintiffs allege that "[m]arket makers and brokerages operate at two different levels," and "Citadel (a market maker) operates in a relevant market upstream of that in which Robinhood (a brokerage) operates."  (AAC ¶ 305.)  Plaintiffs' newfound characterization also makes no sense, as antitrust markets are defined by demand substitutability, *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), and the distinction between Defendants' services is plainly evident here.  A consumer could not go to Citadel Securities to obtain an alternative to Robinhood's brokerage services, nor could a market participant obtain Citadel Securities' market-making services from Robinhood.  Therefore, to the extent that Plaintiffs plead any conspiracy, they plead a *vertical* conspiracy between parties operating in different markets, for which the rule of reason applies.  As the standard of review is a matter of law, the Court can and should apply the rule of reason to the alleged agreement at the motion to dismiss stage.  And because Plaintiffs fail to plead harm to competition in either of the

alleged markets in the Amended Antitrust Complaint (*see* AAC ¶¶ 305-315), Plaintiffs fail to state a claim under the rule of reason.  (*See infra* Section II.)

*Third*, the federal securities laws preclude Plaintiffs' antitrust claim.  In opposition, Plaintiffs argue that the federal securities laws do not address collusive conduct—but as explained in Defendants' Motion and below, the crux of Plaintiffs' claims is purported manipulation of the trading prices of the Relevant Securities, which is in the heartland of federal securities regulation.  Plaintiffs cannot escape the scope of the federal securities laws by labeling their claim as an antitrust conspiracy.  For this independent reason, Plaintiffs' Amended Antitrust Complaint should be dismissed.  (*See infra* Section III.)

After more than a year of litigation, review of thousands of documents from the alleged conspirators and three attempts to plead a cognizable antitrust claim, Plaintiffs still have failed adequately to plead an unlawful agreement in restraint of trade.  Given the ample opportunity this Court has already provided Plaintiffs, the Amended Antitrust Complaint should now be dismissed with prejudice.  (*See infra* Section IV.)

## ARGUMENT

## I.   PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THAT DEFENDANTS AGREED TO CONSPIRE.

The threshold requirement for pleading a Section 1 claim is "to locate the agreement that restrains trade."  (Antitrust Decision at 26 (internal citations omitted).)  Plaintiffs' conspiracy claim should not survive Defendants' motion to dismiss because the claim is not supported by "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, No. 19-21551-CIV, 2021 WL 1109128, at *10 (S.D. Fla. Mar. 23, 2021) (alteration in original) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  Circumstantial evidence does "not support even an inference of conspiracy" if it is "equally consistent with permissible competition."  *Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1582 (11th Cir. 1988).  "Plausibility is the key, as the 'well-pled allegations must nudge the claim across the line from conceivable to plausible.'"  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

In their Opposition, Plaintiffs fail to establish that the Amended Antitrust Complaint alleges the requisite agreement.  (Opp. at 7 & n.5.)  *First*, Plaintiffs concede that they

lack direct evidence of an agreement.  *Second*, despite claiming they pleaded "ample circumstantial evidence" to infer an agreement (*id.* at 6), Plaintiffs fail to identify a single new allegation that supports the inference of such an agreement from their Amended Antitrust Complaint.  Rather, Plaintiffs rely on the exact same communications and rehash the same already rejected circumstantial evidence arguments this Court already reviewed and found insufficient.

Plaintiffs also fail to offer any new argument that casts doubt on the plausibility of the alternative (and true) explanation for why Robinhood put purchasing restrictions in place.  As before, Plaintiffs themselves continue to allege what is an obvious alternative explanation—the restrictions arose from "increased collateral requirements caused by market volatility." (Antitrust Decision at 37.)  If anything, Plaintiffs' conspiracy claim has become *less* plausible than it was when the Court dismissed the previous complaint.  Plaintiffs no longer allege that any other brokers were part of the conspiracy, and have thus abandoned any allegations that those brokers imposed restrictions similar to Robinhood's for any improper reasons.  In that context, with various other market actors imposing similar restrictions for business reasons entirely unrelated to any alleged conspiracy, that is all the more reason to reject as implausible Plaintiffs' claim that Robinhood imposed the purchasing restrictions only because it agreed to do so to help Citadel Securities.

A.    **Plaintiffs Do Not Contest That They Fail to Allege Direct Evidence of an Agreement.**

Defendants demonstrated in their Motion that Plaintiffs failed to plead any direct evidence of a purported agreement between Citadel Securities and Robinhood.  (MTD at 14.) Plaintiffs do not dispute their failure to plead direct evidence.  (*See* Opp. at 8-20.)  Plaintiffs have therefore waived any argument that they have pleaded direct evidence of an agreement.  *See Skinner v. Legal Advocacy Center of Central Fla., Inc.*, No. 6:11-cv-1760-Orl-37KRS, 2013 WL 5720142, at *2 n.3 (S.D. Fla. Oct. 21, 2013).

B.    **Plaintiffs Do Not Plausibly Allege Circumstantial Evidence of an Agreement.**

Plaintiffs' lack of direct evidence of an agreement means they must plead a plausible inference of conspiracy through circumstantial evidence to survive dismissal.  (MTD at 14-15.)  As set out in Defendants' Motion, such circumstantial evidence must demonstrate "a conscious commitment to a common scheme designed to achieve an unlawful objective."  (*Id.* at 15 (quoting *Monsanto*, 465 U.S. at 764).)  The Court "may infer from the factual allegations in

the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)).  (*See* Antitrust Decision at 37-38.)  None of the supposed circumstantial evidence addressed by Plaintiffs supports a reasonable inference of conspiracy.

**Inter-Firm Communications.**  Plaintiffs rely on the same communications between Citadel Securities and Robinhood that this Court previously concluded are insufficient to plausibly plead a conspiracy.  (*Id.* at 49-50.)  As noted above, Defendants' Motion demonstrated this fact through a side-by-side comparison chart.  (MTD at 16 & Ex. A.) Plaintiffs offer *no response* to that comparison, effectively conceding that they have no new allegations or inter-firm communications to support a plausible inference of a conspiracy.[1]

With no new factual allegations to rely upon, Plaintiffs simply try to add their own spin to the communications the Court already reviewed and found insufficient.[2]  But "[c]onclusory allegations of agreement or conspiracy are insufficient."  *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1262 (11th Cir. 2019) (en banc);

---

[1] In their Opposition, Plaintiffs assert that "Defendants' executives acted in ways consistent with advanced knowledge of the conspiracy" and "Defendants' executives were dumping their stock," even though this lacks any support in the Antitrust Amended Complaint.  (Opp. at 9, 12.) As shown in Exhibit A, the sole new communication is an internal message from Mr. Swartwout to another Robinhood employee on January 26, 2021, which the Court already reviewed in connection with its dismissal of the Robinhood Tranche's Consolidated Amended Complaint (Order, ECF No. 453).  In that message, Mr. Swartwout reported selling his "AMC today," and informed his colleague that Robinhood would set a 100% margin requirement on GME (a different stock) on January 27.  (AAC ¶ 234.)  Mr. Swartwout's message was about margin requirements (not part of the alleged conspiracy), not the purchase limitations imposed *after* Robinhood received the $3 billion collateral call from the NSCC.  (MTD at 16 n.10.)  Indeed, discussing a margin requirement would make little sense if Robinhood intended to prohibit purchases, as initial margin pertains to the amount of cash on hand a customer must have to purchase a stock.  Although Plaintiffs suggest that Mr. Swartwout may have sold his AMC shares in connection with a separate email exchange between a different Robinhood employee, Josh Drobnyk, and a Citadel Securities employee the prior day (Opp. at 9-10; *see also* AAC ¶¶ 229-230), this is rank speculation.  Mr. Swartwout did not receive Mr. Drobnyk's email, and that email does not refer to *any* stocks, let alone a plan to impose purchase limits on any stocks.

[2] Plaintiffs' assertion—which Defendants strongly dispute—that Citadel Securities was unsurprised by Robinhood's purchase restrictions (Opp. at 6 n.4, 11) is unsupported and is contradicted by Citadel Securities' internal emails produced to Plaintiffs and cited in the Robinhood Tranche Amended Complaint.  (ECF No. 409 ¶ 220 ("this may cause some big moves").)

*Twombly*, 550 U.S. at 557.  Put differently, a "complaint must state facts—not conclusions—that plausibly suggest a conspiracy." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1256 (S.D. Fla. 2021).  There are no such facts here, and this case is a far cry from those on which Plaintiffs rely, each of which involved robust factual allegations of inter-firm communications indicative of conspiracy not present here.[3]

**Pattern of Concealment.**  Plaintiffs argue that Defendants engaged in a "pattern of concealment" because "the written records that Plaintiffs have obtained" allegedly show that Robinhood and Citadel Securities did not document their communications in writing and because some communications occurred over the phone.  (Opp. at 14-15.)  In effect, Plaintiffs ask the Court to infer a conspiracy because (i) the documents they have obtained provide no evidence of a conspiracy and (ii) Citadel Securities and Robinhood (two entities with an ongoing and lawful business relationship) had some oral communications.[4]  Plaintiffs made the exact same arguments concerning the Dismissed Antitrust Complaint (*see* Pls.' Opp. to Defs.' Mot. to Dismiss the DAC, ECF No. 413 at 16), and the Court properly rejected them (Antitrust Decision at 44-45 ("The Court will not infer a conspiracy simply because two business partners chose to use phones to communicate.")).  Plaintiffs have alleged no new facts to alter the Court's conclusion this go-around, and none of the cases they cite support a different outcome.[5]

---

[3] *See, e.g.*, *DeLong Equip Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1511 (11th Cir. 1989) (finding sufficient evidence of agreement on summary judgment in part because defendant made payment to price fixing co-conspirator alleged to be share of inflated profits); *Associated News, Inc. v. Curtis Circulation Co.*, Civ. A. No. H-80-1201, 1986 WL 13791, at *6 (S.D. Tex. Dec. 4, 1986) (finding, on summary judgment, sufficient evidence of conspiracy in part because two witnesses claimed defendant agreed to deal exclusively with co-defendant).

[4] Try as they might to avoid this characterization of their argument (Opp. at 15 n.13), Plaintiffs cannot escape the fact that they explicitly argue that the Court should infer a conspiracy because "communications between the two companies" were conducted "only in person, via telephone or through lawyers with no written record" (*id.* at 14).

[5] The concealment cases to which Plaintiffs cite include detailed allegations of attempts to obscure the defendants' activities, which are not present here.  *See, e.g.*, *United States v. Siegler*, 990 F.3d 331, 339 (4th Cir. 2021) (upholding conspiracy verdict in part because familiarity of defendants and use of coded language provided evidence defendant acted as middleman); *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (holding destruction of documents may be evidence of conspiracy); *United States v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995) (hiding explosives in basement and denying knowledge of them was evidence of conspiracy).  One of Plaintiffs' cited cases, *Belcher v. Atlantic Capital Realty*,

**Motive to Collude.**  Plaintiffs claim that Robinhood's PFOF business relationship with Citadel Securities gave it a motive to implement the relevant restrictions to benefit Citadel Securities.  (Opp. at 9, 15-17.)  This Court already considered those very allegations and found them insufficient to support an inference of conspiracy.  (*See* Antitrust Decision at 37 ("The mere fact that Citadel Securities is an important business partner of the other Defendants does not provide sufficient motive to conspire.").)  In doing so, the Court noted that there were "no allegations that Citadel Securities threatened or suggested it would cut off business relationships with [Robinhood] if [it] did not impose trading restrictions."  (*Id.*)  Plaintiffs have added no new substantiated allegations in the Amended Antitrust Complaint to warrant a different conclusion.  Instead, they suggest in opposition that the Court's prior analysis was incorrect by claiming that whether Citadel Securities coerced Robinhood "is of no moment."  (Opp. at 12.)  But that entirely misses the point.  As the Court previously held, a pre-existing business relationship itself cannot give rise to a motive to collude.  It is implausible to believe that, with no allegation of coercion, Robinhood would act against its own interest simply to benefit Citadel Securities.[6]

Plaintiffs also fail to explain why, even if Citadel Securities *had* coerced Robinhood, Robinhood would not "simply use another market maker in such a scenario." (Antitrust Decision at 37.)  As Plaintiffs themselves allege, Robinhood had existing relationships with other market makers.  (AAC ¶¶ 78, 84.)  While Plaintiffs baldly assert in opposition that, "[h]ad Robinhood availed itself of alternatives to Citadel, Robinhood would have foregone PFOF revenue" (Opp. at 20), Plaintiffs concede in their Amended Antitrust Complaint that Robinhood earns PFOF revenue from *all* market makers to which it routes orders (AAC ¶¶ 76, 78).  Nowhere do Plaintiffs allege that Citadel Securities paid higher PFOF fees to Robinhood than any other market makers.  Thus, as the Court noted in the Antitrust Decision, the economically rational response on Robinhood's part to a hypothetical demand from Citadel Securities to impose purchase limitations would be to route order flow to other market makers

---

*LLC*, does not address concealment at all.  No. 6:08-cv-1989-Orl-28DAB, 2010 WL 11507399, at *5 (M.D. Fla. Sep. 17, 2010).

[6] Plaintiffs' reliance on *Isaksen v. Vermont Casting, Inc.*, 825 F.2d 1158 (7th Cir. 1987), is misplaced.  *Isaksen* actually involved a threat by a supplier to a retailer to coerce the retailer into agreeing to fix prices.  *See id.* at 1163.  No evidence—or allegation—of a threat is present here.

and continue earning PFOF.[7]  Plaintiffs therefore fail to offer a plausible argument that Robinhood had any motive to collude with Citadel Securities to impose the purchase limits.

**Market Structure.**  Plaintiffs claim that certain characteristics of the "market in which Defendants operate" support an inference of conspiracy.  (Opp. at 17.)  But Plaintiffs misunderstand how market structure can provide circumstantial evidence of a conspiracy— market structure does so only when its features facilitate anticompetitive coordination, such as price-fixing among competitors.  *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003).  Where a market's structure is equally consistent with legal activities, it provides no evidence of an agreement.  *See id*. at 1317 & n.18 (holding allegations of market's high barriers to entry, inelastic demand and fungible product were not "probative of collusive behavior").

As Judge Posner explained in *High Fructose Corn Syrup*—the only case on which Plaintiffs rely—the market structure factors that gave rise to the inference of a conspiracy there included the presence of few sellers, a uniform product (due to standardization) and a lack of product substitutes.  295 F.3d 651, 655-57 (7th Cir. 2002).  Here, by contrast, there are numerous brokers from which customers can choose, and the retail brokerage market (if such a market exists) is not one with a uniform, undifferentiated product.  Indeed, Plaintiffs themselves allege that Robinhood "offer[s] an easy to use" "investment mobile app experience."  (AAC ¶ 324.)  And, while Plaintiffs allege high barriers to entry, they fail to explain how those factors could support an inference of the vertical conspiracy that they allege, nor do they cite any authority supporting how such barriers could do so.  (*Id*. ¶¶ 372-378.)  Nor could they.  As a legal matter, allegations of high barriers to entry are insufficient to constitute circumstantial evidence of an agreement.  *See Williamson*, 346 U.S. at 1317; *Fla. Cement*, 746 F. Supp. 2d at 1317 ("[N]one of these features [including high barriers to entry] make conspiracy a more plausible explanation . . . .").  As a factual matter, the alleged barriers to entry provide no support for the existence of an agreement because customers could open accounts with other retail brokers (alleged to operate in the same product market as Robinhood) and continue purchasing the

---

[7] Plaintiffs' assertion that "other alternative market makers did not have the capacity to route orders had Citadel Securities refused" (Opp. at 20) has no support and does not appear as an allegation in the Amended Antitrust Complaint.  Plaintiffs' assertion that Robinhood would not go to a public exchange is entirely a *non sequitur* distracting from the evident presence of other market makers.  (*See id.*; *see also* MTD at 20 n.15.)

Relevant Securities.  Indeed, at least one named plaintiff—Plaintiff Minahan—opened an account with Fidelity during the putative class period.  (AAC ¶ 30.)

**Market Effects.**  Plaintiffs allege that the Court may infer a conspiracy because, after brokers imposed the trading restrictions, "the market behaved in a noncompetitive manner" and the prices of the Relevant Securities fell.  (Opp. at 17-18.)  But the fact that Robinhood (and other brokers not alleged to have been part of any agreement) imposed restrictions provides no evidence whatsoever that the restrictions were the result of an agreement between Robinhood and Citadel Securities.  (AAC ¶¶ 195, 366.)[8]  Indeed, the fact that many other brokers that are not alleged to be part of any conspiracy, such as WeBull, E*Trade and others, imposed similar restrictions directly ***undermines*** Plaintiffs' assertion that the market effects must demonstrate conspiratorial behavior.  (*See* Antitrust Decision at 38.)

**Pretextual Explanations.**  Finally, Plaintiffs argue that the Court should infer a conspiracy because Robinhood made allegedly pretextual statements explaining that it imposed the purchase restrictions due to the market volatility and collateral requirements.  (Opp. at 18.)  Once again, the Court has already rejected Plaintiffs' pretext argument and Plaintiffs offer no justification for reaching a different conclusion now.  (*See* Antitrust Decision at 45-47.)  As Plaintiffs (correctly) allege, the NSCC increased Robinhood's deposit requirements to over $3 billion on the morning of January 28 and Robinhood put the purchase restrictions in place shortly thereafter.  (AAC ¶¶ 178-179.)  Robinhood continued the restrictions after meeting its deposit requirements that morning because, as the Court found plausible, doing so "reduce[d] the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC."  (Antitrust Decision at 46.)  In short, there was no pretext, and none of the challenged statements proves otherwise, let alone gives rise to any inference of a conspiracy.

*     *     *

---

[8] Plaintiffs again cite only to *High Fructose Corn Syrup*, 295 F.3d at 655.  But Plaintiffs' allegations concerning market effects are entirely different from those held sufficient to demonstrate circumstantial evidence of a conspiracy in that case.  There, the defendants' uniform, synchronous and industry-wide price increases were evidence of agreement.  *Id*.  Here, Plaintiffs have abandoned any allegation that Robinhood acted in tandem with other brokers and instead allege (implausibly) that the institution of trading restrictions—including by other brokers not part of the alleged conspiracy—may serve as circumstantial evidence of a vertical conspiracy between Robinhood and Citadel Securities.

As discussed above, none of the factual allegations in the Amended Antitrust Complaint gives rise to a plausible inference of a conspiracy.  That alone is fatal to Plaintiffs' claim. But their continued insistence that the challenged purchase restrictions must have been the result of an illegal conspiracy also remains "even less plausible given that the [Amended Complaint] provides an 'obvious alternative explanation' for imposing trading restrictions"—the increased collateral requirements during heightened market volatility.  (*Id*. at 37.)[9]  Plaintiffs' counterargument—that Robinhood Securities maintained the purchase restrictions after meeting its deposit requirements on the morning of January 28, 2021—fails to acknowledge that "the trading restrictions reduced the volatility multiplier on the collateral that Robinhood was required to post with the NSCC."  (*Id*. at 46.)  If Robinhood had removed the restrictions, it follows that the volatility multiplier would have again increased. Nothing here has changed, except that Plaintiffs now have abandoned any conspiracy allegation against other brokers that *also* implemented various purchase limits concerning a number of the Relevant Securities.  (MTD at 18-19.)  Plaintiffs cannot explain why Robinhood supposedly imposed restrictions for illegitimate reasons while other brokers (who Plaintiffs no longer allege were part of a conspiracy) did so due to market volatility.  (*Id*.)  Having failed to plead any direct evidence of an agreement, and having failed to adequately plead circumstantial evidence of agreement, Plaintiffs fail to state a claim under Section 1 of the Sherman Act.

## II.   PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A SECTION ONE CLAIM.

In addition to failing to plausibly allege the existence of an agreement, Plaintiffs also fail to address the other fundamental flaw in their Section 1 claim.  As Defendants explained, Plaintiffs fail to plead anticompetitive harm in either of their two alleged markets:  the "upstream" PFOF Market (in which Citadel Securities is alleged to compete) or the "downstream" No-Fee Brokerage Trading App Market (in which Robinhood is alleged to compete).  (MTD at 25.)  Instead, they allege harm in the trading prices of the Relevant

---

[9] Plaintiffs erroneously suggest that it is improper for the Court to consider alternative explanations for Robinhood's conduct on a motion to dismiss.  (Opp. at 11-12.)  But the Court may "infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer."  *Fla. Cement*, 746 F. Supp. 2d at 1308 (citation, internal quotations and alteration omitted).  Indeed, the Court properly applied this reasoning to dismiss the DAC.  (*See, e.g.*, Antitrust Decision at 37.)

Securities, which are in a third, wholly separate (and undefined) market. (*Id.* at 25-27.) Thus, Plaintiffs fail to plead anticompetitive harm in any relevant product market. *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004) (noting that "specific allegations linking market power to harm to competition *in that market*" are required) (emphasis added).

        Rather than respond directly to this argument in opposition, Plaintiffs devote five pages of briefing to arguing issues, including market definition and market power, that were *not* the basis of Defendants' Motion. (Opp. at 25-30.) This is a red herring because, while Defendants dispute Plaintiffs' flawed market definition and allegations of market power, for purposes of this Rule 12(b)(6) Motion, Defendants have already accepted those allegations as true. (MTD at 25-27.) Plaintiffs' long preliminary discussions about market definition and market power thus serve only to obscure that they have no response to Defendants' showing that Plaintiffs fail to plead anticompetitive harm in either of the markets defined in the Amended Antitrust Complaint. (*Id.*) Indeed, Plaintiffs' response to Defendants' argument is essentially relegated to three short paragraphs at the conclusion of Section IV of the Opposition, in which Plaintiffs cite no authorities that support their argument and—fatally to their claim—simply reiterate that the alleged harm to competition is that, "[w]hen the prices of the Relevant Securities dropped due to Defendants' scheme, Retail Investors sold the Relevant Securities at lower prices." (Opp. at 31.)

        As a result, under the rule of reason, the standard of review in a vertical restraint case such as this (*see infra* Section II.A), Plaintiffs fail to plead a Section 1 claim because they fail to allege harm to competition in a relevant product market (*see infra* Section II.B). For this independent reason, Plaintiffs' claim should be dismissed with prejudice.

### A.    Plaintiffs' Claim Does Not Qualify for *Per Se* or "Quick Look" Treatment Under the Antitrust Laws.

        As explained in Defendants' Motion, the Court may determine at the motion to dismiss stage whether the *per se* or rule of reason standard applies to a Section 1 claim. (MTD at 22-23.) This holds particularly true where, as here, the plaintiff alleges that the defendants entered into a vertical agreement. That is because courts emphasize that only "'horizontal restraints'—restraints 'imposed by agreement between *competitors*'—qualify as unreasonable *per se*." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018). Vertical agreements (other than tying arrangements not alleged here) are assessed under the rule of reason. *See id.* at 2284.

Plaintiffs' cases underscore this basic statement of law.  (Opp. at 22-23 (citing *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)).)

Here, Plaintiffs allege that Citadel Securities operates in an "upstream" market and Robinhood operates in a "downstream" market.  (AAC ¶ 305.)  Indeed, Plaintiffs' theory is predicated on a vertical relationship:  Plaintiffs allege that Citadel Securities leveraged its market-maker services relationship with Robinhood to pressure Robinhood into enacting purchasing limits on its brokerage customers.  (AAC ¶¶ 233, 236, 246.)  Therefore, the Court should apply the rule of reason to Plaintiffs' claim.  *See, e.g., Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986).  Plaintiffs' arguments are unavailing.

*First*, Plaintiffs urge the Court to defer any ruling on whether to apply the *per se* standard of review, calling for a fact-intensive inquiry.  (Opp. at 21-22.)  Plaintiffs' position is contrary to Eleventh Circuit law, which authorizes determining, on a motion to dismiss, whether a claim is subject to *per se* liability.  *Tempur-Pedic*, 626 F.3d at 1334-36; *Quality Auto*, 917 F.3d at 1271-72.  A fact-intensive inquiry is inappropriate and not required for a vertical agreement as alleged here, which cannot be subject to a *per se* standard.  *See Am. Express*, 138 S. Ct. at 2284.  Indeed, nearly all of the authorities on which Plaintiffs rely involve types of agreements where the *per se* standard *may* apply (depending on the facts):  horizontal agreements and tying arrangements.[10]

*Second*, Plaintiffs attempt to recast their claim as a horizontal agreement between Citadel Securities and Robinhood, perplexingly arguing that Citadel Securities and Robinhood Securities are "on the same horizontal level of distribution."  (Opp. at 23 n.26.)  This new

_____

[10] *See Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016) (alleging a horizontal market allocation agreement); *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1186 (N.D. Ala. 2014) (alleging a horizontal market allocation agreement among health insurers); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012) (alleging a horizontal "Do Not Cold Call" agreement between employers); *Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214 (S.D. Ohio 2019) (alleging a horizontal agreement between employers); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs., & Antitrust Litig.*, 336 F. Supp. 3d 1256 (D. Kan. 2018) (alleging illegal tying practices); *In re Terzosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279 (S.D. Fla. 2005) (alleging a horizontal pay-for-delay agreement between pharmaceutical companies).  And the district court in *City of Rockford v. Mallinckrodt ARD, Inc.* noted that vertical agreements are ordinarily analyzed under the rule of reason, but deferred doing so because of a separate transaction in the case subject to a Section 2 monopolization claim.  360 F. Supp. 3d 730, 753-54 (N.D. Ill. 2019).

argument flatly contradicts the complaint, where Plaintiffs clearly allege two markets (AAC ¶¶ 305-315) and allege expressly that "[m]arket makers and brokerages operate at two different levels" (*id.* ¶ 305).  It is also plainly incorrect.  An alleged conspiracy is "horizontal" only when the actors are competitors in the same market.  *Am. Express*, 138 S. Ct. at 2283-84.  By contrast, an alleged conspiracy is "vertical" when the actors operate in different markets and instead are in a chain of distribution with each another (for example, a supplier and a manufacturer, or a manufacturer and a distributor).  *See Bus. Elecs.*, 485 U.S. at 730.  Under the antitrust laws, a market is defined to mean that participants offer reasonably interchangeable substitutes.  *See Brown Shoe*, 370 U.S. at 325.  The brokerage services that Robinhood offers and the market-maker services that Citadel Securities offers are not substitutes.  (*Compare* AAC ¶¶ 43-44, 68, 83 (Robinhood's retail brokerage services), *with id.* ¶¶ 84-85 (Citadel Securities' market-making services to brokerages).)  A consumer who wants brokerage services cannot obtain them from Citadel Securities; a brokerage (*e.g.*, a Robinhood competitor) seeking market-maker services for execution of a trade cannot obtain such services from Robinhood.  The conspiracy that Plaintiffs allege can only be vertical.

      *Third*, Plaintiffs suggest in the alternative that the "quick look" standard of review should apply.  (Opp. at 23.)  But Plaintiffs cite no cases applying "quick look" review to a vertical agreement.  Indeed, "[m]ost of the antitrust cases that have explicitly considered a 'quick look' approach involved restraints within the context of a joint venture, professional association, network, or other joint association whose legitimacy was not in question."  Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1508 (4th & 5th Eds., 2015-2021) (last updated Sept. 2021).  No such arrangement is alleged here.[11]

      For these reasons, the Court should apply the rule of reason to Plaintiffs' claim.

**B.     Plaintiffs Fail to State a Claim Under the Rule of Reason.**

      Plaintiffs' Section 1 claim fails because they do not plead harm to competition.  An antitrust plaintiff has the "initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers *in the relevant market*."  *Am. Express*,

---

[11] Moreover, Plaintiffs' own cases reject applying "quick look" review.  *See Cal. ex rel. Harris v. Safeway Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011) (en banc) (rejecting "quick look" analysis because the "limited duration" of the restraint and "the existence of other significant external competitors in the market" rendered any anticompetitive effects "not obvious").

138 S. Ct. at 2284 (emphasis added).  To be in the relevant market, the harm must be in "the area of effective competition" where the defendant operates and the "prohibited conduct must be directed towards competitors and must be intended to injure competition." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999) (internal quotations omitted); *see also Bitmain*, 530 F. Supp. 3d at 1266 ("Before the Court can evaluate harm to competition, it must know the market where this alleged harm has taken place.").

In their Motion, Defendants demonstrated that Plaintiffs fail to plead anticompetitive harm in either of their alleged product markets:  the No-Fee Brokerage Trading App Market or the PFOF Market.  (MTD at 25-27.)  Instead, the harm Plaintiffs assert occurs in a distinct (and undefined) market, the ***market for the Relevant Securities***, and results from the "supply and demand" forces for trading securities.  (AAC ¶¶ 99, 354-355.)  Indeed, Plaintiffs' Opposition repeats the same theory, contending that "Defendants harmed competition by restraining consumer choice and artificially influencing the price of the Relevant Securities.  In so doing, they divorced the price of the Relevant Securities from the fundamental economics of supply and demand."  (Opp. at 30; *see also id.* at 6, 8, 28, 31.)  The alleged harm to competition is in the supposed market for the Relevant Securities, and is ***not*** felt in either the PFOF Market or the No-Fee Brokerage Trading App Market.

