No. 22-11873-F

# United States Court of Appeals
# for the Eleventh Circuit

ANGEL GUZMAN, BURKE MINAHAN,
CHRISTOPHER MILLER, and TERELL STERLING,

*Plaintiffs-Appellants*,

v.

ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL LLC,
ROBINHOOD SECURITIES, LLC and CITADEL SECURITIES LLC,

*Defendants-Appellees.*

*Appeal from U.S. District Court for the Southern District of Florida,
Case No. 21-md-2989, before the Honorable Cecilia M. Altonaga*

## BRIEF OF APPELLEE CITADEL SECURITIES LLC

Adam L. Hoeflich
Abby M. Mollen
Mac LeBuhn
Dawson K. Robinson
BARTLIT BECK LLP
54 W. Hubbard Street, Ste 300
Chicago, IL 60654
(312) 494-4400
adam.hoeflich@bartlitbeck.com
abby.mollen@bartlitbeck.com
mac.lebuhn@bartlitbeck.com
dawson.robinson@bartlitbeck.com

William A. Burck
Derek L. Shaffer
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
1300 I Street NW, Ste 900
Washington, D.C. 20005
(202) 538-8000
williamburck@quinnemanuel.com
derekshaffer@quinnemanuel.com

*Counsel for Defendant-Appellee Citadel Securities LLC*

DECEMBER 14, 2022

John F. O'Sullivan
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
2601 S. Bayshore Drive, Ste 1550
Miami, FL 33133
(305) 439-5008
johnosullivan@quinnemanuel.com

Christopher D. Kercher
Peter H. Fountain
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7187
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

*Counsel for Defendant-Appellee Citadel Securities LLC (cont.)*

No. 22-11873-F

Angel Guzman et al. v. Robinhood Markets, Inc. et al.

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rules 26.1-1 and 26.1-2, Defendant-Appellee Citadel Securities LLC, by undersigned counsel, hereby certifies that the following is a complete list, in alphabetical order, of interested persons:

1.   Altonaga, Cecilia M. (U.S. District Judge, Southern District of Florida)

2.   Alvarado, Maria Castellanos (counsel for Robinhood Financial LLC, Robinhood Securities, LLC, and Robinhood Markets, Inc.)

3.   Bartlit Beck LLP (counsel for Citadel Securities LLC)

4.   Burck, William A. (counsel for Citadel Securities LLC)

5.   Citadel Securities GP LLC (parent company of Citadel Securities LLC)

6.   Citadel Securities LLC

7.   Cravath, Swaine & Moore LLP (counsel for Robinhood Financial LLC, Robinhood Securities, LLC, and Robinhood Markets, Inc.)

8.   Danon, Samuel A. (counsel for Robinhood Financial LLC, Robinhood Securities, LLC, and Robinhood Markets, Inc.)

9.   Fountain, Peter H. (counsel for Citadel Securities LLC)

No. 22-11873-F

Angel Guzman et al. v. Robinhood Markets, Inc. et al.

10.  Furst, Rachel W. (counsel for Plaintiffs-Appellants)

11.  Grossman Roth Yaffa Cohen, P.A. (counsel for Plaintiffs-Appellants)

12.  Guzman, Angel

13.  Hach Rose Schirripa & Cheverie, LLP (counsel for Plaintiffs-Appellants)

14.  Hettler, Kathryn (counsel for Plaintiffs-Appellants)

15.  Hoeflich, Adam L. (counsel for Citadel Securities LLC)

16.  Hunton Andrews Kurth LLP (counsel for Robinhood Financial LLC, Robinhood Securities, LLC, and Robinhood Markets, Inc.)

17.  Joseph Saveri Law Firm, LLP (counsel for Plaintiffs-Appellants)

18.  Kercher, Christopher D. (counsel for Citadel Securities LLC)

19.  LeBuhn, Mac (counsel for Citadel Securities LLC)

20.  Maggard, Abraham A. (counsel for Plaintiffs-Appellants)

21.  Miller, Christopher

22.  Minahan, Burke

23.  Mollen, Abby M (counsel for Citadel Securities LLC)

24.  Orsini, Kevin J. (counsel for Robinhood Financial LLC, Robinhood Securities, LLC, and Robinhood Markets, Inc.)

No. 22-11873-F

Angel Guzman et al. v. Robinhood Markets, Inc. et al.

25.    O'Sullivan, John F. (counsel for Citadel Securities LLC)

26.    Pavsner, Seth (counsel for Plaintiffs-Appellants)

27.    Quinn Emanuel Urquhart & Sullivan, LLP (counsel for Citadel Securities LLC)

28.    Robinhood Financial LLC

29.    Robinhood Markets, Inc. (stock ticker HOOD)

30.    Robinhood Securities, LLC

31.    Robinson, Dawson K. (counsel for Citadel Securities LLC)

32.    Ryan, Antony L. (counsel for Robinhood Financial LLC, Robinhood Securities, LLC, and Robinhood Markets, Inc.)

33.    Saveri, Joseph R. (counsel for Plaintiffs-Appellants)

34.    Schirripa, Frank R. (counsel for Plaintiffs-Appellants)

35.    Shaffer, Derek L. (counsel for Citadel Securities LLC)

36.    Sterling, Terell

37.    Sukiennik, Brittany L. (counsel for Robinhood Financial LLC, Robinhood Securities, LLC, and Robinhood Markets, Inc.)

38.    Torres, Edwin G. (U.S. Mag. Judge, Southern District of Florida)

39.    Williams, Steven N. (counsel for Plaintiffs-Appellants)

40.    Young, Christopher K.L. (counsel for Plaintiffs-Appellants)

No. 22-11873-F

Angel Guzman et al. v. Robinhood Markets, Inc. et al.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, the undersigned counsel hereby certifies that Defendant-Appellee Citadel Securities LLC is a wholly-owned indirect subsidiary of Citadel Securities GP LLC. Counsel further certifies that no publicly-held corporation has a 10% or greater ownership interest in Citadel Securities GP LLC.

December 14, 2022

*/s/ Adam L. Hoeflich*
Adam L. Hoeflich
BARTLIT BECK LLP
54 W. Hubbard Street, Ste 300
Chicago, IL 60654
(312) 494-4400
adam.hoeflich@bartlitbeck.com

## STATEMENT REGARDING ORAL ARGUMENT

Given that the district court's decision is consistent with well-settled pleading standards, Citadel Securities believes that oral argument is unnecessary.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................... C-1

CORPORATE DISCLOSURE STATEMENT ...................................... C-4

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS ............................................................. ii

TABLE OF AUTHORITIES ........................................................ v

STATEMENT OF THE ISSUES ................................................... 1

INTRODUCTION .................................................................... 3

STATEMENT OF THE CASE .................................................... 7

I.     STATEMENT OF FACTS ................................................ 7

       A.    The securities markets as of January 27, 2021 ..................... 8

       B.    Retail investor activity drives increased volatility,
             increased collateral requirements, and brokerage
             restrictions ................................................................ 10

II.    PROCEDURAL HISTORY .............................................. 14

III.   STANDARD OF REVIEW ............................................... 16

SUMMARY OF THE ARGUMENT ............................................ 17

ARGUMENT ....................................................................... 20

I.     Plaintiffs did not plausibly allege the existence of an
       agreement to restrain trade ............................................. 20

       A.    The district court correctly considered the obvious
             alternative explanation for the conduct Plaintiffs allege ..... 22

B.   Plaintiffs' "direct" allegations of a conspiracy is a single email sent in the course of ordinary business ......................25

C.   Plaintiffs' "circumstantial" allegations of a conspiracy show only lawful behavior between business partners ........28

    1.   Plaintiffs' conclusory "interfirm communications" allegations do not support a plausible inference of an illegal agreement. ....................................................29

    2.   Plaintiffs' allegations of motive do not support an inference of a conspiracy. ..............................................32

    3.   Plaintiffs' "acts of concealment" allegations reflect run-of-the-mill communications between business partners. ......................................................................35

    4.   Plaintiffs' allegations about "concerted pretextual explanations" show that a collateral demand, not a conspiracy, led to trading restrictions. .....................37

    5.   Plaintiffs' "market structure" and "market behavior" allegations cut against a plausible inference of conspiracy. .................................................39

D.   The district court examined Plaintiffs' allegations holistically ............................................................................42

II.   The district court correctly found that Plaintiffs had not alleged a claim under the Rule of Reason .....................................43

A.   Because they never alleged the "relevant market" in which harm occurred, Plaintiffs failed to plead an unreasonable restraint .........................................................45

B.   Plaintiffs' antitrust standing arguments address a different question from the one on appeal ...........................51

    1.   Because Plaintiffs failed to allege a Section 1 claim, standing is not at issue. ....................................52

2.    Plaintiffs' standing arguments do not address
their failure to allege a relevant market in which
the harm to competition occurred................................53

C.    Plaintiffs' remaining arguments do not reveal error ...........56

CONCLUSION .........................................................................58

# TABLE OF AUTHORITIES

## Cases

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
 683 F.3d 328 (7th Cir. 2012) ................................................................. 51

*Am. Dental Ass'n v. Cigna Corp.,*
 605 F.3d 1283 (11th Cir. 2010) ..................................................... 23, 31

*Amey, Inc. v. Gulf Abstract & Title, Inc.,*
 758 F.2d 1486 (11th Cir. 1985) ..................................................... 53, 54

*\*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ................................................................... *passim*

*Associated Gen. Contractors of Cal., Inc. v.*
 *Cal. State Council of Carpenters,*
 459 U.S. 519 (1983) ............................................................................ 56

*Auto. Alignment & Body Serv., Inc. v.*
 *State Farm Mut. Auto Ins. Co.,*
 953 F.3d 707 (11th Cir. 2020) ........................................................... 23

