No. 22-11873-F

# United States Court of Appeals
# for the Eleventh Circuit

ANGEL GUZMAN, BURKE MINAHAN,
CHRISTOPHER MILLER, and TERELL STERLING,

*Plaintiffs-Appellants*,

v.

ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL LLC,
ROBINHOOD SECURITIES, LLC and CITADEL SECURITIES LLC,

*Defendants-Appellees*.

*Appeal from U.S. District Court for the Southern District of Florida,
Case No. 21-md-2989, before the Honorable Cecilia M. Altonaga*

## SUPPLEMENTAL APPENDIX OF
## APPELLEE CITADEL SECURITIES LLC
## VOLUME 2 OF 3

Adam L. Hoeflich
Abby M. Mollen
Mac LeBuhn
Dawson K. Robinson
BARTLIT BECK LLP
54 W. Hubbard Street, Ste 300
Chicago, IL 60654
(312) 494-4400
adam.hoeflich@bartlitbeck.com
abby.mollen@bartlitbeck.com
mac.lebuhn@bartlitbeck.com
dawson.robinson@bartlitbeck.com

William A. Burck
Derek L. Shaffer
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street NW, Ste 900
Washington, D.C. 20005
(202) 538-8000
williamburck@quinnemanuel.com
derekshaffer@quinnemanuel.com

*Counsel for Defendant-Appellee Citadel Securities LLC*

DECEMBER 14, 2022

John F. O'Sullivan
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
2601 S. Bayshore Drive, Ste 1550
Miami, FL 33133
(305) 439-5008
johnosullivan@quinnemanuel.com

Christopher D. Kercher
Peter H. Fountain
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7187
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

*Counsel for Defendant-Appellee Citadel Securities LLC (cont.)*

# INDEX TO APPENDIX

## *VOLUME 1 of 3*

Document                                                        Docket/Tab #

District Court Docket Sheet (as of Dec. 14, 2022) ................................... A

Class Action Complaint, *Cheng v. Ally Fin.* (February 1, 2021) .............. 1

Order re Non-Federal Securities Actions (June 3, 2021) .................... 323

## *VOLUME 2 of 3*

Document                                                        Docket/Tab #

Class Action Complaint re Antitrust (July 26, 2021) .......................... 358

Defendants MTD the Antitrust Tranche Complaint (June 3, 2021) .... 408

Order re Antitrust Actions (November 17, 2021) ................................ 438

## *VOLUME 3 of 3*

Document                                                        Docket/Tab #

Order re Other Broker Actions (January 10, 2022) ............................ 450

Order re Robinhood Actions (January 27, 2022) ................................ 453

Plaintiffs Notice of Appeal re Antitrust Actions (June 1, 2022) .......... 474

# TAB 358

# Class Action Complaint re Antitrust

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

IN RE:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**
_____/

This Document Relates to:

ALL ANTITRUST ACTIONS

**CONSOLIDATED CLASS ACTION COMPLAINT**

**[REDACTED VERSION]**

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................................... 1

JURISDICTION AND VENUE .............................................................................................. 5

PARTIES ................................................................................................................................... 6

   A.     Plaintiff Angel Guzman ........................................................................................ 6

   B.     Plaintiff Burke Minahan ....................................................................................... 7

   C.     Plaintiff Christopher Miller .................................................................................. 8

   D.     Plaintiff Terell Sterling ......................................................................................... 8

   E.     Introducing Brokerage Defendants ..................................................................... 9

   F.     Self-Clearing Brokerage Defendants ................................................................. 11

   G.     Market Maker Defendants .................................................................................. 13

   H.     Clearing Defendants ........................................................................................... 13

AGENTS AND CO-CONSPIRATORS ............................................................................... 14

CLASS ALLEGATIONS ........................................................................................................ 15

FACTUAL ALLEGATIONS .................................................................................................. 18

CLAIMS FOR RELIEF ....................................................................................................... 131

PRAYER FOR JUDGMENT .............................................................................................. 133

JURY TRIAL DEMANDED ............................................................................................... 134

Plaintiffs Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### INTRODUCTION

1.     This case is about individual investors (the "Retail Investors") who invested their hard-earned money in the stock market and were stripped of their rights to control their own investments. Defendants and other market players hatched an anticompetitive scheme to restrict Retail Investors' access to the stock market and prevent the market from operating freely and fairly. Defendants did so to protect each other, and to stop the hemorrhaging losses incurred by the Market Maker Defendants as a result of their accumulation of large short positions.

2.     Retail Investors are individual investors who make investments on their own behalf. Retail Investors purchase securities such as stocks, bonds, options, mutual funds, and exchange traded funds (ETFs). They execute their personal trades through websites, apps and trading platforms provided by brokerage firms or other investment service providers. Retail Investors tend to invest smaller amounts, as compared to institutional investors, and have little ability to influence market prices or market dynamics on their own.

3.     Historically, Retail Investors paid a fee or commission to their brokerages for executing personal trades. Today, most brokerages do not charge their investors a fee per transaction, rather, they earn revenue through rebates, kickbacks and other payments from market makers. These payments are collectively known as payment for order flow.

4.     When a Retail Investor places a trade through a brokerage such as Robinhood, the brokerage routes the order to a market maker for processing and execution. When a market maker executes an order, it makes a profit on the spread between the "bid" price, the price at

which a market maker is willing to buy a security, and the "ask" price, the price at which a market maker is willing to sell the security. While the market maker typically earns a modest amount on each share of an order it fulfills, by processing a vast number of orders, market makers can earn a substantial profit.

5.       For every order, there must be a buyer and a seller. Market makers, through a process called "internalization," typically will take the other side of a transaction for orders routed to them. For example, if a buy order is routed to a market maker and there is no sell order available, market makers execute the order, either by selling a security in its inventory or by selling short.

6.       Leading up to January 27, 2021, based on their research and observations, the Retail Investors, through stock brokerages, including the Brokerage Defendants, invested in certain stocks—GameStop (GME), AMC Entertainment (AMC), Bed Bath & Beyond (BBBY), BlackBerry (BB), Express (EXPR), Koss (KOSS), Nokia (NOK), Tootsie Roll Industries (TR), and Trivago NV (TRVG) (the "Relevant Securities")—that they believed would increase and serve as good investment opportunities.

7.       As more Retail Investors bought the Relevant Securities and these orders were routed to market makers, such as Citadel Securities LLC ("Citadel Securities"), the market makers acquired substantial short positions in the Relevant Securities, and were thus exposed to massive potential losses as the prices of the Relevant Securities increased.

8.       "Short" sellers borrow securities believing that that price of the securities will decrease. If the price of the security in fact drops, a short seller buys the security back at a lower price and returns it to the lender. The difference between the sell price and the buy price is the

profit. Short sellers essentially bet on a security's failure or decline rather than its success or increase.

9.     Along with market makers such as Citadel Securities, several large hedge funds and investment firms, including Maplelane Capital, LLC, Melvin Capital Management LP, and others, established massive short positions in the Relevant Securities.

10.     In so doing, the hedge funds, market makers, and other unnamed co-conspirators made highly speculative bets. When the Relevant Securities increased in value, due in large part to Retail Investors purchasing the Relevant Securities, hedge funds were exposed to massive potential losses of several billion dollars.

11.     As more Retail Investors bought the Relevant Securities, those orders were routed to Citadel Securities through the Brokerage Defendants. Citadel Securities took the other side of the buy orders placed by the Retail Investors, i.e., Citadel Securities sold the Relevant Securities short in order to complete the routed retail investors' orders. Citadel Securities, as it took the other side of more and more buy orders, acquired a substantial short position in the Relevant Securities, and was similarly exposed to massive potential losses.

12.     As Retail Investors and others continued to purchase the Relevant Securities, the hedge funds, Clearing Defendants, Citadel Securities and unnamed co-conspirators were caught in a classic "short squeeze." A "short squeeze" occurs when a stock or other asset rises sharply in value, distressing short positions. Short selling investors are faced with a rapid increase in the shorted asset's value, exposing the short seller to increased and theoretically limitless loss. As the price of the asset rises, short sellers face pressure to buy back stock to exit their short positions to mitigate their losses. In the absence of intervention, as short sellers exit their short positions to

buy back stocks to cover their shorts, their repurchase of stock further increases the price of the stock, compounding their losses.

13.     On January 27, 2021, Citadel Securities executed short trades in the Relevant Securities in the after-hours session to develop larger short positions in the Relevant Securities in anticipation of the Relevant Securities declining in price on January 28, 2021.

14.     The Brokerage Defendants, along with Citadel Securities and the Clearing Defendants (collectively, "Defendants") conspired to prevent the Retail Investors from purchasing shares of the Relevant Securities. On January 28, 2021, the Brokerage Defendants disabled all buy features for the Relevant Securities on their platforms thereby stripping the demand-side and halting the price appreciation in the Relevant Securities. Defendants' action drove the stock prices down and forced Retail Investors to sell shares of their Relevant Securities. At the point in time where the Brokerage Defendants engaged in this conspiratorial effort to thwart buyers, the Relevant Securities had appreciated to unprecedented levels. Such highly appreciated stocks are generally sensitive to reversals in price and can make sharp price movements lower when a reversal occurs. Defendants were aware of this dynamic and the propensity of the Relevant Securities to drop substantially as a result of the Defendants' collective action to prevent customers from buying the Relevant Securities.

15.     In furtherance of the conspiracy, the Brokerage Defendants, operating trading platforms through websites and mobile applications—restricted Retail Investors from purchasing the Relevant Securities on their platforms and thereby halted the price appreciation in the Relevant Securities. This conduct predictably and foreseeably caused a loss of confidence in the Relevant Securities and an ensuing panic selloff by the Retail Investors. The Brokerage

Defendants did this to ensure that the stock prices for the Relevant Securities did not appreciate further and would instead sharply decrease in furtherance of the conspiracy.

16.      Defendants and their co-conspirators forced Retail Investors to choose between selling the Relevant Securities at a lower price or holding their rapidly declining positions in the Relevant Securities. Defendants did so with the propose of driving down the prices of the Relevant Securities. By forcing the Retail Investors to sell their Relevant Securities at lower prices than they otherwise would have, Defendants artificially constricted the price appreciation of the Relevant Securities, and reduced the price of the Relevant Securities that Retail Investors either sold or held below the prices that they would have otherwise obtained in a competitive market free of collusion.

## JURISDICTION AND VENUE

17.      Plaintiffs bring this action on their own behalf as well on behalf of the members of the Class to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as any and all equitable relief afforded to them under the federal laws pleaded herein.

18.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the Constitution, laws, or treaties of the United States.

19.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from some Defendants.

20.      Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this

District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or are licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The conspiracy occurred in this judicial District. The conspiracy has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

21.     This Court has personal jurisdiction over each Defendant because, each Defendant: (a) transacted business throughout the United States, including in this District; (b) transacted in substantial amounts of the Relevant Securities throughout the United States; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

22.     The activities of the Defendants and all co-conspirators—whether unnamed or as of yet unknown—as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

**PARTIES**

**A.  Plaintiff Angel Guzman**

23.     Plaintiff Angel Guzman ("Guzman") is a resident of the State of New York. Guzman purchased shares of BlackBerry Ltd., GameStop Corp., and Nokia Corp. on Robinhood and held said shares as of the close of market on January 27, 2021.

24.     On January 28, 2021, Guzman was prohibited from purchasing the Relevant Securities on Robinhood due to the anticompetitive conduct alleged herein.

25.     Consequently, on January 28, 2021, in an effort to purchase the Relevant Securities, Guzman applied for an account with Charles Schwab ("Schwab") because Schwab was not prohibiting its customers from purchasing the Relevant Securities. Yet, on January 28, 2021, Guzman was unable to purchase any of the Relevant Securities on Schwab due to the amount of time required to open the account.

26.     From January 29, 2021 through February 4, 2021, Guzman was subject to the trading limitations Robinhood imposed on certain of the Relevant Securities.

27.     As a result of the anticompetitive conduct alleged herein, Guzman sold shares of BlackBerry Ltd., GameStop Corp., and Nokia Corp. on Robinhood during the Class Period.

**B.  Plaintiff Burke Minahan**

28.     Plaintiff Burke Minahan ("Minahan") is a resident of the State of Minnesota. Minahan purchased shares of BlackBerry Ltd., GameStop Corp., and Nokia Corp. on Robinhood and held said shares as of the close of market on January 27, 2021.

29.     On January 28, 2021, Minahan was prohibited from purchasing the Relevant Securities on Robinhood as a result of the anticompetitive conduct alleged herein.

30.     Consequently, on January 28, 2021, in an effort to purchase the Relevant Securities, Minahan applied for an account with Fidelity because Fidelity was not prohibiting its customers from purchasing the Relevant Securities. Minahan was subsequently able to purchase a share of GameStop Corp. on Fidelity that day.

31.     From January 29, 2021 through February 4, 2021, Minahan was subject to the trading limitations Robinhood imposed on certain of the Relevant Securities.

32.    As a result of the anticompetitive conduct described herein, Minahan sold shares of BlackBerry Ltd., GameStop Corp. and Nokia Corp. on Robinhood during the Class Period.

**C. Plaintiff Christopher Miller**

33.    Plaintiff Christopher Miller ("Miller") is a resident of the State of Kansas. Miller purchased shares of GameStop Corp. on Robinhood and held said shares as of the close of market on January 27, 2021.

34.    On January 28, 2021, Miller was prohibited from purchasing the Relevant Securities on Robinhood due to the anticompetitive conduct described herein.

35.    Consequently, on January 28, 2021, in an effort to purchase the Relevant Securities, Miller applied to open accounts with Fidelity and TD Ameritrade ("TD"), because these firms were not prohibiting their customers from purchasing the Relevant Securities. Yet, on January 28, 2021, Miller was unable to purchase any of the Relevant Securities on Fidelity or TD due to the amount of time required to setup the accounts.

36.    From January 29, 2021 through February 4, 2021, Miller was subject to the trading limitations Robinhood imposed on certain of the Relevant Securities.

37.    As a result of the anticompetitive conduct alleged herein, Miller sold shares of GameStop on Robinhood during the Class Period.

**D. Plaintiff Terell Sterling**

38.    Plaintiff Terell Sterling ("Sterling") is a resident of the State of California. Sterling purchased shares of AMC Entertainment Holdings, Inc., BlackBerry Ltd., GameStop Corp. on Robinhood and held said shares as of the close of market on January 27, 2021.

39.    On January 28, 2021, Sterling was prohibited from purchasing the Relevant Securities on Robinhood due to the anticompetitive conduct described herein.

40.     From January 29, 2021 through February 4, 2021, Sterling was subject to the trading limitations Robinhood imposed on certain of the Relevant Securities.

41.     As a further result of the anticompetitive conduct alleged herein, Sterling sold shares of AMC Entertainment Holdings, Inc., BlackBerry Ltd. and GameStop Corp. on Robinhood during the Class Period.

### E.  Introducing Brokerage Defendants

#### a.  Defendant Ally Financial Inc.

42.     Defendant Ally Financial Inc. ("Ally") is a Delaware corporation, with its headquarters located at Ally Detroit Center 500, Woodward Ave., Floor 10, Detroit, Michigan. Ally provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Ally restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Ally's clearing firm.

#### b.  Defendant Alpaca Securities LLC

43.     Defendant Alpaca Securities LLC ("Alpaca") is a Delaware limited liability company, with its headquarters at 20 N. San Mateo Drive Suite 10, San Mateo, California. Alpaca provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Alpaca restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Electronic Transaction Clearing served as Alpaca's clearing firm.

#### c.  Defendant Dough

44.     Defendant Dough LLC ("Dough") is a Delaware limited liability company and wholly-owned subsidiary of Tastytrade, Inc., with its headquarters located at 327 N. Aberdeen

Street, Chicago, Illinois. Dough provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Dough restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Dough's clearing firm.

### d. Defendant Public.com

45.     Defendant Open To The Public Investing, Inc. ("Public.com") is a New York corporation and wholly-owned subsidiary of Public Holdings Inc., headquartered at 1 State Street Plaza, 10th Floor, New York, New York.

46.     Public.com provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Public.com restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Public.com's clearing firm.

### e. Defendant SoFi

47.     Defendant SoFi Securities LLC ("SoFi") is a New York limited liability company headquartered at 234 1st Street, Building A, Suite 4700, San Francisco, California. SoFi provides financial services including an electronic trading platform to trade financial assets. During the relevant period, SoFi restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as SoFi's clearing firm.

### f. Defendant Stash

48.     Defendant Stash Financial, Inc. ("Stash") is a Delaware corporation and owner of the application Stash, headquartered at 500 7th Avenue,18th Floor, New York, New York. Stash provides financial services including an electronic trading platform to trade financial assets.

During the relevant period, Stash restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Stash's clearing firm.

**g.   Defendant Tastyworks**

49.     Defendant Tastyworks, Inc. ("Tastyworks") is a Delaware corporation and wholly-owned subsidiary of Tastytrade, Inc., headquartered at 1000 West Fulton Market Street, Suite 220, Chicago, Illinois.

50.     Tastyworks provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Tastyworks restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Tastyworks clearing firm.

**h.   Defendant Webull**

51.     Defendant Webull Financial LLC ("Webull") is a Delaware limited liability company headquartered at 44 Wall Street, Ste. 501, New York, New York. Webull provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Webull restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Webull's clearing firm.

**F.  Self-Clearing Brokerage Defendants**

**a.   Defendant E\*Trade**

52.     Defendant E\*Trade Securities LLC is a Delaware limited liability company, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

53.     Defendant E\*Trade Financial Holdings, LLC is a Delaware limited liability

company, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

54.     During the relevant period, E*Trade restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities.

55.     At all relevant times stated herein, E*Trade acted as a self-clearing broker.

### b. Defendant Interactive Brokers

56.     Defendant Interactive Brokers LLC ("Interactive Brokers") is a Delaware limited liability company headquartered at 1 Pickwick Plaza, Greenwich, Connecticut. Interactive Brokers provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Interactive Brokers restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities.

57.     At all relevant times stated herein, Interactive Brokers acted as a self-clearing broker.

### c. Defendant Robinhood

58.     Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California. Defendant Robinhood Markets, Inc. is the corporate parent of and manages, controls and directs the affairs of Defendants Robinhood Financial LLC and Robinhood Securities, LLC.

59.     Defendant Robinhood Financial LLC is a Delaware limited liability company with its principal place of business at 85 Willow Road, Menlo Park, California. It is a wholly-owned subsidiary of Robinhood Markets, Inc.

60.     Robinhood Financial LLC provides financial services including an electronic trading platform to trade financial assets.

61.     Defendant Robinhood Securities, LLC is a Delaware limited liability company

with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida. It is a wholly owned subsidiary of Robinhood Markets, Inc.

62.     Defendant Robinhood Securities, LLC, Robinhood Financial LLC and Robinhood Markets, Inc. are collectively referred to herein as "Robinhood."

63.     During the relevant period, Robinhood restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities.

64.     At all relevant times stated herein, Robinhood acted as a self-clearing broker.

### G. Market Maker Defendants

#### a. Defendant Citadel Securities

65.     Defendant Citadel Securities LLC is a Delaware limited liability company, headquartered at 131 South Dearborn Street, Chicago, Illinois.

66.     Citadel Securities took short positions in the Relevant Securities. During the relevant period, Citadel Securities actively participated in the conspiracy and the wrongful acts alleged herein.

### H. Clearing Defendants

#### a. Defendant Apex

67.     Defendant Apex Clearing Corporation ("Apex") is a New York corporation headquartered at One Dallas Center, 350 N. St. Paul, Suite 1300, Dallas, Texas.

68.     Apex Clearing Holdings LLC and PEAK6 Investments LLC are the parent corporations of Apex.

69.     During the relevant period, Defendant Apex participated in the conspiracy and the wrongful acts alleged herein.

**b. Defendant ETC**

70.     Defendant Electronic Transaction Clearing, Inc. ("ETC") is a Delaware

Corporation located at 660 South Figueroa Street, Suite 1450, Los Angeles, California.

71.     Apex Clearing Holdings LLC and PEAK6 Investments LLC are the parent

corporations of ETC.

72.     During the relevant period, Defendant ETC participated in the conspiracy and the

wrongful acts alleged herein.

**c. Defendant PEAK 6**

73.     Defendant PEAK6 Investments LLC ("PEAK6") is a Delaware limited liability

company located at 141 West Jackson Boulevard, Suite 500, Chicago, IL 60640.

74.     During the relevant period, PEAK6 is the parent corporation of Apex and ETC.

75.     PEAK6 exercised direction and control over Defendants Apex and ETC during

the Relevant Period.

76.     During the relevant period, Defendant PEAK6 participated in the conspiracy and

the wrongful acts alleged herein.

## AGENTS AND CO-CONSPIRATORS

77.     The anticompetitive and unlawful acts alleged against the Defendants in this class

action complaint were authorized, ordered or performed by the Defendants' respective officers,

agents, employees, representatives, or shareholders while actively engaged in the management,

direction, or control of the Defendants' businesses or affairs. The respective Defendant parent

entities identified herein exercise dominance and control over all of their respective Defendant

subsidiary entities and those respective subsidiaries have a unity of purpose and interest with

their respective parents.

14

78.     To the extent any respective parent Defendant did not keep a tight rein on its

respective subsidiary Defendant(s), it had the power to assert control over the subsidiary if the

latter failed to act in the parent's best interest. The respective parent Defendants and their

respective subsidiaries, affiliates and agents thus operated as a single unified entity.

79.     The Defendants' agents operated under the explicit and apparent authority of their

principals.

80.     Various persons and/or firms not named as Defendants herein may have

participated as co-conspirators in the violations alleged herein and may have performed acts and

made statements in furtherance thereof.

81.     Each Defendant acted as the principal, agent, or joint venture of, or for other

Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ALLEGATIONS

82.     Plaintiffs bring this action for damages on behalf of themselves and all others

similarly situated as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules

of Civil Procedure, on behalf of the following Class:

> All persons or entities in the United States that held shares of stock or call options in
> GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), Bed Bath &
> Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation
> (KOSS), Nokia Corp. (NOK), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG)
> as of the close of market on January 27, 2021, and sold the above-listed securities from
> January 28, 2021 up to and including February 4, 2021 (the "Class Period").

83.     This Class definition specifically excludes the following person or entities:

a.     any of the Defendants named herein;

b.     any of the Defendants' co-conspirators;

c.     any of Defendants' parent companies, subsidiaries, and affiliates;

d.     any of Defendants' officers, directors, management, employees, or agents;

e.     all governmental entities; and

f.     the judges and chambers staff in this case, as well as any members of their immediate families.

84.     Plaintiffs do not know the exact number of Class members, because such information is in the exclusive control of Defendants. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

85.     Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

86.     Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

87.     Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a.      whether Defendants combined or conspired with one another to artificially

suppress prices for the Relevant Securities at any time during the Class Period to

shareholders of the Relevant Securities in the United States;

b.      whether Defendants combined or conspired with one another to fix, raise,

maintain, stabilize and/or suppress prices for Relevant Securities at any time

during the Class Period to shareholders of the Relevant Securities in the United

States;

c.      whether Defendants' conduct caused the prices of the Relevant Securities, sold or

held by the Retail Investors in the United States at any time during the Class

Period to be artificially fixed, suppressed, maintained or stabilized; and

d.      whether Plaintiffs and the other members of the Class were injured by

Defendants' conduct and, if so, the appropriate Class-wide measure of damages.

88.      These and other questions of law and fact are common to the Class and

predominate over any questions affecting the Class members individually.

89.      Defendants have acted on grounds generally applicable to the Class. This class

action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy.

Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive

litigation. There will be no material difficulty in the management of this action as a class action.

90.      The prosecution of separate actions by individual Class members would create

the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct

for Defendants.

## FACTUAL ALLEGATIONS

91.     Many of the Retail Investors regularly participate in online financial discussion forums, including but not limited to Reddit, Facebook, and TikTok. Through these forums, and elsewhere, Retail Investors are able to share information about their market observations and help fellow members of these online forums to benefit from their research. During the Relevant Period, Retail Investors communicated and exchanged information regarding the Relevant Securities, among other things.

92.     Based on their research, the Retail Investors, through SEC registered broker-dealers, such as the Brokerage Defendants, purchased the Relevant Securities.

93.     The Market Maker Defendants, hedge funds, and unnamed co-conspirators established "short" positions in the Relevant Securities. By the nature of the developed short positions, the Market Maker Defendants, hedge funds, Clearing Defendants, and certain unnamed co-conspirators, stood to benefit and substantially profit were the prices of the Relevant Securities to decrease. Entering into short positions is highly speculative. In a free and open market, there would be substantial financial risk that prices might increase causing traders with short positions to experience losses.

94.     The Market Maker Defendants, hedge funds, Clearing Defendants, and unnamed co-conspirators found themselves poorly positioned for the rise in Relevant Securities prices that occurred in late January 2021. As Relevant Securities increased in price, Market Maker Defendants were exposed to billions of dollars in losses, exposing the Clearing Defendants to increased collateral requirements if Robinhood were to fail.

95.     Rather than facing the consequences of their exposure to rising Relevant Securities' prices, the Market Maker Defendants, Clearing Defendants, Brokerage Defendants

and their co-conspirators entered into an anticompetitive scheme to prevent the market from operating freely, to halt the significant increase in the prices of the Relevant Securities, to avoid their own financial losses and reduced profits, and to cause financial losses to Plaintiffs and the members of the Class.

### *Role of Participants*

96.     There are numerous participants in the securities market who serve different roles. A brief explanation of some of these players and their roles is below.

### *The Depository Trust & Clearing Corporation*

97.     The Depository Trust & Clearing Corp. ("DTCC") is a holding company that owns and operates three clearing agencies that are registered with the U.S. Securities and Exchange Commission ("SEC") under the Securities and Exchange Act of 1934: National Securities Clearing Corp. ("NSCC"), Fixed Income Clearing Corporation ("FICC") and The Depository Trust Company ("DTC").

98.     The DTCC is a member owned and governed entity. Its members include, among others, Clearing Defendants Apex and ETC, as well as Brokerage Defendants E*Trade, Interactive Brokers, and Robinhood.

99.     NSCC is the central counterparty (CCP) that clears cash transactions in the U.S. equities markets, netting securities deliveries and payments among NSCC's clearing members and guaranteeing completion of trades even if one party to the transaction defaults.

100.    On May 6, 2021, Michael C. Bodson ("Bodson"), the CEO of the DTCC, testified before the U.S. House Committee on Financial Services and explained that:

> The U.S. Markets are multi-layered, and customers generally execute trades through one or more brokers or broker-dealers. NSCC direct clearing members are responsible for completing their customers' trades at the NSCC. NSCC's rules outline clear financial and operation risk management obligations that apply to direct clearing members.

101.    When an investor purchases a security, the transaction is not instantaneous, and instead takes time to settle and clear.

102.    Once the trade is executed, the trade information is relayed to the NSCC for clearing services. Securities trades submitted to the NSCC settle at the end of the second business day after submission, in what is known as T+2 settlement. This means that when an investor executes into a trade on a Monday, the cash and the securities related to that trade are electronically transferred on Wednesday.

103.    The NSCC's stated purpose is to reduce the cost, settlement risk, and operational risk of clearing and settling multiple transactions among multiple parties. Between trade submission and settlement, NSCC guarantees all cleared trades among its members. If a clearing member defaults on its settlement obligations, NSCC guarantees the delivery of cash and securities to its non-defaulting members.

104.    As explained by Bodson in his Congressional testimony, margin protects NSCC and all market participants against clearing member defaults, and margin requirements must be met by clearing members on a timely basis. NSCC's margin requirements are rules-based and subject to regulatory review and approval. The NSCC collects clearing fund contributions, or margin, at the start of each day and intraday in volatile markets. According to Bodson, the rules for calculating on the contribution requirements and the timing of collection of these margin requirements are known to every member. Furthermore, according to Bodson, NSCC provides

reporting tools, calculators and documentation that allow clearing members to monitor their risk in near real-time and estimate clearing fund contribution requirements. Bodson indicated that many clearing members have employed this information to build their own internal calculators and monitoring tools to aid them in risk management.

105.    The internal communications at Robinhood over the period demonstrate that Robinhood's staff did not use these tools in a proactive manner to anticipate the events of January 28, nor was there a consistent practice of tracking concentration levels relative to margin requirements. Robinhood did not utilize NSCC tools to conduct routine and rigorous risk assessment and scenario analysis of the Relevant Securities despite the significant role Robinhood played in providing services to traders that actively traded such securities.

*Independent Clearing Firms*

106.    An independent clearing firm handles the back-office details of securities transactions for broker-dealers (i.e., introducing brokers). An independent clearing firm executes and settles orders and maintains custody of securities and other assets. Essentially, the independent clearing firm handles the back-office operations behind making securities trades actually happen once a trade is submitted by an investor on an introducing broker's website and/or application. Independent clearing firms are also responsible for maintaining the paperwork associated with the clearing and executing of a transaction.

107.    Independent clearing firms have several revenue streams. Independent clearing firms receive interest on uninvested user cash. Additionally, independent clearing firms generate revenue by lending the stock owned by individual investors to other traders. When one broker or dealer lends securities to another, the borrower pays collateral slightly higher than their market

value along with a fee. Both of these streams represent revenue-generating opportunities for the independent clearing firms.

108.     As described below, independent clearing firms also generate a significant portion of their revenue from payment for order flow.

109.     Apex and ETC are independent clearing firms. Operating independently, each of these firms is supervised by the Financial Industry Regulatory Authority ("FINRA") and each serve as clearing agents for introducing brokers that do not have clearing capacity on their own.

110.     Apex serves as the independent clearing firm for Ally, Dough, Public.com, Sofi, Stash, Tastyworks and Webull, while ETC serves as the clearing firm for Alpaca.

111.     Independent clearing firms, including Apex and ETC, are members of the DTCC and therefore subject to its rules and regulations.

*Introducing Brokers*

112.     An introducing broker is a broker-dealer that contracts with an independent clearing firm to handle the execution and settlement of orders that the introducing firm receives from its clients or its own trading desk to buy and sell securities. The introducing broker's independent clearing firm, not the introducing broker, receives payments and maintains custody of the securities.

113.     Ally, Alpaca, Dough, Public.com, Sofi, Stash, Tastyworks and Webull are all introducing brokers.

*Self-Clearing Brokers*

114.     A self-clearing broker is likewise an introducing broker, but in addition to handling orders to buy and sell securities, a self-clearing broker also acts as its own clearing firm in that it executes and settles orders and maintains custody of securities and other assets. Self-

clearing brokers are also responsible for maintaining the paperwork associated with the clearing and executing of a transaction.

115.    Robinhood began as an introducing broker, clearing customer assets through Apex. As customer growth surged, Robinhood announced in 2018 that it received regulatory approval to become a self-clearing broker and did so.

116.    Other self-clearing brokers include E*Trade and Interactive Brokers, and non-defendants Fidelity and Vanguard.

117.    Each self-clearing broker is a member of the DTCC and therefore subject to its rules and regulations.

118.    Under Rule 15c3-l, a broker-dealer is required to "at all times have and maintain net capital" no less than the greatest of the minimum requirement applicable to its business. The rule is designed to require a broker-dealer to maintain sufficient liquid assets to meet all obligations to customers and counterparties and have adequate additional resources to wind down its business in an orderly manner without the need for a formal proceeding if the firm fails financially. All broker-dealers have the ability, using the NSCC's reporting tools, calculators and documentation and internally developed calculators and monitoring tools, to inform themselves in real time of their anticipated daily DTCC deposit requirements.

*Market Makers*

119.    Market makers are market participants who provide bid prices (i.e., the price investors are willing to purchase at) and ask prices (i.e., the price investors are willing to sell at) for securities. The difference between the two is known as the "spread." Market makers maintain an inventory of securities from their own trading and match incoming buy and sell orders in order to fill those orders. Once an order is filled, the spread is pocketed by the market maker as

profit. These spreads can be very small (e.g., under even a penny per transaction) but becomes

significant due to the very large volume of orders filled.

120.    Market makers are typically large financial technological firms that rely on

sophisticated software and algorithms.

121.    Many market makers are now entirely automated and are high-frequency trading

("HFT") firms. HFT firms are computerized and rely on software and data access to connect with

markets with minimal latency or delay. Low latency, or a relatively short time that elapses from

the moment a signal is sent to its receipt, is important for HFT market makers as it permits

arbitrage strategies. Price differences in the bid and offer prices of a security may fluctuate in

milliseconds, so latency is crucial for a HFT to quickly react in order to maximize potential

profits. Citadel Securities is an example of one of these firms.

122.    Market makers may also make trades for their own accounts.

123.    Orders placed through brokerages may be routed to a market maker for

execution.

124.    A market maker may execute an order routed to it by broker by taking the other

side of the transaction, a process known as "internalization."

125.    For example, if a market maker receives an order to buy a certain security, it may

route that order to an exchange or it may execute the orders off-exchange in its capacity as a

dealer by transacting against the buy orders with contra-side sell order, either from its own

inventory or by selling the security short.

*How an Order is Executed*

126.    Each of the players may play a role in how an order is executed.

127.    If a Retail Investor places a buy order through a retail broker—such as the

24

Introducing Brokerage Defendants or the Self-Clearing Brokerage Defendants—the retail broker might route the order through its Smart Order Router ("SOR") to execute the trade on one or more securities exchanges and other trading destinations where it is authorized to execute orders and where it deems it can meet its fiduciary duty of best execution.

128.     If a retail broker has not invested in the technology, connectivity, and memberships required to effectively route orders through a SOR that can satisfy its duty of best execution, the retail broker typically routes to an executing broker that can provide the smart order routing services, such as Citadel Execution Services or G1 Execution Services.

129.     Often the executing broker will operate an off-exchange market maker unit that is provided preferential access to the retail broker's orders and executes a significant percentage of such orders for its own "book" as a dealer instead of routing the order to any exchange or trading destination. Often the market maker unit provides the retail broker with payment-for-order-flow to compensate the retail broker for providing it preferential access to the retail broker's order. Furthermore, such arrangements typically do not charge the retail broker execution fees for orders directed to the market maker unit.

130.     After a Self-Clearing Brokerage's order is executed, the Self-Clearing Brokerage will send the details of the execution to the DTCC-affiliated clearinghouse entity (e.g., the NSCC) for clearinghouse and settling services. If, instead, the Introducing Brokerage does not self-clear, the Introducing Brokerage would instead route the details of the execution to an independent clearing firm such as Apex who would then send such details to the DTCC-affiliated entity for clearinghouse services.

*Background*

131.    As reported in the Financial Times, among other sources, Retail Investors' market

share of U.S. equity trading has steadily increased since 2019.



132.    Credit Suisse estimated that at various times in 2021, Retail Investors accounted

for a third of all U.S. stock market trading.

133.    Retail Investors execute their personal trades through brokerage firms, such as the

Brokerage Defendants that run online platforms from which Plaintiffs and other Retail Investors

are able to buy and sell securities.

134.    Due to their smaller trades, Retail Investors have traditionally paid higher fees

and commissions. Many of the Brokerage Defendants, including Robinhood, represent to Retail

Investors that they offer "commission-free" brokerage services to facilitate fair trading in the stock market. While these brokerages hold themselves out as free, the consumer incurs costs in other ways besides paying commissions. For example, while Robinhood users do not pay trade commissions, they pay a hidden price with each trade in the form of higher transaction costs as Robinhood earns revenue through rebates, kickbacks and other payments from market makers like Citadel Securities who compensate Robinhood for preferential access to Robinhood's order flow.

135.    When a Robinhood user executes a trade, the order is typically executed by an off-exchange market maker instead of being directly routed to a national securities exchange. Robinhood's practice of selling its users' orders to third parties is known as selling "order flow," and Robinhood derives the majority of its profit from this practice. In Robinhood's Form S-1 dated July 1, 2021, Robinhood states "[b]ecause a majority of [Robinhood's] revenue is transaction-based (including payment for order flow, or "PFOF"), reduced spreads in securities pricing, reduced levels of trading activity generally, changes in our business relationships with market makers and any new regulation of, or any bans on, PFOF and similar practices may result in reduced profitability, increased compliance costs and expanded potential for negative publicity." Robinhood's Form S1 is available at:

https://www.sec.gov/Archives/edgar/data/1783879/000162828021013318/robinhoods-1.htm.

136.    For example, if a Retail Investor purchases a share of stock through Robinhood, Robinhood sends the order to a large market maker like Citadel Securities and receives payment in return—i.e., the "payment for order flow" fees. Citadel Securities, meanwhile, makes money itself by executing an offsetting trade at a more favorable price than it transacted for the Robinhood user's purchase, a practice known as "capturing the spread." While the profit may be

relatively small for an individual trade, the sheer number of trades sum to a significant value.

Citadel Securities is Robinhood's largest counterparty. In 2019, 29% of Robinhood's revenue

derived from transactions with Citadel Securities. For 2020, 34% of Robinhood's revenue

derived from transactions with Citadel Securities. Below is an excerpt from Robinhood's Form

S-1, where it details its revenues from market makers in "excess of 10% of total revenues":

### Concentration of credit risk

We had revenues from market makers in excess of 10% of total revenues, as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2020 |
| Market maker: | | |
| Citadel Securities, LLC | 29 % | 34 % |
| Entities affiliated with Susquehanna International Group, LLP[1] | 13 % | 18 % |
| Entities affiliated with Wolverine Holdings, L.P.[2] | 12 % | 10 % |
| All others individually less than 10% | 8 % | 13 % |
| Total as percentage of total revenue: | 62 % | 75 % |

(1)  Consists of Global Execution Brokers, LP and G1X Execution Services, LLC
(2)  Consists of Wolverine Execution Services, LLC and Wolverine Securities LLC

We are engaged in various trading and brokerage activities in which the counterparties primarily include broker-dealers, banks, and other financial institutions when applicable. In the event our counterparties do not fulfill their obligations, we may be exposed to risk. The risk of default depends on the creditworthiness of the counterparty. It is our policy to review, as necessary, the credit standing of each counterparty.

137.    For Robinhood, the payment-for-order-flow compensation is a materially

significant component of its revenue, with the mechanism of payment-for-order-flow effectively

operating as a profit-sharing mechanism through which Citadel Securities compensates

Robinhood for its order flow with profits extracted from such order flow by its market maker.

138.    The SEC requires broker dealers to disclose how their customers' orders are

handled, including reporting the entities that handle their order flow, in what are known as Rule

606 disclosures.

139.    Robinhood is not the only Defendant that sells order flow.

140.    Based upon Apex's SEC Rule 606 filing, Apex directed order flow for 99.99% of

all its "non-directed orders" in January 2021 for S&P 500 stocks and non-S&P 500 stocks.

141.     Apex sent 23.26% of all "non-directed" order flow to Citadel Securities in S&P 500 stocks and 13.26% of all "non-directed" order flow for non-S&P500 stocks to Citadel Securities in January 2021.

142.     As mentioned above, Retail Investors exchange investment information via online discussion forums. Through these forums, as early as 2019, the Retail Investors developed the trading hypothesis that shares of GameStop's (GME) stock were trading at lower prices than they should be based on GameStop's publicly available financial disclosures and future prospects.

143.     GameStop for example, despite being a brick-and-mortar store specializing in video games that can now be downloaded from a person's home, possessed ample cash reserves, was regularly paying off its debts and was presented new opportunity with the release of the next generation of gaming platforms. Despite this, in 2019, shares of GameStop's stock were trading as low as $3 per share. Some Retail Investors correctly deduced that GameStop was undervalued for a variety of reasons that included the observation that large financial institutions had taken large short positions that resulted in levels of short-interest that would bear significant costs if the outlook on GameStop improved and the short positions had to be exited. This was essentially a bet on GameStop's failure by institutional investors that were significantly exposed to a potential "short squeeze" that could drive the stock sharply higher if the price of GameStop was challenged by any significant buying activity by well-capitalized market participants. Due to GameStop's low share price and the belief that short-sellers were pressuring GameStop in a manner that maintained the stock at an artificially low price, these Retailer Investors determined GameStop represented a good investment opportunity.

144.     In addition to GameStop, Retail Investors invested in the other Relevant Securities based on their own valuations and anticipated business performance.

145.     For example, Retail Investors invested in Nokia (NOK) because Nokia, which had historically focused its business on the manufacture and sale of mobile phone handsets, had been expanding in other industries, including investing in 5G communication networks, including towers and other infrastructure.

146.     Like other Retail Investors, Plaintiffs purchased "long" positions in the Relevant Securities.

147.     In a free and open market, stock prices are determined by supply and demand and other market forces. Ordinarily, as more investors buy a certain stock, they tend to bid up the stock's price, and the market price for the stock rises. Conversely, as investors sell stock, the stock price is bid down and the market price for the stock declines.

148.     If an investor has long positions, it means that the investor has bought and owns those shares of stocks (in contrast to a short position, where the investor owes those stocks to someone, but does not actually own them yet). Investors holding long positions generally own the stock with the expectation that it will rise in value and it will be worth more than they paid for it. When the investor sells a long position, the profit or loss from the sale is the difference between the purchase price of the security and the sale price of the security.

149.     Retail Investors took long positions in the Relevant Securities with the expectation that the stock would increase in value, generally because they believed that the respective companies' business prospects were improving. Investors in the Relevant Securities generally believed they were good investment opportunities, and that prices of their securities

would rise as can be expected when a market is operating freely, without fraud, conspiracy or manipulation.

150.    Retail Investors have limited access to the stock market. Generally, Retail Investors must invest in the stock market through intermediaries such as the Brokerage Defendants.

151.    Institutional investors on the other hand have considerably greater access to the stock market. They can invest directly, and those that are broker-dealers do not need to use other brokerages to execute their trades in securities.

152.    Institutional investors also can trade on private stock exchanges that members of the public cannot access. These exchanges are known colloquially as "dark pools" or "dark exchanges" because of their lack of transparency and because they do not disseminate public quotations of securities prices.

153.    Similarly, as market makers internalize trades they do so within their own dark trading operations, which are not accessible to the broader market.

154.    Dark pools, which account for 40% of all U.S. stock trades, are vastly different from traditional or "lit" stock exchanges such as the New York Stock Exchange or NASDAQ. In a lit exchange, the order book including the price and amount an investor wants to trade is public and visible to all participants. Dark pools on the other hand do not display publicly how much an investor wants to buy or at what price. Stock purchased in a lit exchange can be sold on a dark exchange, and stock purchased in a dark exchange can be sold in a lit exchange.

155.    While institutional investors can trade on both dark and lit exchanges, many prefer dark pools over "lit" exchanges because they can discreetly buy or sell securities in large blocks, even in the millions, while mitigating some of the price impact their buying or selling

activity would otherwise have if they transacted on the "lit" national securities exchanges. Dark pools permit institutional investors to trade without visible exposure of their order to the market as a whole until after the trade has been executed. Furthermore, dark pools typically offer lower execution fees than national securities exchanges and may provide some access to retail order flow that market making units have decided not to internalize.

156.    Institutional investors, including the hedge funds and unnamed co-conspirators, acquired massive "short" positions in the Relevant Securities.

157.    As indicated above, "short" sellers essentially bet on an asset's failure rather than its success. Short sellers borrow shares of a company that they believe will reduce in price, in the hope that once the share price falls, they might be able to buy the shares at a reduced price and return them to the lender. They pocket the difference. A short seller's profit is the share value lost at the time a short seller "buys" a security versus the time when the short seller "borrows" the security. For example, a short seller might sell a share of a stock in Company X for $10 and then borrow a share of Company X (for a fee) from a broker for $10. The short seller immediately sells the share and hopes that the value of the share will drop. The share price then falls to $4. The short seller then purchases the share at the reduced value of $4 and returns it to the lender and earns the difference of $6 (less the fees incurred in borrowing the share). On the other hand, if the price of the share rises to $20, the short seller would need to purchase the share at $20 to return it to the lender, thereby incurring a loss of $10 on top of any fees incurred.

158.    The more a stock price increases, the greater the loss to the short seller. The theoretical loss to a short investor who predicts wrongly is potentially infinite because there is no upper boundary on the price to which a company's share price can rise. Should a short seller want to exit a short position in the face of rapidly increasing stock price, they must "buy back"

the stock at the higher price to return to the institution they borrowed the share from. Risk from

bad short selling investments is potentially catastrophic.

159.    On the other hand, the loss to an investor who purchases a stock "long" is limited

to the difference between the amount paid for the shares and the lowest price to which the stock

can fall, which, of course, is zero.

160.    As reported by the financial analytics firm S3, on January 4, 2021, GameStop's

peak short interest was 141.8% of its float (i.e., publicly tradable shares), which indicates that

some short sellers were selling shares without either owning them or identifying an owner from

whom shares could be borrowed. The practice of short selling without identifying a source from

which they can be borrowed is an illegal practice known as "naked shorting." In a "naked" short

sale, a seller does not borrow or arrange to borrow the necessary securities in time to deliver

them to the buyer within the standard two-day settlement period.

161.    Naked short selling is illegal pursuant to SEC Regulation SHO, which requires

broker-dealers "to identify a source of borrowable stock before executing a short sale in any

equity security with the goal of reducing the number of situations where stock is unavailable for

settlement." The regulation is available at: https://www.sec.gov/investor/pubs/regsho.htm.

Sometimes, however, the stock being borrowed may not be available from the lender at the time

of settlement, possibly resulting in a fail to deliver.

162.    Regulation SHO also requires firms that clear and settle trades to take action to

close out failures to deliver by borrowing or purchasing securities of like kind and quantity. For

short sale transactions, failures to deliver must be closed out by no later than the beginning of

regular trading hours on the settlement day following the settlement date, referred to as T+4. For

long sale transactions or bona fide market making activities, failures to deliver must be closed

out by no later than the beginning of regular trading hours on the third settlement day following the settlement date, referred to as T+6.

163.     As a result of Retail Investors building long positions in the Relevant Securities, by both buying stock in the Relevant Securities and buying "out of the money" call options in the Relevant Securities that had "strike prices" well above the prices that the Relevant Securities were then trading at, the stock price of these companies began to rise. As the value of the Relevant Securities increased, this resulted in both a "short squeeze" and a "gamma squeeze."

164.     As explained above, a short squeeze occurs when a stock or other asset rises sharply in value, distressing short positions in the asset. A short squeeze therefore is when investors in short positions are faced with a rapid increase in the shorted asset's value, exposing the short seller to increased loss. As the price of the asset rises, short sellers may face pressure to buy back shares of stock to exit their short positions to mitigate their losses. In the absence of market manipulation or some other intervention, as short sellers exit their short positions by buying shares of stock to cover their short positions, the purchase of those shares further increases the price of the stock.

165.     There is another phenomenon known as a "gamma squeeze" involving a derivative financial vehicle known as an option or an option contract.

166.     "Options" are derivative financial instruments based on the value of an underlying security. An option contract offers the buyer the opportunity, but not the obligation, to buy or sell the underlying asset depending on the type of option contract.

167.     "Call options" give the holder the right to buy the asset at a stated fixed price within a specific timeframe. "Put options" on the other hand give the holder the right to sell the

asset at the stated fixed price within a specific timeframe. The fixed price at which the options

holder may exercise the option is known as the "strike price."

168.    The holder of an option contract is not required to buy or sell the asset if they

choose not to.

169.    An option is "in the money" (ITM) if the option has a strike price that is

favorable in comparison to the prevailing market price for the asset. For example, a call option is

in the money if the option holder has the right to exercise the option to buy the underlying asset

below its current market price. An ITM put option means the option holder can sell the security

above the current market price.

170.    Conversely, an "out of the money" (OTM) option has a strike price unfavorable

in comparison to the market price for the underlying asset. For example, an OTM call option

means the underlying asset's current market price is below the strike price of the call. An option

is "at the money" if the strike price equals the underlying asset price.

171.    Options are priced based on a variety of risk variables known colloquially as the

"Greeks" as they are represented by letters of the Greek alphabet.

172.    "Delta" represents the rate of change between an option's price a small change in

the price of the underlying asset, i.e., the price sensitivity of the option with respect to the asset.

The units of Delta can be normalized to the range -1 to +1, reflecting a one-dollar change in the

underlying asset price. The Delta of a call option ranges from 0 to 1, whereas the Delta of a put

option ranges from 0 to -1. A call option with a Delta of 0.10 therefore will increase by 10 cents

for every one dollar the price of the underlying asset rises, absent any other changes.

173.    "Gamma" represents the rate of change between an option's Delta and the

underlying price. The units of Gamma can be normalized to reflect the amount the Delta would

change given a one-dollar move in the price of the underlying asset. For example, if a call option has a Gamma of 0.10, if the price of the underlying asset increases by one dollar, then the option's Delta will increase by 0.10, absent any other changes.

174.     An option that is deep out of the money or deep in the money has a small Gamma, whereas options that are at or near the money will have larger Gamma.

175.     For at and around the money options, Gamma typically increases as the expiration date of the option approaches.

176.     Market makers also attempt to reduce risk by hedging. A market maker typically hedges by looking at the Delta and buying or selling short an appropriate amount of stock to offset the option. For example, if a market maker sells a call option, then the market maker may hedge with long positions in the underlying security.

177.     Similar to a short squeeze, a Gamma Squeeze occurs when a security experiences a sharp price increase. For example, consider when the price of an underlying security rises up towards the direction of the strike prices of deep out of the money options. When such an increase occurs, options that were previously unlikely to reach their strike prices before expiration see a rapid increase in values as it becomes more likely that the options will reach their strike prices.

178.     At the same time, the options' sensitivity to the price increases, i.e., the Delta, also increases due to the options' Gamma. The Gamma also increases as the option approaches being in the money.

179.     As the Gamma increases, market makers hedge by purchasing more of the underlying security, further driving the price of the security higher. As the price goes higher, more deep out of the money options either go in the money or approach their strike price,

creating a feedback loop that rapidly increases the price of the underlying security, which then moves more out of the money options towards at the money or above.

180.    With regard to GameStop, a popular Reddit user who also creates content on YouTube under the handle Roaring Kitty ("Roaring Kitty") had reason to believe that hedge funds had entered into these short positions with respect to GameStop's stock. Based on his own financial analysis, Roaring Kitty determined that GameStop was actually undervalued due to a range of factors, including that there had been extensive shorting of GameStop by numerous funds, and made an initial purchase of $50,000 of GameStop stock and published his investments on the Reddit financial discussion forum WallStreetBets.

181.    WallStreetBets is a financial discussion forum on Reddit. WallStreetBets is characterized by a particular culture centered around discussion of financial investments and memes. Many users on WallStreetBets are sophisticated, financially savvy Retail Investors with business acumen.

182.    Roaring Kitty regularly updated and continued to publish information and analysis that GameStop stock was undervalued. In August 2020, Roaring Kitty posted an in-depth analysis of GameStop's stock on his YouTube channel, walking his subscribers through his extensive analysis of the value proposition of the stock.

183.    Attention to GameStop's stock was not limited to online financial communities and discussion forums. Dr. Michael Burry (who gained fame for his investment decisions and for correctly predicting the 2008 financial crisis as depicted in the film The Big Short) and his investment firm Scion Asset Management, LLC spent nearly $15 million to purchase stock in GameStop in 2019 at share prices between $2 and $4.20 per share for a 5% ownership position. GameStop's share price steadily increased and Retail Investors took notice.

184.     Ryan Cohen, the co-founder and former CEO of the pet e-commerce website Chewy.com, invested $76 million and acquired a 12.9% stake in GameStop in 2020. Several Retail Investors were optimistic about Ryan Cohen's involvement in GameStop, who joined the board of directors on January 11, 2021.

185.     Institutional investors, holding large short positions in GameStop and the other Relevant Securities began to push back by asserting that the Relevant Securities were not as valuable as the Retail Investors thought. For example, on January 21, 2021, when GameStop was valued at approximately $20 per share, Andrew Left, the founder of Citron Research, a capital research and investment firm, gave an interview explaining why he was shorting GameStop, calling the Retail Investors "the suckers at this poker game."

186.     In response, Retail Investors continued to build long positions and call options in GameStop and the other Relevant Securities. Given the operation of a free and open market, GameStop and other Relevant Securities were bid up and share prices increased. GameStop, for example, jumped 78.46% from $43.03 per share on January 21, 2021, to $76.79 per share on January 25, 2021. This massive price increase exposed the short sellers of the Relevant Securities, including the Market Maker Defendants, to very substantial loses. It was a textbook short squeeze.

187.     The tremendous growth in the Relevant Securities' stock price resulted in significant and potentially disastrous exposure of institutional investors, and hedge funds, holding short positions in the Relevant Securities.

188.     On January 25, 2021, Citadel LLC injected around $3 billion along with another fund, Steven Cohen's Point72 Asset Management ("Point72"), to bailout Melvin Capital from its distressed short position. Notably, Melvin Capital's founder and CEO, Gabe Plotkin, began his

career at Citadel and worked closely with Ken Griffin before becoming a top portfolio manager at Point72's predecessor firm, SAC Capital Management.

189.    The following day, January 26, 2021, GameStop's share price continued to surge after Social Capital's Chamath Palihapitiya tweeted that he bought GameStop call options, betting the share price would go higher. GameStop closed at $147.98, up 92.7% from the previous day's close.

190.    Also on January 26, 2021, Tesla CEO Elon Musk ("Musk") rallied behind GameStop's epic price surge, tweeting "Gamestonk!!" along with a link to the WallStreetBets Reddit page. Shares of GameStop were up more than 60% in after-hours trading following Musk's tweet.

191.    On January 27, 2021, the price of the Relevant Securities soared as trading volumes in U.S. cash equities and options hit an all-time record level at 24.5 billion shares traded and 57.1 million contracts traded. GME's stock price peaked at $380.00, before reaching a closing high of $347.51, a 134.84% increase from the previous day. Other Relevant Securities experienced similar surges. AMC's share price skyrocketed over 300% and EXPR's rose over 200%.

192.    Concurrently, Retail Investors were buying deep out of the money call options in the weeks leading up to January 28, 2021 based on their beliefs that the Relevant Securities were unfairly valued below their true value.

193.    Market makers including Citadel Securities took the other side of these transactions, developing large short positions.

194.    As the price of the Relevant Securities increased, the Delta and Gamma of the previously deep out of the money call options purchased by Retail Investors came closer to their strike price, further increasing the price of the Relevant Securities.

195.    Additionally, January 29, 2021 was an expiry date for options. As the expiration date for options approaches, the Gamma generally increases, further compounding the effects the price increases of the Relevant Securities had on the Delta and Gamma of the Retail Investors' call options.

196.    Similarly, as retail orders for the Relevant Securities were routed to the market makers, the market makers such as Citadel Securities took the other side of those buy orders, i.e., improvidently short selling the security to execute the order by filling buy orders without owning the securities being purchased.

197.    Further, as market makers such as Citadel Securities took the other side of the incoming call option and security purchases from Retail Investors, they built up significant short positions in the Relevant Securities.

198.    As set forth above, the more a stock price increases, the greater the potential loss for the short seller. This culmination of events (i.e., the short-squeeze) triggered the Brokerage Defendants to place unprecedented trading restrictions on the Relevant Securities. In the case of the clearing brokers, the restrictions prevented the risk of liability for a potential clearing member default, and were likely in response to pressure from other market participants who stood to benefit from a decline in the stock, including market makers and funds that were short.

199.    On January 27, 2021, TD Ameritrade announced that "[i]n the interest of mitigating risk for our company and clients, we have put in place several restrictions on some transactions in $GME, $AMC and other securities" and increased the margin requirements on

certain securities. TD Ameritrade cited "unprecedented market conditions and other factors," as the reason for the restrictions.

200.    Charles Schwab similarly "put restrictions in place on certain transactions," including for GME, AMC and EXPR, and Robinhood said it would not allow margin trading of shares of both GME and AMC.

201.    At approximately 5:00 p.m. on January 27, 2021, the SEC released a statement that it was "aware of and actively monitoring the on-going market volatility in the options and equities markets," but neither the SEC nor any other government agency issued any directive to restrict trading in the Relevant Securities.

202.    The figure below summarizes the prices of GameStop's stock from December 28, 2020 through January 29, 2021.



203.    The figure below summarizes the prices of Nokia Corporation's stock from December 28, 2020 through January 29, 2021.



204.    The figure below summarizes the prices of AMC Entertainment Holdings, Inc.'s stock from December 28, 2020 through January 29, 2021.



205.    The figure below summarizes the prices of Koss Corporation's stock from December 28, 2020 through January 29, 2021.



206.    The figure below summarizes the prices of Trivago stock from December 28, 2020 through January 29, 2021.



207.    The figure below summarizes the prices of Bed Bath & Beyond stock from December 28, 2020 through January 29, 2021.



208.    The figure below summarizes the prices of Express stock from December 28, 2020 through January 29, 2021.



209.    The figure below summarizes the prices of Tootsie Roll Industries Inc.'s stock from December 28, 2020 through January 29, 2021.



210.    The figure below summarizes the prices of BlackBerry's stock from December 28, 2020 through January 29, 2021.



### *The Illegal Scheme*

211.     Rather than use their financial acumen to compete and invest in good opportunities in the market to recoup the loss in their short positions as a result of the growth in the Relevant Securities' prices, or paying the price for their highly speculative accumulation of large short positions, Defendants instead hatched an anticompetitive scheme to limit trading in the Relevant Securities.

212.     After the market closed on January 27, 2021, suspicious coordinated after-hours trading occurred.

213.     Analytics reveals a significant volume of GME short volume immediately prior to the markets opening on January 28, i.e., indicating that the after-hour traders were trading in anticipation of a GME sell-off. The grey lines in the chart below represent the volume of short positions in GME. As demonstrated by the grey lines below, the volume of short positions was much higher before January 28, 2021 than any of the prior days and had steadily increased the week prior.



214.     Due to constraints imposed by retail brokers, Retail Investors cannot engage in after-hours trading to the same extent as institutional investors. It is therefore likely that this increase in short volume is the result of institutional investors, like the hedge funds and Market Maker Defendants, taking new short positions.

215.     Failure to deliver ("FTD") occurs when one party in a trading contract does not deliver on its obligations. For example, recall a short seller borrows a security at a price in hopes its price will decrease. If, however, a short seller fails to locate and borrow a security to deliver to a buyer, then that transaction is recorded as a fail to deliver.

216.     Increases in FTDs are indicative of naked short selling. That is because naked short sellers do not actually possess the security they are supposed to "borrow." Thus, when a

buyer then seeks to purchase the borrowed security, the short seller cannot deliver because the short seller never possessed the security in the first place and fails to deliver on its obligations.

217.    Increases in FTDs are also consistent with market makers taking on increased short positions. As market makers take the other side of buy orders routed to them, they borrow securities to sell short, developing a substantial short position themselves.

218.    This practice of shorting stock that is not borrowable is largely inaccessible to Retail Investors, i.e., Retail Investors cannot engage in naked short selling. However, market makers are able to short stock that is not borrowable by utilizing a market maker exemption.

219.    FTDs in the Relevant Securities also rose dramatically in the period leading up to January 28, 2021, a phenomenon consistent with both increasing short interest by the Market Maker Defendants and unnamed coconspirators as well as with improper trading in the form of selling securities without identifying stocks to borrow to deliver to the retail investors who bought them.

220.     The figure below summarizes fails to deliver for AMC from January 1, 2021 through February 9, 2021:



221.     The figure below summarizes fails to deliver for BBBY from January 1, 2021 through February 9, 2021:



222.     The figure below summarizes fails to deliver for BB from January 1, 2021

through February 9, 2021:



223.     The figure below summarizes fails to deliver for EXPR from January 1, 2021

through February 9, 2021:



224.    The figure below summarizes fails to deliver for GME from January 1, 2021 through February 9, 2021:



225.    The figure below summarizes fails to deliver for KOSS from January 1, 2021 through February 9, 2021:



226.    The figure below summarizes fails to deliver for NOK from January 1, 2021

through February 9, 2021:



227.    The figure below summarizes fails to deliver for TR from January 1, 2021

through February 9, 2021:



228.     The figure below summarizes fails to deliver for TRVG from January 1, 2021 through February 9, 2021:



229.     The dramatic increase in short positions was counterintuitive. Chatter in various financial discussion forums indicated high excitement and motivation on the part of Retail Investors to continue investing in the Relevant Securities. Many Retail Investors announced plans to increase long positions in the Relevant Securities on January 28, 2021, which would mean the prices for the Relevant Securities were likely to go further up, not down.

### *The Events of January 28, 2021*

230.     At approximately 1:00 a.m. EST on January 28, 2021, Defendant Robinhood circulated an email to its users with the subject line "[a]n important update on your expiring options," informing them that in light of unprecedented volatility surrounding GME and AMC, and in an effort to help reduce risk, all GME and AMC options with expirations of January 29th, 2021 will be set to closing transactions only. This meant that customers could close out their positions but could not make new investments.

231.    The email was silent as to any restrictions placed on trading shares of GME,

AMC, or other securities.





 This meant that customers could only sell shares in the Relevant Securities and were foreclosed from buying them.



235.     As the markets opened on January 28, 2021, the Retail Investors woke up to find that the Brokerage Defendants had suddenly and without notice restricted their ability to purchase the Relevant Securities.

236.     Retail Investors that used Robinhood as their brokerage could no longer purchase the Relevant Securities. The "buy" button was deactivated as a feature, leaving users with no option but to sell or hold their securities.

237.     Robinhood addressed the "[w]hy don't I see a buy button?" question on its website here: https://robinhood.com/us/en/support/articles/why-dont-i-see-a-buy-button/. It offered three reasons for the buy button being unavailable on a user's account. The three reasons are: 1) "It's a foreign stock, which we don't support." 2) "It's an over-the-counter (OTC) stock or a warrant, which Robinhood generally doesn't support"; and 3) "It's a stock undergoing corporate action. The stock will be tradable again once the corporate action has been finalized." Robinhood's explanations did not correspond with reality, however, because the Relevant Securities were not foreign stocks, OTC stocks or stocks undergoing corporate actions during the Class Period. Robinhood did not warn users of any situation where it could prevent users from buying stock out of its own volition. This explanation was incomplete, inaccurate, untrue, and did not disclose the conspiracy underlying the change.

238.     Worse, Retail Investors who had queued purchase orders overnight on January 27, 2021 to purchase stock when the markets opened on January 28, 2021 discovered that their purchase orders had been cancelled without their consent. Some received messages that claimed "[y]ou canceled your order" despite the fact that they did no such thing.

239.     The restrictions on trading took different forms but had the same effect. Retail Investors were prohibited from opening new long positions in the Relevant Securities. In other words, Retail Investors were not permitted to purchase new positions but only permitted to sell their long positions and not buy more.

240.    On Robinhood's web platform and mobile app, Retail Investors were blocked

from searching for the Relevant Securities' ticker symbols.







It was not in the independent common interest of Robinhood or other conspirators to do so without the agreement of its co-conspirators.

247. ████████████ the other Brokerage Defendants and other brokerages employed similar tactics to prevent Retail Investors from opening new positions in at least one or more of the Relevant Securities.

248.     For instance, Stash prohibited users from viewing tickers for GME and AMC. Other tickers were under no such restriction and were easily searchable on the platform. Because of Stash's platform design, a Retail Investor who cannot view the page for a particular asset cannot trade in that asset. As a result, Retail Investors were unable to access the page for GME and AMC to open new long positions in the Relevant Securities.

249.     News of the trading restrictions imposed by the Brokerage Defendants and other brokerage firms soon came to light via widespread media coverage and through the Brokerage Defendants' own admissions.

250.     Around 9:05 a.m. on January 28, 2021, Interactive Brokers announced via Twitter that it put AMC, BB, EXPR, GME, and KOSS option trading into liquidation only due to the extraordinary volatility in the markets. It also announced that long stock positions would require 100% margin and short stock positions would require 300% margin.

251.     E*Trade likewise confirmed that it halted GME and AMC stock citing "extraordinary volumes" as the reason, and various media outlets reported that Alpaca also restricted trade in the Relevant Securities.

252.     Robinhood tweeted that in light current market volatility, it was restricting transactions for certain securities to position closing only, including $AMC and $GME.

253.     Robinhood subsequently updated its website with a list of securities set to position-closing only, meaning that the Retail Investors could sell and close their positions in these securities, but they were prohibited from opening new positions. The securities included, *inter alia*, AMC, BB, BBBY, EXPR, GME, KOSS, NOK, TR and TRVG.

254.     Robinhood attributed the aforesaid restrictions to ongoing market volatility and other pretextual explanations while not disclosing its communications with other members of the

conspiracy. Robinhood, acknowledged that it had canceled open orders for the listed securities and also disabled the ability for users to search for these securities in Robinhood's mobile app. Robinhood's January 28 blog post titled, *Keeping Customers Informed Through Market Volatility*, also attributed the restrictions to "significant market volatility" and further disclosed that Robinhood raised margin requirements for certain securities.

255.   Reporting throughout January 28, 2021, revealed that the ban on purchasing stock of the Relevant Securities occurred at many brokerages. On information and belief, the Brokerage Defendants adopted similar if not identical restrictions to Retail Investors from opening new positions in all, or at least one or more of the Relevant Securities. It is unlikely that they would have done so but for the conspiratorial agreement. Members of the conspiracy acted to shut down the market with the purpose of benefitting the participants in the conspiracy and with the intent to harm Plaintiffs and the members of the Class.

256.   As intended, Pursuant to the illegal anticompetitive scheme, the coordinated prohibition on buying any new Relevant Securities—through the Brokerage Defendants' forced foreclosure on Retail Investors from buying Relevant Securities—led to a massive sell-off. This resulted in a steep decline in the stock prices of the Relevant Securities.

257.   For example, on January 28, 2021, GME shares reached an intraday peak of $483.00—before plunging down to $112.25, eventually closing at $193.60, a 44.29% drop from GME's close of $347.51 just one day prior. Similarly, shares of AMC plummeted 56.63%, shares of EXPR fell 50.79% and shares of BBBY fell 36.40%. Retail Investors who wanted to take advantage of the price drop to buy more shares the Relevant Securities were unable to due to the prohibition on purchasing.

258.    The figures below (reproduced from above for ease of reference) illustrate the share prices of Relevant Securities from December 28, 2020 through January 29, 2021, and show the rise in share price attributable to the Retail Investors continued purchase of the stocks, as well as the sharp decrease in share price resulting from the restrictions imposed by the Brokerage Defendants on or about January 28, 2021.

259.    The figure below summarizes the prices of GameStop's stock from December 28, 2020 through January 29, 2021.



260.    The figure below summarizes the prices of Nokia Corporation's stock from

December 28, 2020 through January 29, 2021.



261.    The figure below summarizes the prices of AMC Entertainment Holdings, Inc.'

stock from December 28, 2020 through January 29, 2021.



262.    The figure below summarizes the prices of Koss Corporation's stock from December 28, 2020 through January 29, 2021.



263.    The figure below summarizes the prices of Trivago stock from December 28, 2020 through January 29, 2021.



264.    The figure below summarizes the prices of Bed Bath & Beyond stock from December 28, 2020 through January 29, 2021.



265.    The figure below summarizes the prices of Express stock from December 28, 2020 through January 29, 2021.



266.     The figure below summarizes the prices of Tootsie Roll Industries Inc.'s stock from December 28, 2020 through January 29, 2021.



267.     The figure below summarizes the prices of BlackBerry's stock from December 28, 2020 through January 29, 2021.



268.    The prohibition on purchasing stock did not apply to all investors. Large investment firms such as the hedge funds and Market Maker Defendants were not restricted from purchasing the Relevant Securities. While Retail Investors were excluded from purchasing securities at the reduced rate, investment firms and market makers such as Citadel Securities holding short positions were permitted to cover their short positions by buying securities at the artificially reduced price, including from dark pools such as the Market Maker Defendants' own internalized exchanges.

269.    As the Retail Investors sold their shares in the Relevant Securities due to the trading restrictions, the Market Maker Defendants internalized those transactions and took the other side of those sell orders, i.e., they bought the shares the Retail Investors were selling—at an artificially reduced price—to close their short positions. In doing so, the Market Maker Defendants were able to buy and return the borrowed securities they had sold short.

270.    Numerous broker-dealer firms collectively prohibited Retail Investors from opening new positions in GME, AMC and other Relevant Securities on January 28, 2021. Some restricted Retailer Investors from buying or opening new long positions in securities wholesale, whereas others restricted purchasing options only.

271.    Not all brokerages restricted the purchase of the Relevant Securities. Even in the cases where brokerages were allowing Retail Investors to open new long positions, however, clearing firms began to raise fees to purchase securities or otherwise instruct brokerages not to consummate purchase orders.

272.    Brokerages and trading venues route trades through clearing brokers which streamlines the trading process. By increasing fees to purchase a particular stock, the clearing firm can suppress the number of purchases of that stock and negatively affect the stock's price.

273.     Many of the Brokerage Defendants, including Robinhood, act as their own clearing firm. These self-clearing Brokerage Defendants were able to use their own self-clearing ability to restrict trading through their own brokerages.

274.     For the Brokerage Defendants who did not self-clear, they restricted trading at the direction of their clearing broker.

275.     For instance, Anthony Denier ("Denier"), the CEO of Webull, a brokerage which had restricted trading in the Relevant Securities, placed the blame squarely on its clearing firm, Apex. According to Denier, the collateral required by Apex for GameStop increased by 100% and Apex had informed him that Webull needed to shut off the ability to open new positions in certain stocks. Denier further said that the restrictions originated the morning of January 28, 2021 and was informed that Apex was instructed by the DTCC that it was increasing the collateral needed to settle trades for the Relevant Securities.

276.    SoFi also restricted trading at the direction of Apex.



277.    Other brokerages, including Ally, Dough, Public.com, Stash and Tastyworks also reported that Apex had instructed them to halt all opening transactions of GameStop, AMC and Koss on their platforms. For example, Dough tweeted, "[o]ur clearing has notified us that we must set GME, AMC, and KOSS to closing only. We will comply." Public.com similarly tweeted, "[o]ur clearing firm, Apex Holdings, has decided to halt the buying of $KOSS, $GME, and $AMC." Public.com subsequently tweeted "[w]e disagree with this decision and are working hard for our members to resolve the issue."

278.    Upon information and belief, ETC also prohibited Alpaca from allowing its users to purchase the Relevant Securities.

279.     Perhaps fearing reprisal or worried that Apex or ETC would fail to execute, clear, and/or settle its customers' transactions, the Introducing Brokerage Defendants acquiesced to Apex's and ETC's demand to restrict trading in the Relevant Securities.

### *Collusion Amongst Defendants*

280.     Defendants were aware that they were acting in concert to collude and manipulate the market. In an interview given by Interactive Brokers's chairman Thomas Peterffy ("Peterffy") on January 28, 2021, Peterffy admitted that Interactive Brokers had restricted trading in order to "protect ourselves." That same evening, Robinhood's CEO Vlad Tenev ("Tenev") told CNBC that Robinhood decided to stop trading in the Relevant Securities, in part "to protect the firm."

281.     The anticompetitive conspiracy described herein was authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

282.     The coordinated and collusive prohibition on purchasing placed on Retail Investors quickly resulted in criticism from journalists and lawmakers. Robinhood in particular drew criticism from lawmakers on both sides of the aisle, including calls for congressional hearings and investigations by the U.S. Department of Justice.

283.     Following the unprecedented restriction on trading, Robinhood's conflict-ridden relationships quickly came to light. It was revealed that Citadel Securities regularly worked closely with Robinhood, serving as Robinhood's market maker over 60% of the time.

284.     Citadel Securities pays Robinhood for order flow. The "payment for order flow" relationship provides market makers with an opportunity to profit from the large amount of

trading data collected by Robinhood and other Brokerage Defendants and provides Robinhood with profits as well as the funds required to provide zero-commission trading to its users. According to Robinhood's SEC Rule 606 filing, Citadel Securities was responsible for over $141 million of the approximate $330 million that Robinhood received as payment for order flow in the first quarter of 2021 alone.

285.    According to the SEC, payment for order flow can "create conflicts of interest for brokers because of the tension between the firms' interests in maximizing payment for order flow or trading profits generated from internalizing their customers' orders, and their fiduciary obligation to route their customers' orders to the best markets."

286.    Indeed, payment for order flow relationships between Citadel Securities and Robinhood as well as between Citadel Securities and other brokerages create a system ripe for illegal coordination.

287.    Market makers like Citadel Securities developed large short positions in the Relevant Securities in the days leading up to and including January 28, 2021 as a result of the market makers' regular market making activities. As stock prices rise in an environment driven by retail trader buying activity, market makers typically take the other side of the retail traders' stock buys and as a result the market makers develop short positions in the stocks that the retail traders have been buying. Traditional market makers would try to avoid building a short position and remain market neutral in such an environment by buying back shares that the market makers have sold short, while aiming to capturing the bid and ask spread to profit. However, a different type of market maker will integrate market making and speculative position taking in such an environment, which would allow the market maker to take on more trading volume by assuming more risk. It can be difficult for a market maker to both remain neutral and handle high order

flow, and it can be natural for more aggressive market makers to take on more risk. Thus, many larger market makers become a hybrid of a market maker and a proprietary trader.

288.     Market makers that engage in hybrid market making and proprietary trading, in an environment such as that seen in late January 2021 where retail traders are continually buying certain stocks, will see the size of the market makers' short positions grow as they take the other side of the retail trading activity and do not adhere to a strictly market neutral approach. As those market makers' short positions increase, the short positions will at some point begin to reach the market makers' risk limits. This is particularly the case when there are unidirectional market flows, i.e., when a stock is "breaking out," and there are no correlated instruments with which the market makers can hedge their positions. In such a time, it may be impossible for the market makers to buy back all the shares that the market makers have sold short without locking in a loss. A market maker is then faced with the choice of either allowing a continued speculative buildup of a short position, presumably because the market maker expects the market to subsequently reverse, or closing out at the position at loss. Market makers that hold significant short positions that continue to build up during break-out conditions where a security has no natural hedges are clear examples of the hybrid model where speculative position taking is embedded in a market maker operation.

289.     As market makers build their short positions under the dynamic described above, the market makers will approach the market makers' risk limits. When a market maker approaches the market maker's risk limit, the market maker will be faced with the decision to either stop selling and begin buying back the shorted stock at a loss, or to work with the firm's management and risk group to increase the firm's risk limits.

290.     For a market maker that chooses not to increase the risk limits and instead routes

orders away to the exchange, that market maker will face dramatic adverse consequences for the following two reasons.

291.    The first reason is that market makers have an incentive to keep the retail traders' buy orders off the exchange to prevent the buy orders from driving further up the price of the securities that the retail traders are buying. For example, directing an order of $500,000 for a given security towards a public exchange would increase the demand for that security on the exchange and drive the security's price up. If the market maker had already developed significant short positions in that security from the dynamic described above, then any increase in the price of the security would make it difficult for the market maker to buy back that security and close the market maker's short positions, and the market maker would experience mark to market losses as the security moved upward against the market maker's short position.

292.    The second reason is that these market makers have arrangements whereby the market makers pay retail brokers for payment for order flow. Under these arrangements, the market makers pay retail brokers to direct trades towards the market makers, thereby creating volume for the market makers' market making services. If a market maker is unable to take the other side of a trade itself internally, the market maker must instead route the trade to the exchange. In doing so, the market maker then pays a "taker fee" for each trade that the market maker directs to an exchange. In other words, the market maker must realize a mark to market loss for each trade that the market maker directs away from itself to an exchange. This loss may amount to roughly one-half of one cent per share, when payments to the broker and exchange transactions fees are considered.

293.     Those two reasons were strong enough incentives to not route orders away to an exchange that the reasons led the Market Maker Defendants to build large short positions in the Relevant Securities in the days leading up to January 28, 2021.

294.     Market makers that continue to grow large short positions in the way described above may at some point cross the line from market making activity to speculative proprietary trading as the market makers begin to take directional bets on the direction of the market. Such speculative proprietary trading violates SEC Regulation SHO, which allows market makers that engage in bona fide market making activities to benefit from an exception to the "locate" rules that would otherwise require a broker-dealer to locate stock before selling the stock short.

295.     Regulation SHO, which was promulgated in 2004, only applies to bona fide market making activities, and the preamble to Regulation SHO indicates that "[b]ona-fide market making does not include activity that is related to speculative selling strategies or investment purposes of the broker-dealer and is disproportionate to the usual market making patterns or practices of the broker-dealer in that security." (69 FR at 48015). A significantly large short position developed by a market maker should be considered evidence that the market maker actually has a speculative view on the direction that the market will move and that the market maker has chosen not to maintain a neutral position. When large market makers such as Citadel develop such large short positions, those large market makers divert from bona fide market making activities within the meaning of Regulation SHO by not keeping a neutral book and instead taking a bet that the market will drop. Such market makers are then no longer engaged in a bona fide market making activity within the meaning of Regulation SHO but are instead engaged in "speculative selling strategies" that are "disproportionate to the usual market making patterns or practices" of the market maker. Notably, the SEC has successfully pursued actions

against several market makers for violating Regulation SHO through similar speculative short selling activities that did not constitute bona fide market making activities. *See*, *e.g.*, https://www.sec.gov/litigation/admin/2016/34-79579.pdf and https://www.sec.gov/litigation/admin/2012/34-66283.pdf.

296.    Citadel Securities built substantial short positions in the Relevant Securities in late January 2021 through the dynamic described above. Since short positions are not disclosed on Form 13F, though, such positions are not publicly disclosed.

297.    The Market Maker Defendants were able to communicate with the brokerages swiftly and effectively because of their pre-existing relationships. Indeed, high-level executives of Citadel Securities regularly communicated with and coordinated with high-level executives of Robinhood and others in the lead up to, during and after the restrictions imposed on or around January 28, 2021.











307.    As described above, Robinhood makes significant sums from selling order flow,

and in particular, selling order flow to Citadel Securities.







315.    High-level employees of Citadel Securities did not only communicate with

Robinhood's employees.





318.    Defendants' conspiratorial acts resulted in lockstep price movements of the

Relevant Securities that can only be explained by coordinated, lockstep actions by Defendants, in

particular when considering Retail Investors were only permitted to sell positions in the Relevant

Securities.

319.    As demonstrated by the charts below, the stock prices of the Relevant Securities

moved in parallel fashion throughout January 28, 2021. For example, the charts revealed a

coordinated rise in the prices of the Relevant Securities from approximately 11:00-11:30 a.m., immediately after the Relevant Securities took a steep dive after the markets opened. At that time, few if any Retail Investors were permitted to purchase positions in the Relevant Securities and only institutional investors such as hedge funds and the Market Maker Defendants were permitted to purchase.



*The Anticompetitive Scheme Continued After January 28, 2021*

320.    Partly as a result of criticism, as the market opened on January 29, 2021, nearly all of the Brokerage Defendants had lifted their trading restrictions and permitted Retail Investors to open new long positions in the Relevant Securities.

321.    Even in the face of increased scrutiny, however, Defendants continued their anticompetitive scheme to suppress the price of the Relevant Securities.

322.    While purchases of the Relevant Securities were permitted, they were heavily restricted by the Brokerage Defendants, resulting in continuing suppression of their value.

323.    Many of the Brokerage Defendants restricted trading of long option contracts and announced to Retail Investors they would close out their profitable option positions automatically.



324.    Robinhood also placed limitations on the number of new positions its users could open by capping the total number of shares and options contracts an individual could hold in certain securities. Nevertheless, Retail Investors, still believing in the value of the assets, continued to purchase the Relevant Securities once they were permitted.

325.    On January 29, 2021, Robinhood limited users to purchasing imposed limitations on the Relevant Securities. With respect to GameStop, Robinhood first restricted Retail Investors to purchasing only two shares of GameStop, which resulted in a rapid decline in the value of GameStop.



326.     On January 30, 2021, the value of the Relevant Securities began to regain the value lost the prior days as a result of Defendants' coordinated action to suppress the value of the stocks. Because the Market Maker Defendants, hedge funds, and other unnamed conspirators still had distressed short positions outstanding, this threatened their ill-gotten gains achieved the day before. Robinhood then instituted a one share limit on the Relevant Securities, including GME and AMC further causing the value of the stocks to decrease.



327.     Even though some brokerages had lifted their restrictions, the effects of the restrictions persisted as a result of the continued restrictions at Robinhood and other brokerages.





332.     Each artificial limitation in the amount of securities a Retail Investor could purchase correlated with a subsequent decrease in share value. As purchases of the Relevant Securities were limited, more investors were pressured to sell who otherwise would not have in the presence of a free and open market.



337.     Robinhood ultimately continued to impose limitations on certain securities through February 4, 2021, despite announcing on January 29, 2021, that it raised more than $1 billion to help meet rising demands for cash and shore up its balance sheet. The money raised was on top of $500 million Robinhood accessed through credit lines to ensure it had the capital required to keep allowing its clients to trade the Relevant Securities. On February 1, 2021, Robinhood announced that it raised an additional $2.4 billion in funding on top of the $1 billion it has raised the previous week.

338.     On January 29, 2021, the SEC once again issued a statement that it was "closely monitoring and evaluating the extreme price volatility of certain stocks' trading prices over the past several days," and on February 1, 2021, then acting SEC Chair Allison Herren Lee stated during an interview with NPR that "[t]he Commission will closely review actions taken by regulated entities that may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities." She also stated that the SEC was investigating the role that short selling may have played in the recent events.

339.     On January 31, 2021, Robinhood's CEO Tenev published an opinion piece on USA TODAY. Despite previously citing market volatility as the reason for Robinhood's decision to impose the trading restrictions, Tenev now stated Robinhood's decision was made based on clearinghouse-mandated deposit requirements that it claimed were "increased ten-fold."

341.     On February 18, 2021, Robinhood's CEO Tenev testified before the U.S. House Committee on Financial Services. Tenev's prepared statement disclosed that the Robinhood Securities operations team made the decision to impose trading restrictions on the Relevant securities between 6:30 and 7:30 a.m. EST. Although Robinhood had been attributing its trading restrictions to increased clearinghouse-mandated deposit requirements, Tenev revealed that Robinhood met its revised deposit requirements a little after 9:00 a.m. EST on January 28, 2021. Nevertheless, Robinhood held fast to its decision to restrict purchases of the Relevant Securities when the market opened, continued to impose restrictions for the entirety of trading day, and limited the number of stocks and option contracts its users could acquire through February 4, 2021.

342.     Similarly, Apex's president Tricia Rothschild admitted in an interview with Financial Planning on March 4, 2021, that Apex did not restrict trading as a result of capital requirements, stating that Apex had headroom in terms of the capital available on its balance sheet and also had credit lines it could call upon. Notwithstanding, Apex instructed Ally, Dough, Public.com, Sofi, Stash, Tastyworks and Webull to halt their clients' ability to purchase shares of GME, AMC and/or KOSS on January 28. Apex's communication to suspend users' ability to purchase shares of the Relevant Securities was only made telephonically to Webull, and presumably others.

### Data Reveals that Shorts Exited Their Exposed Short Positions

343.     Publicly available data reveals that short interests significantly decreased as a result of the trading restrictions described herein, with the sharpest and most significant decreases occurring after the coordinated restrictions on January 28, 2021.

344.    While it is difficult to determine who owns a particular short interest at any particular time and when that investor exits their short position, entities such as FINRA and governmental organizations such as the SEC regularly aggregate and report certain statistics related to short interests.

345.    FINRA member firms are required to report their short positions as of settlement twice every month: on the 15th (or the preceding business day if the 15th is not a business day) and the last business day of the month. FINRA compiles the data and publishes the total short interest on the 8th business day after the reporting settlement date.

346.    Short interest is defined as the number of shares of a security that have been sold short but have not yet been covered or closed out and may be expressed as a number or percentage.

347.    Based on published short interest rates, aggregate short interest in the Relevant Securities, a strong indicia of bearish market sentiment, generally climbed in the reporting periods before the restrictions on and around January 28, 2021 and dropped precipitously as of January 29, 2021 and continuing through the first few weeks of February, i.e., short interest plummeted during the periods including the trading restrictions indicating short holders had exited their short positions during or soon after the trading restrictions. While some of the Relevant Securities reflect increasing short interest as of the report on January 29, 2021, because the reports do not require investors to disclose when those short positions were purchased, the data could capture large openings of short interest before January 28, 2021.

348.    The below are charts of the estimated total short interest for the Relevant Securities as reported by Market Beat from December 2020 through February 2021:

| AMC Entertainment Holdings, Inc. (AMC) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 38,080,000 | $121.48 million | +13.6% |
| Dec. 31, 2020 | 38,990,000 | $84.22 million | +2.4% |
| Jan. 15, 2021 | 44,670,000 | $97.38 million | +14.6% |
| Jan. 29, 2021 | 37,720,000 | $325.52 million | -15.6% |
| Feb. 12, 2021 | 48,130,000 | $270.01 million | +27.6% |
| Feb. 26, 2021 | 55,490,000 | $460.01 million | +15.3% |

| BlackBerry Ltd. (BB) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 34,570,000 | $285.20 million | +16.8% |
| Dec. 31, 2020 | 39,560,000 | $263.87 million | +14.4% |
| Jan. 15, 2021 | 43,490,000 | $396.19 million | +9.9% |
| Jan. 29, 2021 | 20,410,000 | $299.01 million | -53.1% |
| Feb. 12, 2021 | 32,350,000 | $403.08 million | -58.5% |
| Feb. 26, 2021 | 43,030,000 | $455.26 million | -33.0% |

| Bed Bath & Beyond Inc. (BBBY) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 72,770,000 | $1.37 billion | +9.3 |
| Dec. 31, 2020 | 76,180,000 | $1.42 billion | +4.7% |
| Jan. 15, 2021 | 74,890,000 | $2.05 billion | -1.7% |
| Jan. 29, 2021 | 31,770,000 | $1.07 billion | -57.6% |
| Feb. 12, 2021 | 26,240,000 | $723.96 million | -17.4% |
| Feb. 26, 2021 | 25,460,000 | $669.34 million | -3.0% |

| Express, Inc. (EXPR) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 6,970,000 | $7.25 million | +9.5% |
| Dec. 31, 2020 | 8,020,000 | $7.59 million | +15.1% |
| Jan. 15, 2021 | 7,220,000 | $9.24 million | -10.0% |
| Jan. 29, 2021 | 8,560,000 | $40.23 million | +18.6% |
| Feb. 12, 2021 | 5,930,000 | $16.72 million | -30.7% |
| Feb. 26, 2021 | 4,560,000 | $13.63 million | -23.1% |

| GameStop (GME) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 68,130,000 | $866.61 million | +0.2% |
| Dec. 31, 2020 | 71,200,000 | $1.37 billion | +4.5% |
| Jan. 15, 2021 | 61,780,000 | $2.47 billion | -13.2% |
| Jan. 29, 2021 | 21,410,000 | $4.14 billion | -65.3% |
| Feb. 12, 2021 | 16,470,000 | $841.62 million | -23.1% |
| Feb. 26, 2021 | 14,200,000 | $1.54 billion | -13.8% |

| Koss Corporation (KOSS) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 700 | $1,715.00 | -83.3% |
| Dec. 31, 2020 | 590,300 | $2.18 million | +84,228.6% |
| Jan. 15, 2021 | 12,800 | $39,296.00 | -97.8% |
| Jan. 29, 2021 | 756,100 | $31.73 million | +5,807.0% |
| Feb. 12, 2021 | 289,000 | $4.60 million | -61.8% |
| Feb. 26, 2021 | 598,700 | $12.89 million | -107.2% |

| Nokia Corp. (NOK) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 48,240,000 | $192.96 million | -5.7% |
| Dec. 31, 2020 | 50,520,000 | $196.52 million | +4.7% |
| Jan. 15, 2021 | 59,550,000 | $243.56 million | +17.9% |
| Jan. 29, 2021 | 56,840,000 | $266.58 million | -4.6% |
| Feb. 12, 2021 | 16,470,000 | $841.62 million | -23.1% |
| Feb. 26, 2021 | 48,270,000 | $197.91 million | -15.1% |

| Tootsie Roll Industries, Inc. (TR) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 7,260,000 | $223.03 million | -1.4% |
| Dec. 31, 2020 | 7,390,000 | $219.34 million | +1.8% |
| Jan. 15, 2021 | 7,400,000 | $222 million | +0.1% |
| Jan. 29, 2021 | 5,010,000 | $194.29 million | -32.3% |
| Feb. 12, 2021 | 3,960,000 | $122.64 million | -21.0% |
| Feb. 26, 2021 | 4,020,000 | $128.36 million | +1.5% |

| Trivago N.V. (TRVG) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 2,410,000 | $5.78 million | -18.0% |
| Dec. 31, 2020 | 1,990,000 | $4.48 million | -17.4% |
| Jan. 15, 2021 | 1,940,000 | $4.33 million | -2.5% |
| Jan. 29, 2021 | 976,500 | $2.42 million | -49.7% |
| Feb. 12, 2021 | 2,900,000 | $7.74 million | +197.0% |
| Feb. 26, 2021 | 2,580,000 | $10.73 million | -11.0% |

349.     The data shows that short interest generally declined sharply after the coordinated trading restrictions on January 28, 2021 and continued to decrease into February.

350.     According to Reuters, short interest in GameStop ultimately declined to an estimated 15% as of March 24, 2021 from a peak of 141% in the first week of January.

351.     FINRA also aggregates dark pool trading activity. Generally, FINRA classifies over-the-counter ("OTC"; OTC is generally the trading of securities between two counterparties outside of formal exchanges and without the supervision of an exchange regulator) trading data into two categories, alternative trading systems ("ATS"), and OTC non-ATS dealers. Both ATS's and OTC non-ATS's are considered dark pools or dark exchanges due to their lack of transparency.

352.     As mentioned above, dark pools are the preferred trading venue for large institutional investors largely because they are not transparent. Additionally, Retail Investors generally do not have access to trading on dark pools.

353.     Additionally, the internal exchanges market makers such as Citadel Securities use to internalize order executions are also dark exchanges.

354.     FINRA data shows notable and significant increases in dark pool trading activity for each of the Relevant Securities on and around January 28, 2021, captured in the data tables below in the week beginning January 25, 2021.

355.     Below are the trading data for ATS and OTC non-ATS as published by FINRA for the Relevant Securities for the months of December 2020 through February 2021.

## AMC Entertainment Holdings Inc. (AMC)

|  | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| Week Starting | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 3,892,732 | 18,682 | 67,419,270 | 129,817 |
| 12/14/2020 | 18,391,507 | 46,178 | 104,778,002 | 202,961 |
| 12/21/2020 | 11,346,974 | 24,141 | 33,528,313 | 82,458 |
| 12/28/2020 | 16,302,709 | 26,755 | 64,304,993 | 117,401 |
| 1/4/2021 | 26,753,239 | 57,147 | 91,328,050 | 155,666 |
| 1/11/2021 | 34,838,029 | 52,224 | 190,054,425 | 219,454 |
| 1/18/2021 | 39,025,588 | 107,140 | 468,261,296 | 579,153 |
| **1/25/2021** | **163,944,634** | **861,814** | **1,316,481,677** | **6,387,856** |
| 2/1/2021 | 53,119,619 | 396,405 | 679,049,807 | 5,292,157 |
| 2/8/2021 | 19,006,375 | 100,007 | 267,479,975 | 1,581,292 |
| 2/15/2021 | 11,094,977 | 47,451 | 128,498,955 | 606,484 |
| 2/22/2021 | 57,563,861 | 255,961 | 655,595,790 | 2,765,472 |

## BlackBerry Ltd. (BB)

|  | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| Week Starting | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 6,741,741 | 28,369 | 52,582,544 | 83,413 |
| 12/14/2020 | 7,390,537 | 29,589 | 42,234,476 | 69,413 |
| 12/21/2020 | 4,080,363 | 16,744 | 22,436,470 | 33,445 |
| 12/28/2020 | 3,328,364 | 18,541 | 14,320,357 | 24,573 |
| 1/4/2021 | 5,497,996 | 23,126 | 24,320,552 | 35,956 |
| 1/11/2021 | 15,749,501 | 70,140 | 120,235,955 | 233,852 |
| 1/18/2021 | 22,768,771 | 102,523 | 214,606,499 | 485,668 |
| **1/25/2021** | **97,793,056** | **537,722** | **517,348,442** | **2,535,183** |
| 2/1/2021 | 15,853,070 | 71,561 | 115,283,157 | 706,823 |
| 2/8/2021 | 9,421,223 | 47,468 | 46,803,945 | 289,363 |
| 2/15/2021 | 4,935,816 | 27,732 | 28,637,443 | 150,047 |
| 2/22/2021 | 8,031,370 | 40,568 | 40,626,852 | 168,204 |

### Bed Bath & Beyond Inc. (BBBY)

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 5,657,584 | 32,668 | 8,876,324 | 22,509 |
| 12/14/2020 | 4,042,873 | 30,348 | 10,771,286 | 29,748 |
| 12/21/2020 | 1,750,491 | 13,449 | 5,254,166 | 14,276 |
| 12/28/2020 | 3,178,084 | 23,109 | 8,607,888 | 24,582 |
| 1/4/2021 | 11,217,626 | 58,775 | 29,015,914 | 89,634 |
| 1/11/2021 | 8,259,495 | 45,764 | 29,383,395 | 71,871 |
| 1/18/2021 | 6,835,010 | 38,787 | 25,306,634 | 64,126 |
| **1/25/2021** | **38,730,381** | **193,066** | **110,400,806** | **466,999** |
| 2/1/2021 | 5,591,490 | 28,687 | 16,197,789 | 103,485 |
| 2/8/2021 | 4,498,953 | 17,566 | 6,783,384 | 40,971 |
| 2/15/2021 | 1,599,526 | 14,266 | 2,724,684 | 17,053 |
| 2/22/2021 | 3,416,041 | 19,961 | 4,886,756 | 22,852 |

### Express, Inc. (EXPR)

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 1,380,310 | 5,117 | 10,348,509 | 10,888 |
| 12/14/2020 | 2,071,231 | 5,695 | 8,254,132 | 8,387 |
| 12/21/2020 | 409,385 | 2,000 | 4,185,373 | 4,102 |
| 12/28/2020 | 953,642 | 2,928 | 7,992,473 | 8,329 |
| 1/4/2021 | 903,858 | 3,041 | 6,556,352 | 6,822 |
| 1/11/2021 | 2,745,296 | 9,087 | 32,839,484 | 33,322 |
| 1/18/2021 | 3,192,561 | 11,068 | 29,041,757 | 31,091 |
| **1/25/2021** | **38,745,046** | **219,271** | **393,960,045** | **832,222** |
| 2/1/2021 | 5,518,566 | 24,966 | 51,136,521 | 169,630 |
| 2/8/2021 | 1,955,926 | 9,126 | 25,409,465 | 73,501 |
| 2/15/2021 | 1,483,747 | 7,268 | 16,072,575 | 31,354 |
| 2/22/2021 | 4,167,742 | 23,818 | 67,521,294 | 105,853 |

### GameStop Corp. (GME)

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 4,150,662 | 23,690 | 26,137,279 | 107,667 |
| 12/14/2020 | 3,104,483 | 16,397 | 19,437,594 | 60,013 |
| 12/21/2020 | 4,900,689 | 28,967 | 35,405,726 | 122,854 |
| 12/28/2020 | 1,876,336 | 12,173 | 14,402,253 | 64,118 |
| 1/4/2021 | 3,458,092 | 21,807 | 13,926,925 | 63,783 |
| 1/11/2021 | 22,330,904 | 145,558 | 156,958,902 | 588,136 |
| 1/18/2021 | 29,392,454 | 206,476 | 170,039,730 | 849,773 |
| **1/25/2021** | **44,126,023** | **593,161** | **184,322,090** | **4,275,955** |
| 2/1/2021 | 17,913,654 | 392,399 | 109,775,294 | 3,417,362 |
| 2/8/2021 | 6,997,461 | 80,593 | 49,113,110 | 825,424 |
| 2/15/2021 | 3,905,721 | 45,227 | 21,554,348 | 341,014 |
| 2/22/2021 | 18,960,413 | 370,347 | 121,667,858 | 3,157,435 |

### KOSS Corporation (KOSS)

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 1,020 | 25 | 12,957 | 141 |
| 12/14/2020 | 1,053 | 16 | 7,541 | 110 |
| 12/21/2020 | 957 | 14 | 17,168 | 99 |
| 12/28/2020 | 704,028 | 4,886 | 7,693,766 | 24,331 |
| 1/4/2021 | 49,563 | 281 | 222,980 | 1,144 |
| 1/11/2021 | 19,983 | 175 | 101,229 | 560 |
| 1/18/2021 | 84,142 | 495 | 787,582 | 3,456 |
| **1/25/2021** | **4,018,164** | **38,573** | **30,297,563** | **227,899** |
| 2/1/2021 | 1,333,623 | 13,244 | 12,227,611 | 119,411 |
| 2/8/2021 | 445,988 | 3,444 | 3,053,718 | 28,387 |
| 2/15/2021 | 691,320 | 4,516 | 4,781,106 | 25,017 |
| 2/22/2021 | 3,766,876 | 33,228 | 24,262,377 | 157,009 |

**Nokia Corp. (NOK)**

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 15,304,870 | 37,078 | 58,343,774 | 67,572 |
| 12/14/2020 | 11,046,987 | 22,587 | 38,453,491 | 51,333 |
| 12/21/2020 | 6,159,632 | 14,672 | 37,235,226 | 47,585 |
| 12/28/2020 | 6,279,603 | 13,492 | 29,688,635 | 44,172 |
| 1/4/2021 | 17,024,361 | 27,365 | 53,243,415 | 61,097 |
| 1/11/2021 | 22,745,501 | 35,962 | 84,580,606 | 83,576 |
| 1/18/2021 | 14,035,810 | 33,249 | 51,579,395 | 62,745 |
| **1/25/2021** | **244,503,016** | **912,658** | **971,216,858** | **3,015,757** |
| 2/1/2021 | 54,513,067 | 158,502 | 316,724,886 | 1,331,964 |
| 2/8/2021 | 299,776,442 | 79,687 | 147,701,559 | 519,336 |
| 2/15/2021 | 14,722,906 | 35,643 | 57,872,060 | 199,581 |
| 2/22/2021 | 33,203,315 | 71,206 | 124,573,499 | 292,852 |

**Tootsie Roll Industries, Inc. (TR)**

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 308,812 | 2,804 | 175,519 | 1,131 |
| 12/14/2020 | 132,678 | 2,076 | 166,570 | 1,263 |
| 12/21/2020 | 64,967 | 909 | 65,986 | 1,036 |
| 12/28/2020 | 229,091 | 1,890 | 118,505 | 1,394 |
| 1/4/2021 | 213,383 | 2,306 | 130,491 | 1,305 |
| 1/11/2021 | 78,974 | 1,036 | 91,898 | 1,096 |
| 1/18/2021 | 103,510 | 1,486 | 117,530 | 1,046 |
| **1/25/2021** | **3,042,836** | **17,884** | **2,490,108** | **23,595** |
| 2/1/2021 | 555,331 | 5,426 | 688,068 | 7,510 |
| 2/8/2021 | 147,255 | 1,835 | 282,505 | 2,971 |
| 2/15/2021 | 243,438 | 2,667 | 294,213 | 2,313 |
| 2/22/2021 | 408,039 | 3,555 | 303,286 | 2,759 |

**Trivago N.V. (TRVG)**

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 594,590 | 2,369 | 3,598,268 | 7,023 |
| 12/14/2020 | 289,827 | 1,184 | 2,231,256 | 4,985 |
| 12/21/2020 | 432,013 | 1,722 | 1,486,232 | 2,818 |
| 12/28/2020 | 327,779 | 1,787 | 1,517,784 | 2,911 |
| 1/4/2021 | 303,728 | 2,063 | 1,809,736 | 4,073 |
| 1/11/2021 | 188,440 | 1,216 | 1,552,429 | 3,724 |
| 1/18/2021 | 331,955 | 1,480 | 1,230,548 | 2,732 |
| **1/25/2021** | **6,425,337** | **22,467** | **31,902,982** | **64,826** |
| 2/1/2021 | 1,326,788 | 6,219 | 8,513,999 | 21,645 |
| 2/8/2021 | 2,006,351 | 8,135 | 20,579,588 | 42,034 |
| 2/15/2021 | 1,232,263 | 6,429 | 12,896,577 | 33,888 |
| 2/22/2021 | 1,864,214 | 9,477 | 18,561,297 | 54,194 |

356.    As reported by FINRA, the columns representing total shares are the total volume of shares of that security reported for that particular week. The total trades represent the total amount of transactions involving those shares.

357.    For each of the Relevant Securities, total shares and total trades in dark exchanges peaked during the week of January 25, 2021 and February 1, 2021 during the period when restrictions were first placed on the Relevant Securities, and were higher than every other week recorded from December 2020 through February 2021.

358.    Given that Retail Investors are generally not able to trade in dark pools and dark exchanges, the trading increases set forth in the FINRA reports indicate high institutional investor trading including high market maker activity around the time of the restrictions on the Relevant Securities, consistent with institutional investors taking advantage of the trading restrictions to exit their vulnerable short positions.

359.    Furthermore, FINRA OTC transparency data indicates that not only dark trading activity was elevated for the week of January 25, 2021, but that the bulk of that trading activity can be attributed to Citadel Securities.

| SYMBOL | BROKER | VOLUME | % OF VOLUME |
|---|---|---|---|
| GME | CANACCORD GENUITY LLC | 119,079 | 0% |
| **GME** | **CITADEL SECURITIES LLC** | **92,991,756** | **50%** |
| GME | CLEAR STREET LLC | 148,717 | 0% |
| GME | COMHAR CAPITAL MARKETS, LLC | 3,157,898 | 2% |
| GME | COWEN AND COMPANY | 3,030,737 | 2% |
| GME | CUTTONE & CO., LLC | 326,013 | 0% |
| GME | De Minimis Firms | 1,114,777 | 1% |
| GME | G1 EXECUTION SERVICES, LLC | 22,258,085 | 12% |
| GME | HRT EXECUTION SERVICES LLC | 249,973 | 0% |
| GME | INTERACTIVE BROKERS LLC | 2,999 | 0% |
| GME | JANE STREET CAPITAL, LLC | 6,306,835 | 3% |
| GME | LEK SECURITIES CORPORATION | 375,071 | 0% |
| GME | NASDAQ EXECUTION SERVICES, LLC | 582,562 | 0% |
| GME | NATIONAL FINANCIAL SERVICES LLC | 33,408 | 0% |
| GME | STOCKPILE INVESTMENTS, INC. | 28,622 | 0% |
| GME | TWO SIGMA SECURITIES, LLC | 4,379,714 | 2% |
| GME | UBS SECURITIES LLC | 4,163,075 | 2% |
| GME | VIRTU AMERICAS LLC | 43,388,647 | 24% |
| GME | WOLVERINE SECURITIES, LLC | 1,664,101 | 1% |
| | TOTAL | 184,322,069 | |

| SYMBOL | BROKER | VOLUME | % OF VOLUME |
|--------|--------|--------|-------------|
| **AMC** | **CITADEL SECURITIES LLC** | **732,531,515** | **56%** |
| AMC | CLEAR STREET LLC | 833,054 | 0% |
| AMC | COMHAR CAPITAL MARKETS, LLC | 13,573,292 | 1% |
| AMC | COWEN AND COMPANY | 3,935,620 | 0% |
| AMC | CUTTONE & CO., LLC | 504,341 | 0% |
| AMC | De Minimis Firms | 3,739,069 | 0% |
| AMC | G1 EXECUTION SERVICES, LLC | 99,468,601 | 8% |
| AMC | HRT EXECUTION SERVICES LLC | 3,325,069 | 0% |
| AMC | INTERACTIVE BROKERS LLC | 1,595 | 0% |
| AMC | JANE STREET CAPITAL, LLC | 38,571,184 | 3% |
| AMC | LEK SECURITIES CORPORATION | 2,537,780 | 0% |
| AMC | NATIONAL FINANCIAL SERVICES LLC | 25,683 | 0% |
| AMC | SAGETRADER, LLC | 536,154 | 0% |
| AMC | STOCKPILE INVESTMENTS, INC. | 252,242 | 0% |
| AMC | TWO SIGMA SECURITIES, LLC | 37,512,324 | 3% |
| AMC | UBS SECURITIES LLC | 36,872,566 | 3% |
| AMC | VIRTU AMERICAS LLC | 333,698,597 | 25% |
| AMC | WOLVERINE SECURITIES, LLC | 8,562,991 | 1% |
| | TOTAL | 1,316,481,677 | |

360.     For example, as shown in the first two tables from FINRA's OTC transparency data reports for GME and AMC for the week of January 25, 2021, Citadel Securities represented roughly 50% of the non-dark pool over-the-counter market, the bulk of which is market maker volume. The scale of Citadel Securities's business will have significant impact on short volume reports available from FINRA and provides insight into Citadel Securities's short selling activity beyond what is disclosed in 13F reporting.

361.     The FINRA short volume reports provide daily numbers for Short Volume and Total Volume (one-sided volume) for all dark OTC trading activity. The percentage of the total volume represented by short sales constitutes the percentage volume of sales that were sold short. The associated volume of each trade that is reported through such metrics provides supporting evidence that a party that executed off-exchange had a short position at the time the contributing trade was executed. If a market maker maintains a consistent short position, the market maker will report significant short volume through these metrics. When a market maker that has significant market share has been maintaining a long position and then switches the position to a short position that is subsequently maintained, there will be a significant increase in the short volume reported. Because Citadel Securities represents about 50% of the dark trading activity, a large shift in the percentage of sales represented by short trades is highly likely to be caused by a shift in Citadel Securities's position from long to short or vice versa.

362.     The short volume reporting is consistent with a material change in Citadel Securities's position on January 27th, 2021, where Citadel Securities appears to have shifted from reporting shares sold long to shares sold short, as evidenced by the change in short ratios and short volume reported over the period. As seen in the table below, for each day, January 22, 25 and 26, the percentage of sells represented by shorts was about 35%. On January 27 that amount

jumped to about 53% where it plateaued for roughly 3 days. Such an increase is highly unusual
and consistent with Citadel Securities taking on a large short position and strongly implies that
Citadel Securities was short during that time. The transacted volume and 13F reports of other
candidate market makers that might have contributed to the increase in the percentage of short
volume relative to total volume does not suggest alternative explanations, given their relatively
low share of the OTC market for the week of January 25, 2021.

| DATE | SYMBOL | SHORT | SHORT SALE EXEMPT | TOTAL VOLUME | % SHORT VOLUME |
|---|---|---|---|---|---|
| 20210129 | GME | 8,814,229 | 527,920 | 16,327,706 | 54% |
| 20210128 | GME | 9,606,123 | 455,032 | 18,899,860 | 51% |
| 20210127 | GME | 16,292,827 | 161,900 | 29,923,417 | 54% |
| 20210126 | GME | 27,348,512 | 514,375 | 82,653,297 | 33% |
| 20210125 | GME | 27,342,770 | 393,941 | 72,224,899 | 38% |
| 20210122 | GME | 33,257,918 | 686,860 | 97,123,046 | 34% |

*The Structure and Characteristics of the Market Support the Existence
of an Anticompetitive Agreement*

363.    The structure and characteristics of the market for securities, and in particular the
lack of disclosure of short interest positions at any given time, make it conducive to collusion
and anticompetitive conduct.

364.    Courts, scholars, and government agencies such as the Department of Justice
recognize that structural market factors can help assess whether collusive conduct in violation of
the antitrust laws has occurred.

365.    *High Barriers to Entry.* Markets with high barriers to entry are susceptible to
anticompetitive collusion. Under basic economic principles, if there are high barriers to entry,

new entrants are unlikely to enter the market. If a broker dealer were to restrict trading in a security in high demand, new broker-dealers would enter the market to seek to benefit from the investors who wish to trade in the restricted security.

366.    The financial services industry is characterized by substantial barriers to entry. An entrant seeking to become a broker dealer or a clearing firm would need specialized knowledge, several licenses and memberships, including memberships in organizations such as FINRA. In addition to licensure costs, compliance costs to adhere to industry and regulatory standards are also significant.

367.    Additionally, entrants require significant amounts of cash or capital to deposit at clearinghouses such as the DTCC as collateral. The significant collateralization requirement also serves as a barrier to entry.

368.    Technological infrastructure has also become a barrier to entry. As the financial services industry shifts more and more technology focused and as many successful participants are financial technology firms, a new entrant needs to have the necessary infrastructure and expertise to navigate the digital market. Many of the exchanges on which securities are traded are electronic and fully automated, and allow institutions to directly interact with the securities on offer on the exchanges. NASDAQ for example has been fully electronic since its inception in 1971. Therefore, any potential market entrant would also need significant technological wherewithal and sophistication in order to participate in the financial markets.

369.    *High Fixed Costs and Low Variable Costs.* Markets characterized by high fixed costs and low variable costs are susceptible to anticompetitive collusion. The markets for broker dealers, clearing firms and market making are defined by high fixed costs, low variable costs and benefit greatly from scale, particularly with regards to online broker-dealers and clearing firms.

370.     For example, online broker-dealers require significant IT infrastructure, software, and data security infrastructure in order to develop and maintain the applications through which investors trade. This is in addition to the licensure and regulatory costs described above.

371.     Likewise, clearing firms require significant IT infrastructure, software, and data security infrastructure in order to facilitate the digital clearing and custodial services they provide to online broker dealers.

372.     Similarly, many market makers are high frequency traders and rely on sophisticated software and algorithms to match the incoming bids and offers of the orders routed to them from either broker dealers or clearing firms.

373.     In particular for HFT market makers, latency is critical in order to react quickly and engage in arbitrage strategies. As a result, HFT market makers invest significant effort and resources to increase the speed of trading technology to maximize their profits.

374.     Variable costs are low. Once infrastructure is in place, it generally is not more expensive to handle 10,000 trades as opposed to 10, particularly in the high-tech financial services market as exists today.

375.     *Commoditization.* The Relevant Securities are commodity (homogenous) products. A conspiracy involving commodity products can be easier to organize than one involving differentiated products. One share in a Relevant Security is identical to another share in that same security—it has similar, if not identical, characteristics and could be substituted for the another. Competition is purely based on price, in that a security purchased at a particular time could be more valuable than a security purchased at another time, depending on market conditions. Markets in which the product is commoditized are susceptible to anticompetitive collusion.

376.     Additionally, securities' prices are linked globally. The price of a security being traded on U.S. exchanges will be nearly identical to the price of the security being traded on a foreign exchange.

377.     For example, one share in stock X is functionally identical to another share of stock X. The only determinant of price is the relative supply and demand in investors who want to buy or sell shares in stock X.

378.     *Retail Investors Subject to the Conspiracy Are a Captive Market.* In a competitive market, if a consumer desires a product or service that is not offered by a particular seller, the consumer can go to a different seller who does offer the desired product or service.

379.     For example, in a competitive market for broker dealers, if a broker does not offer a particular security the investor desires, investors will move assets and invest with a broker dealer that does offer trading in that security.

380.     In the short run, however, an investor is generally locked into broker dealers that they already invest with.

381.     Generally, the process to open a trading account with a broker dealer takes a short amount of time, typically several days. Depending on the type of account, the waiting period may be longer or shorter. For example, opening a cash account typically takes a shorter amount of time than opening a margin account or options account because a broker dealer may require additional levels of proof of financial solvency such as a credit score check.

382.     If the coordinated activity however occurs in a short time window, investors have no opportunity to switch or change broker dealers, and are investing without market power.

383.     Even those Retail Investors who had accounts with different broker dealers may have been precluded from purchasing the Relevant Securities as a result of the coordinated conduct without any ability to purchase the Relevant Security of their choice.

384.     In a competitive market, Retail Investors with accounts in different broker dealers could simply purchase a security with another broker dealer that did not restrict trading.

385.     Indeed, Retail Investors may have accounts with multiple broker dealers for a variety of reasons, including the selection of securities available to trade in.

386.     If, however, multiple broker dealers restrict trading at exactly or near exactly the same time, even those Retail Investors with accounts at multiple brokerages would be restricted from purchasing the security they desire.

387.     *The Market is Opaque Rather than Transparent.* While the financial markets are generally regulated, important aspects of it are opaque and render the market susceptible for collusion.

388.     For example, it is generally impossible to know who owns a short interest at any given time despite the prevailing regulatory regime.

389.     While it is possible that a large investor may publicly disclose its present short positions, it would be unusual as it would give competitors an insight into their strategy. Also, because there is no way to verify if that were truly the short position the investor had at that moment, it could just as well be disinformation.

390.     Investment managers who have at least $100 million in assets under management are required by the SEC to file a Form 13F every quarter. Congress created the 13F requirement in 1975 with the intention of providing investors transparency into the holdings of the U.S.'s institutional investors.

391.    Notwithstanding Congress's intent to provide transparency to investors and the public, these reporting requirements are significantly unregulated and subject to abuse. Form 13F filings have earned a reputation for being unreliable. Indeed, a 2010 SEC Report titled "Review of the SEC's Section 13(f) Reporting Requirements" found that "no SEC division or office regular or systemic review of the data filed on Form 13F" and that "no SEC division or office monitors the Form 13F filings for accuracy and completeness." The SEC found that, "[a]s a result, many Forms 13F are filled with errors or problems, which may not be detected or corrected in a timely manner."

392.    Another issue with Form 13F filings is that disclosures are limited. Investors are only required to report long positions, and put and call options, but not short positions.

393.    Because Form 13F filings do not require disclosure of short positions, Form 13F filings can paint a misleading picture as some investment firms generate most of their returns from short selling while using long positions as "hedges."

394.    A "hedge" is an investment made with the intention of reducing the risk of another investment. For example, an investor with a large short position in a particular security may hedge by taking an offsetting or opposite position in a related or the same security. Hedging can also be accomplished through the use of derivative securities such as options.

395.    Another issue with Form 13F filings is the temporal scope of the require reporting. 13F filings may be filed up to 45 days after the end of a quarter. As a matter of practice, 13F filings are submitted as late as possible. 13F filings, however, do not require reporting of when a particular position was purchased. Therefore, a reported position could have been purchased at any time within the four months prior to the filing.

396.     Additionally, if a 13F filing reports purchases of put or call options, there is no requirement to report the strike price or the expiry date, i.e., the price at which an option can be exercised and the date the option contract becomes invalid respectively.

397.     FINRA also requires member firms to report short interest positions in all equity securities twice a month. Reporting is typically on the 15th and the last day of each month with an adjustment to the previous business day if those days themselves do not fall on a business day.

398.     Even though FINRA publishes short interest reports publicly, as a general matter, it takes several days before the information is published and the number of shares sold short in the market may have changed dramatically.

399.     Further, the FINRA reports do not account for smaller intervals of time. Dramatic changes in short interest may occur within a particular window and not be captured in the regularly required report.

400.     Generally, it is not possible to ascertain which investor has a short position in a particular security at any particular time unless the position is voluntarily publicly disclosed by the holder of the short position. Unsurprisingly, very few investors voluntarily disclose their short positions.

401.     Although it is not possible to detect which specific investors are in large exposed short positions, the companies issuing affected securities are aware and can (and sometimes do) confirm if their stock has been significantly shorted or had been subject to a short squeeze.

402.     For example, in GameStop Corp.'s Form 10-K filed March 23, 2021, GameStop Corp. specifically identified a "short squeeze" as a potential risk factor. Further, GameStop Corp. disclosed that it experienced a short squeeze and that a large proportion of its stock had been sold short.

A large proportion of our Class A Common Stock has been and may continue to be traded by short sellers which may increase the likelihood that our Class A Common Stock will be the target of a short squeeze. A short squeeze has led and could continue to lead to volatile price movements in shares of our Class A Common Stock that are unrelated or disproportionate to our operating performance or prospects and, once investors purchase the shares of our Class A Common Stock necessary to cover their positions, the price of our Class A Common Stock may rapidly decline.

403.     In the wake of the 2008 financial crisis, Congress legislated wide sweeping reforms designed at increasing transparency and curtailing the abuses within the financial sector that led to the crisis in the form of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

404.     Section 929X of the Dodd-Frank Act, titled "Short Sale Reforms," empowered the SEC to promulgate rules providing for the public disclosure of short positions to occur monthly at a minimum.

405.     To date, the SEC has not promulgated rules related to Section 929X.

406.     Additionally, Congress placed into Dodd-Frank an antitrust savings clause:

Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified. For purposes of this section, the term "antitrust laws" has the same meaning as in subsection (a) of section 12 of title 15, except that such term includes section 45 of title 15, to the extent that such section 45 applies to unfair methods of competition.

15 U.S.C. § 5303.

### *Motive to Collude*

407.     Defendants shared a common motive to conspire—to prevent themselves, and their peers, from hemorrhaging losses totaling potentially billions of dollars. The Market Maker Defendants and hedge funds possessed significant short positions in the Relevant Securities during the period in question. As the prices of the Relevant Securities went up, the exposure of

the Market Maker Defendants increased, and their losses were potentially infinite if they did not stop the surge of the Relevant Securities.

408.     As of December 31, 2020, Citadel Securities (the market maker), reported $57.5 billion in "securities sold, not yet purchased, at fair value," which is likely representative of Citadel Securities's short position.

409.     As Retail Investors bought securities and call options, Citadel Securities developed a large short position as a function of its market making, i.e., taking the other side of buy orders or purchased call option orders. As the price of the Relevant Securities increased, Citadel Securities's short position became increasingly distressed subjecting to a potential Short or Gamma Squeeze. Citadel Securities stood to benefit from the one-sided restrictions by taking the other side of the Retail Investors' sell orders that resulted from the one-sided sell-only restrictions placed by the Brokerage and Clearing Defendants. By taking the other side of the sell orders, Citadel Securities could return the stock it had borrowed to sell short, and benefit from the rapidly decreasing price of the Relevant Security, mitigating its loss as a result of the Short or Gamma Squeeze.

410.     Citadel Securities stood to gain from stopping the short squeeze by purchasing new short positions at the peak of the Relevant Security price increase and then profiting from the artificial decrease in share price after the trading restriction on January 28th. While there is no publicly available data to show that Citadel Securities was one of the parties that opened up new short positions on January 25—recall there is no requirement that hedge funds disclose their short positions except as described above—it would be in Citadel Securities's best interest to open up new short positions if Citadel Securities planned to leverage its relationships to halt trading of GameStop and other Relevant Securities and artificially depress their share price.

411.     Public Form 13F disclosures by market makers such as Citadel Securities reveal large short positions in Relevant Securities such as GME and AMC that grew substantially from December 2020 to March 2021. While short positions in stocks, call options and put options are not disclosed on Form 13F, long positions in put options are disclosed, and long put options represent short positions on the underlying stock.

412.     On Citadel's December 31, 2020 13F filing, which consolidated Citadel's advisory and market making subsidiaries, Citadel disclosed a long put option position on 2,224,500 shares of GameStop stock and a long put option position on 1,749,200 shares of AMC stock. On Citadel's March 31, 2021 13F filing, Citadel disclosed that the GameStop long put option position had grown by almost 50% to 3,271,400 shares and that the AMC long put option position had grown by 224% to 5,676,200 shares.

413.     Further, given Robinhood relies on payment for order flow for revenue, and sold a significant portion of its order flow to Citadel Securities, the two firms had motive to cooperate due to their close economic relationship. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

414.     The Clearing Defendants, similarly, had reason to participate and join in the conspiracy. NSCC is a member driven corporation. Member clearing agents report the trades they receive to their parent organization, the DTCC. The DTCC then ensures the transfer of money to the seller's broker account and the transfer of security ownership to the buyer's broker account. To mitigate the risk of settling trades, the DTCC requires that NSCC member clearing firms put up collateral, which the NSCC member clearing firms typically pass down to brokerages. The DTCC collateral requirement changes depending on the perceived risk of the

order, since if one side of the trade defaults, and the broker cannot cover the loss, DTCC member

firms are on the hook for completing the trade. In other words, if a member became bankrupt,

DTCC and its member clearing agents would be on the hook for the short positions taken by that

member.

415.    On the morning of January 28, DTCC demanded that its member clearing agents

supply additional collateral to support these trades.

███████████████████████████████████████████████████

417.    The broker dealers, who position themselves as services for the benefit of

retailers, succumbed to the demands of their clearing agents because of their own financial

interests. Broker dealers receive an inordinate amount of revenue from market makers like

Citadel Securities from payment for order flow.

418.    To reiterate, Robinhood makes up a vast majority of its revenue, somewhere

between 60% to 70%, by selling its order flow. Robinhood has reportedly earned a staggering

$331 million in revenues from payment for order flow in the first quarter of 2021, more than

tripling its earnings from the first quarter of 2020, a record year in which Robinhood earned

$687 million in payment for order flow revenue, up 514% year-on-year from 2019. From 2015 to

2016, an incredible 80% of Robinhood's revenue came from payment for order flow.

Robinhood's CEO Vladimir Tenev also testified before the Congressional House Committee on

Financial Services that Citadel Securities's payment for order flow revenue is Robinhood's

primary source of revenue. This essentially proves that Robinhood's client is not the retail

investor themselves, but rather Citadel Securities. In this relationship, it is actually the retail

investor who is Robinhood's product; the product for which Citadel Securities is in fact buying
and paying Robinhood a premium.

419.    As mentioned above, Robinhood is not alone in profiting from payment for order
flow. Every Brokerage Defendant, Apex, and ETC sell order flow. Additionally, Citadel
Securities is either the largest or one of the largest payors for order flow for most of them.

420.    Robinhood and other broker dealers had every motivation to join the
anticompetitive scheme to restrict trading to benefit their real clients: the clearing agents and the
Market Maker Defendants. Robinhood has gamified the investing market to funnel young
investors onto their platform, ultimately to offer the Market Maker Defendants a birds' eye view
of both sides of their trades, enabling companies like Citadel to benefit from simultaneously
making and playing the market.

### Actions Against Unilateral Self Interest

421.    If broker dealers were competing against one another, then it would not be in
their self-interest to stop trading on their platforms for the Relevant Securities. Broker-dealers
benefit from investors transacting on their platforms. Akin to any individual purchasing from a
seller of a service—the seller benefits from more sales. Delisting the Relevant Securities and
preventing investors from entering more transactions was no different from turning away a
paying customer. Broker dealers acted against their self-interest by preventing any transactions.

422.    The actions taken by the clearing brokers, i.e., preventing trades in the Relevant
Securities, was similarly an action against their economic and unilateral self-interest. Clearing
firms such as Apex act as a third party to each trade facilitated by broker dealers. Generally,
clearing firms earn a transaction fee every time they make a trade. The clearing fee is imposed no
matter which brokerage firm the trader uses. By stopping the trades in the Relevant Securities,

clearing firms turned away the clearing fees that form the very basis of their business models. This conduct is against the economic interests of the Defendants if undertaken individually.

423.     Further, Apex's decisions on January 28, 2021 were against its self-interest. By restricting trading and specifically the purchase of the Relevant Securities, Apex was unable to generate revenue from users purchasing the Relevant Securities shares and Apex thereafter, using these shares as stock loans to generate even further revenue.

424.     Market makers such as Citadel Securities pay broker dealers for order flow. Payment for order flow is a practice where a broker-dealer (e.g., Robinhood) will sell its customers' orders to a high frequency trading firm ("HFT") or market maker (e.g., Citadel Securities). The HFT or market maker in turn "fills" the order by buying or selling the shares as requested, while simultaneously using a computer algorithm to pocket the difference between the price the customer was willing to sell at versus the price the market maker was able to get to fill the order.

425.     Market makers compare the bid prices (i.e., the price investors are willing to purchase at) against the offer prices (i.e., the price investors are willing to sell at). The difference between the two is known as the "spread." Market makers maintain an inventory of securities from their own trading and match incoming buy and sell orders in order to fill those orders.

426.     Market makers such as Citadel Securities pay a significant premium or "rebate" to route a broker's order flow. It stands to reason that routing order flow is a lucrative endeavor given the significant sums that market makers pay for order flow. Robinhood for example generated $682 million in payment-for-order flow revenue. All brokerage firms that sell order flow are required by the SEC to disclose who they sell order flow to. Rule 606 requires broker-dealers to publish quarterly reports disclosing the entities to which they route their order flows

and the relationship between the broker-dealer and the entity. Robinhood, for example, receives $260 per $1,000,000 of their order flow traded, and E*Trade makes about $22 per the same volume.

427.   By restricting trading, any entity that sells its order flow is acting against its economic interest. As order flow revenue is generated by volume, restricting trading necessarily diminishes the volume the entity selling order flow may receive for the period that trading is restricted.

428.   As mentioned above, according to public filings, all of the Brokerage Defendants and Clearing Defendants sell order flow.

429.   Likewise, the Market Maker Defendants who pay for order flow and make money through the spreads benefit from a large volume of transactions. Therefore, any restrictions in any entity it purchases order flow from would ultimately negatively impact their bottom line as it would reduce the volume of orders and the number of spreads it can pocket.

430.   Finally, trading restrictions were only placed on buying and only affected Retail Investors because short sellers, such as the Market Maker Defendants, still had the ability to purchase shares of the Restricted Securities via other avenues, such as dark pools, including the Market Maker Defendants own internal dark exchanges.

431.   Taking at face value Brokerage Defendants' explanation that they were concerned with market volatility, it does not justify their one-sided restrictions on the Relevant Securities.

432.   Volatility in the securities markets is often associated with large swings in prices in one direction or another. Volatility is usually characterized by wide price fluctuations and heavy trading.

433.     There is no provision under SEC, DTCC, NSCC, or FINRA rules that allows broker-dealers to unilaterally decline, restrict, or prevent trading because market conditions make executing trading burdensome or unprofitable.

434.     Rather, broker-dealers are expected to ensure that they can continue to provide access to the securities markets even during periods of extreme market volatility.

435.     FINRA reiterated this obligation in Regulatory Notice 21-12, which was issued on March 18, 2021, directly in response to the events giving rise to this action. FINRA was clear: "Member firms should maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months."

436.     There are recognized mechanisms by which trading can be halted during volatility. Exchanges such as NASDAQ have already implemented these mechanisms.

437.     For example, exchanges have put in place "circuit breakers" to halt trading in the event the market is too volatile.

438.     Similarly, the Limit Up-Limit Down mechanism is a tool intended to prevent trades in securities from occurring outside of specified price bands to address extraordinary market volatility. If trading occurs beyond the established price bands, a five-minute trading pause is implemented to allow market volatility to smooth. This is also known as a single stock circuit breaker.

439.     In both cases, circuit breakers halts trading entirely, both buying and selling.

440.     This is not what Defendants did, however, and instead only restricted purchasing of securities by Retail Investors.

441.     Further, the restrictions were not placed on the entire market—institutional
investors could still buy and sell without limitations. It makes little economic sense that
restriction on purchasing on only Retail Investors could address volatility concerns when
institutional investors could still affect the market.

***Traditional Factors Suggesting Conspiracy or Agreement***

442.     The conduct at issue here comprised of factors suggesting conspiracy or illegal
agreement.

443.     *Opportunities to Coordinate and Collude.* On or around January 28, 2021,
Defendants had numerous opportunities to coordinate and collude and did, both interfirm and
intrafirm.



446.     The industry is close-knit and built on preexisting relationships. The industry is
replete with specialized jargon, terms of art, and specialized terminology, providing those in the
industry a common language.

447.     Additionally, individuals within the industry frequently move from one market
participant to another or invest financial resources in other market participants.

448.     For example, in April 2021, Bloomberg and other sources reported that Alpaca
added Robinhood's ex-COO as an investor.



450.     As a result of the close-knit nature of the industry and the prior relationships

developed by those within the industry, there are a high number of interfirm communications

which tend provide opportunities to exchange information and to render a market susceptible to

collusion. Given the events of late 2020 and January 2021, the participants in the conspiracy had

numerous opportunities to conspire to restrain trade—restrict trading and did so.

451.     Many of the Brokerage Defendants have prior relationships with the Clearing

Defendants. Robinhood for example previously used Apex as its clearing firm before Robinhood

began self-clearing in 2018.

452.     Additionally, documentary evidence reveals numerous suspicious interfirm

communications leading up to, during, and after the imposition of the restrictions on January 28,

2021.





459.     Further, Apex presently has and at the relevant time period had no economic relationship with Robinhood. Although Robinhood had previously used Apex as a clearing broker, Robinhood became self-clearing in 2018.

460.     *Evidence of Concealment and Pretext.* Practices that while not in themselves illegal may still lead to the inference of the existence of a conspiracy.

461.     As noted above, communications and coordination occurred between Defendants verbally. Verbal or telephonic communication is difficult to detect and does not leave a paper trail to the alleged wrongdoing leading to an inference that those engaged in verbal coordination were attempting to conceal their communications. Therefore, the coordination of the trading restrictions by verbal or telephonic means supports the inference of an illegal conspiracy.



465.     Pretextual statements and explanations also support an inference of an illegal conspiracy.

466.     For example, statements by representatives of Robinhood and high-level executives provided changing and conflicting explanations for the trading restrictions.

467.     On January 28, 2021, Robinhood posted on its blog that market volatility was the reason for the restrictions.

468.     Additionally, Vlad Tenev, Robinhood's CEO, told the media that the shutdowns were unrelated to Robinhood's liquidity and that Robinhood did not have a liquidity problem.

469.     Robinhood later blamed the trading restrictions to being unable to meet the deposit requirements imposed by clearinghouses.

470.     When Tenev offered testimony to the House Financial Services Subcommittee, when asked if Robinhood had negotiated with counterparts to restrict trading in the Relevant Securities, he stated that trading restrictions were put in place to meet regulatory deposit requirements imposed by DTCC affiliate NSCC. This explanation, however, is either incomplete or misleading.

471.     To clear and settle customer transactions, each trading day by 10 a.m. Eastern Time, clearing agents like Robinhood Securities have to meet the deposit requirements required

by DTCC to support their customer trades between the trade date and the date the trades settle.

On some days clearing brokerage firms may be able to withdraw money, whereas on other days

it may be required to deposit money, depending on that day's requirement. Clearing brokerage

firms like Robinhood Securities also know that the DTCC may assign a volatility multiplier on

certain securities which the DTCC perceives as having more risk.

472.    Based on the orders its customers are placing, Robinhood Securities has the

ability to: (i) monitor its anticipated DTCC deposit requirements in real time (or near real time);

and (ii) monitor its ability to meet anticipated or actual DTCC deposit requirements in real time

(or near real time). Based on the relationship between the affiliated entities, Robinhood Financial

would have access to the same information on anticipated DTCC requirements. At any given

time Robinhood Financial and Robinhood Securities would know how much collateral the

DTCC may ask Robinhood Securities to post to cover the trades its customers have placed.

473.    Michael Bodson, the President of DTCC, later stated in testimony to the House

Financial Services Subcommittee that the decision to restrict trading was internal to Robinhood

and DTCC and NSCC did not have discussions about restricting securities.





478.    As shown, Tenev's testimony was, at best, misleading.

479.    Pretextual statements were not limited to Robinhood. Apex and its highly level

executives also made pretextual statements.

480.    For example, on January 28, 2021, Apex cited increasing collateral requirements

for the restrictions it imposed on trading including through other Brokerage Defendants.



482.    In addition, on March 4, 2021, Apex's President, Tricia Rothschild stated that

Apex restricted "due to anomalous information." Additionally, she stated that We [i.e., Apex] have headroom in terms of the capital available to us on our balance sheet. We have lines of credit that we can call on as needed." Ms. Rothschild further said "I would say it was not a similar situation to Robinhood." Taken at face value, Ms. Rothschild's statements meant that Apex was not faced with a collateralization problem, yet restricted trading nonetheless.

483.    Beyond statements, the opaque nature of the market as described above serve to conceal evidence of the illegal agreement.

484.    Because of the temporal nature of the reporting requirements, short sellers are able to take advantage of reporting gaps to disguise collusive behavior. Participants in the illegal conspiracy were able to exit their short positions and are only required to report periodically without having to report the suspect transactions individually.

485.    Further, because what reporting there is only identifies aggregate short interest and not by particular investor or market maker, individual anticompetitive conduct is hidden from view.

486.    Additionally, because much of the trading in the Relevant Securities recurred on so-called "dark" pools or markets, and in particular the Market Maker Defendants' own internal dark market maker units, participants in the illegal scheme are able to mask the suspect transactions. Because dark pools and dark markets are not directly accessible to the public and "lit" exchanges provide for anonymous trading, participants in the illegal scheme were able to transact without tipping off retail investors about who the trader is, the size of the blocks being traded, or even the execution price of the trade.

487.    *Government Investigations*. The conduct at issue has not escaped the eyes of government actors and are the subject of several investigations. Government investigations are

indicative of anticompetitive collusion.

488.    The Congressional House Financial Services Committee issued subpoenas and held three highly publicized hearings related to the trading restrictions imposed on January 28, 2021.

489.    In addition to proceedings in the House of Representatives, the Senate Banking Committee also held hearings related to the trading restrictions.

490.    According to The Wall Street Journal and public filings, the fraud division of the Department of Justice and the San Francisco U.S. Attorney's office have sought information about the restrictions imposed on January 28, 2021 from brokers and social media companies.

491.    The SEC appears to be investigating the restrictions imposed on January 28, 2021. On June 9, 2021, GameStop Corp. reported in its 10-Q report that "On May 26, 2021, we received a request from the Staff of the SEC for the voluntary production of documents and information concerning a SEC investigation into the trading activity in our securities and the securities of other companies. We are in the process of reviewing the request and producing the requested documents and intend to cooperate fully with the SEC Staff regarding the matter. This inquiry is not expected to adversely impact us."

492.    Robinhood's Focus Report filed with the SEC on February 26, 2021, confirmed many of these investigations and revealed that Robinhood had received inquiries related to the trading restrictions from the U.S. Attorney's Office of the Northern District of California, the SEC's Division of Examinations, FINRA, the New York Attorney General's Office and the offices of other states' Attorneys General, e.g., the Attorneys General of Texas and ███████ state securities regulators and from Congress.

███████████████████████████████████████████████

494.     Finally, on June 30, 2021, FINRA announced that Robinhood was ordered to pay a record financial penalty of $70 million for "systemic supervisory failures and significant harm suffered by millions of customers." According to FINRA, "the sanctions represent the largest financial penalty ever ordered by FINRA and reflect the scope and seriousness of the violations."

### CLAIMS FOR RELIEF
### COUNT ONE

### CONSPIRACY TO RESTRAIN TRADE
### IN VIOLATIONOF SECTION 1 OF THE SHERMAN ACT,
### 15 U.S.C. § 1
### (Against all Defendants)

495.     Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

496.     The Defendants conspired and entered into an anticompetitive scheme to fix, raise, stabilize, maintain or suppress the price of the Relevant Securities, and in order to restrain trade.

497.     Faced with potentially disastrous losses due to their short positions, the Market Maker Defendants, rather than engage in competition or the ordinary activities of the market, conspired, combined, agreed and colluded with the Brokerage Defendants and Clearing Defendants to restrict purchases in stocks by retailer investors and to manipulate and artificially suppress the price of stock, through which they could cover their short positions.

498.     Defendants conspired and agreed with one another with the intent to artificially lower the price of the relevant stocks.

499.     Defendants coordinated a collective shutdown of the stock brokerage market with respect to the Relevant Securities, prohibiting market participants with the exception of institutional investors such as the Market Maker Defendants from purchasing stock in the

Relevant Securities. Pursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of stocks, driving down prices in the Relevant Securities to levels that would not have been obtained, but for the conspiracy, combination, agreement and restraint of trade.

500.     In furtherance of the conspiracy, combination, agreement and restraint of trade, before and before the opening of the stock market on January 28, 2021, the Market Maker Defendants increased short volumes in anticipation of short calls on January 28, 2021.

501.     In furtherance of the conspiracy, combination, agreement and restraint of trade, the Brokerage Defendants prohibited or unreasonably restricted the purchases of shares of the Relevant Securities by Plaintiffs in restraint of trade.

502.     As a direct and intended result of Defendants contract, combination, agreement and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities. The Brokerage Defendants deactivated the buy option on their platforms and left Plaintiffs with no option but to sell shares of the stocks on their platforms. Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination, agreement and restraint of trade. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

503.     The Brokerage Defendants, in particular those who self-clear, disguised their wrongdoing by offering pretextual explanations for the restrictions, claiming they were subject to increased collateral requirements, when in reality the decision to restrict had already been made.

504.     Pursuant to the contract, combination, agreement, conspiracy and restraint of trade, the Brokerage and Clearing Defendants continued to route sell orders to the Market Maker Defendants to purchase stocks at the artificially deflated prices to reduce their distressed short positions. The Market Maker Defendants, who were in exposed short positions due to the short and gamma squeeze, purchased the artificially price-suppressed stocks to cover their short

positions and concealed their activity by using off-exchange trading, including their own internal dark market maker units.

505.    To induce compliance and to limit the effects other Brokerages could have in disrupting Defendants' anticompetitive scheme, the Clearing Defendants raised the fees and/or removed the ability to fill purchases of the Relevant Securities to the brokerages that clear through them, further facilitating the Market Maker Defendants covering of their short positions in furtherance of the conspiracy.

506.    Defendants' anticompetitive and unlawful conduct is per se illegal.

507.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members were injured in their business and property.

508.    Plaintiffs and the Class further seek equitable relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## PRAYER FOR JUDGMENT

**WHEREFORE**, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

a.    This action may proceed as a class action, with Plaintiffs serving as Class Representatives, and with Plaintiffs' counsel as Class Counsel;

b.    Defendants have contracted, combined, and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

c.    Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

d.    Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

e.      Plaintiffs and the Class recover their costs of this suit, including reasonable

attorneys' fees as provided by law;

f.      Plaintiffs and the Class are entitled to equitable relief appropriate to remedy

Defendants' past and ongoing restraint of trade, including:

1)      A judicial determination declaring the rights of Plaintiffs and the Class,

and the corresponding responsibilities of Defendants;

2)      A constructive trust over any ill-gotten property or assets, including but

not limited to stocks in the Relevant Securities received as a result of the

conspiracy or agreement or other wrongful conduct as alleged herein;

g.      Plaintiffs and the Class receive such other or further relief as may be just and

proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of

all the claims asserted in this Complaint so triable.


Dated: July 26, 2021

By:      _____/s/ *Joseph R. Saveri*___          By:      _____/s/ *Frank R. Schirripa*___
          Joseph R. Saveri                                         Frank R. Schirripa

Joseph R. Saveri (CA SBN 130064)               Frank R. Schirripa (NY SBN 4103750)
Steven N. Williams (CA SBN 175489)             Kathryn Hettler (NY SBN 5126065)
Christopher K.L. Young (CA SBN 318371)         Seth Pavsner (NY SBN 4969689)
Anupama K. Reddy (CA SBN 324873)               Eugene Zaydfudim (NY SBN 5204334)
**JOSEPH SAVERI LAW FIRM, LLP**                **HACH ROSE SCHIRRIPA & CHEVERIE LLP**
601 California Street, Suite 1000              112 Madison Ave, 10th Floor
San Francisco, California 94108                New York, New York 10016
Telephone:  (415) 500-6800                     Tel: (212) 213-8311
Facsimile:  (415) 395-9940                     fschirripa@hrsclaw.com
jsaveri@saverilawfirm.com                      khettler@hrsclaw.com
swilliams@saverilawfirm.com                    spavsner@hrsclaw.com
cyoung@saverilawfirm.com                       ezaydufim@hrsclaw.com
areddy@saverilawfirm.com

*Co-Lead Counsel for the Antitrust Tranche*

# TAB 408

# Defendants MTD the Antitrust Tranche Complaint

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-MD-2989-ALTONAGA/TORRES**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to:

ALL ANTITRUST ACTIONS

**DEFENDANTS' MOTION TO DISMISS THE ANTITRUST TRANCHE COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................4

    I.     The Industry Participants. ..........................................................................4

           A.     Introducing Brokers. ......................................................................4

           B.     Clearing Brokers. ...........................................................................5

           C.     Market Makers. ..............................................................................6

           D.     Clearing Agencies. ........................................................................6

    II.    The Mechanics of Securities Trading. ......................................................7

    III.   The Unprecedented Market Volatility of January 2021. ...........................8

    IV.   The Events of January 28, 2021 and Onward. ........................................10

ARGUMENT .......................................................................................................12

    I.     PLAINTIFFS FAIL SUFFICIENTLY TO PLEAD THAT
         DEFENDANTS AGREED TO CONSPIRE. .........................................14

           A.     Plaintiffs Fail To Allege Any Direct Evidence of an Agreement. .............15

           B.     Plaintiffs Fail Adequately To Allege Circumstantial Evidence of an
                Agreement. ...................................................................................16

    II.    PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A
         SECTION 1 CLAIM. ...........................................................................27

           A.     The Court Should Address the Question of *Per Se* vs. Rule of
                Reason at the Motion To Dismiss Stage. ....................................28

           B.     Plaintiffs' Allegations Do Not Qualify for *Per Se* Treatment under
                the Antitrust Laws. .......................................................................28

           C.     Plaintiffs Do Not Even Attempt To Plead a Section 1 Violation
                Based on the Rule of Reason. ......................................................30

    III.   PLAINTIFFS' ANTITRUST THEORY IS PRECLUDED BY THE
         FEDERAL SECURITIES LAWS............................................................33

           A.     Plaintiffs' Antitrust Claims Are Precluded under *Billing* Because
                the Conduct at Issue Is Regulated by the Federal Securities Laws...........33

           B.     There Is No Applicable Savings Clause. ......................................38

    IV.   INDEPENDENT REASONS EXIST TO DISMISS ALL CLAIMS
         AGAINST PEAK6, E*TRADE HOLDINGS AND ROBINHOOD
         MARKETS. ...........................................................................................38

    V.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE........39

CONCLUSION.....................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ................................................17

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   899 F.3d 87 (2d Cir. 2018)....................................................20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..............................................................16

*Austin v. Blue Cross & Blue Shield of Ala.*,
   903 F.2d 1385 (11th Cir. 1990) ............................................32

*Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*,
   953 F.3d 707 (11th Cir. 2020) ..............................................16

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................... passim

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979)....................................................28, 29, 30

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ..............................................................31

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977).............................................................32

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011)................................................15

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988)........................................................14, 28

*Cavero v. Law Offices of Erskine & Fleisher*,
   No. 12-21196-CIV, 2012 WL 13134213 (S.D. Fla. Aug. 28, 2012) ....................................11

*Cement Manufacturers Protective Association v. United States*,
   268 U.S. 588 (1925)..............................................................24

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008)................................................31

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*,
   720 F.2d 1553 (11th Cir. 1983) ............................................28

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) ................................................................................................14

*Credit Suisse Sec. (USA) LLC v. Billing*,
    551 U.S. 264 (2007) ........................................................................................ passim

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) .......................................................................12

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
    504 U.S. 451 (1992) ................................................................................................32

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*,
    588 F.3d 128 (2d Cir. 2009) ............................................................................34, 37

*In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*,
    No. 19-21551-CIV, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021) ............................... passim

*In re Fla. Cement & Concrete Antitrust Litig.*,
    746 F. Supp. 2d 1291 (S.D. Fla. 2010) ...............................................16, 25, 26, 38

*Friedman v. Salomon/Smith Barney, Inc.*,
    313 F.3d 796 (2d Cir. 2002) ........................................................................35, 36, 37

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986) ................................................................................................30

*Gordon v. New York Stock Exchange, Inc.*,
    422 U.S. 659 (1975) ................................................................................................37

*Graphic Prods. Distribs., Inc. v. Itek Corp.*,
    717 F.2d 1560 (11th Cir. 1983) .............................................................................31

*Hoover v. Blue Cross & Blue Shield of Ala.*,
    855 F.2d 1538 (11th Cir. 1988) .............................................................................40

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3rd Cir. 2010) .................................................................................15

*Interstate Cir. v. United States*,
    306 U.S. 208 (1939) ................................................................................................21

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ...................................................................... passim

*Kalmanovitz v. G. Heileman Brewing Co.*,
    769 F.2d 152 (3d Cir. 1985) ..................................................................................31

*La Grasta v. First Union Sec., Inc.*,
   358 F.3d 840 (11th Cir. 2004) .................................................................8

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
   72 F.3d 1538 (11th Cir. 1996) ...............................................13, 27, 28

*In re Loc. TV Advert. Antitrust Litig.*,
   No. 18-C-6785, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) .................15

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)...................................................15, 18, 22

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
   Nos. 08-cv-7746 (BSJ), 08-cv-7747 (BSJ), 2010 WL 430771 (S.D.N.Y. Jan.
   26, 2010), *aff'd on other grounds*, 709 F.3d 129 (2d Cir. 2013) ...........36

*In re Mexican Gov't Bonds Antitrust Litig.*,
   412 F. Supp. 3d 380 (S.D.N.Y. 2019).................................................25

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984).................................................................13, 14, 18

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ...........................................................20, 22

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
   779 F.2d 592 (11th Cir. 1986) ...........................................................28

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
   435 U.S. 679 (1978)...........................................................................27, 28

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
   472 U.S. 284 (1985).............................................................................30

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018)..............................................................28, 30, 32

*Pressner v. Target Corp.*,
   No. 00-cv-6636, 2001 WL 293993 (N.D. Ill. Mar. 27, 2001) .................40

*Procaps S.A. v. Pantheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) .........................................................27, 28

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012)..................................................................29

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
   917 F.3d 1249 (11th Cir. 2019) (en banc) ...................................... passim

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)..............................................................................31

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*,
   812 F. Supp. 387 (S.D.N.Y. 1993).....................................................................30

*In re Se. Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014) ...........................................................................30

*Sinaltrainal v. Coca-Cola Co.*,
   578 F.3d 1252 (11th Cir. 2009) (abrogated on other grounds)...............................13

*St. Paul Fire & Marine Ins. Co. v. Barry*,
   438 U.S. 531 (1978)................................................................................29, 30

*Starr v. Sony BMG Music Ent.*,
   592 F.3d 314 (2d Cir. 2010).............................................................................22

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997).........................................................................................29

*In re Stock Exchs. Options Trading Antitrust Litig.*,
   317 F.3d 134 (2d Cir. 2003)............................................................................37

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006).........................................................................................29

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) .......................................................................24

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
   964 F.2d 1022 (10th Cir. 1992) .......................................................................31

*United Am. Corp. v. Bitmain, Inc.*,
   No. 18-CV-25106, 2021 WL 1807782 (S.D. Fla. Mar. 31, 2021)...........................20

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015).............................................................................21

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)......................................................................................29

*Universal Express, Inc. v. U.S. S.E.C.*,
   177 F. App'x 52 (11th Cir. 2006) .....................................................................12

*Williamson Oil Co. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003) .......................................................................22

**Statutes & Rules**

17 C.F.R. § 240.10b-5 ................................................................................................36

17 C.F.R. § 240.10b-10 ................................................................................................7

17 C.F.R. §§ 240.15a-1 to 240.15c6-1 .......................................................................37

17 C.F.R. §§ 240.15c3-1 to 240.15c3-5 ......................................................................35

17 C.F.R. §§ 240.17Ab2-1 to -2 .................................................................................37

17 C.F.R. §§ 240.17Ad-1 to -24 .................................................................................37

17 C.F.R. § 240.17Ad-22 ............................................................................................36

17 C.F.R. §§ 240.17h-1T to 240.17h-2T ....................................................................36

17 C.F.R. §§ 242.100 to 242.105 ..........................................................................36, 37

15 U.S.C. § 1 ....................................................................................................... passim

15 U.S.C. § 78a, et seq ........................................................................................ passim

Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
      203, 124 Stat. 1376 (2010) ................................................................................38

Fed. R. Civ. P. 12 ...................................................................................................1, 30

Fed. R. Civ. P. 15 .................................................................................................39, 40

Fed. R. Evid. 201 .......................................................................................................12

**Other Authorities**

6 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1485 (1971) ..............................40

Maggie Fitzgerald, *Robinhood restricts trading in GameStop, other names
      involved in frenzy*, CNBC (Jan. 28, 2021, 9:19 AM EST), *available at*
      https://www.cnbc.com/2021/01/28/ robinhood-interactive-brokers-restrict-
      trading-in-gamestop-s.html ................................................................................11

Nasdaq, *Market Activity*, https://www.nasdaq.com/market-activity (last visited
      Aug. 24, 2021) ...............................................................................................8, 10

SEC Division of Enforcement, 2018 Annual Report (Nov. 2, 2018) ...........................36

SEC Division of Enforcement, 2019 Annual Report (Nov. 6, 2019) ...........................36

SEC Division of Enforcement, 2020 Annual Report (Nov. 2, 2020) ............................................36

SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021),
    https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-
    trading-based-social-media-investor-alert ........................................................................12, 37

Defendants respectfully submit this memorandum of law in support of their Motion to Dismiss the "Corrected Consolidated Class Action Complaint" (the "CCAC") filed in the Antitrust Tranche pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT

This putative class action arises from historically unprecedented volatility in the securities markets during the week of January 25, 2021. Spurred by social media and online forums, retail investors sent stock prices and trading volumes for certain stocks soaring, driving the price of GameStop, Inc. ("GME") up 134% on January 27, 2021 *alone*. Other symbols increased between 200% and 300% that same day. A frenzied interest in GME, AMC Entertainment Holdings, Inc. ("AMC") and other "meme" stocks, which Plaintiffs label the "Relevant Securities," pushed trading volatility to record levels. That unprecedented market volatility impacted brokerages in different ways and led market participants to take different actions in an effort to address the impact of the volatility. Clearing agencies (not named in this suit) imposed extraordinary capital requirements on brokerages, including defendants in this action, consistent with SEC regulations and designed to mitigate risk in volatile markets. These sudden requests effectively required those brokerages to post massive amounts of capital (including more than $3 billion for one defendant) with only a few hours' notice.

Each brokerage firm responded to these market developments differently. For instance, Plaintiffs allege that only one of the Introducing Broker Defendants restricted all of the Relevant Securities. The remaining Introducing Broker Defendants adopted restrictions that varied in scope, type and duration. Other brokers—not alleged to be part of the purported conspiracy—adopted restrictions that also differed from broker to broker in scope, type and duration. One of the defendants in this case, Defendant Citadel Securities LLC, continued to

---

[1] Defendants have moved against the unredacted version of the CCAC that Plaintiffs served on August 23, 2021, which is a "corrected" version of what they served on July 27, 2021. Plaintiffs only gave Defendants several hours' notice concerning what Protected Material they intended to include in the Master Complaints, without any meaningful opportunity for Defendants to meet and confer or to substantiate the confidentiality designations. After the Master Complaints were filed, Defendants sought to meet and confer multiple times concerning the filing of lesser-redacted versions of the Consolidated Complaint (ECF No. 358) and the CCAC—specifically, to redact only personally-identifying information—but Plaintiffs declined to do so. Defendants thus reserve the right to seek a protective order concerning the remaining redactions.

facilitate the trading activity from its retail brokerage clients during the relevant time period without interruption or restriction every minute of January 28, 2021.

After brokers imposed different trading restrictions on January 28, counsel for the Antitrust Plaintiffs quickly filed a broad lawsuit against dozens of defendants and then promptly sought MDL coordination. The antitrust claim is predicated on the speculative contention that the "meme" stock prices would have been even higher but for the alleged conduct, combined with the absurd contention that every member of the putative class was harmed because they would all somehow have timed the market perfectly absent the restrictions and sold their shares of the "meme" stocks at a profit. But the claim fails from its inception and in fact has nothing to do with competition at all.

Plaintiffs filed a new consolidated complaint in this MDL still alleging a broad conspiracy at different levels of the securities markets, but dropping more than 19 defendants who were named in the original complaints, effectively conceding the lack of viability of any conspiracy claim against them. Plaintiffs have since "corrected" that complaint to fix critical allegations concerning alleged timing and relationships. They have also dropped from the case an additional eight brokers who they concede implemented trading restrictions at the same time as the remaining broker defendants. Lacking evidence of an actual agreement—and even admitting that they do not know what Citadel Securities' positions were in the Relevant Securities—Plaintiffs continue to insist that disparate trading restrictions, as implemented by Defendants, evidence an unlawful conspiracy. It is a conspiracy born of speculation and contradicted by logic. The allegations do not support, let alone reveal, an unlawful conspiracy or rebut the obvious—and accurate—explanation for the restrictions about which Plaintiffs complain.

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 n.4, 557 (2007), the United States Supreme Court explained that a court assessing a Section 1 conspiracy claim under the Sherman Act must ask whether the factual allegations suffice to create a plausible inference that defendants' conduct makes sense only as part of an unlawful conspiracy, or do those facts instead provide a plausible non-conspiratorial explanation of "independent responses to common stimuli . . . unaided by an advance understanding among the parties?" The facts described above are pleaded in the CCAC, and those facts plausibly establish that there was a "common market stimulus" to which brokers—both those named as defendants and those who are not—each

reacted in their own independent financial interests, unaided by any advance agreement.  That was the unprecedented market volatility for the Relevant Securities, which in turn led to clearing agency demands some brokers could not meet without restrictions.  Plaintiffs' Section 1 claim must, therefore, fail.

While Plaintiffs attempt to brush aside this plausible (and accurate) explanation for what happened as just "cover," their conspiracy theory rings hollow.  According to Plaintiffs, the real reason the Introducing Brokers introduced the disparate restrictions was because Citadel Securities—alleged to have a commercial relationship with some, but not all, of the defendants—sought to depress the prices of the Relevant Securities to protect Citadel Securities' alleged short position.  Despite access to tens of thousands of pages of document productions to government agencies investigating the restrictions, Plaintiffs offer zero direct evidence that:  (1) Citadel Securities actually held a short position in the Relevant Securities; or (2) that any unlawful agreement existed between any two Defendants, never mind among all Defendants.  Plaintiffs fail even to allege that most of the Defendants ever spoke to a single other Defendant during the relevant time period.

The alleged conspiracy is also implausible.  As Plaintiffs acknowledge, Citadel Securities' business is predicated on facilitating trading activity.  There is no allegation—nor could there be—that Citadel Securities ever refused to facilitate trades in any of the Relevant Securities.  Moreover, even if Citadel Securities did stand to benefit from a lower price in the Relevant Securities, none of the brokers did; they are not alleged to have bought or sold these securities for their own account.  To the contrary, restricting trading causes the brokers to lose revenue, and they are agnostic to the price of the Relevant Securities (no different from the thousands of other publicly traded securities).  And they are not alleged to have received *any* financial benefit from Citadel Securities in return for joining the alleged conspiracy.

The circumstances alleged here are a far cry from an actual antitrust conspiracy, where the challenged conduct is unprofitable for any individual firm to engage in alone but becomes profitable when pursued as a group.  Instead, the restrictions cost each broker revenue because they reduced trading volume, regardless of how many other brokers also limited trading, and any one broker's ability to implement restrictions did not depend on others doing the same.  There is no plausible explanation for why the various broker defendants would have sacrificed

their own financial interests to help Citadel Securities and protect it against alleged short position for which Plaintiffs concede they lack any actual evidence.  (*See* Section I.)

Plaintiffs' claim also suffers from two other independent fatal defects.  *First*, even if Plaintiffs had plausibly pleaded an agreement among the Defendants—they have not—they still have not pleaded any of the remaining elements of their Section 1 claim.  The novel conspiracy they allege between actors at different levels of the financial services industry does not fit within the narrow category of restraints for which extensive judicial analysis has confirmed *per se* condemnation applies.  The rule of reason thus applies, and Plaintiffs must adequately allege market definition, market power and anticompetitive effects.  They allege none of those.  (*See* Section II.)  *Second*, this case is no more than a "securities complaint in antitrust clothing," *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 284 (2007), and therefore is implicitly precluded by the federal securities laws.  Congress and the expert regulatory agencies have created a complex system of statutes and regulations that govern the functioning of the securities markets, including the conduct at issue here.  Thus, even if Plaintiffs had adequately pleaded an agreement—they have not—and had also pleaded all the other elements of a Section 1 claim—again, they have not—they still could not pursue antitrust claims as a matter of law.  (*See* Section III.)  This case must be dismissed with prejudice.  (*See* Sections IV and V.)

## <u>BACKGROUND</u>

## I.   THE INDUSTRY PARTICIPANTS.

The allegations at issue here involve a broad number of participants that operate at different levels of the securities industry, many of which are not named as Defendants.  The Defendants fall into three categories:  introducing brokers, clearing brokers and market makers.  (CCAC, ECF No. 388, ¶¶ 42-75.)  Also critical to the allegations are centralized, regulated bodies called clearing agencies, which guarantee completion of trades and work with the other three categories of industry participants to ensure the smooth functioning of the securities markets.  (CCAC ¶¶ 96-104.)  There are no allegations that any of these different categories of industry participants compete with one another.

### A.   Introducing Brokers.

"Introducing Brokers" are customer-facing service providers through which retail investors can place trade orders.  (CCAC ¶¶ 42-63, 126.)  Through an Introducing Broker, customers can place trade orders on the broker's website or mobile application.  Once a trade is

placed, the Introducing Broker routes the order to a clearing broker, which, as described below, processes the customer trade orders.

Plaintiffs have now dismissed all defendants they defined as Introducing Brokers. The only retail customer-facing Defendants that remain in this Action—Robinhood, E*TRADE Securities LLC ("E*TRADE") and Interactive Brokers LLC ("Interactive Brokers")—are what Plaintiffs call "Self-Clearing Brokers," which they allege consist "of an introducing broker . . . [that] also acts as its own clearing firm in that it executes and settles orders and maintains custody of securities."  (*Id.* ¶¶ 113-117.)  This is incorrect as to Robinhood, which maintains a separate introducing entity, Robinhood Financial LLC ("Robinhood Financial"), and clearing entity, Robinhood Securities, LLC ("Robinhood Securities").  For the purposes of this motion, Defendants refer to the so-called Self-Clearing Brokers as "Introducing Brokers."

Plaintiffs do not allege that any of the Introducing Broker Defendants engages in securities trades for its own account, *i.e.*, proprietary trading in stocks or options to generate returns for its business.  The Introducing Brokers are alleged only to provide retail investors with access to the financial markets.  (*Id.* ¶¶ 126, 149.)  There are numerous other Introducing Brokers in the securities industry that are not alleged to be a part of the purported conspiracy (notwithstanding that certain of these brokers are alleged to have imposed trading restrictions), including such major firms as Fidelity, Vanguard, Charles Schwab, TD Ameritrade and, now, the eight Introducing Brokers that were initially named in the CCAC but were subsequently dismissed.  (*Id.* ¶ 115; ECF No. 380, 396-398, 400-404.)

Plaintiffs do not allege that Introducing Brokers (including the so-called Self-Clearing Brokers) compete with Clearing Brokers or Market Makers.  (*Id.* ¶¶ 105-124.)

**B.  Clearing Brokers.**

Clearing Brokers receive accepted customer trade orders from an Introducing Broker, and then, for these accepted trades, are responsible for processing and, in some cases, executing the trade order on the customer's behalf.  (CCAC ¶¶ 66-75, 105.)  They are also responsible for maintaining custody of the securities and assets necessary to clear customer trade orders.  (*Id.*)  As noted above, clearing entities may be either affiliated with an Introducing Broker, or independent companies that contract with unaffiliated Introducing Brokers.  Plaintiffs categorize three entities as Clearing Brokers:  Apex Clearing Corporation ("Apex") and Electronic Transaction Clearing, Inc. ("ETC"), which provide clearing services for various

unaffiliated Introducing Brokers, and PEAK6 Investments LLC ("PEAK6"), a holding company that is the majority owner for both Apex and PEAK6.  (*Id.* ¶¶ 73, 108.)  As a result, all three alleged Clearing Broker Defendants are part of a single corporate family.  (*Id.* ¶ 74.)  Apex performs clearing services for a number of Introducing Brokers that were originally named as defendants, but have since been dismissed from the case.  (*Id.* ¶ 109.)  ETC performs clearing services for Alpaca Securities LLC, which has also been dismissed.  (*Id.*)[2]

As with the Introducing Brokers, Plaintiffs do not allege that any of the Clearing Brokers engages in proprietary trading—buying and selling stocks or options to generate returns for its business.  Plaintiffs also do not allege that the Clearing Brokers compete with Introducing Brokers (including the Self-Clearing Brokers) or Market Makers.  (*Id.* ¶¶ 105-124.)

### C. Market Makers.

A "Market Maker" is an entity that stands ready to fill orders for a particular security at publicly quoted prices, and upon receiving an order from a broker, fills that order with available inventory or by sourcing liquidity from an exchange or other market venue.  (CCAC ¶¶ 118, 124.)  Citadel Securities LLC ("Citadel Securities") is one of many Market Makers.  Plaintiffs do not allege Citadel Securities possesses market power among all Market Makers.  (*See id.*)  Plaintiffs also do not allege that Citadel Securities was the only Market Maker performing such services for any of the defendants that cleared securities transactions during the period of volatility.  (*See id.*; *id.* ¶ 135.)  And while Plaintiffs refer throughout the CCAC to "Market Maker Defendants," they, in fact, have sued only a single Market Maker.  Plaintiffs do not allege that Citadel Securities, or any other Market Maker, competes with Introducing Brokers or Clearing Brokers.  (*See id.*)

### D. Clearing Agencies.

Clearing agencies are centralized entities that validate and finalize securities transactions (*i.e.*, "settle" transactions), and guarantee completion of trades even if a party to the transaction defaults.  (CCAC ¶¶ 98, 101.)  The main clearing agency for the U.S. equities market is the NSCC, which is owned and operated by the DTCC.  (*Id.* ¶¶ 96, 98.)  Both the DTCC and the NSCC are regulated by the Securities and Exchange Commission ("SEC").  (*Id.* ¶¶ 96, 98.)

---

[2] As noted above, Plaintiffs incorrectly lump Defendant Robinhood Securities into the category of "Self-Clearing Brokers."  Robinhood Securities is in fact a Clearing Broker that currently clears accounts exclusively for Robinhood Financial.

## II.  THE MECHANICS OF SECURITIES TRADING.

Retail investors are "individual investors who make investments on their own behalf." (CCAC ¶ 2.)  They can make such investments by opening a brokerage account with an Introducing Broker.  (*Id.* ¶¶ 2, 111-112.)  Some Introducing Brokers offer electronic trading platforms that enable retail investors to place trade orders through a website or mobile application.  (*Id.*)  After a retail investor places a trade order with an Introducing Broker, and the Introducing Broker accepts that order, the Introducing Broker either sends the order to a Clearing Broker for clearing services (as is the case for Robinhood Financial, which sends trade orders to Robinhood Securities), or, if it is an Introducing Broker that clears trades as well, it executes the order itself (as is the case for E*TRADE and Interactive Brokers).  (*Id.* ¶¶ 105, 111.)  The entity clearing the trade (whether it is a Clearing Broker, or an Introducing Broker performing its own clearing services) executes the trade order through an exchange or other trading venue, or sends the order to a Market Maker, which fills the buy or sell order through its inventory or by sourcing liquidity from the market.  (*Id.* ¶¶ 118, 124.)

Market Makers, including Citadel Securities among many others (*see id.* ¶ 423), may pay brokers a fee known as "payment for order flow" ("PFOF") to route orders to the Market Makers' systems (*id.* ¶¶ 134-135).  As alleged in the CCAC, the net amount of PFOF revenue that a broker generates is based in part on the volume of order flow it routes to different Market Makers.  (*Id.* ¶¶ 425-426.)  This practice is long-standing and accepted by the SEC (*see, e.g.*, 17 C.F.R. § 240.10b-10; CCAC ¶ 425), and enables some brokers to offer retail investors the ability to trade without paying commissions.  (CCAC ¶ 3.)  Market Makers may generate revenue by capturing a portion of the "spread" between the bid and ask prices for securities, which can often be as little as one cent per order.  (*Id.* ¶ 118.)  Filled orders are then sent to a clearing agency, such as the NSCC.  (*Id.* ¶¶ 96-98, 101, 129.)  The NSCC clears cash transactions by netting securities deliveries and payments among its members and guaranteeing completion of trades even if a party defaults.  (*Id.* ¶ 98.)  It takes two days for the clearing agency to transfer the stock to the buyer and funds to the seller.  (*Id.* ¶ 101.)

The two-day period between execution and settlement creates a risk that a party to the transaction will be unable to meet its obligations.  (*Id.* ¶¶ 99-103.)  A number of protections are in place to reduce this risk.  (*Id.*)  One protection critical to this case is that clearing agencies require Introducing and Clearing Brokers that execute customer trade orders to pay a deposit to

the clearing agency until the trades are settled.  (*Id.* ¶¶ 103, 470.)  The deposit amount is based largely on risk, which the clearing agencies calculate by looking to, among other things, a firm's customer holdings and open order volume and using a volatility multiplier.  (*Id.* ¶¶ 470-471.) The purpose of these deposit requirements is to protect all market participants—from retail investors to brokers—from potential defaults during the settlement period.  (*Id.* ¶ 103.)  To clear and settle customer transactions, brokers engaged in clearing services must satisfy the NSCC deposit requirements, which can change throughout the course of a single day.  (*Id.* ¶¶ 103, 470.) If an Introducing or Clearing Broker that executes trades fails to timely satisfy its deposit requirements, it risks being "shut down" by the NSCC.  (*Id.* ¶¶ 103, 240-241.)

## III.    THE UNPRECEDENTED MARKET VOLATILITY OF JANUARY 2021.

January 2021 was marked by a series of unprecedented events.  (CCAC ¶¶ 188-190, 228-229.)  Investors—connected through social media platforms and online forums— banded together to cause "short squeezes" by trading in GME, AMC and other stocks they perceived to be the target of short selling activity by institutional investors (the "Relevant Securities").[3]  (*Id.* ¶¶ 141, 142, 185.)  Their activity resulted in "soar[ing]" prices, and in the words of the SEC, "extreme price volatility" in the Relevant Securities.  (*Id.* ¶¶ 190, 337.)  For example, on January 27, GME's price closed at $347.51 per share, a 707.6% increase from just five trading days earlier.  (*Id.* ¶ 190.)  The trading price increase for GME is reflected in the graph below.[4]

---

[3] The "Relevant Securities" are:  GME, AMC, Bed Bath & Beyond Inc. ("BBBY"), Blackberry Ltd. ("BB"), Express, Inc. ("EXPR"), Koss Corporation ("KOSS"), Nokia Corporation ("NOK"), Tootsie Roll Industries, Inc. ("TR") and Trivago N.V. ("TRVG").  (CCAC ¶ 81.)

[4] *See* Nasdaq, *Market Activity*, https://www.nasdaq.com/market-activity (last visited Aug. 24, 2021). The Court may take judicial notice of stock information related to the securities at issue here and in the ensuing charts.  *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004).



The "skyrocket[ing]" and "epic price surge[s]" in the Relevant Securities were unrelated to factors that the securities industry participants traditionally expect would affect stock prices (*e.g.*, earnings reports or public announcements).  (*Id.* ¶¶ 189, 190.)  In the span of just five trading days (from January 21 to January 27, 2021), the total daily trading volume for the Relevant Securities increased from 230 million to 3.3 billion shares.  By the end of that three-day period, the SEC released a statement warning of "on-going market volatility in the options and equities markets."  (*Id.* ¶ 200.)



As the unprecedented volatility and volume unfolded, different brokers took independent, proactive measures to mitigate their exposure to the market risks.  For example, by January 27, 2021, Robinhood Securities increased customer margin requirements to 100% for GME and AMC—in other words, a customer was required to have sufficient funds to pay for the shares in full.  (*Id.* ¶ 199.)  On January 27, 2021, TD Ameritrade (which is not named as a defendant or alleged conspirator) announced that it "put in place several restrictions on some transactions in $GME, $AMC and other securities," including increasing margin requirements to trade in those and other securities.  (*Id.* ¶ 198.)  The same day, Charles Schwab (also not a defendant or alleged conspirator) similarly announced that it would put in place restrictions on three of the Relevant Securities:  GME, AMC and EXPR.  (*Id.* ¶ 199.)  Meanwhile, Plaintiffs do not allege that Citadel Securities ever failed to continue filling orders in its role as a Market Maker with respect to *any* security or broker throughout this volatile period.

## IV.    THE EVENTS OF JANUARY 28, 2021 AND ONWARD.

The historic market volume and volatility in the Relevant Securities came to a head on January 28.  (CCAC ¶¶ 256-266.)  Because brokers had differing risk exposures, they responded to the trading volume and volatility in different ways:  some brokers imposed no restrictions, while others imposed restrictions for different types of transactions, for different durations and involving different securities.  (*See generally id.* ¶¶ 247-252, 269-270.)

On the morning of January 28, the NSCC also issued significantly increased collateral calls for different brokerages.  For example, the NSCC increased Robinhood Securities' deposit requirements to over $3 billion.  (*Id.* ¶ 231.)  The massive capital call was a tenfold increase over what it had been just days before.  (*Id.* ¶ 338.)  Because deposit requirements are based on market volatility, the massive capital call was the direct result of the substantial increases in trading volume and price of the Relevant Securities in previous days—in particular, on January 27.  (*Id.* ¶¶ 102-103, 201-209.)  The capital call of more than $3 billion was also driven in part by the volatility multiplier that the NSCC assigns to securities that it perceives as having more risk.  (*See generally id.* ¶ 470.)

Robinhood Securities received the capital call of more than $3 billion at 5:11 AM EST.  (*Id.* ¶ 231.)  After several hours of internal deliberation, and in light of the "major liquidity

---

[5] *See* Nasdaq, *Market Activity*, https://www.nasdaq.com/market-activity (last visited Aug. 24, 2021).

issue[s]" created by the capital call, it made the difficult decision to impose temporary trading restrictions on the limited number of securities driving the volatility. (*Id.* ¶¶ 232-233.) Robinhood Securities put in place a "position closing only" ("PCO") restriction on stock trades and options contracts for AMC, BB, BBBY, EXPR, GME, KOSS, NOK, TR and TRVG (Plaintiffs' "Relevant Securities") (*id.* ¶ 252), as well as for American Airlines Group, Inc. ("AAL"), Castor Maritime Inc. ("CTRM"), Naked Brand Group, Ltd. ("NAKD") and Sundial Growers, Inc. ("SNDL"),[6] a measure that allowed (but did not require) Robinhood customers to exit their positions in those symbols if they wished, but restricted purchases. (*Id.* ¶¶ 233-238.) Following the imposition of the PCO restrictions, the NSCC revised Robinhood Securities' deposit requirements. (*Id.* ¶ 340.) Robinhood Securities then provided the cash to satisfy its revised deposit requirements a little after 9:00 AM EST, enabling Robinhood's customers to continue trading in all other securities. (*Id.* ¶ 340.) Robinhood Securities lifted the PCO restrictions by January 29, 2021 (*id.* ¶ 324), and removed all trading limitations by market open on February 5, 2021 (*id.* ¶ 340).

Apex also faced an apparent significant (tenfold) increase in its NSCC collateral requirements, which led it on January 28, 2021 to place temporary restrictions on clearing orders for only three stocks (as compared to the 13 that Robinhood restricted): AMC, GME and KOSS. (*See id.* ¶¶ 274, 276, 341, 470-480.) Apex communicated this limitation to its Introducing Broker customers, which in turn notified their customers. (*Id.* ¶¶ 274-276.) Apex resumed clearing transactions in AMC, GME and KOSS later that day. (*Id.* ¶ 327.) Plaintiffs originally alleged that Apex's Introducing Broker customers were members of the purported conspiracy (ECF No. 358, ¶¶ 42-51), but have since dismissed them all from the case.

The remaining Broker Defendants also imposed a variety of different restrictions, each taking its own approach given the unique issues and considerations that each faced during the period of unprecedented trading volume and volatility. Indeed, none of the defendant brokers

---

[6] *See* Maggie Fitzgerald, *Robinhood restricts trading in GameStop, other names involved in frenzy*, CNBC (Jan. 28, 2021, 9:19 AM EST), *available at* https://www.cnbc.com/2021/01/28/ robinhood-interactive-brokers-restrict-trading-in-gamestop-s.html. Plaintiffs allege that Robinhood's limited restrictions included, "*inter alia*," certain "Relevant Securities." (CCAC ¶ 252.) For completeness, Defendants identify the full set of restricted equities as reported by the media, which are "generally known" and "whose accuracy cannot reasonably be questioned." *Cavero v. Law Offices of Erskine & Fleisher*, No. 12-21196-CIV, 2012 WL 13134213, at *2 (S.D. Fla. Aug. 28, 2012).

imposed identical trading restrictions—in terms of the type of restriction and the symbols impacted. For example, E*TRADE placed PCO restrictions on stock trading for only two symbols: GME and AMC. (*Id.* ¶ 250.) Plaintiffs allege that Interactive Brokers took a different approach, and imposed PCO restrictions on options trading only (not stock trading) for only five symbols: GME, AMC, BB, EXPR and KOSS. (*Id.* ¶ 249.) Plaintiffs do not allege that all of the Defendants met or otherwise coordinated these restrictions.[7]

By January 30, many of the brokers had lifted their restrictions. (*Id.* ¶¶ 325-326.) That day, the SEC released an investor alert and bulletin warning about the risks of short-term trading based on social media, and acknowledged that "broker-dealers may reserve the ability to reject or limit customer transactions" for "legal, compliance, or risk management reasons," and that the ability to do so "is typically discussed in the customer account agreement."[8]

## ARGUMENT

Pleading a violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, requires a "(1) conspirac[y] that (2) unreasonably (3) restrain[s] interstate or foreign trade," *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (en banc). In considering a motion to dismiss "a case brought under § 1 of the Sherman Act, [courts] must determine whether the complaint, in asserting a conspiracy or agreement in restraint of trade, contains 'allegations plausibly suggesting (not merely consistent

---

[7] While this fact is not necessary to this Motion, Congress heard testimony revealing that Citadel Securities "had no role in Robinhood's decision to limit trading in GameStop or any other of the 'meme' stocks." *Virtual Hearing – Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide*, 117th Cong. (2021) (statement of Kenneth C. Griffin, Chief Executive Officer, Citadel LLC), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-griffink-20210218.pdf. Congress also heard testimony that the action Robinhood took "was for one reason and one reason only: to allow [Robinhood] to continue to meet [Robinhood's] regulatory deposit requirements." *Id.* (statement of Vladimir Tenev, Chief Executive Officer, Robinhood Markets, Inc.), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-20210218.pdf. The Court may take judicial notice of congressional testimony. *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 n.12 (D.D.C. 2020) (quoting Fed. R. Evid. 201(b)(2)).

[8] SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021) ("SEC Statement"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert. The Court may take judicial notice of the SEC statement because it is a public record, the accuracy of which cannot reasonably be questioned. *See Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (taking judicial notice of public records at the motion to dismiss stage).

with) [a conspiracy or] agreement,' that is, whether the complaint 'possess[es] enough heft to show that the pleader is entitled to relief." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, No. 19-21551-CIV, 2021 WL 1109128, at *10 (S.D. Fla. Mar. 23, 2021). A plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Plausibility is the key, as the 'well-pled allegations must nudge the claim across the line from conceivable to plausible.'" *Jacobs*, 626 F.3d at 1333 (quoting *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (abrogated on other grounds)).

The "'crucial question' with regard to a conspiracy claim under section 1 'is whether the challenged anticompetitive conduct stems from independent decision or from an agreement.'" *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (quoting *Twombly*, 550 U.S. at 553). Plaintiffs must present "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* (alteration in original) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). To plausibly allege an agreement through circumstantial evidence, Plaintiffs must show "parallel conduct" together with sufficient "plus factors," which may include "common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (citations omitted).

Once an agreement is plausibly alleged, courts "must first decide whether to analyze [it] under the *per se* rule or the rule of reason." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549 (11th Cir. 1996). There is a "presumption in cases brought under section 1 of the Sherman Act that the rule-of-reason standard applies," and courts "apply the *per se* rule only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability." *Id.* (citations omitted). If the alleged conduct is not anticompetitive *per se*, the "rule of reason analysis requires the plaintiff to prove (1) an anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the conduct has no procompetitive benefit or justification." *Id.* at 1551 (citations omitted). To prove an anticompetitive effect on the relevant market, Plaintiffs must first sufficiently plead a relevant

13

market.  *Tempur-Pedic*, 626 F.3d at 1336.  Then, Plaintiffs must show either actual anticompetitive harm in that market, which include "reduction of output, increase in price, or deterioration in quality", or potential harm, which requires Plaintiffs also to show that "the defendants possess[] power in that market."  *Id.* at 1339 (citations omitted).

Finally, where antitrust claims arise from activity regulated by the federal securities laws, those claims are precluded by the federal securities laws.  In *Credit Suisse Sec. (USA) LLC v. Billing*, the Supreme Court held that securities laws implicitly preclude antitrust laws if they are "clearly incompatible."  551 U.S. 264, 285 (2007).

Plaintiffs' claims fail for three independent reasons under these applicable legal standards.  *First*, Plaintiffs fail to plead any allegations sufficient to support an inference of an illegal agreement, and instead rely on hollow—and legally deficient—conclusions that a conspiracy was formed.  The alleged conspiracy is wholly implausible; the facts conceded in the CCAC present a far more likely—and lawful—explanation for the challenged conduct.  *Second*, Plaintiffs fail to allege the necessary elements to plead a claim under Section 1 of the Sherman Act.  *Third*, even if Plaintiffs' claims were taken to plead some kind of antitrust claim (which they do not), such a claim would nonetheless be precluded by the federal securities laws.

## I.  PLAINTIFFS FAIL SUFFICIENTLY TO PLEAD THAT DEFENDANTS AGREED TO CONSPIRE.

Plaintiffs must allege "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto*, 465 U.S. at 768.  "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

Plaintiffs allege that entities at three different levels of the financial industry—Citadel Securities as a Market Maker Defendant, the Clearing Broker Defendants and the Introducing Broker Defendants—all conspired in the span of a few days to impose different trading limitations on different stocks.[9]  Plaintiffs are therefore required to allege direct or

---

[9] Among the Defendants, members of the same corporate family are considered as a single economic actor and are thus "incapable of conspiring with each other."  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 776 (1984).  While the CCAC discusses "Clearing Brokerage Defendants"—plural—and lists three entities (Apex, ETC and PEAK6) (CCAC

circumstantial evidence that *each* of the Introducing Broker and Clearing Broker Defendants reached an unlawful agreement with Citadel Securities, that *each* Introducing Broker Defendant reached an agreement with each Clearing Broker Defendant, and that *each* Introducing Broker Defendant reached an agreement with each of the other Introducing Broker Defendants.  *See Twombly*, 550 U.S. at 565 n.10 (dismissing conspiracy allegations because "the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies" and gave "no clue as to which [defendant] (much less which of their employees) supposedly agreed"); *Quality Auto*, 917 F.3d at 1262 (requiring allegations for "each defendant" in the conspiracy).  But Plaintiffs do not specify in any way what the alleged agreement was, its contours, or even the structure of the alleged conspiracy involving market participants that admittedly are not horizontal competitors.

## A.     Plaintiffs Fail To Allege Any Direct Evidence of an Agreement.

Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (quoting *In re Loc. TV Advert. Antitrust Litig.*, No. 18-C-6785, 2020 WL 6557665, at *7 (N.D. Ill. Nov. 6, 2020)).  Such evidence would consist, for example, of a "document or conversation explicitly manifesting the existence of" an agreement.  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3rd Cir. 2010)); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("[Direct] evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level.").  Plaintiffs had the opportunity to review more than 25,000 pages of documents that Defendants produced to government regulators and then re-produced to Plaintiffs; they even requested a 14-day extension of their deadline to file the instant complaint to allow for more time to review those materials.  (*See* Plaintiffs' Unopposed Motion For Extension of Time, ECF No. 334.)  Notwithstanding those documents and that additional time, Plaintiffs have provided *no* direct evidence of the unlawful agreements they

¶¶ 66-75), it then admits that PEAK6 owns both Apex and ETC (*id.* ¶ 73).  Likewise, Robinhood Financial and Robinhood Securities are both owned by Robinhood Markets, Inc ("Robinhood Markets"), and E*TRADE Financial Holdings LLC ("E*TRADE Holdings") owns E*TRADE.  No alleged agreement within any of these intra-family groups could give rise to an actionable conspiracy claim.

allege in the CCAC.  Specifically, there is no direct evidence concerning when, where or how the alleged conspiracy was entered, who was part of it, or what its structure or purpose was.

**B.      Plaintiffs Fail Adequately To Allege Circumstantial Evidence of an Agreement.**

Where, as here, plaintiffs are unable to present direct evidence of an agreement, they must plead "parallel conduct" and "sufficient 'plus factors.'"  *Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (quoting *Quality Auto*, 917 F.3d at 1262).  Critically, "[a]llegations of parallel conduct . . . are insufficient standing alone to raise an inference of conspiracy." *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (quoting *Auto. Alignment*, 953 F.3d at 726).  Instead, plaintiffs must allege both parallel conduct *and* "sufficient 'plus factors' to make the parallel conduct 'more probative of conspiracy than of conscious parallelism.'"  *Auto. Alignment*, 953 F.3d at 726 (quoting *Quality Auto*, 917 F.3d at 1262).  Plaintiffs do not and cannot allege parallel conduct or sufficient plus factors, and therefore fail to push "their claims across the line from conceivable to plausible." *Quality Auto*, 917 F.3d at 1256-57 (citing *Twombly*, 550 U.S. at 570).

**1.      Plaintiffs Fail Plausibly To Allege Parallel Conduct Among Any of the Defendants From Which One Should Infer a Conspiracy.**

Plaintiffs do not plausibly allege parallel conduct among the defendants from which a conspiracy could be inferred.

Under *Twombly*, allegations of parallel conduct alone cannot survive a motion to dismiss, but "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." 550 U.S. at 557.  As this Court has explained, "[f]actual allegations that are 'consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy' are insufficient." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Twombly*, 550 U.S. at 554).  The Court "may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)) (internal quotation and alteration omitted); *see also id.* ("After *Twombly*, to successfully plead a Section 1 claim based on defendants' conduct alone, plaintiffs must allege facts that make the existence of a preceding unlawful agreement the most plausible explanation for a defendants' [sic] behavior."); *Auto. Alignment*, 953 F.3d at 728-29 (holding that plaintiffs failed plausibly to

allege a Section 1 claim when they "offer[ed] no allegations that explain[ed] why the loss in business they allege[ed] [was] plausibly explained by steering instead of other 'obvious alternative explanation[s]'") (quoting *Twombly*, 550 U.S. at 567).

Here, Plaintiffs not only fail to make allegations plausibly suggesting a preceding agreement, but also themselves provide the "obvious alternative explanation" for the allegedly collusive behavior. *Twombly*, 550 U.S. at 567. Specifically, Plaintiffs allege (accurately) that the NSCC—the clearing agency for securities transactions—imposed collateral requirements on brokers to "mitigate the risk of settling trades." (CCAC ¶ 413.) Plaintiffs further allege (correctly) that the NSCC "collateral requirement changes depending on the perceived risk of the order" (*id.*), that the Clearing Brokers "typically pass down to the brokerages [the Introducing Brokers]" those collateral requirements (*id.*),[10] and (again, correctly) that the NSCC "demanded that its member clearing agents supply additional collateral to support" trades in the so-called meme stocks on January 28 (the day of the alleged conspiracy) (*id.* ¶ 414). For example, according to Plaintiffs' own allegations, Robinhood faced a deficit of more than $3 billion on January 28 as a result of the NSCC's collateral call. (*Id.* ¶ 231.) Apex also received a significant increase in its NSCC collateral requirement. (*Id.* ¶¶ 274-276.) Again, according to Plaintiffs themselves, these collateral requirements "protect[] NSCC and all market participants against clearing member defaults," "margin requirements must be met by clearing members on a timely basis," and the "NSCC collects clearing fund contributions, or margin, at the start of each day and intraday in volatile markets." (*Id.* ¶ 103.) Plaintiffs also allege (correctly), that the markets for the Relevant Securities were extraordinarily volatile on the days in question and trading volume was unprecedented, providing an independent rationale for the restrictions implemented by brokers not alleged to have received an increased collateral call. (*Id.* ¶¶ 200-209.)

These pleaded facts are not, as Plaintiffs assert, simply "cover" for an alleged conspiracy (*id.* ¶ 415)—they provide a plausible (and the actual) non-conspiratorial explanation of the brokers' "independent responses to common stimuli . . . unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4 (citation omitted); *see also Am.*

---

[10] This allegation is incorrect as Clearing Brokers do not typically pass on collateral requirements to Introducing Brokers—Clearing Brokers may communicate to Introducing Brokers whether the clearing entity needs to put in place certain restrictions to address volatility-based deposit requirements. (*See, e.g.*, *id.* ¶¶ 273, 470-471.)

*Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) (noting that "[t]he complaint does not plausibly suggest that by using similar methods to downcode and bundle claims, Defendants have acted in any way inconsistent with the independent pursuit of their own economic self-interest," and "[a]ccordingly, Defendants' parallel conduct is equally indicative of rational independent action as it is concerted, illegitimate conduct"); *Mayor & City Council of Balt.*, 709 F.3d at 138 (noting that "Defendants' alleged actions—their en masse flight from a collapsing market in which they had significant downside exposure—made perfect business sense"). And for those reasons the pleaded facts are dispositive.

        The independent, non-conspiratorial rationale for the challenged conduct—and the lack of parallel conduct that could plausibly support a conspiracy claim—is confirmed by two additional facts, each admitted by Plaintiffs. *First,* Plaintiffs concede that a significant number of brokers that are not alleged to have been conspirators enacted trading restrictions in response to the market volatility and volume. (CCAC ¶ 246 ("[T]he other Brokerage Defendants *and other brokerages* employed similar tactics to prevent Retail Investors from opening new positions in at least one or more of the Relevant Securities." (emphasis added)).) This includes major retail brokerages such as Charles Schwab and TD Ameritrade, as well as the eight Introducing Brokers that Plaintiffs have voluntarily dismissed since filing their Consolidated Complaint (ECF No. 358), and other brokers that were listed as Defendants in the original (pre-MDL) Complaints but dropped in Plaintiffs' Consolidated Complaint such as Cash App Investing LLC, eToro USA Securities, Inc. and Barclays Bank PLC (*compare* ECF No. 358, *with Shane Cheng and Terell Sterling v. Ally Financial Inc. et al.*, 21-cv-00781 (N.D. Cal.) (Complaint, ECF No. 1, at 1)). For example, the CCAC recognizes that Charles Schwab implemented restrictions on transactions for GME, AMC and EXPR, and TD Ameritrade restricted transactions in various securities including GME and AMC. (CCAC ¶¶ 198-199.) These actions, undertaken by entities not alleged to be part of the conspiracy, directly refute the plausibility of any claim that the imposition of trading restrictions during the last week of January 2021 "tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (alteration in original) (quoting *Monsanto*, 465 U.S. 764).

        *Second,* the allegedly parallel conduct undertaken by the Defendants varied in material ways, both before and after the NSCC's collateral calls on January 28, 2021. Although

the CCAC discusses nine "Relevant Securities," 11 of the 15 original defendants (and 4 of the remaining 8 defendants) are alleged to have restricted trading in only three of these symbols. (*Compare* CCAC ¶ 6 (listing the nine Relevant Securities), *with* CCAC ¶ 276 (Apex restricted only GME, AMC and KOSS).)  Interactive Brokers is alleged to have restricted trading on *options* (but not stock purchases) for five of the nine Relevant Securities (AMC, BB, EXPR, GME and KOSS).  (*See id.* ¶¶ 249-252.)  For at least four of the Relevant Securities (BBBY, NOK, TR and TRVG)—and four others not listed by Plaintiffs (AAL, CTRM, NAKD, SNDL)— only Robinhood is alleged to have actually imposed *any* restriction.  (*Id.* ¶¶ 251-252)  E*TRADE is alleged only to have "halted GME and AMC."  (*Id.* ¶ 250.)  Finally, for an alleged conspiracy where Citadel Securities purportedly had brokers restricting retail investor purchases of the Relevant Securities for its benefit, *nowhere* in the CCAC do Plaintiffs allege that Citadel Securities adopted any restrictions of its own.  Plaintiffs do not allege *any* facts even suggesting that Citadel Securities did anything other than fulfill all orders for each of the Relevant Securities that it received from Introducing and Clearing Brokers.

The table below summarizes Plaintiffs' allegations concerning the trading restrictions implemented by various brokers, both alleged conspirators and non-conspirators:

| Date | Broker | Security | Action | CCAC | Named as Defendant |
|---|---|---|---|---|---|
| January 27 | TD Ameritrade | GME, AMC and other securities | Placed restrictions and increased margin requirements | 198 | No |
| | Schwab | GME, AMC, EXPR | Placed restrictions | 199 | No |
| | Robinhood | GME, AMC | Disabled margin trading | 199 | Yes |
| January 28 | Robinhood | GME, AMC | Moved options contracts to position closing only | 229 | Yes |
| | Stash | GME, AMC | Prevented users from viewing the securities | 247 | No |
| | Interactive Brokers | AMC, BB, EXPR, GME, KOSS | Moved options trading into liquidation only; increased margin requirements | 249 | Yes |
| | E*Trade | GME, AMC | Halted trading | 250 | Yes |
| | Robinhood | AMC, BB, BBBY, EXPR, GME, KOSS, NOK, TR, TRVG | Moved equities and options to position closing only | 252 | Yes |
| | Webull | Relevant Securities | Restricted trading | 274 | No |
| | SoFi | GME | Moved equities and options to position closing only | 275 | No |
| | Apex | GME, AMC, KOSS | Moved equities and options to position closing only | 276 | Yes |
| | Ally, Dough, Public.com, Stash, Tastyworks | GME, AMC, KOSS | Moved equities and options to position closing only | 276 | No |

Plaintiffs must thus concede that the "restrictions on trading took different forms."  (*Id.* ¶ 238.)

These allegations simply cannot "support[] an inference of a conspiracy" because Defendants' actions were "not uniform" and "defendants each reacted in different ways." *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 105 (2d Cir. 2018) (explaining that "defendants' conduct was not, in fact, parallel" where some defendants refused to pay imposed surcharge, while others "undertook independent efforts to negotiate" or "agreed to temporarily pay the surcharge").

### 2.   Plaintiffs Fail To Allege Sufficient Plus Factors in Support of a Conspiracy.

Plaintiffs further fail to plead "sufficient plus factors to make the parallel conduct more probative of conspiracy" than of independent conduct. *Salmon Antitrust Litig.*, 2021 WL 1109128, at *10; *see also Quality Auto*, 917 F.3d at 1267 (recognizing plus factors as circumstantial evidence that "tends to exclude the possibility of independent action").

### (a)   There Is No Common Motive To Conspire.

Plaintiffs fail to plausibly allege that Defendants had a common motive to conspire. (CCAC ¶ 406.) Such a common motive to conspire would require that the parties had a collective interest in acting in concert to achieve an anticompetitive end, such as raising prices. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (noting that a "firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors"). In support of this factor, Plaintiffs assert that Citadel Securities had a motive to restrict trading to avoid incurring losses on its supposed short positions. (CCAC ¶ 406.) But Plaintiffs fail to allege *any* facts to establish that Citadel Securities held short positions in the Relevant Securities during the relevant time period, sheepishly conceding "it is not possible to ascertain which investor has a short position in a particular security at any particular time." (*Id.* ¶ 399; *see also id.* ¶ 387). "Pure speculation does not make out a plus factor." *United Am. Corp. v. Bitmain, Inc.*, No. 18-CV-25106, 2021 WL 1807782, at *13 (S.D. Fla. Mar. 31, 2021). Nor do Plaintiffs allege that Citadel Securities itself restricted any trading. In short, Plaintiffs' conclusory allegations that Citadel Securities had a motive to concoct this entire conspiracy simply do not add up.

There is also no allegation—conclusory or otherwise—that any Clearing Broker or Introducing Broker Defendant was engaged in proprietary short selling. To the contrary, Plaintiffs concede that the various brokers make money only when trades are processed. (CCAC ¶¶ 420-422.) For the securities trade orders at issue, the trading price at which each security is

bought and sold has no direct bearing on the per-trade fees each of the Introducing Brokers and Clearing Brokers earns from their customers' trading activity.  As Plaintiffs concede, the Introducing Broker and Clearing Broker Defendants thus stood to *lose* significant revenues by implementing trading restrictions, in addition to the significant reputational harm that they faced.  (*Id.*)  Why, then, would the various Clearing and Introducing Broker Defendants decide they wanted to *lose* money and risk negative publicity simply to help Citadel Securities?

The CCAC lacks an answer to that critical question.  Indeed, there is no factual allegation—simply mere innuendo—supporting the proposition that Citadel Securities asked, induced or coerced any of the Defendants.  While Plaintiffs allege that Robinhood (but not several other Introducing Broker and Clearing Broker Defendants) had a PFOF relationship with Citadel Securities, the CCAC does not allege that Citadel Securities had sufficient market power to force any of the Clearing Brokers or Introducing Broker Defendants to do something purely to benefit Citadel Securities.  *Contrast with Interstate Cir. v. United States*, 306 U.S. 208, 214 (1939) (finding that the distributors distributed "about 75 per cent. of all first-class feature films exhibited in the United States," and this market power enabled them to enforce the conspiracy).[11] There also is no allegation that Citadel Securities offered any financial inducement for the Introducing Broker or Clearing Broker Defendants to forgo profits to allegedly save Citadel Securities money.  *Contrast with United States v. Apple, Inc.*, 791 F.3d 290, 298 (2d Cir. 2015) (finding conspiracy where publishers agreed to "raise the price of ebooks and thus protect their profit margins" with Apple's help).  Plaintiffs also fail to provide a plausible theory why the broker defendants would comply with Citadel Securities' alleged wishes to restrict trading, rather than simply re-directing trades to competing market makers (which are noticeably absent from the CCAC).

In sum, Plaintiffs ask this Court to infer that the Introducing and Clearing Broker Defendants decided to introduce varying versions of trading restrictions (at the same time that alleged non-conspirators were also implementing a variety of trading restrictions) simply because *some* had existing business relationships with Citadel Securities, rather than because these Defendants faced unprecedented challenges, such as (in some cases) *billions of dollars in*

---

[11] Plaintiffs allege that Citadel Securities' PFOF made up 29% of Robinhood's revenue in 2019, 34% in 2020 and 43% in the first quarter of 2021 (CCAC ¶¶ 135, 283), and less than one-quarter of Apex's revenue from market makers (*id.* ¶ 140).

*unexpected collateral requirements* in the middle of one of the most volatile market moments in history.  That inference is totally implausible; if these allegations meet the *Twombly* test, it is hard to imagine an alleged conspiracy that would not.

> **(b)  Actions Taken Against Unilateral Self-Interest Are Not Probative Here.**

Plaintiffs entirely fail to allege any actions taken by Defendants against their self-interest that are probative of a conspiracy.  This plus factor is only probative of a conspiracy if Plaintiffs allege some furthered *collective* self-interest.  *See Mayor & City Council of Balt.*, 709 F.3d at 138 (noting that "alleged behavior that would plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals'" may suggest prior agreement) (citing *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 327 (2d Cir. 2010)).  In other words, this plus factor is present when alleged conspirators do something that would be unprofitable if done individually, but *becomes* profitable through collective action—such as imposing a price increase, which would lose business if no competitor raised prices but would help everyone if all sellers in the market raised prices.  *See In re Musical Instruments*, 798 F.3d at 1195.  Plaintiffs face two problems here.

*First*, the allegations give rise to plausible, non-conspiratorial reasons why implementing trading restrictions was *in*—rather than *against*—the independent self-interest of each Clearing Broker and Introducing Broker Defendant:  namely to protect the firms and their customers from exceedingly volatile market trading, as well as to reduce each of their NSCC collateral requirements resulting from the volatility.  (*See* Section I.B.1.)  Each broker's primary interest is to attract and retain a strong customer base.  The Clearing and Introducing Broker Defendants nonetheless were forced out of necessity to impose restrictions, even though such restrictions create a real risk of both immediate and long-term reputational and financial harm (including this Action).  Plaintiffs recognize that various brokers not alleged to be part of the conspiracy and not added as defendants (or originally sued but now dismissed as outlined above) implemented their own restrictions on some of the same securities at the same time.  (*See* Section I.B.1.)  Where a "benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor."  *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1310 (11th Cir. 2003).

*Second,* although the restrictions cost each broker revenue—fewer trades mean fewer payments for order flow (or fewer commissions) for the Clearing and Introducing Broker

Defendants, and less spread capture for the Market Makers (CCAC ¶¶ 420-422)—the fact that others may also decide to reduce trading volume does nothing to fill that revenue hole.  There is no allegation—nor could there be—that *lower* trading volume somehow collectively increases profits for brokers.  This simply is nothing like the cases that involve raising prices or reducing output, where concerted action makes an otherwise unprofitable individual action collectively profitable.

### (c)      Plaintiffs Fail To Allege Opportunities To Coordinate and Collude and Evidence of Concealment and Pretext.

The CCAC also lacks sufficient allegations of opportunities between the Defendants to enter into the supposed conspiracy and to conceal such an agreement. Conversations that courts have found to "support a reasonable inference of conspiracy" include "bilateral and multilateral agreements not to compete and a high level of communications among Defendants."  *Salmon Antitrust Litig.*, 2021 WL 1109128, at *15.

After reviewing tens of thousands of pages of discovery produced to entities investigating the trading restrictions, Plaintiffs can point to only a handful of inter-firm communications in their complaint.  For most of the Defendants, they allege literally no communications.  Indeed, there are no allegations that Defendants PEAK6, ETC or Interactive Brokers *ever spoke or otherwise communicated during the relevant time with each other or any of the other alleged conspirators, including Citadel Securities*.  That pleading failure itself negates Plaintiffs' conspiracy claim as to those Defendants.

E*TRADE is alleged to have communicated with Citadel Securities—but no other alleged conspirator—and those communications related only to order cancellations as a routine part of their ongoing business relationship and resulted in the cancellations of four total orders— none of which are alleged to pertain to the Relevant Securities.  (CCAC ¶¶ 315-316.)

With respect to Apex, Plaintiffs unpersuasively point to a single chat message describing a call between a Robinhood Financial employee (not alleged to be involved in the decisions to impose trading restrictions) and an unidentified Apex employee that flags a Reddit thread highlighting a way in which customers were circumventing Robinhood's restrictions on options.  (*Id.* ¶ 457.)  As Plaintiffs acknowledge, the communication occurred on January 29, 2021, one day *after* Apex had lifted its own trading restrictions for GME and AMC.  (*Id.* ¶ 327.) Plaintiffs do not explain why such a communication suggests the existence of a conspiracy if one of the parties had already abandoned the alleged collusive conduct and offer no basis for their

23

assertion that Apex "continued its participation in the scheme by policing the conspiracy," particularly since Apex was no longer effecting the alleged scheme itself.  (*Id.*)[12]  The remaining allegations concerning Apex simply reflect that Apex communicated with its *customers* on business matters.  (*Id.* ¶¶ 443-444.)

Finally, with respect to Robinhood, Plaintiffs point to limited communications with Citadel Securities that, as is clear from the face of those documents and others produced to Plaintiffs and cited in the CCAC, reflect ordinary business dealings between a Market Maker and its client.[13]  Specifically, those communications related to the ongoing "'payment for order flow' relationship" between Robinhood and Citadel Securities and had nothing to do with the restrictions Robinhood later imposed.  (*Id.* ¶¶ 283, 312-313.)  Plaintiffs concede as much when they note that a Robinhood executive, in discussing an upcoming call with Citadel Securities, "indicated that she believed Citadel Securities would make demands on limiting payment for order flow."  (*Id.* ¶ 305.)  Additional correspondence Plaintiffs rely on further demonstrates that the conversations between Robinhood and Citadel Securities were about PFOF, not trading restrictions.  (*See id.* ¶¶ 307, 310.)  Plaintiffs plead no communications whatsoever indicating even that Citadel had advance notice of the Robinhood restrictions on trading of any of the Relevant Securities, let alone any conspiracy to impose such restrictions.  *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991) ("[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy.").

That leaves only Plaintiffs' allegations concerning public statements by Interactive Brokers' Chairman, Thomas Peterffy,[14] and Robinhood's CEO, Vlad Tenev, on

---

[12] This communication—made for the purpose of informing Robinhood that Robinhood's customers were publicly discussing a plan to evade Robinhood's trading policies (CCAC ¶¶ 327-330)—is moreover protected under *Cement Manufacturers Protective Association v. United States*, 268 U.S. 588, 604 (1925), which holds that it is not an antitrust violation for even competitors to warn one another of fraudulent conduct by others.

[13] Plaintiffs also contend that a communication between Citadel Securities and Robinhood on January 30, 2021 suggests an effort "to coordinate messaging regarding the restrictions placed on January 28, 2021."  (CCAC ¶ 463.)  This does not give rise to an inference of a conspiracy.  As Plaintiffs concede, these communications, which occurred *after* the alleged conspiracy and relevant events, were between public relations teams (*id.* ¶¶ 335, 448), which stands to reason in light of the significant media attention on both companies—among many others—after the market events of late January 2021.

[14] This is Plaintiffs' only allegation pertaining to Interactive Brokers' alleged conduct in the entirety of their 135-page complaint.  It provides no support whatsoever for their claimed

January 28, 2021.  (*See* CCAC ¶ 279.)  Plaintiffs allege that each alluded to the need to "protect" his respective company by restricting trading in the relevant securities, and implausibly suggest the statements evidence the alleged agreement.  (*Id.*)  In fact, they do the opposite, confirming that each broker had an independent incentive to take action to protect its own business and customers in a time of unprecedented market volatility.  The fact that both Peterffy and Tenev made similar true statements on the same day merely reflects the day's unprecedented circumstances, as each company faced common stimuli at the same time.

These allegations are a far cry from the types of allegations upon which courts rely to satisfy this plus factor.  *See, e.g.*, *Salmon Antitrust Litig.*, 2021 WL 1109128, at *15 (referencing "bilateral and multilateral agreements not to compete and a high level of communications among Defendants," including "top management" meetings where participants "discussed plans of non-competition and cooperation between the companies" and their respective prices).  Indeed, this Court rejected as insufficient the pleaded "opportunity to conspire" plus factor in *Florida Cement*, in which the plaintiffs alleged far more than is pleaded in this Action—that the defendants had "frequently communicated through in-person meetings, telephone calls, and other means" and that "Defendants' meetings in furtherance of the conspiracy included those held at trade association meetings, social events, and corporate meetings."  746 F. Supp. 2d at 1316 (denying motion to dismiss based on separate allegations of direct evidence).  The Plaintiffs here—even with substantial discovery—offer no such allegations.

### (d)   Plaintiffs Fail To Show How the Existence of Government Inquiries Creates an Inference of Conspiracy.

Plaintiffs allege that a conspiracy can be inferred based on the announcement of regulatory investigations stemming from the events of January 2021.  (CCAC ¶¶ 486-493.)  But where, as here, "allegations are sparse, the existence of government inquiries [is] insufficient to raise an inference of conspiracy."  *Salmon Antitrust Litig.*, 2021 WL 1109128, at *17; *see also In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019) ("It is far from clear that an ongoing government investigation involving Defendants would, in the absence of more substantial allegations, weigh in favor of the complaint's plausibility.").

---

conspiracy, and the dearth of allegations as to Interactive Brokers merely confirms the infirmity of Plaintiffs' claim against it.

(e)     **Plaintiffs Fail To Allege Structural Characteristics To Support the Existence of an Anticompetitive Agreement.**

Finally, Plaintiffs allege that the "structure and characteristics of the market for securities . . . make it conducive to collusion and anticompetitive conduct." (CCAC ¶ 362.) Courts generally recognize that some market characteristics, such as "high market concentration," "significant barriers to entry" and a "commoditized product," "contribute to [a] circumstantial case." *Salmon Antitrust Litig.*, 2021 WL 1109128, at *14. This plus factor also does nothing to support Plaintiffs' claim.

Typically, a plaintiff relying on this plus factor would demonstrate that a series of horizontal competitors commanded such an uncontestable share of the marketplace that they would profit from raising prices, restricting output or reducing quality. *See Fla. Cement*, 746 F. Supp. 2d at 1317 (noting that "the cement and concrete markets in Florida are controlled by a small number of companies and these markets have high barriers to entry because of high start-up costs" (citation omitted)). For example, an oil-producing cartel could limit the barrels of oil that would go onto the market for the purpose of raising prices, and the plaintiff could demonstrate that there was no meaningful supply alternative. Or salmon distributors could collude to fix prices because there is a limited supply of salmon and those producers who are part of the conspiracy would benefit from increased prices. In other words, the alleged conspirators would participate directly in the alleged market in a way that would permit them to profit from anticompetitive conduct, shielded from competition by barriers to entry or other factors.

That is not at all what Plaintiffs allege here. While the CCAC is far from a model of clarity on this point, the "product" at issue—for which the price was allegedly depressed—appears to be each of the Relevant Securities (*e.g.*, GME, AMC). Plaintiffs seem therefore to allege the existence of a market for each of the securities. (CCAC ¶ 362 (alleging "the market for securities").) However, not one of the Clearing Broker or Introducing Broker Defendants is alleged to have bought or sold the Relevant Securities for its own account. As Plaintiffs concede, regardless of the price of these securities, "[b]roker-dealers benefit from investors transacting on their platforms" (*id.* ¶ 420), and Clearing Brokers generally "earn a transaction fee every time they make a trade," with these "clearing fees [forming] the very basis of their business models" (*id.* ¶ 421). In the alleged market for each of the securities at issue, there are no barriers to entry, no fixed costs and no captive market; a fundamental tenet of the U.S. securities markets is that anyone can buy or sell a share of stock.

The fallacy of Plaintiffs' market structure allegations is that they pivot away from talking about the markets in which they seem to allege harm—the alleged markets for the Relevant Securities—to talking about other issues in other markets.  For example, Plaintiffs allege there are "substantial barriers to entry" in the "financial services industry" (*id.* ¶ 365) and "high fixed costs and low variable costs" in the "markets for broker dealers, clearing firms and market making" (*id.* ¶ 368), and that retail investors are captive consumers in the "market for broker dealers" (*id.* ¶¶ 377-379).  But the market for brokers (if there is any such market) is not relevant here; Plaintiffs do not allege that the brokers somehow conspired to raise prices (*i.e.*, charge commissions) to retail investors or to raise fees (*i.e.*, PFOF) to Market Makers.  Because Plaintiffs fail to make any market structure allegations for the market in which they allege the price was depressed (the purported markets for the Relevant Securities), their reliance on this plus factor also fails.

## II.   PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A SECTION 1 CLAIM.

Even if Plaintiffs had adequately alleged an agreement—and they have not—they still have not adequately pleaded their antitrust claim because the CCAC fails to define the relevant market, adequately allege market power and plead anticompetitive effects.  Each of these elements is required to plead a rule of reason claim.

Plaintiffs do not even try to allege the requisite elements of a rule of reason claim, instead asserting in a single cursory allegation—without any explanation—that the purported conspiracy is unlawful *per se*.  (CCAC ¶ 505 ("Defendants' anticompetitive and unlawful conduct is per se illegal.").)  However, *per se* condemnation is a very narrow exception to the default rule of reason that is reserved for a limited category of specific factual circumstances that courts have determined—after extensive judicial experience with the same basic fact pattern— are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'"  *Procaps S.A. v. Pantheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016) (quoting *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).  Outside the limited category of conduct for which *per se* condemnation is appropriate, courts assess an alleged violation of the Sherman Act by applying the rule of reason, which as noted requires specific—and plausible— factual allegations (and ultimately proof) of an "anticompetitive effect of the defendant's conduct on the relevant market."  *Levine*, 72 F.3d at 1551.

A. **The Court Should Address the Question of *Per Se* vs. Rule of Reason at the Motion To Dismiss Stage.**

"Whether to apply a *per se* or rule of reason analysis is a question of law." *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986). Accordingly, courts routinely address at the motion to dismiss stage whether a plaintiff has adequately pleaded an agreement that would be subject to *per se* treatment. *See, e.g.*, *Tempur-Pedic*, 626 F.3d at 1334-36 (affirming holding that alleged anticompetitive conduct was not a *per se* violation at the motion to dismiss stage); *Quality Auto*, 917 F.3d at 1271-72 (same).

B. **Plaintiffs' Allegations Do Not Qualify for *Per Se* Treatment under the Antitrust Laws.**

Plaintiffs' allegations do not fit within the circumscribed category of cases to which *per se* treatment is confined. In fact, courts consider conduct to be *per se* unlawful "only when history and analysis have shown that in sufficiently similar circumstances" application of "the rule of reason unequivocally results in a finding of liability." *Levine*, 72 F.3d at 1549 (quoting *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983)). *Per se* treatment is therefore typically limited to certain "'horizontal restraints'— restraints 'imposed by agreement between competitors,'" whereas "vertical restraints— *i.e.*, restraints 'imposed by agreement between firms at different levels of distribution'" are assessed under the rule of reason. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018) (quoting *Bus. Elecs.*, 485 U.S. at 730).

But even with respect to horizontal restraints, only a limited number of them are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Procaps*, 845 F.3d at 1083 (quoting *Pro. Eng'rs*, 435 U.S. at 692). The category of restraints that are *per se* unlawful is therefore limited to a very small class of antitrust practices," including "horizontal price fixing among competitors, group boycotts, and horizontal market division—business relationships that, in the courts' experience, virtually always stifle competition." *Tempur-Pedic*, 626 F.3d at 1334. This case does not fit into any of those categories.

To begin, there is no suggestion of market division. This is also not a price-fixing case. Price-fixing agreements are "agreements among competitors to fix prices on their individual goods or services." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979). Plaintiffs provide no evidence of any agreement among *horizontal* competitors; at best,

there is an implausible conclusory suggestion of an agreement between financial services companies that occupy *vertical* relationships.  (*See* Section I.)  Further, the alleged agreement at issue here simply does not match the traditional price-fixing context:  where a group of competitors conspire to fix the price of a good or service they sell in order to reap supracompetitive profits (*i.e.*, to make more money than they would in a competitive market by charging a higher price for their product through an agreement with the companies they should be competing against).  *See, e.g.*, *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) ("To prevail on a claim of horizontal price fixing, a plaintiff must demonstrate that the defendants entered into a conspiracy 'formed for the purpose and with the effect of raising . . . price[s].'" (alterations in original) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940))).  Rather, Plaintiffs allege that the purported conspirators' actions depressed the price of the underlying securities.  And, as described above, none of the Introducing and Clearing Broker Defendants is alleged to have actually bought or sold the Relevant Securities for its own account or to have profited in any way from this supposed agreement.

Thus, what distinguishes this case from price-fixing cases that have been declared *per se* unlawful is that the alleged horizontal competitors (Introducing Broker Defendants) participate in a different market (broker services) from the market in which the alleged harm was suffered (the alleged market or markets for the Relevant Securities).  *Per se* treatment cannot apply to such an alleged agreement, where Defendants do not profit as market participants from the alleged scheme.  *See, e.g.*, *Broad. Music*, 441 U.S. at 10, 23 (refusing to apply *per se* rule to alleged price-fixing arrangement where the Court had "never examined a practice like this one before" and explaining that "[n]ot all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints."); *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (noting that the Supreme Court has "expressed reluctance to adopt *per se* rules . . . 'where the economic impact of certain practices is not immediately obvious'" (alterations in original) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997))).

Nor is this a *per se* group boycott case.  A group boycott consists of "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target."  *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).  The "ultimate target" of the agreement can be either a competitor or "a customer of some or all

of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters]." *Id.* at 543.  Moreover, the Supreme Court has explained that the "*per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986). There are absolutely no allegations that fit this pattern here; indeed, the CCAC is entirely bereft of *any* discussion of market power.  The Supreme Court has twice instructed that the "category of restraints classified as group boycotts is not to be expanded indiscriminately." *Id.*; *see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294-95 (1985). This case does not present a situation that would merit such an indiscriminate expansion.

Thus, while Plaintiffs nod at the concept of either a price-fixing conspiracy or group boycott at various points (*see, e.g.*, CCAC ¶¶ 86, 197, 304, 495), neither label actually fits at all, never mind in a way that would sanction application of the *per se* standard.  *See Broad. Music*, 441 U.S. at 8 ("[E]asy labels do not always supply ready answers.").

### C.      Plaintiffs Do Not Even Attempt To Plead a Section 1 Violation Based on the Rule of Reason.

Since Plaintiffs have not alleged conduct that is a *per* se violation, their CCAC can survive only if they could plead sufficiently the elements of a Sherman Act violation under the rule of reason.  Under this standard, courts are required to "first define the relevant market" and then "conduct a fact-specific assessment of market power and market structure" to determine whether a restraint serves as an unreasonable restraint on competition, *Am. Express*, 138 S. Ct. at 2284 (quotation marks omitted), and to "show that the restraint produced anticompetitive effects within the relevant product and geographic markets," *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014).  Plaintiffs have not satisfied any of these elements.

### 1.      Plaintiffs Do Not Plead a Cognizable Product Market.

A plaintiff attempting to state a claim under the rule of reason must plausibly allege a relevant antitrust market.  *Tempur-Pedic*, 626 F.3d at 1336-39; *see also Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993) (holding that a court may grant a Rule 12(b)(6) motion if "a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand").  Dismissal is appropriate where the alleged product market is defined without "reference to the rule of reasonable interchangeability and cross-

30

elasticity of demand" or where it "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)); *see also TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (affirming dismissal for failure to plead a relevant market).

Plaintiffs do not actually define the specific contours of *any* alleged antitrust market, simply alluding instead to numerous markets, including "the market for securities," "[t]he markets for broker dealers, clearing firms, and market making," "the financial markets" and "the stock brokerage market with respect to the Relevant Securities[.]" (*See, e.g.*, CCAC ¶¶ 362, 368, 386, 498.) On their own, each passing reference fails to allege a cognizable product market. And, taken together, these alleged markets vary significantly as to the "practical indicia" that courts normally use to define a product market, including the "industry or public recognition of the submarket as a separate economic entity," "the product's peculiar characteristics and uses" and its "distinct customers[.]" *Tempur-Pedic*, 626 F.3d at 1337 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

To the extent Plaintiffs are relying on any particular putative market, it appears to be the alleged market for each of the Relevant Securities. But they make no effort to analyze the viability of such product markets. Nor could they; the market for securities of a particular company cannot constitute a cognizable product market because transactions "concerning the stock of a single company" do not "constitute[] trade or commerce within the meaning of § 1 of the Sherman Act." *Kalmanovitz v. G. Heileman Brewing Co.*, 769 F.2d 152, 156 (3d Cir. 1985) (declining to extend antitrust liability in a tender offer for securities dispute). To the extent Plaintiffs are suggesting that there is an antitrust product market limited to the aggregate group of the Relevant Securities, this too fails as they make no effort to explain why those securities (related to companies in disparate industries, such as video game sales, movie theater operations and cell phone manufacturing) should somehow be lumped into a narrow market to the exclusion of all other securities.

## 2. Plaintiffs Do Not Plead Market Power.

"Market power is the ability to raise price significantly above the competitive level without losing all of one's business," *Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d

1560, 1570 (11th Cir. 1983), and "ordinarily is inferred from the seller's possession of a predominant share of the market," *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 464 (1992). Nowhere do Plaintiffs allege that *any* Defendant possesses market power in *any* market. Indeed, Plaintiffs allege that there were multiple competitors who were not party to the purported conspiracy and still allowed trading in more of the Relevant Securities. (CCAC ¶¶ 24-25, 29-30, 34-35.) In fact, Burke Minahan—a named Plaintiff—alleges that he was able to circumvent Robinhood's purported restrictions by applying for an account with Fidelity and purchasing GME securities through that brokerage. (*Id.* ¶¶ 29-30.)

### 3.      Plaintiffs Fail To Plead Actual Harm to Competition.

Pleading an anticompetitive effect requires Plaintiffs to demonstrate "actual detrimental effects [on competition] . . . such as reduced output, increased prices, or decreased quality in the relevant market." *Am. Express*, 138 S. Ct. at 2284. As discussed in the preceding section, Plaintiffs do not allege any of these harms on competition over the price of the good or service in the markets in which any of the Defendants actually compete. Plaintiffs do not plead that the alleged conspiracy has led to an increase in prices in the market for retail brokerage services. They similarly fail to allege that the purported conspiracy affected competition among the Introducing or Clearing Brokers—indeed, they fail to allege that the Introducing and Clearing Brokers compete at all.[15] All that Plaintiffs *do* plead is that the alleged agreement had potential impact on the trading prices for the Relevant Securities—a purported harm in a purported market in which *none* of the Defendants is alleged to compete, because they neither produce the Relevant Securities, nor are they alleged to buy or sell them for their own account. Plaintiffs' failings in this regard are not surprising since this case has nothing to do with competition at all.[16]

---

[15] Nor do Plaintiffs allege that any purported injury flowed from competitive harm. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89 (1977). Indeed, Plaintiff Minahan allegedly purchased GME shares through Fidelity on January 28, 2021. (CCAC ¶ 30.)

[16] Even if Plaintiffs could establish that there has been some anticompetitive effect in a relevant market—and they cannot—their claims of injury are completely speculative. Specifically, each Plaintiff could only have been injured if one assumes that he or she (along with the entire putative class) sold "their shares in the Relevant Securities at a lower price than they otherwise would have," in the absence of trading restrictions." (CCAC ¶ 501.) There is no basis for that speculative assertion that Plaintiffs and the class would have timed the markets perfectly. Courts have denied antitrust standing to plaintiffs relying on this sort of speculative damages claim. *See Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1392-93 (11th Cir. 1990).

III.   **PLAINTIFFS' ANTITRUST THEORY IS PRECLUDED BY THE FEDERAL SECURITIES LAWS.**

Even if Plaintiffs could plead a cognizable antitrust claim—and they cannot—federal securities laws would preclude any such claim.  The Securities Exchange Act of 1934 (the "Exchange Act") extensively regulates all of the conduct Plaintiffs allege in the CCAC.  As a result, the Supreme Court has held that where securities and antitrust law are "clearly incompatible," the securities law implicitly precludes an antitrust claim.  *Billing*, 551 U.S. at 285.  Such incompatibility is particularly likely where the conduct at issue "lie[s] squarely within an area of financial market activity that the securities law seeks to regulate," *i.e.*, "an area of conduct squarely within the heartland of securities regulations."  *Id.* at 264, 285.

Here, Plaintiffs challenge trading restrictions that brokers implemented to comply with capital requirements or otherwise to address unprecedented volume and volatility (*see* Section I.B.1), and allege an underlying agreement for the purpose of manipulating the market price of certain securities (*see* CCAC ¶ 495 (alleging that "Defendants conspired and entered into an anticompetitive scheme to fix, raise, stabilize, maintain or suppress the price of the Relevant Securities")).  Regardless of whether one considers the actual reason for the restrictions, which is plausibly provided by the facts alleged in the CCAC, or the implausible version asserted by Plaintiffs, the conduct at issue falls squarely within the heartland of federal securities law, and the regulatory authority of the SEC, which actively regulates electronic broker platforms, brokers, market makers and clearing agencies.  Federal securities claims have been brought against certain Defendants on the same set of facts alleged here (*see* Order on Leadership Structure, ECF No. 310, at 1-2 (designating a "federal security law claims" tranche)), and Defendants may not be liable under the antitrust statutes where Plaintiffs' claims are "securities complaint[s] in antitrust clothing."  *Billing*, 551 U.S. at 284.

A.   **Plaintiffs' Antitrust Claims Are Precluded under *Billing* Because the Conduct at Issue Is Regulated by the Federal Securities Laws.**

Plaintiffs' antitrust claims are precluded because the conduct at issue is "squarely" within the realm of the federal securities laws.  *See Billing*, 551 U.S. at 285.  In *Billing*, the Supreme Court reaffirmed that application of the antitrust laws may be implicitly precluded by another federal regulatory regime, such as the Exchange Act—even where the plaintiffs allege an unlawful conspiracy under the Sherman Act.  *See id.* at 267-68.  The Court held that "the securities laws [were] clearly incompatible with the application of the antitrust

laws" in the case. *Id.* at 283 (internal quotation marks omitted). In so holding, the court noted that "the fact that the SEC is . . . required to take account of competitive considerations when it creates securities-related policy and embodies it in rules and regulations" makes it "somewhat less necessary to rely upon antitrust actions to address anticompetitive behavior." *Id.* Specifically, the Court observed that "evidence tending to show unlawful antitrust activity and evidence tending to show lawful securities marketing activity may overlap, or prove identical," and antitrust suits and the "risk of treble damages" could therefore cause market participants to avoid conduct that "securities law permits or encourages." *Id.* at 281-82. The Court concluded that the "threat of antitrust lawsuits, through error and disincentive, could seriously alter . . . conduct in undesirable ways," and "to allow an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities markets." *Id.* at 283.

The Court in *Billing* identified four factors that determine when the antitrust laws are implicitly precluded: (1) whether the action involves "an area of conduct squarely within the heartland of securities regulations; (2) clear and adequate SEC authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes." *Id.* at 285. All four factors point strongly in favor of implicit preclusion here.

## 1.   The Conduct at Issue Lies at the Very Heart of the Securities Market.

The first *Billing* factor considers whether the alleged practices "lie squarely within an area of financial market activity that the securities law seeks to regulate." *Billing*, 551 U.S. at 276. The focus for the first factor is not just on the specific anticompetitive conduct that is alleged, but rather the "broad underlying market activity." *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133-34 (2d Cir. 2009) (citing *Billing*, 551 U.S. at 276). Here, the underlying market activities are restrictions on customer trades on electronic broker platforms and, from Plaintiffs' perspective, alleged manipulation of market prices for exchange-traded stocks. Brokers provide access to the securities exchanges and, without them, investors like Plaintiffs would be unable to participate in the securities markets. For this reason, brokers and dealers must register with the SEC. Exchange Act § 15, 15 U.S.C. § 78o. Market integrity for stock prices is a vital aspect of securities regulation and lies at the core of the securities laws. Exchange Act §§ 9-10, 15 U.S.C. §§ 78i-78j. The conduct at issue is "central to the proper functioning of well-regulated capital markets" and this case "concern[s] practices that lie at the very heart of the securities" market. *Billing*, 551 U.S. at 276.

## 2. The SEC Is Authorized To Regulate All of the Activities Here in Question.

The second *Billing* factor considers "the existence of regulatory authority under the securities law to supervise the activities in question." *Billing*, 551 U.S. at 275. As in *Billing*, "the law grants the SEC authority to supervise all of the activities here in question," and "the SEC possesses considerable power to forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate virtually every aspect of the practices in which [brokers] engage." *Id.* at 276. Congress has granted the SEC authority to regulate brokers under Sections 15 and 17 of the Exchange Act. *See* 15 U.S.C. §§ 78o, 78q. As a result, no broker may transact in securities unless such broker complies with SEC rules and regulations, Exchange Act § 15(b)(7), 15 U.S.C. § 78o(b)(7), and the SEC has specific authority to enact rules and regulations to define acts and practices by brokers that "are fraudulent, deceptive, or manipulative," Exchange Act § 15(c)(2)(D), 15 U.S.C. § 78o(c)(2)(D). Similarly, Congress gave the SEC rulemaking authority to define "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of exchange-traded securities, Exchange Act § 10(b), 15 U.S.C. § 78i(b), and made it unlawful:

> To effect either alone or with one or more other persons any series of transactions for the purchase and/or sale of any security . . . for the purpose of pegging, fixing, or stabilizing the price of such security in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Exchange Act § 9(a)(6), 15 U.S.C. § 78i(a)(6). Therefore, the SEC has ample "regulatory authority under the securities law to supervise the activities in question." *Billing*, 551 U.S. at 275; *see also Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 803 (2d Cir. 2002) (holding that "implied immunity bars plaintiffs' claim" regarding stock price-fixing scheme based on the SEC's authority under Section 9(a)(6)).

## 3. There Is Substantial Evidence That the SEC Is Exercising Its Authority.

The third *Billing* factor considers "evidence that the responsible regulatory entities exercise [their] authority." *Billing*, 551 U.S. at 275. Here, there is ample evidence of the SEC's exercise of its authority. Under Section 15(c) of the Exchange Act, the SEC has enacted extensive regulations covering brokers. *See* 17 C.F.R. §§ 240.15c3-1 to -5. The SEC has also

implemented a risk assessment program under Section 17 of the Exchange Act that monitors

brokers and requires them to participate in monthly risk assessment meetings with the SEC.  17

C.F.R. §§ 240.17h-1T to -2T.  The SEC has also enacted regulations that specifically address the

conduct of clearing agencies, including the calculation of and requirements for collateral calls.

17 C.F.R. § 240.17Ad-22.  Finally, the SEC has enacted regulations relating to manipulative or

deceptive devices under Section 10(b) of the Exchange Act, 17 C.F.R. § 240.10b-5, and relating

to market manipulation under Section 9(a) of the Exchange Act, Regulation M, 17 C.F.R.

§§ 242.100 to -105.  Notably, neither the Exchange Act nor SEC regulations prohibit all forms of

market manipulation.  *See Friedman*, 313 F.3d at 803.

Furthermore, the SEC has an enforcement program for violations of its

regulations concerning both brokers and market manipulation:  out of the 405 standalone

enforcement actions brought in 2020, 10% related to broker-dealers and 5% related to market

manipulation.  SEC Division of Enforcement, 2020 Annual Report at 16 (Nov. 2, 2020); *see also*

SEC Division of Enforcement, 2019 Annual Report at 15 (Nov. 6, 2019) (out of 526 standalone

cases, 7% broker-dealer actions and 6% market manipulation actions); SEC Division of

Enforcement, 2018 Annual Report at 19 (Nov. 2, 2018) (out of 490 standalone cases, 13%

broker-dealer actions and 7% market manipulation actions).[17]  The ongoing SEC investigation

concerning the January 2021 short squeeze events, alleged in the CCAC, demonstrates that the

SEC is actively exercising its authority to regulate.  (CCAC ¶¶ 490-491.)  *See Mayor & City

Council of Balt. v. Citigroup, Inc.*, Nos. 08-cv-7746 (BSJ), 08-cv-7747 (BSJ), 2010 WL 430771,

at *5 (S.D.N.Y. Jan. 26, 2010) (finding that the SEC had "actively exercised its authority" by

"undertak[ing] an ongoing investigation into the specific events at issue in this case"), *aff'd on

other grounds*, 709 F.3d 129 (2d Cir. 2013).

### 4. Allowing This Claim To Proceed Would Create a Conflict Between the Antitrust and Securities Laws.

The fourth *Billing* factor considers whether there is "a resulting risk that the

securities and antitrust laws, if both applicable, would produce conflicting guidance,

requirements, duties, privileges, or standards of conduct."  *Billing*, 551 U.S. at 275-76.  In

*Billing*, the Supreme Court engaged in a practical analysis of the "likely consequences" of

allowing antitrust litigation in heavily regulated areas, including whether evidence put forward to

---

[17] *See* SEC Division of Enforcement Annual Reports, *available at* https://www.sec.gov/reports.

support claims of conspiracy would "overlap" or "prove identical" with evidence showing agency-permitted conduct. *Id.* at 275, 281. The Court also recognized the potential for conflict between generalist judges and juries and expert regulators in drawing "a fine, complex, detailed line separat[ing] activity that the SEC permits or encourages (for which [plaintiffs] must concede antitrust immunity)" and conduct that it "forbid[s]." *Id.* at 279. In addition, "actual and immediate" conflict is not required; "potential conflict" is sufficient. *See Elec. Trading Grp.*, 588 F.3d at 138 (holding that implied preclusion may be based on potential conflict, for which "the proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit" (quoting *In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 149 (2d Cir. 2003))).

Here, the enforcement of Plaintiffs' claims would create both an actual and a potential conflict between the Exchange Act and the Sherman Act if a jury in this MDL action were to find that conduct that is otherwise lawful under the securities laws is unlawful under the antitrust laws. Most acutely, an actual conflict exists because the conduct at issue in this case is permitted by the SEC. *See Elec. Trading Grp.*, 588 F.3d at 137 (holding that an "actual conflict arises [between antitrust liability and the securities regime] because antitrust liability would inhibit the prime brokers (and other brokers) from engaging in other conduct that the SEC currently permits"). The SEC has comprehensive regulations for broker-dealers (including net capital requirements), *see* 17 C.F.R. §§ 240.15a-1 to 240.15c6-1, and for clearing agencies (including collateral call requirements), *see id.* §§ 240.17Ab2-1 to -2, 240.17Ad-1 to -24. Indeed, the SEC has explicitly stated that broker-dealers "may reserve the ability to reject or limit customer transactions,"[18] and SEC regulations on market manipulation do not prohibit the alleged conduct, *see id.* §§ 242.100 to -105 (Regulation M only applies to activities "in connection with a distribution of securities"), *see also Friedman*, 313 F.3d at 803. In addition to this actual conflict with SEC regulations, there is the potential for conflict with the SEC's enforcement program because the SEC is currently investigating the January 2021 short squeeze events. (CCAC ¶¶ 490-491.) *See Billing*, 551 U.S. at 273 (explaining that in *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659 (1975), "in light of potential future conflict, the Court found that the securities law precluded antitrust liability even in respect to a practice that both

---

[18] SEC Statement, *supra* note 8.

antitrust law and securities law might forbid").  The antitrust claims in this case are precluded because "a fine, complex, detailed line separates that activity the SEC permits or encourages" from activity it forbids, and that "line-drawing" must be done by the SEC, not by judges and juries under the rubric of antitrust claims.  *Billing*, 551 U.S. at 279.

## B.    There Is No Applicable Savings Clause.

In *Billing*, the Supreme Court found that the general savings clauses in the Exchange Act are not "so broad as to preserve all antitrust actions" and do not prevent implied preclusion of Sherman Act claims.  551 U.S. at 275.  Instead, the Court found that the "securities law and antitrust law are clearly incompatible."  *Id.* at 279.  Apparently conscious of the implied preclusion problem, Plaintiffs cite in the CCAC to the antitrust savings clause in the Dodd-Frank Act.  (CCAC ¶ 405.)  But that savings clause does not apply to Plaintiffs' claims.

The Dodd-Frank Act includes a provision that "[n]othing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."  Pub. L. No. 111-203, § 6, 124 Stat. 1376, 1390 (2010), *codified at* 12 U.S.C. § 5303.  The "Act" referred to in this savings clause is the Dodd-Frank Act.  Dodd-Frank Act § 6, 124 Stat. at 1390.  But nothing in the Dodd-Frank Act is at issue in this case:  its amendments to the Exchange Act relate to security-based swap agreements.  *See* Dodd-Frank Act §§ 761-774, 124 Stat. at 1754-1802.[19]  Accordingly, the Dodd-Frank Act and its antitrust savings clause do not apply to Section 15 of the Exchange Act at all, and apply to Sections 9(a) and 10(b) of the Exchange Act only insofar as those sections were expanded to cover security-based swap agreements.  Plaintiffs' claims do not, however, relate in any way to security-based swap agreements.  (*See, e.g.*, CCAC ¶¶ 402-405.)

## IV.    INDEPENDENT REASONS EXIST TO DISMISS ALL CLAIMS AGAINST PEAK6, E*TRADE HOLDINGS AND ROBINHOOD MARKETS.

Plaintiffs name three parent holding companies as Defendants:  Robinhood Markets, E*TRADE Holdings and PEAK6.  However, claims against all of these entities should be dismissed because Plaintiffs do not plead any allegations against them.  *See Fla. Cement*, 746

---

[19] The Dodd-Frank Act did not amend the substance of Section 15(c).  *See* Dodd-Frank Act §§ 713(a), 762(d)(4), 766(d), 929L, 975(g), 124 Stat. at 1646, 1761, 1799, 1861, 1923.  Nor did it amend the substance of 10(b) of the Exchange Act.  *See* Dodd-Frank Act §§ 762(d)(3), 929L, 124 Stat. at 1761, 1861.  The only amendments the Act made to Section 9(a) were to cover security-based swap agreements.  *See* Dodd-Frank Act § 762(d)(2), 124 Stat. at 1760-61.

F. Supp. 2d at 1324 (holding that parent entity cannot be held liable for subsidiary's actions without allegations against parent).

**V.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.**

The Court should dismiss Plaintiffs' CCAC with prejudice.  Plaintiffs have had months to consider their arguments and legal theories against Defendants since the first complaints were filed at the end of January 2021.  Unlike the vast majority of plaintiffs at the pleading stage, Plaintiffs had the opportunity to review tens of thousands of pages of internal communications and documents regarding the allegations and issues in this case and received a two-week extension of the deadline to file the Consolidated Complaint (ECF No. 358) so they could have more time to review and incorporate those documents.  (*See* ECF No. 335.)

Despite the additional time and discovery Plaintiffs had at their disposal, Plaintiffs amended their Consolidated Complaint just days before the filing of this Motion—Plaintiffs' third such attempt at pleading their claims (ECF No. 388)—and they did so without Defendants' written consent or leave of this Court, in violation of Rule 15(a).  Fed. R. Civ. P 15(a)(2).  Plaintiffs' August 23, 2021 complaint is incorrectly labeled as a "Corrected Consolidated Class Action Complaint," in what appears to be an attempt to hide the substantive change made by Plaintiffs to the core of their conspiracy allegations.  The redline that Plaintiffs served on Defendants prior to filing their amended complaint shows that Plaintiffs "corrected" the complaint to remove the paramount allegation underlying their conspiracy claims against Robinhood.[20]  Specifically, Plaintiffs originally claimed that Robinhood Securities made its decision to impose trading restrictions on the Relevant Securities "a mere 7 minutes" after it had received its January 28, 2021 NSCC collateral call—what Plaintiffs claimed was "highly unlikely" absent premeditation pursuant to an alleged conspiracy.  (ECF No. 358 ¶ 475; *see also id.* ¶ 233.)  This false allegation stems from claiming that events transpiring at 5:18 a.m. Pacific Time—evident on the very documents cited by Plaintiffs—occurred in *Eastern* Time, thereby collapsing the timeline of events by three hours.  (*Id.* ¶ 232 (showing time zone adjustment in the time stamp).)  Plaintiffs' amended complaint now more accurately describes the time it took for

---

[20] Counsel for the Antitrust Plaintiffs served a redline showing the changes to the "corrected" Antitrust Tranche complaint on Monday, August 23, 2021 at 2:16 PM EDT, prior to filing the new complaint later that afternoon.  The changes appear in portions that the Plaintiffs filed with redactions.  Defendants will provide a copy of the redline with the Court under seal or with appropriate redactions to protect personally identifiable information upon request.

Robinhood Securities to deliberate regarding the imposition of trading restrictions as taking more than three hours—an admission that is fatal to their premeditation claims and that further undermines their purported conspiracy and premeditation claims. Plaintiffs also removed demonstrably false allegations concerning Gabriel Plotkin, CEO of Melvin Capital, and Ken Griffin, CEO of Citadel LLC. (*Id.* ¶ 187.) Then, the day after filing the instant "corrected" complaint, Plaintiffs voluntarily dismissed a number of alleged co-conspirators from this Action—changing the size and make-up of the purported antitrust conspiracy a day *after* improperly filing an amended complaint.

Such changes are not simply technical corrections addressing punctuation or verb tenses—these are substantive amendments pursuant to Rule 15 of the Federal Rules of Civil Procedure. *See Pressner v. Target Corp.*, No. 00-cv-6636, 2001 WL 293993 at *3 (N.D. Ill. Mar. 27, 2001) (striking "plaintiff's improperly filed corrected amended complaint," noting that "plaintiff did not seek or obtain leave of court to file the second amended complaint, as required by Fed. R. Civ. P. 15(a)"); *see also Hoover v. Blue Cross & Blue Shield of Ala.*, 855 F.2d 1538, 1544 (11th Cir. 1988) (explaining that "if an amendment that cannot be made as of right is served without obtaining the court's leave or the opposing party's consent, *it is without legal effect*" (quoting 6 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1485 (1971)) (emphasis in original)). Given that Plaintiffs have now had three opportunities to plead their claims, any further amendment would be futile. Therefore, Defendants respectfully submit that this Action should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the CCAC should be dismissed for failure to state a claim, with prejudice.

Dated:  August 30, 2021

*/s/ Samuel A. Danon*

**HUNTON ANDREWS KURTH LLP**
Samuel A. Danon (FBN 892671)
Gustavo Javier Membiela (FBN 513555)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
gmembiela@huntonak.com
mcastellanos@hunton.com

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

*Counsel for Defendants Robinhood Financial
LLC, Robinhood Securities, LLC and
Robinhood Markets, Inc.*

*/s/ Adam L. Hoeflich* (with consent)

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Christopher D. Kercher
Peter H. Fountain
51 Madison Avenue, 22nd Floor,
New York, New York, 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
William A. Burck
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
John F. O'Sullivan (FBN 143154)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 439-5008
johnosullivan@quinnemanuel.com

**BARTLIT BECK LLP**
Adam L. Hoeflich
Dawson Robinson
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
adam.hoeflich@bartlitbeck.com
dawson.robinson@bartlitbeck.com

*Counsel for Defendant Citadel Securities LLC*

*/s/ Shari Ross Lahlou* (with consent)

**DECHERT LLP**
Shari Ross Lahlou
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333
shari.lahlou@dechert.com

**DECHERT LLP**
Andrew J. Levander
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 698 3500
Facsimile:  (212) 698 3599
***andrew.levander@dechert.com***

**DECHERT LLP**
Steven Bizar
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994 4000
Facsimile: (215) 994 2222
steven.bizar@dechert.com

*Counsel for Defendant Interactive Brokers LLC*

*/s/ Peter W. Homer* (with consent)

**HOMER BONNER JACOBS ORTIZ, P.A.**
Peter W. Homer (Florida Bar No. 291250)
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 350-5139
Facsimile: (305) 372-2738
phomer@homerbonner.com

**DAVIS POLK & WARDWELL LLP**
Brian S. Weinstein
Gina Cora
Janet Jones-Duffey
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5972
brian.weinstein@davispolk.com
gina.cora@davispolk.com
janet.jones-duffey@davispolk.com

*Counsel for Defendants E\*TRADE Securities
LLC and E\*TRADE Financial Holdings, LLC*

*/s/ J. Mark Gidley* (with consent)

**WHITE & CASE LLP**
Jack E. Pace III
Bryan D. Gant
1221 Avenue of the Americas
New York, NY  10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
jpace@whitecase.com
bgant@whitecase.com

**WHITE & CASE LLP**
J. Mark Gidley
701 Thirteenth Street, NW
Washington, DC  20005-3807
Telephone: (202) 626-3600
Facsimile: (202) 639-9355
mgidley@whitecase.com

**WHITE & CASE LLP**
Angela Daker
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL  33131-2352
Telephone: (305) 995-5297
Facsimile: (305) 358-5744
adaker@whitecase.com

*Counsel for Defendant Apex Clearing
Corporation, Electronic Transaction Clearing,
Inc. and PEAK6 Investments LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 30, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

Dated:  August 30, 2021

*/s/ Samuel A. Danon*

Samuel A. Danon (FBN 892671)

# TAB 438


# Order re
# Antitrust Actions

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  21-2989-MDL-ALTONAGA/Torres

In re:

JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION
_____/

This Document Relates to the Antitrust Actions

## ORDER

**THIS CAUSE** came before the Court on Defendants'[1] Motion to Dismiss the Antitrust

Tranche Complaint [ECF No. 408].  Plaintiffs[2] filed a [Response] in Opposition [ECF No. 413],

to which Defendants filed a Reply [ECF No. 419].  The Court has carefully considered The

Corrected Consolidated Class Action Complaint (the "CCAC") [ECF No. 416], the parties' written

submissions, the record, and applicable law.  For the following reasons, the Motion is granted.

## I.   BACKGROUND

This putative class action is brought on behalf of individual investors (the "Retail

Investors") who suffered losses as a result of Defendants' response to a "short squeeze" — a

situation in which stocks or other assets rise sharply in value, distressing short positions.[3]  (*See id.*

---

[1] The Defendants are E*Trade Securities LLC; E*Trade Financial Holdings, LLC; Interactive Brokers LLC; Robinhood Markets, Inc.; Robinhood Financial LLC; Robinhood Securities, LLC; Citadel Securities LLC; Apex Clearing Corp.; Electronic Transaction Clearing, Inc.; and PEAK6 Investments LLC (collectively, "Defendants").  (*See* CCAC ¶¶ 51–75).

[2] The Plaintiffs are Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling (collectively, "Plaintiffs").  (*See* CCAC ¶¶ 23–41).

[3] A "short" seller borrows a security believing the price of the security will decrease.  (*See* CCAC ¶ 8).  If the price of the security drops, the short seller buys the security back at a lower price and returns it to the lender.  (*See id.*).  Because the difference between the sell price and the buy price is the short seller's profit, the short seller loses money if the price of the security increases.  (*See id.*).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

¶ 12).  This short squeeze occurred in late January 2021, as the Retail Investors rapidly purchased the Relevant Securities,[4] exposing those with short positions in the Relevant Securities to "massive potential losses[.]"  (*Id.* ¶ 7 (alteration added); *see id.* ¶ 6).  According to Plaintiffs, Defendants conspired to prevent these losses by "artificially constrict[ing] the price appreciation of the Relevant Securities," in violation of the Sherman Act, 15 U.S.C. § 1.  (CCAC ¶ 16 (alteration added); *see id.* ¶¶ 494–507).

    ***The parties***.

    ***The Defendants***.  The CCAC categorizes Defendants into three[5] groups: the Clearing Defendants, the Brokerage Defendants, and the Market Maker Defendants.  (*See id.* ¶¶ 51–75).

---

[4] The "Relevant Securities" are certain stocks the Retail Investors believed would increase in price: GameStop (GME), AMC Entertainment (AMC), Bed Bath & Beyond (BBBY), BlackBerry (BB), Express (EXPR), Koss (KOSS), Nokia (NOK), Tootsie Roll Industries (TR), and Trivago NV (TRVG).  (*See* CCAC ¶ 6).

[5] In the CCAC, Plaintiffs allege there was a fourth group called the Introducing Brokerage Defendants (*see* CCAC ¶¶ 42–50), but they have since voluntarily dismissed those Defendants (*see* [ECF No. 380] (Stash Financial, Inc.); [ECF No. 396] (Open to the Public Investing, Inc.); [ECF No. 397] (Ally Financial Inc.); [ECF No. 398] (Alpaca Securities, LLC); [ECF No. 400] (Dough LLC); [ECF No. 401] (Tastyworks, Inc.); [ECF No. 402] (Webull Financial LLC); [ECF No. 404] (SoFi Securities LLC)).  The Court refers to this group as the "Introducing Brokerages."

The Introducing Brokerages provide financial trading services through an electronic trading platform.  (*See* CCAC ¶¶ 42–44, 46, 47, 49, 50).  During the relevant period, each Introducing Brokerage restricted and/or limited the ability of investors to purchase the Relevant Securities.  (*See id.*).

Because the Introducing Brokerages are only introducing brokerages — as opposed to self-clearing brokerages — they contract with an independent clearing firm to handle the execution and settlement of securities trade orders from clients or their own trading desks, rather than handle the process themselves.  (*See id.* ¶¶ 105, 111).  The independent clearing firm receives payments and maintains custody of the security.  (*See id.* ¶ 111).  At all relevant times, each Introducing Brokerage used a Clearing Defendant as its clearing firm.  (*See id.* ¶¶ 42–44, 46, 47, 49, 50).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

*The Clearing Defendants*.    Defendants, Apex Clearing Corporation ("Apex") and Electronic Transaction Clearing, Inc. ("ETC"), are, collectively, the "Clearing Defendants[.]"[6] (*Id.* ¶¶ 66–75 (alteration added)).

The Clearing Defendants are independent clearing firms: they handle the back-office details of securities transactions for broker-dealers, such as the Introducing Brokerages.   (*See id.* ¶ 105).  Independent clearing firms are supervised by the Financial Industry Regulatory Authority ("FINRA") and the Depository Trust and Clearing Corporation ("DTCC").[7]   (*See id.* ¶¶ 96–97, 108, 110).   Apex and ETC acted as the clearing firms for one or more of the Introducing Brokerages.  (*See id.* ¶¶ 42–44, 46, 47, 49, 50).

*The Brokerage Defendants*.    Defendants, E*Trade;[8] Interactive Brokers LLC; and Robinhood,[9] are, collectively, the "Brokerage Defendants[.]"   (*Id.* ¶¶ 51–63 (alteration added)).

---

[6] Apex Clearing Holdings LLC and Defendant, PEAK6 Investments LLC, are the parent corporations of Defendants, Apex and ETC.  (*See* CCAC ¶¶ 67, 70).

[7] The DTCC is a holding company that owns and operates three clearing agencies registered with the U.S. Securities and Exchange Commission ("SEC"): the National Securities Clearing Corporation ("NSCC"), the Fixed Income Clearing Corporaton ("FICC"), and the Depository Trust Company ("DTC"). (*See* CCAC ¶ 96).  The NSCC is the central counterparty that clears cash transactions in the U.S. equities markets by netting securities deliveries and payments among NSCC's clearing members and guaranteeing the completion of trades, even if one party to the transaction defaults. (*See id.* ¶ 98).  It takes two business days for the NSCC to transfer the security to the buyer and the cash to the seller.  (*See id.* ¶ 101).  If a clearing member defaults on its settlement obligations, the NSCC guarantees the delivery of cash and securities to its non-defaulting members.  (*See id.* ¶ 102).

In line with the CCAC and the parties' briefings, the Court refers to the DTCC and NSCC interchangeably.

[8] Defendant, E*Trade Financial Holdings, LLC (*see* CCAC ¶ 52), is the parent corporation of Defendant, E*Trade Securities LLC (*see* Mot. 22 n.9; Resp. 47).  The Court refers to these two Defendants collectively as "E*Trade[.]"  Doing so has no impact on the Court's analysis.

The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[9] Defendants, Robinhood Markets, Inc.; Robinhood Financial LLC; and Robinhood Securities, LLC, are, collectively, "Robinhood[.]"  Robinhood Financial LLC and Robinhood Securities, LLC are wholly-owned subsidiaries of Robinhood Markets, Inc.  (*See* CCAC ¶¶ 58, 60).  Defendants dispute the inclusion of Robinhood as a self-clearing broker, arguing Robinhood Financial LLC is an introducing broker entity

CASE NO.  21-2989-MDL-ALTONAGA/Torres

The Brokerage Defendants act as self-clearing brokers: they act as both an introducing broker and as their own clearing firm.  (*See id.* ¶¶ 54, 56, 63, 113).  In other words, the Brokerage Defendants handle orders to buy and sell securities, as well as execute and settle orders, maintain custody of securities and other assets, and maintain the paperwork associated with clearing and executing a transaction.  (*See id.* ¶ 113).  Self-clearing brokers are subject to DTCC rules and regulations.  (*See id.* ¶ 116).

*The Market Maker Defendant.*[10]  Defendant, Citadel Securities LLC, is the only named "Market Maker Defendant[] [.]"  (*Id.* ¶¶ 64–65 (alterations added)).

Citadel Securities is a market maker: it acts as a market participant by providing bid prices and ask prices for securities; maintaining an inventory of securities from its own trading; and matching incoming buy and sell orders to fill those orders.  (*See id.* ¶ 118).  Relevant here, "if a market maker receives an order to buy a certain security, it may route that order to an exchange or it may execute the orders off-exchange in its capacity as a dealer by transacting against the buy orders with contra-side sell order, either from its own inventory or by selling the security short."  (*Id.* ¶ 124).  Citadel Securities took short positions in the Relevant Securities during the relevant period.  (*See id.* ¶ 65).

*Agents and co-conspirators.*  Defendants' alleged acts "were authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs."  (*Id.* ¶ 76).  The Defendant parent entities exercise dominance and control

---

separate from Robinhood Securities, LLC, the clearing entity.  (*See* Mot. 13, 14 n.2).  This distinction, however, has no impact on the Court's analysis.

[10] Although Plaintiffs refer to "Market Maker Defendants" (*see, e.g.*, CCAC ¶ 92), Plaintiffs name only one Market Maker Defendant (*see id.* ¶¶ 64–65).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

over all their subsidiary entities; and the Defendant subsidiary entities have a unity of purpose and interest with their respective parents.  (*See id.* ¶¶ 76–78).  In addition, "[e]ach Defendant acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged[.]"  (*Id.* ¶ 80 (alterations added)).  Plaintiffs allege there may be various persons and/or firms that have participated as co-conspirators but are unknown at this time.  (*See id.* ¶ 79).

*The Plaintiffs*.  The named Plaintiffs are four individual investors who were subject to trading limitations imposed on the Relevant Securities between January 28, 2021 and February 4, 2021 (the "Class Period").  (*See id.* ¶¶ 23–41).  Each Plaintiff held shares of one or more of the Relevant Securities at the close of the stock market on January 27, 2021.  (*See id.* ¶¶ 23, 28, 33, 38).  The next day, January 28, 2021, each Plaintiff was prohibited from purchasing the Relevant Securities on Robinhood's trading platform.  (*See id.* ¶¶ 24, 29, 34, 39).

That same day, Guzman and Miller applied for accounts with Charles Schwab, Fidelity, and TD Ameritrade — who were not prohibiting customers from purchasing the Relevant Securities — but were unable due to the amount of time required to set up the accounts.  (*See id.* ¶¶ 25, 35).  Minahan successfully applied for an account with Fidelity and was able to purchase a share of GameStop Corp. stock that day.  (*See id.* ¶ 30).  Each Plaintiff then sold his or her shares of the Relevant Securities on Robinhood between January 28, 2021 and February 4, 2021.  (*See id.* ¶¶ 26–27, 31–32, 36–37, 40–41).

*Injury and proposed class*.  According to the named Plaintiffs:

As a direct and intended result of Defendants [sic] contract, combination, agreement and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities.  The Brokerage Defendants deactivated the buy option on their platforms and left Plaintiffs with no option but to sell shares of the stocks on their platforms.  Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the

CASE NO. 21-2989-MDL-ALTONAGA/Torres

Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination, agreement and restraint of trade.

(*Id.* ¶ 501).

The named Plaintiffs seek to certify the following class:

All persons or entities in the United States that held shares of stock or call options in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Nokia Corp. (NOK), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) as of the close of market on January 27, 2021, and sold the above-listed securities from January 28, 2021 up to and including February 4, 2021 (the "Class Period").

(*Id.* ¶ 81).

### *The alleged facts*.

***Mechanics of securities trading***.  Individual investors' market share of U.S. equity trading has steadily increased since 2019 and has recently accounted for a third of all U.S. stock market trading.  (*See id.* ¶¶ 130–31).  When individual investors make investments on their own behalf, they execute their personal trades through websites, apps, and trading platforms provided by brokerage firms or other investment service providers.  (*See id.* ¶ 2).  After an individual investor places a trade order with a brokerage firm, the brokerage sends the order to an independent clearing firm for clearing services if it is only an introducing broker, or the brokerage firm performs the clearing services itself if it is a self-clearing broker.  (*See id.* ¶¶ 105, 108, 111, 129).  The independent clearing firm or self-clearing broker then executes the trade order itself or sends the order to a market maker for execution.  (*See id.* ¶¶ 105, 113, 122).

Market makers are market participants who provide bid prices and ask prices and match incoming buy and sell orders to fill those orders.  (*See id.* ¶ 118).  Market makers fill these orders from their own inventory, by routing the order to an exchange, or by taking the other side of a

CASE NO.  21-2989-MDL-ALTONAGA/Torres

transaction (*e.g.*, selling a security short in response to receiving an order to buy the security).  (*See id.* ¶¶ 118, 123–24).  Once an order is filled, the market makers pocket the difference between the bid and ask prices, which is known as the "spread."  (*See id.* ¶ 118).  While the spreads may be small, they become significant due to the large volume of orders filled.  (*See id.*).

Although individual investors historically had to pay a fee or commission to their brokerages for executing personal trades, today most brokerages do not charge their investors a fee per transaction.  (*See id.* ¶ 3).  Instead, in exchange for routing the order to the market maker, brokerages earn revenue through rebates, kickbacks, and other payments — these payments are collectively known as payment for order flow.  (*See id.* ¶¶ 3, 133–35).  Clearing firms also generate a significant portion of their revenue from payment for order flow.  (*See id.* ¶ 107).

After an order is filled, the details of the executed order are sent to the NSCC for clearinghouse and settling services.  (*See id.* ¶¶ 101, 129).  Securities trades submitted to the NSCC take two days to settle — *i.e.*, it takes two business days for the cash and the securities to be electronically exchanged.  (*See id.* ¶ 101).  As stated, because there is a risk that a party to a securities transaction defaults before the trade is completed, the NSCC guarantees the delivery of cash and securities to its non-defaulting members.  (*See id.* ¶ 102).

The NSCC collects clearing fund contributions, or margin, from clearing members at the start of each day and intraday in volatile markets.  (*See id.* ¶ 103).  The margin protects the NSCC and all market participants against clearing member defaults, and margin requirements must be met by clearing members on a timely basis.  (*See id.*).  Margin requirements are based in part on market volatility and risk.  (*See id.* ¶ 470).  The rules for calculating the contribution requirements and the timing of collection of contributions are known to every clearing member; and the NSCC

CASE NO.  21-2989-MDL-ALTONAGA/Torres

provides reporting tools, calculators, and documentation to allow the members to monitor their risk in near real-time and estimate clearing fund contribution requirements.  (*See id.* ¶ 103).

***January 2021 market volatility***.  The Retail Investors exchange investment information via online discussion forums such as the WallStreetBets financial discussion forum on Reddit.  (*See id.* ¶¶ 141, 180).  WallStreetBets is characterized by a particular culture centered around discussion of financial investments and memes; many of its users are sophisticated, financially savvy individual investors with business acumen.  (*See id.* ¶ 180).

Beginning in 2019, the Retail Investors, through these online discussion forums, developed the hypothesis that shares of GameStop's stock were trading at lower prices than they should have been based on GameStop's publicly available financial disclosures and prospects.  (*See id.* ¶ 141).  The Retail Investors deduced that GameStop was undervalued for a variety of reasons, including because large financial institutions had taken substantial short positions in GameStop stock.  (*See id.* ¶ 142).  These substantial short positions would bear significant costs if the outlook on GameStop improved and the short positions had to be exited.  (*See id.*).  The Retail Investors saw similar investment opportunities in the other Relevant Securities.  (*See id.* ¶¶ 143–44).

Leading up to January 27, 2021, the Retail Investors, through stock brokerages, including the Brokerage Defendants, purchased long positions in the Relevant Securities with the expectation that the stocks would increase in value.  (*See id.* ¶¶ 6, 91, 148).  As more investors purchased the Relevant Securities and "out of the money" call options[11] in the Relevant Securities, the market prices for the stocks rose due to supply and demand.  (*See id.* ¶¶ 146, 162).  The Relevant Securities started appreciating to "unprecedented levels."  (*Id.* ¶ 14).

---

[11] A call option gives the holder the right to buy the asset at a stated fixed price or the "strike price."  (*See* CCAC ¶ 166).  An "out of the money" option has a strike price unfavorable in comparison to the market price for the underlying asset.  (*See id.* ¶ 169).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

To illustrate this rapid growth, a share of GameStop stock was worth $3.00 in 2019 (*see id.* ¶ 142); $43.03 on January 21, 2021 (*see id.* ¶ 185); $76.79 on January 25, 2021 (*see id.*); $147.98 on January 26, 2021 (*see id.* ¶ 188); and $380.00 on January 27, 2021 (*see id.* ¶ 190). GameStop's stock price reached a closing high of $347.51 on January 27, 2021 — a 134.84% increase from the previous day.  (*See id.*).  Other Relevant Securities experienced similar surges; for example, AMC's and Express's share prices increased over 300% and 200%, respectively. (*See id.*).

As Retail Investors increased long positions in the Relevant Securities, those who held short positions in the Relevant Securities, such as Citadel Securities (*see id.* ¶¶ 7, 195–96), were caught in a short squeeze.  (*See id.* ¶¶ 162–63).  Investors with these short positions were faced with a rapid increase in the shorted assets' values, exposing short sellers to increased and theoretically limitless losses because the short sellers must at some point buy back the stocks to return them to their lenders.  (*See id.* ¶¶ 8, 12, 163).[12]

Around 5:00 p.m. on January 27, 2021, the SEC released a statement indicating it was "aware of and actively monitoring the on-going market volatility in the options and equities markets," but neither the SEC nor any other government agency issued any directive to restrict trading in the Relevant Securities.  (*Id.* ¶ 200 (quotation marks omitted)).

---

[12] Another phenomenon known as a "Gamma squeeze" occurred as the prices of the Relevant Securities increased.  (*See* CCAC ¶¶ 162, 164).  Options are priced based on a variety of risk variables, including one called "Gamma," which increases as the option nears its expiration date or as the option approaches its strike price (*i.e.* "being in the money").  (*See id.* ¶¶ 170, 172–74, 177).  When a security experiences a sharp price increase, the Gamma increases; stated differently, options that were previously unlikely to reach their strike prices before expiration become more likely to.  (*See id.* ¶ 176–78).  As the Gamma increases, market makers hedge by purchasing more of the underlying security, which further drives the price of the security higher and creates a feedback loop as even deeper out of the money options approach their strike price. (*See id.* ¶ 178).

*Events of January 28, 2021*.  Analytics reveal a significant volume of GameStop short position transactions during after-hours trading immediately before the markets opened on January 28, 2021.  (*See id.* ¶ 212).  Because retail brokers do not allow individual investors to engage in after-hours trading to the same extent as institutional investors, it is likely that this increase in short volume was the result of institutional investors, like Citadel Securities, taking new short positions. (*See id.* ¶ 213).  Additionally, failure to delivers ("FTDs") rose dramatically in the period leading up to January 28, 2021, a phenomenon consistent with increasing short interest by market makers like Citadel Securities.[13]  (*See id.* ¶ 218).

This increase in short positions was counterintuitive, considering chatter in various financial discussion forums indicated high excitement and motivation on the part of Retail Investors to continue investing in the Relevant Securities.  (*See id.* ¶ 228).  Many Retail Investors had announced plans to increase long positions in the Relevant Securities on January 28, 2021. (*See id.*).

Around 1:00 a.m. EST on January 28, 2021, Robinhood informed its users that in "light of unprecedented volatility surrounding [GameStop] and AMC [stock], and in an effort to help reduce risk, all [GameStop] and AMC options with expirations of January 29[], 2021 [would] be set to closing transactions only."  (*Id.* ¶ 229 (alterations added)).  Customers would be able to close out their positions in GameStop and AMC but could not make new investments.  (*See id.*).

At 5:11 a.m. EST, Robinhood received an email from the NSCC titled "NSCC Daily Margin Statement" indicating that Robinhood had a collateral requirement deficit of over $3 billion.  (*Id.* ¶ 231).  At 8:00 a.m. EST, Gretchen Howard, Robinhood's COO, messaged internally

---

[13] An FTD occurs when one party in a trading contract, such as in a short transaction, does not deliver on its obligations.  (*See* CCAC ¶ 214).  FTDs are indicative of naked short selling, which occurs when a short seller does not actually possess the security it is supposed to borrow.  (*See id.* ¶ 215).  This practice is largely inaccessible to individual investors but accessible to market makers.  (*See id.* ¶ 217).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

that Robinhood had a "major liquidity issue" and it was moving the Relevant Securities to Position

Close Only ("PCO"), *i.e.*, Robinhood users could sell the Relevant Securities but could not buy

them.  (*Id.* ¶ 233 (quotation marks omitted)).  Shortly thereafter, in an internal Robinhood message,

a manager asked David Dusseault, Robinhood Financial's President and COO, whether Robinhood

made AMC and GameStop stocks PCO, to which Dusseault responded: "[Robinhood Securities]

received a very large call — confidentially, all firms on street Jim is saying [sic] are doing [the]

same thing[.]"  (*Id.* ¶ 244 (alterations added; quotation marks omitted)).

Robinhood moved the Relevant Securities to PCO by the time the markets opened on

January 28, 2021.  (*See id.* ¶¶ 232–34).  Robinhood users were no longer able to purchase the

Relevant Securities — the "buy" button was deactivated as a feature, leaving users with no option

but to sell or hold their securities.  (*See id.* ¶¶ 235–36).  On Robinhood's web platform and mobile

app, users were blocked from searching for the Relevant Securities' ticker symbols.  (*See id.*

¶ 239).  Robinhood also canceled overnight purchase orders of the Relevant Securities placed on

January 27, 2021 and queued to move forward when the markets opened on January 28, 2021.

(*See id.* ¶ 237).

Customers were not given advance notice of the restriction of the Relevant Securities to

PCO.  (*See id.* ¶ 234).  Robinhood announced the news on January 28, 2021 by tweeting that it

was restricting the Relevant Securities to PCO due to market volatility.  (*See id.* ¶¶ 248, 251–53).

The other Brokerage Defendants similarly prevented the Retail Investors from opening

new positions in one or more of the Relevant Securities on January 28, 2021.  (*See id.* ¶ 246).

Around 9:05 a.m. on January 28, 2021, Interactive Brokers announced that it placed AMC, BB,

EXPR, GME, and KOSS option trading into liquidation due to the "extraordinary volatility" in the

markets. (*Id.* ¶ 249). E*Trade halted GME and AMC, citing "extraordinary volumes" as the reason. (*Id.* ¶ 250 (quotation marks omitted)).

While not all brokerages restricted the purchase of the Relevant Securities, the Introducing Brokerages restricted trading because the Clearing Defendants raised fees to purchase the Relevant Securities or otherwise instructed the brokerages not to consummate purchase orders. (*See id.* ¶¶ 270–71, 273, 278). For instance, Anthony Denier, Webull Financial's CEO, blamed Webull's clearing firm, Apex, for its restrictions on trading in the Relevant Securities placed on January 28, 2021. (*See id.* ¶ 274). Apex informed Denier that Webull needed to shut off the ability to open new positions in certain stocks after Apex learned that the DTCC was increasing the collateral needed to settle trades for the Relevant Securities. (*See id.*). Several other Introducing Brokerages also reported that Apex instructed them to halt all opening transactions of GameStop, AMC, and Koss on their platforms, while ETC prohibited Alpaca from allowing its users to purchase the Relevant Securities. (*See id.* ¶¶ 275–77). Apex cited increasing collateral requirements for the restrictions it imposed on trading, including through the Introducing Brokerages. (*See id.* ¶ 479).

Altogether, numerous brokerages blocked the Retail Investors from purchasing the Relevant Securities. (*See id.* ¶¶ 254, 269). Some restricted the Retail Investors from buying or opening new long positions in securities altogether, whereas others restricted purchasing options only. (*See id.* ¶ 269).

This broad prohibition on buying the Relevant Securities led to a massive sell-off, which in turn resulted in a steep decline in the prices of the Relevant Securities. (*See id.* ¶ 255). For example, on January 28, 2021, GameStop shares reached an intraday peak of $483.00 before dropping down to a closing price of $193.60 — a 44.29% drop from the closing price of $347.51 the day before. (*See id.* ¶ 256). Similarly, AMC shares dropped 56.63%, EXPR shares fell

50.79%, and BBBY shares declined 36.40%.  (*See id.*).  The Retail Investors who wanted to take advantage of the price drops to buy more shares of the Relevant Securities were unable to do so due to the prohibition on purchasing.  (*See id.*).

While individual investors were prohibited from purchasing the Relevant Securities, institutional investors were not.  (*See id.* ¶ 267).  Large investment firms were able to purchase the Relevant Securities at artificially reduced prices because they had access to private stock exchanges known as "dark pools."[14]  (*See id.*).  Citadel Securities and other firms with short positions bought the Relevant Securities at artificially reduced prices to close out their positions by returning the borrowed securities they had sold short.  (*See id.* ¶¶ 267–68).

***Events after January 28, 2021***.  As the market opened on January 29, 2021, nearly all the Brokerage Defendants had lifted their trading restrictions and permitted individual investors to open new long positions in the Relevant Securities; even so, the Brokerage Defendants continued to heavily restrict such purchases.  (*See id.* ¶¶ 319, 321).  Robinhood, for example, placed limitations on the number of new positions its users could open in the Relevant Securities, including by limiting purchases of GameStop stock to two shares.  (*See id.* ¶¶ 323–24).  The next day, January 30, as the Relevant Securities began to regain their value, Robinhood instituted a one share limit on certain Relevant Securities, including GME and AMC.  (*See id.* ¶ 325).  Robinhood maintained trading limitations on certain securities through February 4, 2021.  (*See id.* ¶ 336).  Restrictions like these continued to suppress the value of the Relevant Securities and pressured investors to sell these stocks.  (*See id.* ¶¶ 321, 325, 331).

---

[14] Private stock exchanges are known colloquially as "dark pools" or "dark exchanges" because they do not disseminate public quotations of securities prices.  (*See* CCAC ¶¶ 151–54).  Through these private exchanges, institutional investors can discreetly buy or sell securities in large blocks, mitigating some of the price impacts that their buying or selling activity would otherwise have on a "lit," or public, national securities exchange.  (*See id.* ¶ 154).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

On January 31, 2021, Vlad Tenev, Robinhood's CEO, explained in an opinion piece published in USA TODAY that Robinhood maintained trading restrictions because clearinghouse-mandated deposit requirements were "increased ten-fold."  (*Id.* ¶ 338 (quotation marks omitted)).  Robinhood had announced two days earlier that it raised more than $1 billion to help meet rising demands for cash and shore up its balance sheet.  (*See id.* ¶ 336).  This money raised was on top of $500 million Robinhood accessed through credit lines to ensure it had the capital required to allow its clients to trade the Relevant Securities.  (*See id.*).  On February 1, 2021, Robinhood announced it raised an additional $2.4 billion in funding above the $1 billion it had already raised.  (*See id.*).  Weeks later, while testifying before the U.S. House Committee on Financial Services, Tenev testified that Robinhood met its revised deposit requirements a little after 9:00 a.m. on January 28, 2021.  (*See id.* ¶ 340).

Apex also initially cited increased collateral requirements as the reason for the restrictions it imposed on trading, including through other Brokerage Defendants.  (*See id.* ¶ 479).  Later, on February 9, 2021, Apex sent a letter to the New Jersey Office of the Attorney General, stating that it imposed the restrictions due "to the potential future collateral requirement that NSCC appeared it may impose on Apex[.]"  (*Id.* ¶ 480 (alteration added)).  Tricia Rothschild, Apex's president, explained in an interview with Financial Planning on March 4, 2021, that Apex had "headroom in terms of the capital available" and "lines of credit that" it could call on, but still restricted trading on January 28, 2021 "due to anomalous information."  (*Id.* ¶ 481 (quotation marks omitted); *see id.* ¶ 341).

In the period following January 28, 2021, the SEC continued to closely monitor the price volatility of the Relevant Securities.  (*See id.* ¶ 337).  On February 1, 2021, then acting SEC Chair Allison Herren Lee stated that the SEC would "closely review actions taken by regulated entities

CASE NO.  21-2989-MDL-ALTONAGA/Torres

that may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities."
(*Id.* (quotation marks omitted)).  She also specified that the SEC was investigating the role that
short selling may have played in the recent events.  (*See id.*).

Publicly available data reveals short interests in the Relevant Securities generally climbed
leading up to January 28, 2021 (*see id.* ¶¶ 346–47, 361), and then decreased because of the trading
restrictions imposed during the Class Period, with the sharpest and most significant decreases
occurring after the restrictions imposed on January 28, 2021 (*see id.* ¶¶ 342–49).  FINRA data
shows significant increases in dark pool trading activity for each of the Relevant Securities on and
around January 28, 2021, during the period when restrictions were first placed on the Relevant
Securities.  (*See id.* ¶¶ 350–56).  Given that the Retail Investors are generally not able to trade in
dark pools and dark exchanges, this trading activity indicates high institutional investor trading
activity consistent with the exiting of short positions.  (*See id.* ¶ 357).

More specifically, given the scale of Citadel Securities' business, the FINRA data indicates
that the bulk of the trading activity can be attributed to Citadel Securities.  (*See id.* ¶¶ 358–61).
Because Citadel Securities accounts for about 50% of dark trading activity, a large shift in the
percentage of sales represented by short trades is likely to be caused by a shift in Citadel Securities'
position from long to short or vice versa.  (*See id.* ¶ 360).

***Collusion among Defendants***.  The CCAC alleges "Defendants were aware that they were
acting in concert to collude and manipulate the market."  (*Id.* ¶ 279).

<u>*Motive to collude*</u>.  According to the CCAC, "Defendants shared a common motive to
conspire — to prevent themselves, and their peers, from hemorrhaging losses totaling potentially
billions of dollars."  (*Id.* ¶ 406).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Citadel Securities possessed significant short positions in the Relevant Securities during the period in question.  (*See id.*).  As the prices of the Relevant Securities surged to unprecedented levels, Citadel Securities was exposed to potentially infinite losses.  (*See id.* ¶¶ 14, 406).  As of December 31, 2020, Citadel Securities reported $57.5 billion in "securities sold, not yet purchased, at fair value" — which the CCAC asserts are "likely representative of Citadel Securities's short position."  (*Id.* ¶ 407 (quotation marks omitted)).

Each of the Brokerage Defendants and Clearing Defendants earns revenue from payment for order flow sold to market makers.  (*See id.* ¶¶ 412, 416–18).  Robinhood, for example, earns somewhere between 60% and 70% of its revenue by selling its order flow — the primary purchaser of which is Citadel Securities.  (*See id.* ¶ 417).  As for the other Brokerage Defendants and the Clearing Defendants, Citadel Securities is either the largest or one of the largest payors for order flow.  (*See id.* ¶ 418).

*Communications among Defendants*.  In the lead up to, during, and after January 28, 2021, high-level executives of Citadel Securities were able to communicate with brokerages, including Robinhood, due to pre-existing relationships among them.  (*See id.* ¶ 296).

On January 20, 2021, Citadel Securities' Head of Execution Services extended an unknown proposition to Josh Drobnyk, Robinhood's Vice President of Corporate Relations and Communications, who conferred with Daniel Gallagher and Lucas Moskowitz, Robinhood's Chief Legal Officer and Deputy General Counsel, respectively.  (*See id.* ¶¶ 297–98).  The Citadel Securities executive and Drobnyk had a prior relationship through Drobnyk's employment at FINRA.  (*See id.* ¶ 297).  On January 25, 2021, Drobnyk responded via email "[w]e are on board" and that Moskowitz would be the central point of contact for Robinhood.  (*Id.* ¶ 300 (quotation marks omitted)).  The Citadel Securities executive responded to Moskowitz with an offer to chat,

CASE NO.  21-2989-MDL-ALTONAGA/Torres

emphasizing the "strong relationship between the firms[.]"  (*Id.* ¶ 302 (alteration added)).  The details of the ensuing January 26, 2021 phone call have not been disclosed.  (*See id.* ¶¶ 302–03).

On January 27, 2021, the day before the trading restrictions were implemented, Citadel Securities and Robinhood high-level employees exchanged several communications.  (*See id.* ¶ 304).  In an internal conversation around 4:40 p.m., Howard informed Tenev that she, along with Gallagher and Jim Swartwout, President and CEO of Robinhood Securities, would be joining "a call with Citadel" at 5:00 p.m. that day.  (*Id.* ¶ 307; *see id.* ¶ 305).  Howard indicated she believed Citadel Securities would make demands on limiting payment for order flow.  (*See id.* ¶¶ 305, 307).  Tenev responded that "[m]aybe this would be a good time for me to chat with Ken [G]riffin" and told Howard, "[y]ou guys can mention that[.]"  (*Id.* ¶ 307 (quotation marks omitted; alterations added)).  Tenev noted that he had never met Griffin, the CEO of Citadel Securities, before.  (*See id.*).

Shortly thereafter, around 6:25 p.m., Robinhood's Senior Director of Clearing Operations informed Swartwout in an internal chat that there is "[a]necdotal evidence that several 'very large' firms are having really bad nights too."  (*Id.* ¶ 308 (quotation marks omitted)).  Swartwout replied, "everyone is.  [Y]ou wouldnt [sic] believe the conv[ersation] we had with Citadel.  [T]otal mess[.]"  (*Id.* (alterations added)).  At 8:16 p.m., Swartwout updated a Citadel Securities employee that he was "[s]till looking for the new Citadel numbers."  (*Id.* ¶ 310 (alteration added)).  The Citadel Securities employee responded, "[f]irming up right now in light of the follow up conversation between Gallagher and [redacted.]"  (*Id.* (alterations added)).

At 8:29 p.m. that evening, the Citadel Securities Vice President of Business Development notified Swartwout that one of its executives, who Tenev had met before, was available to speak to Tenev that night.  (*See id.* ¶¶ 311, 313).  Swartwout replied, "[b]ecause of our partnership, Vlad

Case 1:21-md-02989-CMA   Document 438   Entered on FLSD Docket 11/17/2021   Page 18 of 51
USCA11 Case: 22-11873   Document: 43-2   Date Filed: 12/14/2022   Page: 212 of 245

CASE NO.   21-2989-MDL-ALTONAGA/Torres

would like to have a discussion with Ken [Griffin] at some point, just given our relationship.  Not specific to this crazy issue[.]"  (*Id.* ¶ 313 (alterations added); *see id.* ¶ 312).  Swartwout emailed in the same chain later that night that he was "beyond disappointed in how this went down[,]" and that it is "difficult to have a partnership when these kind[s] of things go down this way."  (*Id.* ¶ 313 (alterations added)).

On the morning of January 28, 2021, Robinhood Securities executives participated in "a very large call — confidentially."  (*Id.* ¶ 244 (quotation marks omitted)).  Swartwout told Dusseault that "all firms on street . . . are doing [the] same thing[.]"  (*Id.* (alterations added)).  Later that day, employees of Citadel Securities communicated with high-level employees of E*Trade to ensure certain orders were cancelled.  (*See id.* ¶¶ 315–16).

Plaintiffs allege two specific communications among Defendants in the days following January 28, 2021.  (*See id.* ¶¶ 327–35).  First, on January 29, 2021, Apex notified Robinhood about a post on WallStreetBets indicating that the Retail Investors found a loophole allowing them to purchase shares of the Relevant Securities above Robinhood's imposed limitations.  (*See id.* ¶ 330).  This assistance came even though Apex had already lifted its restrictions and did not have an economic relationship with Robinhood at the time.  (*See id.* ¶¶ 457–58).

Second, on January 30, 2021, a Citadel Securities executive sent an email to Drobnyk, stating he "wanted to generally coordinate messaging[.]"  (*Id.* ¶ 335 (alteration added); *see id.* ¶ 333).  The Citadel Securities executive also introduced Drobnyk to someone who was "running point on this narrative for [them]" and copied company lawyers "as an FYI and for privilege."  (*Id.* ¶ 335 (alteration added); *see id.* ¶ 333).

*Actions against unilateral self-interest*.  The Brokerage Defendants and Clearing Defendants sell order flow.  (*See id.* ¶ 427).  Firms that sell order flow, like Robinhood, benefit

CASE NO.  21-2989-MDL-ALTONAGA/Torres

the more investors transact on their platforms.  (*See id.* ¶¶ 420, 423, 425).  Because these entities

earn order flow revenue — which is generated by volume — restricting trading is an action against

their unilateral self-interest.  (*See id.* ¶¶ 420, 426).

Likewise, Citadel Securities, who pays for order flow and earns revenue through spreads,

benefits from a large volume of transactions.  (*See id.* ¶ 428).  If any entity that sells it order flow

restricts trade, Citadel Securities will lose revenue from the reduced volume of orders and the

number of spreads it can pocket.  (*See id.*).

In addition to lost order flow revenue, when Apex restricted trading in the Relevant

Securities, it was unable to generate revenue from users purchasing the shares and from using those

shares as stock loans to generate even further revenue.  (*See id.* ¶ 422).

*Opportunities to coordinate and collude*.  Along with the referenced communications

between some of the Defendants, the CCAC states certain features of the financial services

industry potentially afford Defendants opportunities to coordinate and collude.  (*See id.* ¶¶ 442–

58).  The industry is close-knit and built on preexisting relationships; and it is replete with

specialized jargon, terms of art, and specialized terminology, providing those in the industry a

common language.  (*See id.* ¶ 445).  Further, individuals within the industry frequently move from

one market participant to another or invest financial resources in other market participants.  (*See

id.* ¶ 446).

*Evidence of concealment and pretext*.  Plaintiffs allege that many of the communications

between certain Defendants were verbal or telephonic to avoid detection.  (*See id.* ¶ 460).

In addition, Plaintiffs claim that both Robinhood and Apex provided "changing and

conflicting explanations for the trading restrictions."  (*Id.* ¶ 465; *see id.* ¶ 478).  On January 28,

2021, Robinhood explained that it restricted trading due to market volatility.  (*See id.* ¶ 466).

19

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Tenev also told the media that the shutdowns were unrelated to Robinhood's liquidity and Robinhood did not have a liquidity problem.  (*See id.* ¶ 467).  Later, Robinhood blamed the trading restrictions on being unable to meet the deposit requirements imposed by clearinghouses.  (*See id.* ¶ 468).

More specifically, when Tenev testified before the House Financial Services Subcommittee, he explained that the trading restrictions were put in place to meet regulatory deposit requirements imposed by the DTCC affiliate, the NSCC.  (*See id.* ¶ 469).  Michael Bodson, the President of the DTCC, testified to the House Financial Services Subcommittee that the decision to restrict trading was internal to Robinhood and the DTCC and NSCC did not have discussions about restricting securities.  (*See id.* ¶ 472).  Further, Plaintiffs assert that Robinhood Securities would have at all times known how much collateral the DTCC may ask it to post to cover customer trades.  (*See id.* ¶¶ 470–71).

As for Apex's conflicting explanation, on January 28, 2021, Apex cited increasing collateral requirements for the restrictions it imposed on trading, including through the Introducing Brokerages.  (*See id.* ¶ 479).  On March 4, 2021, however, Rothschild stated that Apex restricted trading "due to anomalous information" and that "it was not a similar situation to Robinhood."  (*Id.* ¶ 481 (quotation marks omitted)).

*Government Investigations*.  Several governmental entities have investigated the trading restrictions imposed on January 28, 2021.  (*See id.* ¶¶ 486–93).  The Congressional House Financial Services Committee issued subpoenas and held three highly publicized hearings regarding the restrictions, and the Senate Banking Committee also held hearings on the topic.  (*See id.* ¶¶ 487–88).  The fraud division of the Department of Justice and the San Francisco U.S. Attorney's office have also sought information about the restrictions from brokers and social media

CASE NO.  21-2989-MDL-ALTONAGA/Torres

companies.  (*See id.* ¶¶ 489, 492).  And according to GameStop's 10-Q report dated June 9, 2021,

the SEC is investigating the trading restrictions imposed on January 28, 2021.  (*See id.* ¶ 490).

Robinhood's Focus Report filed with the SEC on February 26, 2021 confirms many of

these investigations and reveals that Robinhood received inquiries related to the trading restrictions

from the U.S. Attorney's Office of the Northern District of California, the SEC's Division of

Examinations, FINRA, the New York Attorney General's Office, the offices of other states'

Attorneys General, and Congress.  (*See id.* ¶ 491).  On June 30, 2021, FINRA announced that

Robinhood was ordered to pay a record financial penalty of $70 million for "systemic supervisory

failures and significant harm suffered by millions of customers."  (*Id.* ¶ 493 (quotation marks

omitted)).

<u>*Structure and characteristics of the market*</u>.  According to the CCAC, the "structure and

characteristics of the market for securities, and in particular the lack of disclosure of short interest

positions at any given time, make it conducive to collusion and anticompetitive conduct."  (*Id.*

¶ 362).

*High barriers to entry*.  An entrant to the financial services industry seeking to become a

broker-dealer or a clearing firm would need specialized knowledge, several licenses, and

memberships, including memberships in organizations such as FINRA.  (*See id.* ¶ 365).  In

addition to licensure costs, compliance costs to adhere to industry and regulatory standards are

significant.  (*See id.*).  Entrants would also need significant amounts of cash or capital to deposit

at clearinghouses such as the DTCC as collateral.  (*See id.* ¶ 366).  And entrants would need to

have the necessary technological infrastructure and expertise to navigate the digital market.  (*See*

*id.* ¶ 367).

*High fixed costs and low variable costs*.  The markets for broker-dealers, clearing firms, and market makers are defined by high fixed costs and low variable costs.  (*See id.* ¶ 368).  These market participants benefit greatly from scale, particularly with regard to online broker-dealers and clearing firms.  (*See id.*).  Online broker-dealers, for example, require significant IT infrastructure, software, and data security infrastructure to develop and maintain the applications through which investors trade.  (*See id.* ¶ 369).  Clearing firms require similar infrastructures and software to facilitate the digital clearing and custodial services they provide to online broker-dealers.  (*See id.* ¶ 370).  Market makers — in particular, high frequency trading market makers — must invest significant effort and resources to increase the speed of trading technology to maximize their profits.  (*See id.* ¶¶ 371–72).

*Commoditization*.  The Relevant Securities are homogenous products: one share in a Relevant Security is identical to another share in that security and thus can be substituted for another.  (*See id.* ¶ 374).  Competition in trading the Relevant Securities is purely based on price, which is determined by current market conditions.  (*See id.*).  The determinant of price is the relative supply and demand in investors who want to buy or sell shares in the Relevant Security, and price at one point in time is identical globally.  (*See id.* ¶¶ 375–76).

*Captive market*.  In the short run, an investor in the securities market is generally locked into the broker-dealers it already invests with.  (*See id.* ¶ 379).  The process to open a trading account with a broker-dealer may take several days.  (*See id.* ¶ 380).  If coordinated trading restrictions occur in a short time window, investors do not have the opportunity to switch or change broker-dealers.  (*See id.* ¶ 381).  Even investors with multiple trading accounts may be without a short-term trading option if multiple broker-dealers restrict trading at the same time.  (*See id.* ¶ 385).

*Opaque market*.  While financial markets are generally regulated, important aspects of these are opaque.  (*See id.* ¶ 386).  Specifically, it is generally impossible to know who owns a short interest at any given time despite the prevailing regulatory regime.  (*See id.* ¶¶ 387, 399). While an investor may voluntarily disclose its short positions, this does not occur often.  (*See id.* ¶¶ 388, 399).

To provide transparency to investors and the public, the SEC requires investment managers who have at least $100 million in assets under management to file a Form 13F up to 45 days after the end of every quarter.  (*See id.* ¶¶ 389, 394).  Disclosures in Form 13F filings, however, are limited: investors must only report long positions, put options, and call options, but not short positions; and 13F filings do not require the reporting of when a particular position was purchased, or in the case of put or call options, the strike price or expiry date.  (*See id.* ¶¶ 391, 394–95).

FINRA also requires member firms to report short interest positions in all equity securities twice a month, typically on the 15th and the last day of each month.  (*See id.* ¶ 396).  Even though FINRA publishes short interest reports publicly, it takes several days before the information is published — the number of shares sold short in the market may have changed dramatically in that time.  (*See id.* ¶ 397).

Although it is not possible to detect which specific investors are in large exposed short positions, the companies issuing securities can and sometimes do confirm if their stock has been significantly shorted or subject to a short squeeze.  (*See id.* ¶ 400).  For example, GameStop disclosed in its Form 10-K filed on March 23, 2021 that a large proportion of its stock had been sold short and that it experienced a short squeeze.  (*See id.* ¶ 401).

**<u>The CCAC and Defendants' Motion</u>**.  The CCAC alleges a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, against all Defendants.  (*See* CCAC ¶¶ 494–507).  Plaintiffs'

overarching theory is that "Citadel Securities conspired with the Brokerage Defendants and the Clearing Defendants to prevent retail investors from purchasing shares of the Relevant Securities to artificially suppress share prices so that Citadel Securities could cover its short positions and mitigate its potential losses."  (Resp. 11).

Defendants move to dismiss the CCAC.  (*See generally* Mot.).  They argue: (1) Plaintiffs fail to sufficiently plead that Defendants agreed to conspire; (2) Plaintiffs fail to plead the remaining elements of a Sherman Act section 1 claim; and (3) Plaintiffs' antitrust theory is precluded by federal securities laws.  (*See generally* Mot.; Reply).

## II.    LEGAL STANDARD

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (alteration added; citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (alteration added; citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal v. Coca-Cola Co.*,

578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).  When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

### III.    ANALYSIS

As stated, Plaintiffs assert one claim under section 1 of the Sherman Act, 15 U.S.C. § 1. (*See* CCAC ¶¶ 494–507).

Section 1 of the Sherman Act provides "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1 (alterations added).  "Despite the different terminology, there is no magic unique to each term in [section] 1; the terms 'contract,' 'combination,' and 'conspiracy' are used interchangeably to capture the concept of concerted action, that is an 'agreement.'"  *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1233 (11th Cir. 2021) (alteration added; some quotation marks and citation omitted).

"The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition."  *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334–35 (7th Cir. 2012) (citation omitted).  "[T]he Supreme Court has long concluded that Congress intended only to prohibit 'unreasonable' restraints on trade."  *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (alteration added; citation omitted).  Thus, section 1 "prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade."  *Id.* (citation omitted).

In their Motion, Defendants start by attacking the sufficiency of the allegations directed at

CASE NO.  21-2989-MDL-ALTONAGA/Torres

the first requirement — that Plaintiffs plead a conspiracy among Defendants.  (*See* Mot. 22–35).
Defendants next dispute whether Plaintiffs adequately plead that the alleged agreement among
Defendants unreasonably restrained trade.  (*See id.* 35–40).  Lastly, Defendants assert that
Plaintiffs' antitrust theory is precluded by federal securities laws.  (*See id.* 41–46).  Because
Plaintiffs fail to plead a conspiracy, the Court declines to reach the second and third suggested
grounds for dismissal.

   ***Conspiracy***.  "The first inquiry[] in any section 1 claim . . . is to locate the agreement that
restrains trade."  *Tidmore Oil Co., Inc. v. BP Oil Co./Gulp Prods. Div., a Div. of BP Oil Co.*, 932
F.2d 1384, 1388 (11th Cir. 1994) (alterations added).  Adequately stating a section 1 claim
"requires a complaint with enough factual matter (taken as true) to suggest that an agreement was
made."  *Twombly*, 550 U.S. at 556.  The "crucial question" with regard to a conspiracy claim under
section 1 "is whether the challenged anticompetitive conduct stems from independent decision or
from an agreement, tacit or express[.]"  *Id.* at 553 (alteration added; other alteration adopted;
quotation marks and citation omitted).  To allege an antitrust conspiracy, the plaintiff "should
present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and
others had a conscious commitment to a common scheme designed to achieve an unlawful
objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (alteration added;
quotation marks and citations omitted).

   Plaintiffs contend they have plausibly alleged facts, both direct and circumstantial, that
"Citadel Securities conspired with the Brokerage Defendants and the Clearing Defendants to
prevent retail investors from purchasing shares of the Relevant Securities to artificially suppress
share prices so that Citadel Securities could cover its short positions and mitigate its potential
losses."  (Resp. 11; *see id.* 12–29).  The Court examines these allegations that purport to support

26

CASE NO.  21-2989-MDL-ALTONAGA/Torres

the existence of a conspiracy directly or circumstantially.

*Allegations of direct evidence of an agreement*.  "[I]t is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators."  *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573–74 (11th Cir. 1991) (alteration added; citation omitted).  According to Plaintiffs, "[t]his is one of those rare cases" that involves "direct evidence of [an] unlawful agreement."  (Resp. 14 (alterations added)).  The Court disagrees.

"Direct evidence of an agreement is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *7 (N.D. Ill. Nov. 6, 2020) (quotation marks and citations omitted); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("[A] plaintiff may . . . assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. . . .  Such evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." (alterations added; citation omitted)).  The CCAC contains several allegations that Plaintiffs claim constitute direct evidence.  Upon further examination, each allegation requires an inference to establish that an unlawful agreement was entered into between Defendants and therefore cannot be direct evidence.

To begin, Plaintiffs allege that "high-level executives of Citadel Securities regularly communicated with and coordinated with high-level executives of Robinhood and others in the lead up to, during and after the restrictions imposed on or around January 28, 2021."  (CCAC ¶ 296; *see also* Resp. 14).  Yet, by Plaintiffs' own admission, "[t]he written communications appear deliberately vague and do not describe the contents of what was agreed to in the communications." (Resp. 14 n.6 (alteration added)).  Indeed, the alleged communications between

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Citadel Securities and Robinhood merely show that high-level executives at both firms agreed to "chat" and "work[] together."  (CCAC ¶¶ 299, 302 (alteration added); *see id.* ¶¶ 297–307, 452–53).  The CCAC does not detail any subsequent discussions because "these communications have not been disclosed[.]"  (*Id.* ¶ 303 (alteration added)).  These unknown discussions have no relevance at all unless one *infers* that Citadel Securities requested that Robinhood restrict trading in the Relevant Securities and Robinhood agreed.[15]

Similarly, Plaintiffs claim that "on January 28, 2021, high level employees of [] E*Trade communicated with employees of Citadel Securities to ensure certain orders were cancelled."  (CCAC ¶ 315 (alteration added); *see also* Resp. 14).  As support, the CCAC contains a screenshot of a January 28, 2021 email between the Senior Manager for Trading Operations for E*Trade and a Citadel Securities employee titled, "RE: Potential open orders[.]"  (CCAC ¶ 316 (alteration added)).  The E*Trade executive lists a number of securities and asks: "[c]an you confirm you're out on these?"  (*Id.* (alteration added)).  The Citadel Securities employee responds, "[c]anceled[.]"  (*Id.* (alterations added)).

As described by Defendants, this appears to be "no more than a routine daily trading account reconciliation email canceling ten trade orders, and Plaintiffs fail to allege that the email even pertains to the Relevant Securities."  (Reply 9).  To conclude this email evidences an unlawful agreement to restrain trade requires an exercise in incredible leaping logic in which the Court declines to engage.

---

[15] Plaintiffs find no support in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 324 n.23 (3d Cir. 2010).  (*See* Resp. 14).  There, the court explained that direct conspiracy includes "document[s] or conversation[s] explicitly manifesting the existence of the agreement in question[.]"  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 324 n.23 (alterations added; citations omitted).  As Plaintiffs concede, the alleged conversations between Citadel Securities and Robinhood were "vague and do not describe the contents of what was agreed to in the communications" — in other words, the opposite of explicit.  (Resp. 14 n.6).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Plaintiffs also assert that Apex "instructed" several Introducing Brokerages "to halt all opening transactions of GameStop, AMC and Koss on their platforms" (CCAC ¶ 276; *see id.* ¶¶ 274–75), which purportedly is direct evidence of an unlawful agreement to restrain trade (*see* Resp. 14).  The only specific details provided in the CCAC about these instructions are: (1) the CEO of Webull explained that the brokerage restricted trading in the Relevant Securities on January 28, 2021 because "the collateral required by Apex for GameStop increased by 100% and Apex had informed him that Webull needed to shut off the ability to open new positions in certain stocks[,]" and "Apex was instructed by the DTCC that it was increasing the collateral needed to settle trades for the Relevant Securities" (CCAC ¶ 274 (alteration added)); (2) SoFi informed users that its clearing partner, Apex, "ha[d] prevented purchases in GME" (*id.* ¶ 275 (alteration added)); (3) Dough LLC tweeted, "our clearing has notified us that we must set GME, AMC, and KOSS to closing only.  We will comply." (*id.* ¶ 276 (alteration adopted; quotation marks omitted)); and (4) Public.com tweeted, "our clearing firm, Apex Holdings, has decided to halt the buying of $KOSS, $GME, and $AMC" (*id.* (alteration adopted; quotation marks omitted)).

According to Plaintiffs, these Introducing Brokerages' statements show an explicit agreement between Apex and the Introducing Brokerages to *unlawfully* restrain trade; curiously an alternative explanation for the trading restrictions is provided by the CEO of Webull himself and appears in the pleading's factual allegations — "the DTCC . . . was increasing the collateral needed to settle trades for the Relevant Securities."  (*Id.* ¶ 274 (alteration added)).  The CCAC provides further support for this alternative explanation: "on February 9, 2021, in its letter to the New Jersey Office of the Attorney General, Apex stated" that "[t]he reason for the temporary trading restrictions [it] imposed regarding purchases of AMC, GME and KOSS relates directly to the potential future collateral requirement that NSCC appeared it may impose on Apex as part of

CASE NO.  21-2989-MDL-ALTONAGA/Torres

the margin system NSCC maintains to comply with the SEC's standards for covered clearing agencies." (*Id.* ¶ 480 (alterations added)). This explanation makes sense because NSCC clearing members can "monitor their risk in near real-time and estimate clearing fund contribution requirements." (*Id.* ¶ 103). Plaintiffs thus ask the Court to *infer* that the publicly stated explanations recited in the CCAC are untrue.

It is important to remember that Plaintiffs' conspiracy theory is that Citadel Securities influenced the Clearing Defendants and Brokerage Defendants to restrain trading in the Relevant Securities to protect itself from a short squeeze. Therefore, if the Introducing Brokerages' statements are to have any relevance to the alleged conspiracy at all, one must also *infer* that the true reason Apex instructed the Introducing Brokerages to restrict trading was to benefit Apex's business partner, Citadel Securities. These statements clearly cannot constitute direct evidence of an unlawful agreement given the chain of inferences that must be made for them to have relevance.

Plaintiffs proffer several other pieces of purported "direct evidence that Defendants acted in concert": "an internal Robinhood communication . . . discussing that others were doing the same"; "Robinhood['s] deci[sion] to impose purchasing restrictions on the Relevant Securities shortly after the NSCC margin call"; Defendants' "homogenous public statements to explain the events"; and Apex's warning to Robinhood "of efforts by investors to purchase the Restricted Securities even though Apex had no business relationship with Robinhood." (Resp. 14–15 (alterations added; footnote call numbers omitted)). Yet, by Plaintiffs' own admission, these allegations — at the most — "*demonstrate*[] that the coordinated trading restrictions imposed by Defendants were not the result of happenstance or independent decision-making[.]" (*Id.* 15 (emphasis and alterations added; footnote call number omitted)). Put differently, one can only *infer* an unlawful agreement was entered into based on these alleged facts.

30

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Taken together, Plaintiffs fall far short of providing allegations "explicitly manifesting the existence of the agreement in question[.]"  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 324 n.23 (alteration added; citations omitted).   Certainly, "the complaint leaves no doubt that [P]laintiffs rest their [section] 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among [Defendants]."  *Twombly*, 550 U.S. at 564 (alterations added).   "Although in form a few stray statements speak directly of agreement, on fair reading these are merely legal conclusions resting on the prior allegations. . . .  The nub of the complaint, then, is [Defendants'] parallel behavior, . . . and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience."  *Id.* at 564–65 (alterations added; footnote call numbers omitted).

*Allegations of circumstantial evidence of an agreement*.  As an alternative to alleging direct evidence, a plaintiff "may present circumstantial facts supporting the inference that a conspiracy existed."  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (quotation marks and citation omitted).   A conspiracy "may be inferred on the basis of conscious parallelism,[16] when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices."  *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (alteration added; citations omitted).   In other words, "[a]llegations of parallel conduct . . . are insufficient standing alone to raise an inference of conspiracy[;]" rather, "a plaintiff must allege sufficient plus factors to make the parallel conduct more probative of conspiracy than of conscious parallelism."  *Auto. Alignment & Body Serv., Inc. v. State Farm Mut.*

---

[16] Conscious parallelism is a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (citation omitted).

*Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (alterations added; quotation marks and citations omitted).  Such plus factors "may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Citigroup, Inc.*, 709 F.3d at 136 (quotation marks, citation, and footnote call number omitted); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) (explaining circumstantial evidence can include "speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways" (collecting cases)).

> _Parallel conduct_.  "A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted similarly." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) (quotation marks and citations omitted).  "Parallel conduct occurs when competitors act similarly or follow the same course of action — for example, adopting similar policies at or around the same time in response to similar market conditions." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915 (N.D. Cal. 2019) (citations omitted).  Examples of parallel conduct allegations that suffice under the *Twombly* standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties[;]" and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason[.]"  *Twombly*, 550 U.S. at 556 n.4 (alterations added; quotation marks and citations omitted).

> Defendants argue the allegedly parallel conduct was not, in fact, parallel because it "varied in material ways, both before and after the NSCC's collateral calls on January 28, 2021."  (Mot. 26).  Indeed, "each Defendant put in place restrictions for different stock symbols, for different

CASE NO.  21-2989-MDL-ALTONAGA/Torres

durations and for varying types of trades."  (Reply 11 (footnote call number omitted)).  On January

28, 2021, Robinhood set to position-closing only AMC, BB, BBBY, EXPR, GME, KOSS, NOK,

TR, and TRVG (*see* CCAC ¶ 252); E*Trade "halted GME and AMC" (*id.* ¶ 250); Interactive

Brokers "put AMC, BB, EXPR, GME, and KOSS option trading into liquidation only" (*id.* ¶ 249);

and Apex instructed the Introducing Brokerages to "halt all opening transactions of GameStop,

AMC and Koss on their platforms" (*id.* ¶ 276).  As for ETC, the only allegation regarding its

conduct is the general assertion that it "prohibited Alpaca from allowing its users to purchase the

Relevant Securities."  (*Id.* ¶ 277).

The restrictions among Defendants also varied in duration.  For example, Apex lifted

restrictions on trading by January 29, 2021 (*see id.* ¶ 327), while Robinhood maintained trading

limitations on certain securities through February 4, 2021 (*see id.* ¶ 336).  And one firm — Citadel

Securities — did not impose any trading restrictions at all.  (*See generally* CCAC; *see* Mot. 27).

While the Court disagrees with Plaintiffs' characterization of these restrictions as "virtually

identical" (Resp. 17), Plaintiffs have at least alleged Defendants acted "similarly."  *SD3, LLC*, 801

F.3d at 427 (quotation marks omitted; quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del.

Co., Inc.*, 998 F.2d 1224, 1243 (3d Cir. 1993); other citation omitted).  The key parallel conduct

allegation here is that on January 28, 2021 the Brokerage Defendants and the Clearing Defendants

each restricted trading in one or more of the Relevant Securities.  (*See, e.g.*, CCAC ¶¶ 14–15).  As

a result, the prices of the Relevant Securities decreased.  (*See id.* ¶ 331).  That the Brokerage

Defendants and the Clearing Defendants did not restrict trading in the exact same manner or stock

is not fatal to Plaintiffs' allegations of parallelism.  *See Anderson News, L.L.C. v. Am. Media, Inc.*,

680 F.3d 162, 191 (2d Cir. 2012) (disagreeing with the district court's holding that the plaintiff's

"conspiracy claim was implausible because [the] defendants had a variety of reactions" and instead

CASE NO.  21-2989-MDL-ALTONAGA/Torres

finding that "the *key* parallel conduct allegation was that all of the publisher and distributor defendants ceased doing business with [the plaintiff]" (alterations added; quotation marks, emphasis, and citation omitted));[17] *Jones*, 400 F. Supp. 3d at 916 ("That these adjustments are not alleged to have occurred simultaneously is immaterial, and the available case law does not suggest any firm temporal limitation on 'parallel.'" (citing *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939))).

Further, the fact that Citadel Securities did not itself restrict trading is inconsequential. Plaintiffs allege the Brokerage Defendants and the Clearing Defendants restricted trading to benefit Citadel Securities, who executed short trades in the Relevant Securities on January 27, 2021, "in anticipation of the Relevant Securities declining in price on January 28, 2021." (CCAC ¶ 13).   Plaintiffs contend they have pleaded a "hub-and-spoke conspiracy" wherein Citadel Securities "coordinate[d] [] horizontal agreement[s] to restrict markets or to fix prices."  (Resp. 34 (alterations added; citations omitted)).  In these scenarios, it is obvious that the "hub" would not necessarily take the same action as the "spoke."

In all, Plaintiffs adequately allege that Defendants engaged in parallel conduct.[18]  But because Plaintiffs' parallel conduct allegations are "insufficient standing alone to raise an inference of conspiracy[,]" the Court turns to whether Plaintiffs "allege sufficient plus factors to make the parallel conduct more probative of conspiracy than of conscious parallelism."  *Auto.*

---

[17] Defendants' reliance on *Anderson News, L.L.C. v. American Media, Inc.*, 899 F.3d 87 (2d Cir. 2018), is inapt.  (*See* Mot. 28).  There, after initially finding at the motion-to-dismiss stage that the varied responses by the defendants were inconsequential to a finding of parallel conduct, *see Anderson News, L.L.C.*, 680 F.3d at 191, the Second Circuit held at the summary judgment stage that the defendants' conduct "was not, in fact, parallel" because "*evidence presented at summary judgment* undercut[] th[e] allegation" of parallel conduct.  *Anderson News, L.L.C.*, 899 F.3d at 105 (alterations and emphasis added).

[18] While the varied restrictions do not preclude a finding of parallel conduct at this stage, they do influence the Court's plausibility analysis.

34

CASE NO.  21-2989-MDL-ALTONAGA/Torres

*Alignment & Body Serv.*, 953 F.3d at 726 (alteration added; quotation marks and citations omitted).

*Plus Factors*.  "[A]ny showing by [plaintiffs] that tends to exclude the possibility of independent action can qualify as a plus factor."  *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003) (alterations added; other alteration adopted; quotation marks and citation omitted); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017) ("There is no finite list of potential plus factors.").  The Court examines below each of the plus factors identified by Plaintiffs.  (*See* Resp. 18–29).

*Common motive to conspire*.  The CCAC details an intricate plot in which Citadel Securities purchased short positions in the Relevant Securities — even as the Retail Investors' trading activity increased the price of the Relevant Securities to extreme, historic levels — and then "leverage[d] its relationships" with the other Defendants "to halt trading of GameStop and other Relevant Securities and artificially depress their share price[s]."  (CCAC ¶ 409 (alterations added)).

As an initial matter, Defendants argue any allegation that Citadel Securities held short positions in the Relevant Securities during the relevant time period is based on "[p]ure speculation[.]"  (Mot. 28 (alterations added; quotation marks omitted; citing *United Am. Corp. v. Bitmain, Inc.*, No. 18-cv-25106, 2021 WL 1807782, at *13 (S.D. Fla. Mar. 31, 2021) ("Pure speculation does not make out a plus factor.")))  Notably, the CCAC admits "it is not possible to ascertain which investor has a short position in a particular security at any particular time unless the position is voluntarily publicly disclosed by the holder of the short position."  (CCAC ¶ 399; *see also id.* ¶ 387).  Plaintiffs instead rely on publicly available data.

As detailed in the CCAC, "FINRA data shows notable and significant increases in dark pool trading activity for each of the Relevant Securities on and around January 28, 2021" (*id.*

CASE NO. 21-2989-MDL-ALTONAGA/Torres

¶ 353), and short volume reporting shows a significant shift from shares sold long to shares sold short during that time (*see id.* ¶ 361). Given that individual investors generally cannot engage in dark trading (*see id.* ¶ 357), and "Citadel Securities represents about 50% of the dark trading activity [during that time], a large shift in the percentage of sales represented by short trades is highly likely to be caused by a shift in Citadel Securities's position from long to short or vice versa" (*id.* ¶ 360 (alteration added)). Plaintiffs' methodology is appropriate given the circumstances. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 n.10 (N.D. Ill. 2011) ("If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data."). That Citadel Securities held short interests in the Relevant Securities is a reasonable inference to be drawn in Plaintiffs' favor. *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 n.1 (11th Cir. 2004).

Plaintiffs' theory regarding the Brokerage Defendants and Clearing Defendants' motive is more attenuated. According to the CCAC, the Brokerage Defendants and Clearing Defendants agreed to halt trading to benefit Citadel Securities because Citadel Securities "is either the largest or one of the largest payors for order flow for most of them." (CCAC ¶ 418). To illustrate, in 2020, "34% of Robinhood's revenue derived from transactions with Citadel Securities" (*id.* ¶ 135); and "Apex sent 23.26% of all 'non-directed' order flow to Citadel Securities in S&P 500 stocks and 13.26% of all 'non-directed' order flow for non-S&P500 stocks to Citadel Securities in January 2021" (*id.* ¶ 140). Plaintiffs conclude that "[t]he preservation of [the] Brokerage and Clearing Defendants' mutually beneficial and highly lucrative payment for order flow relationships alone provides sufficient motive to conspire." (Resp. 20 (alterations added)).

36

CASE NO.  21-2989-MDL-ALTONAGA/Torres

In essence, Plaintiffs ask the Court to infer the Brokerage Defendants and Clearing Defendants had a common motive to illegally restrain trade simply because Citadel Securities is an important business partner of the other Defendants and might have suffered losses as a result of its short positions in the Relevant Securities.  Yet, as discussed below, Plaintiffs also maintain that "restrict[ing] trading in the Relevant Securities is against the Brokerage and Clearing Defendants' self-interest" because they earn revenue from each transaction and because the trading restrictions create a risk of "both immediate and long-term reputational harm[.]"  (Resp. 20, 22 (alterations added; quotation marks omitted)).  As Defendants note, there are no allegations that Citadel Securities threatened or suggested it would cut off business relationships with any other Defendants if they did not impose trading restrictions, and Plaintiffs fail to otherwise explain why each Defendant would not simply use another market maker in such a scenario.  (*See* Reply 13). The mere fact that Citadel Securities is an important business partner of the other Defendants does not provide sufficient motive to conspire.

Plaintiffs' proffered motive theory is even less plausible given that the CCAC provides an "obvious alternative explanation" for imposing the trading restrictions provided in the CCAC: increased collateral requirements caused by market volatility.  *Iqbal*, 556 U.S. at 682 (quotation marks omitted; quoting *Twombly*, 550 U.S. at 567).  As clearing entities, each of the Brokerage Defendants and Clearing Defendants is a member of the DTCC and therefore subject to its collateral requirements.  (*See* CCAC ¶¶ 110, 116).  "The DTCC collateral requirement changes depending on the perceived risk of the order, since if one side of the trade defaults, and the broker cannot cover the loss, DTCC member firms are on the hook for completing the trade." (*Id.* ¶ 413).

As stated in the CCAC, the markets for the Relevant Securities were extremely volatile in

CASE NO.  21-2989-MDL-ALTONAGA/Torres

the days leading up to January 28, 2021.  (*See id.* ¶¶ 200–209).  "On the morning of January 28, [the] DTCC demanded that its member clearing agents supply additional collateral to support these trades [in the Relevant Securities]."  (*Id.* ¶ 414 (alterations added)).  For example, "[a]t 5:11 a.m. Eastern Standard Time, Robinhood received an email from NSCC indicating that Robinhood had a deficit of roughly $3 billion dollars."  (*Id.* ¶ 231 (alteration added)).

Robinhood and multiple other Defendants cited the extraordinary market volatility and/or collateral requirements as the motivation for their trading restrictions.  (*See, e.g.*, *id.* ¶¶ 249–51, 274, 338–40, 479–80).  The fact that each Defendant implemented varying trading restrictions gives support to their stated reasons because each Defendant would have its own unique risk tolerance and collateral requirements.  And considering the CCAC itself states that firms *not alleged to be part of the conspiracy* also restricted transactions in the Relevant Securities and similarly cited "unprecedented market conditions[,]" the Court finds Plaintiffs' theory regarding motive implausible.  (*Id.* ¶ 198 (alteration added); *see id.* ¶ 199).

To recap, Plaintiffs adequately explain Citadel Securities' motive for allegedly orchestrating the trading restrictions imposed by the Brokerage Defendants and Clearing Defendants.  But the Court is unconvinced that Plaintiffs have set forth a coherent common motive as to the Brokerage Defendants and Clearing Defendants.  This plus factor does not weigh in Plaintiffs' favor.

*Actions against unilateral self-interest*.  "It is firmly established that actions that are contrary to an actor's economic interest constitute a plus factor[.]"  *Williamson Oil*, 346 F.3d at 1310 (alteration added; citation omitted).  Nonetheless, courts "must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments of all kinds."  *Id.* (citation omitted).  "[E]xtreme action

against self-interest . . . may suggest prior agreement — for example, where individual action

would be so perilous in the absence of advance agreement that no reasonable firm would make the

challenged move without such an agreement."  *In re Musical Instruments and Equip. Antitrust

Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015) (alterations added); *see also City of Tuscaloosa v.

Harcros Chems. Inc.*, 158 F.3d 548, 570 n.33 (11th Cir. 1998) (citations omitted).

Defendants concede the trading restrictions imposed on January 28, 2021 were against their

self-interest because the restrictions (1) "create[d] a real risk of both immediate and long-term

reputational and financial harm (including this Action)" and (2) "cost each broker

revenue — fewer trades mean fewer payments for order flow (or fewer commissions) for the

Clearing and [Brokerage] Defendants, and less spread capture for the Market Makers[.]"  (Mot.

30–31 (alterations added); *see* Resp. 21–22).

Nevertheless, the CCAC itself "provides ample independent business reasons" why each

of the Brokerage Defendants and Clearing Defendants would have restricted trading without

assurances that all other brokerages and clearing firms would restrict trading.  *In re Musical

Instruments*, 798 F.3d at 1195 (finding no action against self-interest at the motion-to-dismiss

stage).  These Defendants faced historic market volatility and increased NSCC collateral

requirements resulting from the volatility.  Based on these allegations, Plaintiffs cannot credibly

argue that "no reasonable firm" would have restricted trading in such circumstances.  *Id.*  In fact,

the CCAC itself identifies firms *not alleged to be part of the conspiracy* that implemented

restrictions on certain transactions involving the Relevant Securities on January 28, 2021.  (*See*

CCAC ¶¶ 198–99).  Plaintiffs fail to make out a plus factor here.

*Opportunity to coordinate and collude*.  Plaintiffs contend Defendants had ample

opportunity to conspire because "[t]he financial industry is close-knit and secretive, replete with

CASE NO.  21-2989-MDL-ALTONAGA/Torres

specialized jargon and terminology[,]" and "[i]ndividuals within the industry frequently move from one company to another and often work closely with competitors."  (Resp. 23 (alterations added)).  These are generic descriptions of features that many industries share.  While it is perhaps necessary to allege some opportunity to conspire to infer a conspiracy, "the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy." *Williamson Oil*, 346 F.3d at 1319 (quotation marks and citation omitted); *see also Twombly*, 550 U.S. at 567 n.12.

   *Interfirm communications*.[19]  (*See* Resp. 23).  "[E]vidence of a high level of interfirm communications" may constitute a plus factor.  *Citigroup*, 709 F.3d at 136 (alteration added; footnote call number, quotation marks, and citation omitted).  The CCAC alleges several interfirm communications, some of which warrant consideration here, while others do not.

   Beginning with those that do not — first, Apex warned Robinhood that the Retail Investors found a loophole around some of the trading restrictions imposed by Robinhood.  (*See* CCAC ¶¶ 327–30).  The CCAC explains "Apex had lifted restrictions on trading" by January 29, 2021.  (*Id.* ¶ 327).  While Plaintiffs claim this shows Apex was "policing the conspiracy" (*id.*), they fail to explain how this makes sense considering Apex had already lifted its trading restrictions by then.  In any event, helping a competitor prevent fraudulent conduct is not an antitrust violation. *See Cement Mfrs.' Protective Ass'n v. United States*, 268 U.S. 588, 604 (1925).

   Second, the CCAC includes what appears to be a routine email between E*Trade and Citadel Securities (*i.e.*, a brokerage and its market maker) about cancelling a securities order between them.  (*See* CCAC ¶¶ 315–16).  Plaintiffs do not explain the email's relevance.

---

[19] This section addresses Plaintiffs' arguments raised in their Response under both the "ample opportunity to coordinate and collude" and "acts [] inconsistent with unilateral conduct" sections.  (Resp. 22–24, 28–29 (alteration added)).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Third and finally, several of the Introducing Brokerages reported that Apex "instructed

them to halt all opening transactions of GameStop, AMC and Koss on their platforms."  (*Id.* ¶ 276;

*see id.* ¶¶ 274–75, 443–44).  Given that Apex served as these firms' clearing entity and "was

instructed by the DTCC that it was increasing the collateral needed to settle trades for the Relevant

Securities[,]" these instructions are neither here nor there.  (*Id.* ¶ 274 (alteration added); *see id.*

¶¶ 275–76).

Now, the communications that do warrant consideration.  Embedded in the CCAC are

several vague and ambiguous emails between high-level executives of Robinhood and Citadel

Securities and internal Robinhood emails discussing external conversations that, given the timing

and overall context, could be inferred to relate to the trading restrictions imposed on January 28,

2021.

On January 20, 2021, Citadel Securities' Head of Execution Services emailed Josh

Drobnyk, Robinhood's Vice President of Corporate Relations and Communications, stating he was

happy they "will be working together" and asking Drobnyk to "let [him] know if [they are]

interested and who the main contact should be."  (*Id.* ¶ 299 (alterations added; quotation marks

omitted)).  On January 25, 2021, Drobnyk replied "[w]e are on board" and copied Lucas

Moskowitz, Robinhood's Deputy General Counsel, who was "going to be [Robinhood's] central

point of contact[.]"  (*Id.* ¶ 300 (alterations added)).  Moskowitz and the Citadel Securities

executive then arranged a call for the morning of January 26, 2021 — the details of which are

unknown.  (*See id.* ¶¶ 302–03).  Considering the CCAC admits the details of this agreement or

discussion are unknown, these emails are only relevant given their timing.

Around 4:40 p.m. EST on January 27, 2021, Gretchen Howard, Robinhood's COO,

messaged Vlad Tenev, Robinhood's CEO, that she, along with Daniel Gallagher and Jim

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Swartwout, Robinhood's Chief Legal Officer and Robinhood Securities' President and CEO,
would be joining "a call with Citadel" at 5 p.m. that day.  (*Id.* ¶ 307; *see id.* ¶ 305).  Howard told
Tenev that she believed Citadel Securities would "make some demands on limiting [payment for
order flow] across the board" but that they "won't agree to anything[.]"  (*Id.* ¶ 307 (alterations
added)).  Tenev told Howard that although he had never met Ken Griffin, the CEO of Citadel
Securities, she could mention on the call that "this would be a good time for [Tenev] to chat with
[] Griffin[.]"  (*Id.* (alterations added)).  The request from a market maker to limit the order flow
sent to it is not equivalent to a demand to restrict trading in certain securities; however, the timing
and the involvement of high-level executives render these emails relevant.

Roughly two hours later, Swartwout received an internal message stating there was
"[a]necdotal evidence that several 'very large' firms are having really bad nights too"; to which
Swartwout replied, "everyone is.  [Y]ou wouldnt [sic] believe the conv[ersation] we had with
Citadel.  [T]otal mess[.]"  (*Id.* ¶ 308 (alterations added)).  Around 8:30 p.m. that night, Swartwout
emailed Citadel Securities' Vice President of Business Development to offer to set up a call that
night with Tenev, and mentioned Tenev would like to have a discussion with Griffin at some point,
given their relationship, but "[n]ot specific to this crazy issue[.]"  (*Id.* ¶ 313 (alterations added);
*see id.* ¶¶ 311–12).  After the Citadel Securities executive asked Swartwout if Tenev would like to
have the call that night, Swartout declined and said: "[j]ust looking for your dictated schedule and
caps.  I have 20 minutes until batch so whatever it is we are not going to be able to address it
tomorrow given the notice.  I have to say I am beyond disappointed in how this went down.  It's
difficult to have a partnership when these kind[s] of things go down this way."  (*Id.* ¶ 313
(alterations added)).  Again, these emails are vague and ambiguous, and are only relevant
considering the timing and those involved.

On the morning of January 28, 2021, after Robinhood set AMC and GME to PCO, David
Dusseault, Robinhood Financial's President and COO, informed Robinhood's Manager of Market
Operations that "[Robinhood Securities] received a very large call — confidentially.  [A]ll firms
on street . . . are doing [the] same thing[.]"  (*Id.* ¶ 244 (quotation marks omitted; alterations
added)).  The CCAC does not assert who was on this call.

Lastly, on January 30, 2021, a Citadel Securities executive informed Drobnyk that he
"wanted to generally coordinate messaging" and copied on the email Robinhood's "[General
Counsels] as an FYI and for privilege."  (*Id.* ¶ 335 (alteration added); *see id.* ¶¶ 332–33).  The two
then arranged an "[u]rgent" phone call.  (*Id.* ¶ 335 (alteration added)).  Given the context of the
preceding communications and the fact that this request to coordinate messaging occurred even as
Robinhood continued to restrict trading in the Relevant Securities, these emails — while vague
and ambiguous — do lend some credence to Plaintiffs' conspiracy theory.

Defendants insist each of these communications between Citadel Securities and Robinhood
"reflect[s] ordinary business dealings between a Market Maker and its client."  (Mot. 32 (alteration
added; footnote call number omitted)).  But given the timing, the players involved, and the fact
that each of these emails could be inferred to relate to the trading restrictions imposed on January
28, 2021, Plaintiffs' allegations of interfirm communications are supportive of a conspiracy.

The support is thin, however.  Plaintiffs cite to the undersigned's opinion in *In re Salmon*,
No. 19-21551-Civ, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021), but the allegations here are hardly
comparable.  (*See* Resp. 22–24).  There, the plaintiffs "point[ed] to bilateral and multilateral
agreements not to compete and a high level of communications among [d]efendants," including
complete details of multiple meetings, such as who was in attendance, when the meetings occurred,
and the contents of those communications.  *In re Salmon*, 2021 WL 1109128, at *15 (alterations

CASE NO. 21-2989-MDL-ALTONAGA/Torres

added). Here, Plaintiffs concede they do not know what was discussed during the several calls between Robinhood and Citadel Securities executives.

In addition, the CCAC lacks specific allegations of interfirm communications between any other alleged co-conspirator. The Court thus finds no support here for a reasonable inference of a conspiracy involving any other Defendants.

In sum, Plaintiffs establish a plus factor here supporting, albeit weakly, an inference of a conspiracy between Robinhood and Citadel Securities.

*Evidence of concealment and pretext.* Plaintiffs contend "[u]nrecorded communications between coconspirators are hallmarks of antitrust conspiracies[,]" suggesting the simple fact that Robinhood and Citadel Securities[20] arranged to have discussions over the phone instead of exchanging information via email supports an inference of an illegal conspiracy. (Resp. 24–25 (alterations added; citations omitted)). The Court is not convinced such a proposition supports plausibility on a motion to dismiss.

In this regard, Plaintiffs cite *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 364–65 (3d Cir. 2004), wherein the court noted a coconspirator asked another coconspirator to call him — one minor fact among a litany of allegations. (*See* Resp. 24). It is not clear that the phone call was important to the court's analysis.

Plaintiffs also cite *In re Urethane Antitrust Litigation*, 913 F. Supp. 2d 1145, 1154–56 (D. Kan. 2012). (*See* Resp. 24–25). There, at summary judgment the court did find persuasive circumstantial evidence "that the alleged conspirators undertook to maintain the secrecy of their communications, particularly those involving pricing." 913 F. Supp. 2d at 1155. The court relied

_____

[20] In their Response, Plaintiffs also refer to phone calls between Apex and the Introducing Brokerages it serves. (*See* Resp. 24). As explained, absent animating details, the Court declines to find these phone calls suggestive of an illegal agreement.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

on numerous, detailed facts indicating efforts to maintain secrecy, for example: coconspirators made calls "from a pay phone at a gas station using a prepaid credit card"; at a particular meeting with competitors, coconspirators "went outside to discuss pricing, in order to avoid listening devices in the facility"; the coconspirators' "reports of the meeting excluded their pricing discussion"; at the same meeting, coconspirators shared documents containing pricing information after "assurances that the document would be destroyed"; and coconspirators left trade association meetings to "conduct future price discussions at an off-site coffee shop so that the men could talk in confidence[.]"  *Id.* at 1155–56 (alteration added); *see id.* at 1161–63.

The only similarity between the allegations in the present case and the record in *In re Urethane* is that alleged coconspirators made phone calls around the time the alleged anticompetitive conduct occurred.  Upon further examination, however, even this shared fact is not helpful to Plaintiffs.

The coconspirators in *In re Urethane* were direct competitors conspiring to fix prices — the fact that they would have numerous phone calls around the time of price increase announcements is highly suspicious.  *See id.* at 1149, 1155–56.  Here, Citadel Securities is Robinhood's most important business partner.  It surely is not unusual for two firms in an ongoing business relationship to have conversations over the phone; and Plaintiffs admit they do not know the substance of these conversations.  (*See* CCAC ¶ 461).  The Court will not infer a conspiracy simply because two business partners chose to use phones to communicate.

In addition to these allegations of concealment, Plaintiffs insist they have set forth "pretextual statements" made by Robinhood and Apex "that provide evolving, inconsistent and conflicting explanations for the trading restrictions."  (Resp. 25 (footnote call number omitted)).  Plaintiffs first point to the fact that Robinhood "initially attributed the trading restrictions to market

CASE NO.  21-2989-MDL-ALTONAGA/Torres

volatility, only to later assert that clearinghouse collateral requirements forced Robinhood to impose said restrictions." (*Id.*).  Defendants counter that those statements were not inconsistent and conflicting because "market volatility led to the increased collateral requirements."  (Reply 14).  Defendants have the better argument.

Indeed, the CCAC itself explains that collateral requirements change because "the DTCC may assign a volatility multiplier on certain securities which the DTCC perceives as having more risk." (CCAC ¶ 470).  And the fact that Robinhood continued to impose restrictions after meeting its collateral requirements is of no moment because the trading restrictions "reduce[d] the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC."  (Reply 15 (alteration added); *see* Resp. 25; CCAC ¶ 470).  It is not suspicious for Robinhood to strive to avoid higher collateral requirements.

Plaintiffs next cite several Robinhood statements that they assert conflict with its COO, Gretchen Howard's internal message that Robinhood had a "major liquidity issue" as it set certain Relevant Securities to PCO in the early morning of January 28, 2021.  (CCAC ¶ 233; *see* Resp. 25).  Later that day, "Robinhood posted on its blog that market volatility was the reason for the restrictions." (CCAC ¶ 466).  In addition, Robinhood's CEO, Vlad Tenev, publicly stated "that the shutdowns were unrelated to Robinhood's liquidity and that Robinhood did not have a liquidity problem." (*Id.* ¶ 467).  Tenev later testified before the House Financial Services Subcommittee "that trading restrictions were put in place to meet regulatory deposit requirements imposed by DTCC affiliate NSCC." (*Id.* ¶ 469; *see also id.* ¶ 340).

These statements are not conflicting because Howard's internal message stating Robinhood had a "major liquidity issue" came shortly after Robinhood "received an email from NSCC indicating that Robinhood had a deficit of roughly $3 billion dollars." (*Id.* ¶¶ 231, 233).  Even

CASE NO.  21-2989-MDL-ALTONAGA/Torres

viewing the pleading in the light most favorable to Plaintiffs, Howard was likely referring to Robinhood's ability to pay the increased collateral requirements caused by the market volatility, which is consistent with Robinhood later placing the blame on these collateral requirements.

Finally, Plaintiffs again refer to Apex's "conflicting explanations as to why it restricted trading."  (Resp. 25).  According to Plaintiffs, "[a]lthough Apex cited increased collateral requirements as the reason for the restrictions, Apex later admitted that it was not subject to any heightened collateral requirements but rather made the decision to restrict trade based solely on a 'potential future' collateral requirement despite having sufficient capital and available lines of credit."  (*Id.* (alteration added)).

As further explained in the CCAC, Apex had told state regulators it imposed restrictions because of "the potential future collateral requirement that NSCC *appeared* it may impose on Apex" (CCAC ¶ 480 (emphasis added)); and Apex's President explained that Apex restricted "due to anomalous information" (*id.* ¶ 481 (quotation marks omitted)).  Considering Apex lifted its restrictions after one day, this explanation makes sense.  (*See id.* ¶ 327).  As Defendants put it: "the market volatility in late January 2021 was extraordinary, with events occurring quickly to meet market and clearinghouse demands.  Therefore, it is understandable that earlier-in-time internal Robinhood and Apex communications, as Plaintiffs identified, did not reflect final information later presented publicly."  (Reply 15).[21]

In total, Plaintiffs do not make out a plus factor here.

*Government investigations*.  Plaintiffs maintain the investigations of "the events concerning the January 28, 2021 trading restrictions" by "[t]he [SEC], FINRA, Congress, the

---

[21] Contrary to Plaintiffs' suggestion, the fact that government regulators did not directly call on Defendants to restrict trading is inconsequential (*see* Resp. 25 n.18), because the restrictions lowered the volatility multiplier that determines DTCC collateral requirements (*see, e.g*, CCAC ¶ 470).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Department of Justice, the San Francisco U.S. Attorney's Office, and the Attorneys General of various states" are indicative of collusion among Defendants.  (Resp. 26 n.20 (alterations added)). The CCAC does not allege, however, that any of these authorities is investigating possible *collusion* among Defendants.  (*See* CCAC ¶¶ 486–93).  In fact, Plaintiffs concede "there is simply no evidence to suggest that the SEC is investigating the claims of concerted activity at issue here." (Resp. 45 (footnote call number and citation omitted)).

Defendants do not disagree that government investigations can bolster conspiracy allegations.  (*Compare* Mot. 33, *and* Reply 15, *with* Resp. 26).  They instead correctly note that where "allegations are sparse, the existence of government inquiries is insufficient to raise an inference of conspiracy."  (Mot. 33 (alteration adopted; quotation marks and citations omitted)); *see also e.g.*, *In re Loc. TV Advert.*, 2020 WL 6557665, at *8 (collecting cases).  Such is the case here.  Given the thin allegations overall, and the fact that Plaintiffs have not alleged an investigation specifically into concerted activity among Defendants, Plaintiffs fail to establish a plus factor here.

*Structural characteristics of the market.*  Plaintiffs contend they have alleged "economic market factors [that] paint a picture of a market whose characteristics make it ripe for collusion in violation of the antitrust law."  (Resp. 28 (alteration added)).  While the CCAC does allege the existence of several characteristics that each tend to make a market susceptible to anticompetitive conduct and unlawful collusion, Plaintiffs present an incoherent market definition.  (*See* CCAC ¶¶ 362–405).

In their Response, Plaintiffs argue that "the CCAC makes clear that the relevant market to which [they] refer is the securities market."  (Resp. 26 (alteration added)).  But the CCAC is hardly a model of clarity on this point.  (*See* Mot. 34).  Although Plaintiffs do not elaborate, it appears

CASE NO.  21-2989-MDL-ALTONAGA/Torres

from the CCAC that Plaintiffs are attempting to define multiple markets — one for each Relevant Security — by stating "[t]he Relevant Securities are commodity (homogenous) products." (CCAC ¶ 374 (alteration added)).  To complicate matters further, the CCAC also confusingly discusses characteristics of "[t]he markets for broker dealers, clearing firms and market making[.]" (*Id.* ¶ 368 (alterations added)).  The Court is thus unable to discern from the CCAC what the alleged market definition is.

Moreover, Plaintiffs fail to grapple with Defendants' argument that the case is unlike the typical price-fixing conspiracies where this plus factor is invoked.  (*See* Mot. 34).  In each of the cases cited by Plaintiffs — all of which involve price-fixing conspiracies — the defendants utilized their market power to raise the prices of goods they sold.  (*See* Resp. 26–28 (citing *In re Salmon*, 2021 WL 1109128, at *14; *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1295–96 (M.D. Fla. 2016); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 169 (D. Conn. 2009); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656–58 (7th Cir. 2002))).  Here, Plaintiffs allege that the Brokerage Defendants and Clearing Defendants restricted output to lower prices for securities they are not alleged to have bought or sold for their own accounts, all to benefit the Market Maker Defendant who actually engages in such transactions.  Plaintiffs do not address this distinction at all and do not provide any legal authority supporting the application of this plus factor to their novel anticompetitive theory.

In short, Plaintiffs fail to coherently define a market and persuade the Court that this plus factor weighs in their favor.

\* \* \*

What factual allegations are left standing that support a plausible inference of a conspiracy?

49

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Well, there are none — other than an allegation of parallel conduct — with respect to Defendants, E*Trade, Interactive Brokers, Apex, ETC, and PEAK6.  Each of these Defendants therefore must be dismissed because "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to state a section 1 claim.  *Twombly*, 550 U.S. at 556.

That leaves Robinhood and Citadel Securities.  High-level executives at these firms exchanged various vague and ambiguous emails immediately before and after Robinhood imposed trading restrictions on the Relevant Securities on January 28, 2021.  These emails set up telephone discussions between the executives, the substance of which is unknown to Plaintiffs.  Admittedly, these emails may be somewhat suspicious given the participants and their timing.  But are a few vague and ambiguous emails between two firms in an otherwise lawful, ongoing business relationship enough to "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible[?]"  *Id.* at 570 (alterations added).  The Court thinks not.

Accordingly, the CCAC is dismissed.

## IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Antitrust Tranche Complaint **[ECF No. 408]** is **GRANTED**.  The Corrected Consolidated Class Action Complaint **[ECF No. 416]** is **DISMISSED without prejudice**.  Plaintiffs have until **December 20, 2021** to file their final amended complaint in the Antitrust Tranche of this Multidistrict Litigation.

Plaintiffs' Motion to Strike Defendant Citadel Securities LLC's Notice of Supplemental Authority **[ECF No. 437]** is **DENIED as moot**.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

**DONE AND ORDERED** in Miami, Florida, this 17th day of November, 2021.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record
         *Pro Se* Plaintiffs