Plaintiffs' response misses the mark.  (*Id.* at 31-32.)  *First*, Plaintiffs contend that "Defendants attempt to misdirect the focus . . . on competition between Robinhood and the other brokerage services for customers or between Citadel Securities and other market makers."  (*Id.* at 31.)  But this is not misdirection.  Plaintiffs rightly observe the first part of the formulation that the "basic focus of the antitrust laws" is "the 'protection of *competition*, not *competitors*.'"  (*Id.* (citing *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 137 (D.D.C. 2018).)  But the focus of the antitrust laws is on competition *in the alleged product markets*, which here (according to Plaintiffs' Amended Antitrust Complaint) are the No-Fee Brokerage Trading App Market and the PFOF Market.

*Second*, Plaintiffs try to mask the market jumping nature of their asserted harm by arguing "reduced output" of Robinhood's brokerage services.  (Opp. at 28.)  This argument makes no sense.  In antitrust law, a "reduction in output" refers to a reduction in product volume to create an artificially high price for that product. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) ("Supracompetitive pricing entails a

14

restriction in output.").  Nothing of the sort occurred in the brokerage market here, where Robinhood continued to offer commission-free retail brokerage accounts to any member of the public (there was no reduction in output) and Robinhood's brokerage services remained free of charge to customers (there was no increase in price).  Plaintiffs do not allege otherwise.  (*See, e.g.*, AAC ¶¶ 8, 69, 73.)  The supposed "reduction in output" is merely a reduction in the number of purchase orders for the Relevant Securities, which has nothing to do with harm to competition in the alleged markets.

In any event, Plaintiffs quickly pivot back to the real focus of their theory:  that the harm to competition is felt in "the pricing of the Relevant Securities" and Defendants' alleged interference with "the price discovery that would have occurred through the operation of supply and demand."  (Opp. at 28-29; *see also id.* at 31 ("When the prices of the Relevant Securities dropped due to Defendants' scheme, Retail Investors sold the Relevant Securities at lower prices—the precise result Defendants desired."); *id.* at 31 n.38 ("The harm can be estimated by the amount lost when Plaintiffs were unable to sell the Relevant Securities due to the trading restrictions.").)  As explained above, this alleged harm is in a market for the Relevant Securities, not in either the PFOF Market (in which Citadel Securities allegedly competes) or the No-Fee Brokerage Trading App Market (in which Robinhood allegedly competes).  Plaintiffs do not, and cannot, plead that competitors were foreclosed from either of the alleged markets or that prices rose in either of those markets.  Accordingly, the anticompetitive harm Plaintiffs assert is outside "the area[s] of effective competition" in which Defendants operate—*i.e.*, it occurs in the unalleged market for the Relevant Securities—and for this reason, Plaintiffs' Section 1 claim fails.  *Intergraph*, 195 F.3d at 1353.[12]

---

[12] None of Plaintiffs' cited authorities supports their theory of harm because in each case the anticompetitive effects arose in the market in which the defendant operated.  *See Am. Express*, 138 S. Ct. at 2284 ("[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."); *Tempur-Pedic*, 626 F.3d at 1339 (same); *United States v. Microsoft Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001) (en banc) (holding harm in market for operating systems for Intel compatible PCs, in which defendant operated, was sufficient); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (affirming finding that horizontal agreement between toy manufacturers resulted in anticompetitive harm in toy retailer market, in which defendant operated); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 456-57 (1986) (affirming finding that alleged agreement among dentists to withhold x-rays harmed market for dentistry insurance, in which defendants participated);

III.   **PLAINTIFFS' ANTITRUST THEORY IS PRECLUDED BY THE FEDERAL SECURITIES LAWS.**

Plaintiffs' antitrust claims are also precluded by federal securities law.

A.   **The Dodd-Frank Act Savings Clause Does Not Apply.**

Plaintiffs try to avoid preclusion of their claims by relying on the Dodd-Frank Act's antitrust savings clause.  As Defendants showed in their Motion, that reliance is misplaced. (MTD at 34-35.)  Section 6 of the Dodd-Frank Act states that "*[n]othing in this Act, or any amendment made by this Act*, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."  12 U.S.C. § 5303 (emphasis added). "[T]his Act" refers to the Dodd-Frank Act, not the Exchange Act, *see* Dodd-Frank Act §§ 1(a), 6, 124 Stat. 1376, 1390 (2010), and the savings clause is codified in title 12 (banks and banking), not title 15 (where the securities laws appear).  *See* 12 U.S.C. § 5303.

The savings clause in the Dodd-Frank Act thus applies to conduct covered by the Dodd-Frank Act or amendments made by that Act—concerning security-based swap agreements (MTD at 34)—but *not* conduct covered by pre-existing provisions of the Exchange Act or other statutes otherwise unamended by the Dodd-Frank Act.  *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 495-98 (S.D.N.Y. 2017) (holding the Dodd-Frank Act savings clause applied to alleged conspiracy among interest rate swap dealers, where Act regulated swap markets); *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2014 WL 4379112, at *16-17 (S.D.N.Y. Sept. 4, 2014) (same for credit default swaps).

The conduct that Plaintiffs allege was unlawful is *not* conduct the Dodd-Frank Act covers.  Rather, pre-existing market manipulation provisions of the Exchange Act, which the Dodd-Frank Act did *not* amend, cover the "manipulation of the prices of the Relevant Securities" that Plaintiffs allege (AAC ¶ 354).  *See* Exchange Act § 15(c)(2)(D), 15 U.S.C. § 78o(c)(2)(D); Exchange Act § 9(a)(6), 15 U.S.C. § 78i(a)(6); Exchange Act § 10(b), 15 U.S.C. § 78j(b).  Nor did the Dodd-Frank Act amend the Exchange Act provisions concerning broker risk mitigation and management.  (*See infra* Section III.B.)  Plaintiffs try to shoehorn their claims into the Dodd-

---

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1444 (9th Cir. 1995) (alleged agreement to fix predatory prices harmed the retail gasoline market, in which defendants operated); *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 3:15-CV-734-J-20JRK, 2015 WL 9987969 (M.D. Fla. Nov. 4, 2015) (holding allegations of vertical resale price maintenance agreement adequately alleged harm in market for contact lenses, in which defendants operated).

Frank Act's savings clause by asserting that provisions of the Dodd-Frank Act "touch upon issues alleged in the Amended Complaint," namely short-selling. (Opp. at 33.)  But the unlawful conduct that Plaintiffs allege in this case concerns purchase restrictions that Robinhood imposed on its stock trading platform, *not* any short-selling activity. (*See id.* at 1.)  Plaintiffs' (unsupported) suggestion that Citadel Securities' alleged short sales provided a *motive* for the alleged conspiracy does not make short sales an object of the conspiracy or bring this action within the ambit of the Dodd-Frank Act.  Indeed, Plaintiffs acknowledge that their claims "do not attack or seek to prohibit short selling generally." (*Id.* at 40.)[13]

Plaintiffs' reliance on Section 929X(a) of the Dodd-Frank Act is equally misplaced.  That section authorizes the SEC to issue rules regarding the public disclosure of short positions on a monthly basis.  124 Stat. at 1870.  To date, the SEC has not issued regulations under the provision, and if the SEC had done so by late January 2021, they would have been limited to monthly disclosure of short positions, which would have had no impact on Plaintiffs' claims, and could not have prohibited short selling.[14]

As a result, Plaintiffs do not—and, as set out in Defendants' Motion, cannot—show that the Dodd-Frank Act or any of the amendments it made cover the trading restrictions at issue in this action.  (MTD at 34-35.)  Therefore, the Act's antitrust savings clause does not apply.[15]  And, as the Supreme Court held in *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 275 (2007), the general savings clause in the Exchange Act is not "so broad as to preserve all antitrust actions" and does not prevent implied preclusion of Sherman Act claims.

**B.      Plaintiffs' Antitrust Claims Are Precluded under *Billing* Because the Conduct at Issue Is Regulated by the Federal Securities Laws.**

The conduct underlying Plaintiffs' claims is regulated by the securities laws, and

---

[13] Plaintiffs note that "Dodd-Frank also has specific provisions related to market making" without explaining how this statement relates to the alleged antitrust conspiracy. (*Id.* at 33.)  In any event, as with short sales, Plaintiffs do not allege that Citadel Securities' market-making activities were unlawful.

[14] The SEC recently proposed regulations under Section 929X, requiring institutional investment managers to make monthly disclosure of short positions.  SEC Release No. 34-94313, 87 Fed. Reg. 14,950, 15,015-16 (Mar. 16, 2022) (proposed 17 C.F.R. § 240.13f-2).

[15] Plaintiffs also argue that the Dodd-Frank Act modified portions of "Section 15 of the Securities Exchange Act" without providing any explanation as to how this relates to their case. (Opp. at 33.)  In fact, these amendments, *see* Dodd-Frank Act § 913(g), 124 Stat. at 1828 (adding 15 U.S.C. § 78o(k)-(*l*)), have nothing to with the Exchange Act provisions relevant to this action.

Plaintiffs' antitrust claims are accordingly precluded—regardless of whether the Securities Tranche Plaintiffs state a claim.[16]  Each of the four *Billing* factors weighs in favor of preclusion.

### i.    The Conduct at Issue Lies at the Very Heart of the Securities Market.

Plaintiffs argue that the first *Billing* factor weighs against preclusion because "Defendants do not—and—cannot demonstrate how cutting off retail investors' access to the securities market by restricting trading" is "central to the proper functioning of well-regulated markets."  (Opp. at 35-36.)  Plaintiffs' argument fails for two reasons.  *First*, Defendants showed in their Motion that market integrity for stock prices, and the prohibition on market manipulation of the kind Plaintiffs allege here, lie at the core of the securities laws.  *See* Exchange Act §§ 9-10, 15 U.S.C. §§ 78i-78j; (MTD at 29).  Plaintiffs allege that the object of the purported conspiracy was "to manipulate and artificially suppress the price of stock."  (AAC ¶ 405.)  *Second*, Defendants explained in their Motion how restrictions on purchasing volatile stocks permitted Robinhood to meet clearing agency collateral calls and continue to serve all customers trading all securities (beyond the volatile stocks).  (MTD at 17.)  That was central to the proper functioning of well-regulated securities markets.  Indeed, an SEC investor alert and bulletin has explicitly stated that broker-dealers "may reserve the ability to reject or limit customer transactions."[17]  Accordingly, "limit[ing] financial exposure" by implementing trading restrictions when necessary is a practice that "lie[s] squarely within an area of financial market activity that the securities law seeks to regulate."  *Billing*, 551 U.S. at 276.

### ii.    The SEC Is Authorized To Regulate All of the Activities in Question.

Plaintiffs further argue that the second *Billing* factor weighs against preclusion because the "SEC does not have authority to supervise 'all of the activities in question here,' in particular Robinhood's imposed limitations on trading."  (Opp. at 36.)  Again, this is simply

---

[16] Plaintiffs erroneously rely on *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 172 F.R.D. 119 (S.D.N.Y. 1997), and *Kalmanovitz v. G. Heilman Brewing Co.*, 769 F.2d 152, 157 (3d Cir. 1985), to argue that "[a]ntitrust laws have long been enforced with respect to wrongdoers in the securities market."  (Opp. at 35 n.44.)  Both cases predate *Billing*.  The *NASDAQ* court did not consider any preclusion arguments, 894 F. Supp. 703, 710-15 (S.D.N.Y. 1995), and the *Kalmanovitz* court recognized that the securities laws may preempt the antitrust laws where "necessary to make [the securities laws] work," 769 F.2d at 157.  Neither case is in tension with applying *Billing* preclusion to the claims here.

[17] SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021) ("SEC Statement"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert.

untrue. The SEC has the authority to promulgate rules to prevent fraudulent, deceptive or manipulative conduct by broker-dealers, which is fundamentally what Plaintiffs allege here. 15 U.S.C. § 78o(c)(2)(D); (AAC ¶ 405 (alleging conspiracy "to manipulate and artificially suppress the price of stock"); *see also* 15 U.S.C. § 78k-1 (authorizing SEC to promulgate rules relating to the national market system for securities). For example, in a related context, the SEC requires brokers with "market access" to have risk management controls and supervisory procedures in place to "prevent the entry of orders," and "reject[] orders," if such orders would "exceed appropriate pre-set credit or capital thresholds in the aggregate for each customer and the broker or dealer." 17 C.F.R. § 240.15c3-5(c)(1). Moreover, as set forth in Defendants' Motion, the SEC has the authority to enact regulations governing the market manipulation that Plaintiffs allege here. *See* Exchange Act §§ 9(a)(6) & 10(b), 15 U.S.C. §§ 78i(a)(6) & 78j(b); (MTD at 30-31). Thus, the SEC clearly has the "regulatory authority under the securities law to supervise the activities in question." *Billing*, 551 U.S. at 275.[18]

### iii.   There Is Substantial Evidence That the SEC Exercises Its Authority.

Although Plaintiffs concede that "the SEC investigated the events concerning the market activities of January 28, 2021," they still contend "there is simply no evidence to suggest that the SEC investigated the claims of concerted activity at issue here." (Opp. at 37-38.) But as discussed in Defendants' Motion, the SEC Staff reviewed the facts at issue and concluded that broker-dealers decided to restrict trading in certain stocks as a result of intraday margin calls from a clearinghouse. (MTD at 32.) Indeed, Plaintiffs' contention that the SEC did not investigate the alleged concerted activity is belied by the SEC Staff's Report, which expressly addressed the "narrative at the time," which "attributed the broker-dealer trading restrictions to pressure from hedge funds and their commercial partners." (SEC Staff Report at 32-33.) Furthermore, as set out in Defendants' Motion, the SEC is exercising its authority to enforce the federal securities laws through various enforcement programs, as demonstrated by the SEC's ongoing investigation into the market events of January 2021. (MTD at 31-32.) The SEC may

---

[18] Plaintiffs apparently misread 15 U.S.C. § 78o(c)(2) and 15 U.S.C. § 78j(b). (Opp. at 36-37.) These statutes expressly grant authority to the SEC to promulgate rules and regulations defining acts and practices that are fraudulent, deceptive, or manipulative. *See* 15 U.S.C. § 78o(c)(2)(D) (for broker-dealers); 15 U.S.C. § 78j(b) (for all market participants). That the SEC has chosen not to prohibit the imposition of purchase restrictions here shows that Defendants' conduct is lawful, not that the SEC lacks authority to regulate it.

conclude that Plaintiffs' claims of a conspiracy to manipulate the securities markets are baseless, but that would be an entirely appropriate exercise of the SEC's authority.

> ### iv.    Allowing This Claim To Proceed Would Create a Conflict Between the Antitrust and Securities Laws.

Plaintiffs assert that "Defendants cite to no law that would be in conflict with or undermined were Plaintiffs['] claims to succeed." (Opp. at 39.)  That is untrue.  Defendants cited to the SEC's comprehensive regulations for broker-dealers (including net capital requirements), *see* 17 C.F.R. §§ 240.15a-1 to 240.15c6-1, and for clearing agencies (including collateral call requirements), *see id.* §§ 240.17Ab2-1 to -2, 240.17Ad-1 to -24.  (*See* MTD at 37.)  There is an actual conflict because Congress has expressly authorized these regulations.  *See* Exchange Act §§ 15, 17 & 17A, 15 U.S.C. §§ 78o, 78q & 78q-1.  In any event, *Billing* does not require an *actual* conflict.  *See Billing*, 551 U.S. at 273, 276.  As Plaintiffs correctly note, a "conflict may occur when there is either an actual conflict *or* a potential conflict between antitrust law and securities regulations."  (Opp. at 38.)  Here, despite extensive SEC regulation in this area, the SEC's rules do not prohibit the purchase restrictions at issue, and an SEC investor alert has stated that broker-dealers "may reserve the ability to reject or limit customer transactions."[19]  Accordingly, there is an actual conflict between the securities laws and the application of federal antitrust law in this action, and Plaintiffs' antitrust claims are precluded.

## IV.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.

Plaintiffs have now had three opportunities to state a claim against Defendants, to no avail.  Plaintiffs do not even argue that they could remedy the deficiencies in their complaint and therefore should not be afforded any further leave to amend.  Plaintiffs' claims should be dismissed with prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Amended Complaint with prejudice.

---

[19] SEC Statement, *supra* note 17.

Dated:  March 25, 2022

_/s/ Samuel A. Danon_

**HUNTON ANDREWS KURTH LLP**
Samuel A. Danon (FBN 892671)
Gustavo Javier Membiela (FBN 513555)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
gmembiela@huntonak.com
mcastellanos@hunton.com

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

_Counsel for Defendants Robinhood Financial_
_LLC, Robinhood Securities, LLC and_
_Robinhood Markets, Inc._

*/s/ Adam L. Hoeflich* (with consent)

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Christopher D. Kercher
Peter H. Fountain
51 Madison Avenue, 22nd Floor,
New York, New York, 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
William A. Burck
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
John F. O'Sullivan (FBN 143154)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 439-5008
johnosullivan@quinnemanuel.com

**BARTLIT BECK LLP**
Adam L. Hoeflich
Dawson Robinson
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
adam.hoeflich@bartlitbeck.com
dawson.robinson@bartlitbeck.com

*Counsel for Defendant Citadel Securities LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 25, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

Dated:  March 25, 2022                                    */s/ Samuel A. Danon*

                                                    Samuel A. Danon (FBN 892671)

# Doc 470

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  21-2989-MDL-ALTONAGA/Torres

In re:

**JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION**
_____/

This Document Relates to the Antitrust Actions

## ORDER

**THIS CAUSE** came before the Court on Defendants'[1] Motion to Dismiss the Amended Antitrust Tranche Complaint [ECF No. 456], filed on February 18, 2022.  Plaintiffs[2] filed a Response [ECF No. 459], to which Defendants filed a Reply [ECF No. 463].  The Court has carefully considered the Amended Consolidated Class Action Complaint (the "Am. Compl.") [ECF No. 451], the parties' written submissions, the record, and applicable law.  For the following reasons, the Motion is granted.

## I.        INTRODUCTION

The Amended Complaint is Plaintiffs' third attempt at pleading an antitrust conspiracy claim arising from the January 2021 short squeeze.  The Court dismissed Plaintiffs' Corrected Consolidated Class Action Complaint (the "CCAC") last fall, giving Plaintiffs the opportunity to amend.  (*See generally* Nov. 17, 2021 Order [ECF No. 438]).  They did so.  What has changed with the latest pleading?  Not much.

---

[1] The Defendants are Robinhood Markets, Inc.; Robinhood Financial LLC; Robinhood Securities, LLC; and Citadel Securities LLC.  (*See* Am. Compl. ¶¶ 42–49).

[2] The Plaintiffs are Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling.  (*See* Am. Compl. ¶¶ 23–41).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

The CCAC described a wide-ranging conspiracy purportedly orchestrated by a market maker and involving over a dozen Defendants, including introducing brokerages, self-clearing brokerages, and clearinghouses.  Plaintiffs alleged the market maker, Citadel Securities, pressured the other Defendants to halt trading in certain stocks that had undergone rapid and historic price increases due to a retail trading frenzy.  According to Plaintiffs, Citadel Securities held significant short positions in the affected stocks, rendering it especially vulnerable to the retail-induced short squeeze.

Plaintiffs adequately pleaded parallel conduct among the Defendants.  But there were no additional factual allegations supporting a plausible inference of a conspiracy — except for references to a few vague and ambiguous emails that were exchanged between a brokerage, Robinhood,[3] and its market maker, Citadel Securities.  The Court dismissed the CCAC in its entirety because a few questionable emails between two firms in an otherwise lawful business relationship were not enough to support a plausible inference of an unlawful conspiracy.

This third time around, Plaintiffs only allege collusion between Robinhood and Citadel Securities; they have dropped every other Defendant from the suit.  While Plaintiffs profess to have bolstered their factual allegations as to Robinhood and Citadel Securities, the allegations of conspiracy are in substance the same and thus inadequate.  In addition, Plaintiffs fail to plausibly allege an unreasonable restraint of trade because their garbled market theory does not conform to the alleged facts.  The Court explains.

---

[3] The Court refers to Robinhood Markets, Inc.; Robinhood Financial LLC; and Robinhood Securities, LLC, collectively, as "Robinhood[.]"  Robinhood Financial LLC and Robinhood Securities, LLC are wholly-owned subsidiaries of Robinhood Markets, Inc.  (*See* Am. Compl. ¶¶ 42–45).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

## II.     BACKGROUND

This putative class action is brought on behalf of individual investors (the "Retail Investors") who suffered losses as a result of Defendants' response to a "short squeeze" — a situation in which stocks or other assets rise sharply in value, distressing short positions.[4]  (*See* Am. Compl. ¶¶ 12, 15–16).  This short squeeze occurred in late January 2021, as the Retail Investors purchased the Relevant Securities *en masse* over a short period of time,[5] exposing those with short positions in the Relevant Securities — such as Citadel Securities — to large potential losses.  (*See id.* ¶¶ 7, 11–12, 64–66).  According to Plaintiffs, Citadel Securities pressured Robinhood to restrict trading on its platform, which "artificially constricted the price appreciation of the Relevant Securities[,]" in violation of the Sherman Act, 15 U.S.C. § 1.  (Am. Compl. ¶ 16 (alteration added); *see id.* ¶¶ 13, 67, 403–415).

*Parties.*

*Defendants.*   Robinhood Markets is the corporate parent of Robinhood Financial and Robinhood Securities.  (*See id.* ¶ 42).  Robinhood Financial is an introducing broker: it provides financial services through an electronic trading platform, or application, where individual investors can trade financial assets.  (*See id.* ¶ 43).  Robinhood Securities is a clearing broker: it handles the execution, clearing, and settling of trades placed on Robinhood Financial's application.  (*See id.* ¶¶ 44, 83).   Collectively, Robinhood restricted the Retail Investors' ability to purchase the

---

[4] A "short" seller borrows a security from a lender, believing the price of the security will decrease.  (*See* Am. Compl. ¶ 108).  It then sells the borrowed security to a buyer.  (*See id.*).  If the price of the security drops, the short seller buys the security back at a lower price and returns it to the lender.  (*See id.*).  The difference between the sell price and the buy price is the short seller's profit.  (*See id.*).  Conversely, the short seller loses money if the price of the security increases.  (*See id.*).

[5] The "Relevant Securities" are certain stocks the Retail Investors believed would increase in price: GameStop (GME), AMC Entertainment (AMC), Bed Bath & Beyond (BBBY), BlackBerry (BB), Express (EXPR), Koss (KOSS), Nokia (NOK), Tootsie Roll Industries (TR), and Trivago NV (TRVG).  (*See* Am. Compl. ¶ 7).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Relevant Securities between January 28, 2021, and February 4, 2021 (the "Class Period").  (*See id.* ¶¶ 46, 55).

Citadel Securities is a market maker: it acts as a market participant by providing bid and ask prices for securities, maintaining an inventory of securities from its own trading, and matching incoming buy and sell orders to fill those orders.  (*See id.* ¶¶ 48, 85).  Citadel Securities took short positions in the Relevant Securities during the period in question.  (*See id.* ¶ 49).

*Plaintiffs.*  The named Plaintiffs are four individual investors who were subject to trading limitations imposed on the Relevant Securities during the Class Period.  (*See id.* ¶¶ 23–41).  Each Plaintiff held shares of one or more of the Relevant Securities at the close of the stock market on January 27, 2021.  (*See id.* ¶¶ 23, 28, 33, 38).  The next day, January 28, 2021, they were all prohibited from purchasing the Relevant Securities on Robinhood's trading platform.  (*See id.* ¶¶ 24, 29, 34, 39).

That same day, Guzman and Miller applied for accounts with Charles Schwab, Fidelity, and TD Ameritrade — these did not prohibit customers from purchasing the Relevant Securities — but Guzman and Miller were unable to complete purchases due to the amount of time required to set up the accounts.  (*See id.* ¶¶ 25, 35).  Minahan successfully applied for an account with Fidelity and was able to purchase a share of GameStop stock that day.  (*See id.* ¶ 30).  Each Plaintiff then sold his or her shares of the Relevant Securities on Robinhood between January 28, 2021, and February 4, 2021.  (*See id.* ¶¶ 26–27, 31–32, 36–37, 40–41).

_Injury and proposed class._  According to Plaintiffs:

> As a direct and intended result of Defendants [sic] contract, combination, agreement and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities.  Robinhood deactivated the buy option on its platform and left Plaintiffs and Class members with no option but to sell or hold shares of the stocks on their platforms.  Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the

CASE NO. 21-2989-MDL-ALTONAGA/Torres

Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination, agreement and restraint of trade. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

(*Id.* ¶ 410 (alterations added)).

Plaintiffs seek to certify the following class:

All persons or entities in the United States that held shares of stock or call options through Robinhood in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Nokia Corp. (NOK), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) as of the close of market on January 27, 2021, and sold the above-listed securities from January 28, 2021 up to and including February 4, 2021 (the "Class Period").

(*Id.* ¶ 55).

### *Alleged facts.*

***Mechanics of securities trading on Robinhood.*** Individual investors' market share of U.S. equity trading has steadily increased since 2019 and has recently accounted for a third of all U.S. stock market trading. (*See id.* ¶¶ 92–93). When individual investors make investments on their own behalf, they execute their personal trades through websites, apps, and trading platforms provided by brokerage firms or other investment service providers. (*See id.* ¶ 6).

Robinhood Financial provides one such trading application to individual investors. (*See id.* ¶¶ 6, 43, 68). Robinhood Financial is one of the largest retail brokers in the United States — the trading demand of its over 31 million users substantially influences the movements of stock prices. (*See id.* ¶¶ 70–72).

Once a trade is placed on Robinhood Financial's application, the customer's cash and securities are custodied by Robinhood Financial's clearing broker, Robinhood Securities. (*See id.* ¶ 83). Robinhood Securities services the customer's account by executing, clearing, and settling the trade order. (*See id.*).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Although individual investors historically had to pay a fee or commission to their brokerages for executing personal trades, today most brokerages do not charge their investors a fee per transaction.  (*See id.* ¶ 8).  Rather, in exchange for routing the order to a market maker, brokerages earn revenue through rebates, kickbacks, and other payments — known collectively as payment for order flow ("PFOF").  (*See id.* ¶¶ 8, 73).

Robinhood Securities typically routes a customer's trade order to a large market maker like Citadel Securities.  (*See id.* ¶¶ 74, 84).  As a market maker, Citadel Securities fills these orders from its own inventory, by routing the order to an exchange, or by taking the other side of a transaction (*e.g.*, selling a security short in response to receiving an order to buy the security).  (*See id.* ¶¶ 85–86).  Once an order is filled, the market makers pocket the difference between the bid and ask prices; this is known as the "spread."  (*Id.* ¶¶ 74, 85).  While the spreads may be small, they are significant in the aggregate due to the large volume of orders filled.  (*See id.*).

After an order is filled, the details of the executed order are sent to the National Securities Clearing Corporation ("NSCC") for clearinghouse and settling services.  (*See id.* ¶ 87).  Because trades do not settle immediately, there is a risk that a party to a transaction may default before the trade is completed.  (*See id.* ¶¶ 87–88).  The NSCC clears cash transactions by netting securities deliveries and payments among NSCC's clearing members and guaranteeing the completion of trades, even if one party to the transaction defaults.  (*See id.* ¶ 88).  Thus, if a clearing member such as Robinhood defaults on its settlement obligations, the NSCC guarantees the delivery of cash and securities to its non-defaulting members.  (*See id.*).

The NSCC collects clearing fund contributions, or margin, from clearing members at the start of each day and intraday in volatile markets.  (*See id.* ¶ 90).  The margin protects the NSCC and all market participants against clearing member defaults, and margin requirements must be

CASE NO.  21-2989-MDL-ALTONAGA/Torres

met by clearing members on a timely basis.  (*See id.*).  Margin requirements are largely based on risk and market volatility.  (*See id.*).  The rules for calculating the contribution requirements and the timing of the collection of contributions are known to every clearing member; and the NSCC provides reporting tools, calculators, and documentation to allow the members to monitor their risk in near real-time and estimate clearing fund contribution requirements.  (*See id.*).

*January 2021 market volatility.*  Retail Investors often exchange investment information via online discussion forums like Facebook, TikTok, and, most relevant here, the WallStreetBets financial discussion forum on Reddit.  (*See id.* ¶¶ 64, 95, 127–28).  WallStreetBets is characterized by a particular culture centered around the discussion of financial investments and memes; many of its users are sophisticated and shrewd individual investors.  (*See id.* ¶ 128).

Beginning in 2019, the Retail Investors, through these online discussion forums, hypothesized that shares of GameStop's stock were significantly undervalued, trading at much lower prices than they should have been, based on GameStop's publicly available financial disclosures and prospects.  (*See id.* ¶¶ 95–96).  The Retail Investors saw similar investment opportunities in the other Relevant Securities.  (*See id.* ¶¶ 97–98).

One such Retail Investor, the popular Reddit and YouTube user, Roaring Kitty, deduced that GameStop was undervalued for a variety of reasons, including substantial short positions that large financial institutions had taken against the stock.  (*See id.* ¶¶ 96, 127).  Roaring Kitty continuously published his investments on WallStreetBets, such as his initial purchase of $50,000 of GameStop; he also posted an in-depth analysis of GameStop's stock on his YouTube channel in August 2020.  (*See id.* ¶¶ 127, 129).