*\*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007) ................................................................... *passim*

*Blue Shield of Va. v. McCready,*
 457 U.S. 465 (1982) ..................................................................... 54, 55

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
 429 U.S. 477 (1977) ............................................................................ 53

*Brunswick Corp. v. Riegel Textile Corp.,*
 752 F.2d 261 (7th Cir. 1984) ............................................................. 56

*Calzadilla v. Banco Latino Internacional,*
 413 F.3d 1285 (11th Cir. 2005) ......................................................... 26

*Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*,
   710 F.2d 752 (11th Cir. 1983) .................................................. 54, 55, 56

*Credit Suisse Sec. (USA) LLC v. Billing*,
   551 U.S. 264 (2007) ............................................................................ 49

*Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
   123 F.3d 301 (5th Cir. 1997) ............................................................. 52

*Ekbatani v. Cmty. Care Health Network, LLC*,
   No. 21-12322, 2022 WL 31793 (11th Cir. Jan. 4, 2022)
   (per curiam) ........................................................................................ 56

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
   466 F.3d 961 (11th Cir. 2006) ........................................................... 56

*Hairston v. Pac. 10 Conf.*,
   101 F.3d 1315 (9th Cir. 1996) ........................................................... 52

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ............................................................................ 55

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) .............................................................. 40

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012) .......................................................... 36, 37

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
   626 F.3d 1327 (11th Cir. 2010) .................................................. *passim*

*Jes Props., Inc. v. USA Equestrian, Inc.*,
   458 F.3d 1224 (11th Cir. 2006) ......................................................... 52

*Kalmanovitz v. G. Heileman Brewing Co.*,
   769 F.2d 152 (3d Cir. 1985) ................................................... 6, 20, 49

*Laskar v. Peterson*,
   771 F.3d 1291 (11th Cir. 2014) ......................................................... 13

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ............................................................. 50

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
   72 F.3d 1538 (11th Cir. 1996) ................................. 44, 50, 52

*Loeb Indus., Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) ......................................... 54, 55

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) .......................................... 26, 33

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
   734 F.2d 705 (11th Cir. 1984) (per curiam) ....................... 56

*Nat'l Mining Ass'n v. United Steel Workers*,
   985 F.3d 1309 (11th Cir. 2021) .......................................... 58

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ..................................... 19, 44, 48, 50

*Procaps S.A. v. Patheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) .......................................... 44

*\*Quality Auto Painting Ctr. of Roselle, Inc. v.
   State Farm Indem. Co.*,
   917 F.3d 1249 (11th Cir. 2019) (en banc) ................... *passim*

*Sicor Ltd. v. Cetus Corp.*,
   51 F.3d 848 (9th Cir. 1995) ............................................... 52

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
   376 F.3d 1065 (11th Cir. 2004) .......................................... 16

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   No. 1:09-cv-00560-LJO-BAM, 2013 WL 595122 (E.D. Cal. Feb.
   15, 2013), *aff'd*, 803 F.3d 1084 (9th Cir. 2015) ................... 39

*Supermarket of Marlinton, Inc. v. Valley Rich Dairy*,
   161 F.3d 3 (4th Cir. 1998) (per curiam) ............................ 52

*Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div.*,
   932 F.2d 1384 (11th Cir. 1991) ..........................................21

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) ..........................................52

*Universal Express, Inc. v. S.E.C.*,
   177 F. App'x 52 (11th Cir. 2006) (per curiam) ...................13

*Williamson Oil Co. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003) ..........................................30

**Statutes**

15 U.S.C. § 1 ................................................................... *passim*

**Rules**

Fed. R. Civ. P. 8.............................................................21, 34

**Regulations**

17 C.F.R. § 240.10 ...............................................................9

**Other Authorities**

SEC, *Staff Report on Equity and Options Market Structure
   Conditions in Early 2021* (Oct. 14, 2021), *available at*
   https://www.sec.gov/files/staff-report-equity-options-market-
   struction-conditions-early-2021.pdf........................ 12, 13, 25

Shortening the Securities Transaction Settlement Cycle,
   87 Fed. Reg. 10436 (Feb. 24, 2022).......................... 12, 13, 25

U.S. House Comm. on Fin. Servs., 117th Cong., *GAME STOPPED:
   How the Meme Stock Market Event Exposed Troubling Business
   Practices, Inadequate Risk Management, and the Need for
   Legislative and Regulatory Reform* (June 2022), available at
   https://financialservices.house.gov/uploadedfiles/6.22_hfsc_gs.
   report_hmsmeetbp.irm.nlrf.pdf .............................. 12, 13, 25

## STATEMENT OF THE ISSUES

1.    On January 27, 2021, trading by retail investors and social media enthusiasm drove a precipitous increase in the price and volatility of certain securities.  The historic and unprecedented volumes that followed caused clearinghouses to impose additional collateral requirements on brokerages that handled trades in these securities, with one clearinghouse requiring $3 billion of increased collateral from Robinhood alone.  As a result of these increased collateral requirements, Robinhood (like other brokerages not named as defendants here) restricted its customers (including Plaintiffs) from buying these volatile "meme stocks."  Was it proper for the district court, which found that Plaintiffs' allegations did not plausibly allege an unlawful agreement, to consider the obvious alternative explanation that Robinhood restricted trading because its clearinghouse required it to post $3 billion in additional collateral in response to market volatility?

2.    Plaintiffs alleged that Citadel Securities and Robinhood had a vertical relationship in two markets—an upstream PFOF Market and a downstream No-Fee Brokerage Trading App Market—but they claimed harm in a third, unidentified market relating to securities whose prices

decreased.  Given that the Rule of Reason requires Plaintiffs to allege the relevant market in which a harm to competition occurred, did the district court properly hold that Plaintiffs failed to allege harm in a relevant market?

## INTRODUCTION

This case involves settled requirements for pleading an antitrust claim. Plaintiffs invested in "meme stocks" whose prices rose sharply during the week of January 25, 2021 and later dropped after several brokerage firms imposed temporary trading restrictions. Plaintiffs brought lawsuits alleging securities, state law, and antitrust claims against market participants to recover for alleged trading losses. This case is part of the ensuing MDL. On appeal is Plaintiffs' challenge to the district court's dismissal of their antitrust complaint, in which they sued Robinhood, one of many brokerages that imposed trading restrictions, and Citadel Securities, one of several market-makers who filled securities orders for Robinhood and other brokerages. Plaintiffs allege that Robinhood imposed trading restrictions because of an unlawful agreement with Citadel Securities and thus caused their investing losses.

The district court properly concluded that Plaintiffs' speculative and conclusory claim of an antitrust conspiracy did not satisfy the plausibility test of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Plaintiffs allege a vertical nonprice restraint under Section 1 of the Sherman Act. Companies in a preexisting vertical relationship, like

brokerages and the market makers that fill their customer orders, interact all the time.  As the district court's comprehensive review of the complaint revealed, there is nothing unusual or suspect—let alone conspiratorial—about the normal-course business interactions alleged in this case.

What's more, the district court was correct to recognize the obvious alternative explanation for Robinhood's trading restrictions.  Shortly before Robinhood, and other brokerages not alleged to have been part of a conspiracy, put trading restrictions in place, the clearinghouses which guarantee settlement of trades responded to the volatility in "meme stock" share prices by requiring massive additional collateral from brokerages handling retail orders, including *$3 billion* in additional collateral from Robinhood alone, as Plaintiffs themselves allege.  Nothing in the case law required the district court to ignore these allegations. Likewise, the U.S. Securities and Exchange Commission and the U.S. House of Representatives Financial Services Committee each reported after their own extensive examinations of the events underlying this case that the demand for massive additional collateral led to Robinhood's trading restrictions.

Under *Twombly*, it is not enough for a complaint to plead a conceivable conspiracy; it must also possess enough "heft to show that the pleader is entitled to relief" and to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." 550 U.S. at 556-57 (cleaned up); *see also Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1261 (11th Cir. 2019) (en banc). The district court properly held that plaintiffs did not plausibly plead a conspiracy in violation of Section 1 of the Sherman Act.

Antitrust plaintiffs must also plausibly plead "the relevant market in which the harm occur[ed]." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010). Alleged in this case is an "anticompetitive scheme to restrict Retail Investors' access to specific securities in the stock market," which "reduced the price of the Relevant Securities that Retail Investors either sold or held below the prices that they would have otherwise obtained in a competitive market free of collusion." Am. CCAC[1] ¶¶ 1, 16.

---

[1] "Am. CCAC" or "Amended Complaint" refers to the January 20, 2022 Amended Consolidated Class Action Complaint (Dkt. No. 451), filed in this Court in Volume II of Appellants' Appendix on October 21, 2022.

The district court properly held that the Amended Complaint, alleging an upstream PFOF Market (referring to the price market makers pay brokerages for retail orders) and a downstream No-Fee Brokerage Trading App Market (referring to the market for mobile apps offered by brokerages) did not plausibly plead the relevant market in which the harm occurred, especially given that the alleged harm was to the price of securities, not to the alleged PFOF or mobile brokerage trading app markets. Plaintiffs plead as they do because the Sherman Act does not reach the purchase and sale of individual securities. *Kalmanovitz v. G. Heileman Brewing Co.*, 769 F.2d 152, 156 (3d Cir. 1985). Given the insurmountable market definition challenges, the district court properly found that Plaintiffs' own "garbled" market theory doomed their complaint. Order[2] at 2, 51. On appeal, Plaintiffs do not engage with the district court's conclusion but instead focus on why they have standing, which was not briefed below and is not at issue now. This Court should affirm the dismissal of the Amended Complaint.

---

[2] "Order" refers to the May 13, 2022 Order granting Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 470), filed in this Court in Volume III of Appellants' Appendix on October 21, 2022.