Leading up to January 27, 2021, the Retail Investors purchased long positions in the Relevant Securities — primarily through Robinhood — with the expectation that the stocks would

CASE NO.  21-2989-MDL-ALTONAGA/Torres

increase in value.  (*See id.* ¶¶ 7, 64, 101).  As more investors purchased the Relevant Securities

and "out of the money" call options[6] in the Relevant Securities, the market prices for the stocks

rose due to supply and demand.  (*Id.* ¶¶ 99, 114).  The Relevant Securities started appreciating to

"unprecedented levels." (*Id.* ¶ 15).

To illustrate this rapid growth, a share of GameStop stock traded for as low as $2.00 a share

in 2019 (*see id.* ¶ 130); $43.03 on January 21, 2021 (*see id.* ¶ 132); $76.79 on January 25, 2021

(*see id.*); $147.98 on January 26, 2021 (*see id.* ¶ 135); and $380.00 on January 27, 2021 (*see id.*

¶ 137).  GameStop's stock price reached a closing high of $347.51 on January 27, 2021 — a

134.84% increase from the previous day.  (*See id.*).  Other Relevant Securities experienced similar

surges; for example, AMC's and Express's share prices increased over 300% and 200%,

respectively.  (*See id.*).

As Retail Investors increased long positions in the Relevant Securities, those who held

short positions in the Relevant Securities, such as Citadel Securities (*see id.* ¶¶ 11, 141–42), were

caught in a short squeeze.  (*See id.* ¶¶ 114–15).  Investors with these short positions faced a rapid

increase in the shorted assets' values, exposing short sellers to even greater losses because the

short sellers must at some point buy back the stocks to return them to their lenders.  (*See id.* ¶¶ 12,

115).[7]

---

[6] A call option gives the holder the right to buy the asset at a stated fixed price or the "strike price."  (Am. Compl. ¶ 114).  An "in the money" option has a favorable strike price because it is *lower* than the market price of a stock (*id.* ¶ 119), while an "out of the money" option has an unfavorable strike price because it is *higher* than market price for the underlying asset (*id.* ¶ 120).  If an option expires while out of the money, the contract becomes valueless.  (*See id.* ¶¶ 119–120, 140, 294).

[7] Another phenomenon known as a "Gamma squeeze" occurred as the prices of the Relevant Securities increased.  (Am. Compl. ¶¶ 114, 116).  Options are priced based on a variety of risk variables, including one called "Gamma," which increases as the option nears its expiration date or as the option approaches its strike price (*i.e.*, "being in the money").  (*Id.* ¶¶ 121, 123–26).  When a security experiences a sharp price increase, the Gamma increases; stated differently, options that were previously unlikely to reach their strike prices before expiration become more likely to do so.  (*See id.* ¶¶ 124–26).  As the Gamma increases, market makers hedge by purchasing more of the underlying security, which further drives the price of the security

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Around 5:00 p.m. on January 27, 2021, the SEC released a statement indicating it was "aware of and actively monitoring the on-going market volatility in the options and equities markets[.]"  (*Id.* ¶ 144 (alteration added; quotation marks omitted)).  It declined to step in and restrict trading, however.  (*See id.*).

***Events of January 28, 2021.***  Right before markets opened on January 28, 2021, analytics captured a significant volume of GameStop short transactions.  (*See id.* ¶ 156).  Retail brokers generally do not allow individual investors to engage in after-hours trading to the same extent as institutional investors, so this increase in short volume was likely the result of institutional investors, like Citadel Securities, taking new short positions.  (*See id.* ¶ 157).  Additionally, failure to delivers ("FTDs"), which occur when one of two transacting parties fails to meet its obligations in a securities trade, rose dramatically in the period leading up to January 28, 2021, a phenomenon consistent with increasing short interest by market makers like Citadel Securities.[8]  (*See id.* ¶¶ 161, 165).

This increase in short positions baffled some observers.  (*See id.* ¶ 175).  The dominant view in many financial discussion forums reflected a high degree of excitement and motivation among Retail Investors.  (*See id.*).  Many announced plans to increase long positions in the Relevant Securities on January 28, 2021.  (*See id.*).

Around 1:00 a.m. EST on January 28, 2021, Robinhood informed its users that in the face of unprecedented volatility surrounding GameStop and AMC stock, all GameStop and AMC options with expirations of January 29, 2021 would be set to closing transactions only.  (*See id.*

---

higher and creates a feedback loop as even deeper out of the money options approach their strike price. (*See id.* ¶ 126).

[8] FTDs can be strong indicators of naked short selling, which occurs when a short seller does not actually possess the security it is supposed to borrow, or of market makers taking on more short positions.  (*See* Am. Compl. ¶¶ 162–63).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

¶ 176).   Apparently, the restrictions would help Robinhood reduce risk.   (*See id*.).   For the immediate future, customers could close out their positions in GameStop and AMC but could not make new investments.   (*See id.*).

At 5:11 a.m. EST, Robinhood received an email from the NSCC titled "NSCC Daily Margin Statement" advising Robinhood had a collateral requirement deficit of over $3 billion.   (*Id.* ¶ 178).   At 8:00 a.m. EST, Gretchen Howard, Robinhood's COO, messaged internally that Robinhood had a "major liquidity issue" and was moving the Relevant Securities to Position Close Only ("PCO"), meaning Robinhood users could sell the Relevant Securities but could not buy them.   (*Id.* ¶¶ 179–80 (quotation marks omitted)).   Around that same time, David Dusseault, Robinhood Financial's President and COO, said in another internal message, "we will navigate through this [NSCC] issue[,]" and "we are to [sic] big for them to actually shut us down[.]"   (*Id.* ¶ 182 (alterations added)).   Robinhood negotiated with the NSCC to significantly reduce its margin requirements and was subsequently able to meet its revised NSCC deposit requirement shortly after 9:00 a.m. EST.   (*See id.* ¶¶ 183–185).

Robinhood moved the Relevant Securities to PCO by the time the markets opened on January 28, 2021.   (*See id.* ¶¶ 179–180).   To their surprise, Robinhood users were no longer able to purchase the Relevant Securities — the "buy" button was deactivated as a feature, leaving users with no option but to sell or hold their securities.   (*See id.* ¶¶ 186–88).   Further, Robinhood blocked users on its web platform and mobile app from searching for the Relevant Securities' ticker symbols.   (*See id.* ¶ 190).   Robinhood also canceled overnight purchase orders of the Relevant Securities placed on January 27, 2021, which were queued to move forward when the markets opened on January 28, 2021.   (*See id.* ¶ 188).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Customers were not given advance notice of the switch to PCO for the Relevant Securities. (*See id.* ¶ 185).  Robinhood announced the news via Twitter on January 28, 2021, stating it was restricting the Relevant Securities to PCO due to market volatility.  (*See id.* ¶¶ 192–94).

Other brokerages also restricted trading, adjusted margin requirements, or restricted trading strategies.[9]  (*See id.* ¶¶ 195, 365–67).  On January 28, 2021, Ally, Dough, Public.com, SoFi, Stash, Tastyworks, and WeBull restricted purchases of two or three of the Relevant Securities;[10] E*Trade restricted purchases of GameStop and AMC; and Interactive Brokers restricted trading on options. (*See id.*).  Charles Schwab and TD Ameritrade did not halt trading but instead adjusted margin requirements for certain securities and restricted certain strategies usually employed by advanced traders.  (*See id.* ¶ 365).

The broad prohibition on buying the Relevant Securities spawned a massive sell-off, which sent prices of the Relevant Securities tumbling.  (*See id.* ¶ 197).  For example, on January 28, 2021, GameStop shares reached an intraday peak of $483.00 before dropping down to a closing price of $193.60 — a staggering 44.29% drop from the prior day's closing price of $347.51.  (*See id.* ¶ 198).  Similarly, AMC shares dropped 56.63%, EXPR shares fell 50.79%, and BBBY shares declined 36.40%.  (*See id.*).  The Retail Investors who wanted to take advantage of the price drops to buy more shares of the Relevant Securities were unable to do so due to the prohibition on purchasing.  (*See id.*).

While individual investors were prohibited from purchasing the Relevant Securities, institutional investors were not.  (*See id.* ¶ 209).  Large investment firms and market makers such

---

[9] Internal Robinhood documents show Robinhood actively monitored the actions of other broker-dealers. (*See* Am. Compl. ¶ 196).

[10] Many of these brokerages reported that their clearing firm, Apex, was responsible for implementing the restrictions.  (*See* Am. Compl. ¶ 195).  Apex only imposed restrictions on January 28, 2021.  (*See id.*).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

as Citadel Securities were able to purchase the Relevant Securities at artificially reduced prices because they had access to private stock exchanges known as "dark pools."[11]  (*Id.*).  As the Retail Investors sold their shares in the Relevant Securities because of the trading restrictions, firms like Citadel Securities bought the Relevant Securities at artificially reduced prices to close out their short positions.  (*See id.* ¶¶ 209–10).

***Events after January 28, 2021.***  When the market opened on January 29, 2021, Robinhood lifted its trading restrictions and permitted individual investors to open new long positions in the Relevant Securities; even so, Robinhood continued to heavily restrict such purchases.  (*See id.* ¶¶ 249–51).  For example, Robinhood placed limitations on the number of new positions its users could open in the Relevant Securities, restricting purchases of GameStop stock to two shares and then to one share.  (*See id.* ¶¶ 253–55).  It maintained trading limitations on certain securities through February 4, 2021 (*see id.* ¶ 261); further suppressing the value of the Relevant Securities and pressuring investors to sell, rather than buy or hold (*see id.* ¶¶ 251, 255–56).

On January 31, 2021, Vlad Tenev, Robinhood's CEO, explained in an opinion piece published in USA TODAY that Robinhood maintained trading restrictions because clearinghouse-mandated deposit requirements were "increased ten-fold."  (*Id.* ¶ 262 (quotation marks omitted)).  Two days earlier, Robinhood had announced that it raised more than $1 billion to help meet rising demands for cash and shore up its balance sheet.  (*See id.* ¶ 261).  Robinhood raised this money on top of $500 million it accessed through credit lines to ensure it had sufficient capital to allow its clients to trade the Relevant Securities.  (*See id.*).  On February 1, 2021, Robinhood announced

---

[11] Private stock exchanges are known colloquially as "dark pools" or "dark exchanges" because they do not disseminate public quotations of securities prices.  (Am. Compl. ¶¶ 104–07).  Through these private exchanges, institutional investors can discreetly buy or sell securities in large blocks, mitigating some of the price impacts that their buying or selling activity would otherwise have on a "lit," or public, national securities exchange.  (*Id.* ¶ 106).

it had raised an additional $2.4 billion in funding above the $1 billion it had already raised.  (*See id.*).  Weeks later, Tenev testified before the U.S. House Committee on Financial Services that Robinhood had met its revised deposit requirements a little after 9:00 a.m. on January 28, 2021. (*See id.* ¶ 264).

Publicly available data reveal short interests[12] in the Relevant Securities climbed steadily in the weeks leading up to January 28, 2021 (*see id.* ¶¶ 269–70, 284); and then decreased because of the trading restrictions imposed during the Class Period, with the sharpest and most significant decreases occurring after the restrictions imposed on January 28, 2021 (*see id.* ¶¶ 265, 269–72). FINRA data show significant increases in dark pool trading activity for each of the Relevant Securities on and around January 28, 2021, during the period when restrictions were first placed on the Relevant Securities.  (*See id.* ¶¶ 273–79).  Institutions dominate trading in dark pools and dark exchanges, which are generally beyond the reach of individual investors, so this activity indicates high institutional investor trading activity consistent with the exiting of short positions. (*See id.* ¶ 280).

The scale of Citadel Securities's business also indicates that the bulk of the activity captured by this FINRA data can be attributed to Citadel Securities.  (*See id.* ¶¶ 281–84).  Because Citadel Securities accounts for about 50% of dark trading activity, a large shift in the percentage of sales represented by short trades is likely to be caused by a shift in Citadel Securities's position from long to short or vice versa.  (*See id.* ¶ 283).

***Collusion between Defendants.***  Plaintiffs allege that Robinhood and Citadel Securities colluded to limit buy-side trading in the Relevant Securities so that Citadel Securities could recoup

---

[12] "Short interests" are defined as the number of shares of a security that have been sold short but have not yet been covered or closed out.  (Am. Compl. ¶ 268).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

losses in its short positions caused by the rise of the Relevant Securities' prices.  (*See id.* ¶ 154 (alterations added)).

*Motive to collude.*  According to Plaintiffs, "Robinhood and Citadel Securities shared a common motive to conspire — to protect their individual self-interest over the welfare of Robinhood's users.  Robinhood restricted competition on its platform to protect itself and Citadel from hemorrhaging losses totaling potentially billions of dollars."  (*Id.* ¶ 393).  Further, "in light of its planned 2021 IPO, Robinhood simply could not run the risk that its 'transaction-based revenue would be impacted negatively' should Citadel Securities terminate its relationship with Robinhood."  (*Id.* ¶ 401; *see also id.* ¶¶ 318, 400).

PFOF is Robinhood's primary source of revenue.  (*See id.* ¶¶ 5, 75, 316).  Market makers such as Citadel Securities pay more for Robinhood's order flow than they do for Robinhood's competitors.  (*See id.* ¶¶ 76, 402).  Today, Robinhood derives somewhere between 60% to 70% of its revenue from selling PFOF to market makers like Citadel Securities.  (*See id.* ¶¶ 73–75).  Citadel Securities alone was responsible for 29% of Robinhood's revenue in 2019, 34% in 2020, and 43% of Robinhood's PFOF revenue in the first quarter of 2021.  (*See id.* ¶¶ 5, 78, 80, 318).  Indeed, Citadel Securities is Robinhood's primary source of revenue.  (*See id.* ¶ 5).

In its Form S-1, Robinhood stated:

> For the three months ended March 31, 2021, 59% of our total revenues came from four market makers.  If any of these market makers, or any other market makers with whom we do business, were unwilling to continue to receive orders from us or to pay us for those orders (including, for example, as a result of unusually high volatility), we may have little to no recourse and, if there are no other market makers that are willing to receive such orders from us or to pay us for such orders, or if we are unable to find replacement market-makers in a timely manner, our transaction-based revenue would be impacted negatively.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

(*Id.* ¶ 81; *see also id.* ¶ 317 ("As set forth in Robinhood's Registration Statement, Robinhood's 'PFOF . . . arrangements with market makers are not documented under binding contracts.'" (alteration in original)).

Citadel Securities possessed significant short positions in the Relevant Securities during the period in question.  (*See id.* ¶ 394).  As the prices of the Relevant Securities increased, Citadel Securities was exposed to "potentially infinite" losses.  (*Id.*).  As of December 31, 2020, Citadel Securities reported $57.5 billion in "securities sold, not yet purchased, at fair value" — which are "likely representative of Citadel Securities's short position."  (*Id.* ¶ 395 (quotation marks omitted)).

Plaintiffs conclude that Citadel Securities used its relationship with Robinhood to pressure the company into restricting trading in the Relevant Securities so it could buy the stocks at an artificially reduced price to close out its short positions.  (*See id.* ¶¶ 400–02).

According to Plaintiffs, Defendants' public attempt to attribute the motivation for its trading restrictions to market volatility and the resulting NSCC margin call was pretextual.  (*See id.* ¶¶ 357–69).  In other words, Robinhood was not innocently responding to increased volatility; it was trying to keep its most important customer happy, to the detriment of the Retail Investors.  Plaintiffs allege that restricting trading was *against* Robinhood's self-interest because Robinhood's profits are based on the volume of transactions on its application.  (*See id.* ¶¶ 358–60).  Further, Plaintiffs claim Robinhood could have either used its lines of credit instead of restricting trading to meet its margin requirements, or it could have imposed less restrictive measures like other brokerages did.  (*See id.* ¶¶ 363–69).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

_Communications among Defendants._  In the run up to, during, and after January 28, 2021, high-level executives of Citadel Securities communicated with high-level executives of Robinhood.  (*See id.* ¶ 226).

On January 20, 2021, the Citadel Securities Head of Execution Services extended an unknown proposition to Josh Drobnyk, Robinhood's Vice President of Corporate Relations and Communications, who conferred with Daniel Gallagher and Lucas Moskowitz, Robinhood's Chief Legal Officer and Deputy General Counsel, respectively.  (*See id.* ¶¶ 227–28).  The Citadel Securities executive and Drobnyk had a relationship because Drobnyk previously worked at FINRA.  (*See id.* ¶ 227).  On January 25, 2021, Drobnyk replied via email that "[w]e are on board" and Moskowitz would be the central point of contact for Robinhood.  (*Id.* ¶ 230 (alteration added; quotation marks omitted)).  The Citadel Securities executive responded to Moskowitz with an offer to chat, emphasizing the "strong relationship between the firms[.]"  (*Id.* ¶ 231 (alteration added; quotation marks omitted)).  The details of the ensuing January 26, 2021 phone call have not been disclosed.  (*See id.* ¶¶ 232–33).

On January 26, 2021, during the short squeeze, Jim Swartwout, President and CEO of Robinhood Securities, alerted other Robinhood executives through an internal chat that Robinhood "was moving GameStop to 100% margin the next day, stating 'I sold my AMC today. FYI — tomorrow we are moving GME to 100% — so you are aware.'"  (*Id.* ¶ 234).

On January 27, 2021, the day before the trading restrictions were implemented, Citadel Securities and Robinhood executives exchanged several communications.  (*See id.* ¶ 235).  In an internal conversation around 4:40 p.m., Robinhood COO Howard informed Tenev that she, along with Gallagher and Swartwout, would be joining "a call with Citadel" at 5:00 p.m. that day.  (*Id.* ¶ 237 (quotation marks omitted); *see id.* ¶ 239).  Howard said she believed Citadel Securities

16

CASE NO.  21-2989-MDL-ALTONAGA/Torres

would make demands on limiting PFOF.  (*See id.* ¶¶ 237, 239).  Tenev responded that "[m]aybe this would be a good time for me to chat with Ken [G]riffin[,]" the CEO of Citadel Securities, and told Howard, "[y]ou guys can mention that."  (*Id.* ¶ 239 (quotation marks omitted; alterations added)).  Tenev noted he had not previously met Griffin.  (*See id.*).

Shortly thereafter, around 6:25 p.m., Swartwout messaged in an internal chat that he was aware of "anecdotal evidence that several 'very large' firms [were] having really bad nights too." (*Id.* ¶ 240 (alteration adopted; alteration added; quotation marks omitted)).  Swartwout replied, "everyone is.  [Y]ou wouldnt [sic] believe the conv[ersation] we had with Citadel.  [T]otal mess." (*Id.* ¶ 241 (alterations added); *see id.* ¶ 240–41).  At 8:16 p.m., Swartwout updated a Citadel Securities employee that he was looking for "new Citadel numbers."  (*Id.* ¶ 242 (quotation marks omitted)).  The Citadel Securities employee responded that the numbers were "firming up right now in light of the follow up [sic] conversation between Gallagher and [redacted.]"  (*Id.* (alteration adopted; alterations added; quotation marks omitted)).

At 8:29 p.m. that evening, the Citadel Securities Vice President of Business Development notified Swartwout that one of Citadel Securities's executives, whom Tenev had previously met, was available to speak to Tenev that night.  (*See id.* ¶¶ 243, 245).  Swartwout replied, "[b]ecause of our partnership, Vlad would like to have a discussion with Ken [Griffin] at some point, just given our relationship.  Not specific to this crazy issue."  (*Id.* ¶ 244 (first alteration added; second alteration in original; quotation marks omitted); *see id.* ¶ 245).  Swartwout emailed in the same chain later that night that he was "beyond disappointed in how this went down[,]" and it was "difficult to have a partnership when these kind[s] of things go down this way."  (*Id.* ¶ 245 (alterations added; quotation marks omitted)).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

On January 30, 2021, a Citadel Securities executive emailed Drobnyk, stating he "wanted to generally coordinate messaging." (*Id.* ¶ 258 (quotation marks omitted); *see id.* ¶ 260). The Citadel Securities executive also introduced Drobnyk to someone who was "running point on this narrative for [them]" and copied company lawyers "for privilege." (*Id.* ¶ 258 (alteration added; quotation marks omitted); *see id.* ¶ 260).

***Market definitions.***  Plaintiffs define two relevant product markets "within the distribution of securities trading services" — the upstream market in which Citadel Securities operates and the downstream one in which Robinhood operates.[13] (*Id.* ¶ 305). Plaintiffs define these as the "PFOF Market" and the "No-Fee Brokerage Trading App Market[,]" respectively. (*Id.* ¶¶ 306, 312 (alteration added)).

<u>*The PFOF Market.*</u>  Citadel Securities competes with other market makers in the upstream PFOF Market, which Plaintiffs geographically limit to the United States. (*See id.* ¶¶ 306, 311). Plaintiffs allege Citadel Securities accounts for approximately 27% of the U.S. equities volume and executes approximately 37% of all U.S.-listed retail volumes, making it a "relative behemoth[,]" with the largest market share of any wholesale market maker in the PFOF Market. (*Id.* ¶¶ 306–07 (alteration added)). The firm has garnered approximately 40% of all PFOF in the United States for the past two years, more than its next three competitors combined. (*See id.* ¶ 307).

Citadel Securities paid brokers roughly $1.1 billion for their order flows in 2020, more than any other market maker and nearly equal to its four largest competitors combined. (*See id.* ¶ 308). From January 2021 through June 2021, Citadel Securities paid nearly $1.5 billion to brokers for their order flow, more than any other market maker. (*See id.* ¶ 309).

---

[13] "Upstream" here refers to an earlier stage in the production or distribution chain, while "downstream" refers to a later stage. (Am. Compl. ¶ 305).

*No-Fee Brokerage Trading App Market.*  Robinhood competes with other brokerages in the downstream or consumer-facing No-Fee Brokerage Trading App Market, which is also geographically limited to the United States.  (*See id.* ¶¶ 312–13, 315).  Brokerages in this market offer no-fee transactions on their trading applications because they receive PFOF from market makers in the upstream market.  (*See id.* ¶¶ 312–13).

Based on monthly active users, Robinhood is far and away the most popular electronic trading application in the world and is responsible for a significant number of daily trades.  (*See id.* ¶¶ 326, 333).  In January 2021, Robinhood had nearly three-times as many users as then second-place brokerage Fidelity Investments (*see id.* ¶ 334); in July 2021, Robinhood had nearly three-times as many users as then second-place brokerage WeBull (*see id.* ¶ 336).

*Structure and characteristics of the markets.*  According to Plaintiffs, the "structure and characteristics of the market for securities, and in particular the lack of disclosure of short interest positions at any given time, make it conducive to collusion and anticompetitive conduct."  (*Id.* ¶ 370).

*High barriers to entry.*  An entrant to the No-Fee Brokerage Trading App Market would need specialized knowledge, licenses, and memberships, including memberships in organizations such as FINRA.  (*See id.* ¶ 373).  The cost of compliance with applicable industry and regulatory standards is substantial.  (*See id.*).  Entrants would need significant cash on hand to deposit at clearinghouses such as the DTCC as collateral.  (*See id.* ¶ 374).  And entrants would need to have the necessary technological infrastructure and expertise to navigate the digital market.  (*See id.* ¶¶ 375–76).  An entrant to the PFOF Market would also need extensive infrastructure and significant mathematical expertise to design the sophisticated algorithms that are necessary to compete in the high-frequency trading market.  (*See id.* ¶¶ 377–78).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

*High fixed costs and low variable costs.*  Both relevant markets are defined by high fixed costs and low variable costs, and participants in these markets benefit greatly from scale.  (*See id.* ¶ 379).  Online broker-dealers participating in the No-Fee Brokerage Trading App Market require significant IT infrastructure, software, and data security infrastructure to develop and maintain the applications through which investors trade.  (*See id.* ¶ 380).  Market makers participating in the PFOF Market require similar infrastructures and software to facilitate the digital clearing and custodial services they provide to online broker-dealers.  (*See id.* ¶ 381).  Market makers — high frequency trading market makers, in particular — must invest significant effort and resources to increase the speed of trading technology to maximize their profits.  (*See id.* ¶¶ 382–83).

*Captive market.*  In the short run, retail investors in the securities market are locked into the broker-dealers they already invest with.  (*See id.* ¶¶ 158, 387).  The process to open a trading account with a broker-dealer may take several days.  (*See id.* ¶ 388).  If a broker-dealer like Robinhood imposes short-term trading restrictions, retail investors may not have the opportunity to switch or change broker-dealers before the restrictions are lifted.  (*See id.* ¶ 392).

If Robinhood users wish to transfer or withdraw funds from their Robinhood accounts to their personal bank accounts, they will not have access to their funds for three-to-five days after initiating a request.  (*See id.* ¶¶ 159, 389).  During the week of January 25, 2021, Robinhood users experienced additional delays or errors when attempting to transfer or withdraw funds or close accounts.  (*See id.* ¶¶ 160, 391).  Robinhood also charges users a $75 fee to transfer their assets to another brokerage, thereby compounding the difficulties associated with switching.  (*See id.* ¶ 389).

*Antitrust injury.*  Plaintiffs allege the Retail Investors suffered "a reduction in the quality of their trades" because of Citadel Securities's and Robinhood's collusive behavior.  (*Id.* ¶ 350;

Case 1:21-md-02989-CMA   Document 470   Entered on FLSD Docket 05/13/2022   Page 21 of 53
USCA11 Case: 22-11873   Document: 36-3   Date Filed: 10/21/2022   Page: 104 of 189

CASE NO.  21-2989-MDL-ALTONAGA/Torres

see id. ¶ 351).  According to Plaintiffs, Robinhood's prohibition on purchases of the Relevant Securities imposed transaction costs on the Retail Investors, forcing them to pay "a higher quality-adjusted price as a result of Defendants' conduct."  (*Id.* ¶¶ 350, 353).  In exchange for allowing Robinhood to route their trades to market makers like Citadel Securities, Robinhood users expect efficient execution of intended trades.  (*See id.* ¶ 350).  By blocking the efficient execution of trades of the Relevant Securities, the quality of user experience significantly decreased, effectively increasing the price of trading on Robinhood.  (*See id.* ¶¶ 350–51).

Further, the trading restrictions reduced the number of buy orders for the Relevant Securities, artificially decreasing their price and harming the Retail Investors who held positions. (*See id.* ¶ 353).  Plaintiffs also allege harm to the companies whose securities the Retail Investors wanted to purchase by reducing the output of their stock.  (*See id.* ¶¶ 355–56).

***Amended Complaint and Defendants' Motion.***  Plaintiffs assert a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, against Defendants.  (*See* Am. Compl. ¶¶ 403–415).  Defendants move to dismiss the Amended Complaint, arguing: (1) Plaintiffs fail to sufficiently plead that Defendants agreed to conspire; (2) Plaintiffs fail to sufficiently plead the remaining elements of a Sherman Act section 1 claim; and (3) Plaintiffs' antitrust theory is precluded by federal securities laws.  (*See generally* Mot.; Reply).

## III.   STANDARD

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation." *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (alteration added; citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added; citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take its factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

## IV.    ANALYSIS

Plaintiffs assert one claim under section 1 of the Sherman Act, 15 U.S.C. § 1. (*See* Am. Compl. ¶¶ 403–15). Section 1 of the Sherman Act provides "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (alterations added). Section 1 claims require two or more parties agreeing on a restriction; "wholly unilateral" conduct is the exclusive province of section 2. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (quotation marks and citations omitted). "Despite the different terminology, there is no magic unique to each term in [section] 1; the terms 'contract,' 'combination,' and 'conspiracy' are used interchangeably to

capture the concept of concerted action, that is an 'agreement.'" *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1233 (11th Cir. 2021) (alteration added; some quotation marks and citation omitted).

"The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334–35 (7th Cir. 2012) (citation omitted). "[T]he Supreme Court has long concluded that Congress intended only to prohibit 'unreasonable' restraints on trade." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (alteration added; citation omitted). Thus, section 1 "prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade." *Id.* (citation omitted).

Defendants attack the sufficiency of the allegations directed at the first requirement — that Plaintiffs adequately plead a conspiracy among the Defendants. (*See* Mot. 19–28).[14] Defendants also dispute whether Plaintiffs adequately plead the alleged agreement unreasonably restrained trade. (*See id.* 28–34). Lastly, Defendants assert that Plaintiffs' antitrust theory is precluded by federal securities laws. (*See id.* 34–42). Because Plaintiffs fail to plausibly allege the existence of an agreement — let alone one that unreasonably restrains trade — the Court declines to reach the third suggested ground for dismissal.

***Defendants' Relationship.*** "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) (footnote call number omitted). As an initial matter, it is necessary to determine whether Plaintiffs have alleged a vertical or horizontal restraint on trade.

---

[14] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Plaintiffs insist Defendants have a horizontal relationship (*see* Resp. 30 n.26) — likely because "virtually all vertical agreements now receive a traditional rule-of-reason analysis" rather than straightforward *per se* condemnation.  *In Re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 318 (3rd Cir. 2010) (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007); other citation and footnote call number omitted).  Contrary to Plaintiffs' position, the relationship in question is obviously vertical.