## STATEMENT OF THE CASE

### I.    STATEMENT OF FACTS

In the closing days of January 2021, the securities markets roiled as Plaintiffs and others—flocking to "online financial discussion forums like Reddit, Facebook, and TikTok" where they obtained investment advice on forums called "WallStreetBets" and from users named "Roaring Kitty"—piled into the Relevant Securities.  Am. CCAC ¶¶ 64, 127-32; *see also id.* ¶ 7 (defining "Relevant Securities").  GameStop (GME) was a primary object of Plaintiffs' interest.  *Id.* ¶¶ 127-32.

Share prices for GameStop increased from $2 in 2019 to $43.03 on January 21, 2021.  *Id.* ¶¶ 130-32.  From January 21 to January 27, GameStop's share price underwent what Plaintiffs describe as an "epic price surge," fueled by continuing social media promotion including Elon Musk's "Gamestonk!!" tweet.  *Id.* ¶¶ 136-37.  By January 27, GameStop's share price hit a high of $380.  *Id.* ¶ 137.  The Relevant Securities all experienced similar increases.  *Id.* ¶¶ 145-53.

There is no doubt that this was a "period of volatility."  *Id.* ¶ 358. At 5:00 p.m. on January 27, the SEC issued a statement that it was

"actively monitoring the on-going market volatility in the options and equities markets." *Id.* ¶ 144 (internal quotation marks omitted).

### A. The securities markets as of January 27, 2021

As Plaintiffs' allegations make clear, the market conditions of January 2021 generated vibrations across the infrastructure within which securities are traded. This infrastructure consists of four general pieces: brokerages, market makers, clearinghouses, and investors themselves. Am. CCAC ¶¶ 83-88. At a high level, brokerages have relationships with individual investors, who place orders that the brokerages route to market makers to complete the trades—*e.g.*, to match a buyer with a seller. *Id.* Clearinghouses ensure that the trades settle. *Id.* To understand the events of January 27 and 28, each piece of this infrastructure warrants a closer look.

Plaintiffs define the brokerages at issue as "zero account-minimum, no-fee brokerages that [ ] offer a user-friendly mobile app to Retail Investors to place orders" to buy and sell stocks, options, and other securities. *Id.* ¶ 312. These brokerages include Robinhood, Charles Schwab, E*Trade, and TD Ameritrade. *Id.* ¶ 313. No-fee brokerages receive payment for order flow (PFOF), in which they charge market

makers a fee for routing their customers' orders to that market maker. *Id.* ¶¶ 8, 73-78, 84. The amount of PFOF is based on the volume of orders filled by the market maker. *Id.* ¶¶ 75, 221. The SEC permits PFOF. *See id.* ¶¶ 79-80; 17 C.F.R. § 240.10b-10.

Market makers assist brokerages by handling orders, whether by filling them from their inventory or from a third party through an exchange or other market. Am. CCAC ¶¶ 8-10. Citadel Securities is one of many market makers; others include G1 Execution Services, Global Execution Brokers, Two Sigma Securities, Wolverine Securities, LLC, and Virtu Americas, LLC. *Id.* ¶¶ 281, 306-07.

After a brokerage has routed the order to a market maker, which handles the order, a clearinghouse must ensure that the order settles. *Id.* ¶¶ 87-88. For an order to settle, the security and money must exchange hands. *Id.* ¶ 87. This process takes two days. *Id.* The two-day delay creates a risk that one party to a trade will not meet its obligations to deliver the security or the cash. *See id.* ¶¶ 87-90. To guard against this risk, a clearinghouse requires brokers to pay a deposit—also known as "collateral" or "margin"—that the clearinghouse holds until the trade

is settled. *Id.* ¶¶ 90, 374. The amount of deposit is based on risk factors like market volatility. *Id.* ¶ 90.

## B. Retail investor activity drives increased volatility, increased collateral requirements, and brokerage restrictions

On January 27, retail investors crowded into the securities markets. Am. CCAC ¶ 137. Meme stock prices "soared" over a matter of days, with each of the Relevant Securities seeing price increases around 100% and 300% over the days prior. *Id.* More than 24 billion shares were exchanged—a new record. *Id.* Acknowledging this unprecedented activity, the SEC issued a warning about "on-going market volatility." *Id.* ¶ 144 (internal quotation marks omitted). This volatility was noteworthy to the clearinghouses, which must ensure that all of these trades properly settle. *See id.* ¶¶ 87-90, 178.

On January 28, at 5:11 a.m., the National Securities Clearing Corporation ("NSCC") sent Robinhood a notice requiring it to deposit an additional $3 billion in collateral. *Id.* ¶ 178. This marked a tenfold increase over what NSCC had required just days earlier. *Id.* ¶ 262. After receiving the notice, Robinhood raised over $1 billion "to help meet rising demands for cash" and accessed over $500 million in credit "to ensure it

had the capital required to keep allowing its clients to trade the Relevant Securities." *Id.* ¶ 261. Like many other brokerages, Robinhood also temporarily restricted its customers from purchasing the Relevant Securities that were driving the volatility. *Id.* ¶ 180. Robinhood imposed a "position close only" restriction on the Relevant Securities, which allowed Robinhood customers to sell the securities but not to make additional purchases. *Id.* ¶¶ 179, 186, 189.

At least eleven other brokerages also imposed trading restrictions relating to these securities during this period of market volatility, including Ally, Charles Schwab, Dough, E*Trade, Interactive Brokers, Public.com, SoFi, Stash, Tastyworks, TD Ameritrade, and Webull. *Id.* ¶¶ 195, 365-68.[3] Following these limitations, the prices of the Relevant Securities declined. Am. CCAC ¶ 199.

Robinhood publicly explained that it imposed trading restrictions due to volatility and collateral requirements. *Id.* ¶ 411. Regulators reached the same conclusion. After investigating the trading restrictions

---

[3] Although Plaintiffs previously alleged that many of these brokerages were part of the purported conspiracy, they no longer contend that these brokerages' trading restrictions were the result of an allegedly improper agreement. *See* Supp. App., Dkt. No. 358 (Consolidated Class Action Complaint).

imposed by many brokers in late January, the SEC concluded that "brokers experienced intraday margin calls from a clearinghouse" and "[i]n reaction, some broker-dealers decided to restrict trading." SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021* at 43 (Oct. 14, 2021), *available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf [hereinafter, "SEC Staff Report"]. The SEC echoed this view during subsequent rulemaking designed to address the collateral issue, finding that broker-dealers restricted trading in light of collateral costs in January 2021, "following heightened interest in certain 'meme' stocks." *See* Shortening the Securities Transaction Settlement Cycle, 87 Fed. Reg. 10436, 10482 n.337 (Feb. 24, 2022) (hereinafter, "Proposed Rule"). Likewise, the U.S. House Committee on Financial Services majority report concluded that Robinhood's trading restrictions arose from the unprecedented and unexpected collateral requirement: "[f]aced with an extremely large deposit requirement … [Robinhood] attempted to mitigate the volatility that it believed was driving its collateral deposit requirements." U.S. House Comm. on Fin. Servs., 117th Cong., *GAME STOPPED: How the Meme Stock Market Event Exposed Troubling*

*Business Practices, Inadequate Risk Management, and the Need for Legislative and Regulatory Reform* at 72 (June 2022), available at https://financialservices.house.gov/uploadedfiles/6.22_hfsc_gs.report_hmsmeetbp.irm.nlrf.pdf [hereinafter, "*Game Stopped* Report"]. It reached a similar conclusion for other brokerages. *Id.* at 76.[4]

Plaintiffs have alleged a nefarious motive behind Robinhood's decision to impose these trading restrictions (but only Robinhood's decision, and not the similar decisions of other brokerages). Am. CCAC ¶ 1. They allege that Robinhood and Citadel Securities "hatched an anticompetitive scheme to limit buy-side trading in the Relevant Securities." *Id.* ¶ 154; *see also id.* ¶ 13 (alleging agreement that "artificially suppressed" prices of "securities that would have otherwise traded freely on the stock market"). Plaintiffs further allege that Citadel Securities possessed short positions in the Relevant Securities which purportedly gave it a motive to force Robinhood—and for some reason only Robinhood—to restrict trading in the stock market. *Id.* ¶¶ 298, 394.

---

[4] The Court may take judicial notice of the SEC Staff Report, Proposed Rule, and *Game Stopped* Report, as "public records are among the permissible facts a [ ] court may consider." *Laskar v. Peterson*, 771 F.3d 1291, 1295 n.3 (11th Cir. 2014); *see also Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (per curiam) (same).

Although Plaintiffs concede that generally "it is not possible to ascertain which investor has a short position in a particular security at any particular time," they still made conclusory allegations that Citadel Securities sought to exit those positions. *Id*.

## II.  PROCEDURAL HISTORY

In the order on appeal, the district court dismissed with prejudice Plaintiffs' attempt (their third) to plead an antitrust claim.  Background leading up to that dismissal follows.

Shortly after the stock prices for certain meme stocks dropped, Plaintiffs filed multiple lawsuits in federal courts alleging securities claims, state law claims, and antitrust claims against a variety of defendants.  The Judicial Panel on Multidistrict Litigation transferred related complaints to the Southern District of Florida.  *In re January 2021 Short Squeeze Trading Litig.*, Case No. 1:21-md-02989-CMA (S.D. Fla.).  The district court divided the various claims into four "tranches." This appeal addresses only the Antitrust Tranche.  Plaintiffs' securities suits against Robinhood based on substantially the same facts survived

motions practice and continue to proceed.  *See* App. Vol III[5], Dkt. No. 503 at 52 (denying motion to dismiss the Securities Tranche).[6]

In their first complaint, plaintiffs alleged that 35 defendants agreed to participate in a "large, overarching conspiracy to prevent the market from operating freely."  *See, e.g.*, Supp. App., Dkt. No. 1 at 1 (*Cheng v. Ally Fin. Inc.*, No. 3:21-cv-00781 (N.D. Cal.)).  Once in the MDL, the district court ordered the defendants, including Robinhood and Citadel Securities, to produce discovery comprising "[r]ecords already produced by Defendants to Congress and other government entities."  Supp. App., Dkt. No. 323 at 2.