The agreement alleged in the Amended Complaint is among firms at different levels of distribution.  For Plaintiffs to argue otherwise is surprising, given the Amended Complaint explicitly alleges that Defendants "operate at two different levels within the distribution of securities trading services."  (Am. Compl. ¶ 305).  Citadel Securities competes in the "upstream product market consist[ing] of market makers that pay brokerage firms to route their clients' trades to that market maker[.]"  (*Id.* ¶ 306 (alterations added)).  Robinhood competes in the "downstream or consumer-facing relevant product market consist[ing] of zero account-minimum, no-fee brokerages[.]"  (*Id.* ¶ 312 (alterations added)).

According to Plaintiffs, "'upstream' refers to an earlier stage in the production or distribution chain" than the "downstream" stage.  (*Id.* ¶ 305).  It does not get any more vertical than "up" and "down."  *See Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 344 (6th Cir. 2006) ("In analyzing the economics of any given restraint, and determining thereby which kind of legal treatment it merits, it is vital to distinguish between horizontal restraints that involve direct competitors at a given level of the market, and *vertical restraints that typically involve entities that are upstream or downstream of one another*." (emphasis added)).

Tellingly, Plaintiffs also allege that Citadel Securities is Robinhood's "real client[.]"  (Am. Compl. ¶ 402 (alteration added)).  Much of the Amended Complaint is devoted to showing how

CASE NO.  21-2989-MDL-ALTONAGA/Torres

dependent Robinhood is on Citadel Securities for PFOF revenue.  (*See, e.g.*, *id.* ¶¶ 316–23).  As Plaintiffs describe this relationship, "it is actually the Retail Investors who are Robinhood's product; a product for which Citadel Securities is paying Robinhood a premium." (*Id.* ¶ 402).  In other words, Plaintiffs' own description of Citadel Securities and Robinhood's arrangement does not illustrate an agreement to "eliminate competition between two entities that provide the same product," but instead "a vertical agreement between parties that provide very different services, in which each party profits solely from a different level of the chain of commerce." *Cates v. Crystal Clear Techs., LLC*, No. 3:16-cv-08, 2016 WL 4379220, at *10 (M.D. Tenn. Aug. 17, 2016).

In their Response, Plaintiffs insist Citadel Securities is "on the same horizontal level of distribution as clearing entities such as Robinhood Securities (Robinhood's clearing entity)." (Resp. 30 n.26).  Yet, according to their Amended Complaint, customers place trades on Robinhood Financial's application, Robinhood Securities takes custody of the customer's cash and securities, and then "Robinhood Securities typically routes the trade to a market maker, predominately Citadel."  (Am. Compl. ¶¶ 83–84).  All three entities thus operate at different distribution levels: Robinhood Securities (clearinghouse) acts in between Robinhood Financial (introducing brokerage) and Citadel Securities (market maker).[15]

Even if there are horizontal elements to Citadel Securities and Robinhood's relationship, the focus of Plaintiffs' allegations is the vertical relationship between them.  *See AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3rd Cir. 2006) (concluding an alleged restraint was vertical despite the defendants having a relationship with "horizontal elements" because the relationship

---

[15] Other courts have also held that restraints involving securities trading platforms and market makers are vertical, not horizontal. *See, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, No. 16-mc-2704, 2018 WL 2332069, at *12 n.8 (S.D.N.Y. May 23, 2018) ("Tradeweb was not a horizontal competitor of the Dealers, as it was a provider of electronic trading platforms, not a market maker.  The label 'naked restraint,' which antitrust law uses in connection with horizontal competitors, therefore, does not fit." (quotation marks and citation omitted)).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

"was primarily vertical").  Where predominantly vertical firms enter into a vertical restraint of

trade, rule of reason analysis is appropriate "[e]ven though in some ways the companies may have

operated in similar lines of business[.]"  *Generac Corp. v. Caterpillar, Inc.*, 172 F.3d 971, 977 (7th

Cir. 1999) (alterations added).  So, the Court will analyze whether Plaintiffs plausibly allege an

unlawful *vertical* restraint on trade.  But first, the Court analyzes whether Plaintiffs plausibly allege

an agreement at all.

    ***Conspiracy.***  "The first inquiry[] in any section 1 claim . . . is to locate the agreement that

restrains trade."  *Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prods. Div., a Div. of BP Oil Co.*, 932

F.2d 1384, 1388 (11th Cir. 1994) (alterations added).  Adequately stating a section 1 claim

"requires a complaint with enough factual matter (taken as true) to suggest that an agreement was

made."  *Twombly*, 550 U.S. at 556.  The "crucial question" with regard to a conspiracy claim under

section 1 "is whether the challenged anticompetitive conduct stems from independent decision or

from an agreement, tacit or express[.]"  *Id.* at 553 (alteration added; other alteration adopted;

quotation marks and citation omitted).

    To allege an antitrust conspiracy, the plaintiff "should present direct or circumstantial

evidence that reasonably tends to prove that the [defendant] and others had a conscious

commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co. v.

Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (alteration added; quotation marks and citations

omitted).  "Standing alone, parallel conduct is inconclusive, as it is consistent with an unlawful

conspiracy, as well as rational and competitive business strategy prompted by common perceptions

of the market."  *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1258–59 (S.D. Fla. 2021)

(citing *Twombly*, 550 U.S. at 554).

    In the November 17 Order dismissing the CCAC, the Court found Plaintiffs failed to allege

CASE NO.  21-2989-MDL-ALTONAGA/Torres

direct evidence of an agreement among Defendants.  (*See* Nov. 17, 2021 Order 27–31).

Defendants contend the Amended Complaint is similarly devoid of such allegations.  (*See* Mot.

21).  Plaintiffs do not argue otherwise and instead focus on whether there is circumstantial evidence

of an agreement.  (*See* Resp. 14–16).  The Court thus examines whether Plaintiffs plausibly allege

a conspiracy through circumstantial evidence, concluding they do not.

 ***Allegations of circumstantial evidence of an agreement.***  Direct evidence of an antitrust

conspiracy is "extremely rare[.]"  *Am. Chiropractic Ass'n v. Trigon Healthcare*, 367 F.3d 212, 226

(4th Cir. 2004) (alteration added; citation omitted).  As an alternative, a plaintiff "may present

circumstantial facts supporting the inference that a conspiracy existed."  *Gamm v. Sanderson

Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (quotation marks and citation omitted).  The plaintiff

must allege "claimed facts that collectively give rise to a plausible inference that an agreement

existed."  *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021)

(quotation marks and citation omitted).  Whether the plaintiff alleges a horizontal or vertical

conspiracy, the focus is similar: do the allegations plausibly suggest an agreement was made?  *See

Stewart Glass & Mirror, Inc. v. U.S.A. Glas*, 17 F. Supp. 2d 649, 653 (E.D. Tex. 1998).

 When deciding a dispositive motion in an antitrust conspiracy suit, a court will first "look

for evidence of interdependence or, put another way, that the defendants have an economic motive

to behave in concert."  *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp.

2d 991, 998 (N.D. Ill. 2011) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 596–97 (1986)).  The court then "looks to all the evidence suggesting agreement, or 'plus

factors,' which can be in the form of economic or non-economic evidence."  *Id.* (citing *In re High

Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002); *In re Baby Food Antitrust*

CASE NO. 21-2989-MDL-ALTONAGA/Torres

*Litig.*, 166 F.3d 112, 122 (3d Cir. 1999)).[16]

"[A]ny showing by [plaintiffs] that tends to exclude the possibility of independent action can qualify as a plus factor." *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003) (alterations added; other alteration adopted; quotation marks and citation omitted); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017) ("There is no finite list of potential plus factors."). Plaintiffs argue the existence of several plus factors: motive to collude, interfirm communications, Defendants' pattern of concealment and pretextual explanations, and the structural characteristics and behavior of the market. (*See* Resp. 16–25).[17] The Court examines each.

*Common motive to conspire.* In the absence of direct evidence and parallel conduct allegations, it is important for Plaintiffs to establish a plausible common motive to conspire. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d at 998 (citing *Matsushita*, 475 U.S. at 596–97); *see also Quality Auto Painting Ctr. of Roselle, Inc.*, 917 F.3d at 1263 n.14 ("[The common motive] plus factor is more properly invoked in contexts where the

---

[16] In the November 17 Order dismissing the CCAC, the Court first examined whether Plaintiffs alleged parallel conduct between Defendants. (*See* Nov. 17, 2021 Order 32–35). This analysis was necessary because Plaintiffs previously alleged a "hub-and-spoke conspiracy" involving horizontal relationships between multiple clearinghouses and brokerages. (*Id.* 34). Now, Plaintiffs have narrowed the Defendants to Robinhood and Citadel Securities, who are alleged to be important partners in a vertical relationship rather than competitors. As such, Plaintiffs no longer rely on allegations of parallel conduct, which require "'plus factors' to make the parallel conduct 'more probative of conspiracy than of conscious parallelism.'" *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (citation omitted).

Still, "[a] plus-factor analysis provides a way to organize circumstantial evidence that, in the plaintiff's view, reduces the probability that defendants were acting independently." *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-864, 2022 WL 199274, at *14 (N.D. Ill. Jan. 21, 2022) (alteration added). The Court thus continues to use the plus-factor framework to analyze Plaintiffs' allegations of circumstantial evidence.

[17] Plaintiffs no longer rely on several other plus factors the Court previously rejected, such as actions against unilateral self-interest (*see* Nov. 17, 2021 Order 38–39), the opportunity to coordinate and collude (*see id.* 39–40), and government investigations (*see id.* 47–48). (*See* Resp. 14–25).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

motive is unique and specific to the alleged conspirators." (alteration added; citation omitted)). Parties with "independent reasons" for conspiring can still be "interdependent" for section 1 purposes. *United States v. Apple, Inc.*, 791 F.3d 290, 317–18 (2d Cir. 2015) (citation and quotation marks omitted).  "Antitrust law has never required identical *motives* among conspirators when their independent reasons for joining together lead to collusive action." *Id*. (emphasis in original; citation and quotation marks omitted).

According to Plaintiffs, a common motive stemmed from "Defendants' lucrative self-styled PFOF 'partnership[.]'" (Resp. 22 (alteration added; quoting Am. Compl. ¶ 244)).  Plaintiffs' theory is that, during the trading frenzy in January 2021, Citadel Securities was at risk of incurring substantial losses because of its short positions in the Relevant Securities,[18] so Robinhood restricted trading to benefit Citadel Securities in the hopes of preserving their PFOF relationship. (*See id.* 22–24).

The Court rejected Plaintiffs' prior, similar motive theory as implausible.  (*See* Nov. 17, 2021 Order 35–38).   While Plaintiffs adequately explained why Citadel Securities would orchestrate the trading restrictions, the Court was unconvinced as to why the other Defendants would agree to implement the unlawful restrictions.  (*See id.* 38).  More specifically, the Court found that (1) "[t]he mere fact that Citadel Securities is an important business partner of the other Defendants d[id] not provide sufficient motive to conspire" (*id.* 37 (alteration added)), and (2) "the CCAC provide[d] an 'obvious alternative explanation' for imposing the trading restrictions" — the "increased collateral requirements caused by market volatility" (*id.* (alteration added; quoting *Iqbal*, 556 U.S. at 682)).  Given that Plaintiffs rely on the same general theory, the

---

[18] "That Citadel Securities held short interests in the Relevant Securities is a reasonable inference to be drawn in Plaintiffs' favor."  (Nov. 17 2021 Order 36 (citing *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 n.1 (11th Cir. 2004))).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

question now is whether they have sufficiently bolstered their allegations to render their motive theory plausible.

In the Amended Complaint, Plaintiffs shift their focus to Robinhood and Citadel Securities' relationship, dropping every other Defendant.  In doing so, Plaintiffs add allegations expanding upon the lucrative PFOF relationship between Robinhood and Citadel Securities.  (*See, e.g.*, Am. Compl. ¶¶ 316–323).  The Court previously determined this relationship alone did not provide sufficient motive to conspire considering Plaintiffs did not allege that Citadel Securities threatened or suggested it would end the relationship or explain why Robinhood would not simply use a different market maker if it did.  (*See* Nov. 17, 2021 Order 37).  In other words, Plaintiffs failed to explain why Robinhood would agree to an illegal demand to restrict trading.

Plaintiffs have added a new wrinkle that warrants consideration.  In the Amended Complaint, Plaintiffs state that Robinhood filed for an initial public offering ("IPO") in March 2021 and went public on July 29, 2021.  (*See* Am. Compl. ¶ 82).  Plaintiffs allege that Robinhood acquiesced to an anticompetitive agreement with Citadel Securities because Robinhood — which was anticipating filing for an IPO — "simply could not run the risk that its 'transaction-based revenue would be impacted negatively' should Citadel Securities terminate" their relationship.  (*Id.* ¶ 401; *see id.* ¶¶ 318–19).  This theory finds some support from Howard's internal message on January 27, 2021 informing Tenev that she believed Citadel Securities would make some demands on limiting PFOF, although this message does not indicate what, if anything, Citadel Securities was asking for in return.  (*See id.* ¶¶ 237, 239).

According to Plaintiffs, Robinhood "could not rely on the possibility that other market makers, such as Virtu Americas, were standing by willing and able to pay Robinhood for order flow that Citadel would have otherwise accepted[,]" considering how much more PFOF Citadel

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Securities typically purchased than the others.  (*Id.* ¶ 319 (alteration added); *see id.* ¶ 318; Resp. 23 n.17).  This conclusion is supported by Robinhood's Form S-1, where Robinhood disclosed that its "transaction-based revenue would be impacted negatively" if any of its four biggest market maker relationships ended and it could not find a replacement market maker in a timely manner. (*Id.* ¶ 81 (quotation marks omitted)).

Still, the alleged motive for Robinhood is somewhat speculative and conclusory.  There are no factual allegations supporting the notion that Robinhood restricted trading with its forthcoming IPO in mind.  Plaintiffs essentially ask the Court to infer that Robinhood was motivated to agree to unlawfully restrict trading simply because of the timing of its forthcoming IPO.  (*See id.* ¶ 318).  Plaintiffs also ask the Court to infer that Citadel Securities wielded its influence as Robinhood's largest purchaser of PFOF to make anticompetitive demands.  (*See id.* ¶¶ 318–19).  And Plaintiffs ask the Court to infer that Robinhood could not and would not find replacement buyers for PFOF because Citadel Securities was Robinhood's largest purchaser of PFOF.  (*See id.*).  Plaintiffs' proffered motive theory thus rests on a series of inferences.

Taken together, Plaintiffs plausibly allege economic motives for why Citadel Securities and Robinhood might have entered into an anticompetitive agreement, although Robinhood's motive tenuously rests upon a series of inferences.  Plaintiffs' motive allegations weakly support an inference of a conspiracy.

*Interfirm communications.*  "[E]vidence of a high level of interfirm communications" may constitute a plus factor.  *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (alteration added; footnote call number, quotation marks, and citation omitted).  In dismissing the CCAC, the Court examined Plaintiffs' allegations of interfirm communications and concluded they weakly support an inference of a conspiracy between Robinhood and Citadel

CASE NO. 21-2989-MDL-ALTONAGA/Torres

Securities. (*See* Nov. 17, 2021 Order 44). The Amended Complaint does not add any new allegations of communications between the two entities. (*Compare* CCAC ¶¶ 296–313, 332–35, 452–53, 455, 461–63, *with* Am. Compl. ¶¶ 226–235, 239–46, 257–60, 320–22). The Court examines these allegations once more.

Embedded in the Amended Complaint are several vague and ambiguous emails between high-level executives of Robinhood and Citadel Securities and internal Robinhood emails discussing external conversations with Citadel Securities. Given their timing and overall context, these communications could be inferred to relate to the trading restrictions imposed on January 28, 2021.

On January 20, 2021, Citadel Securities's Head of Execution Services emailed Josh Drobnyk, Robinhood's Vice President of Corporate Relations and Communications, stating he was happy they "will be working together" and asking Drobnyk to "let [him] know if [they are] interested and who the main contact should be." (Am. Compl. ¶ 229 (alterations added; quotation marks omitted)). On January 25, 2021, Drobnyk replied "[w]e are on board" and copied Lucas Moskowitz, Robinhood's Deputy General Counsel, who was "going to be [Robinhood's] central point of contact[.]" (*Id.* ¶ 230 (alterations added)). Moskowitz and the Citadel Securities executive then arranged a call for the morning of January 26, 2021, the details of which are unknown. (*See id.* ¶¶ 231–33). Considering the Amended Complaint admits the details of this agreement or discussion are unknown, these emails are only relevant given their timing and participants.

Around 4:40 p.m. EST on January 27, 2021, Howard, Robinhood's COO, messaged Tenev, Robinhood's CEO, that she, along with Daniel Gallagher and Jim Swartwout, Robinhood's Chief Legal Officer and Robinhood Securities' President and CEO, respectively, would be joining "a

32

call with Citadel" at 5:00 p.m. that day.  (*Id.* ¶ 239; *see id.* ¶ 237).  Howard told Tenev she believed

Citadel Securities would "make some demands on limiting [payment for order flow] across the

board" but that they "won't agree to anything[.]"   (*Id.* ¶ 239 (alterations added)).  Tenev told

Howard that although he had never met Ken Griffin, the CEO of Citadel Securities, she could

mention on the call that "this would be a good time for [Tenev] to chat with [] [G]riffin[.]"  (*Id.*

(alterations added)).  The request from a market maker to limit the order flow sent to it is not

equivalent to a demand to restrict trading in certain securities; however, the timing and the

involvement of high-level executives render these emails relevant.

　　　Roughly two hours later, Swartwout received an internal message stating there was

"[a]necdotal evidence that several 'very large' firms are having really bad nights too"; to which

Swartwout replied, "everyone is.  [Y]ou wouldnt [sic] believe the conv[ersation] we had with

Citadel.  [T]otal mess[.]"  (*Id.* ¶ 240 (alterations added)).  At 8:16 p.m., Swartwout updated a

Citadel Securities employee that he was looking for "new Citadel numbers"; the employee

responded that the numbers were "firming up right now in light of the follow up [sic] conversation

between Gallagher and [redacted.]"   (*Id.* ¶ 242 (alteration adopted; alterations added; quotation

marks omitted)).  Around 8:30 p.m. that night, Swartwout emailed Citadel Securities's Vice

President of Business Development to offer to set up a call that night with Tenev and mentioned

Tenev would like to have a discussion with Griffin at some point, given their relationship, but

"[n]ot specific to this crazy issue[.]"  (*Id.* ¶ 245 (alterations added); *see id.* ¶¶ 243–44).  After the

Citadel Securities executive asked Swartwout if Tenev would like to have the call that night,

Swartout declined and said:

> Just looking for your dictated schedule and caps.  I have 20 minutes until batch so
> whatever it is we are not going to be able to address it tomorrow given the notice.
> I have to say I am beyond disappointed in how this went down.  It's difficult to
> have a partnership when these kind [sic] of things go down this way.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

(*Id.* ¶ 245 (alteration added)).  Again, these emails are vague and ambiguous, and they are only relevant considering the timing and those involved.

Lastly, on January 30, 2021, a Citadel Securities executive informed Drobnyk that he "wanted to generally coordinate messaging" and copied on the email Robinhood's "[General Counsels] as an FYI and for privilege."  (*Id.* ¶ 260 (alteration added); *see id.* ¶¶ 257–58).  The two then arranged an "[u]rgent" phone call.  (*Id.* ¶ 260 (alteration added)).  Given the context of the preceding communications and the fact that this request to coordinate messaging occurred even as Robinhood continued to restrict trading in the Relevant Securities, these emails — while vague and ambiguous — do lend some credence to Plaintiffs' conspiracy theory.

Of course, Defendants must frequently communicate given their business relationship. *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 56–57 (1st Cir. 2016) (explaining that companies operating in the same market can have legitimate business reasons to communicate, and those communications do not themselves establish a plausible antitrust conspiracy).  But given the timing, the players involved, and the fact that each of these emails could be inferred to relate to the trading restrictions imposed on January 28, 2021, Plaintiffs' allegations of interfirm communications are supportive of a conspiracy.

But the support is thin.  Plaintiffs cite *In re Salmon*, No. 19-21551-Civ, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021), where the undersigned found interfirm and intrafirm communications supported a reasonable inference of conspiracy.  (*See, e.g.*, Resp. 14).  There, the plaintiffs "point[ed] to bilateral and multilateral agreements not to compete and a high level of communications among [d]efendants," including complete details of multiple meetings, such as who was in attendance, when the meetings occurred, and the contents of those communications. *In re Salmon*, 2021 WL 1109128, at *15 (alterations added).  Here, Plaintiffs concede they do not

34

CASE NO.  21-2989-MDL-ALTONAGA/Torres

know what was discussed during the several calls between the Robinhood and Citadel Securities executives.

This is not necessarily fatal, for Plaintiffs do not have to plead the *contents* of the interfirm communications to move the needle closer to plausibility.  Interfirm communications can help Plaintiffs establish an "opportunity to conspire," even if "such opportunity alone is insufficient to support an inference that a conspiracy actually happened."  *Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 322 (S.D.N.Y. 2018).

Plaintiffs have alleged a sufficiently high level of interfirm communications to demonstrate an opportunity to conspire.  Allegations of *occasional* interfirm communications typically do not establish the plus factor.  *See Mayor & Council of Balt.*, 709 F.3d at 140.  Plaintiffs must allege a "high level" of interfirm communications.  *Id*. (quotation marks omitted).  A "high level" of interfirm communications contemplates multiple meetings, emails, phone calls, or other communications taking place over time.  *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015) ("[T]he complaint describes phone calls, meetings, and discussions among the various conspirators." (alteration added)); *Hendershot v. S. Glazer's Wine & Spirits of Oklahoma, LLLP*, No. 20-cv-0652, 2021 WL 3501523, at *8 (N.D. Okla. Aug. 9, 2021) ("[D]efendants communicated frequently via an industry group they created[.]" (alterations added)); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 318 (S.D.N.Y. 2021) ("Defendants share close business relationships, including common founders, interlocking membership in organizations, attending the same meetings, and promotion of each other's products and activities[.]" (alterations added and citations omitted)); *Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 169 (W.D.N.Y. 2020) (finding a "high level of interfirm communications" where the amended complaint alleged the defendants participated in

35

CASE NO.  21-2989-MDL-ALTONAGA/Torres

"three meetings during the Class Period that always coincided with price increase announcements").

Plaintiffs meet this standard here.  According to the Amended Complaint, at least two phone calls between Citadel Securities and Robinhood executives took place in the days leading up to January 28, 2021, the day Robinhood curtailed trading on the Restricted Securities.  (*See* Am. Compl. ¶¶ 232, 237).  The parties also exchanged numerous emails between January 20 and January 28, indicating Robinhood and Citadel Securities kept frequent contact throughout the short squeeze.  (*See id.* ¶¶ 227–233, 235).  In other words, Plaintiffs allege not just "isolated discussions" but "a 'high level' of interfirm communications."  *Mayor & Council of Balt.*, 709. F.3d at 140.

But Plaintiffs must allege more than that Robinhood and Citadel Securities communicated. Plaintiffs have only alleged an *opportunity* to conspire; they have not connected that opportunity to a plausible inference of an actual antitrust conspiracy.  Interfirm communications, under the right circumstances, can help give rise to a plausible conspiracy claim, but not when those allegations have an "obvious alternative explanation."  *Twombly*, 550 U.S. at 567.  The Court cannot take allegations of communications, followed by allegations of a restriction, and simply fill in the blanks for Plaintiffs, particularly where it "is just as plausible, if not more so," that the communications did not form the basis of an antitrust conspiracy.  *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1093 (9th Cir. 2015).

Here, the retail-driven short squeeze, driven in part by Robinhood users, had set the financial world ablaze: "several 'very large' firms [were] having really bad nights[.]"  (Am. Compl. ¶ 240 (alterations added)).  Given the PFOF relationship between Robinhood and Citadel Securities, it would be understandable for employees — even executive-level employees — at a broker and a market maker to communicate about what impact the squeeze might have on each

CASE NO.  21-2989-MDL-ALTONAGA/Torres

party's ability to fulfill its obligations.  *See, e.g.*, *Int'l Constr. Prod. LLC v. Ring Power Corp.*, No. 5:20-cv-226, 2021 WL 6755717, at *8 (N.D. Fla. Dec. 23, 2021) (holding that interfirm conversation between defendant companies' "high-level executives" about plaintiff and its business partner did not give rise to a boycott conspiracy because plaintiff and its partner "injected an entirely new business model into the industry[,]" which was worthy of conversation (alteration added)).  Plaintiffs' revisions to the Amended Complaint do little to advance the theory that when Robinhood and Citadel Securities communicated, they conspired to stop purchases of the Restricted Securities.

Certainly, interfirm communications between executives are a plus factor, and the communications Plaintiffs allege are relevant.  But in this instance, the messages *at best* create an "equally plausible inference of mere interdependent behavior" that nevertheless "fall[s] short of a tacit agreement" to restrict trading.  *Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 254 (2d Cir. 1987) (alteration added and citation omitted).  The Court thus "find[s] it difficult" to infer an antitrust conspiracy.  *Id*. (alteration added).

In sum, Plaintiffs' allegations of vague and ambiguous communications between Defendants only support a weak inference of a conspiracy, which does not, by itself, advance Plaintiffs' theory from possible to plausible.

*Pattern of concealment.*   "[A]cts of concealment are circumstantial evidence of a conspiracy's existence[.]" *In re Urethane Antitrust Litig.*, No. 04-1616, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (alterations added; citing *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011)).  To establish concealment, Plaintiffs must allege that Robinhood or Citadel Securities engaged in some affirmative "trick or contrivance tending to exclude suspicion and prevent inquiry." *Texas v. Allan Constr. Co., Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988) (quotation marks,

CASE NO.  21-2989-MDL-ALTONAGA/Torres

citation, and footnote call number omitted).  Plaintiffs argue they have plausibly alleged that Defendants engaged in a pattern of concealment, as evidenced by Defendants' vague and ambiguous emails and reliance on oral communications.  (*See* Resp. 21–22.)

The Court previously rejected this same argument because it "is not unusual for two firms in an ongoing business relationship to have conversations over the phone; and Plaintiffs admit they do not know the substance of these conversations."  (Nov. 17, 2021 Order 45).  The Court distinguished *In re Urethane Antitrust Litigation*, 913 F. Supp. 2d 1145, 1154–56 (D. Kan. 2012), a case Plaintiffs previously relied upon, given (1) the case included numerous, detailed facts suggesting concealment such as document destruction, and (2) the oral communications in that case were suspicious because the conspirators were *direct competitors*.  (*See* Nov. 17, 2021 Order 44–45).  Here, in contrast, Plaintiffs describe a handful of vague and ambiguous emails between a firm and its client.  Plaintiffs have not provided any new allegations of concealment and instead rehash the same argument with new, inapt case citations.[19]  (*See* Resp. 21–22.)

As before, "[t]he Court will not infer a conspiracy simply because two business partners chose to use phones to communicate."  (Nov. 17, 2021 Order 45 (alteration added)).  Plaintiffs do not make out a plus factor here.

*Pretextual explanations.*    Pretextual statements may constitute circumstantial evidence of a conspiracy.  *See In re McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016).  Plaintiffs

---

[19] Plaintiffs' cited cases do not provide support here.  (*See* Resp. 21–22 (citing *United States v. Siegler*, 990 F.3d 331, 339 (4th Cir. 2021) (upholding inference that the defendant knowingly participated in a drug distribution conspiracy because of the familiarity between the coconspirators and the coded language they used); *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (holding the destruction of documents may be evidence of a conspiracy); *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011) (finding statements imploring one not to go to the authorities were highly probative of a conspiracy); *Belcher v. Atl. Cap. Realty, LLC*, No. 6:08-cv-1989, 2010 WL 11507399, at *5 (M.D. Fla. Sept. 17, 2010) (no discussion of concealment); *United States v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995) (finding the concealment of explosives was evidence of a conspiracy to manufacture explosives).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

renew their previously rejected contention that they have plausibly alleged that Robinhood made pretextual statements to explain the trading restrictions.  (*Compare* Resp. 25, *with* Nov. 17, 2021 Order 45–47).  They allege that Robinhood used the NSCC's $3 billion dollar margin call on January 28, 2021 as a pretext to impose trading restrictions to benefit Citadel Securities.  (*See* Resp. 25; Am. Compl. ¶ 178).  Plaintiffs offer the following three facts in support of this argument: (1) "Robinhood's executives were selling their own shares of the Relevant Securities" before the margin call; (2) "Robinhood and Citadel were engaged in heated discussions regarding the degrading market conditions" before the margin call; and (3) "Robinhood met its capital requirements" before and after January 28, 2021.  (Resp. 25).  The Court examines each in turn.

To start, Plaintiffs point to a January 26, 2021 internal chat where Swartwout informed another Robinhood executive "that Robinhood was moving GameStop to 100% margin the next day, stating 'I sold my AMC today.  FYI — tomorrow we are moving GME to 100% — so you are aware.'"  (Am. Compl. ¶ 234).  There are two problems with this point.  First, Swartwout's message related to *margin requirements*, not trading positions.  Second, the allegation undermines Plaintiffs' position: that Swartwout and other Robinhood executives knew they would impose margin requirements on January 26, 2021 — before "the heated discussions" with Citadel Securities occurred on January 27, 2021 — *reinforces* the notion that Robinhood was in fact concerned about meeting the NSCC's daily margin calls.  (Reply 25; *see* Am. Compl. ¶¶ 234–35).