With the benefit of tens of thousands of pages of discovery, Plaintiffs prepared their Antitrust Tranche complaint.  Supp. App., Dkt. Nos. 358, 408.  They alleged that 15 "market players hatched an

---

[5] Citations to Plaintiffs' Appendix will be in the form "App. Vol. #, Dkt. No. # at Page." Citations to Defendant's Supplemental Appendix will be in the form "Supp. App., Dkt. No. # at Page."

[6] In the two other tranches, Plaintiffs alleged tort claims against Robinhood and the other brokerages.  The Other Broker Tranche was dismissed.  Supp. App., Dkt. No. 450.  The Robinhood Tranche was dismissed with prejudice.  Supp. App., Dkt. No. 453.  It is now on appeal.  *See generally Juncadella v. Robinhood Fin. LLC*, No. 22-10669 (11th Cir.).

anticompetitive scheme to restrict Retail Investors' access to the stock market and prevent the market from operating freely and fairly." Supp. App., Dkt. No. 358 ¶¶ 1, 42-76. Defendants moved to dismiss, and after briefing the district court concluded that Plaintiffs failed to allege an unlawful agreement and dismissed their claims without prejudice. Supp. App., Dkt. No. 438 at 50.

In the third complaint—the Amended Complaint at issue in this appeal—Plaintiffs dropped 13 of the 15 initial defendants, leaving only Robinhood and Citadel Securities—despite the other brokerages' having imposed restrictions similar to those Robinhood imposed. Am. CCAC ¶¶ 42-49. On May 13, 2022, the district court dismissed the Amended Complaint, as Plaintiffs failed to plausibly allege (1) an agreement or (2) the relevant market in which the purported harm occurred. Order at 52-53. Plaintiffs filed their Notice of Appeal on June 1, 2022. Supp. App., Dkt. No. 474.

## III. STANDARD OF REVIEW

This Court reviews the decision to dismiss an antitrust complaint for failure to state a claim *de novo*. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004).

16

## SUMMARY OF THE ARGUMENT

To adequately allege a Section 1 claim, Plaintiffs must plausibly show (1) an agreement that (2) unreasonably restrains trade. *See Quality Auto Painting*, 917 F.3d at 1260-61. The district court correctly found that Plaintiffs did not adequately allege either element.

First, Plaintiffs did not plausibly allege an agreement between Robinhood and Citadel Securities. Not only are there no plausible allegations of an unlawful agreement to restrict trading, the Amended Complaint pleads an obvious alternative explanation for Robinhood's conduct—the historic market volatility and related significant collateral requirements that led Robinhood (and many other brokerages not named as defendants) to impose trading restrictions. Plaintiffs unsuccessfully attempt to wave off this explanation by arguing that a district court may not consider alternative explanations. That is wrong. The Federal Rules not only permit but require a court to take these explanations into account. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* Under this Court's

precedent, Plaintiffs must present allegations showing why an unlawful conspiracy is "more plausible" than ordinary, lawful conduct. *Jacobs*, 626 F.3d at 1342.

Plaintiffs contend that they alleged both direct and indirect evidence showing a conspiracy. They failed to allege either. Indeed, Plaintiffs did not argue in the district court that they had direct evidence of an agreement. *See* Order at 26-27 (noting that Plaintiffs did not argue that they had direct evidence). They cannot present these new arguments on appeal. *See infra* at 26 n.7. Nor do Plaintiffs allege sufficient indirect, or circumstantial, evidence. Because Plaintiffs had the benefit of significant discovery before preparing their complaint, they have had access to a large volume of communications between Robinhood and Citadel Securities. But the communications they allege in their complaint concern normal exchanges between companies in a business relationship, not an unlawful agreement. *See* Am. CCAC ¶ 242 (Robinhood email asking for "the new Citadel numbers"). Likewise, Plaintiffs fail to plausibly allege a motive for Citadel Securities and Robinhood to agree to restrict trade. Plaintiffs do not allege that Citadel Securities attempted to stop any brokerage from submitting orders for

the Relevant Securities (other than Robinhood) or that Citadel Securities stopped filling orders in the Relevant Securities for any broker who placed them.

Second, Plaintiffs failed to allege an unreasonable restraint of trade. Plaintiffs have alleged the existence of *two* markets here—but neither market is the one in which competition was allegedly harmed. Plaintiffs do not contest that their claims are properly considered under the Rule of Reason, App. Br. at 40 n.15, which first requires Plaintiffs to define the market in which the harm occurred, as "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market." Order at 47 (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)). Here, Plaintiffs have failed to allege harm in a "relevant market." *Jacobs*, 626 F.3d at 1336.

The district court found that rather than identifying harm in the two identified markets—the PFOF market and the No-Fee Brokerage Trading App Market——Plaintiffs instead alleged harm to competition in a separate market: the securities market. Order at 49-50. Indeed, the Amended Complaint alleges an "anticompetitive scheme to restrict Retail Investors' access to specific securities in the *stock market*." Am. CCAC

¶ 1 (emphasis added).  The stock market is not one of the markets that Plaintiffs allege to be relevant.  (Nor could it be, as the Sherman Act does not reach the purchase and sale of individual securities. *Kalmanovitz*, 769 F.2d at 156.)  This mismatch is fatal to their claims.

Rather than address this deficiency, Plaintiffs attempt to divert this Court's attention by citing to a number of "antitrust standing" cases.  They are irrelevant.  These cases address whether a plaintiff can enforce an already established claim where harm has been alleged in a relevant market—and the claim on appeal was never adequately alleged.

Given the deficiencies in Plaintiffs' arguments, this Court should affirm the district court's dismissal of the Amended Complaint.

## ARGUMENT

### I.    Plaintiffs did not plausibly allege the existence of an agreement to restrain trade

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

To allege a plausible claim, the complaint must allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," then the plaintiff has not shown that he or she is entitled to relief under Rule 8(a). *Iqbal*, 556 U.S. at 679. An antitrust plaintiff asserting a conspiracy to restrain trade must provide allegations that "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Quality Auto Painting*, 917 F.3d at 1261 (quoting *Twombly*, 550 U.S. at 556); *see also Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div.*, 932 F.2d 1384, 1388 (11th Cir. 1991) ("The first inquiry[ ] in any [S]ection 1 claim . . . is to locate the agreement that restrains trade.").

Instead of plausibly suggesting an agreement, Plaintiffs ignore the obvious explanation for Robinhood's conduct and assert an account based solely on circumstantial allegations that is implausible in its own right. This is inadequate to state a claim.

## A. The district court correctly considered the obvious alternative explanation for the conduct Plaintiffs allege

The district court held that the Amended Complaint provides "an obvious alternative explanation for the trading restrictions: the increased collateral requirements imposed by the NSCC in response to unprecedented market volatility." Order at 41, 52 (internal quotation marks omitted). Plaintiffs argue that the district court erred by offering "its own admittedly alternative explanations" for the evidence on which Plaintiffs based their conspiracy allegations. App. Br. at 28-29 (cleaned up). According to Plaintiffs, the district court erred because "we are at the motion to dismiss stage, not the summary judgment stage"—so "'alternative explanations' are not a proper consideration." *Id.* at 29. This argument is flatly wrong. Contrary to Plaintiffs' arguments, courts are not required to check their common sense at the door when ruling on a motion to dismiss. In fact, courts must consider "more likely explanations," *Iqbal*, 556 U.S. at 681, and "obvious alternative explanation[s]," *Twombly*, 550 U.S. at 567. As the Supreme Court observed in *Iqbal*, the plaintiffs in *Twombly* had failed to "plausibly suggest an illicit accord because it was not only compatible with, but

indeed was more likely explained by, lawful, unchoreographed free-market behavior." 556 U.S. at 680. As this Court previously stated, a plaintiff has the burden of presenting allegations "showing why it is more plausible" that the defendants entered into an unlawful agreement than acted independently. *Jacobs*, 626 F.3d at 1342.

This Court regularly affirms where district courts considered such alternatives when dismissing a complaint for failure to state a claim. *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) ("[T]he Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." (cleaned up)); *see also Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto Ins. Co.*, 953 F.3d 707, 728-29 (11th Cir. 2020) (dismissing antitrust complaint because the loss of business that plaintiffs alleged "could just as plausibly be explained by any number of legitimate market forces"); *Quality Auto Painting*, 917 F.3d at 1266 (dismissing antitrust complaint because "legitimate business strategy" rationally "explain[s] why there is uniformity in price").