Next, Plaintiffs emphasize the "heated discussions" themselves.  (Reply 25).  As a brief recap, on January 27, 2021, Howard informed Tenev that she was joining a call that evening with Swartwout and Citadel Securities, and she believed Citadel Securities would "make some demands on limiting PFOF across the board."  (Am. Compl. ¶ 239).  A few hours later, Swartwout emailed a Citadel Securities executive again, stating:

Just looking for your dictated schedule and caps.  I have 20 minutes until batch so whatever it is we are not going to be able to address it tomorrow given the notice. I have to say I am beyond disappointed in how this went down.  It's difficult to have a partnership when these kind [sic] of things go down this way.

(*Id.* ¶ 245 (alteration added)).

Crucially, these communications do not indicate whether Citadel Securities and Robinhood executives discussed trading on January 27, 2021.  A market maker's demand to reduce its purchases of PFOF from a broker is not equal to a demand that the broker impose trading restrictions on certain stocks for all retail investors.  To infer that Robinhood used the January 28, 2021 margin call as pretext to impose trading restrictions on behalf of Citadel Securities is a leap.

This inference is also not reasonable because the Amended Complaint provides several indications that Robinhood was legitimately concerned about meeting its collateral requirements. As stated, Robinhood executives discussed raising margin requirements for the Relevant Securities *before* the discussions with Citadel Securities on January 27, 2021.  (*See* Am. Compl. ¶ 234).  And on the morning of January 28, 2021, shortly after the NSCC sent Robinhood a $3 billion margin call (*see id.* ¶ 178), Howard, Robinhood's COO, "messaged *internally* that Robinhood ha[d] a 'major liquidity issue'" (*id.* ¶ 180 (alteration and emphasis added)).  In another *internal* message on January 28, 2021, Dusseault, Robinhood Financial's President and COO, said "we will navigate through this [NSCC] issue[.]" (*Id.* ¶ 182 (alteration added)).  Further, other brokerages *not alleged to be part of this conspiracy* adjusted margin requirements or imposed trading restrictions on January 28, 2021.  (*See id.* ¶¶ 195, 365–367).  These facts render it implausible that the margin call was used as pretext simply because Robinhood and Citadel Securities engaged in some unknown discussion about PFOF — the subject of their otherwise lawful business relationship — on January 27, 2021.

Finally, Plaintiffs contend the margin call was used as pretext because Robinhood

continued to impose some trading restrictions even after it met its capital requirements.  (*See* Resp. 25).  As the Court previously stated, however, "the fact that Robinhood continued to impose restrictions after meeting its collateral requirements is of no moment because the trading restrictions 'reduce[d] the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC.'"  (Nov. 17, 2021 Order 46 (alteration in original)).  "It is not suspicious for Robinhood to strive to avoid higher collateral requirements."  (*Id.*).[20]

In short, Plaintiffs fail to make out a plus factor here.  Further, an examination of the Amended Complaint's allegations reveals an "obvious alternative explanation" for the trading restrictions:  the increased collateral requirements imposed by the NSCC in response to unprecedented market volatility.  *Twombly*, 550 U.S. at 567.

*Market structure.*  Plaintiffs renew their argument that structural characteristics of the markets Defendants operate in render the markets "ripe for collusion."  (Resp. 24 (footnote call number omitted)).  The Court previously rejected this argument because Plaintiffs failed to coherently define the market and because the case law Plaintiffs relied on "involve[s] price-fixing conspiracies [where] the defendants utilized their market power to raise the prices of goods they sold."  (Nov. 17, 2021 Order 49 (alterations added; citations omitted)).

Plaintiffs now define two markets: an upstream market maker market and a downstream brokerage market.  (*See* Am. Compl. ¶¶ 306, 312).  They allege these markets are "defined by high barriers to entry, high fixed costs, and low variable costs[;]" and the brokerage consumers "are locked-in in the short run[.]"  (Resp. 24 (alterations added; citing Am. Compl. ¶¶ 370–92)).  The

---

[20] Plaintiffs argue "the decision to implement restrictions on purchasing only was arbitrary" because "[v]olatility is caused by both increases and decreases in a stock price."  (Resp. 25 n.20 (alteration added; emphasis omitted); *see also* Am. Compl. ¶¶ 361–62).  Why, then, would "other broker-dealers, including Ally, Dough, Public.com, SoFi, Stash, Tastyworks and Webull implement[] purchasing restrictions" but not sales restrictions?  (Am. Compl. ¶ 195 (alteration added)).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Court remains unconvinced that a plus factor exists here.

Plaintiffs once more rely on *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, in arguing that a plus factor exists under these market characteristics.  (Resp. 24).  Yet, as the Court previously stated, *In re High Fructose Corn Syrup Antitrust Litigation* involved price fixing among competitors.  (*See* Nov. 17, 2021 Order 49).  Plaintiffs present a different anticompetitive theory: a brokerage allegedly restricted output to lower prices for securities it did not buy or sell for its own accounts, all for the benefit of its market maker client.  Plaintiffs have made no effort to address the distinction between this case and the price-fixing case they rely on, nor do they otherwise provide legal authority supporting the application of this plus factor to their novel anticompetitive theory.  (*See* Resp. 24).

Even if the Court was convinced that this plus factor applies to Plaintiffs' novel anticompetitive theory and that Plaintiffs do not merely describe a legal oligopoly, Plaintiffs define the wrong markets, as discussed below.

*Market Behavior.*  Also in reliance on *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, Plaintiffs argue for the application of a plus factor based on "evidence that the market behaved in a noncompetitive manner."  (Resp. 24 (capitalization omitted)).  But Plaintiffs must do more than simply allege that "market behavior is interdependent and characterized by conscious parallelism."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 322 (citations and footnote call number omitted).  Here, they maintain the trading restrictions imposed by Robinhood were anticompetitive because retail customers were unable to purchase the Relevant Securities despite their desire to do so.  (*See* Resp. 24–25).

This clearly falls short.  Robinhood was not the only firm in the brokerage market that implemented purchasing restrictions — Ally, Dough, Public.com, SoFi, Stash, Tastyworks,

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Webull, E*Trade, and Interactive Brokers all implemented purchasing restrictions on January 28, 2021; and none of these brokerages is alleged to be part of the conspiracy.  (*See* Am. Compl. ¶¶ 195, 366–67).  Therefore, the trading restrictions themselves do not warrant the application of a plus factor here.

* * *

To recap, Plaintiffs successfully advance two plus factors, each providing only weak support for a plausible inference of a conspiracy.  The first plus factor is the common motive to conspire.  Plaintiffs allege economic motives that explain why Citadel Securities and Robinhood might have conspired to restrict trading in the Relevant Securities in January 2021.  Citadel Securities is alleged to have held substantial short positions in the Relevant Securities in January 2021, subjecting it to potentially massive losses considering the unprecedented increases in the stocks' prices caused by a retail trading frenzy.

Further, Robinhood allegedly acquiesced because it could not risk sustaining revenue losses right before its forthcoming IPO.  The plausibility of Robinhood's motive is tenuous, however, because it rests on a series of unsubstantiated inferences.  Plaintiffs ask the Court to infer that Robinhood was motivated by the forthcoming IPO simply based on the timing of the IPO, that Citadel Securities wielded its influence as Robinhood's most important client to pressure the brokerage to restrict trading, and that Robinhood could not simply turn to another market maker because Citadel Securities accounts for a large portion of Robinhood's PFOF revenue.  While Plaintiffs do not bolster this theory with concrete allegations linking Robinhood's decision to impose restrictions and the IPO, they nevertheless allege economic motivations that *could* justify why both firms would benefit from an agreement to restrict trading, so this plus factor provides some support for Plaintiffs.

43

CASE NO.  21-2989-MDL-ALTONAGA/Torres

The second plus factor is the communications between Defendants.  High-level executives at these firms exchanged several vague and ambiguous emails immediately before and after Robinhood imposed trading restrictions on the Relevant Securities on January 28, 2021.  These emails set up telephone discussions between the executives, the substance of which is unknown to Plaintiffs.  Certainly, these emails may be somewhat suspicious given the participants and their timing, and they indicate Defendants had an *opportunity* to conspire.  But a few vague and ambiguous emails between two firms in an otherwise lawful, ongoing business relationship only provide thin support for Plaintiffs.

So, Plaintiffs have tenuously alleged conditions under which Defendants may have agreed to restrict trading.  Is it conceivable that Robinhood restricted trading on January 28, 2021 at Citadel Securities's direction?  Sure.  But do Plaintiffs' allegations "nudge[] their claims across the line from conceivable to plausible[?]"  *Twombly*, 550 U.S. at 570 (alterations added).  No.

What's more, the Amended Complaint provides "an obvious alternative explanation" for the trading restrictions: the increased collateral requirements imposed by the NSCC in response to unprecedented market volatility.  *Id.*  at 567.  Even before the allegedly contentious discussions between Robinhood and Citadel Securities on January 27, 2021, in internal messages, Robinhood executives discussed imposing margin requirements on the Relevant Securities.  And on January 28, Robinhood executives sent internal messages expressing concern about the NSCC margin call and liquidity problems.  Further, Ally, Dough, Public.com, SoFi, Stash, Tastyworks, Webull, E*Trade, and Interactive Brokers all imposed trading restrictions on January 28; and none of these firms is alleged to have done so on behalf of Citadel Securities.

Altogether, Plaintiffs have not plausibly alleged an agreement between Robinhood and Citadel Securities to restrict trading on January 28, 2021.  For this reason, the Amended Complaint

CASE NO.  21-2989-MDL-ALTONAGA/Torres

is due to be dismissed.

*__Unreasonable restraint on trade.__*  Even if Plaintiffs plausibly alleged a conspiracy, they fail to allege an "unreasonable restraint on competition[.]"  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (alteration added; citation omitted).  "An unreasonable restraint of trade is one that harms competition in general, rather than the plaintiff, or any other competitor."  *Bitmain*, 530 F. Supp. 3d at 1266 (citing *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1069).  "In assessing whether an agreement unreasonably restrains trade such that it violates [section 1], courts generally apply one of three modes of antitrust analysis: (1) the *per se* rule, for obviously anticompetitive restraints; (2) the quick look approach, for those restraints with some procompetitive justification; or (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine."  *In re Terazosin Hyrdochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1310–11 (S.D. Fla. 2005) (alteration added; citations omitted).  "The presumption in cases brought under section 1 of the Sherman Act is that the rule-of-reason standard applies."  *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991) (citation omitted).[21]

As explained, the Amended Complaint alleges a vertical relationship between Defendants and thus a vertical restraint on trade.  "Typically only 'horizontal' restraints — restraints 'imposed by agreement between competitors' — qualify as unreasonable *per se*."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018) (citation omitted).  By contrast, "nearly every . . . vertical

___

[21] Plaintiffs insist "it is premature for the Court to determine whether the *per se* or the rule of reason test applies at the motion[-]to[-]dismiss stage."  (Resp. 13 (alterations added); *see also id.* 28–29).  Not so. Courts routinely determine which test applies at the motion-to-dismiss stage.  *See, e.g.*, *Quality Auto Painting Ctr. of Roselle, Inc.*, 917 F.3d at 1271–72; *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333–36 (11th Cir. 2010); *In re Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d 1186, 1191–93 (9th Cir. 2015); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205–206 (4th Cir. 2002); *cf. PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417–20 (5th Cir. 2010) (using the rule of reason test at motion-to-dismiss stage); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434–37 (6th Cir. 2008) (analyzing under both the *per se* and rule of reason tests at motion-to-dismiss stage).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

restraint . . . should be assessed under the rule of reason." *Id.* at 2284 (citations omitted). In half-heartedly arguing the *per se* rule applies here, Plaintiffs ignore well-established Supreme Court precedent establishing that "virtually all vertical agreements now receive a traditional rule-of-reason analysis." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 318 (citing *Leegin*, 551 U.S. 877; other citation and footnote call number omitted). The Court is thus unconvinced the *per se* rule applies.

Nor is the Court convinced it should evaluate the alleged agreement under the quick look approach. The quick look approach "fills in the continuum between *per se* analysis and the full rule of reason." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 510 (4th Cir. 2002) (citation omitted). It only applies when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999) (citation omitted). That is clearly not the case here.

First, while Plaintiffs may emphasize that Robinhood Securities and Citadel Securities operate at the same level of distribution (*see* Resp. 30 n.26), the restraint alleged is vertical, for its participants are Citadel Securities, the upstream market maker, and Robinhood, the downstream broker-dealer (*see* Am. Compl. ¶¶ 305–06, 312). Vertical restraints do not become horizontal restraints just because one of the participants operates several lines of business, one of which is similar to that of the other participant. *See Generac Corp.*, 172 F.3d at 977. As this is a vertical restraint, the rule of reason analysis should apply, not the quick look. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 318 (holding that the quick look analysis applies to horizontal restraints, while vertical restraints are evaluated using the rule of reason); *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 770 (N.D. Ill. 2015) (declining to apply the quick look because a

CASE NO.  21-2989-MDL-ALTONAGA/Torres

"reasonable fact finder could not infer a horizontal agreement from these facts" (citation omitted));
*Acton v. Merle Norman Cosms., Inc.*, No. 88-cv-7462, 1995 WL 441852, at *8 (C.D. Cal. May 16, 1995) ("The 'quick look' approach . . . has not been judicially approved for analyzing the vertical nonprice restraints raised in this case[.]" (alterations added; citation omitted)).

Second, the restraint here involves a complicated scheme where one participant allegedly shut down purchases of the Restricted Securities to mitigate the other's losses, all in the face of a largely unforeseen short squeeze orchestrated by retail investors on the Internet.  In other words, this is an unusual antitrust case.  Courts do not use the quick look approach in unusual cases. Where "the circumstances of the restriction are somewhat complex," *Cal. Dental Ass'n*, 526 U.S. at 775 n.12, or the "features of the arrangement" are "unique[,]" *Cal. ex rel. Harris*, 651 F.3d 1118, 1137 (9th Cir. 2011) (alteration added), the quick look approach is inappropriate.  Accordingly, the rule of reason applies here.

**Rule of reason.**  In applying the rule of reason, a court must ask whether the defendant "has shown that the alleged restraint has had an anticompetitive effect on the market." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016).  "[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market." *Am. Express Co.*, 138 S. Ct. at 2285 (alteration added; citation and footnote call number omitted).  "Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* (alterations adopted; citations and quotation marks omitted).  The Amended Complaint therefore "must 'identify the relevant market in which the harm occurs.'" *Bitmain*, 530 F. Supp. 3d at 1256 (citing *Jacobs*, 626 F.3d at 1336).  It does not.

Plaintiffs define two relevant product markets: the upstream PFOF Market where Citadel Securities competes with other market makers (*see* Am. Compl. ¶ 306), and the downstream No-

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Fee Brokerage Trading App Market where Robinhood competes with other brokerages (*see id.* ¶ 313).  The downstream No-Fee Brokerage Trading App Market is the "consumer-facing relevant product market[.]"  (*Id.* ¶ 312 (alteration added).  Competitors in the No-Fee Brokerage Trading App Market, such as Robinhood Financial, "offer[] brokerage services to Retail Investors."  (*Id.* ¶ 68 (alteration added); *see also id.* ¶¶ 69, 305, 350–51).

According to Plaintiffs, Defendants harmed Plaintiffs "[b]y forcing the Retail Investors to sell their Relevant Securities at lower prices than they otherwise would have sold[.]"  (*Id.* ¶ 16 (alterations added)).  More specifically, Plaintiffs allege that "Defendants artificially constricted the price appreciation of the Relevant Securities and reduced the price of the Relevant Securities that Retail Investors either sold or held below the prices that they would have otherwise obtained in a competitive market free of collusion."  (*Id.*; *see also id.* ¶¶ 407).  In other words, Plaintiffs allege that Defendants caused antitrust injury by reducing the number of trades in the Relevant Securities, thereby distorting the supply and demand for the stocks and leading to their rapid price decline.  (*See id.* ¶ 354).

There is a curious gap between Plaintiffs' defined markets and the injury alleged, which is detrimental to Plaintiffs' antitrust standing.  "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (quotation marks and citation omitted).  Antitrust standing requires that Plaintiffs sustain "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Antitrust law is supposed to prevent injury to competition.  *See id.* at 488 (citation omitted).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Competition is injured if a defendant's conduct, like entering into a conspiracy to restraint trade, generates anticompetitive effects in that relevant market.  *See Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1071 (citation omitted).  This can involve "adverse effects on the price, quality, or output of the relevant good or service."  *N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006).

Importantly, there should be a "direct[]" connection between Plaintiffs' antitrust injury and the "alleged restraint in the relevant market[.]"  *Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994) (alterations added; citation omitted).  Put another way, the harm should take place in the relevant market the plaintiff has defined.  *See Am. Express Co.*, 138 S. Ct. at 2285 (citation omitted).  Here emerges the critical issue: in which market did Robinhood and Citadel Securities effectuate an unlawful restraint, and did Plaintiffs' injury flow from anticompetitive effects *in that market*?

This alleged antitrust injury certainly did not stem from any anticompetitive effects in the PFOF Market, where Citadel Securities competes to provide market maker services.  Plaintiffs do not describe any connection between Defendants' alleged agreement and competition in the PFOF market, much less that any anticompetitive effects there caused the prices of the Restricted Securities to fall.

Nor did the alleged restraint impose any anticompetitive effects in the No-Fee Brokerage Trading App Market, where Robinhood competes to provide retail brokerage services.  Plaintiffs cannot plausibly argue a restraint harmed competition there, for the agreement between Robinhood and Citadel Securities, as alleged, did not concern price, quality, or output for any other broker-dealer's services.  Plaintiffs allege Robinhood curtailed purchases of the Relevant Securities on its own platform to appease Citadel Securities.  That harmed Robinhood users.

49

CASE NO.  21-2989-MDL-ALTONAGA/Torres

But to trigger the antitrust laws, a restraint must harm *competition*.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).  Defendants' alleged agreement left Ally, Dough, Public.com, SoFi, Stash, Tastyworks, Webull, E*Trade, Interactive Brokers, and any other brokerage free to adopt or eschew any policy they desired with respect to the Restricted Securities — or anything else, for that matter.  Further, it imposed no further restrictions on Retail Investors' ability to trade with any of Robinhood's competitors.  (*See, e.g.*, Am. Compl. ¶ 30).  Plaintiffs thus may not hedge their antitrust claim on anticompetitive effects in the No-Fee Brokerage Trading App Market.

The alleged anticompetitive injury occurred in entirely separate markets: the markets for the Relevant Securities.  The products in question are the Relevant Securities, the prices of which were negatively affected by the trading restrictions.  Plaintiffs, however, do not center their market definition around the sales of the Relevant Securities.  This is not surprising, as there is an extensive body of persuasive case law holding "that transactions in a particular stock do not fall within [section] 1" of the Sherman Act.  *Kalmanovitz v. G. Heileman Brewing Co., Inc.*, 769 F.2d 152, 156 (3rd Cir. 1985) (alteration added; citing *Bucher v. Shumway*, 452 F. Supp. 1288 (S.D.N.Y. 1978), *aff'd*, 622 F.2d 572 (2d Cir. 1980), *cert. denied*, 449 U.S. 841 (1980); *Schaefer v. First Nat'l Bank*, 326 F. Supp. 1186 (N.D. Ill. 1970), *appeal dismissed*, 465 F.2d 234 (7th Cir. 1972)).[22]

---

[22] The Supreme Court has stated that "the Sherman Act applies only to a 'restraint upon commercial competition in the marketing of goods or services.'"  *Kalmanovitz*, 769 F.2d at 156 (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 495 (1940)).  And lower courts have "observed that the purchase or sale of stock by investors does not fit easily within the definition of goods or services as used by the antitrust laws."  *Id.* (footnote call number omitted; citing *Bucher*, 452 F. Supp. 1288).  The court in *Kalmanovitz* held the sale of stock of a single company within the context of a takeover battle did not fall within the definition of section 1 of the Sherman Act.  *See id.*  In its reasoning, the *Kalmanovitz* court relied on two other lower court opinions: in *Bucher*, the court held an agreement to effectuate a tender offer was not an unreasonable restraint of trade even though it fixed the price of the company's shares to the shareholders' detriment, 452 F. Supp. at 1289; and in *Schaefer*, the court concluded the common law interpretation of "restraint of trade" never encompassed stock market manipulation and accordingly dismissed the plaintiffs' Sherman Act suit, 326 F. Supp. at 1191–92.  *See Kalmanovitz*, 769 F.2d at 156.  While the *Kalmanovitz* court noted "a number of cases in which the antitrust laws have been applied to the securities industry[,]" *id.* at 157 (alteration

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Plaintiffs continue to reject a market definition based on the Relevant Securities in their Response but do so in vain.  (*See* Resp. 38).

That Plaintiffs do not define the relevant market is fatal to their rule of reason analysis. "Regardless of whether the plaintiff alleges actual or potential harm to competition . . . , he must identify the relevant market in which the harm occurs." *Jacobs*, 626 F.3d at 1336 (alteration added; citing *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986)).  This remains true even where, unlike here, a plaintiff "rel[ies] exclusively on direct evidence" of "anticompetitive effects[.]" *Am. Express Co.*, 138 S. Ct. at 2284–85 (alterations added; footnote call number omitted).  Unfortunately, the Amended Complaint's failure to plausibly do so leaves Plaintiffs with little more than a garbled market theory that ignores a crucial fact: the alleged harm to competition occurred in an entirely separate market from the markets Plaintiffs define.  And Plaintiffs do not even attempt to define that third, relevant market.  That fatal flaw renders Plaintiffs' theory of harm unworkable.

Accordingly, the Amended Complaint is due to be dismissed.

## V.   CONCLUSION

The Amended Complaint fails for two reasons.  One, Plaintiffs fail to plausibly allege the existence of an agreement to restrict trade between Defendants.  Sure, Citadel Securities would have economically benefited given its short positions.  But Robinhood's supposed incentive depends on the assumptions that it was motivated by its forthcoming IPO, that Citadel Securities threatened to cut off its relationship with Robinhood in exchange for the trading restrictions, and that Robinhood was unwilling to find another market maker.  Plaintiffs do not plausibly allege that Robinhood had such a motivation here, and even if they had done so, economic incentive is not in

added; collecting cases), *Kalmanovitz*, *Bucher*, and *Schaefer* caution against the creation of a market defined by the sale of certain stocks to investors.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

itself enough for the Court to infer that Defendants actually had an unlawful agreement to restrain trade.

The only additional evidence plausibly alleged by Plaintiffs consists of vague and ambiguous emails between two entities in an otherwise lawful business relationship that, while suspicious given their timing, do little to bolster the strength of Plaintiffs' allegations.  And juxtaposed with the compelling alternative explanation for the trading restrictions — the increased collateral requirements imposed by the NSCC in response to historic market volatility — Plaintiffs' theory is speculative and implausible.

Two, even if Plaintiffs did plausibly allege an agreement, they fail to plausibly allege an unreasonable restraint of trade.  Plaintiffs allege a vertical restraint of trade, which must be evaluated under a rule of reason analysis and thus requires an accurate market definition — something they do not provide.  Indeed, Plaintiffs ignore the reality of their suit: they allege that Defendants caused harm to the market for Relevant Securities, but they neglect to define that market.  And because they do not define the market for Relevant Securities, their claim fails.

Defendants request that the Court dismiss the Amended Complaint with prejudice.  (*See* Mot. 42–43).  As the Court stated in the November 17 Order dismissing the CCAC, the Amended Complaint would be Plaintiffs' final opportunity.  (*See* Nov. 17, 2021 Order 50).  Plaintiffs do not insist otherwise, and the Court sees no reason to give Plaintiffs a fourth attempt to plead.

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Amended Antitrust Tranche Complaint **[ECF No. 456]** is **GRANTED**.  The Amended Consolidated Class Action Complaint **[ECF No. 451]** is **DISMISSED**.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

**DONE AND ORDERED** in Miami, Florida, this 12th day of May, 2022.


**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**


cc:     counsel of record; *Pro Se* Plaintiffs

# Doc 503

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-2989-MDL-ALTONAGA/Torres

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to the Securities Tranche

### ORDER

**THIS CAUSE** came before the Court on Defendants, Robinhood Markets, Inc.;
Robinhood Financial, LLC; and Robinhood Securities, LLC's (collectively, "Robinhood['s]")
Motion to Dismiss the Federal Securities Tranche Complaint [ECF No. 449], filed on January 7,
2022.  Plaintiffs filed a Response [ECF No. 454], to which Defendants filed a Reply [ECF No.
455].  The Court has carefully considered the Consolidated Class Action Complaint ("CCAC")
[ECF No. 446], the parties' written submissions, the record, and applicable law.  For the following
reasons, the Motion is granted in part and denied in part.

### INTRODUCTION

In January 2021, market volatility prompted regulators to raise deposit requirements for
clearing brokers, including Robinhood, to ensure that they could cover the costs of unexecuted
trades.  Robinhood could not afford the new deposit requirements and sought another way to
appease regulators.  It succeeded after regulators agreed to waive the deposit requirements so long
as Robinhood restricted its customers' access to certain stocks.

What followed is disputed, but Plaintiffs characterize it as market manipulation.  While
Robinhood agreed to restrict access to certain stocks, it did not want knowledge of its lack of
liquidity to become widespread because such information might undermine Robinhood's

CASE NO. 21-2989-MDL-ALTONAGA/Torres

credibility with customers and investors alike.  To divert the public's attention away from Robinhood's lack of liquidity, Robinhood blamed market volatility for its restrictions and vehemently denied any trouble with its own liquidity.

Now, Robinhood asks the Court to dismiss the pleading setting forth Plaintiffs' market manipulation theory.  It relies on the unconventional nature of the theory, among other reasons, as a basis for dismissal.  Plaintiffs, in contrast, argue that irrespective of the theory's unconventional nature, it is sufficient that Robinhood's alleged actions artificially affected supply and demand, thereby depriving investors of an accurate picture of the market.  The Court agrees with Plaintiffs and explains further below.

**BACKGROUND**

### I.      Robinhood's History

In the wake of the Occupy Wall Street protests, Vlad Tenev and Baiju Bhatt came up with an idea to democratize finance: Robinhood.  (*See* CCAC ¶ 31).  The two Robinhood founders set out to create an application-based trading platform that would give anyone with a smart phone access to public markets.  (*See id.* ¶ 2).  Its users joined a growing trend of lay traders, also known as retail investors, who use online brokerage firms to trade securities.  (*See id.* ¶¶ 2, 5, 8, 35, 37). With Robinhood leading the pack, the online retail trading industry exploded, bringing markets to consumers' fingertips.  (*See id.* ¶ 35).

Democratizing finance proved to be extremely lucrative.  Robinhood earned millions of dollars from a system called "payment for order flow" ("PFOF").  (*Id.* ¶ 32 (quotation marks omitted)).  PFOF is a revenue model whereby customers bid on securities through their brokerage platform, but instead of taking the bid directly to an exchange, like the New York Stock Exchange (NYSE) or NASDAQ, the broker brings the bid to a market maker.  (*See id.*).  Market makers

stand ready to buy or sell securities but typically respond to the bid with an ask price that, if accepted, decreases or increases the return for the customer.  (*See* Robinhood Fin., LLC, Securities Act Release No. 10906, Exchange Act Release No. 90694, 2020 WL 7482170, at *3 (Dec. 17, 2020)).[1]   High volume trading makes PFOF extremely lucrative because market makers compensate brokers for routing their customers' orders to them — hence "payment for order flow." (*See* CCAC ¶¶ 32, 49).  For example, in 2020, Citadel Securities, a market maker, paid Robinhood $326 million, up from $80.5 million in 2019.  (*See id.* ¶ 49).

Market makers also route the trading data from Robinhood's platform to high-frequency traders ("HFTs").  (*See id.* ¶¶ 3, 33 n.9).  HFTs use algorithms that automatically trade based on existing trends.  (*See id.* ¶ 30 n.5).  Upon receiving bid data from market makers, HFTs front-run the bid, anticipating the effect of the bid on the security's price before the transaction is consummated.  (*See id.* ¶¶ 3, 30 n.5, 31, 34).

Robinhood's popularity also reflected the growing trend of retail trading during the COVID-19 pandemic.  (*See id.* ¶ 35).  Retail investors convened on social media sites, like Reddit and Stockwit, "to discuss investment strategy and the merits of trading in particular stocks."  (*Id.*).

By December 2020, Robinhood claimed "to have opened nearly 50% of all retail brokerage accounts in the past five years" and had a total of 12.5 million online accounts.  (*Id.* ¶ 5 (footnote call number omitted)).  Before Robinhood would go on to add another 3 million accounts in January 2021, the press reported in December that Robinhood had selected Goldman Sachs to manage Robinhood's initial public offering in 2021.  (*See id.* ¶¶ 5, 39 (citation omitted)).