And in this case, the obvious alternative explanation—which is found in Plaintiffs' own allegations—is impossible to ignore. Between January 21 and January 27, 2021, the prices of the Relevant Securities skyrocketed: GameStop, for instance, jumped from $43 to $380. Am. CCAC ¶¶ 130-32, 137; *see also id.* ¶¶ 145-53 (alleging similar increases for other Relevant Securities). On January 27, the SEC stated it was "actively monitoring the on-going market volatility." *Id.* ¶ 144 (internal quotation marks omitted). Early the next morning, Robinhood's clearinghouse, the NSCC, issued a notice that Robinhood needed to provide $3 billion in additional collateral. *Id.* ¶ 178. These collateral requirements are based on risk factors like market volatility. *Id.* ¶¶ 88-90. As Plaintiffs allege, Robinhood went on to raise more than $1.5 billion in additional funds "to ensure it had the capital required to keep allowing its clients to trade the Relevant Securities." *Id.* ¶ 261. The restrictions that Robinhood imposed were far from unique. *Id.* ¶¶ 195, 365-68. Nearly a dozen other brokerages also imposed trading restrictions during the same period relating to these securities. *Id.*

Taken together, these allegations show that Robinhood's trading restrictions occurred in a context of unprecedented market volatility

giving rise to significantly increased new collateral requirements from clearinghouses, and comparable trading restrictions from other brokerages *not* alleged to be part of the conspiracy. These allegations lead to an obvious alternative explanation: the restrictions arose as a result of market volatility and collateral requirements, not because of an unlawful agreement. Governmental regulators have reached the same conclusion: reports from the SEC and from the U.S. House Committee on Financial Services found that Robinhood imposed its restrictions only after receiving "an extremely large deposit requirement on the morning of January 28, 2021 . . . which Robinhood would have been unable to satisfy." *Game Stopped* Report at 72; *see also generally* SEC Staff Report; Proposed Rule. In "draw[ing] on its judicial experience and common sense," the district court properly considered the alternative explanations—again, drawn from Plaintiffs' own complaint—for the alleged conduct. *Iqbal*, 556 U.S. at 679.

### B.  Plaintiffs' "direct" allegations of a conspiracy is a single email sent in the course of ordinary business

Plaintiffs claim on appeal to have provided "direct evidence that Robinhood was 'on board' with imposing the restrictions to save Citadel from massive losses if the short squeeze continued unabated." App. Br.

at 28.  This argument—which Plaintiffs abandoned at the district court —is not just inconsistent with Plaintiffs' Amended Complaint.[7]  *See* Am. CCAC ¶ 233 ("[T]he details of these communications have not yet been disclosed . . . .").  It is also wrong.  A showing of direct evidence of a conspiracy is only met when plaintiff alleges the existence of a conspiracy through evidence that does not require reliance on any inferences.  *See Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Direct evidence of an agreement in violation of the antitrust laws "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Id*.

Plaintiffs' allegations fail to clear this high bar.  Plaintiffs argue the alleged direct evidence via a single email in which a Robinhood employee

---

[7] When Defendants moved to dismiss Plaintiffs' original MDL Complaint, Plaintiffs argued that they had alleged a conspiracy through direct evidence.  *See* Supp. App., Dkt. No. 438 at 27-31.  After the District Court rejected Plaintiffs' argument, Plaintiffs chose not to advance it again when responding to Defendants' motion to dismiss the Amended Complaint—so the District Court did not address it.  *See* Order at 26-27 ("Plaintiffs do not argue [that the Amended Complaint contained direct evidence of an agreement] and instead focus on whether there is circumstantial evidence of an agreement.").  Accordingly, this Court should refuse to consider Plaintiffs' direct-evidence argument on appeal. *See Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1287 (11th Cir. 2005) ("Generally, this court does not consider an issue or theory on appeal that was not raised in the district court.").

states: "We are on board." *See* App. Br. at 3, 23, 28. While Plaintiffs contend on appeal that email is a "smoking gun" subject to "no other reasonable inference" than confirmation of a conspiracy, the Amended Complaint explicitly recognizes that Plaintiffs do not know "the details of these communications." *Id.* at 3, 23; Am. CCAC ¶ 233. Plaintiffs made the same concession in briefing the motion to dismiss before the district court, expressly acknowledging that "the substance of the communications" leading to this email were not known. App. Vol. III, Dkt. 459 at 9.

Plaintiffs' bald-faced reversal aside, and as the district court properly found, Robinhood and Citadel Securities have a preexisting business relationship. They of course communicate and regularly enter into agreements in the normal course of business. This singular email is far from a recorded phone call in which two competitors agreed to fix prices. Plaintiffs allege nothing further that shows Robinhood was "on board" with a conspiracy to restrain trade—as opposed to any other aspect of the parties' established (and legal) business relationship. *See* Am. CCAC ¶¶ 73, 76-78. This is not "smoking gun evidence." App Br. at 3. Plaintiffs have not alleged direct evidence of a conspiracy.

### C. Plaintiffs' "circumstantial" allegations of a conspiracy show only lawful behavior between business partners

Plaintiffs also claim to have presented sufficient circumstantial allegations of a Section 1 conspiracy. Their purported circumstantial allegations fall into five categories: (1) interfirm communications; (2) common motive to conspire; (3) acts of concealment; (4) concerted pretextual explanations; and (5) market structure and behavior.[8] App. Br. at 28-39.

As the district court properly found, Plaintiffs' allegations (both individually and together) do not create a plausible inference of conspiracy. Further, none defeats the "obvious alternative explanation" that Robinhood—just like many other brokerages—imposed trading restrictions to address heightened market volatility and the collateral requirements that followed. *See Twombly*, 550 U.S. at 554 (allegations of coordinated conduct "prompted by common perceptions of the market"

---

[8] Plaintiffs spread their purported circumstantial allegations across two sections of their brief: one addressing the "who, what, where, when, how, and why of the conspiracy" and another addressing "plus factors plausibly establishing a conspiracy." App. Br. at 22, 26. For the sake of clarity, Citadel Securities considers all of Plaintiffs' circumstantial allegations at one time.

do not give rise to an inference of unlawful agreement). Dismissal is appropriate where, as here, well-pleaded facts do not permit the court to infer anything more than "the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

> ### 1. Plaintiffs' conclusory "interfirm communications" allegations do not support a plausible inference of an illegal agreement.

Plaintiffs argue that the district court failed to properly consider "interfirm communications between high-level employees of Citadel and Robinhood leading up to the imposition of the January 28 trading restrictions." App Br. at 28. But the various communications that Plaintiffs cite do not create a reasonable inference that Citadel Securities and Robinhood conspired to restrict trading. Neither the timing nor the substance of the communications Plaintiffs cite indicates (or even suggests) that Citadel Securities had advance notice of Robinhood's decision to restrict on trading of any of the Relevant Securities, much less that Citadel Securities manufactured a conspiracy to impose those restrictions.

It is unsurprising that Robinhood and Citadel Securities communicated in the days leading up to January 28. As the Amended

Complaint alleges, trading levels reached unprecedented volume in the runup to January 28, leading to increased volatility. Am. CCAC ¶ 137 ("On January 27, 2021 . . . trading volumes in U.S. cash equities and options hit an all-time record level at 24.5 billion shares traded and 57.1 million contracts traded."); ¶ 144 ("[O]n January 27, 2021, the SEC released a statement that it was 'aware of and actively monitoring the on-going market volatility in the options and equities markets.'"). As the district court rightly held: "Given the PFOF relationship between Robinhood and Citadel Securities"—a key factor of which is the volume of orders sent to Citadel Securities, *see id.* ¶¶ 75, 221—"it would be understandable for employees [at Robinhood and Citadel Securities] . . . to communicate about what impact the squeeze might have on each party's ability to fulfill its obligations." Order at 36-37. The timing and frequency of communications between Robinhood and Citadel Securities shows—at most—that Robinhood and Citadel Securities had "an opportunity to conspire." Order at 35. But that is not sufficient to push Plaintiffs' conspiracy allegations from possible to plausible. *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1319 (11th Cir. 2003) ("[T]he mere opportunity to conspire among antitrust defendants does not,

standing alone, permit the inference of conspiracy." (internal quotation marks omitted)).

Neither is the substance of the communications that Plaintiffs rely on. Plaintiffs cite a variety of uncontextualized emails, *see* App. Br. at 24 (citing Am. CCAC ¶¶ 237, 239-46, 258-60)—none of which suggest that Robinhood and Citadel Securities conspired to restrict trading. *See* Order at 38 ("Plaintiffs admit they do not know the substance of these conversations [between Robinhood and Citadel Securities]." (internal quotations omitted)).  Contrary to Plaintiffs' argument, the district court is not required to adopt their explanation for these communications.  As the Supreme Court has stated, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  *See Twombly*, 550 U.S. at 567-68; *Am. Dental. Ass'n*, 605 F.3d at 1290. And here, the district court rightly held that the communications pleaded by Plaintiffs had an "obvious alternative explanation"—which is the existing business relationship between Robinhood and Citadel Securities.  *See Iqbal*, 556 U.S. at 678 (plaintiffs are only entitled to "reasonable inference[s]").

Plaintiffs' allegations of a few "vague and ambiguous communications," Order at 37, between Robinhood and Citadel Securities does not create a reasonable inference of an unlawful agreement.

> ## 2. Plaintiffs' allegations of motive do not support an inference of a conspiracy.

Plaintiffs argue that they plausibly alleged a common motive to conspire: Citadel Securities allegedly held a short position in the Relevant Securities that risked substantial losses and, by leveraging its PFOF payments, it coerced Robinhood—and none of the many other brokerages who restricted trading—into agreeing to the restrictions. *See, e.g.*, Am. CCAC ¶ 2. Even though Robinhood regularly routed trades for the Relevant Securities to other market makers who pay PFOF, Plaintiffs allege that Robinhood agreed to the wholesale restriction of trading given the importance of its business relationship with Citadel Securities and the prospect of an upcoming initial public offering. App. Br. at 30.

Plaintiffs have advanced an inadequate theory of motive. As the district court held, "[t]he mere fact that Citadel Securities is an important business partner of the other Defendants does not provide sufficient motive to conspire." Supp. App., Dkt. No. 438 at 37. Courts are often skeptical of allegations of common motive where the motive

32

reflects normal and ordinary market conduct.  In the context of horizontal conspiracies, allegations of common motive do not support an inference of conspiracy if they simply make the "legally insufficient" point that market participants acted in interdependent ways, as this is regular and lawful behavior.  *See Mayor & City Council of Balt.*, 709 F.3d at 138-39 (discussing inadequacy of alleged common motives for a horizontal conspiracy that were explained by interdependent conduct).  The same situation exists here.  If Plaintiffs can allege that a business relationship supports an inference of conspiracy, then virtually every allegation of vertical conspiracies will come out of the gate with an inference suggesting a conspiracy, as vertical conspiracies regularly involve pre-existing business relationships.