---

[1] Federal Rule of Evidence 201(b)(2) allows the Court to take judicial notice of the Securities & Exchange Commission's ("SEC['s]") cease-and-desist order, as well as other SEC publications.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

## II.      The Short-Squeeze Crisis

Several prominent investors planted seeds of crisis in November 2020, when they purchased shares in what became known as "meme stocks" or the "Affected Stocks."[2]  (*Id.* ¶¶ 4, 40 (quotation marks omitted)).  The investments pitted these well-known investors against several hedge funds that took short positions in the meme stocks.  (*See id.* ¶¶ 35, 40, 43).  Melvin Capital was one such hedge fund that took a short position in GameStop.  (*See id.* ¶ 43).

Short positions derive from a belief that the price of a security is overvalued and will eventually fall.  To capitalize on this hunch, investors, known as short sellers, purchase a "short." (*See id.* ¶¶ 40–43, 70–72).  The mechanics of a short are as follows: (1) an investor identifies a security that it wants to short, such as a stock, and deposits capital, or margin, into a brokerage account to cover the risk of loss associated with the short; (2) a lender loans the security to the investor; (3) upon receiving the borrowed security, the investor sells it for a high price; and (4) the investor waits until the anticipated drop in share price occurs and then repurchases the stock for less than she sold it.  (*See* Jan. 26, 2022 Order [ECF No. 453] 3 [hereinafter "Robinhood Tranche Order"]).

Short positions may bear substantial risk.  (*See, e.g.*, CCAC ¶¶ 41–43).  If the stock price rises a little, the short seller loses money.  (*See, e.g., id.* ¶ 41).  If the stock price rises a lot, the broker may issue a margin call, which requires that the short seller deposit more capital into its brokerage account to minimize the risk of the rising stock.  (*See id.* ¶¶ 38, 38 n.18, 42; *see also* SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021*, at 26 (Oct. 28, 2021), https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-

---

[2] The "Affected Stocks" include AMC Entertainment Holdings, Inc. ("AMC"); Bed Bath & Beyond Inc. ("BBBY"); BlackBerry Ltd. ("BB"); Express Inc. ("EXPR"); GameStop Corp. ("GME"); Koss Corp. ("KOSS"); Tootsie Roll Industries Inc. ("TR"); and American Depositary Shares of foreign-issuers Nokia ("NOK") and trivago N.V ("TRVG").  (*See* CCAC ¶¶ 1, 128).

early-2021.pdf ("SEC Staff Report"))).  If the stock price continues to rise with no end in sight, short sellers will capitulate and purchase the stock to cover their losses.  (*See* CCAC ¶ 43).  This pattern results in a vicious cycle known as a short squeeze: (1) a stock's price rises; (2) short sellers purchase the stock to cover their losses; (3) short sellers' capitulation causes the stock price to rise further; (4) and other short sellers are forced to purchase the stock; (5) sending the stock price rising even further, and so on.

After noticing the contest between hedge funds and other investors, retail investors rallied against the hedge funds.  (*See id.* ¶¶ 40–41).  Using a sub-Reddit thread called WallStreetBets as a collective action platform, retail investors purchased millions of shares of GME, sending the stock price soaring.  (*See id.* ¶¶ 35, 40–43).

GME closed at $43.03 on January 21, 2021.  (*See id.* ¶ 41).  Twenty-four hours later, it closed at $65.01.  (*See id.*).  By January 27, the share price reached $347.51.  (*See id.* ¶ 121).  The skyrocketing share price created a short squeeze, which forced hedge funds, like Melvin Capital, to take short positions in GME to quickly cover their losses.  (*See id.* ¶ 43).  Despite receiving two loans for $750 million and $2 billion each, Melvin Capital had to close out its short position.  (*See id.*).

### III.   Robinhood's Reckoning: January 28 – February 2, 2021

Hedge funds were not alone.  The short squeeze forced Robinhood to reckon with its newfound popularity.  Specifically, the short squeeze created volatile market conditions that forced the National Securities Clearing Corporation ("NSCC") to impose higher collateral requirements on Robinhood (*see id.* ¶ 58) — requirements that Robinhood could not meet.

Before delving into how the collateral requirements affected Robinhood, it is worth pausing to explain the NSCC's role in this matter.  The NSCC is a national clearing agency regulated by

CASE NO. 21-2989-MDL-ALTONAGA/Torres

the SEC that provides services to its clearinghouse members, including Robinhood Securities.  (*See* Robinhood Tranche Order 3 n.7).  Among its services, the NSCC guarantees that clearinghouses will complete securities transactions.  (*See id.*).  To ensure that it can guarantee the transaction, the NSCC imposes collateral requirements on its members.  (*See id.*).  These collateral requirements create the capital necessary for clearinghouses to complete a trade.  (*See id.*).  The NSCC imposes higher collateral requirements for volatile stocks.  (*See* CCAC ¶¶ 12, 58).

Market volatility affects two components of the collateral requirements: the core clearing fund charge and excess capital premium charge.  (*See id.* ¶¶ 58–59).  The core clearing fund charge also encompasses a value at risk ("VaR") charge, which the NSCC calculates based on the estimated risk in the member's portfolio.  (*See id.* ¶ 58).  The excess capital premium charge is the difference between the member's excess net capital and its core clearing fund charge.  (*See id.*). "The more the core charges exceed the member's capital cushion, the larger the [excess] capital premium charge.  To avoid incurring the latter charge the member must either reduce the level of risk or raise additional capital."  (*Id.* (alteration added; footnote call number omitted)).

Robinhood knew that its collateral requirements would rise.  (*See id.* ¶¶ 44–47).  Not only had it become the most downloaded application on the App Store (*see id.* ¶ 47), it also predicted having to raise margin requirements on its users (*see id.* ¶ 42).  It was right.

Robinhood raised margin requirements for GME to 80% on January 26, 2021.  (*See id.* ¶ 47).  Later that day, Jim Swartwout, Robinhood Securities' President and Chief Operating Officer, told his staff that he "sold [his] AMC today.  FYI — tomorrow morning we are moving GME to 100% — so you are aware."  (*Id.* ¶ 47 n.24 (alteration added; citation and quotation marks omitted)).  Sure enough, on January 27, 2021, Robinhood moved GME to 100% margin.  (*See id.* ¶ 47).  Despite its efforts, Robinhood knew its collateral requirements would still rise.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

On January 28, 2021, in anticipation of the NSCC's deposit requirements, Robinhood imposed a position closing only ("PCO") restriction on GME and AMC options with an expiration of January 29, 2021. (*See id.* ¶ 52). This meant that option holders could only sell their options. Despite Robinhood's preemptive attempt to decrease its deposit requirements, the NSCC requested that Robinhood deposit $3.7 billion to ensure that it could complete its unsettled trades. (*See id.* ¶ 58).

The $3.7 billion deposit proved too much. Robinhood Markets' Chief Operating Officer, Gretchen Howard, sent an email describing the circumstances as a "major liquidity issue" and moved eight stocks — AMC, GME, NOK, BB, NAKD, KOSS, EXPR and BBBY — to PCO; no Robinhood user could purchase these stocks. (*Id.* ¶ 59 (quotation marks omitted)). After Robinhood promised to maintain the PCO restriction on stocks "that had driven the increased deposit requirements," the NSCC waived Robinhood's capital premium charge through February 1, 2021. (*Id.* ¶ 60 (quotation marks and footnote call number omitted)).[3]

Robinhood notified its customers that several stocks had been moved to PCO but failed to apprise investors that it had also closed out existing options (*see id.* ¶ 52)[4] and cancelled orders after markets closed on January 27 (*see id.* ¶ 62). Instead, customers received an abbreviated explanation of Robinhood's actions:

---

[3] According to Michael Bodson, Chief Executive Officer of the Depository Trust and Clearing Corporation ("DTCC") that oversees the NSCC, the NSCC never "instruct[ed] any clearing member to impose restrictions during the market volatility events of late January." (CCAC ¶ 60 n.37 (alteration added; citation and quotation marks omitted)).

[4] The CCAC does not specify whether Robinhood cancelled put or call options. Call options give the buyer the ability to pay a premium to purchase a security at a certain price, known as a strike price. (*See* SEC Staff Report 5 n.5). Put options are the opposite: they give the purchaser the ability to sell the security at the strike price. (*See* SEC, *Investor Bulletin: An Introduction to Options* (Mar. 18, 2015) https://www.sec.gov/oiea/investor-alerts-bulletins/ib_introductionoptions). While the CCAC is silent on this point, the SEC's report suggests that call options contributed to the short squeeze. (*See* SEC Staff Report 29, 43, 43 n.117).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

> Our mission at Robinhood is to democratize finance for all.  We're proud to have
> created a platform that has helped everyday people, from all backgrounds, shape
> their financial futures and invest for the long term.
>
> We continuously monitor the markets and make changes where necessary.  In light
> of recent volatility, we are restricting transactions for certain securities to position
> closing only, including $AAL, $AMC, $BB, $BBY, $CTRM, $EXPR, $GME,
> $KOSS, $NAKD, $NOK, $SNDL, $TR, and $TRVG.  We also raised margin
> requirements for certain securities.
>
> Amid significant market volatility, it's important as ever that we help customers
> stay informed.  That's why we're committed to providing people with educational
> resources.  We recently revamped and expanded Robinhood Learn to help people
> take advantage of the hundreds of financial resources we offer and educate
> themselves, including how to make sense of a volatile market.  In 2020, more than
> 3.2 million people read our articles through Robinhood Learn.

(*Id.* ¶ 63 (footnote call number omitted)).

By market close, Robinhood managed to raise $1 billion from existing investors.  (*See id.*

¶ 61).  The Affected Stocks were less fortunate.  After switching the Affected Stocks to PCO, each

stock experienced significant decline:

|  | Closing Price January 27, 2021 | Closing Price January 28, 2021 |
|---|---|---|
| AMC (AMC Entertainment Holdings Inc.) | $19.90 | $8.63 |
| BB (BlackBerry Ltd.) | $25.10 | $14.65 |
| BBBY (Bed Bath & Beyond Inc.) | $52.89 | $33.64 |
| EXPR (Express Inc.) | $9.55 | $4.70 |
| GME (Gamestop Corp.) | $347.51 | $193.60 |
| KOSS (Koss Corp.) | $58.00 | $41.96 |
| NOK (Nokia Oyj) | $6.55 | $4.69 |
| TR (Tootsie Roll Industries Inc.) | $41.25 | $37.33 |
| TRVG (Trivago N.V.) | $3.19 | $2.48 |

CASE NO. 21-2989-MDL-ALTONAGA/Torres

(*Id.* ¶ 76).

Robinhood's trading restrictions prompted immediate outrage from investors and elected officials alike.  (*See id.* ¶ 69).  Many speculated that Robinhood had imposed the restrictions to appease hedge funds, including Robinhood's largest source of revenue: Citadel Securities.  (*See id.* ¶ 70).

To assuage investors and onlookers, Tenev appeared on several news outlets, where he made two notable statements.  (*See id.* ¶¶ 77–80).  First, he rejected the theory that Robinhood issued the restrictions "at the direction of any market maker or hedge fund or anyone we route to or any other market participants." (*Id.* ¶ 77 (emphasis and footnote call number omitted)).  Second, he stated "[t]here was no liquidity problem" at Robinhood (*id.* ¶ 79 (alteration added; emphasis omitted), instead attributing the restrictions to market volatility (*see id.* ¶ 78).

According to Plaintiffs, Tenev's assurances led to a flurry of premarket trading activity on the morning of January 29, 2021.  (*See id.* ¶ 83).  Investors believed Robinhood would lift the PCO restrictions soon, a belief bolstered after Robinhood received $1 billion of investor financing.  (*See id.*).  They were wrong.

Robinhood maintained restrictions on the numbers of shares and option contracts an investor could purchase.  (*See id.* ¶¶ 84–85).  It continued to impose greater purchase restrictions throughout January 29 as the Affected Stocks rebounded from the previous day's close price.  (*See id.* ¶ 85).  The Affected Stocks were not alone; Robinhood subjected other issuers, such as Starbucks and General Motors, to purchase restrictions.  (*See id.* ¶ 87).

Once again, reactions to the restrictions prompted Tenev to appear on media outlets to pacify outraged investors and onlookers.  This time he directed viewers' focus to other brokers and financial institutions, claiming the trade restrictions were commonplace and "just a standard

CASE NO. 21-2989-MDL-ALTONAGA/Torres

part of practices in the brokerage industry and the broader financial industry." (*Id.* ¶ 92). But unlike other institutions, Robinhood imposed broader restrictions that coincided with price dips in the restricted stocks. (*See id.* ¶¶ 87, 90, 93).

Tenev continued damage control throughout the weekend, on January 30 and 31. He maintained that Robinhood simply followed standard industry practices and was not in the pocket of institutional investors like Citadel Securities. (*See id.* ¶¶ 98–100). When asked by Elon Musk why Robinhood implemented a purchase-only restriction as opposed to a complete purchase-sale restriction, Tenev stated it would be "categorically worse" to restrict both purchases and sales because "[p]eople get really pissed off if they're holding stock and they want to sell it and they can't." (*Id.* ¶ 101 (alteration added; quotation marks omitted)). But other Robinhood employees felt the PCO restriction would still result in outrage, noting that Robinhood would "get crucified for pco-ing." (*Id.* ¶ 102 n.60 (alteration adopted; citations and quotation marks omitted)).

The weekend also gave Robinhood time to build up capital in anticipation of fresh collateral requirements from the NSCC. Robinhood raised $2.4 billion from venture capital funds and consequently loosened trading restrictions on some, but not all, of the Affected Stocks going into Monday, February 1, 2021. (*See id.* ¶¶ 107, 109–10).

The purchase restrictions eased further on February 2, 2021; still, some restrictions remained in place. (*See id.* ¶¶ 112–13). Robinhood did not lift all restrictions until late in the day on February 4, 2021. (*See id.* ¶ 121). Despite the delay and backlash, Robinhood's "IPO [was] full steam ahead." (*Id.* ¶ 120 (alteration added; footnote call number and quotation marks omitted)).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

IV.    **The Aftermath**

Robinhood's conduct left investors and onlookers disgruntled and concerned.  (*See id.* ¶¶ 80, 101–03, 119, 126).  On February 23, 2021, the CEO of Barstool Sports, Dave Portnoy, outlined the frustrations during an interview with Tenev.  (*See id.* ¶ 80).

First, Portnoy probed Robinhood's liquidity.  He asked Tenev whether Robinhood would have permitted trading to continue absent the NSCC's initial deposit requirements.  (*See id.*).  Tenev conceded that under such circumstances, Robinhood would have allowed trading to continue.  (*See id.*).  Portnoy pointed out that Tenev's answer suggested Robinhood had a liquidity problem (*see id.*) — a problem Tenev had previously denied (*see, e.g., id.* ¶ 79 ("There was no liquidity problem." (emphasis and quotation marks omitted)).  Tenev initially resisted Portnoy's observation but conceded that Robinhood might have experienced a liquidity crisis if it had not restricted trading.  (*See id.* ¶ 80).

Second, Portnoy asked why Robinhood had instituted purchase-only restrictions instead of a complete freeze on meme stock trading.  (*See id.* ¶ 103).  Tenev had previously told Elon Musk that Robinhood implemented PCOs to avoid "piss[ing] off" customers eager to sell (*id.* ¶ 101 (alteration added; quotation marks omitted)); to Portnoy, Tenev changed his answer and conceded that the PCO restrictions allowed Robinhood to mitigate its deposit requirements (*see id.* ¶ 103).  In particular, Tenev stated that restricting *sales*, as opposed to *purchases*, would not have decreased Robinhood's VaR charges from the NSCC.  (*See id.* ("The VaR formula was in this case driven by the one-sided long position, so it actually wouldn't help us; wouldn't help the deposit requirements to restrict selling in this case[.]" (alteration added))).

Five months after Tenev's interview with Portnoy, Robinhood went public at $38 per share.  (*See id.* ¶ 126).  After the IPO ceremony, Tenev responded to questions about the short squeeze,

stating that Robinhood had "learned a lot" and improved certain services to make it "easier for customers that want to come back to the service[.]" (*Id.* (alteration added)). Tenev also noted that "it's been an amazing six months and it really [sic] 18 months and much, much more than that[.]" (*Id.* (alteration added)).

Plaintiffs filed the CCAC against Defendants on November 30, 2021. (*See generally id.*).[5] Plaintiffs all owned shares of at least one of the Affected Stocks at the close of markets on January 27, 2021 and sold those shares leading up to February 4, 2021. (*See id.* ¶¶ 21–22). Of the Plaintiffs, only some used the Robinhood platform. (*See id.*).

The CCAC contains two claims for relief. Count I alleges that Robinhood manipulated the prices of the Affected Stocks in violation of section 9(a) of the Securities Exchange Act of 1934. (*See id.* ¶¶ 136–41).[6] Count II alleges an identical theory, but it relies on section 10(b) and rule 10b-5 promulgated thereunder. (*See id.* ¶¶ 142–49).

Count I contains two subclaims under sections 9(a)(2) and 9(a)(4), respectively. (*See id.* ¶¶ 137–39; Resp. 32).[7] Plaintiffs allege that Robinhood violated section 9(a)(2) by intentionally manipulating the market to artificially depress the prices of the Affected Stocks. (*See* CCAC ¶ 138; Resp. 32–37). As for section 9(a)(4), Plaintiffs allege that Robinhood misstated or omitted material facts to mislead investors into thinking that it did not have a liquidity problem — a problem that would cause Robinhood to lose investors, customers, money, and relatedly, the

---

[5] The Plaintiffs are Blue Laine-Beveridge, Abraham Huacuja, Ava Bernard, Brandon Martin, Brendan Clarke, Brian Harbison, Cecilia Rivas, Garland Ragland Jr., Joseph Gurney, Santiago Gil Bóhorquez, and Trevor Tarvis. (*See* CCAC ¶¶ 21–22).

[6] Codified in 15 U.S.C. section 78i(a).

[7] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

chance at a lucrative initial public offering.  (*See* CCAC ¶ 139; Resp. 37–46).

Count II alleges that Robinhood manipulated the market when it (1) raised margin requirements (2) canceled purchase orders for the Affected Stocks, (3) closed out options in AMC and GME early, and (4) prohibited and restricted purchases of the Affected Stocks on its platform. (*See* CCAC ¶¶ 72, 143; Resp. 20).[8]  These actions allegedly "created a false impression of actual demand for the Affected Stocks" and "artificially increased supply of the Affected Stocks[.]" (Resp. 20 (alteration added)).

Defendants move to dismiss the CCAC for failure to satisfy the requisite pleading requirements.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  *Twombly*, 550 U.S. at 555 (alteration added).  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (alteration added; citing *Twombly*, 550 U.S. at 556).  When reviewing a motion to

---

[8] Although Count II incorporates a claim under rule 10b-5, for brevity, the Court refers to Count II as the "section 10(b) claim."

CASE NO. 21-2989-MDL-ALTONAGA/Torres

dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc*., 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

While run-of-the-mill complaints are adequate if they contain "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2) (alteration added), securities fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), *see Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 789 (11th Cir. 2010) (citations omitted). Securities fraud claims therefore must state "with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b) (alteration added). Rule 9(b) is satisfied if the complaint includes:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (quotation marks omitted; quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)).

"[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Id*. (alteration added). The purpose for this degree of particularity is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges of immoral and fraudulent behavior." *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (alterations added; citation and quotation marks omitted).

The pleading requirements do not end with those found in Rule 9(b). Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995)

(codified as amended in scattered sections of 15 U.S.C.), a complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1)(B).  "[W]ith respect to each act or omission alleged[,]" the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A) (alterations added).

A "'strong inference' is one that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  And the required state of mind, commonly referred to as scienter, "is an 'intent to defraud or severe recklessness on the part of the defendant.'" *Id.* (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011)).  Scienter can be inferred from an aggregate of the factual allegations.  *See id.*

### ANALYSIS

Plaintiffs' market manipulation claims under sections 9(a)(2) and 10(b) satisfy the heightened pleading requirements under the PSLRA and Rule 9(b) and thus may proceed.  The same cannot be said for Plaintiffs' misstatement claim under section 9(a)(4).  The Court explains.

### I.      Section 9(a) Claims

Section 9(a) contains six subparts, each of which prohibits a different form of price manipulation.  *See* 15 U.S.C. §§ 78i(a)(1)–(6).  While the CCAC does not identify which of the sections Plaintiffs seek to recover under (*see* CCAC ¶¶ 136–41), the Response narrows the claims to sections 9(a)(2) and 9(a)(4) (*see* Resp. 32).  And while the section 9(a)(2) claim contains a particularized theory of relief, Plaintiffs' section 9(a)(4) claim falls short of demonstrating that

CASE NO. 21-2989-MDL-ALTONAGA/Torres

Robinhood misrepresented and omitted material facts for the purpose of inducing retail investors into selling their shares.

### a.   Section 9(a)(2)

Section 9(a)(2) prohibits "any person" from effecting

> alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(2).  The text of the statute reflects Congress's choice to "outlaw every device 'used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage.'"  *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 794 (2d Cir. 1969) (quoting 3 Loss, Securities Regulations 1549–55 (2d ed. 1961)).

A section 9(a)(2) cause of action consists of five elements:

> (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of inducing the security's sale or purchase by others, [that] (4) was relied on by the plaintiff; (5) and affected plaintiff's purchase or selling price.

*Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1164 (5th Cir. 1982) (alteration added; footnote call numbers omitted), *vacated on other grounds* 460 U.S. 1007 (1983).

### i.   Transactions in a Security

Plaintiffs partially clear the first element.  They allege that canceling purchase orders, closing out options, restricting purchases, and liquidating customers' shares of Affected Stocks after raising capital requirements all constitute "transactions" for purposes of the statute.  (*See* CCAC ¶ 137; *see also* Resp. 33).  Robinhood disagrees that any of its conduct can be characterized

as a "transaction," let alone manipulative.  (*See* Reply 13).  To resolve the parties' competing

interpretations, the Court examines the meaning of "transaction" under section 9(a)(2).

"With securities laws, 'as in other contexts, the starting point in construing a statute is the

language of the statute itself.'"  *Tello*, 410 F.3d at 1278 (quoting *Randall v. Loftsgaarden*, 478

U.S. 647, 656 (1986)).  "In addition to the 'particular statutory language at issue,' federal courts

also must consider 'the language and design of the statute as a whole' to determine 'the plain

meaning of the statute.'"  *Id.* (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)).

Courts cannot simply look to one word in isolation; they must also consider "the statutory scheme

for clarification and contextual reference."  *United States v. McLemore*, 28 F.3d 1160, 1162 (11th

Cir. 1994) (citation omitted).  "When a statute's language is not unambiguous on its face, [courts]

look to the legislative history and the statutory scheme."  *Id.* at 1163 (alteration added; citations

omitted).

Dictionaries are an appropriate place to begin in defining a term's ordinary meaning.  *See*

*United States v. Isaac*, 987 F.3d 980, 991–92 (11th Cir. 2021).  A leading authority defines

"transaction" as "1. The act or an instance of conducting business or other dealings; esp., the

formation, performance, or discharge of a contract.  2. Something performed or carried out; a

business agreement or exchange.  3. Any activity involving two or more persons."  *Transaction*,

Black's Law Dictionary (11th ed. 2019); *see also United States v. Radley*, 632 F.3d 177, 182–83

(5th Cir. 2011); *Fed. Nat'l Mortg. Ass'n v. City of Chicago*, 874 F.3d 959, 963 (7th Cir. 2017).

Consistent with the dictionary's definition, courts have broadly interpreted "transaction"

under section 9(a)(2).  For example, courts have concluded that a "transaction" encompasses "not

only completed purchases or sales but also bids and orders to purchase or sell securities."  *Secs.*

*and Exch. Comm'n v. Lek Secs. Corp.*, 276 F. Supp. 3d 49, 62 (S.D.N.Y. 2017) (citations omitted);

*see also Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 C 2139, 1990 WL 172712, at *2 (N.D. Ill. Oct. 30, 1990), *aff'd*, 977 F.2d 255 (7th Cir. 1992)).  These readings are consistent with the SEC's definition.  *See* 17 C.F.R. § 240.17f-1(a)(5) ("The term securities-related transaction shall mean a purpose, sale or pledge of investment securities, or a custodial arrangement for investment securities.").

One decision, *Securities and Exchange Commission v. Lek Securities Corporation*, highlights another important factor in assessing whether an activity is a "transaction" under section 9(a)(2): the appearance it gives to investors.  *See* 276 F. Supp. 3d at 62.  There, the defendants, a broker-dealer and its principal, engaged in a market manipulation scheme called "layering" and "cross-market manipulation[,]" wherein they submitted bids to drive up the price of a stock, then canceled the bids after taking out shorts against their position.  *Id.* at 55–56 (alteration added). Canceling the bids resulted in a sudden drop in the stock price that benefitted the defendants' short position.  *See id.*  Although the defendants never finalized their bids, the bids created a "false impression of supply or demand for securities and . . . induce[d] other market participants to purchase or sell securities."  *Id.* at 62 (alteration added).  Because the transactions created a false impression of trading, the court permitted the claims to proceed.  *See id.*

**PCO Restriction.**  Turning to the activity at issue here, Plaintiffs cite no decisions supporting their contention that Robinhood's PCO restriction amounts to a transaction under section 9(a)(2).  Nor could they.  The PCO restriction involved no bid, pledge, or other arrangement to consummate a securities transaction.  It *affected* the manner in which customers traded by forcing them to hold or sell their shares, but it did not *effect* an actual or incomplete trade.  *See Spicer*, 1990 WL 172712, at *3.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

Even under the dictionary's broad definition, the PCO restriction would not qualify as a transaction because it involved no exchange or activity between two or more persons. *See Transaction*, Black's Law Dictionary (11th ed. 2019). To hold otherwise would equate a transaction with *any* activity and result in prospective liability under section 9(a) for virtually any conduct; at which point, the refrain, "'Everything is securities fraud'" would ring true. Andrew K. Jennings, *Shareholders United?* 95 Notre Dame L. Rev. Reflection 47, 47 n.2 (2019) (quoting Matt Levine, *Exxon Is in Trouble over Climate Change*, Bloomberg (Oct. 25, 2018, 10:40 AM EDT), https://www.bloomberg.com/opinion/articles/2018-10-25/exxon-is-in-trouble-over-climate-change; Matt Levine, *Securities Fraud Was Lurking in the Orca Pool*, Bloomberg (Sept. 21, 2018, 12:00 PM EDT)). Thus, the PCO restriction is not a transaction under section 9(a)(2).

Canceling purchase orders, liquidating customers' shares, and closing out options, however, are a different story.

***Cancelled Purchase Orders.*** As a reminder, Robinhood cancelled its customers' purchase orders for Affected Stocks on January 28, 2021. (*See* CCAC ¶ 62 & n.40 (citing Robinhood Tranche Compl. [ECF No. 409] ¶¶ 243–44)). A review of section 9(a)(2)'s text and precedent supports treating cancelled purchase orders as transactions.

While Robinhood correctly notes that it never "purchased, sold, bid[,] or ordered the purchase or sale of the Affected Stocks" (Reply 13 (alteration added)); the definition of "transaction" encompasses cancelled transactions, *see Transaction*, Black's Law Dictionary (11th ed. 2019) (1. The act . . . of conducting business or other dealings; esp., the formation, performance, or *discharge* of a contract. . . . 3. Any activity involving two or more persons." (alterations and emphasis added)). Thus, courts have treated cancelled bids and other unconsummated broker conduct as transactions under section 9(a)(2) — the former is functionally

19

CASE NO. 21-2989-MDL-ALTONAGA/Torres

the same as a cancelled purchase order.  *See Lek*, 276 F. Supp. 3d at 62 (rejecting defendants'

argument that "cancelled bids and offers are not 'transactions'"); *Spicer*, 1990 WL 172712, at *2

("The [defendant] did not buy or sell, which would be means of effecting a transaction, or even

place bids, which would also qualify." (alteration added; citations omitted)); *Secs. and Exch.*

*Comm'n v. Malenfant*, 784 F. Supp. 141, 145 (S.D.N.Y. 1992) (treating unexecuted attempts to

match buy and sell orders as a series of transactions).   Even the SEC has concluded that a

transaction encompasses unconsummated transactions.   *See Biremis Corp., Peter Beck, and*

*Charles Kim*, 105 S.E.C. 862, 2012 WL 6587520, at *2 (Dec. 18, 2012).

Robinhood cites several cases in arguing that Plaintiffs fail to identify a transaction.  (*See*

Reply 9 (citing *Spicer*, 1990 WL 172712, at *2; *Baum v. Phillips, Appel & Walden, Inc.*, 648 F.

Supp. 1518, 1530 (S.D.N.Y. 1986), *aff'd sub nom.*, 867 F.2d 776 (2d Cir. 1989))).  But the unique

nature of Robinhood's business model distinguishes this case from the decisions Robinhood relies

on.