Moreover, Plaintiffs' alleged motive suffers from significant deficiencies.  Plaintiffs do not explain why Citadel Securities would have coerced only Robinhood into the trading restrictions and not any other brokerage.  They do not allege why Citadel Securities would need to coerce Robinhood into similar trading restrictions to those that all of Robinhood's competitors imposed without coercion.  There is also no valid explanation why Robinhood would submit to pressure on this front when

it could continue to route trades (and collect PFOF) from other market makers. And they do not allege that Citadel Securities itself ever stopped filling orders in the Relevant Securities. These deficiencies show that Plaintiffs failed to identify a plausible motive for Citadel Securities to encourage Robinhood, and Robinhood alone, to restrict trading.

Instead of addressing these gaps in their theory, Plaintiffs try to poke holes in the district court's holding. They contend that the district court erred in finding that their allegations were "somewhat speculative and conclusory." App. Br. at 31 (quoting Order at 31). The allegations *are* speculative and conclusory. And the district court did not misapply the legal standard in concluding that "[p]laintiffs' proffered motive theory . . . tenuously rests upon a series of inferences." Order at 31.

Plaintiffs contend that the district court made a second error when it concluded that they had not adequately alleged a motive. They argue that the district court inconsistently applied the Rule 8 standard because in the Securities Tranche it found that Robinhood had a motive to manipulate securities but in the Antitrust Tranche it did not find strong evidence of a motive to enter into the alleged anticompetitive agreement. App. Br. at 31 n.12. There was no inconsistency between these holdings.

34

In the Securities Tranche, plaintiffs alleged that Robinhood did not accurately describe the reasons for its trading restrictions, which plaintiffs alleged to include the massive collateral call.  App. Vol. III, Dkt. No. 503 at 29 (Robinhood had "implemented the restrictions because it did not have capital to pay the collateral requirements spawned by the volatile market.").   The Securities Tranche plaintiffs therefore acknowledged that the restrictions are explained by the collateral requirements, not an imagined conspiracy.  The massive collateral call exists in the Antitrust Tranche as well—but it contradicts Plaintiffs' concocted conspiracy, so Plaintiffs are attempting to argue that the collateral call was not an important factor.  Am. CCAC ¶ 1.  Plaintiffs, not the district court, are treating these allegations inconsistently.

### 3.  Plaintiffs' "acts of concealment" allegations reflect run-of-the-mill communications between business partners.

Plaintiffs claim to have alleged certain "acts of concealment" that should be considered evidence showing a conspiracy.  App. Br. at 32-33. But the acts that Plaintiffs identify—using "telephone calls" to communicate, "cop[ying] attorneys on emails," and touching base to "coordinate messaging," *see id.* at 32—only indicate that Citadel

Securities and Robinhood did business together. Plaintiffs do not point to any authority suggesting that these actions support an inference of a conspiracy, nor do they offer any allegations (other than their say-so) that suggest these actions were either abnormal or unlawful.

Plaintiffs rely on *In re Publication Paper Antitrust Litigation*, 690 F.3d 51 (2d Cir. 2012) (hereinafter, "*Publication Paper*"), claiming it held that "private phone calls and meetings—for which no social or personal purpose has been persuasively identified suggested conspiratorial communications." App. Br. at 32 (internal quotation marks omitted). That is not what *Publication Paper* held. If it did, every private communication between business partners would be presumed conspiratorial. Instead, the Second Circuit held—in a case involving an alleged horizontal price-fixing conspiracy between business competitors—that private phone calls and meetings between the business competitors were evidence of conspiracy because during those phone calls and meetings, the competitors "shared [ ] pricing strategies," "disclosed to each other their [ ] intentions to increase prices before those decisions had been publicly announced," and "developed a 'joint story' to conceal from the government the true nature of their communications."

36

*Publication Paper*, 690 F.3d at 65.   It was the content of the communications—not the standalone fact that they were conducted "private[ly]" or without a "social or personal purpose," App. Br. at 32— that drove the Second Circuit's holding.   And in this case, the alleged communications (which are between business *partners*, and which Plaintiffs themselves characterize as "vague," *id.*) are a far cry from the explicit price-fixing discussions between competitors at issue in *Publication Paper*.

Given the unremarkable nature of the communications at issue, the district court held that it "will not infer a conspiracy simply because two business partners chose to use phones to communicate."   Order at 38 (cleaned up).   Its ruling was correct.

> **4.  Plaintiffs' allegations about "concerted pretextual explanations" show that a collateral demand, not a conspiracy, led to trading restrictions.**

Next, Plaintiffs claim they have pleaded "concerted pretextual explanations" that demonstrate a conspiracy.   App. Br. at 33.   The problem for Plaintiffs here is that the alleged "pretextual explanations" Robinhood made are, as the district court held, not pretextual.   They reflect the obvious alternative explanation for the trading restrictions:

the $3 billion collateral requirement that the NSCC imposed on Robinhood. Order at 38-41; Am. CCAC ¶¶ 178-79.

Plaintiffs claim that Robinhood "made a number of inconsistent statements" regarding the reason for imposing trading restrictions—ranging from statements blaming "increased volatility," "increased NSCC collateral requirements," and "liquidity problems." App. Br. at 34. But there is nothing inconsistent about these statements. Each of them describes a piece of the January 2021 trading frenzy: unprecedented levels of trading led to increased volatility in the market, which in turn led to the $3 billion collateral call and liquidity pressure that Robinhood faced. *See* Am. CCAC ¶¶ 87-90, 137, 178-180. Likewise, there is nothing inconsistent about the alleged general benefit that Robinhood derives from increased volatility and the alleged acute issue posed by the collateral requirements. *See* App. Br. at 35. Finally, there is nothing inconsistent about the district court's holdings in the Antitrust and Securities Tranches, because (as the district court found) only the Securities Tranche plaintiffs acknowledged how collateral requirements drove Robinhood's decision to restrict trading. No facts are alleged that permit a plausible inference that Robinhood agreed with Citadel

38

Securities to restrict trading, and these purported "inconsistencies" do not require a different finding.

### 5. Plaintiffs' "market structure" and "market behavior" allegations cut against a plausible inference of conspiracy.

Finally, Plaintiffs present a series of arguments claiming that "market structure" and "market behavior" support an inference of conspiracy. *See* App. Br. at 36-39. In doing so, they suggest that the district court "misse[d] the point" and "misunderstood" their arguments. *Id.* Plaintiffs are incorrect. The district court demonstrated a precise understanding of Plaintiffs' garbled market structure and market behavior arguments and rightly rejected them.

First, Plaintiffs criticize the district court for characterizing their anticompetitive theory as "novel." *Id.* at 37. But Plaintiffs' market structure argument *is* novel. In both of the cases Plaintiffs cite in support of their "market structure" argument, *id.* at 37 n.14, the courts held that "a market structure that is conducive to collusion" can be a plus factor in support of an inference of a conspiracy where—importantly—the defendants operate *in the same market. Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. 1:09-cv-00560-LJO-BAM, 2013 WL 595122, at

\*11, \*13 (E.D. Cal. Feb. 15, 2013), (granting motion for summary judgment on antitrust claim where "[t]he record [ ] does not support a reasonable inference that [the defendants] were part of any agreement to allocate the market [for tin mill products]"), *aff'd*, 803 F.3d 1084 (9th Cir. 2015); *see also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir. 2004) ("[P]laintiffs allege that PPG engaged in horizontal price-fixing– i.e., where competitors at the same market level agree to fix or control the prices they will charge for their respective goods or services." (internal quotation marks omitted)).

That is not what Plaintiffs allege here. Plaintiffs explicitly allege that Robinhood and Citadel Securities operate in *different* markets. *Compare* Am. CCAC ¶ 306 (alleging that Citadel Securities operates in the "upstream product market" of "market makers that pay brokerage firms to route their clients' trades to that market maker"), *with id.* ¶¶ 312-13 (alleging that Robinhood operates in the "downstream or consumer-facing" "No-Fee Brokerage Trading App Market"). Yet, confusingly, Plaintiffs' market structure argument claims that the "structural characteristics of the market in which Defendants operate" is conducive to anticompetitive behavior because it includes "high barriers

to entry, high fixed and low variable costs, payment for order flow, and a captive short-term market." App Br. at 36. Those allegations all relate to the No-Fee Brokerage Trading App Market, Am. CCAC ¶ 373, a market that is different from the market in which Citadel Securities operates (the upstream market for market makers), *see* Am. CCAC ¶ 306) and the market in which the alleged conspiracy took place (the securities market), *see* Am. CCAC ¶ 1 (describing an "anticompetitive scheme to restrict Retail Investors' access to specific securities in the stock market"). Plaintiffs make no effort to explain how the structural characteristics of one market make coordination from a participant in a second market to create an anticompetitive effect in a third market more likely—nor do they cite a single case suggesting that such an argument has ever been accepted.

Next, Plaintiffs claim that the district court "failed to consider Plaintiffs' allegations regarding the scope and timing of the other brokerages' purchasing restrictions." App. Br. at 39. But Plaintiffs do not explain why their allegations about other brokerages' purchasing restrictions support their conspiracy claims. Nor do Plaintiffs dispute the district court's commonsense observation that allegations regarding

other brokerages' trading restrictions cut against Plaintiffs' conspiracy claims, given that many other brokerages—including Ally, Dough, Public.com, SoFi, Stash, Tastyworks, Webull, E*Trade, and Interactive Brokers—"all implemented purchasing restrictions on January 28, 2021; and none of these brokerages is alleged to be part of the conspiracy." Order at 42-43 (citing CCAC ¶¶ 195, 366-67).