In *Spicer v. Chicago Board Options Exchange, Inc.*, the court rejected a section 9(a)(2)

claim against the Chicago Board Options Exchange ("CBOE"), a national securities exchange

registered to conduct options trading.  *See* 1990 WL 172712, at *1.  A group of investors alleged

that the CBOE opened on the now-infamous Black Monday[9] knowing it could not maintain an

orderly market.  *See id.*  Throughout Black Monday, the CBOE took actions that allegedly caused

options' prices to fluctuate.  These included: delaying the execution of index options; modifying

trading procedures in a confusing manner; failing "to halt or suspend trading"; allowing market

makers to engage in transactions at inflated prices; and not enforcing rules on market makers.  *Id.*

(citations and quotation marks omitted).

---

[9] "Black Monday" refers to the stock market crash that occurred on Monday, October 19, 1987.  *See Spicer*,
1990 WL 172712, at *1.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

In dismissing the complaint, the court highlighted the distinction between "*affecting*" and "*effecting*" transactions and determined that the CBOE's conduct may have affected securities transactions, but it did not effect, or bring about, the transactions by simply opening the market and modifying trading procedures. *See id.* at \*2. Rather, the CBOE's conduct simply changed the manner by which others effected transactions. *See id.*

*Spicer* is distinguishable because Robinhood, as a vertically integrated trading platform, has a fundamentally different role from that of an exchange, like the CBOE. Robinhood provides online and app-based brokerage services that allow investors to trade in the market (*see* CCAC ¶ 23), and it executes and clears the trades introduced by its brokerage platform (*see id.* ¶¶ 24, 58). The CBOE was much more hands-off when it came to the actual transactions. It was a marketplace that controlled the way investors traded, *see Spicer*, 1990 WL 172712, at \*1; but it did not facilitate investors' trades, route investors' orders to market makers, or cancel requested transactions.

By contrast, when Robinhood's customers submitted their purchase requests to Robinhood, they engaged in transactions whereby Robinhood could accept or reject the customers' requests to facilitate the purchase of securities. That Robinhood chose the latter does not yield the conclusion that no transaction occurred. To the contrary, refusing to provide a product or service falls within the meaning of a transaction. *See, e.g.*, *Radley*, 632 F.3d at 184 (refusing to buy propane constituted a transaction for purposes of the commodities price manipulation statute); *Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 587 (3d Cir. 1975) (treating an "incomplete transaction" as a transaction).[10]

---

[10] Robinhood's reliance on *Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518, fares no better. There, "[n]either the Complaint nor plaintiffs' answering papers address[ed] the elements of a [section] 9(a)(2) claim." *Id.* at 1530 (alterations added). The court ultimately rejected the claim because the plaintiffs did not allege any transactions occurred, let alone that they relied on the missing transactions. *See id.* The apparent basis for the dismissal rested on the plaintiffs' pleading deficiencies rather than a determination that unexecuted trades do not constitute a series of transactions. *See id.*

*Liquidating shares.* The foregoing analysis also helps illuminate how Robinhood conducted a "series of transactions" when it liquidated its customers' shares after raising margin requirements. 15 U.S.C. § 78i(a)(2). Raising margin requirements itself is not a transaction; after all, it affects the way customers effect transactions. *See Spicer*, 1990 WL 172712, at *2. But what happens next, *i.e.*, when the customer fails to meet the margin call, does constitute a transaction.

The margin calls pitted customers between two choices: covering the new margins or liquidating their stocks. (*See* CCAC ¶ 125 & n.63). Some customers, however, did not have an opportunity to decide because Robinhood liquidated the stocks before they could satisfy the new margin requirements. (*See id.* ¶¶ 52–53, 125 & n.63; *see also* Resp. 20, 33). In liquidating the Affected Stocks, Robinhood necessarily had to reach into its customers' margin accounts and sell or otherwise convert the Affected Stocks to cash. Such conduct is emblematic of a transaction. *See, e.g.*, *Trane v. O'Connor Secs.*, 561 F. Supp. 301, 302 (S.D.N.Y. 1983) (noting that transactions include "reorganizations, liquidations, mergers and tender offers").[11]

*Closing out options.* Robinhood's premature closing of customers' AMC and GME options required the same mechanics as its forced liquidation. (*See* CCAC ¶¶ 52–53). Closing an option requires the broker, *i.e.*, Robinhood, to sell the option to another individual or entity. (*See* Reply 21 n.20). Such a sale constitutes a transaction under section 9(a)(2). *See Lek*, 276 F. Supp.

---

[11] Even the SEC treats a forced liquidation as a transaction. *See, e.g.*, *Goldman, Sachs & Co.*, 1999 WL 123998 (S.E.C. No-Action Letter, Feb. 22, 1999) ("Upon notification of a margin call, a . . . client usually will transfer cash or securities into its margin account. If the client needs to liquidate securities to meet a margin call, it may place the order with a broker. . . . In the event that a client does not respond to a margin call by increasing its equity in the margin account, [the broker] is required by law to exercise its rights as a creditor and liquidate assets in the account ('*liquidation transaction*')." (alterations and emphasis added; footnote call number omitted)).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

3d at 56, 62 (treating the sale of options in a cross-market trading scheme as a transaction under section 9(a)(2)).

In sum, cancelling purchase orders, liquidating shares, and closing out options each comports with the plain meaning of "transaction," section 9(a)(2)'s statutory history, and existing decisions.  The Court agrees with Robinhood that the transactions occurred in a context that hardly mirrors run-of-the-mill market manipulation claims, but the unique context is also attributable to the avant-garde nature of Robinhood's trading platform, the likes of which no court has encountered when evaluating market manipulation claims.  Robinhood's cutting edge platform cannot defeat the principle that "[n]ovel or atypical methods should not provide immunity from the securities laws." *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967) (alteration added).

### ii.  Scienter

Counts I and II both allege market manipulation claims; Count I utilizes section 9(a)(2), and Count II utilizes section 10(b) and rule 10b-5.  (*See* CCAC ¶¶ 136–49; Resp. 18–32). Both sections 9(a) and 10(b) contain a scienter element; if scienter is absent or insufficiently pleaded, the claims must be dismissed.

Interpreting section 10(b), the Eleventh Circuit has held that "scienter consists of intent to defraud or severe recklessness on the part of the defendant." *FindWhat Inv'r Grp.*, 658 F.3d at 1299–300 (quotation marks omitted; quoting *Edward J. Goodman Life Income Tr.*, 594 F.3d at 790).  Courts in the Eleventh Circuit have not yet weighed in on section 9(a)(2)'s scienter element, and courts outside the Eleventh Circuit appear divided as to whether section 9(a)(2)'s scienter element only encompasses an intent to defraud, as opposed to severe recklessness.[12]  Fortunately,

---

[12] *Compare Chemetron Corp.*, 682 F.2d at 1165 ("[R]ecklessness may not be used to fulfill section 9's scienter requirement[.]" (alterations added)) *with S.E.C. v. Competitive Techs., Inc.*, No. 3:04cv1331, 2005

23

the Court need not wade into the split because, as elaborated below, Plaintiffs allege with particularity that Robinhood acted willfully.[13]

Viewing scienter through the lens of market manipulation, as opposed to misrepresentation, the Court must determine whether Robinhood allegedly "intended to deceive investors by artificially affecting the market price of securities." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (citations omitted).   Scienter is particularly important in market manipulation claims because "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." *Id.*   Courts can infer scienter when the defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (citation and quotation marks omitted); *see also MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No: 6:19-cv-619, 2019 WL 5394011, at *16 (M.D. Fla. Oct. 16, 2019).

Here, two alleged facts create a particularized inference of scienter.   First, Robinhood benefitted concretely through its survival, increased financing, and planned IPO.   (*See* CCAC ¶¶ 9, 12, 15, 39, 49, 60 & n.39, 71, 75, 97, 107, 119, 120, 126).   Second, its employees, including

---

WL 1719725, at *6 n.7 (D. Conn. July 21, 2005) ("The standard for scienter in securities fraud cases has generally been stated in relation to section 10(b) manipulation claims rather than section 9(b) manipulation claims; however courts have consistently applied the same standard to both sets of claims." (collecting cases)).

[13] Because, at a minimum, market manipulation claims under sections 9(a)(2) and 10(b) both require an intent to defraud, the parties agree that decisions evaluating an intent to defraud under section 10(b) generally can be applied in the context of section 9(a), and vice versa.   (*See* Mot. 29 ("Courts customarily analyze market manipulation claims under the two sections together[.]" (alteration added)); Resp. 35 (incorporating Plaintiffs' section 10(b) scienter arguments into the scienter argument under section 9(a)(2))).

Tenev, knew that its statements were inaccurate and harmful, yet made them anyway.  (*See id.* ¶¶ 42, 45–52, 56–57, 59, 62–64, 67–68, 71–72, 74, 80, 99, 102 n.60).

As for the benefits, Plaintiffs allege with particularity that Robinhood could not afford the NSCC's rising collateral requirements and faced liquidation unless it somehow found a way to either raise enough capital or reduce the collateral requirements.  (*See id.* ¶¶ 12, 59–60, 60 n.39, 118, 122).  It pursued both options.  It raised capital from investors while simultaneously implementing restrictions to lower the Affected Stocks' share prices.  (*See id.* ¶ 12).  As share prices fell, so did Robinhood's collateral requirements.  (*See id.* ¶¶ 12, 60, 72, 74, 80, 91, 103).  Without cancelling purchase orders, closing out options, and liquidating shares, Robinhood would have been forced to liquidate its customers' positions, ending Robinhood (*see id.* ¶¶ 15, 78, 80) and leaving other members of the NSCC to cover its losses (*see id.* ¶¶ 12, 60, 67, 80).

For its part, Robinhood maintains that Plaintiffs' theory boils down to an unactionable general motive to profit.  (*See* Mot. 43 (citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996))).  Specifically, Robinhood contends that "[a] desire to protect Robinhood's own financial condition cannot support an inference of intent to depress the stock price of unrelated companies." (Reply 22 (alteration added)).  Not so.

Robinhood relies on unpersuasive authority.  *Chill v. General Electric Company*, 101 F.3d 263, utilizes the Second Circuit's "motive and opportunity" test that the Eleventh Circuit has rejected as a dispositive test in establishing scienter.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir. 1999) ("[T]he Reform Act does not codify the 'motive and opportunity' test formulated by the Second Circuit." (alteration added)); *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-Civ-22572, 2010 WL 1332574, at *13 (S.D. Fla. Mar. 30, 2010) ("Motive and opportunity alone . . . are insufficient to support a finding of scienter." (alteration

added; citing *Bryant*, 187 F.3d at 1285)).  To the extent courts in the Eleventh Circuit rely on motive as a relevant factor in evaluating scienter, they limit the weight of common motives that apply to all defendants.  *See Holmes v. Baker*, 166 F. Supp. 2d 1362, 1377 (S.D. Fla. 2001) (concluding that motive and opportunity allegations deserved limited weight "because such motives can be ascribed to virtually all corporate officers and directors" (alteration adopted; citation and quotation marks omitted)).

Examples of common corporate motives that enjoy limited weight include the motive to maintain a high credit rating, the motive to maintain the appearance of corporate profitability, the desire to maintain a high stock price to increase compensation, and the desire to protect a company's viability.  *See In re PXRE Grp., Ltd., Secs. Litig.*, 600 F. Supp. 2d 510, 530 (S.D.N.Y. 2009) (collecting cases); *see also Coronel v. Quanta Cap. Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *16 (S.D.N.Y. Jan. 26, 2009) (finding that the defendant's motive to maintain a financial rating to protect the viability of the company was insufficient, under the law of the Second Circuit, to establish a motive to commit fraud).

But as courts and commentators have acknowledged, defining an impermissible corporate motive is borderline unworkable.  *See, e.g.*, Ann Morales Olazabal & Patricia Sanchez Abril, *The Ubiquity of Greed: A Contextual Model for Analysis of Scienter*, 60 Fla. L. Rev. 401, 405 & n.21, 429–431 (2008) ("[J]udicial opinions of the last decade have muddled the issue to the point of obscurity." (alteration added; citing *Phillips v. LCI Int'l., Inc.*, 190 F.3d 609, 620 (4th Cir. 1999))). At their base, all fraudulent motives boil down to a desire to be profitable.  *See In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 451–52 (S.D.N.Y. 2019). And courts do not consistently agree on what motives are sufficiently concrete to strengthen an inference of scienter.  *See Bryant*, 187 F.3d at 1286 ("[E]ven within the Second Circuit, the

CASE NO. 21-2989-MDL-ALTONAGA/Torres

wellspring of the analysis, the status of the motive and opportunity test was somewhat uncertain, having been applied in a seemingly inconsistent fashion." (alteration added; citing *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259 (2d Cir. 1993); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994))).

So, as it pertains to the alleged facts, the Court takes a holistic approach, consistent with the Eleventh Circuit's precedent, as shared by other courts. First, motive and opportunity are probative, but not sufficient to establish scienter. *See Bryant*, 187 F.3d at 1286 ("[M]otive and opportunity are specific kinds of evidence, which along with other evidence might contribute to an inference of recklessness or willfulness." (alteration added)). Second, to the extent motive is probative, ubiquitous motives are less probative than individualized ones. *See Holmes*, 166 F. Supp. 2d at 1377. Third, in addition to evaluating motive, the Court relies on "published statements when [defendants] knew facts suggesting the statements were inaccurate or misleadingly incomplete" because such statements are "classic evidence of scienter." *U.S. Secs. Exch. Comm'n v. Revolutionary Concepts, Inc.*, No. 21-10984, 2022 WL 386085, at *10 (11th Cir. Feb. 9, 2022) (alteration added; citation and quotation marks omitted).

Turning to the allegations, the Court agrees that Robinhood's financial desperation, alone, is too generalized to *create* a particularized inference of scienter, but it does "contribute to a finding of scienter . . . [and] must be considered together with other allegations to determine if they rise to a strong inference of scienter." *Owens v. Jastrow*, 789 F.3d 529, 539–40 (5th Cir. 2015)) (concluding that the threat of ceasing operations contributed to a finding of scienter (alterations added; citation and footnote call number omitted)); *see also Skiadas v. Acer Therapeutics Inc.*, 1:19-cv-6137, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) (concluding that plaintiffs bolstered the inference of scienter after alleging defendants needed to fundraise "to remain

viable"); *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at

*10 (M.D. Tenn. Apr. 19, 2018) (treating defendants' need for financing as a factor in inferring

scienter).

But the Complaint does more than simply rely on Robinhood's financial desperation as a

basis to infer scienter.  When combined with Robinhood's employees' statements, *see Phillips v.*

*Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004) ("[T]he PSLRA . . . permit[s] the

aggregation of facts to infer scienter." (alterations added; citations omitted)), the Complaint alleges

with particularity that Robinhood knew its restrictions would artificially depress the Affected

Stocks, sought to do so, and benefitted from its efforts.

Tenev hinted to this in a statement on January 31, 2021: "In a matter of days, our

clearinghouse-mandated deposit requirements related to stocks increased ten-fold. . . . They are

what led us to put temporary buying restrictions in place on a small number of securities that the

clearinghouses had raised their deposit requirements on."  (CCAC ¶ 99 (alteration added).  And

in selling his AMC shares before imposing restrictions, including the margin calls, Jim Swartwout,

Robinhood Securities' President and COO, implicitly acknowledged that he knew Robinhood's

restrictions would lower the price for Affected Stocks.  (*See id*. ¶ 74 ("I sold my AMC today.  FYI

— tomorrow morning we are moving GME to 100% margin — so you are aware[.]" (alteration

adopted; other alteration added; quotation marks omitted)); *see also id*. ¶¶ 52, 62, 72).[14]

_____

[14] According to Plaintiffs, Swartwout also lied under oath when he stated: "At no time on or since January
27, 2021, did Robinhood restrict a customer's ability to exercise . . . in-the-money options."  (CCAC ¶ 57
(alteration added; other alteration adopted; footnote call number omitted)).   Robinhood insists that
Plaintiffs' characterization fundamentally misunderstands how options work "because to exercise a call
option, a customer must have the cash on hand to purchase 100 shares of the underlying security," and
many of Robinhood's customers did not have the cash on hand to do so.  (Reply 21 n.20).  But Plaintiffs'
factual allegations suggest the opposite, *i.e.*, that customers did have cash on hand to exercise their options,
but Robinhood prevented them from doing so.  (*See* CCAC ¶¶ 53–57).  Either way, Plaintiffs' factual
allegations, which the Court must accept as true, support a reasonable inference that Swartwout's statement

Robinhood's staff's observations that Robinhood would "get crucified for pco'ing" and "the blowback from this is going to be exponentially worse as time goes on" further demonstrate that Robinhood expected the Affected Stocks' price to drop. (*Id.* ¶ 102 n.60 (citations and quotation marks omitted)).

Tenev's statements also show not only what Robinhood stood to gain, or rather avoid losing, but the deception used to protect these interests. Tenev admitted that if Robinhood could not meet its "capital requirements, or [its] deposit requirements, then [it was] essentially dead[.]" (*Id.* ¶ 80 (alterations added; emphasis omitted)). When the media interviewed Tenev, he categorically denied any liquidity problem and insisted that Robinhood implemented restrictions to combat market volatility. (*See id.* ¶¶ 45–46, 79, 99). He repeated the same line to Robinhood's customers. (*See id.* ¶¶ 62–63).

These statements boil down to a rhetorical sleight of hand, if not an outright lie. Plaintiffs allege that Robinhood implemented the restrictions because it did not have capital to pay the collateral requirements spawned by the volatile market. (*See id*. ¶¶ 80, 99). Even Gretchen Howard, Robinhood Markets's COO, conceded on January 28, 2021, that Robinhood had a "major liquidity issue[.]" (*Id.* ¶ 59 (alteration added; quotation marks omitted)). Yet Tenev outright denied the problem until confronted by Portnoy:

Portnoy: If you don't get a call at three in the morning, do you regulate trading?

Tenev: Well, no, we did this because we had to comply with our capital requirements[.]

Portnoy: But you found that out at like three in the morning[.]

Tenev: If we had a bunch more headroom, yes, we probably would have let things continue[.]

---

was misleading. *See Brooks*, 116 F.3d at 1369. And Swartwout's alleged lie lends support to Plaintiffs' theory of scienter.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

Portnoy: Well if you didn't get a call that says, hey, we need this money from you, you wouldn't have shut off buying?

Tenev: Correct.  The last thing we would want to do is shut off buying[.]

Portnoy: That is a capital issue, he specifically said, a liquidity issue, you need this much money, you didn't have it, so you acted.  Isn't that the essence of liquidity?  Like, are you afraid to say liquidity, because of a domino effect with the banks?

Tenev: I think that liquidity issue, and I probably should be careful and call it the "L word," right, the "L word" is a big thing in financial services.  Basically, if you say liquidity issue means [sic] you can't meet your capital requirements, or your deposit requirements, then you're essentially dead, and that was not the case with Robinhood.  We met our capital requirements; we met our deposit requirements[.]

Portnoy: But, that theoretically could be a technicality, right, if you didn't change the trading of that day, you may have had a liquidity issue tomorrow?

Tenev: Exactly. I think that's accurate.

(*Id.* ¶ 80 (alterations added; emphases and footnote call number omitted)).

The back-and-forth begins with Tenev first contradicting his earlier statements that Robinhood did not have a liquidity problem.  Before the interview, Tenev used the NSCC's rising collateral requirements as justification for imposing the restrictions without acknowledging Robinhood's capital concerns.  (*See id.* ¶ 99).  This justification deflected the proximate cause of Robinhood's restrictions: Robinhood lacked the "headroom," *i.e.*, liquidity, to continue trading.  Period.  Indeed, Tenev admitted to Portnoy that but-for the lack of capital, he would have allowed buying to continue, regardless of the market volatility.  (*See id.* ¶ 80).  Tenev's admission to Portnoy directly conflicted with Tenev's previous statements to Andrew Ross Sorkin, among others, that "[t]here was no liquidity problem."  (*Id.* ¶ 79 (alteration added; emphasis and quotation marks omitted); *see also id.* ¶ 80).

The conflicting statements are important in the context of Rule 9(b)'s heightened pleading standard because they underscore the "manner in which" Plaintiffs were misled.  *Tello*, 794 F.3d at 972 (citation and quotation marks omitted).  Plaintiffs sought to understand why Robinhood

imposed the restrictions, but instead of being forthright, Robinhood blamed market volatility while outright denying its own liquidity concerns.  (*See* CCAC ¶ 99).  Tenev even conceded to Portnoy on another podcast that Robinhood "could have communicated this a little better to customers." (*Id.* ¶ 64; *see also id.* ¶ 67 n.44).  Believing that the restrictions were the byproduct of market volatility as opposed to Robinhood's self-interest, Plaintiffs sold their shares.  (*See id.* ¶¶ 1, 21–22, 125, 134, 140).  Thus, in citing Tenev's statements, coupled with Robinhood's restrictions and motive to lower the price of the securities, Plaintiffs allege with particularity the "who, what, when, where, and how" necessary to allege fraud under Rule 9(b).

Turning back to scienter, the interview with Portnoy, when aggregated with other statements of Robinhood employees, "create a strong inference" that Robinhood acted with the intent to artificially depress the price of the Affected Stocks.  15 U.S.C. § 78u–4(b)(2); *see also ATSI Commc'ns, Inc.*, 493 F.3d at 102.  Above all, Portnoy got Tenev to effectively admit that widespread knowledge of Robinhood's liquidity problem would be its end.  (*See* CCAC ¶ 80).  This admission provides a window into Tenev's mindset as the short squeeze events unfolded.  And the most compelling inference to draw from Tenev's statement is that he lied, or at least told half-truths, about the status of Robinhood's liquidity to stave off its potential demise.  *See Mizzaro*, 544 F.3d at 1238 ("[Plaintiff] must . . . plead 'with particularity facts giving rise to a strong inference' that the defendants . . . intended to defraud investors . . . when they made the allegedly materially false or incomplete statements. (alterations added)).  In other words, without the restrictions, the short-squeeze jeopardized Robinhood's planned IPO (*see id.* ¶¶ 39, 49, 71, 126); venture funding (*see id.* ¶¶ 9, 97, 107); and overall existence (*see id.* ¶¶ 15, 60 & n.39).

Tenev's subtle admission that Robinhood sought to avoid a major liquidity issue (*see id.* ¶¶ 15, 78, 80, 99), coupled with Robinhood's employees' conflicting statements, misdirections,

CASE NO. 21-2989-MDL-ALTONAGA/Torres

and admissions that they intended the Affected Stocks' prices to fall (*id.* ¶¶ 12–14, 42, 44 n.23, 52, 71–75, 102 & n.60), generate a particularized inference that Robinhood acted willfully to lower the prices of the Affected Stocks.  Such an inference satisfies the heightened pleading requirements of Rule 9(b) and the PSLRA.  Robinhood allegedly knew that its transactions would cause the Affected Stocks' price to drop and engaged in those transactions anyway to serve its own interests over those of its customers.

### iii.  Purpose of Inducing the Sale of Securities

In its final attempt to achieve the dismissal of Plaintiffs' section 9(a)(2) claim, Robinhood asserts that the CCAC fails to allege that Robinhood "acted with 'the purpose of inducing the purchase or sale of such security by others.'"  (Reply 13 (quoting 15 U.S.C. § 78i(a)(2))). According to Robinhood, the CCAC does not allege "that a reduction in the price of the Affected Stocks would have helped Robinhood meet its NSCC deposit requirements."  (*Id.*).  The Court disagrees.

Even Tenev acknowledged that a selloff of the Affected Stocks would lower the VaR charge, a component of NSCC's deposit requirements.  (*See, e.g.*, CCAC ¶ 103 ("The VaR formula was in this case driven by *the one-sided long position*, so it actually wouldn't help us; wouldn't help the deposit requirements to restrict selling in this case[.]  Restricting selling wouldn't help the exponential growth in the deposit requirements[.]" (alterations and emphasis added)); *see also id.* ¶¶ 59, 106).  When Portnoy asked Tenev why Robinhood did not restrict purchases *and* sales of Affected Stocks, Tenev conceded that "the VaR charge, which drives our deposit requirements, was driven by the size of the long position."  (*Id.* ¶ 103).  In other words, "Robinhood[] unilateral[ly] manipulat[ed] . . . demand . . . because only purchase risk affects the VaR charge Robinhood sought desperately to reduce[.]"  (*Id.* ¶ 106 (alterations added)).

32

CASE NO. 21-2989-MDL-ALTONAGA/Torres

The CCAC, including Tenev's statements, create a particularized inference that Robinhood sought to induce its customers into selling their shares of the Affected Stocks in an effort to lower the Affected Stocks' share prices.  (*See, e.g.*, *id.* ¶ 101 ("We knew this was a bad outcome for customers." (quotation marks omitted))).  Certainly, Robinhood's "distorti[on] [of] the demand side of the market" (*id.* ¶ 138 (alterations added)) is probative of its efforts to decrease share prices, thereby decreasing its VaR charges.  Without any arguments from Robinhood remaining, Plaintiffs' section 9(a)(2) claim may proceed.

### b.  Section 9(a)(4)

The same cannot be said for Plaintiffs' section 9(a)(4) claim.  Section 9(a)(4) states:

(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

. . . .

> (4) If a dealer, broker, security-based swap dealer, major security-based swap participant, or other person selling or offering for sale or purchasing or offering to purchase the security, a security-based swap, or security-based swap agreement with respect to such security, to make, regarding any security registered on a national securities exchange, any security not so registered, any security-based swap, or any security-based swap agreement with respect to such security, for the purpose of inducing the purchase or sale of such security, such security-based swap, or such security-based swap agreement any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which that person knew or had reasonable ground to believe was so false or misleading.

15 U.S.C. § 78i(a)(4).

Courts simplify this dense provision to require a "(1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price." *Chemetron Corp.*, 682 F.2d at 1161–62 (footnote call numbers omitted).  "[T]he 'intent to induce' requirement creates a higher burden of proof for the plaintiff under section 9(a)(4) than that borne under Rule

10b-5(b)." *Id.* at 1162 (alteration added); *see also Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 477 (S.D.N.Y. 2014). While a general intent to commit fraud may satisfy the intent element under rule 10b-5, it will not suffice under section 9(a)(4) unless the intent specifically seeks to induce the sale or purchase of securities. *See Chemetron Corp.*, 682 F.2d at 1162.

Evaluating intent invokes the PSLRA's heightened pleading requirements, *see* 15 U.S.C. § 78u-4(b)(2)(A), which mandate consideration of "any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (footnote call number omitted). From there, the Court must answer the question: How likely is it that Plaintiffs' alleged inference, as compared to alternatives, flows from the allegations? *See id.* at 323.

Plaintiffs cite two categories of misstatements and omissions: (1) Robinhood's failure to inform investors that it could not meet the NSCC's collateral requirements (*see* Resp. 38–42), and (2) Robinhood's misleading statements to the public about its liquidity concerns (*see id.* 43–46). Neither category, however, supports Plaintiffs' theory.

To begin, the text of the statute requires that the allegedly misleading statements or omissions be made "regarding any security registered on a national securities exchange," 15 U.S.C. § 78i(a)(4), yet none of Robinhood's alleged misstatements or omissions directly pertain to the Affected Stocks. Instead, the omissions and misleading statements reflect Robinhood's corporate wellbeing. (*See, e.g.*, Resp. 38 ("Robinhood was severely reckless in failing to inform customers of the NSCC deposit requirement in its statements on the morning of January 28[.]" (alteration added; emphasis omitted); *id.* 43 ("Robinhood publicly dissembled about its liquidity crisis while it privately searched for capital to keep the doors open[.]" (alteration added; emphasis omitted)).

In the section 9(a)(2) analysis, the Court treated Robinhood's misstatements and omissions as circumstantial evidence of Robinhood's deception and motivation for engaging in transactions

CASE NO. 21-2989-MDL-ALTONAGA/Torres

that artificially depressed the Affected Stocks' price. But it does not necessarily follow that Robinhood misstated and omitted information for the purpose of inducing investors to sell their shares. Rather, the more compelling explanation is that Robinhood sought to bamboozle investors as to the basis for its restrictions so investors would not flee its platform. Plaintiffs allege as much. (*See, e.g.*, CCAC ¶ 66 ("Internal Robinhood communications reveal that at 8:13 a.m. EST on January 28th, Robinhood was fashioning just the right message to not lose credibility with its current and future customer base[.]" (alteration added)); Resp. 44 ("[Robinhood] did not want to lose customers and wanted to make it appear that this was a short-term problem." (alteration added))).

If investors knew the true reason for Robinhood's restrictions — *i.e.*, that they were imposed to satisfy capital requirements — they would have turned to other trading platforms. (*See, e.g.*, CCAC ¶ 42 ("[F]rom a public perception POV, we may want to consider the risks our customers face. . . . Although we don't have a straightforward obligation here because our customers are self directed . . . our action[s] may well be compared to the actions of other firms (with other obligations to customers)." (alterations added; quotation marks and footnote call number omitted))). And they did. Robinhood lost customers but managed to cauterize the bleeding and simultaneously attract thousands of new users. (*See id.* ¶ 119 ("[T]he flood of new investors 'far outweighed' any attrition. Robinhood was the top app in the iOS app store for multiple days. It also led the industry in app downloads by a wide margin with 600,000 people downloading the free-trading app[.]" (alterations added))).