The district court was correct. Plaintiffs have not plausibly alleged sufficient direct or indirect evidence of a conspiracy.

### D. The district court examined Plaintiffs' allegations holistically

Plaintiffs also challenge the district court's holding on the basis that "[i]t was error for the district court to not evaluate the evidence holistically." App. Br. at 39. They are correct that allegations must be considered holistically, and the district court did just that.

When reviewing the sufficiency of a plaintiff's antitrust allegations on a motion to dismiss, courts should avoid "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Quality Auto Painting*, 917 F.3d at 1263 n.15 (internal quotation marks omitted). The district court observed this rule. Even a cursory read of the Order shows that the Court took a comprehensive

view of the allegations in the Amended Complaint. *See* Order at 43 (providing a "recap" of Plaintiffs' conspiracy allegations); *id.* at 44 (analyzing Plaintiffs' conspiracy allegations "[a]ltogether"); *id.* at 51-52 (reviewing Plaintiffs' conspiracy allegations as a whole). That the district court also considered each of Plaintiffs' arguments specifically hardly negates the fact that the district court properly analyzed their allegations as a whole.

*   *   *

In order to survive a motion to dismiss, an antitrust plaintiff's complaint must contain enough factual information "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Here, despite already having had pre-complaint discovery, Plaintiffs fall short of that standard. This Court should affirm the district court's ruling that Plaintiffs have failed to plausibly allege a conspiracy under Section 1.

## II. The district court correctly found that Plaintiffs had not alleged a claim under the Rule of Reason

To allege a vertical conspiracy claim under the Rule of Reason, Plaintiffs must first allege "the relevant market in which the harm occurs." *Jacobs*, 626 F.3d at 1336 (affirming dismissal for failure to

43

adequately plead a relevant market); *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016) (plaintiff must plead "anticompetitive effects" from the alleged restraint "in the relevant market" (internal quotation marks omitted)).[9]   Plaintiffs contend that the district court improperly concluded that they failed to allege harm in a relevant market.  *See* App. Br. at xiv; *id.* at 40.  But Plaintiffs devote most of their energy to whether they have standing to assert an antitrust claim.  This approach is mistaken.  This was not the ground on which the district court ruled, and antitrust standing is not an issue on appeal.  "When a court concludes that no [antitrust] violation has occurred, it has no occasion to consider standing."  *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996) (cleaned up).

The district court properly concluded that the complaint failed to allege an unreasonable restraint on trade.  In evaluating whether Plaintiffs had alleged an anticompetitive effect on the relevant market, the district court noted that "the harm should take place in the relevant

---

[9] Plaintiffs alleged a vertical agreement.  As the Supreme Court has emphasized, alleged vertical conspiracies always require the court to "first define[ ] the relevant market."  *Am. Express*, 138 S. Ct. at 2285 n.7.  This restriction relaxes for allegations of horizontal conspiracy, which are not at issue here.  *Id.*

market the plaintiff has defined." Order at 49. The district court then held that "the alleged harm to competition occurred in an entirely separate market from the markets Plaintiffs define. And Plaintiffs do not even attempt to define that third, relevant market." *Id.* at 51. The district court reached the correct decision, and this Court should affirm.

### A. Because they never alleged the "relevant market" in which harm occurred, Plaintiffs failed to plead an unreasonable restraint

For an alleged vertical conspiracy, Plaintiffs must allege the "relevant product market" so that they may establish "harm to competition in that market." *Jacobs*, 626 F.3d at 1339. The Amended Complaint alleges two markets. Am. CCAC ¶¶ 305-15. In the so-called upstream "PFOF Market," market makers "pay brokerage firms to route their clients' trades to that market maker." *Id.* ¶ 306. Citadel Securities is a participant in the alleged PFOF Market, along with other market makers like G1 Execution Services, Global Execution Brokers, and Virtu Americas. *Id.* They compete over handling brokerages' orders in exchange for PFOF. *Id.*

In the so-called downstream "No-Fee Brokerage Trading App Market," brokerages who utilize mobile trading apps compete to "offer a

user-friendly mobile app to Retail Investors." *Id.* ¶ 312. They also obtain payment for order flow from the market makers. *Id.* "The No-Fee Brokerage Trading App Market consists of brokerages such as Robinhood, Charles Schwab, E*Trade, TD Ameritrade, WeBull, and others." *Id.* ¶ 313. These brokerages compete to sign up customers who would use their "user-friendly mobile app." *Id.* ¶ 312. Participants in this market must possess "significant IT infrastructure, software, and data security infrastructure in order to develop and maintain the applications through which investors trade." *Id.* ¶ 380. When an investor participates in this market, the investor chooses whether to download the trading apps of Robinhood, Schwab, and others. *See id.* ¶¶ 312-13.

Neither of these markets constitutes the *relevant* market in which the supposed harm occurred. Plaintiffs do not allege harm in the PFOF Market: they do not contend that there was reduced competition between Citadel Securities and other market makers in setting PFOF rates. In fact, Plaintiffs never allege (nor could they) that Citadel Securities stopped filling orders in the relevant securities for each and every broker that asked it to fill orders during the class period.

Plaintiffs also do not claim harm in the No-Fee Brokerage Trading App Market. As Plaintiffs emphasize in their brief, the No-Fee Brokerage Trading App Market is "the consumer market where Robinhood promoted and sold its no-fee brokerage trading services." App. Br. at 13. Plaintiffs do not allege that the agreement reduced competition among "user-friendly mobile app[s]." Am. CCAC ¶ 312.

Plaintiffs' other allegations do not constitute harm in this market. For instance, they allege that the conspiracy "reduce[d] the quality of order execution" and produced "a quality degradation of the brokerage services rendered" by Robinhood. *Id.* ¶¶ 3, 350. But these allegations do not claim harm to competition in "the consumer market where Robinhood promoted and sold its no-fee brokerage trading services." App. Br. at 13. The allegations do not describe a reduction in competition between Robinhood and other brokerages for customers in the alleged No-Fee Brokerage Trading App Market. As the district court observed, the "alleged agreement left Ally, Dough, Public.com, SoFi, Stash, Tastyworks, Webull, E*Trade, Interactive Brokers, and any other brokerage free to adopt or eschew any policy they desired with respect to

the Restricted Securities—or anything else, for that matter." Order at 50.

Instead of alleging harm to competition in these alleged markets, Plaintiffs focus on a harm occurring in a separate market never specifically addressed in the Amended Complaint—the market for certain securities whose prices went down. Indeed, Plaintiffs contend that Robinhood and Citadel Securities agreed to "restrict Retail Investors' access to specific securities *in the stock market*." Am. CCAC ¶ 1 (emphasis added). Under the alleged agreement, Robinhood and Citadel Securities sought to "suppress the prices of these securities[ ] and to prevent the market from operating freely and fairly." *Id.* In Plaintiffs' words, the Appellees "reduced the price of the Relevant Securities that Retail Investors either sold or held below the prices that they would have otherwise obtained in a competitive market free of collusion." *Id.* ¶ 16.

Plaintiffs' arguments ignore that "effective competition" over the price of securities occurs in the securities markets, not the PFOF or No-Fee Brokerage Trading App Markets. *Am. Express*, 138 S. Ct. at 2285 (internal quotation marks omitted). Market makers do not compete over the price of individual securities in the PFOF Market. Brokerages do not

compete over the price of individual securities in the No-Fee Brokerage Trading App Market.

It is unsurprising that Plaintiffs do not allege that the securities market is the relevant market. "[T]he purchase or sale of stock by investors" does not constitute a cognizable market under the Sherman Act. *Kalmanovitz*, 769 F.2d at 156 (emphasis omitted) (transactions "concerning the stock of a single company" do not "constitute[ ] trade or commerce within the meaning of § 1 of the Sherman Act"). Further, the antitrust laws are impliedly precluded when the alleged conduct "lie[s] squarely within an area of financial market activity that the securities law seeks to regulate." *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 276 (2007). Plaintiffs contort their arguments to avoid alleging that the securities market comprises the relevant market. But by avoiding the actual market in which the purported harm occurred, Plaintiffs failed to allege the threshold element of a Rule of Reason claim—the relevant market in which harm to competition occurred—and it dooms their claim.

Rather than address settled case law regarding necessary allegations of a relevant market in which the harm occurred, Plaintiffs would brush it away. In their brief, Plaintiffs argue that it does not

"matter . . . whether there is a connection between the defined markets and where the harm occurred." App. Br. at 43. But the Supreme Court, the Eleventh Circuit, and many other courts have held that this connection does matter. Without connecting the alleged harm to a defined, relevant market, the court could not assess its anticompetitive effect. *See, e.g.*, *Am. Express*, 138 S. Ct. at 2284-85; *Jacobs*, 626 F.3d at 1336; *Levine*, 72 F.3d at 1551.

The requirement to identify the relevant market where the harm to competition occurs flows naturally from the aims of the Sherman Act, which "outlaws only unreasonable restraints." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (cleaned up). To distinguish unreasonable restraints from other practices using the Rule of Reason, courts consider "specific information about the relevant business," the "restraint's history, nature, and effect," and "market power and market structure." *Id.* at 885-86 (internal quotation marks omitted). To do so, courts should be able to identify the "relevant market" in which the alleged harm occurred. *Levine*, 72 F.3d at 1551. "Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Am. Express*, 138 S. Ct. at 2285 (cleaned up).