Putting aside the more compelling inference to focus on Plaintiffs' proposed inference fares no better. Plaintiffs strain to argue that the various categories of misstatements and omissions occurred with the purpose of causing investors to sell their shares. In their Response, Plaintiffs

simply state, "Not knowing the truth about Robinhood's reason for its actions induced panic selling." (Resp. 41 (citing CCAC ¶¶ 68–69)). But this assertion says nothing about Robinhood's intent.

Indeed, nowhere in the Response do Plaintiffs bridge Robinhood's various statements, or lack of statements, about collateral requirements to its intent to cause a selloff. To the contrary, Plaintiffs acknowledge that Robinhood made those statements to protect its image and prevent the mass exodus of its customers. (*See, e.g.*, Resp. 42 ("Robinhood's motive for not being truthful was that it would hurt the company's image, with an IPO in the works, to admit that it was so undercapitalized[.]" (alteration added; citation omitted); *id.* 44 ("Robinhood dissembled because it did not want to lose customers and wanted to make it appear that this was a short-term problem.")). And while misstating facts to protect Robinhood's public image may satisfy the scienter element under rule 10b-5, the same cannot be said for section 9(a)(4). After all, "the 'intent to induce' requirement of subsection 9(a)(4) is distinct from the scienter requirement of Rule 10b-5(b)" in that intending to commit a fraudulent act, alone, is insufficient to establish intent under section 9(a)(4), unless the fraud is to induce the purchase or sale of securities. *Chemetron Corp.*, 682 F.2d at 1162.

Plaintiffs thus fail to explain how Robinhood's omissions and misstatements were designed to induce investors to sell their shares. Sure, Robinhood allegedly acted dishonestly, and that dishonesty serves as circumstantial evidence that its *restrictions* were manipulative; but nowhere in the CCAC or Response do Plaintiffs articulate why it is "at least as compelling" that Robinhood omitted material information to induce customers to sell their shares, as opposed to prevent customers from fleeing its application. *Tellabs*, 551 U.S. at 324 (footnote call number omitted). The distinction is important because the former is prohibited under section 9(a)(4), and the latter

CASE NO. 21-2989-MDL-ALTONAGA/Torres

is not.  Because the latter is more compelling than Plaintiffs' purported inference, Plaintiffs' section 9(a)(4) claim fails.

## II.      Section 10(b) Claim

Section 10(b) makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (alteration added; footnote call number omitted).  Rule 10b-5, promulgated under section 10(b), encompasses the same "conduct already prohibited by [section] 10(b)[,]" *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (alterations added; citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)), and provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
>     (a) To employ any device, scheme, or artifice to defraud,
>
>     (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
>     (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Section 10(b) and rule 10b-5 "capture a wide range of conduct" and are designed "to root out all manner of fraud in the securities industry." *Lorenzo v. Secs. Exch. Comm'n*, 139 S. Ct. 1094, 1101, 1104 (2019).  Such conduct includes "the making of a material misstatement (or omission) or the commission of a manipulative act." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) (citation omitted).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

"Manipulation . . . . refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus.*, 430 U.S. at 476 (alteration added; citations omitted). These practices are referred to as "market manipulation." *In re Galectin Therapeutics, Inc. Secs. Litig.*, 843 F.3d 1257, 1273 (11th Cir. 2016) (citation omitted).

To assert a market manipulation claim, Plaintiffs must "allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Commc'ns*, 493 F.3d at 101 (citations omitted). By contrast, a more quotidian misrepresentation claim requires Plaintiffs to allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners*, 552 U.S. at 157 (citation omitted).

Market manipulation and misrepresentation claims differ from one another in several respects. First, a market manipulation claim arises from market *activity*, rather than a *misrepresentation*, that injects false information into the market. *See ATSI Commc'ns*, 493 F.3d at 101. Second, a plaintiff "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim" because a market manipulation claim "can involve facts solely within the defendant's knowledge[.]" *Id.* at 102 (alteration added; citations omitted). Third, market manipulation "permits the plaintiff to plead that it relied on an *assumption* of an efficient market free of manipulation, whereas a misrepresentation claim requires the plaintiff to allege

reliance upon a misrepresentation or omission." *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 27

(2d Cir. 2013) (Lohier, J., concurring in part and dissenting in part) (citations omitted).

The first two distinctions prove to be important in assessing Robinhood's argument that

Plaintiffs fail to satisfy the first element, "manipulative acts[.]"  *ATSI Commc'ns*, 493 F.3d at 101

(alteration added).  The argument contains two parts: (1) Robinhood could not have sent false

pricing signals to the market because it did not trade any of the Affected Stocks (*see* Reply 8–9);

and (2) Robinhood's conduct cannot be characterized as manipulative since it disclosed the

restrictions (*see id.* 10–12, 19).  In addition to conflating principles distinguishing market

manipulation from misrepresentation claims, Robinhood's argument fails because it

mischaracterizes or ignores the allegations.  The Court explains.

### a.   Section 10(b) is Not Limited to Transactions.

To repeat, section 10(b) prohibits the use of "any manipulative or deceptive device[.]"  15

U.S.C. § 78j(b) (alteration added).  Court have interpreted the statute's use of "manipulative or

deceptive device" to refer "generally to practices, such as wash sales, matched orders, or rigged

prices, that are intended to mislead investors by artificially affecting market activity."  *Santa Fe*

*Indus.*, 430 U.S. at 476 (citations omitted).

While wash sales, matched orders, or rigged prices are not at issue here, Plaintiffs point to

the following restrictions as examples of manipulative conduct:

> (a) canceling purchase orders for the Affected Stocks placed before the markets
> opened for trading on January 28, 2021; (b) closing out options positions in AMC
> and GME early; (c) prohibiting and later restricting purchases of the Affected
> Stocks on the Robinhood trading platform and (d) abruptly raising margin
> requirements for Robinhood's customers, forcing those who could not meet the
> margin calls for the Affected Stocks to sell some or all of their holdings.

(CCAC ¶ 137).  The Court has already concluded that (a), (b), and (d) constitute transactions under

section 9(a)(2); and thus, would fall within Robinhood's narrow interpretation of manipulative acts

CASE NO. 21-2989-MDL-ALTONAGA/Torres

under section 10(b).  This leaves (c): Robinhood's PCO restriction.  So, as a threshold issue, the Court must determine whether Robinhood's PCO restriction constitutes a "device or contrivance[.]"  15 U.S.C. § 78j(b) (alteration added).

Robinhood does not address section 10(b)'s use of "manipulative or deceptive device or contrivance" (*id.*); instead, it interprets several section 10(b) cases to require a defendant to "engag[e] in some sort of deceptive market transaction[,]" such as the purchase or sale of a stock. (Reply 9 (alterations added; emphasis omitted; collecting cases)).  But without any analysis of the text, Robinhood's argument lacks legs.  *See Tello*, 410 F.3d at 1278 ("With securities laws, 'as in other contexts, the starting point in construing a statute is the language of the statute itself.'" (quoting *Randall*, 478 U.S. at 656)).

Section 10(b)'s use of "device or contrivance" as opposed to "transaction" ensures that claims brought under section 10(b) need not allege a market transaction to plead a market manipulation claim.  *Compare* 15 U.S.C. § 78j(b) *with* 15 U.S.C. § 78i(a)(2).  "A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning[,]" *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) (alteration added), and any "material variation in terms suggests a variation in meaning," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012).  Commentators generally refer to this as the "presumption of consistent usage" canon of statutory interpretation.  *Id.*  The canon plays an important role when comparing sections 10(b) and 9(a)(2): Section 10(b) prohibits the use of "any manipulative or deceptive device or contrivance[,]" 15 U.S.C. § 78j(b) (alteration added), whereas section 9(a)(2) prohibits "a series of *transactions* in any security . . . creating actual or apparent active trading in such security," 15 U.S.C. § 78i(a)(2) (alterations and emphasis added).

If section 10(b) only applied to market transactions, it would say so. Instead, Congress drafted section 10(b) broadly to encompass acts affecting the prices of securities, as opposed to limiting claims to transactions. *See Chemetron Corp.*, 682 F.2d at 1166 (comparing section 10(b) to section 9(a) and concluding that "[f]rom its inception through various amendments and into its final form, section 10(b) was always intended as a 'catchall' provision to reach activities not covered or anticipated in other provisions of the Acts" (alteration added)); *see also Spicer*, 1990 WL 172712, at *3 ("Section 9(a)(2) is not a catch-all section . . . . There is a provision of the securities laws which achieves roughly that. *See* Rule 10b–5(1)." (alteration added; footnote call number omitted)).

The cases Robinhood cites do not suggest otherwise. *ATSI Communications, Inc. v. Shaar Fund, Ltd.* involved market transactions, but the court never limited section 10(b) claims to market transactions exclusively. *See* 493 F.3d at 100. Robinhood reads too far into the court's statement that "courts generally ask whether a *transaction* sends a false pricing signal to the market[,]" *id.* (alteration and emphasis added), particularly since the court went on to refer to "*practices* that impair the function of stock markets[,]" *id.* (alteration and emphasis added; citation, footnote call number, and quotation marks omitted), and ultimately concluded that prohibited conduct encompasses "some *market activity*," *id.* at 101 (emphasis added; citation omitted).[15]

In contrast, decisions that address the scope of section 10(b) support the Court's reading. In *City of Providence v. Bats Global Markets, Inc.*, the Second Circuit considered whether a group of securities exchanges, including the NASDAQ and NYSE, engaged in manipulative conduct

---

[15] The other decisions Robinhood relies on fare no better. (*See* Reply 9 (citing *Spicer*, 1990 WL 172712, at *2; *Baum*, 648 F. Supp. at 1530)). As stated, *Spicer* acknowledged that rule 10b-5 encompasses broader conduct than section 9(a)(2). *See* 1990 WL 172712, at *3. And *Baum* did not involve a market manipulation claim under section 10(b) or rule 10b-5. *See* 648 F. Supp. at 1524–26 (addressing plaintiffs' misrepresentation claim under section 10(b)).

when they "created products and services for HFT firms that illicitly 'rigged the market' in the firms' favor in exchange for hundreds of millions of dollars in fees"; "failed to disclose the full impact that such products and services would have on market activity"; and "knowingly created a false appearance of market liquidity that, unbeknownst to plaintiffs, resulted in their bids and orders not being filled at the best available prices." 878 F.3d 36, 49 (2d Cir. 2017) (citation omitted).

The exchanges argued that their conduct could not qualify as "manipulative" because they never engaged in any "trading activity." *Id.* at 50 (citation and quotation marks omitted). Noting the dearth of authority supporting the exchanges' argument, the court disagreed. *See id.* Even if the exchanges did not trade securities, they "engaged in conduct that manipulated market activity, including by deceiving investors into 'believing that prices at which they purchased and sold securities [were] determined by the natural interplay of supply and demand, not rigged by manipulators.'" *Id.* (alterations adopted; other alteration added; quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999); other citation omitted).

The reasoning in *Bats Global Markets* applies equally here. Robinhood may not have traded securities when it disabled the buy button, but this restriction misled investors into thinking that the Affected Stocks' value reflected the "natural interplay of supply and demand[.]" *Id.* (alteration added; citations and quotation marks omitted). In reality, the value reflected a Hobson's choice: hold shares of Affected Stocks while Robinhood indefinitely blocks its users — who by the way, traded "4% of all shares traded in the U.S. in January 2021" (CCAC ¶ 5 (emphasis omitted)) — from purchasing more shares *or* sell the shares in anticipation of the inevitable "tsunami of selling unleashed by Robinhood's disabling of 'buy' buttons for the very stocks that were the most popular with its customer base" (*id.* ¶ 76).

Just as the exchanges altered the natural interplay of supply and demand when they sold products that gave firms the "ability to access market data at a faster rate, obtain non-public information, and take priority over ordinary investors' trades," *Bats Global Markets, Inc.*, 878 F.3d at 49, Robinhood placed its thumb on the scale of supply and demand when it restricted the sales of the Affected Stocks.  This conduct, irrespective of whether Robinhood purchased the Affected Stocks, constitutes a "device or contrivance[.]"  15 U.S.C. § 78j(b) (alteration added).

In sum, Plaintiffs need not allege that Robinhood engaged in a market transaction to state a claim for market manipulation under section 10(b).  To hold Plaintiffs to such a burden would undermine the text and purpose of the statute, in addition to erasing a noteworthy distinction between sections 9(a)(2) and 10(b).

### b.   Robinhood Only Disclosed Half of the Truth.

Next, Robinhood argues that its conduct cannot be characterized as manipulative because it disclosed each restriction.  (*See* Mot. 22 ("Because the challenged conduct was fully disclosed, there can be no manipulation." (citations omitted)); Reply 10–12).[16]  In principle, Robinhood is correct: "Deception is the gravamen of a claim for market manipulation, and the market is not misled when a transaction's terms are fully disclosed."  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021) (quotation marks and footnote call number omitted)); *see also Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011) ("In order for market activity

---

[16] As a notable aside, Plaintiffs allege that Robinhood did not disclose each restriction.  (*See* CCAC ¶¶ 52–54, 62).  Instead of informing investors of its intention to cancel purchase orders submitted after markets closed, Robinhood allegedly cancelled the orders and then disclosed the cancellations to customers after the fact.  (*See id.* ¶ 62).  It made the same post-hoc disclosure after it preemptively closed in-the-money options of GME and AMC.  (*See id.* ¶¶ 52–54).  Plaintiffs argue that even if market manipulation claims require nondisclosure, such nondisclosure exists because Robinhood did not disclose the cancelled transactions until after the fact.  (*See* Resp. 20).  The Court need not address this argument because Robinhood's alleged failure to disclose its reason for implementing the restrictions, in addition to the anticipated effects of such restrictions, also constitute material nondisclosures.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

to be manipulative, that conduct must involve misrepresentation or nondisclosure." (citations omitted)). But there's more: even if the terms are fully disclosed, "'half-truths' — literally true statements that create a materially misleading impression — will support claims for securities fraud." *Wilson*, 671 F.3d at 130–31 (quotation marks omitted; quoting *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir.2011); other citation omitted); *see also Set Cap. LLC*, 996 F.3d at 85. Such is the case here.

*Set Capital LLC v. Credit Suisse Group AG* is instructive. *See* 996 F.3d 64. There, Credit Suisse entered into an agreement with Set Capital under which Credit Suisse issued XIV Notes that increased in value during steady periods in the market and decreased in value with volatility. *See id.* at 69–70. When the parties entered into the agreement, Credit Suisse disclosed that it would hedge its exposure by investing in VIX futures contracts — mirror securities that became more valuable with volatility and less valuable when the market was steady. *See id.* at 71. Later, it qualified this disclosure: "Although we . . . have no reason to believe that our . . . hedging activities will have a material impact on the level of the applicable underlying VIX Futures Index, there can be no assurance that the level of the applicable underlying Index will not be affected." *Id.* at 72 (alterations added; other alteration adopted; footnote call number and quotation marks omitted).

After entering into the agreement, Credit Suisse discovered that it could artificially depress the price of the XIV Notes by purchasing large amounts of VIX futures contracts. *See id.* at 71. Armed with this information, Credit Suisse used a period of market volatility to purchase a large position in VIX futures contracts, simultaneously causing the value of XIV Notes to plummet. *See id.* at 73. Once the XIV Notes' price reached a low of $5.99 per note, Credit Suisse issued a call

CASE NO. 21-2989-MDL-ALTONAGA/Torres

notice to XIV Notes' purchasers and terminated all notes, resulting in a $1.8 billion loss to investors and roughly half-a-billion-dollar profit for Credit Suisse. *See id.* at 74.

The Second Circuit relied on Credit Suisse's disclosure to infer its culpability. The disclosure misled investors into believing that Credit Suisse would not hedge its position in a manner that materially affected the XIV Notes, even though Credit Suisse intended just the opposite. *See id.* at 79, 84–86. Credit Suisse knew that market volatility could be utilized to depress the value of the XIV Notes and "used this knowledge as part of an *undisclosed* scheme to profit at their investors' expense." *Id.* at 77 (emphasis added). In other words, Credit Suisse bought VIX futures knowing it would induce a liquidity squeeze on XIV Notes, thereby causing XIV Notes to become virtually worthless, and it hid this plan from investors. *See id.* at 79.

The omissions and half-truths in *Set Capital LLC* are similar to Robinhood's alleged conduct here. Just as Credit Suisse misled investors into thinking that it would not materially affect the value of the XIV Notes, Robinhood misled users into thinking that only market volatility — not its lack of capital — played a role in its decision to raise margin requirements, impose purchase restrictions, close out option positions early, and cancel purchase orders. Despite knowing that it lacked sufficient liquidity to meet the NSCC's capital requirements, Robinhood outright denied having a liquidity issue and blamed market volatility exclusively. (*See* CCAC ¶¶ 78–80). Yes, market volatility prompted the NSCC to impose higher collateral requirements — collateral requirements that Robinhood could not meet — but as Tenev admitted, if Robinhood had "more headroom," *i.e.*, more capital, it "would have let things continue[.]" (*Id.* ¶ 80 (alteration added; emphasis omitted)).

Robinhood did not share these facts with its customers, nor did it disclose that the restrictions would depress the Affected Stocks' share prices (*see id.* ¶¶ 13, 59, 103) — a critical

CASE NO. 21-2989-MDL-ALTONAGA/Torres

omission that mirrors Credit Suisse's undisclosed scheme to tank the price of XIV Notes.  *See Set Cap. LLC*, 996 F.3d at 77.  The omissions consequently deprived Robinhood users of the full picture as they debated whether to hold or sell their Affected Stocks.  To them, the Affected Stocks' declining prices reflected the market's concern about volatility, not Robinhood's inadequate capital cushion, and certainly not an intentional scheme on the part of Robinhood to lower the stocks' value.  (*See id.* ¶ 80).  In allegedly failing to disclose these concerns, Robinhood coupled its restrictions with half-truths that collectively "sen[t] a false pricing signal to the market."  *ATSI Commc'ns*, 493 F.3d at 100 (alteration added).

Robinhood insists that *Set Capital LLC* is distinguishable because "Plaintiffs are missing any allegation that Robinhood engaged in a market transaction or did so without disclosure." (Reply 11).  Without these allegations, argues Robinhood, Plaintiffs cannot show that Robinhood acted deceptively.  (*See id.*).

Not only does Robinhood mischaracterize the pleading, but *Bats Global Markets* also demonstrates why Robinhood's argument is legally flawed.  There, the Second Circuit held that a defendant need not engage in market transactions to be liable for market manipulation.  *See Bats Glob. Mkts.*, 878 F.3d at 49.  It relied on the exchanges' failure to disclose the range and effects of their products to infer manipulative conduct.  *See id.* at 50.

One such product, the "complex order type," enabled HFTs to submit "hide and light" orders that remained hidden from ordinary listings until the "stock reache[d] a particular price, at which point the hidden orders emerge[d] and jump[ed] the queue ahead of other investors' orders." *Id.* (alterations added).  These orders created a façade of market liquidity that resulted in the investors' bids "not being filled at the best available prices."  *Id.* at 49.  Had the exchanges disclosed the scope and effects of the complex order, investors could have avoided "increased

CASE NO. 21-2989-MDL-ALTONAGA/Torres

opportunity costs from unexecuted fill orders, adverse selection and price movement bias on executed fill orders, and increased execution costs." *Id.* at 43.

Robinhood does not address *Bats Global Markets* as it applies to Plaintiffs' market manipulation claim.   It is a curious oversight on Robinhood's part, considering its alleged omissions bear marked similarities to those of the exchanges.  Both Robinhood and the defendant in *Bats Global Markets* allegedly did not disclose the scope, purpose, and effect of their conduct/products, thereby sending false signals to the market.

At the risk of sounding like a broken record, the CCAC describes how the undisclosed information impacted Plaintiffs and the market as a whole.  Plaintiffs had no idea that their submitted orders would be cancelled, nor did they receive any warning that their in-the-money options would be preemptively closed.  (*See* CCAC ¶¶ 52–54, 62).  Robinhood hid its personal stake in the restrictions, letting the market believe that volatility acted as the only impetus for the restrictions.  (*See id.* ¶ 80).  Meanwhile, days before notifying customers of the new margin requirements, Robinhood's own executive sold his stake in AMC and warned Robinhood employees that the planned margin hikes would cause the Affected Stocks' price decline.  (*See id.* ¶¶ 72–74).  Plaintiffs did not receive the same benefit.

To summarize, the Court disagrees with Robinhood that its "conduct was openly and accurately disclosed and thus could not be deceptive." (Reply 12).  Even if Robinhood disclosed the restrictions — a premise that Plaintiffs dispute (*see* Resp. 20) — the disclosures were allegedly incomplete and misleading.  Regurgitating "market volatility" as the basis for restrictions, while simultaneously denying any concerns about liquidity despite internal and subsequent statements to the contrary (*see* CCAC ¶¶ 12, 79–80, 103), can hardly be characterized as an "open[] and "accurate[] disclos[ure,]" (Reply 12 (alterations added)).  Robinhood's selective disclosures

CASE NO. 21-2989-MDL-ALTONAGA/Torres

allegedly misled investors, the market, and Plaintiffs, and thus, they constitute manipulative conduct under section 10(b) and rule 10b-5.

## III.    Impact on Other Tranches

Before concluding, the Court pauses to address the parties' arguments that the conclusions contained in this Order may somehow be in tension with the Court's past decisions in the Antitrust and Robinhood Tranches. (*See* Mot. 37; Resp. 29 n.21, Reply 16–17). Such is not the case.

### a.  Antitrust Tranche

Robinhood points to the November 17, 2021 Order [ECF No. 438] ("Antitrust Order") in arguing that Tenev's statements denying Robinhood's liquidity problem did not conflict with Howard's statement that Robinhood had a "major liquidity issue[.]" (CCAC ¶ 59 (alteration added; quotation markets omitted); *see* Mot. 42–44; Reply 17–18). Robinhood is mistaken.

First, the interview with Portnoy puts Tenev's and Howard's statements in a different light. Admittedly, the Antitrust Order concluded that blaming market volatility was not inconsistent with blaming Robinhood's liquidity problem. But it is significant that neither iteration of the Antitrust Tranche Complaints [ECF Nos. 416, 451] included Tenev's interview with Portnoy. *Cf. Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) ("A court's review on a motion to dismiss is limited to the four corners of the complaint." (citations and quotation marks omitted)). The interview is important because it explored Tenev's intent as it pertained to the explanations for the restrictions; the Antitrust Tranche Complaints lacked the same insight into Tenev's internal deliberations.

Take Tenev's explanation to Portnoy for why he was so squirrelly around the term "liquidity." (*See* CCAC ¶ 80). "I think that liquidity issue, and I probably should be careful and call it the 'L word,' right, the 'L word' is a big thing in financial services. Basically, if you say

48

CASE NO. 21-2989-MDL-ALTONAGA/Torres

liquidity issue means you can't meet your capital requirements, or your deposit requirements, then you're essentially dead[.]  (*Id.* (alteration added; emphasis omitted)).  Likening the term "liquidity" to a swear word displays Tenev's, and by consequence Robinhood's, fear that the public would rightfully believe Robinhood lacked sufficient capital.  This alleged fact, combined with Tenev's concession that Robinhood could not afford the NSCC's collateral requirements without imposing the restrictions (*see id.*), create a particularized inference that Robinhood steered the public spotlight toward market volatility to avoid scrutiny.

Second, the legal contexts are different.  Section 1 of the Sherman Act, 15 U.S.C. section 1, relies on plus factors, including evidence of pretext, to create an inference of a conspiracy to restrain trade.  *See In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016).  Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 rely on a defendant's misleading or false statements to infer its intent.  *See U.S. S.E.C. v. Weintraub*, No. 11-21549-Civ, 2011 WL 6935280, at *7 (S.D. Fla. Dec. 30, 2011).

The Antitrust Order scrutinized Howard's statements to ascertain whether the reasons underlying Robinhood's conduct were pretextual and thus, probative of an antitrust *conspiracy*, not *scienter* in a market manipulation scheme.  (*See* Antitrust Order 46–47).  Ultimately, in the Antitrust Order, the Court concluded that blaming market volatility was not pretext to steer onlookers away from the alleged conspiracy with market makers and clearing brokers; rather, the more compelling explanation for Howard's statement was that she simply misspoke and conflated market volatility and liquidity.  (*See id.* 47 ("Howard was likely referring to Robinhood's ability to pay the increased collateral requirements caused by the market volatility[.]" (alteration added)).  Here, the more compelling inference is that Howard's statement accurately identified the proximate cause of the restriction — lack of liquidity — a cause that Tenev did not want the public

CASE NO. 21-2989-MDL-ALTONAGA/Torres

to know about because widespread knowledge would make Robinhood "essentially dead[.]" (CCAC ¶ 80 (alteration added)).

### b. Robinhood Tranche

As for the Robinhood Tranche, the Court's conclusion that Plaintiffs plausibly allege that Robinhood intended to artificially depress the Affected Stocks is entirely consistent with the Robinhood Tranche Order. There, the Court concluded that no special relationship under California law existed between Robinhood and the plaintiffs that would give rise to liability for economic losses. (*See* Robinhood Tranche Order 22–23, 30–34). As an initial matter, the question of whether a tort duty exists under California law calls for an exacting, policy-driven judicial inquiry, while the question of whether a complaint adequately alleges liability and causation turns on textbook pleading principles. Moreover, in concluding that no tort duties under California law existed, the Court evaluated six factors, two of which merit discussion: (1) "the closeness of the connection between [plaintiffs'] injury and [Robinhood's] conduct" and (2) Robinhood's "moral blameworthiness[.]" (*Id.* 31–32 (alterations added)).

First, the undersigned concluded that "the link between th[e] decline [of the meme stocks' value] and [Robinhood's] conduct [was] attenuated at best." (*Id.* 31 (alterations added)). Theoretically, this conclusion could implicate the causation element under federal securities laws, but Robinhood does not challenge causation as it applies to Plaintiffs' market manipulation claims. It challenges causation only in the context of Plaintiffs' misstatement claim. (*See* Mot. 40–42; Reply 16). But Plaintiffs abandoned their section 10(b) misstatement claim (*see generally* Resp.), and their misstatement claim under section 9(a)(4) fails for other reasons.

Second, the Court's moral blameworthiness analysis focused solely on whether the SEC and the customer agreement permitted Robinhood's conduct. (*See* Robinhood Tranche Order 32).

50

CASE NO. 21-2989-MDL-ALTONAGA/Torres

And while "the Customer Agreement and the SEC expressly permitted the types of trading restrictions that [Robinhood] implemented[,]" (*id.* (alterations added; citations omitted)), federal securities laws do not permit restrictions if they are "accompanied by manipulative intent[,]" *Set Cap. LLC*, 996 F.3d at 77 & n.49 (alteration added; citing *ATSI*, 493 F.3d at 100). Courts have permitted federal securities claims premised on conduct approved by regulators if the extent of the approval is unclear. *See Bats Global Mkts., Inc.*, 878 F.3d at 50. Even if Robinhood argued that the NSCC's approval of the restrictions immunized Robinhood from Plaintiffs' claims, it would need to identify some sort of good faith conformity defense, akin to that prescribed by 15 U.S.C. section 80b-11(d), or an extension of the self-regulated organization immunity doctrine, *see Weissman v. Nat'l Ass'n of Secs. Dealers, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007). If such a defense exists, it is not apparent from the pleading or from any information the Court may take judicial notice of.

\* \* \*

The short squeeze stretched Robinhood thin, straining its ability to simultaneously provide unconstrained access to markets and comply with regulators. In the end, balancing the two proved too much for Robinhood, so it imposed restrictions that hampered its customers' access to markets. These restrictions, of course, impacted the natural state of supply and demand for the Affected Stocks, but they alone did not amount to market manipulation. Rather, Robinhood's allegedly opaque and conflicting statements made to hide its lack of capital, coupled with its restrictions, evince an intent on the part of Robinhood to artificially depress share prices for its personal benefit.

At this stage, the Court's task is to assess whether the well-pleaded allegations, taken as true, are sufficiently particularized to satisfy heightened pleading requirements. *See* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u–4(b)(2)(A). The task presented interesting legal questions, convoluted

CASE NO. 21-2989-MDL-ALTONAGA/Torres

by the novelty of Robinhood's platform, but at the end of the day, Plaintiffs' market manipulation claims clear the particularized threshold.[17]

## CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Motion to Dismiss the Securities Tranche Complaint **[ECF No. 449]** is **GRANTED in part**. Count I's misrepresentation claim under 15 U.S.C. section 78i(a)(4) is **DISMISSED**. The remaining market manipulation claims under Counts I and II may proceed. On or before August 22, 2022, Plaintiffs shall file a notice indicating whether they would like to proceed with their Motion Requesting Entry of a Scheduling Order Re: Amendment of Complaint **[ECF No. 495]**.

**DONE AND ORDERED** in Miami, Florida, this 10th day of August, 2022.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[17] As is, the CCAC may constitute a shotgun complaint because Count II "repeat[s] and reallege[s] each and every allegation contained in the foregoing paragraphs as if fully set forth herein." (CCAC ¶ 142 (alterations added)); *see Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002) ("[A] shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." (alteration added)). The Court opts not to dismiss the CCAC as a shotgun complaint given the substantial overlap between Counts I and II. Both rely on the same set of factual allegations and virtually identical legal theories, thus satisfying the need to "know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).