50

For these reasons, "a plaintiff's threshold burden under the Rule of Reason analysis" is to "show[ ] a precise market definition." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012). Given Plaintiffs' failure to allege a precisely defined market in which harm occurred, the Court should affirm the dismissal.

## B. Plaintiffs' antitrust standing arguments address a different question from the one on appeal

Eschewing the challenges posed by the Rule of Reason analysis, Plaintiffs attempt to focus the Court on a different question: whether they have standing to assert an antitrust claim. *See, e.g.*, App. Br. at 48. Yet, as Plaintiffs concede elsewhere, standing is not at issue. *See id.* at xiv (Statement of the Issues). In its thoughtful reasoning on the disconnect between the harms alleged and the markets alleged, the district court noted a "curious gap" that was also "detrimental" to Plaintiffs' standing. Order at 48. Plaintiffs have attempted to use this observation to recast the issue on appeal as a question of standing—but standing was plainly not the basis for the district court's holding that Plaintiffs failed to allege a restraint of trade that caused harm in a relevant market, which was entirely correct.

### 1.    Because Plaintiffs failed to allege a Section 1 claim, standing is not at issue.

When a plaintiff fails to establish an antitrust claim, it is unnecessary for the court to "decide whether [the plaintiff] has met the requirements for standing as to any of his [or her] antitrust claims." *Levine*, 72 F.3d at 1545.  "When a court concludes that no violation has occurred, it has no occasion to consider standing."  *Id.* (cleaned up); *see also Jes Props., Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1228 (11th Cir. 2006) (forgoing standing analysis after concluding that plaintiff had not established an antitrust violation); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455 (11th Cir. 1991) (affirming grant of summary judgment on the merits, regardless of plaintiff's standing to assert antitrust claim).  Other circuits have similarly adopted this common-sense rule.  *See, e.g.*, *Supermarket of Marlinton, Inc. v. Valley Rich Dairy*, 161 F.3d 3, 4 n.39 (4th Cir. 1998) (per curiam); *Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 306 (5th Cir. 1997); *Hairston v. Pac. 10 Conf.*, 101 F.3d 1315, 1318 (9th Cir. 1996); *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 855 n.10 (9th Cir. 1995).

Here, Plaintiffs have failed to allege a violation of Section 1 in at least two ways: they did not plausibly allege an agreement and they

failed to allege the relevant market.  In arguing that they have standing to assert a claim, they assumed a claim where none exists.  Their arguments relating to standing do not cure either pleading failure.

### 2.  Plaintiffs' standing arguments do not address their failure to allege a relevant market in which the harm to competition occurred.

In the order on appeal, the district court referred to antitrust standing cases to illustrate how "the alleged harm to competition occurred in an entirely separate market from the markets Plaintiffs define." Order at 51.  Plaintiffs have seized on those citations to suggest standing caselaw governs this issue.[10]  Not so.

Whether a given plaintiff identified the relevant market in which a harm to competition occurred is distinct from whether a given plaintiff suffered an antitrust injury.  The standing inquiry looks into whether the

---

[10] Plaintiffs must satisfy standing as a separate—and additional—element of their claim. Antitrust standing requires the plaintiff to show several elements, including an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  In the Eleventh Circuit, a plaintiff has antitrust injury if he or she was "in the sector of the economy which is the target of the antitrust violation." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1494 (11th Cir. 1985).

plaintiff's antitrust claim would advance the policies that Congress intended the Sherman Act to achieve. *Amey*, 758 F.2d at 1493-94, 1500.

Plaintiffs primarily rely on three cases—*McCready*, *Loeb Industries*, and *Construction Aggregate Transport*—that all consider whether a plaintiff alleged antitrust injury, an element of the standing inquiry. In each, plaintiffs alleged or established harm in a relevant market, and the question before the court was whether the plaintiffs' injuries constituted antitrust injuries. None of the cases evaluates whether the plaintiff adequately alleged a definition of the market in which the anticompetitive harm occurred, which is the issue on appeal.

In *McCready*, the Supreme Court addressed whether the plaintiff had standing after the district court found that respondent had adequately pleaded harm in a relevant market—namely an insurance company's boycott to "exclude clinical psychologists from a segment of the psychotherapy market." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 470 (1982). The Court concluded that McCready, a beneficiary of an insurance policy, was injured by her insurer's conspiracy to restrict competition in the psychotherapy market by only reimbursing for treatment from psychiatrists, not psychologists. *Id.* at 467. Unlike the

54

*McCready* plaintiff, Plaintiffs have not alleged any harms occurring in the PFOF Market and the No-Fee Brokerage Trading App Market.

The other cases are no more helpful to Plaintiffs. In *Loeb Industries*, the Seventh Circuit held that the district court erred in finding on summary judgment that the plaintiffs did not have standing to assert their antitrust claims. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481-84 (7th Cir. 2002). As with *McCready*, the antitrust violation itself was not in doubt: the claims arose after the defendants had reached a settlement with the Commodities and Futures Trading Commission regarding their conspiracy to fix the price of copper futures at artificially high levels. The district court only permitted discovery into whether plaintiffs had standing. *Id.* at 478.[11] Similarly, the violation was also not in question in *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752 (11th Cir. 1983). In that case, plaintiffs obtained a favorable jury verdict, and the only issue that the defendant appealed was the plaintiffs' standing to assert the claim. *Id.*

---

[11] Further, the *Loeb Industries* decision turned on the application of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)—a Supreme Court case involving indirect purchaser standing to bring an antitrust claim. *Loeb Indus.*, 306 F.3d at 498. Plaintiffs have not alleged an indirect purchaser suit.

at 762.  The Eleventh Circuit noted that the complaint "clearly allege[d]" that the defendant attempted to eliminate competition in the aggregate hauling industry and therefore the court had no need to look at whether the plaintiff had adequately defined the market in which harm occurred. *Id.* at 763.  Neither case sheds light on the issue on appeal.

These cases and others on which Plaintiffs rely are irrelevant to whether Plaintiffs failed to properly allege the markets in which competition was harmed.[12]  While Plaintiffs may wish that this Court would instead address whether they have standing, that is not the basis on which the dismissal order rests and does not provide a ground on which to reverse it.

### C.  Plaintiffs' remaining arguments do not reveal error

None of Plaintiffs' remaining arguments would require this Court to reverse the district court.

---

[12] *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984) (assessing whether appellant possessed standing to assert an antitrust claim); *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 967 (11th Cir. 2006) (same); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) (same); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 721 (11th Cir. 1984) (per curiam); *Ekbatani v. Cmty. Care Health Network, LLC*, No. 21-12322, 2022 WL 31793, at *2 (11th Cir. Jan. 4, 2022) (per curiam) (same).

First, Plaintiffs contend that the Appellees and the district court did not contest "Plaintiffs' defined markets, the fact of Defendants' market power in those markets, or that Plaintiffs suffered injury at the hands of the Defendants." App. Br. at 40. That is wrong. As Plaintiffs themselves stated in the underlying briefing, "Defendants challenge the relevant market." App. Vol. III, Dkt. No. 459 at 25 n.29. Appellees' briefing bears that out. Appellees argued that Plaintiffs failed to define the market and they would not be able to "support their arbitrarily narrow alleged markets, their claims of market power by either Citadel Securities or Robinhood in their respective markets, or their claim that there was any actual harm to competition." App. Vol. II, Dkt. No. 456 at 22 n.17. Because Plaintiffs failed to identify the relevant market, Appellees noted that Plaintiffs could not "allege the necessary elements to plead a claim under Section 1 of the Sherman Act under the rule of reason." *Id.* at 12. Contrary to Plaintiffs' claim, Appellees identified all of these deficiencies.

Second, Plaintiffs raise in just a few sentences that the alleged restraint may be affirmed as bribery. App. Br. at 41 n.16. This Court does not need to address this argument, as the Eleventh Circuit does not

consider arguments raised in "a perfunctory and conclusory manner." *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1327 n.16 (11th Cir. 2021).

*   *   *

To allege an unlawful restraint of trade, Plaintiffs must allege the relevant market in which the harm occurred. Plaintiffs took a different approach: they alleged two markets and alleged harm relating to a third market, involving the purchase and sale of securities that they did not define in the Amended Complaint and which under long-standing precedent is not the proper subject for an antitrust claim. Failure to allege harm in a properly defined market is fatal to plaintiffs' claim, and the district court rightly dismissed on this basis.

## CONCLUSION

For the foregoing reasons, the judgment below should be affirmed.

December 14, 2022

Respectfully submitted,

*/s/ Adam L. Hoeflich*

Adam L. Hoeflich
Abby M. Mollen
Mac LeBuhn
Dawson K. Robinson
BARTLIT BECK LLP
54 W. Hubbard Street, Ste 300
Chicago, IL 60654
(312) 494-4400
adam.hoeflich@bartlitbeck.com
abby.mollen@bartlitbeck.com
mac.lebuhn@bartlitbeck.com
dawson.robinson@bartlitbeck.com

William A. Burck
Derek L. Shaffer
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street NW, Ste 900
Washington, D.C. 20005
(202) 538-8000
williamburck@quinnemanuel.com
derekshaffer@quinnemanuel.com

John F. O'Sullivan
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
2601 S. Bayshore Drive, Ste 1550
Miami, FL 33133
(305) 439-5008
johnosullivan@quinnemanuel.com

Christopher D. Kercher
Peter H. Fountain
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7187
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

*Counsel for Defendant-Appellee Citadel Securities LLC*

59

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this document contains 11,240 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 14-point, Century Schoolbook font.

December 14, 2022

*/s/ Adam L. Hoeflich*
Adam L. Hoeflich
BARTLIT BECK LLP
54 W. Hubbard Street, Ste 300
Chicago, IL 60654
(312) 494-4400
adam.hoeflich@bartlitbeck.com