No. 22-11873-F

# United States Court of Appeals
# for the Eleventh Circuit

ANGEL GUZMAN, BURKE MINAHAN,
CHRISTOPHER MILLER, and TERELL STERLING,

*Plaintiffs-Appellants*,

v.

ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL LLC,
ROBINHOOD SECURITIES, LLC and CITADEL SECURITIES LLC,

*Defendants-Appellees.*

*Appeal from U.S. District Court for the Southern District of Florida,
Case No. 21-md-2989, before the Honorable Cecilia M. Altonaga*

## SUPPLEMENTAL APPENDIX OF
## APPELLEE CITADEL SECURITIES LLC
## VOLUME 3 OF 3

Adam L. Hoeflich
Abby M. Mollen
Mac LeBuhn
Dawson K. Robinson
BARTLIT BECK LLP
54 W. Hubbard Street, Ste 300
Chicago, IL 60654
(312) 494-4400
adam.hoeflich@bartlitbeck.com
abby.mollen@bartlitbeck.com
mac.lebuhn@bartlitbeck.com
dawson.robinson@bartlitbeck.com

William A. Burck
Derek L. Shaffer
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street NW, Ste 900
Washington, D.C. 20005
(202) 538-8000
williamburck@quinnemanuel.com
derekshaffer@quinnemanuel.com

*Counsel for Defendant-Appellee Citadel Securities LLC*

DECEMBER 14, 2022

John F. O'Sullivan
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
2601 S. Bayshore Drive, Ste 1550
Miami, FL 33133
(305) 439-5008
johnosullivan@quinnemanuel.com

Christopher D. Kercher
Peter H. Fountain
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7187
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

*Counsel for Defendant-Appellee Citadel Securities LLC (cont.)*

# INDEX TO APPENDIX

## *VOLUME 1 of 3*

Document                                                    Docket/Tab #

District Court Docket Sheet (as of Dec. 14, 2022) ................................... A

Class Action Complaint, *Cheng v. Ally Fin.* (February 1, 2021) ............. 1

Order re Non-Federal Securities Actions (June 3, 2021) .................... 323

## *VOLUME 2 of 3*

Document                                                    Docket/Tab #

Class Action Complaint re Antitrust (July 26, 2021) .......................... 358

Defendants MTD the Antitrust Tranche Complaint (June 3, 2021) .... 408

Order re Antitrust Actions (November 17, 2021) ................................ 438

## *VOLUME 3 of 3*

Document                                                    Docket/Tab #

Order re Other Broker Actions (January 10, 2022) ............................ 450

Order re Robinhood Actions (January 27, 2022) ................................ 453

Plaintiffs Notice of Appeal re Antitrust Actions (June 1, 2022) .......... 474

# TAB 450

# Order re Other Broker Actions

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  21-2989-MDL-ALTONAGA/Torres

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**
_____/

This Document Relates to the Actions in the
Other Broker Tranche

## <u>ORDER</u>

**THIS CAUSE** came before the Court on Defendant, Apex Clearing Corporation's Rule 12

Motion to Dismiss Plaintiffs' Amended Consolidated Other Broker Tranche Class Action

Complaint [ECF No. 422], filed on October 15, 2021.  Plaintiffs filed a [Response] in Opposition

[ECF No. 435], to which Defendant filed a Reply [ECF No. 440].  The Court has carefully

considered the Amended Consolidated Class Action Complaint ("Amended CCAC") [ECF No.

410], the parties' written submissions, the record, and applicable law.  For the following reasons,

the Motion is granted.

## I.    BACKGROUND

This putative class action is brought on behalf of Defendant's customers and other

individual investors who suffered losses as a result of Defendant's decision to block them from

purchasing shares of AMC Entertainment Holdings, Inc. ("AMC"), GameStop Corporation

("GME"), and Koss Corporation ("KOSS") for nearly three-and-a-half hours on January 28, 2021.

(*See* Am. CCAC ¶¶ 1–2, 29, 67, 93).  Defendant is a broker-dealer for certain direct customers and

provides clearing broker services to introducing broker-dealers and their customers.  (*See id.* ¶¶ 1,

24–25).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Leading up to January 28, 2021, individual investors began purchasing large numbers of shares of AMC, GME, and KOSS.  (*See id.* ¶¶ 3, 57, 59, 64).  The increased demand for these stocks drove share prices up and led to a "short squeeze."[1]  (*See id.* ¶¶ 59–64).  In a "short squeeze," individual investors like Plaintiffs typically "stand to benefit . . . as the value of the stocks they purchased increases.  Short sellers, on the other hand, risk further losses, as stock prices rise as a natural consequence of market forces."  (*Id.* ¶ 63 (alteration added)).

In response to the ongoing market volatility, at approximately 10:31 a.m.[2] on January 28, 2021, Defendant "blocked its direct customers and directed its [i]ntroducing [b]roker-[d]ealers to block [their] [c]ustomers from purchasing shares of AMC, GME, and KOSS."  (*Id.* ¶ 67 (alterations added); *see also id.* ¶¶ 68–72, 74–75).

Defendant has maintained it restricted trading due to potential future collateral requirements the National Securities Clearing Corporation ("NSCC")[3] "appeared it may impose on [Defendant] as part of the margin system NSCC maintains to comply with the [Securities and Exchange Commission]'s standards for covered clearing agencies."  (*Id.* ¶ 77 (alterations added; quotation marks omitted)).  Specifically, Defendant received an NSCC report at 8:30 a.m. projecting substantially increased collateral requirements.  (*See id.* ¶ 76).

Yet Defendant did not take any action to "confirm the higher collateral number" from the NSCC.  (*Id.* ¶ 80).  Moreover, documents submitted to regulators reveal Defendant knew its NSCC collateral deposit requirement was lower than initially expected at 10:00 a.m. — approximately 30

---

[1] In a "short squeeze," short sellers are pressured to purchase the affected stocks at inflated, and continually rising, prices in order to cover their losses and prevent potentially greater losses.  (*See* Am. CCAC ¶ 62).

[2] All times refer to the Central Time Zone.

[3] The NSCC "is the central counterparty that clears cash transactions in the U.S. equities markets, netting securities deliveries and payments among NSCC's clearing members, and guaranteeing completion of trades even if one party to the transaction defaults."  (Am. CCAC ¶ 32).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

minutes before it implemented the trading restrictions.  (*See id.* ¶¶ 76, 78, 80).  And despite having the opportunity to confirm the lower number on a call with the Depository Trust and Clearing Corporation[4] at 10:47 a.m., Defendant waited until 1:55 p.m. to lift the trading restrictions.  (*See id.* ¶¶ 76, 78–80).  In any event, Defendant has subsequently admitted it was never unable to meet its capital requirements.  (*See id.* ¶¶ 83–84).

As a result of Defendant's one-way trading restrictions, Plaintiffs were prevented from purchasing additional shares of these stocks, the prices of these stocks fell, and Plaintiffs were forced to either sell at artificially suppressed prices or continue holding their shares despite depreciating values.  (*See id.* ¶¶ 2, 6–7, 65).

Plaintiffs assert claims for negligence, breach of fiduciary duty, and tortious interference with a business relationship.  (*See id.* ¶¶ 100–123).  Plaintiffs, Erik Chavez (*see id.* ¶¶ 14–17) and Peter Jang (*see id.* ¶¶ 18–21), did not file lawsuits in other districts that were then transferred to the Court through the Judicial Panel on Multidistrict Litigation ("JPML" or "Panel"), nor did they file a separate action in this District that was then consolidated with this multidistrict litigation ("MDL").  Instead, Plaintiffs assert claims related to the events of January 28 for the first time directly in this MDL.  (*See generally id.*).[5]

---

[4] The Depository Trust Clearing Corporation "keeps a record of the stocks owned through the clearing brokerage firms for NSCC members, including [Defendant], and establishes financial requirements for clearing brokerage firm members, which include deposit requirements designed to reduce risk to the DTCC."  (Am. CCAC ¶ 31 (alteration added)).

[5] Plaintiffs Chavez and Jang first asserted their claims in the Consolidated Class Action Complaint (*see* [ECF No. 359] ¶¶ 70–77), in response to which Defendant filed a Motion to Dismiss [ECF No. 405].  Plaintiffs then filed the Amended CCAC, thereby rendering moot the initial Motion to Dismiss.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Defendant moves to dismiss the Amended CCAC on the grounds that: (1) Plaintiffs' claims are not properly before the Court as part of this MDL proceeding (*see* Mot. 22–24)[6]; (2) Plaintiffs lack Article III standing (*see id.* 24–28); (3) Plaintiffs fail to state claims upon which relief can be granted (*see id.* 28–57, 61–62); and (4) Plaintiffs' state law tort claims are preempted by federal securities laws (*see id.* 57–61).  Because the Court agrees that Plaintiffs' claims have not been properly consolidated in this MDL, and hence the Court lacks subject matter jurisdiction, the Court does not reach Defendant's remaining arguments.

## II.   LEGAL STANDARD

Subject matter jurisdiction must be established before a case can proceed on the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998).  This is because "[f]ederal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (alteration added).  It is presumed that a federal court lacks jurisdiction in a case until the plaintiff demonstrates the court has jurisdiction over the subject matter.  *See id.* (citing *Turner v. Bank of N. Am.*, 4 U.S. 8, 11 (1799); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 182–83 (1936)).  "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case[.]"  *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001) (alterations added; citations omitted).

A defendant may attack subject matter jurisdiction under Rule 12(b)(1) in two ways — a facial attack or factual attack.  *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).  A facial attack asserts a plaintiff has failed to allege a basis for subject matter jurisdiction in the complaint.  *See id.* (citation omitted).  In a facial attack, the plaintiff's allegations are taken

---

[6] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

as true for purposes of the motion, *see id.* (citation omitted); and the plaintiff is afforded safeguards like those provided in challenging a Rule 12(b)(6) motion raising the failure to state a claim for relief, *see Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (citation omitted).  A district court may *sua sponte* convert a motion to dismiss under Rule 12(b)(6) to a Rule 12(b)(1) motion to dismiss relying on a facial challenge to subject matter jurisdiction.  *See McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1247, 1251 (11th Cir. 2007).

In contrast to a facial challenge, a factual attack "challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  *Menchaca*, 613 F.2d at 511 (citation omitted).  In a factual attack, courts are free to weigh the evidence to satisfy themselves they have the power to hear the case.  *See Lawrence*, 919 F.2d at 1529 (citations omitted).  No presumption of truth attaches to the plaintiff's allegations, and the existence of disputed material facts does not prevent the trial court from evaluating for itself the merits of the jurisdictional claim.  *See id.* (citations omitted).  "In the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists."  *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (citations and footnote call number omitted).

"A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice."  *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (citing *Crotwell v. Hockman-Lewis Ltd.*, 734 F.2d 767, 769 (11th Cir. 1984)).

### III.    ANALYSIS

Defendant presents a factual challenge to the Court's subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. section 1407(a) and the Supreme Court's decision in *Lexecon*

*Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).  (*See* Mot. 22–24; Reply 34–36).  Specifically, Defendant argues both *Lexecon* and Section 1407 require cases consolidated in an MDL to be remanded to their originating courts once pretrial proceedings have concluded.  (*See* Mot. 22).  Because Plaintiffs asserted their claims for the first time directly in the MDL, their claims do not have an originating "home" court to return to (*see id.* 23); and there is no apparent statutory authority that would permit the Court, sitting in its capacity as custodian of the MDL member cases, to accept new complaints or new claims by new plaintiffs directly within the MDL proceeding (*see id.*; Reply 35).  Therefore, Defendant contends the Court lacks subject matter jurisdiction over Plaintiffs, Chavez and Jang's claims.  (*See* Mot. 23; Reply 34–36).[7]  The Court agrees.

Section 1407 sets forth the procedure by which actions may be added to an MDL.  The statute was enacted to authorize the transfer and centralization of existing actions filed in different districts that share common facts.  *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 410 (2015) (citing H.R. Rep. No. 1130, 90th Cong., 2d Sess., 2 (1968)).  Upon a determination that consolidation would promote convenience and efficiency, the JPML may transfer such actions to a "transferee" district for consolidated pretrial proceedings.  *See* 28 U.S.C. §§ 1407(a)–(b).  After the JPML authorizes an MDL and transfers actions to a transferee district, "[a]ny party or counsel in actions previously transferred under Section 1407 shall promptly notify the Clerk of the Panel of any potential tag-along actions in which that party is also named or in which that counsel appears."  J.P.M.L. R. 7.1(a) (alteration added).  The Clerk may then "enter a conditional order

---

[7] Although there are some features of Section 1407 that suggest the issue is a defect in venue, the Court treats it as an issue of subject matter jurisdiction because the parties address it as such in their briefing and other courts that have considered the propriety of direct filing have likewise treated it as a matter of subject matter jurisdiction.  Regardless of whether the defect is one of venue or subject matter jurisdiction, the fate of Plaintiffs, Chavez and Jang's claims remains the same.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

transferring that action to the previously designated transferee district court[.]"   *Id.* 7.1(b) (alteration added).

There is one exception to this process: "[p]otential tag-along actions filed in the transferee district do not require Panel action."  *Id.* 7.2(a) (alteration added).  To invoke this exception, a party filing a tag-along action in the transferee district "should request assignment of such action[] to the Section 1407 transferee judge in accordance with applicable local rules."  *Id.* (alteration added).  Under the Southern District of Florida's Local Rules, counsel is instructed to inform the court if an action is similar or related to another action or proceeding then pending before the court.  *See* L.R. 3.8.  If appropriate, the court will then transfer the newly-filed action to the judge presiding over the existing proceedings.  *See* S.D. Fla. Internal Operating Procedures 2.15.00.

A close review of the language of the MDL statute and Panel rules indicates that a plaintiff's claims are properly before an MDL court only where the plaintiff has first asserted his or her claims in a separate action.  For example, Section 1407 limits those "actions [which] may be transferred to any district for coordinated or consolidated pretrial proceedings" to "civil *actions* involving one or more common questions of fact [that] *are pending in different districts*[.]"  28 U.S.C. § 1407(a) (alterations and emphases added); *see In re Mortg. Elec. Registration Sys. (Mers) Litig.*, No. 09-md-02119, 2016 WL 3931820, at *11 (D. Ariz. July 21, 2016) ("[Section] 1407(a) indicates that all actions must first be filed and pending before that action may be transferred for consolidated pretrial proceedings." (alteration added; citation omitted)).

Similarly, a tag-along action is defined as "a civil *action pending in a district court* which involves common questions of fact with either (1) actions on a pending motion to transfer to create an MDL or (2) actions previously transferred to an existing MDL[.]"  J.P.M.L. R. 1.1(h) (alteration and emphasis added).  Both the statute and the Rules thus presuppose the existence of separate

CASE NO.  21-2989-MDL-ALTONAGA/Torres

"civil actions" that are "pending" in different districts prior to consolidation and transfer into an MDL.  The sole exception to Panel action likewise contemplates the filing of a separate, individual action.  *See id.* 7.2(a) (referring to "potential tag-along *actions* filed in the transferee *district*" rather than directly in an MDL (emphases added)).

As stated, Plaintiffs, Chavez and Jang, did not assert their claims in any separate civil action.  They did not have any separate civil action pending which could have been transferred to the Court by the JPML, either in the first instance upon creation of the MDL or in a later tag-along action.  Plaintiffs did not file a tag-along action in this District or in any court, for that matter, nor did they request consolidation or assignment of their claims to the undersigned.  In short, Plaintiffs did not abide by the procedures prescribed in Section 1407 and the JPML Rules for joining this MDL.  *See In re Mortg. Elec. Registration Sys.*, 2016 WL 3931820, at *6 ("[I]t is clear that neither . . . Section 1407, the Rules of Procedure of the [JPML], nor the Local Rules permit a transferee court to join a new plaintiff in the MDL when such plaintiff never filed his own case or had his case transferred to the court by the [JPML]." (alterations added)).

Plaintiffs' failure to assert their claims in a separate action(s) not only directly contravenes the procedures set forth by statute and Panel Rules, but it is also inconsistent with the Supreme Court's directive that MDL member cases be remanded to their originating courts upon completion of pretrial proceedings.  Section 1407 requires MDL transferee courts, upon the conclusion of pretrial proceedings, to remand "[e]ach action . . . to the district from which it was transferred[.]" 28 U.S.C. § 1407(a) (alterations added); *see also In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-md-2744, 2017 WL 6402992, at *3 (E.D. Mich. Mar. 21, 2017) ("Section 1407 makes clear that the role of a transferee court is to act as a judicial caretaker of actions that come from somewhere else, manage those actions to ready them for trial (or until they are resolved by

CASE NO.  21-2989-MDL-ALTONAGA/Torres

motion or settlement), and then send them back for trial." (citation omitted)), *reconsideration denied*, 2017 WL 6402991 (E.D. Mich. Mar. 23, 2017); *In re: Soc'y Ins. Co. Covid-19 Bus. Interruption Prot. Ins. Litig.*, MDL No. 2964, 2021 WL 3290962, at *6 (N.D. Ill. Aug. 1, 2021) ("The MDL statute is clear in its division of labor between the transferor and transferee district courts, contemplating that the case will originate in its proper home district . . . and then later return to that district for trial." (alteration added; citation omitted)).

The Supreme Court emphasized this statutory language in *Lexecon* and reiterated the transferee court's "obligat[ion]" to send all transferred actions back to their originating districts. *Lexecon*, 523 U.S. at 34 (alteration added).[8] *See also id.* at 35 (explaining that the statute imposes an express "remand duty"); *id.* at 40 (noting the statute's "straightforward language imposing the Panel's responsibility to remand"; quoting the legislative history demonstrating that Congress intended the remand requirement to be obligatory); *In re FCA US*, 2017 WL 6402992, at *3 (explaining the Supreme Court in *Lexecon* held that cases in a Section 1407 MDL "*must* return" to their home districts (emphasis in original; citation omitted)).

Thus, both Section 1407 and *Lexecon* make clear that, "[i]n the unique procedural world of an MDL, the authority of the transferee court to handle the case . . . ends on conclusion of pretrial proceedings." *In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*, MDL No. 33-1439, 2008 WL 4763029, at *3 (D. Or. Oct. 28, 2008) (alterations added; citing *Lexecon*, 523 U.S. at 36–37); *see also In re FCA US*, 2017 WL 6402992, at *3 ("The transferee court is without power to take any further action in the individual cases once [pretrial] proceedings are concluded." (alteration added; citing *Lexecon*, 523 U.S. at 28)).  This is so because "[c]ases

---

[8] In *Lexecon*, the Supreme Court held that a transferee district court did not have the authority under section 1404(a) to transfer an individual MDL action from the originating district to itself for trial, because Section 1407 mandates that MDL member cases be remanded at the conclusion of pretrial proceedings.  *See* 523 U.S. at 34–37, 40.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

consolidated for MDL pretrial proceedings ordinarily retain their separate identities" throughout

the MDL process.  *Gelboim*, 574 U.S. at 413 (alteration added; footnote call number omitted).

Indeed, Section 1407 refers to a multitude of individual "actions"; it does not create "any

monolithic multidistrict action[.]"   *Id.* (alteration added; citation, quotation marks, and footnote

call number omitted); *see also Lexecon*, 523 U.S. at 37 ("Section 1407 [does not] imbu[e]

transferred actions with some new and distinctive . . . character[.]" (alterations added)).   MDL

member cases are "intended to resume their independent status once the pretrial stage of litigation

is over."  *In re Mortg. Elec. Registration Sys.*, 2016 WL 3931820, at *8 (citation and quotation

marks omitted).   And the obligation to remand "each" transferred action, as set forth in Section

1407 and *Lexecon*, reflects that intention.

The addition of plaintiffs directly in an MDL tangibly frustrates these principles.  Plaintiffs

who assert their claims for the first time in an MDL's master pleading lack a case capable of

retaining or resuming a separate identity.   Moreover, the practice leaves transferee courts without

options at the conclusion of pretrial proceedings, as direct-filed cases do not have a transferor

"home" court to which the transferee court can remand them.  *See* J.P.M.L. R. 1.1(j) ("'Transferor

district' is the federal district court where an *action was pending* prior to its transfer pursuant to

Section 1407, for inclusion in an MDL, and where the Panel may *remand that action* at or before

the conclusion of pretrial proceedings." (emphases added)); *see also In re Packaged Ice Antitrust

Litig.*, No. 08-md-1952, 2011 WL 6178891, at *8 (E.D. Mich. Dec. 12, 2011) ("Were the Court to

permit the addition of these [p]laintiffs, the Court would be without options at the time of

remand[.]" (alterations added)); *In re: Soc'y Ins. Co.*, 2021 WL 3290962, at *6 (agreeing with

defendant's observation that direct filing by new plaintiffs puts "*Lexecon* rights at stake, given that

there is no obvious transferor court to which to remand those plaintiffs' claims for trial[,]" and

10

CASE NO.  21-2989-MDL-ALTONAGA/Torres

requiring new plaintiffs to file actions in their home districts before seeking transfer into the MDL (alteration added)); *In re Farmers Ins. Exch.*, 2008 WL 4763029, at *3 (claims by new plaintiffs, which "were not transferred . . . through proper MDL procedures but, rather, were simply added by fiat, . . . had no 'home federal court' to which [the MDL court] could eventually remand them" (alterations added)); *In re Mortg. Elec. Registration Sys.*, 2016 WL 3931820, at *10 ("This Court has no 'home court' to remand [newly-added plaintiff]'s action to at the conclusion of pretrial proceedings because [his] claim was never filed in any court nor transferred to this Court by the [JPML] or by Local Rule." (alterations added; citation omitted)); *In re FCA US*, 2017 WL 6402992, at *3 ("[I]n the case of the newly-named plaintiffs who have never filed any lawsuit anywhere, in any court, there is no 'transferor court' from which this Court could inherit its authority over their claims[,]" and to which the transferee court could remand them.  (alterations added; citation omitted)).

Simply put, the direct addition of new plaintiffs' claims in an MDL is "at odds" with the statutory scheme established by Congress.  *Id.* ("The idea that an MDL proceeding is an environment that can spawn fresh actions by new plaintiffs is at odds with [Section 1407]." (alteration added)); *see also In re Mortg. Elec. Registration Sys.*, 2016 WL 3931820, at *7 (Adding new plaintiffs by amendment in an MDL "directly contradicts the appropriate procedures designated in [Section] 1407 for consolidating cases for pretrial proceedings." (alteration added; citation omitted)); *In re: Soc'y Ins. Co.*, 2021 WL 3290962, at *6 (concluding "it is improper to add new plaintiffs . . . 'directly' to [an] MDL" because "[t]he MDL statute is clear" (alterations added)).

The Court — sitting in its capacity not as an ordinary district court, but as an MDL transferee court — plainly only has jurisdiction over MDL member cases properly transferred or

11

CASE NO.  21-2989-MDL-ALTONAGA/Torres

consolidated under Section 1407 and the accompanying JPML Rules.  *See* 28 U.S.C. § 1407(f)

(permitting the Panel to prescribe additional rules).  It therefore follows, using elementary logic,

that a transferee court does not have jurisdiction over an action that was never "filed" or

"pending[,]" within the meaning of Section 1407.  *Id.* § 1407(a) (alteration added); J.P.M.L. R.

1.1(h), 1.1(j), 7.1, 7.2(a).  It is obvious that an unfiled case does not invoke federal subject matter

jurisdiction in any federal court, let alone an MDL transferee court.  *See* 15 Fed. Prac. & Proc.

Juris. § 3866 (4th ed.) (A transferee judge's authority "does not extend to . . . un-transferred federal

cases[] *or unfiled claims*." (alterations and emphasis added; footnote call number omitted)).  In

other words, a transferee court "does not have subject matter jurisdiction to adjudicate an action

that is lacking in original federal jurisdiction."  *In re Mortg. Elec. Registration Sys.*, 2016 WL

3931820, at *8 (citation and quotation marks omitted); *see also In re Packaged Ice*, 2011 WL

6178891, at *8–9 (Adding new plaintiffs directly to an MDL "ignore[s] basic Article III principles

and . . . bypasse[s] the appropriate MDL process for consolidation of these plaintiffs' claims.";

"While an MDL court has 'substantial discretion' with regard to consolidated cases, [it does] 'not

have the power to override the application of substantive legal standards.'  The Court cannot

simply 'assimilate' these proposed Plaintiffs' claims into this MDL action." (alterations added;

citation omitted)).

    The weight of authority further supports the conclusion that an MDL transferee court lacks

subject matter jurisdiction over claims by new plaintiffs asserted for the first time directly in an

MDL proceeding. *See In re Mortg. Elec. Registration Sys.*, 2016 WL 3931820, at *5–11

(dismissing new plaintiff's claims for lack of subject matter jurisdiction because "[a] plaintiff may

not unilaterally add actions in the MDL that have not been pending in federal court elsewhere or

which were not transferred to the transferee court through the MDL process" (alteration added;

citation omitted; collecting cases)); *In re Farmers Ins. Exch.*, 2008 WL 4763029, at *5 ("I have discovered no authority for this court, as an MDL transferee court, to exercise subject matter jurisdiction over state law claims not transferred by the MDL Panel and [therefore] over which this court lacks original jurisdiction." (alteration added)); *In re Packaged Ice*, 2011 WL 6178891, at *8–9; *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 17-md-2785, 2021 WL 2585065, at *76–77 (D. Kan. June 23, 2021), *reconsideration denied*, 2021 WL 4948269, at *12–13 (D. Kan. Oct. 25, 2021); *see also In re: Soc'y Ins. Co.*, 2021 WL 3290962, at *6 ("The Court has also not been able to find persuasive caselaw that explains precisely, with regard to statutory and precedential authority, how plaintiffs may be added 'directly' to an MDL[.]" (alteration added)); *In re FCA US*, 2017 WL 6402992, at *2–4.[9]  The Court agrees with the analyses undertaken in these cases and finds that it lacks subject matter jurisdiction over Plaintiffs, Chavez and Jang's claims.

Plaintiffs cite *In re Takata Airbag Products Liability Litigation*, 379 F. Supp. 3d 1333 (S.D. Fla. 2019), to support their addition of new plaintiffs directly into the MDL.  There, at first glance, the transferee court appears to have permitted direct filing, in the same manner Plaintiffs, Chavez and Jang, seek to do in this case.  *See id.* at 1336–37, 1338.  But, as Defendant points out (*see* Reply 34), a closer look at the record reveals that the plaintiffs who allegedly "direct-filed" in *Takata* were actually added via amendment to an existing — *separate* — underlying civil action (S.D. Fla., Case No. 14-cv-24009).  *See In re FCA US*, 2017 WL 6402992, at *3 ("None of the cases cited by the plaintiffs endorsed attempts by parties to add newly-named individual plaintiffs

---

[9] *Cf. In re KBR, Inc.*, 736 F. Supp. 2d 954, 978 (D. Md. 2010) (striking consolidated MDL complaint where plaintiffs added new plaintiffs "nowhere to be found in the original forty-three . . . complaints Plaintiffs filed in this action"); *In re Motor Fuel Temperature Sales Pracs. Litig.*, No. 07-md-1840, 2008 WL 7708967, at * 3–4 (D. Kan. Nov. 18, 2008) (denying motion to amend consolidated complaint to add new plaintiffs, or to add new plaintiffs in the underlying cases already consolidated in the MDL but permitting them to file new cases in the underlying jurisdictions).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

without explicitly making them parties to a specific, underlying, properly-transferred case."). By contrast, Chavez and Jang are not affiliated with an underlying civil case number in this District, let alone a proper home district.

In addition, the cases relied on by the *Takata* court are inapposite. *See Takata*, 379 F. Supp. 3d at 1338–39. For example, the plaintiffs in *Heartland Payment Systems* did not file directly into the MDL, as Plaintiffs here have attempted to do. Rather, they filed their own separate suit in the Southern District of Texas, asserting diversity jurisdiction, and then moved to consolidate their suit with actions already consolidated and transferred to that district by the JPML, under Panel Rule 7.2(a). *See In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, MDL No. 2046, 2011 WL 1232352, at *4 (S.D. Tex. Mar. 31, 2011).

Likewise, in *In re Managed Care Litigation*, one case (*Humana*) was filed in the Southern District of Florida, and six others were transferred from the Southern District of Mississippi by the JPML to this District for consolidation with the *Humana* case. *See* 150 F. Supp. 2d 1330, 1334 (S.D. Fla. 2001). "Apparently[,] each [Southern District of Mississippi] [p]laintiff filed [an amended] complaint directly [in the Southern District of Florida] in anticipation of [their] case[s] being transferred from the Southern District of Mississippi . . . by the MDL Panel." *Id.* at 1336 n.5 (alterations added). Nothing in the opinion, however, suggests those plaintiffs attempted to add new plaintiffs in their amended complaints. *See id.* Because the amended complaints merely "reiterat[ed]" the allegations of the original transferred complaints, the court declined to dismiss them on that basis. *Id.* (alteration added).

Unlike the present situation, each of the purportedly "direct-filed" complaints in these cases had its own separate case number and retained its identity throughout the MDL. Thus, although the *Takata* court relies on these cases in support of permitting the addition of new plaintiffs directly

14

CASE NO.  21-2989-MDL-ALTONAGA/Torres

in an MDL, neither case actually stands for that proposition or contemplates "direct filing" in the manner Plaintiffs have done here.[10]

The *Takata* court also cites *In re Vioxx Products Liability Litigation*, 478 F. Supp. 2d 897 (E.D. La. 2007).  In *Vioxx*, the court entered a direct filing order — an entirely separate procedure whereby the defendant waived venue objections on the stipulation that, when pretrial proceedings concluded, the court would remand direct-filed cases (by plaintiffs who did not reside in the transferee district) to a federal district court of proper venue under 28 U.S.C. section 1404(a).  *See In re Vioxx*, 478 F. Supp. 2d at 903–04, 904 n.2.  Similarly, Plaintiffs cite *Wahl v. General Electric Company*, 786 F.3d 491 (6th Cir. 2015), in support of direct filing, but the plaintiffs in that case also direct filed only because the MDL court implemented a direct filing order.  *See id.* at 493.[11] This procedure, purely a creature of stipulation or other agreement, is irrelevant in this case, where the parties have neither stipulated to nor requested entry of a direct filing order, and the Court has not entered one.

Finally, Plaintiffs argue their direct-filed claims should be allowed to proceed in this MDL for efficiency's sake.  (*See* Resp. 25 (stating that direct filing avoids "the seemingly inefficient step of filing-and-transfer from the JPML" (citation and quotation marks omitted)); *id.* 26 (arguing MDLs are "designed to increase efficiency," and direct filing "eliminate[s] the delays associated with transfer of cases into an MDL proceeding" (alteration added; citation omitted))).  Plaintiffs perceive Defendant's subject matter jurisdiction argument as "little more than a stall tactic that would result in the identical outcome of adding [P]laintiffs Jang and Chavez's tort claims to a

---

[10] *Takata* and the cases it cites are also distinguishable because, in each case, the defendants challenged (and the court addressed) personal jurisdiction, not subject matter jurisdiction.

[11] On appeal, the Sixth Circuit did not address the propriety of direct filing, either by order, stipulation, or fiat.  *See generally Wahl*, 786 F.3d 491.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

consolidated action before this MDL Court, but only after wasting time and judicial resources." (*Id.* 27 (alteration added; footnote call number omitted)).

What Plaintiffs appear to ignore is that direct filing, although presumably efficient for plaintiffs on the front end, creates accumulating inefficiencies for the Court and the parties to address on the back end.  Specifically, were the Court to permit direct filing, it would then, at the conclusion of pretrial proceedings, be tasked with conducting a series of mini-trials in order to determine the proper venue for remand.  Such a consequence unquestionably defeats the supposed purpose of direct filing: efficiency.

As they all but admit, Plaintiffs "are simply trying to make an end run around the proper procedural framework that governs MDL proceedings, and to avoid the necessary prerequisites of initiating a civil action or actions in some suitable federal district court . . . , and then seeking transfer and consolidation through the appropriate channels[.]"  *In re FCA US*, 2017 WL 6402992, at *4 (alterations added).  But contrary to Plaintiffs' opinion — and as Defendant correctly points out — the requirement that plaintiffs in an MDL have filed a separate action prior to consolidation and transfer "is not a mere procedural nicety."  (Mot. 23).  "Federal courts are courts of limited jurisdiction[,]" *Kokkonen*, 511 U.S. at 377 (alteration added); and as the Court has explained, failure to assert claims in a separate action prior to consolidation in an MDL deprives a transferee court of subject matter jurisdiction over those claims.  Absent subject matter jurisdiction, the Court is powerless to proceed.  *See Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1092 (11th Cir. 2010) (citing *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999)); *see also In re Packaged Ice*, 2011 WL 6178891, at *9 (rejecting plaintiffs' argument that they "thought they were achieving efficiencies" by direct filing and "making it easier for everyone" because in doing so, they "ignored basic Article III principles" (quotation marks omitted)).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant, Apex Clearing
Corporation's Rule 12 Motion to Dismiss Plaintiffs' Amended Consolidated Other Broker Tranche
Class Action Complaint **[ECF No. 422]** is **GRANTED**.  The Amended Consolidated Class Action
Complaint **[ECF No. 410]** is **DISMISSED without prejudice**.  If Plaintiffs, Chavez and Jang,
wish to assert their claims in this MDL, they must follow the proper procedures for doing so.

Plaintiffs in the Other Broker Tranche of this Multidistrict Litigation have until **February
14, 2022** to file a final amended complaint.

**DONE AND ORDERED** in Miami, Florida, this 10th day of January, 2022.

_Cecilia M. Altonaga_

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:    counsel of record
       *Pro Se* Plaintiffs

17

# TAB 453

# Order re Robinhood Actions

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  21-02989-MDL-ALTONAGA/Torres

In re:

JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION
_____/

This Document Relates to the Robinhood Tranche

## ORDER

**THIS CAUSE** came before the Court on the Motion to Dismiss the Robinhood Tranche

Complaint [ECF No. 421] filed by Defendants Robinhood Markets, Inc.; Robinhood Financial

LLC; and Robinhood Securities, LLC (collectively, "Defendants" or "Robinhood") on October

15, 2021.  Plaintiffs filed a Response in Opposition [ECF No. 436], and Defendants filed a Reply

[ECF No. 439].  The Court has carefully considered the Amended Consolidated Class Action

Complaint [ECF No. 409], the parties' written submissions, the record, and applicable law.

## INTRODUCTION

This case is about meme stocks.[1]  In January 2021, scores of retail investors rushed to

purchase stocks that hedge funds and institutional investors had bet would decline in value, causing

a dramatic increase in those stocks' share prices.  The mass rush to purchase these "meme stocks"

led to a highly volatile securities trading market, with the prices of certain stocks varying wildly

by the hour.

---

[1] The Securities and Exchange Commission ("SEC") recently defined "meme stocks" as stocks that
"experienced a dramatic increase in their share price in January 2021 as bullish sentiments of individual
investors filled social media."  SEC, *Staff Report on Equity and Options Market Structure Conditions in
Early 2021*, at 2 (Oct. 28, 2021), https://www.sec.gov/files/staff-report-equity-options-market-struction-
conditions-early-2021.pdf.

CASE NO.  21-02989-MDL-ALTONAGA/Torres

For securities brokers who execute investor trades, the regulatory environment became correspondingly unpredictable.  In the securities trading industry, registered clearing brokers must meet daily deposit requirements set by self-regulatory organizations.  The amount clearing brokers must deposit each day depends on the level of volatility in the securities they trade.  The purpose of deposit requirements is to stabilize the marketplace and reduce the risk that market participants will prove unable to meet financial obligations related to securities trades.

When meme stock share prices took off in January 2021, regulators reacted.  In a span of three days, Robinhood Securities, a clearing broker, incurred both a deposit *surplus* of $11 million and a deposit *deficit* of over $3 billion.  These oscillating collateral requirements were driven primarily by Robinhood customers' concentrated positions in meme stocks.  Robinhood Securities proved able to meet its daily deposit requirements each day up to January 28, 2021.

Still, it and its affiliates — parent company Robinhood Markets and introducing broker Robinhood Financial — grew concerned about the rapidly changing circumstances.  It then made the fateful decision to restrict purchases of the meme stocks on the Robinhood platform for a week.  That decision helped fix Robinhood's compliance quandary.  But, Robinhood customers say, it also forced share prices of the meme stocks into a steep decline.

Several of those customers sued Robinhood, and their suits were consolidated into this Multi-District Litigation.[2]   Robinhood now moves to dismiss.  The Motion to Dismiss challenges whether any of Plaintiffs' seven claims is viable.

---

[2] The Plaintiffs are Andrea Juncadella, Edward Goodan, William Makeham, Mark Sanders, Jaime Rodriguez, Patryk Krasowski, Cody Hill, Sammy Gonzalez, Joseph Daniluk, Jonathan Cornwell, Paul Prunean, and Julie Moody.  (*See* Am. Compl. ¶¶ 29–84).

CASE NO. 21-02989-MDL-ALTONAGA/Torres

## BACKGROUND

I.     **The Mechanics of Securities Trading**

    a.  **Securities Transactions**

A securities transaction involves several steps.  A decision to invest in or disinvest from a particular security is referred to as taking a "position."  Positions may be long or short.  A "long" position refers to the purchase of a security based on the belief that its value will rise over time.  Investors who take a long position on a security may close their position by selling the security.

By contrast, a "short" position assumes that the price of the security will fall.  (*See* Am. Compl. ¶ 106 n.8).  Short position holders typically borrow a security from a lender, sell the security at a high price, and then purchase the security at a much lower price before it is due back to the lender.  (*See id.*).  Short traders earn revenue from the difference between the purchase and sale prices of the shorted security.  (*See id.*).  If the price of the security increases between the time of the sale and repurchase, the short seller incurs a loss.  (*See id.*).

Investors may initiate a securities transaction by placing an order to buy or sell a security with an introducing broker.  (*See id.* ¶¶ 89–90; Robinhood Financial LLC Form CRS Relationship Summ., Am. Compl. Ex. B [ECF No. 409-2] 2 [hereinafter CRS]).[3]  The introducing broker may choose to accept or reject the order.  (*See, e.g.*, Robinhood Financial LLC & Robinhood Securities, LLC Customer Agreement, Am. Compl. Ex. A [ECF No. 409-1] § 16 [hereinafter Cust. Agmt.]).  If the introducing broker accepts an order, it sends the order to a clearing broker.  (*See* Am. Compl. ¶ 93; CRS 2).

Clearing brokers forward accepted orders to "market makers" — firms that execute the orders.  (Am. Compl. ¶ 140).  In executing orders, market makers determine what prices investors

---

[3] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

CASE NO.  21-02989-MDL-ALTONAGA/Torres

will pay and receive.  (*See id.*).  Market makers profit by buying and selling the ordered securities

for better prices than those investors pay or receive.  (*See id.*).  Thus, market makers pay brokers

like Robinhood significant sums for the right to fill investors' orders.  (*See id.*).  These payments

are known in the industry as "payment for order flow."  (*Id.* ¶ 137; *see id.* ¶¶ 137–41).  A

consequence of this revenue structure is that brokers earn more the more that investors trade.  (*See

id.* ¶ 137).

### b.  Regulation of Securities Markets

After an order is executed, the clearing broker submits the trade to a clearinghouse for final

clearance and settlement.  (*See id.* ¶¶ 152–54).  The National Securities Clearing Corporation

("NSCC") is the main clearinghouse for securities traded in the United States.  *See* Rules Relating

to Confidentiality Requirements and Market Disruption Events, 86 Fed. Reg. 57,230 (Oct. 8,

2021).  The NSCC is part of a larger holding company called the Depository Trust & Clearing

Corporation ("DTCC") that operates clearing agencies registered with the Securities and Exchange

Commission ("SEC"), the independent agency authorized to regulate U.S. financial markets.  *See

id.*; 15 U.S.C. § 78d.

Securities trading can be risky.  Sometimes, market participants will be unable to meet

obligations in connection with their trades.  (*See, e.g.*, Am. Compl. ¶ 158).  This possibility creates

risks not just for the parties to a particular transaction, but also for the market as a whole.  (*See

id.*).  In part for that reason, the securities trading industry is heavily regulated.

The DTCC plays an important role in mitigating systemic risk to securities markets.  It

"keeps a record of the stocks owned through the clearing brokerage firms for NSCC members"

and imposes daily deposit requirements on clearing brokers.  (*Id.* ¶ 152; *see id.* ¶ 156).  The DTCC

sets daily deposit requirements based on several volatility-based metrics.  (*See id.* ¶¶ 156, 158).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

For example, if the DTCC determines that certain securities are particularly risky, it may assign those securities a "volatility multiplier" that increases the amount of collateral a clearing broker must post.  (*Id.* ¶ 156).  Although the DTCC follows formulas in setting deposit requirements, it also retains discretion to depart from formulaic calculations.  (*See, e.g.*, *id.* ¶ 223).  Clearing brokers must meet the deposit requirements set by the DTCC every trading day by 10:00 a.m. EST until their trades clear and settle.  (*See id.* ¶ 156).  A broker that fails to meet the DTCC's daily requirements might suffer significant penalties, including the forced liquidation of its business.  (*See id.* ¶ 155).  The DTCC may also require intraday deposits.  (*See id.* ¶¶ 209, 212).

Securities brokers and dealers must comply with regulations issued by the Financial Industry Regulatory Authority, or "FINRA."  Although FINRA is a private nonprofit corporation, it is authorized by statute to regulate the trading of certain types of securities.  *See* 15 U.S.C. § 78o-3(b).  FINRA rules obligate members to "observe high standards of commercial honor and just and equitable principles of trade."  FINRA Rule 2010.[4]  FINRA also requires its members to design and implement supervisory systems that permit them to monitor and mitigate systemic risks.  *See* FINRA Rule 3110; FINRA Rule 4370; (*see also* Am. Compl. ¶ 169).  On March 18, 2021, FINRA issued a notice announcing: "Fair dealing is a core principle that underlies many FINRA rules, and FINRA guidance repeatedly has emphasized the importance of preserving fair customer treatment, even during times of market stress."  FINRA Regulatory Notice 21-12.

The SEC likewise issues regulations to sustain the health of securities markets.  Brokers must comply with the SEC's Net Capital Rule, which requires all registered brokers and dealers to "at all times have and maintain net capital no less than the greater of the highest minimum

---

[4] The Court takes judicial notice of FINRA regulations under Federal Rule of Evidence 201, subsections (b)(2) and (d).  *See Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 294 (2d Cir. 2021) (taking judicial notice of FINRA rules).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

requirement applicable to its ratio requirement . . . and [to] otherwise not be 'insolvent[.]'" 17 C.F.R. § 240.15c3-1(a) (alterations added); *see also id.* § 240.17Ad-22.  Ultimately, liquidity-focused regulations like the Net Capital Rule and the DTCC deposit requirements aim to preserve market stability and protect investors from broker defaults.  (*See* Am. Compl. ¶¶ 158, 161).

## II.    Robinhood and its Customers

### a.    Robinhood's Business Model and Compliance History

Robinhood is a collection of financial services companies that prides itself on "democratiz[ing] finance" and providing "everyone [with] access to the financial system."  (*Id.* ¶¶ 1, 108 (alterations added; emphasis, citations, and quotation marks omitted)).  Three Robinhood entities are relevant here.  Robinhood Markets, Inc. is the parent company of Robinhood Financial LLC and Robinhood Securities, LLC.  (*See id.* ¶¶ 85–94).  Robinhood Financial is a customer-facing introducing broker that offers investors access to various types of financial assets on its electronic trading platform.  (*See id.* ¶ 88).  Robinhood Securities clears trades introduced to customers by Robinhood Financial.  (*See id.* ¶ 93).

Robinhood Financial and Robinhood Securities are registered brokers and FINRA members.  (*See id.* ¶¶ 89, 92).  Robinhood Securities is a member of the NSCC and DTCC.  (*See id.* ¶ 92).

In its effort to "democratize finance[,]" Robinhood provides customers with an electronic trading platform that caters to non-professional retail investors.  (*Id.* ¶ 108 (alteration added; citation and quotation marks omitted)).  Robinhood does not charge customers commissions for trades or require them to maintain account minimums to invest.  (*See id.* ¶¶ 107, 109, 133).  Because Robinhood does not charge commissions, it derives most of its revenue from payment for order flow.  (*See id.* ¶¶ 142, 145).

6

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Robinhood also offers customers various user-friendly educational resources.  These tools include the "Robinhood Snacks" daily podcast with courses on the basics of investing; the "Robinhood Snacks" newsletter, which provides daily financial news to tens of millions of people; "Robinhood Learn," a series of web publications with tutorials on investment fundamentals; and Robinhood's "Gold" paid subscription service, which provides professional market research and data prepared by outside research firms like Morningstar and NASDAQ.  (*Id.* ¶ 123 (citations and quotation marks omitted); CRS 2).  Additionally, Robinhood provides its customers with cash management services that enable them to write checks, withdraw funds, and make payments with Robinhood-branded debit cards.  (*See* Am. Compl. ¶ 123).

Other features make Robinhood's trading platform especially attractive to younger, less experienced investors who use smartphones.  (*See id.* ¶ 133).  The platform uses a variety of "behavioral nudges" and "gamification" features, including emojis, prizes, graphics, and animation.  (*Id.* ¶¶ 128–29 (citation and quotation marks omitted)).  For instance, traders might receive an image of falling confetti after making their first trade using Robinhood's smartphone application.  (*See id.* ¶ 130).

Robinhood's access-focused approach to facilitating trading has fueled rapid company growth.  Between 2015 and today, Robinhood's customer base increased from 500,000 to more than 31 million.  (*See id.* ¶ 116).  By the second quarter of 2021, Robinhood had 21 times the number of funded customer accounts than it did in 2016.  (*See id.* ¶ 117).

The Amended Complaint alleges that Robinhood was unprepared to scale up its business to then-current levels and connects this putative unpreparedness to a series of regulatory violations.  (*See id.* ¶¶ 146–151).  Between 2015 and 2016, Robinhood Financial violated FINRA rules by, among other things, failing to satisfy its obligations of best execution and to maintain supervisory

CASE NO.  21-02989-MDL-ALTONAGA/Torres

systems and procedures designed to satisfy those obligations.  (*See id.* ¶ 149).  FINRA fined Robinhood Financial $1,250,000 as a result.  (*See id.* ¶ 148).

In June 2021, FINRA again penalized Robinhood Financial, this time to the tune of $70 million, after finding "systemic supervisory failures and significant harm suffered by millions of customers."  (*Id.* ¶ 146 (quotation marks omitted)).  The acts and omisions pertained to Robinhood's "false and misleading statements to customers, failure to supervise technology critical to providing customers with core broker-dealer services, and failure to create a reasonably designed business continuity plan[.]"  (*Id.* ¶ 147 (alteration added; quotation marks omitted)).  The $70 million fine was the largest financial penalty ever imposed by FINRA.  (*See id.* ¶ 146).

The Amended Complaint alleges that Robinhood's reliance on payment for order flow "create[s] conflicts of interest" because Robinhood earns greater profit the more its customers trade.  (*Id.* ¶ 144 (alteration added; citation and quotation marks omitted); *see id.* ¶ 137).  It further alleges that Robinhood has designed its trading platform in a manner "intended to keep the attention of [Robinhood] users" and "draw inexperienced investors into risky trading." (*Id.* ¶ 129 (alteration added)).  These features allegedly go beyond merely introducing investors to securities and executing trades.  According to Plaintiffs, the Robinhood platform's "gamified" features "encourage more rapid trading than a buy-and-hold approach[] and . . . recommend particular strategies, such as option trading or use of margin."  (*Id.* ¶ 131 (alterations added; citation and quotation marks omitted)).

### b.  The Customer Agreement

Robinhood requires its customers to enter into a Customer Agreement between the customer, Robinhood Financial, and Robinhood Securities.[5]  (*See, e.g.*, *id.* ¶¶ 311, 328).  Each of

---

[5] Robinhood Markets is not a party to the Customer Agreement.  (*See* Cust. Agmt.; Mot. 21 n.8).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

the Plaintiffs entered into the Customer Agreement.  (*See* Am. Compl. ¶¶ 30, 34, 42, 47, 51, 55, 61, 65, 69, 73, 77, 81, 311, 328).  In it, they agreed to "appoint Robinhood Financial as [their] agent for the purpose of carrying out [their] directions to Robinhood Financial in accordance with the terms and conditions of th[e] Agreement and any attendant risks with respect to the purchase or sale of securities."  (Cust. Agmt. § 4 (alterations added)).

The Customer Agreement suggests that customers bear responsibility for their own investment decisions on Robinhood's platform.  Investors who sign the Customer Agreement agree that their Robinhood accounts are "self-directed," they are "solely responsible for any and all orders" made on their account, and their orders reflect their "own investment decisions[.]" (Cust. Agmt. § 5.A (alteration added)).  They also agree that Robinhood Financial and Robinhood Securities do not "provide investment advice in connection with [the customer's] Account" or "recommend any security, transaction or order[.]"  (*Id.* (alterations added)).

Several provisions of the Customer Agreement purport to reserve Robinhood's discretion to accept customer orders and restrict customers' abilities to trade on its platform.  These are a few examples:

- Robinhood Financial and Robinhood Securities "may at any time, at [their] sole discretion and without prior notice to [the customer] (i) prohibit or restrict [the customer's] access to the use of the App or the Website or related services and . . . ability to trade, (ii) refuse to accept any of [the customer's] transactions, (iii) refuse to execute any of [the customer's] transactions, or (iv) terminate [the customer's] Account."  (*Id.* § 16 (alterations added)).

- Robinhood Financial and Robinhood Securities "may, in [their] discretion, prohibit or restrict the trading of securities, or the substitution of securities, in any of [the customer's] Accounts."  (*Id.* (alterations added)).

- Robinhood Financial and Robinhood Securities "may at any time, in [their] sole discretion and without prior notice . . . prohibit or restrict [the customer's] ability to trade securities."  (*Id.* § 5.F (alterations added)).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Section 13 of the Customer Agreement is captioned "Market Volatility; Market Orders; Limit Orders; and Queued Orders."  (*Id.* § 13).  Section 13 addresses what customers can expect in a volatile securities market.  It provides: "Particularly during periods of high volume, illiquidity, fast movement or volatility in the marketplace, the execution price received may differ from the quote provided on entry of an order, and [customers] may receive partial executions of an order at different prices."  (*Id.* (alteration added)).  Despite its caption, Section 13 does not state that it contains an exhaustive list of rights that Robinhood retains to address volatile market conditions.

Finally, the Agreement contains a choice-of-law clause that states:

> This Agreement and all transactions made in [the customer's] Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof), except to the extent governed by the federal securities laws, FINRA Rules, and the regulations, customs and usage of the exchanges or market (and its clearing house) on which transactions are executed.

(*Id.* § 37.K (alteration added)).

The Customer Agreement is attached to the Complaint.

## III.    The Meme Stock Short Squeeze

### a.   The Short Squeeze Drives Volatility and Large Daily Deposit Requirements

Plaintiffs' claims center around the rapidly shifting conditions of securities trading markets in January 2021.  That month, many retail investors, including Plaintiffs, collectively began purchasing stocks that hedge funds were short selling.  (*See* Am. Compl. ¶¶ 183–84).  The mass rush to purchase these meme stocks upended many institutional investors' and regulators' expectations and volatilized the securities trading market.[6]  (*See id.* ¶¶ 185, 191, 209, 213, 239).

---

[6] The "meme stocks" at issue in this case include GameStop Corporation (GME); Blackberry Ltd. (BB); Nokia (NOK); AMC Entertainment Holdings, Inc. (AMC); American Airlines Group, Inc. (AAL); Bed Bath & Beyond, Inc. (BBBY); Castor Maritime, Inc. (CTRM); Express, Inc. (EXPR); Koss Corporation (KOSS); Naked Brand Group Ltd. (NAKD); Sundial Growers, Inc. (SDNL); Tootsie Roll Industries, Inc. (TR); and Trivago NV (TRVG).  (*See* Am. Compl. ¶ 4).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

For example, the closing share price of GameStop Corporation (GME), a meme stock, increased by more than 707 percent between January 21 and January 27, 2021.  (*See id.* ¶¶ 185, 191).

The precipitously increasing value of the meme stocks resulted in a "short squeeze."  (*Id.* ¶¶ 187–88).  A short squeeze occurs when the price of a security that traders have taken short positions on begins rising, thus pressuring short traders to repurchase shares to prevent even greater losses.  (*See id.*).  In a short squeeze, investors who take long positions benefit from securities' rising prices, while short sellers risk incurring significant losses.  (*See id.* ¶ 189).  Market makers whose payments for order flow account for the majority of Robinhood's revenue were among the investors who had taken short positions on the meme stocks.  (*See id.* ¶ 190).  Thus, according to Plaintiffs, the short squeeze pitted the interests of Robinhood's retail-investor customer base against those of Robinhood's revenue-generating clients.  (*See id.*).

As the squeeze progressed, Robinhood sensed that something was awry.  One Robinhood "insider" suggested "consider[ing] the risks our customers face[,]" noting that "[a]lthough we don't have a straightforward obligation here because our customers are self directed, the perception is that they are relatively inexperienced[.]"  (*Id.* ¶ 195 (alterations added; emphases omitted)).  On January 26, 2021, Jim Swartwout, Robinhood Securities' President and COO, told others: "I sold my AMC today.  FYI — tomorrow morning we are moving GME to 100% - so you are aware."  (*Id.* ¶ 12 (quotation marks omitted)).

---

Throughout the Complaint, Plaintiffs refer to these stocks as the "Suspended Stocks," while Defendants call them "meme stocks," borrowing the phrase assigned to the stocks by popular and social media.  At the time the market volatility began in January 2021, Robinhood had not yet suspended trading on its platform. Thus, the Court refers to the stocks as "meme stocks" here but alternates between the phrases "meme stocks" and "suspended stocks" as contextually appropriate.

Both AMC and GME are meme stocks.  (*See id.* ¶ 4).  On January 27, 2021, Robinhood broke its record for single-day app downloads and became the number one app on the Apple App Store for the first time.  (*See id.* ¶ 203).

The ongoing market volatility exposed Robinhood Securities to wildly fluctuating daily deposit requirements.  On January 25, 2021, the NSCC informed Robinhood Securities that it had a deposit surplus exceeding $11 million.  (*See id.* ¶ 208).  Just two days later, the firm had a deposit *deficit* of roughly $407 million.  (*See id.* ¶ 213).

This volatility culminated early the next morning — January 28, 2021 — when the NSCC advised Robinhood Securities that its deposit deficit had ballooned to *more than $3 billion*.  (*See id.* ¶ 215).  The NSCC's notice also warned that "[i]f an intraday call is made, all deficits must be received within one hour of the notification[.]"  (*Id.* (alterations added; emphasis omitted)).  Markets would not open for several more hours.  (*See id.*; Resp. 23).  In an internal communication, a Robinhood employee said, "We aren't paying $3B worth."  (Am. Compl. ¶ 219 (emphasis and quotation marks omitted)).

Plaintiffs suggest that Robinhood was never in real danger of having to pay the initial $3 billion deficit because "[t]he DTCC was willing to work with Robinhood, adjust the premiums, and not let it fail."  (*Id.* ¶ 218 (alteration added); *see also id.* ¶ 234).  The morning of January 28, Robinhood Markets Chief Operating Officer David Dusseault told colleagues in a Slack chat that Robinhood was "to [sic] big for [the NSCC] to actually shut us down."  (*Id.* ¶ 6 (second alteration added; emphasis, footnote call number, and quotation marks omitted)).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

### b.  Robinhood's Position Closing Only ("PCO") Policy

Several hours after receiving the NSCC's notice, but before markets opened for the day, Robinhood elected to prohibit further purchases of some, but not all, of the meme stocks.[7]  (*See id*. ¶¶ 219–20).  Although Plaintiffs allege that Swartwout, in his capacity as COO of Robinhood Securities, made the ultimate decision to restrict these stock purchases (*see id*. ¶ 28), they at times suggest that all three Defendants collectively made the decision (*see id*. ¶ 219).

The initial restriction on purchases of the meme stocks was a "position closing only" or "PCO" restriction.  (*Id*. ¶¶ 7, 15–16, 219–20, 240, 247).  A PCO restriction permits customers to close out their positions on the restricted stocks by selling their holdings but prohibits them from purchasing new shares.  (*See id*. ¶¶ 3, 7).  The initial PCO restriction affected Plaintiffs.  They and other Robinhood customers could not purchase shares of the meme stocks covered by the restriction on January 28.  (*See id*. ¶¶ 240–41).  And Robinhood notified those customers who had placed orders to purchase shares of those stocks the day before that their orders were cancelled. (*See id*. ¶¶ 242–44).

Markets still had not opened on January 28 when the NSCC informed Robinhood Securities that it had waived the excess capital premium charge for the day, decreasing Robinhood Securities' deposit deficit to $1.4 billion.  (*See id*. ¶ 223).  Shortly after Robinhood Securities received the NSCC's notice, Robinhood Securities' Clearing Operations Manager wrote in a note, "We don't have that either."  (*Id*. ¶ 224 (quotation marks omitted)).  The NSCC reduced Robinhood's deposit deficit "despite no change in the underlying factors that go into a calculation of the risk of the"

---

[7] The stocks covered by this initial restriction included GameStop Corporation; Blackberry Ltd.; Nokia, AMC Entertainment Holdings, Inc.; Bed Bath & Beyond, Inc.; Express, Inc.; Koss Corporation; and Naked Brand Group Ltd.  (*See* Am. Compl. ¶ 220).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

meme stocks.  (*Id.* ¶ 223).  The NSCC then further reduced the firm's net deposit requirement —

again before markets opened for the day — to roughly $734 million.  (*See id.* ¶ 225).

Robinhood met its revised deposit requirements shortly after 9 a.m. EST that morning.

(*See id.* ¶ 235).  Yet Robinhood kept its initial PCO restriction in place.  (*See id.*).  In the meantime,

Robinhood Securities rushed to raise enough cash to meet clearinghouses' rapidly evolving deposit

requirements.  (*See id.* ¶¶ 226–34).  The firm managed to round up roughly $3.4 billion in a few

days, including hundreds of millions of dollars borrowed from its parent, Robinhood Markets.

(*See id.* ¶¶ 226–34, 265).  Robinhood Securities drew some of these funds from several revolving,

unsecured lines of credit with Robinhood Markets worth $550 million.  (*See id.* ¶¶ 99, 232).

Throughout the next week, Robinhood adjusted the restrictions placed on users.  Later on

January 28, Robinhood applied its PCO restriction to all of the meme stocks, citing "current market

volatility."  (*Id.* ¶ 247 (quotation marks omitted); *see id.* ¶ 248).  It raised margin requirements —

the amount of the purchase price that an investor must pay in cash — for certain securities.  (*See*

*id.* ¶ 249).  It also imposed limitations on long option contracts and capped the numbers of shares

and options contracts that a user could hold in some securities.  (*See id.* ¶ 259).  On January 29,

Robinhood permitted customers to purchase limited shares of most of the suspended stocks.  (*See*

*id.* ¶ 261).[8]

The next day, the SEC released an investor alert summarizing the risks associated with

short-term trading based on recommendations made on social media.  *See* SEC, *Thinking About*

*Investing in the Latest Hot Stock*? (Jan. 30, 2021), https://www.sec.gov/oiea/investor-alerts-and-

bulletins/risks-short-term-trading-based-social-media-investor-alert (hereinafter SEC Invs. Alert).

---

[8] The only meme stock not covered by this restriction was Castor Maritime, Inc.  (*See* Am. Compl. ¶¶ 4,
261).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

The Alert warned that "broker-dealers may reserve the ability to reject or limit customer transactions[,]" especially when "a transaction presents certain associated compliance or legal risks." *Id.* (alteration added).  It also noted that the flexibility to impose such restrictions "is typically discussed in the customer account agreement."[9]  *Id.*

Robinhood lifted all purchasing restrictions on February 5.  (*See* Am. Compl. ¶ 266).  Plaintiffs acknowledge that other broker-dealers imposed trading restrictions during the same week.  (*See id.* ¶¶ 252–53).  But they assert that Robinhood's restrictions lasted longer and swept more broadly than those implemented by its peers.  (*See id.*).

Robinhood publicly explained its decision to impose the PCO restrictions.  In a January 28, 2021 blog post, Robinhood Markets' Chief Executive Officer, Vlad Tenev, suggested that Robinhood had imposed the restrictions because of "market volatility[.]"  (*Id.* ¶ 235 (alteration added; quotation marks omitted)).  Tenev later testified before Congress that Robinhood imposed the restrictions "[i]n the face of . . . unprecedented volatility . . . to facilitate compliance with clearinghouse deposit requirements."[10]  *Hearing Before the H. Comm. on Fin. Servs.*, 117th Cong. 8 (2021) (statement of Vlad Tenev, Chief Executive Officer, Robinhood Markets, Inc.) (alterations added),   https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-20210218.pdf.

---

[9] Federal Rule of Evidence 201(b)(2) allows the Court to take judicial notice of the SEC's statement.

[10] The Amended Complaint references portions of Tenev's testimony.  (*See* Am. Compl. ¶ 235).  The Court takes judicial notice of Tenev's full statement to Congress under Federal Rules of Evidence 201 (b)(2) and (d).  *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 n.12 (D.D.C. 2020); *see also In re Healthsouth Corp. Secs. Litig.*, No. CV-98-J-2634-S, 2000 WL 34211319, at *2 (N.D. Ala. Dec. 13, 2000) (taking judicial notice of congressional testimony on motion to dismiss).  Plaintiffs have neither contested Defendants' citation to Tenev's full testimony (*see* Mot. 18 n.6) nor requested to be heard further on the matter, *see* Fed. R. Evid. 201(e).  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1279 (11th Cir. 1999) ("The prohibition against going outside of the facts alleged in the complaint protects against a party being caught by surprise when documents outside the pleadings are presented at that early stage.  However[,] in the instant case, . . . Plaintiffs were well aware of the [documents]." (alterations added)).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Robinhood Markets made similar statements in its most recent SEC registration statement. (*See* Resp. 24 (citation omitted)).  In that statement, Robinhood Markets suggested if it failed to meet clearinghouse deposit requirements, it could "be forced to restrict trading in certain stocks[.]"[11]  Robinhood Markets, Inc., Registration Statement (Form S-1) 37 (July 1, 2021) (alteration added); (*see also* Am. Compl. ¶ 178).

## IV.    Procedural History

On April 1, 2021, the U.S. Judicial Panel on Multi-District Litigation consolidated various actions relating to the events of January 2021 into this Multi-District Litigation.  (*See* Transfer Order [ECF No. 1]).  The parties later filed a Joint Status Report that contemplated the filing of "Master Complaints" in this tranche and others.  (Joint Status Report [ECF No. 322] 2).  The parties stipulated that the "Master Complaints will supersede the individual complaints filed to date and will constitute the operative pleadings with respect to those claims pursuant to Fed. R. Civ. P. 8."  (*Id.*).

The Court then entered an Order providing deadlines for filing a master complaint in each tranche.  (*See* June 3, 2021 Order [ECF No. 323] 1–2).  In the Order, the Court partially stayed discovery.  (*See id.* 2).  The partial stay required Defendants to produce to Plaintiffs the same records already produced to Congress and other governmental entities but halted further production.  (*See id.*).  That discovery turned out to be substantial, so the Court granted Plaintiffs' request for an extension of time to amend their initial Complaint to allow them to review the many

---

[11] The Court likewise takes judicial notice of this statement from the S-1 form that Robinhood submitted to the SEC on July 1, 2021, because Plaintiffs have quoted it in their filings, and it is not subject to reasonable dispute.  *See* Fed. R. Evid. 201(b)(2), (d); *see also Bryant*, 187 F.3d at 1278–79 (taking judicial notice of SEC filing because "SEC filings are generally recognized as the most accurate and authoritative source of public information about a company").

documents Defendants produced.  (*See* Pls.' Unopposed Motion for Extension of Time [ECF No. 334] 1; July 8, 2021 Order [ECF No. 335] 1).

Plaintiffs filed an initial Complaint [ECF No. 359] on July 27, 2021.  After Defendants moved to dismiss it (*see* [ECF No. 406]), Plaintiffs filed the Amended Complaint on September 21, 2021.  (*See* Am. Compl. [ECF No. 409]).  Focusing on the PCO restrictions that Robinhood placed on customer accounts between January 28 and February 5, 2021, the Amended Complaint asserts seven causes of action on behalf of Plaintiffs and a putative class.

In Counts I and II, Plaintiffs allege negligence and gross negligence, respectively, against all three Defendants.[12]  (*See id.* ¶¶ 282–301).  Count III claims that Robinhood Securities and Robinhood Financial breached fiduciary duties owed to Plaintiffs.  (*See id.* ¶¶ 302–308).  Counts IV and V assert breaches of certain implied covenants against Robinhood Securities and Robinhood Financial.  (*See id.* ¶¶ 309–33).  Count VI alleges that Robinhood Markets tortiously interfered with Plaintiffs' business relationships with the other Defendants.  (*See id.* ¶¶ 334–41).  Finally, Count VII seeks to hold all three Defendants liable for civil conspiracy.  (*See id.* ¶¶ 342–46).

Defendants move to dismiss the Amended Complaint.  (*See* Mot.).  They argue that their duties to Plaintiffs are defined by the Customer Agreement rather than by tort law.  (*See id.* 22–26).  And because the Customer Agreement permitted Robinhood to restrict customers' abilities to trade, Defendants assert that their decision to impose the PCO restrictions did not transgress their obligations under the Agreement.  (*See id.* 12).

---

[12] The Court assumes Plaintiffs intended to sue Robinhood Markets in Counts I and II, even though neither Count expressly names Robinhood Markets as a Defendant or singles out Robinhood Markets in any of its allegations.  (*See* Am. Compl. ¶¶ 282–301).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

## STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A pleading withstands a motion to dismiss if it alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).  A complaint's "well-pled allegations must nudge the claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Typically, a court must confine its review of a motion to dismiss to the four corners of the complaint, including any attached exhibits. *See Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (citing *Brooks*, 116 F.3d at 1368).  But courts may take judicial notice of matters "not subject to reasonable dispute," including stock prices. *La Grasta v. First*

CASE NO.  21-02989-MDL-ALTONAGA/Torres

*Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) (citations omitted); *see also* Fed. R. Evid. 201(b).

District courts must liberally grant leave to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (holding that Rule 15(a)(2) limits a district court's discretion to dismiss pleadings without leave to amend). Only a "substantial reason" for denying leave to amend will justify the denial. *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1520 (11th Cir. 1996) (quoting *Shipner v. E. Air Lines, Inc.*, 868 F.2d 401, 407 (11th Cir. 1989)).   A plaintiff who seeks to amend a complaint under Federal Rule of Civil Procedure 15(a)(2) must request leave by filing a written motion and setting forth the substance of the proposed amendment. *See United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1361–62 (11th Cir. 2006) (citations and footnote call number omitted).

## DISCUSSION

### I.    Choice of Law

Plaintiffs and Defendants agree that California law governs Plaintiffs' contract claims (Counts IV and V). (*See* Resp. 26 n.12; Reply 31 n.15).  They disagree about what law applies to Plaintiffs' tort claims (Counts I, II, III, VI, and VII). (*See* Resp. 26–30; Reply 14–15).  Defendants cite the Customer Agreement's choice-of-law clause's selection of California law to insist that California law extends to the tort claims.  (*See* Reply 14–15).  Plaintiffs argue that the tort claims fall outside the scope of the choice-of-law clause and Florida's "most significant relationship" test requires applying Florida law to these claims.  (Resp. 28–30).

Consolidated pleadings in multidistrict litigation are generally a procedural device that facilitates streamlined litigation and does not affect the substantive rights of the parties.  *See In re 21st Century Oncology Customer Data Breach Litig.*, 380 F. Supp. 3d 1243, 1258–59 (M.D. Fla.

2019) (citing *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1332 (S.D. Fla. 2016)).

Thus, in multidistrict litigation, the transferee court usually must follow the choice-of-law rules of

the forum state of each transferor court. *See id.* at 1258. But parties to multidistrict litigation may

consent to filing a "master complaint" that supersedes the previously filed individual pleadings

and merges the transferred actions until pretrial proceedings have concluded. *Gelboim v. Bank of

Am. Corp.*, 574 U.S. 405, 413 n.3 (2015). When parties consent to filing a superseding master

complaint, the transferee court becomes the forum court, and the choice-of-law rules of the

transferee court's forum state apply. *See In re Bridgestone/Firestone, Inc. Tires Prods. Liab.

Litig.*, 155 F. Supp. 2d 1069, 1078 (S.D. Ind. 2001).

Here, the parties agreed that Plaintiffs' Complaint would supersede all previous pleadings.

(*See* Joint Status Report 2). So, Florida's choice-of-law rules apply.

Under Florida's choice-of-law rules, courts need not decide a choice-of-law dispute unless

a true conflict of laws exists. *See Hatton v. Chrysler Canada, Inc.*, 937 F. Supp. 2d 1356, 1367

(M.D. Fla. 2013). "A false conflict can exist under at least three different circumstances." *Tune

v. Philip Morris Inc.*, 766 So. 2d 350, 352 (Fla. 2d DCA 2000). Those circumstances include (1)

when the laws of the relevant jurisdictions are the same; (2) when the laws of the relevant

jurisdictions are different but would produce the same outcome; or (3) when applying one state's

law would promote the policies of that state and applying the law of another state would not

advance that state's policies. *See id.* (citation omitted).

This case does not present a genuine conflict of laws. For reasons that will be explained,

California law and Florida law both require dismissal of the Amended Complaint. *See id.* (noting

that a false conflict exists when application of different states' laws would produce the same

outcome). Consequently, the Court need not decide whether the Customer Agreement's choice-

of-law clause applies to Plaintiffs' tort claims or what law applies to Plaintiffs' claims under

Florida's "most significant relationship" test.  *See James River Ins. Co. v. Arlington Pebble Creek,*

*LLC*, 188 F. Supp. 3d 1246, 1254 (N.D. Fla. 2016); *William Morris Endeavor Ent., LLC v. Cantor*,

No. 1:11-cv-24470, 2012 WL 13014664, at *3 (S.D. Fla. Mar. 2, 2012).

Because state law applies, the Court must apply decisions of each state's highest court and,

absent a decision by that court, must look to the decisions of the state's lower courts and other

available data to ascertain state law.  *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236–37 (1940);

*U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1133–34 (9th Cir. 2011).

## II.    Negligence and Gross Negligence (Counts I and II)

Counts I and II assert claims of negligence and gross negligence, respectively, against

Defendants.[13]  (*See* Am. Compl. ¶¶ 282–301).  Boiled down to their essence, the claims allege that

Robinhood's way of doing business — its marketing, corporate structure, revenue model, platform

features, and undertaking to provide brokerage services to customers — obligated it to make

reasonable efforts to keep trading open, even "during periods of market volatility."  (*Id.* ¶ 174).

Plaintiffs allege Robinhood failed to meet that obligation when it restricted Plaintiffs' abilities to

trade in January 2021.  (*See id.* ¶¶ 288, 299).

Defendants seek dismissal of Counts I and II.  They argue they had no tort duty to protect

Plaintiffs from economic loss.

---

[13] Defendants' asserted bases for requesting dismissal of Counts I and II — that Defendants do not owe
Plaintiffs tort duties — are the same.  Under both California and Florida law, the analysis of whether a party
owes a duty in negligence applies equally to negligence and gross negligence claims.  *See, e.g.*, *Verso Paper
LLC v. HireRight, Inc.*, No. 10–01959, 2012 WL 2343314, at *4 (C.D. Cal. June 19, 2012) (citations
omitted); *Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012).  Therefore, the
Court addresses these two claims together.

CASE NO. 21-02989-MDL-ALTONAGA/Torres

### a. California Law

"Recovery in a negligence action depends as a threshold matter on whether the defendant had 'a duty to use due care toward an interest of the plaintiff's that enjoys legal protection against unintentional invasion.'" *S. Cal. Gas Leak Cases*, 441 P.3d 881, 885 (Cal. 2019) (other alteration adopted; quotation marks and citation omitted). The existence of a duty is a question of law. *See Weimer v. Nationstar Mortg., LLC*, 260 Cal. Rptr. 3d 712, 720 (Cal. Ct. App. 2020) (citation omitted).

Generally, parties have no duty to protect others against purely economic losses.[14] *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 1(1) (Am. L. Inst. 2020) ("An actor has no general duty to avoid the unintentional infliction of economic loss on another."). California follows this general principle. In California, "liability in negligence for purely economic losses . . . is 'the exception, not the rule[.]'" *S. Cal. Gas Leak Cases*, 441 P.3d at 886 (alterations added; quoting *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 532 (Cal. 1998)). "[P]urely economic losses flowing from a financial transaction gone awry[,]" in particular, "are primarily the domain of contract and warranty law or the law of fraud, rather than of negligence." *Id.* at 888 (alterations added; citation and quotation marks omitted).

The rationale for prohibiting tort recoveries for purely economic losses turns on a fundamental concern of tort law: promoting socially responsible behavior while also avoiding indeterminate, limitless liability. *See id.* at 896. The prohibition also keeps important distinctions between contract and tort law intact. *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 1 cmt. c(2) (Am. L. Inst. 2020).

---

[14] California law defines a purely economic loss as a "pecuniary or commercial loss that does not arise from actionable physical, emotional, or reputational injury to persons or physical injury to property." *S. Cal. Gas Leak Cases*, 441 P.3d at 885 (quotation marks and citation omitted).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Like many other rules, the rule that parties generally need not protect others from suffering economic losses has exceptions.  Relevant here, a plaintiff may recover purely economic losses in a negligence action if a "special relationship" exists between the plaintiff and defendant.  *Aas v. Superior Ct.*, 12 P.3d 1125, 1131 (Cal. 2000) (citation and quotation marks omitted), *superseded by statute on other grounds as recognized in S. Cal. Gas Leak Cases*, 441 P.3d at 888.

The "special relationship" exception was announced in *Biakanja v. Irving*, 320 P.2d 16 (Cal. 1958).  In *Biakanja*, the California Supreme Court held that the intended beneficiary of a failed testamentary gift could recover from a notary public who negligently prepared the will.  *See id.* at 19.  The notary owed a contractual duty only to the testator — not to the plaintiff.  *See id.* at 17.  Yet, the court held that the notary owed a tort duty to the plaintiff "even though they were not in privity of contract" and set out a case-by-case test for determining whether "the defendant will be held liable to a third person not in privity[.]"  *Id.* at 18–19 (alteration added).  The test requires consideration of six factors: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blameworthiness of the defendant's conduct; and (6) the policy of preventing future harm.  *See id.* (citations omitted).

Twenty-one years later, the California Supreme Court applied the six factors and held that a special relationship existed in a different scenario.  In *J'Aire Corporation v. Gregory*, 598 P.2d 60 (Cal. 1979), the court held that the tenant of a building used as a restaurant could sue a contractor hired by the building's owner in negligence for failing to timely complete the construction project.  *See id.* at 64.  It explained "that a contractor owes a duty of care to the tenant of a building undergoing construction work to prosecute that work in a manner which does not cause undue

CASE NO.  21-02989-MDL-ALTONAGA/Torres

injury to the tenant's business, where such injury is reasonably foreseeable." *Id.*  Addressing concerns about creating unwieldy liability, the court maintained that its six-factor test "and ordinary principles of tort law such as proximate cause are fully adequate to limit recovery without the drastic consequence of an absolute rule which bars recovery in all such cases." *Id.* at 65 (citation omitted).

In later years, California's lower appellate courts have expanded the reach of the special relationship test.  Several of these courts have held that the six-factor test applies even when the plaintiff and defendant are parties to a contract. *See, e.g.*, *N. Am. Chem. Co. v. Superior Ct.*, 69 Cal. Rptr. 2d 466, 477 (Cal. Ct. App. 1997); *Ott v. Alfa-Laval Agri, Inc.*, 37 Cal. Rptr. 2d 790, 801 (Cal. Ct. App. 1995); *Pisano v. Am. Leasing*, 194 Cal. Rptr. 77, 79 (Cal. Ct. App. 1983).  In *North American Chemical Company v. Superior Court*, the California Court of Appeal stated that "[a] contract for the performance of services . . . necessarily carries with it both the reasonable expectation and implied at law promise that it will be performed with reasonable care."  69 Cal. Rptr. 2d at 478 (alterations added).  Nonetheless, the court held that "the reasoning of *J'Aire* and the six criteria on which it relies will determine the existence of the necessary special relationship[,] and it does not matter whether the plaintiff and defendant are in privity or not." *Id.* (alteration added).

The California Supreme Court has never definitively held that the special relationship test applies to negligence claims for economic losses regardless of privity.  In *Aas v. Superior Court*, the California Supreme Court considered whether homeowners could recover in negligence for construction defects that had not yet caused property damage. *See* 12 P.3d at 1128.  The court recognized that at least some of the plaintiffs were in privity of contract with one defendant. *See id.* at 1135.  It then rejected these plaintiffs' argument that privity *supported* a finding that the

24

CASE NO.  21-02989-MDL-ALTONAGA/Torres

defendant owed them tort duties.  *See id.*

The *Aas* court also observed that "[t]he lower courts have . . . . applied *J'Aire* to cases in which privity did exist[,]" even though it stopped short of endorsing that expansion.  *Id.* at 1137 (alterations added).  Ultimately, the court held that the homeowners could not recover for the cost of repairing construction defects that had not yet caused property damage.  *See id.* at 1128.  Its precise rationale for this holding is not obvious.  On the one hand, the court stated it was "[a]pplying settled law limiting the recovery of economic losses in tort actions[,]" citing a previous decision that forbade recovery without analyzing the six factors set out in *Biakanja*.  *Id.* (alterations added; citing *Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965)).  On the other hand, the court concluded the plaintiffs could not recover under the special relationship exception after applying the six factors.  *See id.* at 1137–43.

Later, in *Bily v. Arthur Young & Company*, 834 P.2d 745 (Cal. 1992), the California Supreme Court held that investors in a failed company could not recover from the company's auditor financial losses they allegedly suffered because of the auditor's negligent preparation of a public financial report.  *See id.* at 761.  The court conceded the plaintiffs suffered a foreseeable injury, but it also explained that foreseeability "is but one factor to be considered in the imposition of negligence liability" and "[f]oreseeability is endless because it, like light, travels indefinitely in a vacuum."  *Id.* at 761–62 (alteration added; other alterations adopted; quotation marks and citation omitted).

Then came the *Southern California Gas Leak Cases*.  There, the California Supreme Court considered whether the special relationship exception could support claims asserted by local businesses for purely economic losses they suffered because of their proximity to a natural gas leak.  *See* 441 P.3d at 883.  Discussing *J'Aire* and *Biakanja*, the court explained that a "special

CASE NO.  21-02989-MDL-ALTONAGA/Torres

relationship" is one where "the plaintiff was an intended beneficiary of *a particular* transaction but was harmed by the defendant's negligence in carrying it out."  *Id.* at 887 (emphasis added).

The court then held that the defendant did not owe any duty to avoid inflicting economic losses on the plaintiffs.  *See id.* at 895–96.  In doing so, it neither expressly applied the six factors of the special relationship test nor overruled *Biakanja* and *J'Aire*.  Instead, the court explained that "[d]eciding whether to impose a duty of care turns on a careful consideration of 'the sum total' of the policy considerations at play, not a mere tallying of some finite, one-size-fits-all set of factors."  *Id.* at 887 (alteration added; citations and quotation marks omitted).

The court next addressed the purpose of duty as a threshold requirement in negligence actions.  It reinforced the holding of *Bily*, explaining that "[i]n requiring more than mere foreseeability for imposing a duty of care in *Bily*, we appreciated the need to safeguard the efficacy of tort law by setting meaningful limits on liability."  *Id.* (alteration added; citation omitted).  In like vein, the court extensively quoted the then-draft Restatement (Third) of Torts and its commentary, noting the "widespread judicial concern that purely economic losses 'proliferate more easily than losses of other kinds'" and thus "threaten 'liabilities that are indeterminate and out of proportion to a defendant's culpability[.]'"  *Id.* at 892 (alteration added; other alterations adopted; citation omitted).  The court went on: "Only when the foregoing considerations are weak or absent . . . does a duty to guard against purely economic losses exist under the Restatement approach to negligence claims."  *Id.* (alteration added; citation omitted).

Now, this case.  Plaintiffs suggest they have a special relationship with Defendants *as a matter of law* simply because the Customer Agreement is one for services.  (*See* Resp. 33–34 (citations omitted)).  Put differently, they contend that the Court need not apply the six-factor *Biakanja* test to conclude that they have alleged a special relationship.  (*See id.*).  Yet, the case

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Plaintiffs rely on — *North American Chemical* — does not support their argument.  There, the Court of Appeal held that a special relationship existed only after applying the six factors.  *See* 69 Cal. Rptr. 2d at 478 ("[T]he reasoning of *J'Aire* and the six criteria on which it relies will determine the existence of the necessary special relationship[.]" (alterations added)).  Plaintiffs' argument also ignores the principle that "conduct . . . becomes tortious when it also violates a duty independent of the contract arising from principles of tort law."  *Aas*, 12 P. 3d at 1136 (alteration added; citation omitted).

Defendants likewise seek to avoid application of the special relationship test.  They argue that no special relationship can exist when parties are in privity of contract.  (*See* Reply 23).  As support, they point to a long list of decisions by federal courts that have reached that conclusion.  (*See id.* n.9); *see also Grey Fox, LLC v. Plains All Am. Pipeline, L.P.*, No. cv 16-3157, 2019 WL 4196066, at *7 n.5 (C.D. Cal. Apr. 8, 2019); *Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084, 1093 (C.D. Cal. 2017); *Elsayed v. Maserati N. Am., Inc.*, 215 F. Supp. 3d 949, 963 (C.D. Cal. 2016); *Barrier Specialty Roofing & Coatings, Inc. v. ICI Paints N. Am., Inc.*, No. cv-F-07-1614, 2008 WL 1994947, at *8 (E.D. Cal. May 6, 2008); *City of San Diego v. Amoco Chem. Co.*, No. Civ. 98-0474-E, 1999 WL 33548157, at *4 (S.D. Cal. Sept. 9, 1999).[15]  For two reasons, Defendants' position is misguided.

First, Defendants fail to cite a single decision by a California *state* court holding that a special relationship cannot exist when parties are in privity.  California's intermediate courts of appeal generally agree that "privity or the absence of privity is not a controlling factor in *J'Aire*-type cases[,]" at least when the contract is one for *services*.  *Ott*, 37 Cal. Rptr. 2d at 801 (alteration

---

[15] As Plaintiffs point out, many federal courts have reached the opposite conclusion too.  *See Whitesides v. E*Trade Secs., LLC*, No. 20-cv-05803, 2021 WL 930794, at *5 (N.D. Cal. Mar. 11, 2021) (collecting cases).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

added); *see also N. Am. Chem. Co.*, 69 Cal. Rptr. 2d at 477–78.  Only one state appellate court has

held otherwise.  *See Stop Loss Ins. Brokers, Inc. v. Brown & Toland Med. Grp.*, 49 Cal. Rptr. 3d

609, 613–14 (Cal. Ct. App. 2006).  Certainly, the consensus of a majority of California's

intermediate appellate courts is "a datum for ascertaining state law which is not to be disregarded

by a federal court unless it is convinced by other persuasive data that the highest court of the state

would decide otherwise."  *West*, 311 U.S. at 237.

Second, Defendants have not offered "other persuasive data" that the California Supreme

Court would decide differently.  Defendants contend that the California Supreme Court has applied

the six-factor special relationship test only when parties are *not* in privity of contract.  (*See* Reply

23).  But recall *Aas.*  The *Aas* court recognized that at least some of the plaintiffs had entered a

service contract with a defendant, *see* 12 P.3d at 1135, and yet it applied the special relationship

test to determine whether the defendants owed plaintiffs a duty, *see id.* at 1137–43.

The *Aas* court's application of the special relationship test may or may not have been

*dictum*.  Still, the court *did* apply the test to parties in privity of contract.  And although one

intermediate appellate court in California has held that privity of contract between the plaintiff and

defendant bars a negligence claim for economic losses, the majority opinion in that case appears

to have overlooked the *Aas* court's application of the six factors.  *See Stop Loss*, 49 Cal. Rptr. 3d

at 613–15.[16]  The concurring opinion recognized this omission.  *See id.* at 629 (Pollak, J.,

concurring).  Thus, on balance, *Aas* and the decisions of a majority of state appellate courts in

California suggest that privity does not preclude the existence of a special relationship.  *See*

*Whitesides*, 2021 WL 930794, at *6 ("[T]he Court predicts that the California Supreme Court

---

[16] In a recent, non-precedential decision, the Ninth Circuit applied *Stop Loss* and ruled that plaintiffs who
were not in privity with the defendant could not recover for economic losses in negligence.  *See Berk v.
Coinbase, Inc.*, 840 F. App'x 914, 915–16 (9th Cir. 2020).

would hold that courts must examine the particular policy considerations at play under the facts of each case to determine if a special relationship exists[.]"  (alterations added)).

That said, the Customer Agreement remains *relevant*.  Courts may consider the existence of a contract as one factor in "the sum total of the policy considerations at play" in determining whether the parties' relationship warrants imposition of a tort duty.  *S. Cal. Gas Leak Cases*, 441 P.3d at 887 (citation and quotation marks omitted).  The California Supreme Court's endorsement of the Restatement (Third) supports exactly this approach.  *See id.* at 891–92.  As the Restatement (Third) explains, "[r]isks of economic loss tend to be especially well suited to allocation by contract" because "[c]ontracts . . . are governed by a body of commercial law that has been developed to address economic loss, and that tends to be better suited for that task than the law of torts."  Restatement (Third) of Torts: Liab. for Econ. Harm § 1 cmt. c(2) (Am. L. Inst. 2020) (alterations added); *see also Sheen v. Wells Fargo Bank, N.A.*, 250 Cal. Rptr. 3d 677, 684 (Cal. Ct. App. 2019) ("The law of contract and the law of restitution . . . . provide a more extensive and finely tuned apparatus for [allocating economic losses] than the law of torts, which has developed primarily to address injuries that occur outside contractual relationships." (alterations added; citation and quotation marks omitted)).

Also relevant is the California Supreme Court's treatment of the special relationship exception since *J'Aire.*  Only two of that court's post-*J'Aire* decisions have extended the special relationship exception to new situations.  And both situations involved circumstances vastly different from those present here.  *See, e.g.*, *Centinela Freeman Emergency Med. Assocs. v. Health Net of Cal., Inc.*, 382 P.3d 1116, 1131 (Cal. 2016) (holding that health care service plans owe duty to noncontracting emergency service providers when entering into contracts delegating financial responsibility for emergency services to individual practice associations); *Christensen v. Superior*

CASE NO.  21-02989-MDL-ALTONAGA/Torres

*Ct.*, 820 P.2d 181, 193 (Cal. 1991) (holding that defendants owed duty to close family members for whose benefit funeral services were intended to avoid mishandling decedent's remains). Today, commentators question *J'Aire* and *Biakanja*'s continuing import.  *See, e.g.*, Restatement (Third) of Torts: Liab. for Econ. Harm § 1 reporter's note e (Am. L. Inst. 2020) ("*J'Aire* has not been overruled, but the extent of its vitality in California is questionable, and it has not been influential elsewhere." (citation omitted)); David Gruning, *Pure Economic Loss in American Tort Law: An Unstable Consensus*, 54 Am. J. Comp. L. 187, 194 n.26 (2006) ("*J'Aire*, while still authority in California, is even taught as an outlier." (citation omitted)).

With these principles in mind, the Court considers the viability of Counts I and II under the special relationship exception.  The first of the six *Biakanja* factors examines the extent to which the transaction was intended to affect the plaintiff.  *See* 320 P.2d at 19.  Plaintiffs do not allege that the PCO restriction applied only to them: the restriction applied to *all users* of Robinhood's platform.  For that reason, the first factor disfavors finding a special relationship here.  *See Whitesides*, 2021 WL 930794, at *6 (concluding that first factor did not support special relationship because "Plaintiffs in this case do not plead intent particular to them, as opposed to all users of E*TRADE's trading platform"); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 972 (S.D. Cal. 2014) (concluding that first factor weighed against special relationship because "Plaintiffs have failed to allege why the transactions at issue were intended to affect Plaintiffs 'in a way particular to them, as opposed to all potential' consumers" (alteration adopted; quoting *Greystone Homes, Inc. v. Midtec, Inc.*, 86 Cal. Rptr. 3d 196 (Cal. Ct. App. 2008))); *Ott*, 37 Cal. Rptr. 2d at 801 (concluding that first factor weighed against special relationship because nothing suggested action "particular to the plaintiffs, as opposed to all potential purchasers of the equipment").

CASE NO.  21-02989-MDL-ALTONAGA/Torres

The second factor is foreseeability.  *See Biakanja*, 320 P.2d at 19.  The Court assumes Plaintiffs have plausibly alleged that the market volatility and other circumstances that led Robinhood to impose the PCO restrictions were foreseeable.  The question is how much weight foreseeability deserves in cases involving only economic harm.  The answer from the California Supreme Court is clear: not much.  That is because "although foreseeability 'may set tolerable limits for most types of physical harm, it provides virtually no limit on liability for nonphysical harm.'"  *S. Cal. Gas Leak Cases*, 441 P.3d at 887–88 (quotation marks omitted; quoting *Bily*, 834 P.2d 745).

The third and fourth factors involve the degree of certainty that Plaintiffs were injured and the closeness of the connection between their injury and Defendants' conduct, respectively.  *See Biakanja*, 320 P.2d at 19.  Plaintiffs have adequately alleged the value of their meme stock holdings declined after Robinhood implemented the PCO restriction.  But the link between that decline and Defendants' conduct is attenuated at best.

Plaintiffs allege that the rapidly rising value of the meme stocks created extremely volatile market conditions.  (*See, e.g.*, Am. Compl. ¶¶ 191, 209).  Those conditions, in turn, presented significant compliance risks to brokers, as the SEC recognized.  *See* SEC Invs. Alert.  Robinhood allegedly "fueled" the volatile conditions through marketing and other efforts.  (*See* Am. Compl. ¶¶ 5, 9, 105).

These allegations discount the self-directed nature of Robinhood investment accounts and the many investment decisions that drove the volatile market conditions.  Even accepting Plaintiffs factual allegations as true, it is evident that the January 2021 short squeeze was caused by the aggregation of many individual decisions by independent decision-makers.  Robinhood's actions were just one link in the causal chain.  *See Whitesides*, 2021 WL 930794, at *7.  And, as the SEC

31

CASE NO.  21-02989-MDL-ALTONAGA/Torres

noted, Plaintiffs' investments in the meme stocks were risky to begin with.  *See* SEC Invs. Alert.

The fifth *Biakanja* factor — moral blameworthiness — favors Defendants.  Robinhood operates in a heavily regulated market under the daily risk of burdensome compliance requirements.  Faced with market conditions that Plaintiffs admit were highly volatile, Defendants elected to *partially* limit trading in a few stocks that were driving significant compliance risks for only a short period of time.  Both the Customer Agreement and the SEC expressly permitted the types of trading restrictions that Defendants implemented.  (*See* Cust. Agmt. 5.F); SEC Invs. Alert.  And notably, Plaintiffs admit other brokers restricted trading of the same stocks, even though they allege that these brokers did not go quite as far as Robinhood.  (*See, e.g.*, Am. Compl. ¶ 253; Resp. 38 n. 19).

Even when drawing all reasonable inferences to benefit Plaintiffs, the Amended Complaint's factual allegations suggest that Robinhood decided to exercise a contractual right under difficult circumstances.  (*See* Am. Compl. ¶¶ 191–226, 233–40).  Plaintiffs' attempt to hold Defendants liable nonetheless would "threaten 'liabilities that are indeterminate and out of proportion to [Defendants'] culpability[.]'"  *S. Cal. Gas Leak Cases*, 441 P.3d at 892 (alterations added; citation omitted); *see also Mega RV Corp. v. HWH Corp.*, 170 Cal. Rptr. 3d 861, 881 (Cal. Ct. App. 2014) (holding that fifth factor weighed in favor of defendant because "there was certainly no evidence of reckless or purposeful behavior, or of anything other than economic damages").

The policy of preventing future harm is the sixth *Biakanja* factor, and it, too, favors Defendants.  Holding Defendants liable for their conduct in January 2021 would likely deter brokers from imposing trading restrictions in the future.  It might also discourage the provision of brokerage services altogether.  *See S. Cal. Gas Leak Cases*, 441 P.3d at 892 (concluding that liability for economic losses could create "exaggerated pressure to avoid an activity altogether"

CASE NO.  21-02989-MDL-ALTONAGA/Torres

(citation and quotation marks omitted)).

Indeed, the duty that Plaintiffs seek to impose is remarkably broad: they assert Defendants owe a tort duty to permit trading in all securities, at all times, to all "foreseeable" Plaintiffs, even during periods of market volatility.  (Resp. 31; Am. Compl. ¶ 174).  Plaintiffs offer virtually no limiting principle to this theory of duty, other than to point to Robinhood's retail investor-focused marketing tactics.  (*See* Am. Compl. ¶ 9, 115, 126, 202).  All the while, they do not cite a single California case holding that a company's marketing or business philosophy created an independent duty in tort — much less a duty of the breadth that Plaintiffs propose.

For similar reasons, "the sum total of the policy considerations at play" in this case warrant dismissal.  *See S. Cal. Gas Leak Cases*, 441 P.3d at 886 (citations and quotation marks omitted).  Every investor who uses Robinhood's platform agrees to enter a contract — the Customer Agreement.  The Customer Agreement permits Robinhood Securities and Robinhood Financial to restrict trading.  (*See* Cust. Agmt. § 5.F).  The primary regulator of securities markets in the United States — the SEC — recognizes that many brokers retain rights to impose similar restrictions.  *See* SEC Invs. Alert.  And California law favors contract law over tort law as an avenue for allocating economic losses absent extraordinary circumstances.

The California Supreme Court has explained:

> When two parties make a contract, they agree upon the rules and regulations which will govern their relationship; the risks inherent in the agreement and the likelihood of its breach.  The parties to the contract in essence create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks.  Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give him only such benefits as he expected to receive; this is the function of contract law.

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 461 (Cal. 1994) (alteration

33

CASE NO.  21-02989-MDL-ALTONAGA/Torres

adopted; quotation marks omitted).

Here, Plaintiffs repackage their dissatisfaction with the PCO restrictions as negligence claims.[17]  In doing so, they seek to obtain precisely what the Customer Agreement that they freely entered denied: a right to unrestricted trading.  They also ask the Court to extend California tort law into uncharted waters by imposing on Robinhood a tort duty to all foreseeable investors to permit trading of any security, at any time.  California law does not endorse such freewheeling liability, and it is not the Court's role to second-guess that policy determination.

Counts I and II fail under California law.

### b.  Florida Law

Negligence claims under Florida law involve four elements: duty, breach, causation, and damages.  *See Virgilio v. Ryland Grp.*, 680 F.3d 1329, 1339 (11th Cir. 2012) (citation omitted).  "[T]he existence of a duty under [Florida] negligence law is a minimum threshold legal requirement that opens the courthouse doors . . . and is ultimately a question of law for the court rather than a jury."  *Williams v. Davis*, 974 So. 2d 1052, 1056 n.2 (Fla. 2007) (alterations added; citation omitted).

Florida law generally does not obligate parties to avoid causing economic loss.  *See Virgilio*, 680 F.3d at 1339–40; *see also Monroe v. Sarasota Cnty. Sch. Bd.*, 746 So. 2d 530, 531

---

[17] The Court's analysis applies equally to all three Defendants, even though Robinhood Markets is not a party to the Customer Agreement.  Plaintiffs' negligence claims against Robinhood Markets allege that Robinhood Markets controlled its subsidiaries' conduct or at least collaborated with its subsidiaries in implementing the PCO restriction.  (*See* Am. Compl. ¶¶ 95–100, 194, 214, 226–29).  Nothing in the Customer Agreement prevented Robinhood Markets from taking these actions.

More fundamentally, Robinhood Markets' involvement with its subsidiaries' affairs does not change the essentials of the duty analysis: Plaintiffs suffered only economic losses, the Customer Agreement defines Plaintiffs' rights, and each of the six *Biakanja* factors applies to Robinhood Markets the same way it would to Robinhood Financial and Robinhood Securities.  Robinhood Markets' status as a non-party to the Customer Agreement means, if anything, that its relationship with Plaintiffs was more distant and attenuated than that of its subsidiaries.  Finally, neither Count I nor Count II contains allegations specific to Robinhood Markets or clearly names Robinhood Markets as a Defendant.  (*See id.* ¶¶ 282–301).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

(Fla. 2d DCA 1999) ("[A]s a general rule, . . . bodily injury or property damage is an essential element of a cause of action in negligence." (alterations added)).  "[T]o proceed on a common law negligence claim based solely on economic loss, there must be some sort of link between the parties or some other extraordinary circumstance that justifies recognition of such a claim."  *Tank Tech, Inc. v. Valley Tank Testing, LLC*, 244 So. 3d 383, 393 (Fla. 2d DCA 2018) (alteration added; citing *Monroe*, 746 So. 2d at 531; other citations omitted).  Courts faced with these claims must "examine the relationship between the parties to determine whether it warrants creating a duty to protect economic interests outside contract and statutory law."  *Monroe*, 746 So. 2d at 534 n.6.

Plaintiffs do not agree that these principles apply.  They contend that the Florida Supreme Court's decision in *Tiara Condominium Association, Inc. v. Marsh & McLennan Companies*, 110 So. 3d 399 (Fla. 2013), confined Florida law's skepticism of negligence claims for economic losses to the products liability context.  (*See* Resp. 33).

In *Tiara*, a majority of the Florida Supreme Court held that the "economic loss rule" applies only to products liability claims.  110 So. 3d at 407.  The court criticized what it called the "unprincipled" expansion of the rule beyond its products-liability roots, including to claims for professional malpractice, fraudulent inducement, and negligent misrepresentation.  *Id.* at 406.  Several justices dissented from the court's decision to limit the economic loss rule.  *See id.* at 410–11 (Polston, C.J., dissenting); *id.* at 411–14 (Canady, J., dissenting).  Justice Pariente concurred.  *See id.* at 407–10 (Pariente, J., concurring).  She insisted that the court's holding was "neither a monumental upsetting of Florida law nor an expansion of tort law at the expense of contract principles."  *Id.* at 408.

Plaintiffs equate the economic loss rule — a defense to negligence claims for defective products — with the duty *element* of all negligence claims.  The two concepts are distinct.  Then-

35

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Justice Cantero of the Florida Supreme Court explained the difference in a pre-*Tiara* case:

> Limiting the scope of the economic loss rule removes one obstacle to the recovery of purely economic losses.  But significant obstacles remain.  As the majority recognizes, plaintiffs whose cases fall outside of the economic loss rule must still satisfy "the traditional negligence principles of duty, breach, and proximate cause."  The "duty" prong remains a strong filter in these cases — virtually as strong as the rule itself.  A service provider's mere failure to exercise reasonable care in performing a service contract does not render it liable in tort to every party who loses revenue or incurs additional expense.  The plaintiff still must demonstrate an independent duty to protect that plaintiff's purely economic interests.

*Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 546 (Fla. 2004) (Cantero, J., concurring) (citations omitted).  The Restatement (Third) of Torts draws the same distinction.  *See* Restatement (Third) of Torts: Liab. for Econ. Harm §§ 1 cmt. b, 3 cmt. a (Am. L. Inst. 2020); *see also id.* § 3 reporter's notes a and b (observing that Florida follows the majority of jurisdictions in distinguishing between the economic loss rule and the general lack of a duty to avoid causing economic harm).

Other observations confirm *Tiara*'s limited impact.  As Justice Pariente noted, *Tiara*'s holding "does not undermine Florida's contract law or provide for an expansion in viable tort claims."  110 So. 3d at 408 (Pariente, J., concurring).  That is why, since *Tiara*, courts have continued to recognize that the duty requirement precludes most negligence claims predicated on economic harm alone.  *See, e.g.*, *Tank Tech*, 244 So. 3d at 393–94; *Lucarelli Pizza & Deli v. Posen Constr., Inc.*, 173 So. 3d 1092, 1094–95 (Fla. 2d DCA 2015); *see also Insight Secs., Inc. v. Deutsche Bank Tr. Co. Ams.*, No. 20-23864-Civ, 2021 WL 3473763, at *3–4 (S.D. Fla. Aug. 6, 2021); *Segev v. Lynn Univ., Inc.*, No. 19-cv-81252, 2021 WL 2269838, at *18 (S.D. Fla. Feb. 26, 2021), *report and recommendation adopted in relevant part by* 2021 WL 1996437 (S.D. Fla. May 19, 2021); *Underwriters at Interest v. All Logistics Grp., Inc.*, 483 F. Supp. 3d 1199, 1211–13 (S.D. Fla. 2020).  *Tiara* did not address the duty element of negligence claims, and thus, it did not

CASE NO.  21-02989-MDL-ALTONAGA/Torres

impose a general tort duty to avoid causing economic harm where none had existed before.

Plaintiffs next assert that Robinhood owed them a tort duty simply because it provided them with brokerage services.  (*See* Resp. 31–32).  Plaintiffs rest that contention on the notion that "[w]henever one undertakes to provide a service to others, whether . . . gratuitously or by contract, the individual who undertakes to provide the service . . . assumes a duty to act carefully and to not put others at an undue risk of harm."  *Clay Elec. Co-op, Inc. v. Johnson*, 873 So. 2d 1182, 1186 (Fla. 2003) (alterations added; footnote call omitted); *see also Est. of Rotell ex rel. Rotell v. Kuehnle*, 38 So. 3d 783, 785 (Fla. 2d DCA 2010); (Resp. 31–32).  Again, this seemingly limitless principle less likely applies when "the plaintiff seeks only the recovery of an economic loss[.]"  *Virgilio*, 680 F.3d at 1339 (alteration added).  When a negligence claim alleges only economic loss, "the duty element . . . serves as an important barrier to over-extension of liability."  *Id.* (alteration added; citation and footnote call omitted).

The takeaway is that Florida law, like California law, permits courts to entertain negligence claims for economic harm "only when specific circumstances have warranted a more liberal judicial rule and an expanded duty of care."  *Lucarelli Pizza & Deli*, 173 So. 3d at 1094 (citations omitted).  Under Florida law, a duty can arise from one of four sources: (1) statutes and regulations; (2) judicial interpretations of legislation; (3) judicial decisions; or (4) the facts of a particular case.  *See Insight Secs.*, 2021 WL 3473763, at *3 (citation omitted).  Plaintiffs do not point to any specific statute, regulation, or judicial decision that imposes a duty of care on brokers such as Robinhood.[18]  Thus, the question here is whether Plaintiffs have alleged facts that

---

[18] Plaintiffs point out their allegations that Robinhood violated the Net Capital Rule and other regulations. (*See* Resp. 39).  But they also appear to admit that these purported violations are irrelevant to determining whether Defendants owed Plaintiffs a duty of care sounding in negligence.  For example, Plaintiffs do not argue that any of their cited regulations is *the source* of the tort duties they allege Defendants owe them. Instead, they assert that the regulations "help define" and "explain [Robinhood's] standard of care" (*id.* at

CASE NO. 21-02989-MDL-ALTONAGA/Torres

demonstrate "some sort of link between the parties or some other extraordinary circumstance that justifies recognition of" a duty. *Tank Tech*, 244 So. 3d at 393 (citations omitted).

The answer is "no." There is nothing "extraordinary" about Plaintiffs' relationship with Robinhood. *Id.* Plaintiffs are simply consumers who chose to use Robinhood's services. They are parties to a contract that defines their rights as users of the Robinhood platform. That contract permits restricting Plaintiffs' ability to trade securities (*see* Cust. Agmt. § 5.F), as do many other contracts between investors and brokers, *see* SEC Invs. Alert. "If two parties have a contract, the argument for limiting tort claims between them is at its most powerful." Restatement (Third) of Torts: Liab. for Econ. Harm § 3 cmt. a (Am. L. Inst. 2020). Plaintiffs offer no compelling reason why tort law, rather than contract law, should govern a relationship with a broker they chose to use. Although Plaintiffs point to Robinhood's marketing efforts, marketing is not generally a reason to impose a duty to protect another's economic interests. *See Virgilio*, 680 F.3d at 1340.

Moreover, Plaintiffs do not plausibly allege that Robinhood "fits into a special professional category where the standard of care includes a duty to protect the economic interests of clients or affected parties." *Lucarelli Pizza & Deli*, 173 So. 3d at 1095. The Customer Agreement provides that Plaintiffs' Robinhood accounts are self-directed, Plaintiffs assume the risk of losses, and Robinhood Securities and Robinhood Financial may elect to restrict trading at any time. (*See* Cust. Agmt. §§ 5.A, 5.C, 5.F). These provisions confirm that Plaintiffs assumed the risk of many of the events they now complain of.

---

37, 39 (alteration added)), and that the alleged violations are "evidence" of a breach of duty (*id.* at 38 (emphasis, citation, and quotation marks omitted)).

These contentions assume that a duty of care in fact exists, and thus, they are irrelevant to whether Robinhood owed Plaintiffs a tort duty. That irrelevance aside, Plaintiffs do not actually allege that Robinhood violated the Net Capital Rule or explain how Robinhood's conduct *in January 2021* violated any of the cited regulations. (*See* Am. Compl. ¶ 161; Resp. 38–40).

"[T]he existence of a contractual relationship is a good reason not to create a negligence cause of action shifting economic risks that the parties could have shifted through bargaining." *Monroe*, 746 So. 2d at 537 (alteration added; citations omitted).  For that reason, courts applying Florida law have declined to impose tort duties on custodians of investment accounts when investors' customer agreements contain similar risk-allocating provisions.  *See Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 948–50 (11th Cir. 2014); *Paszamant v. Ret. Accts., Inc.*, 776 So. 2d 1049, 1053 (Fla. 5th DCA 2001).

In short, the Customer Agreement merits judicial respect under Florida law.  And the Court declines Plaintiffs' invitation to rewrite the Agreement under the guise of novel negligence claims.

Because Counts I and II do not adequately allege the existence of a tort duty under either California or Florida law, they are dismissed.

## III.     Breach of Fiduciary Duty (Count III)

In Count III, Plaintiffs allege that Robinhood Financial and Robinhood Securities violated fiduciary duties "to provide an open trading platform free of self-imposed trading restrictions[.]" (Am. Compl. ¶ 304 (alteration added); *see id.* ¶ 306).  Under California and Florida law, a plaintiff who asserts a breach of fiduciary duty claim must establish (1) a fiduciary duty exists; (2) a breach of that duty; and (3) proximate cause.  *See Brown v. Cal. Pension Adm'rs & Consultants, Inc.*, 52 Cal. Rptr. 2d 788, 796 (Cal. Ct. App. 1996); *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).

Robinhood Securities and Robinhood Financial focus on the first element.  They argue that they never accepted any fiduciary obligations and never gave Plaintiffs investment advice or directed Plaintiffs' investments.  (*See* Mot. 32, 35).  Moreover, Robinhood Securities argues that a clearing broker like itself owes no fiduciary duties to customers as a matter of law.  (*See id.* 33 n.18).  Plaintiffs contend that all brokers owe fiduciary duties to their customers and that

Robinhood Financial and Robinhood Securities' fiduciary obligations arose from their special, confidential relationship with Plaintiffs.  (*See* Resp. 40–45).

### a.  Robinhood Financial

### i.  California Law

"A stockbroker is an agent of his client."  *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561, 567 (9th Cir. 1985).  Under California law, "[a]n agency relationship is a fiduciary one, obliging the agent to act in the interest of the principal."  *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997) (alteration added; citation omitted).  Still, a principal and agent may limit the scope of an agency relationship by agreement.  *See, e.g.*, *Meyers v. Guar. Sav. & Loan Ass'n*, 144 Cal. Rptr. 616, 620 (Cal. Ct. App. 1978).

Stockbrokers owe general fiduciary duties to their customers if they manage a discretionary account — *i.e.*, make investments on their clients' behalf — or if they provide investment advice to their clients.  *See Twomey v. Mitchum, Jones & Templeton, Inc.*, 69 Cal. Rptr. 222, 242 (Cal. Ct. App. 1968).  But they do not owe general fiduciary duties to clients with non-discretionary accounts unless they also provide those clients with investment advice.  *See Brown*, 52 Cal. Rptr. 2d at 796.

The Customer Agreement creates and defines an agency relationship between Robinhood Financial and its customers.  (*See* Cust. Agmt. § 4).  The Agreement expressly limits the scope of Robinhood Financial's agency "in accordance with the terms and conditions of th[e] Agreement and any attendant risks with respect to the purchase or sale of securities."  (*Id.* (alteration added)).  When Plaintiffs signed the Customer Agreement, they each agreed that their accounts are self-directed and Robinhood Financial does not provide them with investment advice in connection with their accounts.  (*See id.* § 5.A).  The Agreement further provides that Robinhood Financial

CASE NO.  21-02989-MDL-ALTONAGA/Torres

may "at any time, in its sole discretion and without prior notice . . . prohibit or restrict [customers'

abilities] to trade securities."  (*Id.* § 5.F (alterations added)).

As these provisions illustrate, Robinhood Financial's "policy was not to provide

investment advice to customers[.]"  *Petersen v. Secs. Settlement Corp.*, 277 Cal. Rptr. 468, 472

(Cal. Ct. App. 1991) (alteration added).  Instead, Robinhood Financial assumed only duties related

to carrying out customer orders (*see* Cust. Agmt. § 4), and even those duties are limited (*see id.* §

16).  This "limited role" does not warrant imposing a broad fiduciary duty.  *Petersen*, 277 Cal.

Rptr. at 472–73.

More critically, the Customer Agreement contradicts Plaintiffs' allegation that Robinhood

Financial owed them a duty "to provide an open trading platform free of self-imposed trading

restrictions[.]"  (Am. Compl. ¶ 304 (alteration added)).  Just as California law recognizes "that the

scope of a broker's duty to disclose is delimited by the nature of the broker's relationship with the

customer[,]" so, too, is a broker's putative duty to permit purchases of any securities at any time

limited by the broker's relationship with its client.  *Petersen*, 277 Cal. Rptr. at 473 (alteration

added).  Plaintiffs expressly agreed that Robinhood Financial could prohibit trading on the

Robinhood platform.  (*See* Cust. Agmt. § 5.F).  Thus, Robinhood Financial had no duty, fiduciary

or otherwise, to keep trading open.  *See Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 70

Cal. Rptr. 3d 199, 214 (Cal. Ct. App. 2007) (noting that "even when a stockbroker acts on behalf

of a customer, the scope of the broker's fiduciary duty depends on the nature of the

broker/customer relationship"); *Brown*, 52 Cal. Rptr. 2d at 797 (holding that brokers had no

fiduciary duty to disclose certain facts to plaintiffs when brokers' relationship with plaintiffs "was

confined to . . . performance of transactions selected by their customers" and brokers "had

absolutely no responsibility to advise" plaintiffs how to manage their self-directed accounts

CASE NO.  21-02989-MDL-ALTONAGA/Torres

(alteration added)).

Plaintiffs nonetheless insist that Robinhood Financial owes them broad, general fiduciary duties simply because it is a broker.  (*See* Resp. 40–41).  To be sure, Plaintiffs cite several cases that, when read in isolation, would broadly charge brokers with fiduciary responsibilities.  (*See id.*); *see also, e.g.*, *Duffy v. Cavalier*, 264 Cal. Rptr. 740, 752 (Cal. Ct. App. 1989) ("[T]he relationship between any stockbroker and his or her customer is fiduciary in nature, imposing on the former the duty to act in the highest good faith toward the customer." (alteration added; citations omitted)).  But each of these cases contemplated a different type of broker-client relationship — one in which the broker provided investment advice that functioned "for all practical purposes [as] the controlling factor in the [customer's] transactions."  *Twomey*, 69 Cal. Rptr. at 242 (alterations added).  They did not consider the duties of self-directed brokerages — like Robinhood, E*Trade, TD Ameritrade, and Charles Schwab — that have become common today.  In cases involving these kinds of brokers, general fiduciary duties "do not arise."  *Petersen*, 277 Cal. Rptr. at 473 (footnote call number omitted); *see also Apollo Cap. Fund*, 70 Cal. Rptr. 3d at 214; *Brown*, 52 Cal. Rptr. 2d at 797.

Plaintiffs next contend that their relationship with Robinhood Financial is "special or confidential" because they are "inexperienced" investors "target[ed]" by Robinhood.  (Resp. 42 (alteration added)).  In some circumstances, under California law, a fiduciary duty may arise out of a "confidential relationship."  *City Sols., Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1048, 1050 (N.D. Cal. 2002) (quotation marks omitted).  A confidential relationship usually arises only when there is a power imbalance between the parties and the more powerful party solicits or accepts the trust placed in it by the weaker party.  *See Richelle L. v. Roman Catholic Archbishop*, 130 Cal. Rptr. 2d 601, 611 (Cal. Ct. App. 2003) (citation omitted).  Plaintiffs point to

CASE NO.  21-02989-MDL-ALTONAGA/Torres

their relative investment inexperience, Robinhood's marketing efforts, and the allegedly volume-focused educational tools available on Robinhood's platform as evidence of a confidential relationship.[19]  (*See* Resp. 42–43; Am. Compl. ¶¶ 131, 186).

For two reasons, Plaintiffs' "confidential relationship" theory misses the mark.  First, California law typically recognizes only personal relationships with a significant power imbalance as confidential.  *See, e.g.*, *Richelle*, 130 Cal. Rptr. 2d at 611.  These relationships "usually arise[] from advanced age, youth, lack of education, weakness of mind, grief, sickness, *or some other incapacity*."  *Id.* (alteration and emphasis added).  For example, a confidential relationship might stem from a client's engagement of an attorney, *see Aoki v. Gilbert*, No. 11-cv-02797, 2020 WL 6741693, at *25 (E.D. Cal. Nov. 17, 2020), or a friend taking financial advantage of an elderly person in a weakened condition, *see Stenger v. Anderson*, 429 P.2d 164, 170–71 (Cal. 1967).

Robinhood's relationships with its many customers are not special or confidential.  Plaintiffs might not be finance experts, but they do not allege that they lack the capacity to make their own decisions or that Robinhood Financial personally took advantage of them.  Tellingly, they cite no example of a confidential relationship arising from a garden-variety consumer contract signed by millions of customers.  And understandably so.  Extending fiduciary obligations to all such relationships would revolutionize the brokerage industry — a consequence California courts have not embraced.  *See Siemonsma v. Mut. Diversified Emp. Fed. Credit Union*, No. 10-1093, 2011 WL 1485979, at *3 (C.D. Cal. Apr. 19, 2011) ("To find a confidential relationship arising out of the mere depositing of funds would make confidential relationships ubiquitous in the lending

---

[19] Although Plaintiffs allege that Robinhood's educational tools "encourage" high-volume trading, they stop short of alleging that Robinhood offers investment advice.  (Am. Compl. ¶¶ 129–30).  That is likely because Plaintiffs themselves agreed that Robinhood does not provide investment advice (*see* Cust. Agmt. § 5.A) and because California law premises fiduciary responsibility on the existence of a "direct and *personal* relationship between broker and customer," *Petersen*, 277 Cal. Rptr. 2d at 473 (emphasis added), as opposed to "behavioral nudges" that tend to "encourage" higher-volume trading (Am. Compl. ¶ 129).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

industry, which strikes the Court as contrary to the meaning of a confidential relationship.").

Second, Plaintiffs do not allege that Robinhood Financial accepted or recognized its relationships with Plaintiffs as confidential.  "The mere fact that in the course of their business relationships the parties reposed trust and confidence in each other does not impose any corresponding fiduciary duty[.]"  *City Sols.*, 201 F. Supp. 2d at 1050 (alteration added; citation and quotation marks omitted).  A confidential relationship cannot exist unless the alleged confidant "voluntarily accepts or assumes to accept the confidence[.]"  *Barbara A. v. John G.*, 193 Cal. Rptr. 422, 431 (Cal. Ct. App. 1983) (alteration added; citations and quotation marks omitted).

Here, Plaintiffs do not plausibly allege that Robinhood Financial recognized confidential relationships as existing between itself and Plaintiffs.  The Customer Agreement's many provisions limiting Robinhood Financial's duties indicate that Robinhood Financial generally keeps only an arms'-length relationship with its customers.  And although Plaintiffs emphasize Robinhood's marketing efforts, advertising to the public does not amount to assuming fiduciary obligations to recipients of the advertisements.  *See Comm. on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 676 (Cal. 1983) (holding that no fiduciary relationship existed between advertisers of cereal and consumers because "it is unnecessary to call upon the law of fiduciary relationships to perform a function for which it was not designed and is largely unsuited"), *superseded by statute on other grounds as recognized in Branick v. Downey Sav. & Loan Ass'n*, 138 P.3d 214, 218 (Cal. 2006). Plaintiffs' misplaced reliance on their broker is no reason to impose on it a fiduciary responsibility it never accepted.  *See, e.g.*, *Vashisht-Rota v. Ottawa Univ.*, No. 20-cv-959, 2020 WL 6544708, at *3 (S.D. Cal. Nov. 6, 2020).

### ii.    Florida Law

Count III fails under Florida law for the same reasons that it fails under California law.

44

CASE NO. 21-02989-MDL-ALTONAGA/Torres

Florida law, like California law, permits introducing brokers to limit the scope of their duties to customers by agreement. *See SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1339–40 (11th Cir. 2010). Again, the Customer Agreement provides that Plaintiffs' Robinhood accounts are self-directed, Robinhood Financial may prohibit or restrict their abilities to trade, and Robinhood does not provide investment advice. (*See* Cust. Agmt. §§ 5.A, 5.F). Plaintiffs cannot override these provisions with allegations that ignore the actual relationship and contract between them and Robinhood. Thus, Count III must be dismissed. *See SFM Holdings*, 600 F.3d at 1339–40 (affirming dismissal of breach of fiduciary duty claim because existence of fiduciary duty "is determined by the substantive agreement of the parties[,]" the relevant agreement "explicitly stated" that the defendant "was not acting as an adviser or fiduciary to the customer[,]" and the defendant's "actions were appropriate within the limited agency created by the . . . agreement" (alterations added)).

Plaintiffs rely on *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042 (11th Cir. 1987), for the notion that a broker always owes customers general fiduciary duties. (*See* Resp. 41). *Gochnauer* involved a broker who, in April 1979, personally "recommended" that the plaintiffs pursue options trading with a particular investment advisor. 810 F.2d at 1044. The court thus lacked occasion to consider the obligations of a hands-off broker, like Robinhood Financial, that holds funds in self-directed customer accounts. Notably, the court assumed that a broker would at least have a duty to "confer as to a particular transaction[,]" *id.* at 1049 n.9 (alteration added), and the broker bore responsibility for "selection of the investment," *id.* at 1050 (citation omitted).

The *Gochnauer* court did not consider — because it did not need to — the duties of a broker in a "limited agency created by . . . [a]greement." *SFM Holdings*, 600 F.3d at 1340

CASE NO.  21-02989-MDL-ALTONAGA/Torres

(alterations added).  Neither *Gochnauer* nor other cases involving brokers who intervene in clients' investment decisions can salvage Count III.  *Cf. Banc of Am. Secs. LLC v. Stott*, No. 04-81086-Civ, 2005 WL 8156027, at *4 (S.D. Fla. Aug. 30, 2005) (denying dismissal of breach of fiduciary duty claim because broker "had complete discretion to do as he wished with the funds in the [customer] account" (alteration added)).

Count III also fails under Florida law because Plaintiffs do not plausibly allege that Robinhood Financial accepted any confidential relationship with Plaintiffs.  "In order for a confidential or fiduciary relationship to exist under Florida law, there must be substantial evidence showing some dependency by one party and some undertaking by the other party to *advise, counsel, and protect the weaker party*."  *Lanz v. Resolution Tr. Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991) (emphasis added; citing *Cripe v. Atlantic First Nat'l Bank*, 422 So. 2d 820 (Fla. 1982)).

Plaintiffs do not allege that Robinhood Financial elected to "advise, counsel, and protect" them.  *Id.*  The opposite is true: Plaintiffs expressly acknowledged that Robinhood Financial does not provide investment advice.  (*See* Cust. Agmt. § 5.F).  And in Florida, "an arms length transaction" does not obligate "either party to act for the benefit or protection of the other party[.]"  *Lanz*, 764 F. Supp. at 179 (alteration added; citation omitted); *see also Harris v. Zeuch*, 137 So. 135, 189 (Fla. 1931) ("[T]here is nothing to show that the complainant recognized or accepted any trust reposed in himself . . . .  A large part of the business of the world . . . is done on faith, but a contract should not be set aside and obligations canceled merely because of misplaced confidence reposed in a business adversary." (alterations added)).

For these reasons, Count III fails to state a claim against Robinhood Financial.

### b.  Robinhood Securities

Under both California and Florida law, a clearing broker does not generally owe fiduciary

duties to investors whose transactions it executes.  *See Petersen*, 277 Cal. Rptr. at 472–73 ("SSC claims that as a clearing broker it had no such [fiduciary] duty.  We agree with SSC." (alteration added)); *SFM Holdings*, 600 F.3d at 1338–39 ("[C]learing brokers ordinarily owe no fiduciary duty to the customers of introducing brokers."  (alteration added; citing *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 n.12 (11th Cir. 2002))).

Undeterred, Plaintiffs argue that a clearing broker owes fiduciary duties to the customers of an introducing broker when it involves itself in the introducing broker's actions.  (*See* Resp. 47); *see also In re Blech Secs. Litig.*, 961 F. Supp. 569, 584 (S.D.N.Y. 1997) (denying clearing broker's motion to dismiss claim for violation of federal securities laws because plaintiffs alleged the defendant's actions went beyond "mere clearing conduct").  They emphasize the Amended Complaint's allegations that suggest a close relationship between Robinhood Financial and Robinhood Securities — particularly the allegations that the two firms collaborated in imposing the PCO restriction.  (*See* Resp. 47–48; Am. Compl. ¶¶ 90, 93, 95, 99, 112 n.9, 328 338–39; *see also id.* ¶ 28 (alleging that Swartwout, Robinhood Securities' COO, ordered the PCO restriction)).

For two reasons, this theory cannot shore up the claim against Robinhood Securities.  First, it lacks legal support.  Plaintiffs do not cite a single case where a court concluded that a clearing broker owes *fiduciary* duties to the customers of an introducing broker.  *See, e.g.*, *McDaniel v. Bear Stearns & Co., Inc.*, 196 F. Supp. 2d 343, 361 (S.D.N.Y. 2002) (affirming arbitration award that held defendant liable for aiding and abetting fraud and recognized that defendant "owed no fiduciary duty to Claimants . . . as to the basic clearing relationship" (alteration in original; quotation marks and citation omitted)).  Second, even if Robinhood Securities could be equated with an introductory broker, that fact would leave it in the same position as Robinhood Financial, which, under the facts alleged, did not owe fiduciary duties to Plaintiffs.  *See SFM Holdings*, 600

CASE NO.  21-02989-MDL-ALTONAGA/Torres

F. 3d at 1339–40; (*see also* Cust. Agmt. §§ 5.A, 5.F).

The limited agency created by the Customer Agreement forecloses Plaintiffs' effort to hold Robinhood Financial and Robinhood Securities to the standard of fiduciaries in exercising their right to restrict trading.  Thus, Count III fails under both California and Florida law, and it is dismissed.

### IV.   Breach of the Implied Duty of Care (Count IV) and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count V)

Counts IV and V allege that Robinhood violated implied duties owed to Plaintiffs under the Customer Agreement.  Defendants seek dismissal of both claims.  They argue that section 5.F of the Customer Agreement authorized Robinhood to impose the PCO restriction on Plaintiffs' accounts.  (*See* Mot. 39).  And because California law[20] generally does not permit implied terms to alter express agreements, Robinhood maintains it did not owe Plaintiffs any implied duty to avoid restricting stock purchases.  (*See id.*).

#### a.   Breach of the Implied Duty of Care (Count IV)

Count IV alleges that Robinhood Securities and Robinhood Financial violated the Customer Agreement's implied duty of care.  (*See* Am. Compl. ¶ 310).  The Customer Agreement authorizes Robinhood to provide "trading and brokerage services" to investors.  (Cust. Agmt. § 4). Those services include "executing, clearing and settling . . . trades[.]"  (CRS 2 (alterations added)). Plaintiffs argue that Robinhood's promise to furnish brokerage services created an implied obligation to provide those services "with due care" and Robinhood violated this implied obligation when it suspended purchases of the meme stocks.  (Resp. 55).

Under California law, courts may read implied terms into a contract only "[u]nder limited circumstances."  *Ben-Zvi v. Edmar Co.*, 47 Cal. Rptr. 2d 12, 14 (Cal. Ct. App. 1995) (alteration

---

[20] The parties agree that California law determines the fate of both claims.  (*See* Mot. 21; Resp. 49 n.21).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

added).  "Implied terms are disfavored at law."  *Series AGI W. Linn of Appian Grp. Invs. DE, LLC v. Eves*, 158 Cal. Rptr. 3d 193, 203–04 (Cal. Ct. App. 2013) (quotation marks and citation omitted).  That is because judges lack "the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there."  *Holguin v. Dish Network, LLC*, 178 Cal. Rptr. 3d 100, 114 (Cal. Ct. App. 2014) (quotation marks and citation omitted).  Thus, implied terms may be enforced "only when they are not inconsistent with some express term of the contract and, in the absence of such implied terms, the contract could not be effectively performed."  *Series AGI*, 47 Cal Rptr. 3d at 203 (citation and quotation marks omitted; quoting *Tanner v. Title Ins. & Tr. Co.*, 129 P.2d 383 (Cal. 1942)).

Defendants argue that Count IV must be dismissed because the implied term Plaintiffs allege exists would contradict the Customer Agreement's express text.  That, it would.  Once more, the Customer Agreement permits Robinhood Financial and Robinhood Securities to "at any time, in [their] sole discretion and without prior notice . . . prohibit or restrict [the customer's] ability to trade securities."  (Cust. Agmt. § 5.F (alterations added)).  It is difficult to imagine a clearer authorization to impose the limited trading restrictions Plaintiffs now object to.

This plain authorization to restrict trading creates obstacles that Plaintiffs cannot surmount.  The reason is simple: "if defendants were given the right to do what they did by the express provisions of the contract there can be no breach."  *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 728 (Cal. 1992) (quotation marks omitted; quoting *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 777–78 (S.D.N.Y. 1969)).  Courts applying California law have routinely reinforced this principle.  *See, e.g.*, *Oakland v. GCCFC 2005-GG5 Hegenberger Retail Ltd. P'ship*, No. 19-cv-00403, 2019 WL 1571881, at *3 (N.D. Cal. Apr. 11, 2019) ("A pillar of contract law is that an implied term cannot contradict express terms of an

agreement." (citation omitted)); *Series AGI*, 158 Cal. Rptr. 3d at 204 ("The courts will not imply

a better agreement for parties than they themselves have been satisfied to enter into, or rewrite

contracts whenever they operate harshly." (citations and quotation marks omitted)).  And they

routinely dispose of claims for breaches of implied terms when those supposedly implicit

obligations would forbid conduct that an agreement expressly allows.  *See, e.g.*, *Al Owaidah v.*

*Mazzei*, No. 18-246, 2020 WL 1041091, at *10–12 (C.D. Cal. Jan. 27, 2020); *Oakland*, 2019 WL

15711881, at *3–4; *Yalley v. Liberty Life Assur. Co.*, Nos. A154076 & A154803, 2019 WL

2710242, at *7 (Cal. Ct. App. June 28, 2019).

"But this can't be true," Plaintiffs argue.  They insist that reading the Customer Agreement

"to afford Robinhood Financial and Robinhood Securities unbridled discretion to impose the PCO

limitations . . . . would render the brokerage services [they] agreed to provide illusory."  (Resp. 55

(alterations added)).  Put another way, Plaintiffs argue that the Customer Agreement contains

implied limits on Robinhood's discretion to restrict trading because, otherwise, the Customer

Agreement would be invalid.

This argument relies on a narrow exception to California law's skepticism of implied

contractual terms.  Under that exception, courts may imply a contract term that conflicts with an

express grant of discretionary power when — but only when — "reading the [express] provision

literally would, contrary to the parties' clear intention, result in an unenforceable, illusory

agreement."  *Third Story Music, Inc. v. Waits*, 48 Cal. Rptr. 2d 747, 753 (Cal. Ct. App. 1995)

(alteration added).  In other words, courts apply the exception only when they cannot otherwise

reconcile the parties' apparent "intent to give one party total discretion over its performance[,]" on

the one hand, and their "intent to have a mutually binding agreement[,]" on the other.  *Id.* at 751

(alterations added); *see also Ben-Zvi*, 47 Cal. Rptr. 2d at 473 (holding that "[a] term can only be

CASE NO.  21-02989-MDL-ALTONAGA/Torres

implied upon grounds of obvious necessity" (alteration added; other alterations adopted; citations and quotation marks omitted)).

An agreement that grants one party total discretion to perform lacks mutuality "only if the total discretion granted one party renders the contract lacking in consideration." *Perdue v. Crocker Nat'l Bank*, 702 P.2d 503, 510 (Cal. 1985) (citing *Auto. Vending Co. v. Wisdom*, 6 Cal. Rptr. 31 (Cal. Ct. App. 1960)).  But "[i]f there are reciprocal promises," an agreement's grant of unilateral discretion "does not render the contract illusory." *Id.* (alteration added).

The illusory-contract exception does not help Plaintiffs here.  The Customer Agreement offers Plaintiffs and other Robinhood customers many benefits *besides trading*.  The Agreement affords Plaintiffs access to Robinhood's cash management services.  (*See* Cust. Agmt. §§ 24, 30; Am. Compl. ¶ 123; CRS 3).  It also permits Plaintiffs to use Robinhood's "investment tools and education to help . . . make investment decisions" (CRS 2 (alteration added)); like Robinhood's podcast, newsletter, and website publications (Am. Compl. ¶ 123; *see also id.* ¶¶ 317–19 (alleging that the Customer Agreement incorporates the Customer Relationship Summary by reference)).

As these provisions illustrate, the Customer Agreement confers many benefits on Plaintiffs that have nothing to do with trading.  Those benefits have value.  Thus, "whether or not an implied covenant is read into the [A]greement, the [A]greement would be supported by consideration and would be binding." *Third Story Music*, 41 Cal. Rptr. 2d at 753 (alterations added; footnote call number omitted).

When California courts imply contract terms that conflict with the parties' express intent, they do so only to harmonize that intent with the parties' apparent "intent to have a mutually binding agreement." *Id.* at 751.  But here, there is "no tension between the parties' express agreement and their intention to be bound, and no necessity to impose an implied covenant to

51

CASE NO.  21-02989-MDL-ALTONAGA/Torres

create mutuality." *Id.* at 753; *see also Sweet v. Google Inc.*, No. 17-cv-03953, 2018 WL 1184777, at *9 (N.D. Cal. Mar. 7, 2018) ("Regardless of how YouTube exercised its discretionary power . . . the agreement . . . was supported by adequate independent consideration." (alterations added)). Plaintiffs might have come to regret their decision to enter into the Customer Agreement, but the Court lacks authority to save Plaintiffs from themselves.

Plaintiffs alternatively argue that section 5.F of the Customer Agreement is ambiguous. (*See* Resp. 53). More concretely, they assert that section 5.F may not have afforded Robinhood a basis to impose the PCO restriction at all because section 13 of the Customer Agreement — which identifies certain rights that Robinhood retains "[p]articularly during periods of high volume, illiquidity, fast movement or volatility in the marketplace" — does not contain language authorizing trading restrictions. (Cust. Agmt. § 13 (alteration added)).

Any perceived conflict between sections 5.F and 13 is manufactured. Plaintiffs, to be sure, are correct that section 13 does not "give Defendants the right to bar trading in any securities." (Resp. 55–56). But section 13 certainly does not *forbid* such activity. (*See* Cust. Agmt. § 13).

Also, the phrase "Market volatility" in section 13's heading proves very little. (*Id.*). Section 13 nowhere indicates that it exhaustively lists Robinhood's rights in the event of a volatile securities market. By contrast, Section 5.F expressly permits Robinhood Financial and Robinhood Securities to restrict customer trading "at *any* time" — including, presumably, during periods of market volatility. (*Id.* § 5.F (emphasis added)). Section 13's silence on trading restrictions simply does not conflict with section 5.F's explicit authorization to limit trading.

Plaintiffs are also wrong to suggest that Count IV can survive a Rule 12(b)(6) challenge because the existence and scope of Defendants' putative implied duties are "fact questions[.]" (Resp. 55 (alteration added)).   Under California law, contract interpretation, including the

CASE NO.  21-02989-MDL-ALTONAGA/Torres

determination of whether a contract imposes implied obligations, "is essentially a judicial function[.]"  *Holguin*, 178 Cal. Rptr. 3d at 114 (alteration added; quotation marks omitted; quoting *Parsons v. Bristol Dev. Co.*, 402 P.2d 839 (Cal. 1965)).  Plaintiffs attach the Customer Agreement to the Amended Complaint, so the Court may consider and interpret the Agreement on a motion to dismiss.  *See* Fed. R. Civ. P. 10(c); *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007).  No fact beyond the Amended Complaint would alter the inevitable conclusion that the implied obligations Plaintiffs seek to add to the Customer Agreement would contradict the Agreement's plain text.  *See Sweet*, 2018 WL 1184777, at *9–10 (dismissing claim for breach of implied term because implied term would conflict with express agreement).

Count IV is dismissed.

### b.  Breach of the Implied Covenant of Good Faith and Fair Dealing (Count V)

Plaintiffs' claim of breach of the implied covenant of good faith and fair dealing meets the same fate for essentially the same reasons.  "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*."  *Guz v. Bechtel Nat'l Ins.*, 8 P.3d 1089, 1110 (Cal. 2000) (citation omitted).  The implied covenant "functions 'as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.'"  *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 160 Cal. Rptr. 3d 718, 729–30 (Cal. Ct. App. 2013) (citation and quotation marks omitted).

Plaintiffs claim that imposing the PCO restriction violated the Customer Agreement's implied covenant of good faith and fair dealing.  They fail to persuade.

Section 5.F of the Customer Agreement expressly allows Robinhood Securities and

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Robinhood Financial to limit trading from customer accounts.  (*See* Cust. Agmt. § 5.F).  "[O]ne cannot invoke the implied covenant to prohibit conduct that a contract expressly allows."  *21st Century Ins. Co. v. Superior Ct.*, 213 P.3d 972, 982 (Cal. 2009) (alteration added); *see also Carma Devs.*, 826 P.2d at 728 ("We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement.").  In fact, the California Supreme Court has recognized

> that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . .  And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.

*Carma Devs.*, 826 P.2d at 728 (alteration added; quotation marks omitted; quoting *VTR, Inc.*, 303 F. Supp. at 777–78).  Plainly, California law precludes Plaintiffs from using the implied covenant to override section 5.F's express grant of discretion.

Plaintiffs again insist that the Customer Agreement would be unenforceable unless their proposed implied covenant limits the discretion afforded by section 5.F.  Once more, this is not so.

The Customer Agreement permits Robinhood Financial and Robinhood Securities in their "sole discretion" to restrict Plaintiffs' abilities to buy and sell securities (Cust. Agmt. § 5.F), but it also affords Plaintiffs many valuable benefits that have nothing to do with trading from their Robinhood accounts (*see id.* §§ 24, 30; Am. Compl. ¶¶ 123, 330; CRS 2–3).  Those benefits make the Customer Agreement enforceable regardless of how much discretion section 5.F confers on Robinhood.  As one California court has explained, "if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and 'can never violate

CASE NO.  21-02989-MDL-ALTONAGA/Torres

an implied covenant of good faith and fair dealing.'"  *Wolf v. Walt Disney Pictures & Television*,

76 Cal. Rptr. 3d 585, 597 (Cal. Ct. App. 2008) (quoting *Carma Devs.*, 826 P.2d at 729).  California

courts consistently uphold this principle.  *See, e.g.*, *Storek & Storek, Inc. v. Citicorp Real Est., Inc.*,

122 Cal. Rptr. 2d 267, 277–78 (Cal. Ct. App. 2007); *Third Story Music*, 48 Cal. Rptr. 2d at 753;

*see also Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824, 832–33 (N.D. Cal. 2020);

*Sweet*, 2018 WL 1184777, at *6–10; *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 885 (N.D.

Cal. 2015).  The undersigned will do the same.

Plaintiffs argue that their implied covenant claim should survive because section 5.F's

explicit grant of discretion conflicts with section 13 and is therefore ambiguous.  (*See* Resp. 53).

Just as this contention could not save Count IV, it cannot support Count V.  Section 5.F expressly

permits Robinhood to enforce trading restrictions "at any time" (Cust. Agmt. § 5.F), including

during periods of market volatility, while section 13 says nothing about the matter (*see id.* § 13).

The two provisions plainly do not conflict.

Finally, Plaintiffs disparagingly refer to the Customer Agreement as "a contract of

adhesion[.]"  (Resp. 49 (alteration added)).  Yet they stop short of arguing that the Agreement is

unenforceable, and for good reason: adhesive contracts "are indispensable facts of modern life that

are generally enforced."  *Murphy v. Twitter, Inc.*, 274 Cal. Rptr. 3d 360, 379 (Cal. Ct. App. 2021)

(quotation marks omitted; quoting *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 11 (Cal. 2016); other

citation omitted).  "To describe a contract as adhesive in character is not to indicate its legal effect."

*Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 172 (Cal. 1981); *see also AT&T Mobility LLC v.

Concepcion*, 563 U.S. 333, 346–47 (2011) ("[T]he times in which consumer contracts were

anything other than adhesive are long past." (alteration added; citations and footnote call number

omitted)).  Plaintiffs do not argue that section 5.F of the Customer Agreement is unenforceable

CASE NO.  21-02989-MDL-ALTONAGA/Torres

against them and labeling the Agreement adhesive does not change that fact.

Because Count V does not state a viable claim of breach of the Customer Agreement, it must be dismissed.[21]

### V.   Tortious Interference with Contract and Business Relationship (Count VI)

Count VI alleges that Robinhood Markets tortiously interfered with Plaintiffs' contractual relationship with Robinhood Securities and Robinhood Financial.  Plaintiffs claim that Robinhood Markets illegally interfered with the Customer Agreement by, among other things, "forcing the Suspended Stocks into PCO[,]" "failing to have adequate business contingency and continuity plans to ensure customer access in the event of market volatility[,]" and "continuing to allow new customers to join the platform[.]"  (Am. Compl. ¶ 338 (alterations added)).  In this analysis, the Court first addresses Florida law and then turns to California law.

To succeed on a claim of tortious interference with a contractual relationship under Florida law, a plaintiff must show: "(1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach."  *Special Purpose Accts. Receivable Co-op Corp. v. Prime One Cap. Co., L.L.C.*, 125 F. Supp. 2d 1093, 1103 (S.D. Fla. 2000) (citing *Johnson v. Enter. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th

---

[21] Plaintiffs suggest that Robinhood Securities and Robinhood Financial breached their implied duties in ways unrelated to the PCO restrictions.  (*See* Resp. 48–49 (citing Am. Compl. ¶¶ 13, 105, 204, 300, 323)).  They point, for instance, to the Amended Complaint's allegations that "Robinhood fueled trading of the Suspended Stocks without either the tools needed to manage or and [sic] capital required to protect against the known risks associated with concentrated positions in highly volatile [securities]" (Am. Compl. ¶ 105 (alteration added)), and "Robinhood failed to take the necessary precautions to ensure that its platform would continue to be available for trading, while simultaneously expanding its marketing, taking on new customers and facilitating trading" (*id.* ¶ 204).  The problem with Plaintiffs' argument is that these alleged acts would never have affected Plaintiffs absent Robinhood's exercise of its express right to impose the PCO restriction.  And Plaintiffs cannot sue in federal court for actions that never harmed them.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Cir. 1998)).  The elements of claims for tortious interference with contracts under California law are nearly, but not completely, the same.  *Compare id. with Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 575 (Cal. 2020) (citation omitted).  The main difference between the two states' laws is that Florida law requires showing that the defendant caused a breach of contract, *see Iaffaldano v. Sun West Mortg. Co., Inc.*, No. 2:17-cv-14222, 2017 WL 9362576, at *4 (S.D. Fla. Dec. 11, 2017) (citation omitted), while California law requires only that the defendant have intentionally acted "to induce a . . . *disruption* of the contractual relationship[,]" *Ixchel Pharma*, 470 P.3d at 575 (alterations and emphasis added; citations omitted).[22]

That element dooms Count VI under Florida law.  Plaintiffs do not allege that Robinhood Markets caused a violation of any express provision of the Customer Agreement.  In fact, neither Count VI nor Plaintiffs' Response identifies what term of the Customer Agreement Robinhood Markets caused to be breached.  (*See* Am. Compl. ¶¶ 334–41; Resp. 56–58).  Plaintiffs argue only that Robinhood Markets caused its subsidiaries to breach *implied* terms of the Agreement.  (*See* Resp. 57–58).  That argument fails here for the same reason it fails as to Counts IV and V: a party does not breach a contract by doing something the contract expressly allows.  *See Hogan v.*

---

[22] Although Count VI references the Customer Agreement, some of its allegations might suggest that Plaintiffs intended to allege tortious interference with *a business relationship*.  (*See, e.g.*, Am. Compl. ¶ 335 ("Robinhood Markets tortiously interfered with existing business relations[.]" (alteration added))).  Although tortious interference with a business relationship is a tort separate from tortious interference with contractual relations, courts sometimes conflate the two.  *See, e.g.*, *Palm Springs Assocs., Ltd. v. T-Mobile USA, Inc.*, No. 20-22841-Civ, 2020 WL 7711687, at *3 (S.D. Fla. Dec. 29, 2020).  One difference between the two torts is that claims for tortious interference with a business relationship require showing "that a business relationship existed," and that relationship need not be "evidenced by an enforceable contract[.]" *Register v. Pierce*, 530 So. 2d 990, 993 (Fla. 1st DCA 1988) (alteration added; citation omitted); *see also Special Purpose*, 125 F. Supp. at 1103 (citations omitted).

Plaintiffs do not suggest that they allege tortious interference with a business relationship, but the claim would fail even if they did.  A claim for tortious interference with a business relationship must allege a relationship that "afford[s] the plaintiff existing or prospective legal or contractual rights." *Register*, 530 So. 2d at 993 (alteration added).  It must also allege that those rights "have been substantively damaged[.]" *Id.* (alteration added).  Count VI alleges neither.

CASE NO.  21-02989-MDL-ALTONAGA/Torres

*Praetorian Ins. Co.*, No. 1:17-cv-21853, 2018 WL 8266803, at *7 (S.D. Fla. Jan. 11, 2018); *21st*

*Century Ins. Co.*, 213 P.3d at 982; (*see also* Cust. Agmt. § 5.F).

That leaves California law.  In California, parties may sometimes assert tortious

interference claims in circumstances where no breach has occurred.  A tortious interference claim

can succeed if the defendant caused an intentional "disruption of the contractual relationship[.]"

*Ixchel Pharma*, 470 P.3d at 575 (alteration added; citations omitted).  Under California law, in

other words, a plaintiff may prevail on a tortious interference claim by proving only that

"performance has been prevented or rendered more expensive or burdensome[,]" even absent a

breach.  *Lipman v. Brisbane Elementary Sch. Dist.*, 359 P.2d 465, 469 (Cal. 1961) (alteration

added), *abrogation on other grounds recognized by Brown v. Kelly Broad. Co.*, 771 P.2d 406, 433

n.37 (Cal. 1989).

Plaintiffs say they have adequately alleged a tortious interference claim under California

law because they need not allege an actual breach of the Customer Agreement.  (*See* Resp. 57).

They base that contention on two California Supreme Court decisions — *Lipman* and *Pacific Gas*

*& Electric Company v. Bear Stearns and Company*, 791 P.2d 587 (Cal. 1990).  The Court

disagrees.

In *Lipman*, the California Supreme Court noted that a tortious interference claim may

succeed "where the *plaintiff's performance* has been prevented or rendered more expensive or

burdensome[.]" 359 P.2d at 469 (alteration and emphasis added).  That is not what is alleged here.

Plaintiffs do not allege the existence of any obligation to "perform[]" that the PCO restrictions

supposedly interfered with.  *Id.* (alteration added).  The Customer Agreement does not *require*

Plaintiffs — or even give them a right — to purchase securities.  Thus, they cannot credibly

contend that the PCO restrictions made their "*performance*" of the Customer Agreement "more

58

CASE NO.  21-02989-MDL-ALTONAGA/Torres

expensive or burdensome[.]"  *Id.* (alteration and emphasis added).

 *Pacific Gas* does no more to help Plaintiffs.  In that case, the California Supreme Court commented in *dictum* that a "Plaintiff need not allege an actual or inevitable breach of contract" to state a tortious interference claim.  791 P.2d at 592.  It also reiterated "that interference with the *plaintiff's performance* may give rise to a claim . . . if *plaintiff's performance* is made more costly or more burdensome."  *Id.* (alteration and emphases added).  Nowhere does *Pacific Gas* endorse more open-ended tort liability for non-parties to contracts.  To the contrary, the court counseled "cautio[n] in defining the interference torts, to avoid promoting speculative claims."  *Id.* at 597 (alteration added).

 Plaintiffs point to a litany of other allegations that purportedly establish Robinhood Markets' tortious interference with Plaintiffs' rights under the Customer Agreement.  (*See* Resp. 57).  Among those allegations: Robinhood Markets "fail[ed] to have adequate business contingency and continuity plans to ensure customer access in the event of market volatility[,]" "continu[ed] to allow new customers to join the platform[,]" and "fail[ed] to have a supervisory control system that would have identified and prevented the capitalization issues[.]"  (Am. Compl. ¶ 338 (alterations added)).  Tellingly, Plaintiffs do not tie these alleged acts and omissions to any identifiable provision of the Customer Agreement, let alone to a provision that obligated Plaintiffs to perform.  (*See* Resp. 57).  That omission is fatal.  None of the allegations that Plaintiffs cite supports an inference that Robinhood Markets caused a breach of the Customer Agreement — as required to state a claim under Florida law — or that it disrupted Plaintiffs' performance of the Agreement — as required under California law.[23]

---

[23] Because none of the alleged acts that Plaintiffs cite would have actually resulted in a breach or disruption of the Customer Agreement, Robinhood Markets' alleged inducement of its subsidiaries to commit those acts could not have amounted to an "intentional [attempt] to induce a breach or disruption of the contractual

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Under either state's law, Count VI is defective.  It is therefore dismissed.

## VI.   Civil Conspiracy (Count VII)

Count VII asserts a civil conspiracy claim against all three Defendants.  (*See* Am. Compl. ¶¶ 342–46).  Under both California and Florida law, claims for civil conspiracy generally must be supported by allegations of a standalone tort.  *See Applied Equip.*, 869 P.2d at 457 ("Standing alone, a conspiracy does no harm and engenders no tort liability.  It must be activated by the commission of an actual tort."); *Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 103 (Fla. 3d DCA 2019) ("There is no freestanding cause of action in Florida for 'civil conspiracy.'  In order to state a claim for civil conspiracy, a plaintiff must allege an underlying independent tort.").

Plaintiffs allege that the predicate tort here was Robinhood Markets' tortious interference with Plaintiffs' rights under the Customer Agreement.  (*See* Am. Compl. ¶ 343; Resp. 60).  But for the reasons explained, Plaintiffs' tortious interference claim against Robinhood Markets fails.  By extension, the claim for civil conspiracy based on that alleged tort also fails.  *See, e.g.*, *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1027–28 (Fla. 3d DCA 1981) (affirming dismissal of civil conspiracy claim because plaintiff did not adequately allege elements of underlying tort).

Plaintiffs alternatively contend that Count VII should proceed because of an exception to the predicate-tort requirement under Florida law.  Under that exception, a plaintiff may state a claim for an "independent tort of conspiracy" if the alleged conspirators displayed "some peculiar power of coercion . . . by virtue of their combination, which power an individual could not possess."  *Buckner*, 403 So. 2d at 1029 (alteration added; citing *Churruca v. Miami Jai-Alai, Inc.*, 353 So. 2d 547 (Fla. 1977); other citation omitted).  Courts sometimes describe this exception as

---

relationship[.]"  *Ixchel Pharma*, 470 P.3d at 575 (alterations added; citations and quotation marks omitted). Count VI fails to state a claim for this reason too.

an "economic boycott." *Am. Diversified Ins. Servs., Inc. v. Union Life Fid. Ins. Co.*, 439 So. 2d 904, 906 (Fla. 2d DCA 1983) (quotation marks omitted). Claims predicated on an alleged "economic boycott" must rest on "allegation[s] of anti-competitive conduct[.]" *Banco de los Trabajadores v. Cortez Moreno*, 237 So. 3d 1127, 1136 n.9 (Fla. 3d DCA 2018) (alterations added; citation omitted).

Although Plaintiffs, in their Response, attempt to recast Count VII as an independent conspiracy claim, the Amended Complaint's allegations do not support that characterization. Plaintiffs allege only that Defendants conspired to tortiously interfere with Plaintiffs' purported rights — not that Defendants' actions were anti-competitive. (*See* Am. Compl. ¶ 343). Likewise, Plaintiffs do not allege that Defendants collectively possessed "power" that "an individual could not possess." *Buckner*, 403 So. 2d at 1029 (citation omitted). Thus, Florida law's "economic boycott" exception to the predicate-tort requirement does not help Plaintiffs here.

Count VII fails for another reason too. Under both California and Florida law, "tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort[.]" *Applied Equip.*, 869 P.2d at 457 (alteration added); *see Richardson v. Progressive Am. Ins. Co.*, No. 2:18-cv-715, 2019 WL 2287955, at *8 (M.D. Fla. May 29, 2019). Here, the relevant, alleged tort is interference with the Customer Agreement.

Again, this alleged predicate creates problems for Plaintiffs. "[O]ne cannot tortiously interfere with a contract to which it is a party." *Richardson*, 2019 WL 2287955, at *8 (alteration added; citing *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1099 (Fla. 1st DCA 1999)); *see also Applied Equip.*, 869 P.2d at 459 ("[T]he tort cause of action for interference with contract does not lie against a party to the contract." (alteration added)). Because Robinhood Securities and Robinhood Financial are parties to the Customer Agreement, neither is "legally capable" of

committing interference.  *Applied Equip.*, 869 P.2d at 457.  That leaves only Robinhood Markets.

Yet "a civil conspiracy requires more than one party" because "it is not possible for a corporation

to conspire with itself[.]"  *Richardson*, 2019 WL 2287955, at *8 (alteration added; citing *Dickerson*

*v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000)).  Count VII thus fails to allege a

conspiracy by two or more parties who are legally capable of conspiring to commit a tort against

Plaintiffs.[24]  So, it must be dismissed.

### VII.   Leave to Amend

The Court has afforded Plaintiffs ample time and resources — more than most litigants —

to refine their claims.  This action was consolidated more than eight months ago, and Plaintiffs

filed their initial Complaint [ECF No. 359] in July 2021 with the benefit of having reviewed the

many pre-consolidation pleadings.  Plaintiffs also had the opportunity to review Defendants'

motion to dismiss the initial Complaint [ECF No. 406] before filing the Amended Complaint as of

right.  Before Plaintiffs filed any master pleading — and more than three months before Plaintiffs

filed the Amended Complaint — the Court ordered Defendants to produce thousands of pages of

relevant discovery.  (*See* June 3, 2021 Order [ECF No. 323] 2).  That discovery was so extensive

that the Court granted Plaintiffs' request for an extension of time to amend their initial Complaint

to allow them to review it.  (*See* July 8, 2021 Order [ECF No. 335] 1).

Here's the point.  District courts may deny a Plaintiff leave to amend only when a

"substantial reason" justifies doing so.  *Fla. Power & Light*, 85 F.3d at 1520 (quoting *Shipner*, 868

---

[24] Plaintiffs resist dismissal on this basis by emphasizing that a co-conspirator need not be "a direct participant in the wrongful act."  (Resp. 60 (quotation marks omitted; quoting *AREI II Cases*, 157 Cal. Rptr. 3d 368, 384 (Cal. Ct. App. 2013))).  That observation might be true, but it is also irrelevant.  Count VII is not defective because it fails to allege Robinhood Securities and Robinhood Financial's "direct" interference with the Customer Agreement.  *AREI II Cases*, 157 Cal. Rptr. 3d at 384 (citation and quotation marks omitted).  It is defective because Robinhood Securities and Robinhood Financial are *legally incapable* of tortiously interfering with the Agreement.

CASE NO.  21-02989-MDL-ALTONAGA/Torres

F.2d at 406).  That reason exists here.

The Amended Complaint's deficiencies cannot be explained away by a lack of opportunity to cure them.  Nearly a year has passed since the events giving rise to this lawsuit, and in that time, Plaintiffs have been offered many tools to remedy any shortcomings in their legal theories.  Those tools include Defendants' motion to dismiss the initial Complaint, the many individual pleadings filed prior to consolidation, and the exercise of Plaintiffs' right to amend under Federal Rule of Civil Procedure 15(a).  Nonetheless, Plaintiffs have failed to plead a single viable claim.

Plaintiffs also fail to explain how an amendment will resuscitate their case.  They point only to the purported "extreme divergence between Robinhood's internal communications and its public statements."  (Resp. 61).  But that argument misses the point.  "[A] plaintiff 'should not be allowed to amend his complaint without showing how the complaint could be amended to save the meritless claim.'"  *McInteer*, 470 F.3d at 1362 (alteration added; other alteration adopted; citation omitted).

Plaintiffs have not filed a motion for leave to amend or "set forth the substance of the proposed amendment."  *Id.* (citation omitted).  Plaintiffs' failure to explain how next time will be different does not inspire confidence in their ability to state a claim.  *See id.* at 1361–62 (affirming dismissal with prejudice because plaintiff did not identify proposed amendment in request for leave to amend included in response to motion to dismiss); *Lacy v. BP P.L.C.*, 723 F. App'x 713, 717 (11th Cir. 2018) (affirming dismissal with prejudice because plaintiff "failed to allege or propose any new facts that would have cured the complaint's defects").  And substance aside, Plaintiffs improperly request leave to amend "as an afterthought . . . at the ta[il]-end" of their Response.  *Insight Secs.*, 2021 WL 3473763, at *5 (alterations added); *see also Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) ("[W]here a request for leave to file an amended

CASE NO. 21-02989-MDL-ALTONAGA/Torres

complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." (alteration added; quotation marks omitted; quoting *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009))).

These facts and the Amended Complaint's deficiencies persuade the Court that amendment would be futile. Even if Plaintiffs filed another complaint, they would, at some point, run squarely into the Customer Agreement — an obstacle they cannot overcome. *See SFM Holdings*, 600 F.3d at 1340 (affirming dismissal with prejudice because broker "acted pursuant to" its contracts with its customers). Plaintiffs also cannot argue that dismissal results from inadequate knowledge of the facts. They received voluminous discovery, including hundreds of pages of Defendants' internal communications, before filing the Amended Complaint. *In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1342, 1348 (11th Cir. 2017) (affirming dismissal with prejudice because plaintiffs' allegations "were not made at a point in the litigation when [p]laintiffs lacked the necessary knowledge to fill in the blanks[,]" as "[p]laintiffs had enjoyed the opportunity for extensive discovery" (alterations added)). And, again, the Court liberally granted Plaintiffs additional time review that discovery. (*See* July 8, 2021 Order).

Simply, there is no cure for the many ailments that plague the Amended Complaint. Further amendment would thus be futile and leave to amend is denied.

\* \* \*

The result in this case comes down to a simple truth: both California and Florida law require courts to respect and enforce the terms of valid contracts, even when one party to a contract boasts greater bargaining power. Plaintiffs have not argued or alleged that the Customer Agreement is unenforceable. Thus, both California and Florida law require holding Plaintiffs to the Agreement's terms. Those terms permitted Defendants to do precisely what they did.

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Plaintiffs' request to enlarge Defendants' obligations beyond those contained in the Agreement is understandable but misguided.  California and Florida law each carve out a vital gatekeeping function for courts faced with novel tort claims.  Indeed, both California and Florida recognize that tort law is an imperfect — and often, an undesirable — mechanism for allocating financial risk and responsibility.  Unlike contract law, which encourages parties to allocate risks related to future events, tort law concerns itself with after-the-fact determinations of fault.  Expanding tort law at contract law's expense may cause uncertainty.  And the uncertain threat of ruinous tort liability can discourage behavior that benefits society.  That is why California, Florida, and virtually every other state in the nation make a point of setting "[m]eaningful limits" on tort liability.  *S. Cal. Gas Leak Cases*, 441 P.3d at 896 (alteration added).  One of those limits is a healthy skepticism of tort claims better suited for resolution by contract law — for example, claims for purely economic losses, like those asserted by Plaintiffs here.

No doubt, Plaintiffs were gravely disappointed when Robinhood suspended purchases of the meme stocks and their holdings declined in value.  But the law does not afford relief to every unfulfilled expectation.  Sometimes, it requires "denying recovery in negligence cases like this one even though purely economic losses inflict real pain."  *Id.*  Plaintiffs' claims fail because entertaining them would sanction a departure from the parties' own agreement and California and Florida tort-law principles.  For that reason, the Amended Complaint must be dismissed.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Robinhood Tranche Complaint **[ECF No. 421]** is **GRANTED**.  The Amended Consolidated Class Action Complaint **[ECF No. 409]** is **DISMISSED** with prejudice.

CASE NO.  21-02989-MDL-ALTONAGA/Torres

**DONE AND ORDERED** in Miami, Florida, this 26th day of January, 2022.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

# TAB 474

# Plaintiffs
# Notice of Appeal
# re Antitrust Actions

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

IN RE:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to:

ALL ANTITRUST ACTIONS

<u>**NOTICE OF APPEAL**</u>

Notice is hereby given that Plaintiffs Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling (collectively, "Plaintiffs"), on behalf of themselves and others similarly situated, appeal to the United States Court of Appeals for the Eleventh Circuit from the final Order entered on May 13, 2022 [ECF No. 470], which grants Defendants Robinhood Markets, Inc., Robinhood Financial LLC, Robinhood Securities, LLC and Citadel Securities LLC's Motion to Dismiss the Amended Antitrust Tranche Complaint [ECF No. 456], and dismisses Plaintiffs' Amended Consolidated Class Action Complaint [ECF No. 451] with prejudice. A copy of the order is attached as Exhibit A hereto.

Dated: June 1, 2022

Respectfully Submitted,

By:    /s/ *Joseph R. Saveri*
       Joseph R. Saveri

By:    /s/ *Frank R. Schirripa*
       Frank R. Schirripa

Joseph R. Saveri (CA SBN 130064)
Steven N. Williams (CA SBN 175489)
Christopher K.L. Young (CA SBN 318371)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
cyoung@saverilawfirm.com

Frank R. Schirripa (NY SBN 4103750)
Kathryn Hettler (NY SBN 5126065)
Seth Pavsner (NY SBN 4969689)
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Ave, 10th Floor
New York, New York 10016
Tel: (212) 213-8311
fschirripa@hrsclaw.com
khettler@hrsclaw.com
spavsner@hrsclaw.com

*Co-Lead Counsel for the Antitrust Tranche*

2

# Exhibit A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  21-2989-MDL-ALTONAGA/Torres

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**
_____/

This Document Relates to the Antitrust Actions

### ORDER

**THIS CAUSE** came before the Court on Defendants'[1] Motion to Dismiss the Amended

Antitrust Tranche Complaint [ECF No. 456], filed on February 18, 2022.  Plaintiffs[2] filed a

Response [ECF No. 459], to which Defendants filed a Reply [ECF No. 463].  The Court has

carefully considered the Amended Consolidated Class Action Complaint (the "Am. Compl.")

[ECF No. 451], the parties' written submissions, the record, and applicable law.  For the following

reasons, the Motion is granted.

## I.        INTRODUCTION

The Amended Complaint is Plaintiffs' third attempt at pleading an antitrust conspiracy

claim arising from the January 2021 short squeeze.  The Court dismissed Plaintiffs' Corrected

Consolidated Class Action Complaint (the "CCAC") last fall, giving Plaintiffs the opportunity to

amend.  (*See generally* Nov. 17, 2021 Order [ECF No. 438]).  They did so.  What has changed

with the latest pleading?  Not much.

---

[1] The Defendants are Robinhood Markets, Inc.; Robinhood Financial LLC; Robinhood Securities, LLC;
and Citadel Securities LLC.  (*See* Am. Compl. ¶¶ 42–49).

[2] The Plaintiffs are Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling.  (*See* Am.
Compl. ¶¶ 23–41).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

The CCAC described a wide-ranging conspiracy purportedly orchestrated by a market maker and involving over a dozen Defendants, including introducing brokerages, self-clearing brokerages, and clearinghouses.  Plaintiffs alleged the market maker, Citadel Securities, pressured the other Defendants to halt trading in certain stocks that had undergone rapid and historic price increases due to a retail trading frenzy.  According to Plaintiffs, Citadel Securities held significant short positions in the affected stocks, rendering it especially vulnerable to the retail-induced short squeeze.

Plaintiffs adequately pleaded parallel conduct among the Defendants.  But there were no additional factual allegations supporting a plausible inference of a conspiracy — except for references to a few vague and ambiguous emails that were exchanged between a brokerage, Robinhood,[3] and its market maker, Citadel Securities.  The Court dismissed the CCAC in its entirety because a few questionable emails between two firms in an otherwise lawful business relationship were not enough to support a plausible inference of an unlawful conspiracy.

This third time around, Plaintiffs only allege collusion between Robinhood and Citadel Securities; they have dropped every other Defendant from the suit.  While Plaintiffs profess to have bolstered their factual allegations as to Robinhood and Citadel Securities, the allegations of conspiracy are in substance the same and thus inadequate.  In addition, Plaintiffs fail to plausibly allege an unreasonable restraint of trade because their garbled market theory does not conform to the alleged facts.  The Court explains.

---

[3] The Court refers to Robinhood Markets, Inc.; Robinhood Financial LLC; and Robinhood Securities, LLC, collectively, as "Robinhood[.]"  Robinhood Financial LLC and Robinhood Securities, LLC are wholly-owned subsidiaries of Robinhood Markets, Inc.  (*See* Am. Compl. ¶¶ 42–45).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

## II.    BACKGROUND

This putative class action is brought on behalf of individual investors (the "Retail Investors") who suffered losses as a result of Defendants' response to a "short squeeze" — a situation in which stocks or other assets rise sharply in value, distressing short positions.[4]  (*See* Am. Compl. ¶¶ 12, 15–16).  This short squeeze occurred in late January 2021, as the Retail Investors purchased the Relevant Securities *en masse* over a short period of time,[5] exposing those with short positions in the Relevant Securities — such as Citadel Securities — to large potential losses.  (*See id.* ¶¶ 7, 11–12, 64–66).  According to Plaintiffs, Citadel Securities pressured Robinhood to restrict trading on its platform, which "artificially constricted the price appreciation of the Relevant Securities[,]" in violation of the Sherman Act, 15 U.S.C. § 1.  (Am. Compl. ¶ 16 (alteration added); *see id.* ¶¶ 13, 67, 403–415).

*Parties.*

*Defendants.*   Robinhood Markets is the corporate parent of Robinhood Financial and Robinhood Securities.  (*See id.* ¶ 42).  Robinhood Financial is an introducing broker: it provides financial services through an electronic trading platform, or application, where individual investors can trade financial assets.  (*See id.* ¶ 43).  Robinhood Securities is a clearing broker: it handles the execution, clearing, and settling of trades placed on Robinhood Financial's application.  (*See id.* ¶¶ 44, 83).  Collectively, Robinhood restricted the Retail Investors' ability to purchase the

---

[4] A "short" seller borrows a security from a lender, believing the price of the security will decrease.  (*See* Am. Compl. ¶ 108).  It then sells the borrowed security to a buyer.  (*See id.*).  If the price of the security drops, the short seller buys the security back at a lower price and returns it to the lender.  (*See id.*).  The difference between the sell price and the buy price is the short seller's profit.  (*See id.*).  Conversely, the short seller loses money if the price of the security increases.  (*See id.*).

[5] The "Relevant Securities" are certain stocks the Retail Investors believed would increase in price: GameStop (GME), AMC Entertainment (AMC), Bed Bath & Beyond (BBBY), BlackBerry (BB), Express (EXPR), Koss (KOSS), Nokia (NOK), Tootsie Roll Industries (TR), and Trivago NV (TRVG).  (*See* Am. Compl. ¶ 7).

3

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Relevant Securities between January 28, 2021, and February 4, 2021 (the "Class Period").  (*See id.* ¶¶ 46, 55).

Citadel Securities is a market maker: it acts as a market participant by providing bid and ask prices for securities, maintaining an inventory of securities from its own trading, and matching incoming buy and sell orders to fill those orders.  (*See id.* ¶¶ 48, 85).  Citadel Securities took short positions in the Relevant Securities during the period in question.  (*See id.* ¶ 49).

**Plaintiffs.**  The named Plaintiffs are four individual investors who were subject to trading limitations imposed on the Relevant Securities during the Class Period.  (*See id.* ¶¶ 23–41).  Each Plaintiff held shares of one or more of the Relevant Securities at the close of the stock market on January 27, 2021.  (*See id.* ¶¶ 23, 28, 33, 38).  The next day, January 28, 2021, they were all prohibited from purchasing the Relevant Securities on Robinhood's trading platform.  (*See id.* ¶¶ 24, 29, 34, 39).

That same day, Guzman and Miller applied for accounts with Charles Schwab, Fidelity, and TD Ameritrade — these did not prohibit customers from purchasing the Relevant Securities — but Guzman and Miller were unable to complete purchases due to the amount of time required to set up the accounts.  (*See id.* ¶¶ 25, 35).  Minahan successfully applied for an account with Fidelity and was able to purchase a share of GameStop stock that day.  (*See id.* ¶ 30).  Each Plaintiff then sold his or her shares of the Relevant Securities on Robinhood between January 28, 2021, and February 4, 2021.  (*See id.* ¶¶ 26–27, 31–32, 36–37, 40–41).

<u>Injury and proposed class.</u>  According to Plaintiffs:

As a direct and intended result of Defendants [sic] contract, combination, agreement and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities.  Robinhood deactivated the buy option on its platform and left Plaintiffs and Class members with no option but to sell or hold shares of the stocks on their platforms.  Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the

4

Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination, agreement and restraint of trade. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

(*Id.* ¶ 410 (alterations added)).

Plaintiffs seek to certify the following class:

All persons or entities in the United States that held shares of stock or call options through Robinhood in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Nokia Corp. (NOK), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) as of the close of market on January 27, 2021, and sold the above-listed securities from January 28, 2021 up to and including February 4, 2021 (the "Class Period").

(*Id.* ¶ 55).

### *Alleged facts.*

***Mechanics of securities trading on Robinhood.*** Individual investors' market share of U.S. equity trading has steadily increased since 2019 and has recently accounted for a third of all U.S. stock market trading. (*See id.* ¶¶ 92–93). When individual investors make investments on their own behalf, they execute their personal trades through websites, apps, and trading platforms provided by brokerage firms or other investment service providers. (*See id.* ¶ 6).

Robinhood Financial provides one such trading application to individual investors. (*See id.* ¶¶ 6, 43, 68). Robinhood Financial is one of the largest retail brokers in the United States — the trading demand of its over 31 million users substantially influences the movements of stock prices. (*See id.* ¶¶ 70–72).

Once a trade is placed on Robinhood Financial's application, the customer's cash and securities are custodied by Robinhood Financial's clearing broker, Robinhood Securities. (*See id.* ¶ 83). Robinhood Securities services the customer's account by executing, clearing, and settling the trade order. (*See id.*).

Although individual investors historically had to pay a fee or commission to their brokerages for executing personal trades, today most brokerages do not charge their investors a fee per transaction.  (*See id.* ¶ 8).  Rather, in exchange for routing the order to a market maker, brokerages earn revenue through rebates, kickbacks, and other payments — known collectively as payment for order flow ("PFOF").  (*See id.* ¶¶ 8, 73).

Robinhood Securities typically routes a customer's trade order to a large market maker like Citadel Securities.  (*See id.* ¶¶ 74, 84).  As a market maker, Citadel Securities fills these orders from its own inventory, by routing the order to an exchange, or by taking the other side of a transaction (*e.g.*, selling a security short in response to receiving an order to buy the security).  (*See id.* ¶¶ 85–86).  Once an order is filled, the market makers pocket the difference between the bid and ask prices; this is known as the "spread."  (*Id.* ¶¶ 74, 85).  While the spreads may be small, they are significant in the aggregate due to the large volume of orders filled.  (*See id.*).

 After an order is filled, the details of the executed order are sent to the National Securities Clearing Corporation ("NSCC") for clearinghouse and settling services.  (*See id.* ¶ 87).  Because trades do not settle immediately, there is a risk that a party to a transaction may default before the trade is completed.  (*See id.* ¶¶ 87–88).  The NSCC clears cash transactions by netting securities deliveries and payments among NSCC's clearing members and guaranteeing the completion of trades, even if one party to the transaction defaults.  (*See id.* ¶ 88).  Thus, if a clearing member such as Robinhood defaults on its settlement obligations, the NSCC guarantees the delivery of cash and securities to its non-defaulting members.  (*See id.*).

The NSCC collects clearing fund contributions, or margin, from clearing members at the start of each day and intraday in volatile markets.  (*See id.* ¶ 90).  The margin protects the NSCC and all market participants against clearing member defaults, and margin requirements must be

met by clearing members on a timely basis. (*See id.*). Margin requirements are largely based on risk and market volatility. (*See id.*). The rules for calculating the contribution requirements and the timing of the collection of contributions are known to every clearing member; and the NSCC provides reporting tools, calculators, and documentation to allow the members to monitor their risk in near real-time and estimate clearing fund contribution requirements. (*See id.*).

**January 2021 market volatility.** Retail Investors often exchange investment information via online discussion forums like Facebook, TikTok, and, most relevant here, the WallStreetBets financial discussion forum on Reddit. (*See id.* ¶¶ 64, 95, 127–28). WallStreetBets is characterized by a particular culture centered around the discussion of financial investments and memes; many of its users are sophisticated and shrewd individual investors. (*See id.* ¶ 128).

Beginning in 2019, the Retail Investors, through these online discussion forums, hypothesized that shares of GameStop's stock were significantly undervalued, trading at much lower prices than they should have been, based on GameStop's publicly available financial disclosures and prospects. (*See id.* ¶¶ 95–96). The Retail Investors saw similar investment opportunities in the other Relevant Securities. (*See id.* ¶¶ 97–98).

One such Retail Investor, the popular Reddit and YouTube user, Roaring Kitty, deduced that GameStop was undervalued for a variety of reasons, including substantial short positions that large financial institutions had taken against the stock. (*See id.* ¶¶ 96, 127). Roaring Kitty continuously published his investments on WallStreetBets, such as his initial purchase of $50,000 of GameStop; he also posted an in-depth analysis of GameStop's stock on his YouTube channel in August 2020. (*See id.* ¶¶ 127, 129).

Leading up to January 27, 2021, the Retail Investors purchased long positions in the Relevant Securities — primarily through Robinhood — with the expectation that the stocks would

increase in value.  (*See id.* ¶¶ 7, 64, 101).  As more investors purchased the Relevant Securities and "out of the money" call options[6] in the Relevant Securities, the market prices for the stocks rose due to supply and demand.  (*Id.* ¶¶ 99, 114).  The Relevant Securities started appreciating to "unprecedented levels."  (*Id.* ¶ 15).

To illustrate this rapid growth, a share of GameStop stock traded for as low as $2.00 a share in 2019 (*see id.* ¶ 130); $43.03 on January 21, 2021 (*see id.* ¶ 132); $76.79 on January 25, 2021 (*see id.*); $147.98 on January 26, 2021 (*see id.* ¶ 135); and $380.00 on January 27, 2021 (*see id.* ¶ 137).  GameStop's stock price reached a closing high of $347.51 on January 27, 2021 — a 134.84% increase from the previous day.  (*See id.*).  Other Relevant Securities experienced similar surges; for example, AMC's and Express's share prices increased over 300% and 200%, respectively.  (*See id.*).

As Retail Investors increased long positions in the Relevant Securities, those who held short positions in the Relevant Securities, such as Citadel Securities (*see id.* ¶¶ 11, 141–42), were caught in a short squeeze.  (*See id.* ¶¶ 114–15).  Investors with these short positions faced a rapid increase in the shorted assets' values, exposing short sellers to even greater losses because the short sellers must at some point buy back the stocks to return them to their lenders.  (*See id.* ¶¶ 12, 115).[7]

---

[6] A call option gives the holder the right to buy the asset at a stated fixed price or the "strike price."  (Am. Compl. ¶ 114).  An "in the money" option has a favorable strike price because it is *lower* than the market price of a stock (*id.* ¶ 119), while an "out of the money" option has an unfavorable strike price because it is *higher* than market price for the underlying asset (*id.* ¶ 120).  If an option expires while out of the money, the contract becomes valueless.  (*See id.* ¶¶ 119–120, 140, 294).

[7] Another phenomenon known as a "Gamma squeeze" occurred as the prices of the Relevant Securities increased.  (Am. Compl. ¶¶ 114, 116).  Options are priced based on a variety of risk variables, including one called "Gamma," which increases as the option nears its expiration date or as the option approaches its strike price (*i.e.*, "being in the money").  (*Id.* ¶¶ 121, 123–26).  When a security experiences a sharp price increase, the Gamma increases; stated differently, options that were previously unlikely to reach their strike prices before expiration become more likely to do so.  (*See id.* ¶¶ 124–26).  As the Gamma increases, market makers hedge by purchasing more of the underlying security, which further drives the price of the security

Around 5:00 p.m. on January 27, 2021, the SEC released a statement indicating it was "aware of and actively monitoring the on-going market volatility in the options and equities markets[.]" (*Id.* ¶ 144 (alteration added; quotation marks omitted)). It declined to step in and restrict trading, however. (*See id.*).

**Events of January 28, 2021.** Right before markets opened on January 28, 2021, analytics captured a significant volume of GameStop short transactions. (*See id.* ¶ 156). Retail brokers generally do not allow individual investors to engage in after-hours trading to the same extent as institutional investors, so this increase in short volume was likely the result of institutional investors, like Citadel Securities, taking new short positions. (*See id.* ¶ 157). Additionally, failure to delivers ("FTDs"), which occur when one of two transacting parties fails to meet its obligations in a securities trade, rose dramatically in the period leading up to January 28, 2021, a phenomenon consistent with increasing short interest by market makers like Citadel Securities.[8] (*See id.* ¶¶ 161, 165).

This increase in short positions baffled some observers. (*See id.* ¶ 175). The dominant view in many financial discussion forums reflected a high degree of excitement and motivation among Retail Investors. (*See id.*). Many announced plans to increase long positions in the Relevant Securities on January 28, 2021. (*See id.*).

Around 1:00 a.m. EST on January 28, 2021, Robinhood informed its users that in the face of unprecedented volatility surrounding GameStop and AMC stock, all GameStop and AMC options with expirations of January 29, 2021 would be set to closing transactions only. (*See id.*

---

higher and creates a feedback loop as even deeper out of the money options approach their strike price. (*See id.* ¶ 126).

[8] FTDs can be strong indicators of naked short selling, which occurs when a short seller does not actually possess the security it is supposed to borrow, or of market makers taking on more short positions. (*See* Am. Compl. ¶¶ 162–63).

¶ 176).  Apparently, the restrictions would help Robinhood reduce risk.  (*See id*.).  For the immediate future, customers could close out their positions in GameStop and AMC but could not make new investments.  (*See id.*).

At 5:11 a.m. EST, Robinhood received an email from the NSCC titled "NSCC Daily Margin Statement" advising Robinhood had a collateral requirement deficit of over $3 billion.  (*Id.* ¶ 178).  At 8:00 a.m. EST, Gretchen Howard, Robinhood's COO, messaged internally that Robinhood had a "major liquidity issue" and was moving the Relevant Securities to Position Close Only ("PCO"), meaning Robinhood users could sell the Relevant Securities but could not buy them.  (*Id.* ¶¶ 179–80 (quotation marks omitted)).  Around that same time, David Dusseault, Robinhood Financial's President and COO, said in another internal message, "we will navigate through this [NSCC] issue[,]" and "we are to [sic] big for them to actually shut us down[.]"  (*Id.* ¶ 182 (alterations added)).  Robinhood negotiated with the NSCC to significantly reduce its margin requirements and was subsequently able to meet its revised NSCC deposit requirement shortly after 9:00 a.m. EST.  (*See id.* ¶¶ 183–185).

Robinhood moved the Relevant Securities to PCO by the time the markets opened on January 28, 2021.  (*See id.* ¶¶ 179–180).  To their surprise, Robinhood users were no longer able to purchase the Relevant Securities — the "buy" button was deactivated as a feature, leaving users with no option but to sell or hold their securities.  (*See id.* ¶¶ 186–88).  Further, Robinhood blocked users on its web platform and mobile app from searching for the Relevant Securities' ticker symbols.  (*See id.* ¶ 190).  Robinhood also canceled overnight purchase orders of the Relevant Securities placed on January 27, 2021, which were queued to move forward when the markets opened on January 28, 2021.  (*See id.* ¶ 188).

Customers were not given advance notice of the switch to PCO for the Relevant Securities. (*See id.* ¶ 185). Robinhood announced the news via Twitter on January 28, 2021, stating it was restricting the Relevant Securities to PCO due to market volatility. (*See id.* ¶¶ 192–94).

Other brokerages also restricted trading, adjusted margin requirements, or restricted trading strategies.[9] (*See id.* ¶¶ 195, 365–67). On January 28, 2021, Ally, Dough, Public.com, SoFi, Stash, Tastyworks, and WeBull restricted purchases of two or three of the Relevant Securities;[10] E*Trade restricted purchases of GameStop and AMC; and Interactive Brokers restricted trading on options. (*See id.*). Charles Schwab and TD Ameritrade did not halt trading but instead adjusted margin requirements for certain securities and restricted certain strategies usually employed by advanced traders. (*See id.* ¶ 365).

The broad prohibition on buying the Relevant Securities spawned a massive sell-off, which sent prices of the Relevant Securities tumbling. (*See id.* ¶ 197). For example, on January 28, 2021, GameStop shares reached an intraday peak of $483.00 before dropping down to a closing price of $193.60 — a staggering 44.29% drop from the prior day's closing price of $347.51. (*See id.* ¶ 198). Similarly, AMC shares dropped 56.63%, EXPR shares fell 50.79%, and BBBY shares declined 36.40%. (*See id.*). The Retail Investors who wanted to take advantage of the price drops to buy more shares of the Relevant Securities were unable to do so due to the prohibition on purchasing. (*See id.*).

While individual investors were prohibited from purchasing the Relevant Securities, institutional investors were not. (*See id.* ¶ 209). Large investment firms and market makers such

---

[9] Internal Robinhood documents show Robinhood actively monitored the actions of other broker-dealers. (*See* Am. Compl. ¶ 196).

[10] Many of these brokerages reported that their clearing firm, Apex, was responsible for implementing the restrictions. (*See* Am. Compl. ¶ 195). Apex only imposed restrictions on January 28, 2021. (*See id.*).

as Citadel Securities were able to purchase the Relevant Securities at artificially reduced prices because they had access to private stock exchanges known as "dark pools."[11]  (*Id.*).  As the Retail Investors sold their shares in the Relevant Securities because of the trading restrictions, firms like Citadel Securities bought the Relevant Securities at artificially reduced prices to close out their short positions.  (*See id.* ¶¶ 209–10).

*Events after January 28, 2021.*  When the market opened on January 29, 2021, Robinhood lifted its trading restrictions and permitted individual investors to open new long positions in the Relevant Securities; even so, Robinhood continued to heavily restrict such purchases.  (*See id.* ¶¶ 249–51).  For example, Robinhood placed limitations on the number of new positions its users could open in the Relevant Securities, restricting purchases of GameStop stock to two shares and then to one share.  (*See id.* ¶¶ 253–55).  It maintained trading limitations on certain securities through February 4, 2021 (*see id.* ¶ 261); further suppressing the value of the Relevant Securities and pressuring investors to sell, rather than buy or hold (*see id.* ¶¶ 251, 255–56).

On January 31, 2021, Vlad Tenev, Robinhood's CEO, explained in an opinion piece published in USA TODAY that Robinhood maintained trading restrictions because clearinghouse-mandated deposit requirements were "increased ten-fold."  (*Id.* ¶ 262 (quotation marks omitted)).  Two days earlier, Robinhood had announced that it raised more than $1 billion to help meet rising demands for cash and shore up its balance sheet.  (*See id.* ¶ 261).  Robinhood raised this money on top of $500 million it accessed through credit lines to ensure it had sufficient capital to allow its clients to trade the Relevant Securities.  (*See id.*).  On February 1, 2021, Robinhood announced

---

[11] Private stock exchanges are known colloquially as "dark pools" or "dark exchanges" because they do not disseminate public quotations of securities prices.  (Am. Compl. ¶¶ 104–07).  Through these private exchanges, institutional investors can discreetly buy or sell securities in large blocks, mitigating some of the price impacts that their buying or selling activity would otherwise have on a "lit," or public, national securities exchange.  (*Id.* ¶ 106).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

it had raised an additional $2.4 billion in funding above the $1 billion it had already raised. (*See id.*). Weeks later, Tenev testified before the U.S. House Committee on Financial Services that Robinhood had met its revised deposit requirements a little after 9:00 a.m. on January 28, 2021. (*See id.* ¶ 264).

Publicly available data reveal short interests[12] in the Relevant Securities climbed steadily in the weeks leading up to January 28, 2021 (*see id.* ¶¶ 269–70, 284); and then decreased because of the trading restrictions imposed during the Class Period, with the sharpest and most significant decreases occurring after the restrictions imposed on January 28, 2021 (*see id.* ¶¶ 265, 269–72). FINRA data show significant increases in dark pool trading activity for each of the Relevant Securities on and around January 28, 2021, during the period when restrictions were first placed on the Relevant Securities. (*See id.* ¶¶ 273–79). Institutions dominate trading in dark pools and dark exchanges, which are generally beyond the reach of individual investors, so this activity indicates high institutional investor trading activity consistent with the exiting of short positions. (*See id.* ¶ 280).

The scale of Citadel Securities's business also indicates that the bulk of the activity captured by this FINRA data can be attributed to Citadel Securities. (*See id.* ¶¶ 281–84). Because Citadel Securities accounts for about 50% of dark trading activity, a large shift in the percentage of sales represented by short trades is likely to be caused by a shift in Citadel Securities's position from long to short or vice versa. (*See id.* ¶ 283).

***Collusion between Defendants.*** Plaintiffs allege that Robinhood and Citadel Securities colluded to limit buy-side trading in the Relevant Securities so that Citadel Securities could recoup

---

[12] "Short interests" are defined as the number of shares of a security that have been sold short but have not yet been covered or closed out. (Am. Compl. ¶ 268).

losses in its short positions caused by the rise of the Relevant Securities' prices.  (*See id.* ¶ 154 (alterations added)).

*Motive to collude.*  According to Plaintiffs, "Robinhood and Citadel Securities shared a common motive to conspire — to protect their individual self-interest over the welfare of Robinhood's users.  Robinhood restricted competition on its platform to protect itself and Citadel from hemorrhaging losses totaling potentially billions of dollars."  (*Id.* ¶ 393).  Further, "in light of its planned 2021 IPO, Robinhood simply could not run the risk that its 'transaction-based revenue would be impacted negatively' should Citadel Securities terminate its relationship with Robinhood."  (*Id.* ¶ 401; *see also id.* ¶¶ 318, 400).

PFOF is Robinhood's primary source of revenue.  (*See id.* ¶¶ 5, 75, 316).  Market makers such as Citadel Securities pay more for Robinhood's order flow than they do for Robinhood's competitors.  (*See id.* ¶¶ 76, 402).  Today, Robinhood derives somewhere between 60% to 70% of its revenue from selling PFOF to market makers like Citadel Securities.  (*See id.* ¶¶ 73–75).  Citadel Securities alone was responsible for 29% of Robinhood's revenue in 2019, 34% in 2020, and 43% of Robinhood's PFOF revenue in the first quarter of 2021.  (*See id.* ¶¶ 5, 78, 80, 318).  Indeed, Citadel Securities is Robinhood's primary source of revenue.  (*See id.* ¶ 5).

In its Form S-1, Robinhood stated:

> For the three months ended March 31, 2021, 59% of our total revenues came from four market makers.  If any of these market makers, or any other market makers with whom we do business, were unwilling to continue to receive orders from us or to pay us for those orders (including, for example, as a result of unusually high volatility), we may have little to no recourse and, if there are no other market makers that are willing to receive such orders from us or to pay us for such orders, or if we are unable to find replacement market-makers in a timely manner, our transaction-based revenue would be impacted negatively.

(*Id.* ¶ 81; *see also id.* ¶ 317 ("As set forth in Robinhood's Registration Statement, Robinhood's 'PFOF . . . arrangements with market makers are not documented under binding contracts.'" (alteration in original)).

Citadel Securities possessed significant short positions in the Relevant Securities during the period in question. (*See id.* ¶ 394). As the prices of the Relevant Securities increased, Citadel Securities was exposed to "potentially infinite" losses. (*Id.*). As of December 31, 2020, Citadel Securities reported $57.5 billion in "securities sold, not yet purchased, at fair value" — which are "likely representative of Citadel Securities's short position." (*Id.* ¶ 395 (quotation marks omitted)).

Plaintiffs conclude that Citadel Securities used its relationship with Robinhood to pressure the company into restricting trading in the Relevant Securities so it could buy the stocks at an artificially reduced price to close out its short positions. (*See id.* ¶¶ 400–02).

According to Plaintiffs, Defendants' public attempt to attribute the motivation for its trading restrictions to market volatility and the resulting NSCC margin call was pretextual. (*See id.* ¶¶ 357–69). In other words, Robinhood was not innocently responding to increased volatility; it was trying to keep its most important customer happy, to the detriment of the Retail Investors. Plaintiffs allege that restricting trading was *against* Robinhood's self-interest because Robinhood's profits are based on the volume of transactions on its application. (*See id.* ¶¶ 358–60). Further, Plaintiffs claim Robinhood could have either used its lines of credit instead of restricting trading to meet its margin requirements, or it could have imposed less restrictive measures like other brokerages did. (*See id.* ¶¶ 363–69).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

*Communications among Defendants.* In the run up to, during, and after January 28, 2021, high-level executives of Citadel Securities communicated with high-level executives of Robinhood. (*See id.* ¶ 226).

On January 20, 2021, the Citadel Securities Head of Execution Services extended an unknown proposition to Josh Drobnyk, Robinhood's Vice President of Corporate Relations and Communications, who conferred with Daniel Gallagher and Lucas Moskowitz, Robinhood's Chief Legal Officer and Deputy General Counsel, respectively. (*See id.* ¶¶ 227–28). The Citadel Securities executive and Drobnyk had a relationship because Drobnyk previously worked at FINRA. (*See id.* ¶ 227). On January 25, 2021, Drobnyk replied via email that "[w]e are on board" and Moskowitz would be the central point of contact for Robinhood. (*Id.* ¶ 230 (alteration added; quotation marks omitted)). The Citadel Securities executive responded to Moskowitz with an offer to chat, emphasizing the "strong relationship between the firms[.]" (*Id.* ¶ 231 (alteration added; quotation marks omitted)). The details of the ensuing January 26, 2021 phone call have not been disclosed. (*See id.* ¶¶ 232–33).

On January 26, 2021, during the short squeeze, Jim Swartwout, President and CEO of Robinhood Securities, alerted other Robinhood executives through an internal chat that Robinhood "was moving GameStop to 100% margin the next day, stating 'I sold my AMC today. FYI — tomorrow we are moving GME to 100% — so you are aware.'" (*Id.* ¶ 234).

On January 27, 2021, the day before the trading restrictions were implemented, Citadel Securities and Robinhood executives exchanged several communications. (*See id.* ¶ 235). In an internal conversation around 4:40 p.m., Robinhood COO Howard informed Tenev that she, along with Gallagher and Swartwout, would be joining "a call with Citadel" at 5:00 p.m. that day. (*Id.* ¶ 237 (quotation marks omitted); *see id.* ¶ 239). Howard said she believed Citadel Securities

would make demands on limiting PFOF.  (*See id.* ¶¶ 237, 239).  Tenev responded that "[m]aybe this would be a good time for me to chat with Ken [G]riffin[,]" the CEO of Citadel Securities, and told Howard, "[y]ou guys can mention that."  (*Id.* ¶ 239 (quotation marks omitted; alterations added)).  Tenev noted he had not previously met Griffin.  (*See id.*).

Shortly thereafter, around 6:25 p.m., Swartwout messaged in an internal chat that he was aware of "anecdotal evidence that several 'very large' firms [were] having really bad nights too." (*Id.* ¶ 240 (alteration adopted; alteration added; quotation marks omitted)).  Swartwout replied, "everyone is.  [Y]ou wouldnt [sic] believe the conv[ersation] we had with Citadel.  [T]otal mess." (*Id.* ¶ 241 (alterations added); *see id.* ¶ 240–41).  At 8:16 p.m., Swartwout updated a Citadel Securities employee that he was looking for "new Citadel numbers."  (*Id.* ¶ 242 (quotation marks omitted)).  The Citadel Securities employee responded that the numbers were "firming up right now in light of the follow up [sic] conversation between Gallagher and [redacted.]" (*Id.* (alteration adopted; alterations added; quotation marks omitted)).

At 8:29 p.m. that evening, the Citadel Securities Vice President of Business Development notified Swartwout that one of Citadel Securities's executives, whom Tenev had previously met, was available to speak to Tenev that night.  (*See id.* ¶¶ 243, 245).  Swartwout replied, "[b]ecause of our partnership, Vlad would like to have a discussion with Ken [Griffin] at some point, just given our relationship.  Not specific to this crazy issue."  (*Id.* ¶ 244 (first alteration added; second alteration in original; quotation marks omitted); *see id.* ¶ 245).  Swartwout emailed in the same chain later that night that he was "beyond disappointed in how this went down[,]" and it was "difficult to have a partnership when these kind[s] of things go down this way."  (*Id.* ¶ 245 (alterations added; quotation marks omitted)).

On January 30, 2021, a Citadel Securities executive emailed Drobnyk, stating he "wanted to generally coordinate messaging." (*Id.* ¶ 258 (quotation marks omitted); *see id.* ¶ 260).  The Citadel Securities executive also introduced Drobnyk to someone who was "running point on this narrative for [them]" and copied company lawyers "for privilege."  (*Id.* ¶ 258 (alteration added; quotation marks omitted); *see id.* ¶ 260).

*Market definitions.*  Plaintiffs define two relevant product markets "within the distribution of securities trading services" — the upstream market in which Citadel Securities operates and the downstream one in which Robinhood operates.[13]  (*Id.* ¶ 305).  Plaintiffs define these as the "PFOF Market" and the "No-Fee Brokerage Trading App Market[,]" respectively.  (*Id.* ¶¶ 306, 312 (alteration added)).

*The PFOF Market.*  Citadel Securities competes with other market makers in the upstream PFOF Market, which Plaintiffs geographically limit to the United States.  (*See id.* ¶¶ 306, 311).  Plaintiffs allege Citadel Securities accounts for approximately 27% of the U.S. equities volume and executes approximately 37% of all U.S.-listed retail volumes, making it a "relative behemoth[,]" with the largest market share of any wholesale market maker in the PFOF Market. (*Id.* ¶¶ 306–07 (alteration added)).  The firm has garnered approximately 40% of all PFOF in the United States for the past two years, more than its next three competitors combined.  (*See id.* ¶ 307).

Citadel Securities paid brokers roughly $1.1 billion for their order flows in 2020, more than any other market maker and nearly equal to its four largest competitors combined.  (*See id.* ¶ 308). From January 2021 through June 2021, Citadel Securities paid nearly $1.5 billion to brokers for their order flow, more than any other market maker.  (*See id.* ¶ 309).

---

[13] "Upstream" here refers to an earlier stage in the production or distribution chain, while "downstream" refers to a later stage.   (Am. Compl. ¶ 305).

18

*No-Fee Brokerage Trading App Market.* Robinhood competes with other brokerages in the downstream or consumer-facing No-Fee Brokerage Trading App Market, which is also geographically limited to the United States. (*See id.* ¶¶ 312–13, 315). Brokerages in this market offer no-fee transactions on their trading applications because they receive PFOF from market makers in the upstream market. (*See id.* ¶¶ 312–13).

Based on monthly active users, Robinhood is far and away the most popular electronic trading application in the world and is responsible for a significant number of daily trades. (*See id.* ¶¶ 326, 333). In January 2021, Robinhood had nearly three-times as many users as then second-place brokerage Fidelity Investments (*see id.* ¶ 334); in July 2021, Robinhood had nearly three-times as many users as then second-place brokerage WeBull (*see id.* ¶ 336).

*Structure and characteristics of the markets.* According to Plaintiffs, the "structure and characteristics of the market for securities, and in particular the lack of disclosure of short interest positions at any given time, make it conducive to collusion and anticompetitive conduct." (*Id.* ¶ 370).

*High barriers to entry.* An entrant to the No-Fee Brokerage Trading App Market would need specialized knowledge, licenses, and memberships, including memberships in organizations such as FINRA. (*See id.* ¶ 373). The cost of compliance with applicable industry and regulatory standards is substantial. (*See id.*). Entrants would need significant cash on hand to deposit at clearinghouses such as the DTCC as collateral. (*See id.* ¶ 374). And entrants would need to have the necessary technological infrastructure and expertise to navigate the digital market. (*See id.* ¶¶ 375–76). An entrant to the PFOF Market would also need extensive infrastructure and significant mathematical expertise to design the sophisticated algorithms that are necessary to compete in the high-frequency trading market. (*See id.* ¶¶ 377–78).

*High fixed costs and low variable costs.* Both relevant markets are defined by high fixed costs and low variable costs, and participants in these markets benefit greatly from scale. (*See id.* ¶ 379). Online broker-dealers participating in the No-Fee Brokerage Trading App Market require significant IT infrastructure, software, and data security infrastructure to develop and maintain the applications through which investors trade. (*See id.* ¶ 380). Market makers participating in the PFOF Market require similar infrastructures and software to facilitate the digital clearing and custodial services they provide to online broker-dealers. (*See id.* ¶ 381). Market makers — high frequency trading market makers, in particular — must invest significant effort and resources to increase the speed of trading technology to maximize their profits. (*See id.* ¶¶ 382–83).

*Captive market.* In the short run, retail investors in the securities market are locked into the broker-dealers they already invest with. (*See id.* ¶¶ 158, 387). The process to open a trading account with a broker-dealer may take several days. (*See id.* ¶ 388). If a broker-dealer like Robinhood imposes short-term trading restrictions, retail investors may not have the opportunity to switch or change broker-dealers before the restrictions are lifted. (*See id.* ¶ 392).

If Robinhood users wish to transfer or withdraw funds from their Robinhood accounts to their personal bank accounts, they will not have access to their funds for three-to-five days after initiating a request. (*See id.* ¶¶ 159, 389). During the week of January 25, 2021, Robinhood users experienced additional delays or errors when attempting to transfer or withdraw funds or close accounts. (*See id.* ¶¶ 160, 391). Robinhood also charges users a $75 fee to transfer their assets to another brokerage, thereby compounding the difficulties associated with switching. (*See id.* ¶ 389).

*Antitrust injury.* Plaintiffs allege the Retail Investors suffered "a reduction in the quality of their trades" because of Citadel Securities's and Robinhood's collusive behavior. (*Id.* ¶ 350;

*see id.* ¶ 351).  According to Plaintiffs, Robinhood's prohibition on purchases of the Relevant Securities imposed transaction costs on the Retail Investors, forcing them to pay "a higher quality-adjusted price as a result of Defendants' conduct." (*Id.* ¶¶ 350, 353).  In exchange for allowing Robinhood to route their trades to market makers like Citadel Securities, Robinhood users expect efficient execution of intended trades. (*See id.* ¶ 350).  By blocking the efficient execution of trades of the Relevant Securities, the quality of user experience significantly decreased, effectively increasing the price of trading on Robinhood. (*See id.* ¶¶ 350–51).

Further, the trading restrictions reduced the number of buy orders for the Relevant Securities, artificially decreasing their price and harming the Retail Investors who held positions. (*See id.* ¶ 353).  Plaintiffs also allege harm to the companies whose securities the Retail Investors wanted to purchase by reducing the output of their stock. (*See id.* ¶¶ 355–56).

***Amended Complaint and Defendants' Motion.***  Plaintiffs assert a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, against Defendants. (*See* Am. Compl. ¶¶ 403–415).  Defendants move to dismiss the Amended Complaint, arguing: (1) Plaintiffs fail to sufficiently plead that Defendants agreed to conspire; (2) Plaintiffs fail to sufficiently plead the remaining elements of a Sherman Act section 1 claim; and (3) Plaintiffs' antitrust theory is precluded by federal securities laws. (*See generally* Mot.; Reply).

## III.    STANDARD

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation." *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (alteration added; citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added; citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take its factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

## IV.    ANALYSIS

Plaintiffs assert one claim under section 1 of the Sherman Act, 15 U.S.C. § 1. (*See* Am. Compl. ¶¶ 403–15). Section 1 of the Sherman Act provides "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (alterations added). Section 1 claims require two or more parties agreeing on a restriction; "wholly unilateral" conduct is the exclusive province of section 2. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (quotation marks and citations omitted). "Despite the different terminology, there is no magic unique to each term in [section] 1; the terms 'contract,' 'combination,' and 'conspiracy' are used interchangeably to

capture the concept of concerted action, that is an 'agreement.'" *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1233 (11th Cir. 2021) (alteration added; some quotation marks and citation omitted).

"The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334–35 (7th Cir. 2012) (citation omitted). "[T]he Supreme Court has long concluded that Congress intended only to prohibit 'unreasonable' restraints on trade." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (alteration added; citation omitted). Thus, section 1 "prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade." *Id.* (citation omitted).

Defendants attack the sufficiency of the allegations directed at the first requirement — that Plaintiffs adequately plead a conspiracy among the Defendants. (*See* Mot. 19–28).[14] Defendants also dispute whether Plaintiffs adequately plead the alleged agreement unreasonably restrained trade. (*See id.* 28–34). Lastly, Defendants assert that Plaintiffs' antitrust theory is precluded by federal securities laws. (*See id.* 34–42). Because Plaintiffs fail to plausibly allege the existence of an agreement — let alone one that unreasonably restrains trade — the Court declines to reach the third suggested ground for dismissal.

**_Defendants' Relationship._** "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) (footnote call number omitted). As an initial matter, it is necessary to determine whether Plaintiffs have alleged a vertical or horizontal restraint on trade.

---

[14] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

Plaintiffs insist Defendants have a horizontal relationship (*see* Resp. 30 n.26) — likely because "virtually all vertical agreements now receive a traditional rule-of-reason analysis" rather than straightforward *per se* condemnation. *In Re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 318 (3rd Cir. 2010) (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007); other citation and footnote call number omitted). Contrary to Plaintiffs' position, the relationship in question is obviously vertical.

The agreement alleged in the Amended Complaint is among firms at different levels of distribution. For Plaintiffs to argue otherwise is surprising, given the Amended Complaint explicitly alleges that Defendants "operate at two different levels within the distribution of securities trading services." (Am. Compl. ¶ 305). Citadel Securities competes in the "upstream product market consist[ing] of market makers that pay brokerage firms to route their clients' trades to that market maker[.]" (*Id.* ¶ 306 (alterations added)). Robinhood competes in the "downstream or consumer-facing relevant product market consist[ing] of zero account-minimum, no-fee brokerages[.]" (*Id.* ¶ 312 (alterations added)).

According to Plaintiffs, "'upstream' refers to an earlier stage in the production or distribution chain" than the "downstream" stage. (*Id.* ¶ 305). It does not get any more vertical than "up" and "down." *See Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 344 (6th Cir. 2006) ("In analyzing the economics of any given restraint, and determining thereby which kind of legal treatment it merits, it is vital to distinguish between horizontal restraints that involve direct competitors at a given level of the market, and *vertical restraints that typically involve entities that are upstream or downstream of one another*." (emphasis added)).

Tellingly, Plaintiffs also allege that Citadel Securities is Robinhood's "real client[.]" (Am. Compl. ¶ 402 (alteration added)). Much of the Amended Complaint is devoted to showing how

dependent Robinhood is on Citadel Securities for PFOF revenue. (*See, e.g.*, *id.* ¶¶ 316–23). As Plaintiffs describe this relationship, "it is actually the Retail Investors who are Robinhood's product; a product for which Citadel Securities is paying Robinhood a premium." (*Id.* ¶ 402). In other words, Plaintiffs' own description of Citadel Securities and Robinhood's arrangement does not illustrate an agreement to "eliminate competition between two entities that provide the same product," but instead "a vertical agreement between parties that provide very different services, in which each party profits solely from a different level of the chain of commerce." *Cates v. Crystal Clear Techs., LLC*, No. 3:16-cv-08, 2016 WL 4379220, at *10 (M.D. Tenn. Aug. 17, 2016).

In their Response, Plaintiffs insist Citadel Securities is "on the same horizontal level of distribution as clearing entities such as Robinhood Securities (Robinhood's clearing entity)." (Resp. 30 n.26). Yet, according to their Amended Complaint, customers place trades on Robinhood Financial's application, Robinhood Securities takes custody of the customer's cash and securities, and then "Robinhood Securities typically routes the trade to a market maker, predominately Citadel." (Am. Compl. ¶¶ 83–84). All three entities thus operate at different distribution levels: Robinhood Securities (clearinghouse) acts in between Robinhood Financial (introducing brokerage) and Citadel Securities (market maker).[15]

Even if there are horizontal elements to Citadel Securities and Robinhood's relationship, the focus of Plaintiffs' allegations is the vertical relationship between them. *See AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3rd Cir. 2006) (concluding an alleged restraint was vertical despite the defendants having a relationship with "horizontal elements" because the relationship

---

[15] Other courts have also held that restraints involving securities trading platforms and market makers are vertical, not horizontal. *See, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, No. 16-mc-2704, 2018 WL 2332069, at *12 n.8 (S.D.N.Y. May 23, 2018) ("Tradeweb was not a horizontal competitor of the Dealers, as it was a provider of electronic trading platforms, not a market maker. The label 'naked restraint,' which antitrust law uses in connection with horizontal competitors, therefore, does not fit." (quotation marks and citation omitted)).

"was primarily vertical"). Where predominantly vertical firms enter into a vertical restraint of trade, rule of reason analysis is appropriate "[e]ven though in some ways the companies may have operated in similar lines of business[.]" *Generac Corp. v. Caterpillar, Inc.*, 172 F.3d 971, 977 (7th Cir. 1999) (alterations added). So, the Court will analyze whether Plaintiffs plausibly allege an unlawful *vertical* restraint on trade. But first, the Court analyzes whether Plaintiffs plausibly allege an agreement at all.

**_Conspiracy._** "The first inquiry[] in any section 1 claim . . . is to locate the agreement that restrains trade." *Tidmore Oil Co., Inc. v. BP Oil Co./Gulp Prods. Div., a Div. of BP Oil Co.*, 932 F.2d 1384, 1388 (11th Cir. 1994) (alterations added). Adequately stating a section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. The "crucial question" with regard to a conspiracy claim under section 1 "is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express[.]" *Id.* at 553 (alteration added; other alteration adopted; quotation marks and citation omitted).

To allege an antitrust conspiracy, the plaintiff "should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (alteration added; quotation marks and citations omitted). "Standing alone, parallel conduct is inconclusive, as it is consistent with an unlawful conspiracy, as well as rational and competitive business strategy prompted by common perceptions of the market." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1258–59 (S.D. Fla. 2021) (citing *Twombly*, 550 U.S. at 554).

In the November 17 Order dismissing the CCAC, the Court found Plaintiffs failed to allege

direct evidence of an agreement among Defendants.  (*See* Nov. 17, 2021 Order 27–31).

Defendants contend the Amended Complaint is similarly devoid of such allegations.  (*See* Mot.

21).  Plaintiffs do not argue otherwise and instead focus on whether there is circumstantial evidence

of an agreement.  (*See* Resp. 14–16).  The Court thus examines whether Plaintiffs plausibly allege

a conspiracy through circumstantial evidence, concluding they do not.

  ***Allegations of circumstantial evidence of an agreement.***  Direct evidence of an antitrust

conspiracy is "extremely rare[.]"  *Am. Chiropractic Ass'n v. Trigon Healthcare*, 367 F.3d 212, 226

(4th Cir. 2004) (alteration added; citation omitted).  As an alternative, a plaintiff "may present

circumstantial facts supporting the inference that a conspiracy existed."  *Gamm v. Sanderson

Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (quotation marks and citation omitted).  The plaintiff

must allege "claimed facts that collectively give rise to a plausible inference that an agreement

existed."  *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021)

(quotation marks and citation omitted).  Whether the plaintiff alleges a horizontal or vertical

conspiracy, the focus is similar: do the allegations plausibly suggest an agreement was made?  *See

Stewart Glass & Mirror, Inc. v. U.S.A. Glas*, 17 F. Supp. 2d 649, 653 (E.D. Tex. 1998).

  When deciding a dispositive motion in an antitrust conspiracy suit, a court will first "look

for evidence of interdependence or, put another way, that the defendants have an economic motive

to behave in concert."  *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp.

2d 991, 998 (N.D. Ill. 2011) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 596–97 (1986)).  The court then "looks to all the evidence suggesting agreement, or 'plus

factors,' which can be in the form of economic or non-economic evidence."  *Id.* (citing *In re High

Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002); *In re Baby Food Antitrust*

*Litig.*, 166 F.3d 112, 122 (3d Cir. 1999)).[16]

"[A]ny showing by [plaintiffs] that tends to exclude the possibility of independent action can qualify as a plus factor." *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003) (alterations added; other alteration adopted; quotation marks and citation omitted); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017) ("There is no finite list of potential plus factors."). Plaintiffs argue the existence of several plus factors: motive to collude, interfirm communications, Defendants' pattern of concealment and pretextual explanations, and the structural characteristics and behavior of the market. (*See* Resp. 16–25).[17] The Court examines each.

*Common motive to conspire.* In the absence of direct evidence and parallel conduct allegations, it is important for Plaintiffs to establish a plausible common motive to conspire. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d at 998 (citing *Matsushita*, 475 U.S. at 596–97); *see also Quality Auto Painting Ctr. of Roselle, Inc.*, 917 F.3d at 1263 n.14 ("[The common motive] plus factor is more properly invoked in contexts where the

---

[16] In the November 17 Order dismissing the CCAC, the Court first examined whether Plaintiffs alleged parallel conduct between Defendants. (*See* Nov. 17, 2021 Order 32–35). This analysis was necessary because Plaintiffs previously alleged a "hub-and-spoke conspiracy" involving horizontal relationships between multiple clearinghouses and brokerages. (*Id.* 34). Now, Plaintiffs have narrowed the Defendants to Robinhood and Citadel Securities, who are alleged to be important partners in a vertical relationship rather than competitors. As such, Plaintiffs no longer rely on allegations of parallel conduct, which require "'plus factors' to make the parallel conduct 'more probative of conspiracy than of conscious parallelism.'" *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (citation omitted).

Still, "[a] plus-factor analysis provides a way to organize circumstantial evidence that, in the plaintiff's view, reduces the probability that defendants were acting independently." *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-864, 2022 WL 199274, at *14 (N.D. Ill. Jan. 21, 2022) (alteration added). The Court thus continues to use the plus-factor framework to analyze Plaintiffs' allegations of circumstantial evidence.

[17] Plaintiffs no longer rely on several other plus factors the Court previously rejected, such as actions against unilateral self-interest (*see* Nov. 17, 2021 Order 38–39), the opportunity to coordinate and collude (*see id.* 39–40), and government investigations (*see id.* 47–48). (*See* Resp. 14–25).

motive is unique and specific to the alleged conspirators." (alteration added; citation omitted)).

Parties with "independent reasons" for conspiring can still be "interdependent" for section 1

purposes. *United States v. Apple, Inc.*, 791 F.3d 290, 317–18 (2d Cir. 2015) (citation and quotation

marks omitted). "Antitrust law has never required identical *motives* among conspirators when

their independent reasons for joining together lead to collusive action." *Id.* (emphasis in original;

citation and quotation marks omitted).

According to Plaintiffs, a common motive stemmed from "Defendants' lucrative self-

styled PFOF 'partnership[.]'" (Resp. 22 (alteration added; quoting Am. Compl. ¶ 244)). Plaintiffs'

theory is that, during the trading frenzy in January 2021, Citadel Securities was at risk of incurring

substantial losses because of its short positions in the Relevant Securities,[18] so Robinhood

restricted trading to benefit Citadel Securities in the hopes of preserving their PFOF relationship.

(*See id.* 22–24).

The Court rejected Plaintiffs' prior, similar motive theory as implausible. (*See* Nov. 17,

2021 Order 35–38). While Plaintiffs adequately explained why Citadel Securities would

orchestrate the trading restrictions, the Court was unconvinced as to why the other Defendants

would agree to implement the unlawful restrictions. (*See id.* 38). More specifically, the Court

found that (1) "[t]he mere fact that Citadel Securities is an important business partner of the other

Defendants d[id] not provide sufficient motive to conspire" (*id.* 37 (alteration added)), and (2) "the

CCAC provide[d] an 'obvious alternative explanation' for imposing the trading

restrictions" — the "increased collateral requirements caused by market volatility" (*id.* (alteration

added; quoting *Iqbal*, 556 U.S. at 682)). Given that Plaintiffs rely on the same general theory, the

---

[18] "That Citadel Securities held short interests in the Relevant Securities is a reasonable inference to be drawn in Plaintiffs' favor." (Nov. 17 2021 Order 36 (citing *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 n.1 (11th Cir. 2004))).

question now is whether they have sufficiently bolstered their allegations to render their motive theory plausible.

In the Amended Complaint, Plaintiffs shift their focus to Robinhood and Citadel Securities' relationship, dropping every other Defendant. In doing so, Plaintiffs add allegations expanding upon the lucrative PFOF relationship between Robinhood and Citadel Securities. (*See, e.g.*, Am. Compl. ¶¶ 316–323). The Court previously determined this relationship alone did not provide sufficient motive to conspire considering Plaintiffs did not allege that Citadel Securities threatened or suggested it would end the relationship or explain why Robinhood would not simply use a different market maker if it did. (*See* Nov. 17, 2021 Order 37). In other words, Plaintiffs failed to explain why Robinhood would agree to an illegal demand to restrict trading.

Plaintiffs have added a new wrinkle that warrants consideration. In the Amended Complaint, Plaintiffs state that Robinhood filed for an initial public offering ("IPO") in March 2021 and went public on July 29, 2021. (*See* Am. Compl. ¶ 82). Plaintiffs allege that Robinhood acquiesced to an anticompetitive agreement with Citadel Securities because Robinhood — which was anticipating filing for an IPO — "simply could not run the risk that its 'transaction-based revenue would be impacted negatively' should Citadel Securities terminate" their relationship. (*Id.* ¶ 401; *see id.* ¶¶ 318–19). This theory finds some support from Howard's internal message on January 27, 2021 informing Tenev that she believed Citadel Securities would make some demands on limiting PFOF, although this message does not indicate what, if anything, Citadel Securities was asking for in return. (*See id.* ¶¶ 237, 239).

According to Plaintiffs, Robinhood "could not rely on the possibility that other market makers, such as Virtu Americas, were standing by willing and able to pay Robinhood for order flow that Citadel would have otherwise accepted[,]" considering how much more PFOF Citadel

Securities typically purchased than the others.  (*Id.* ¶ 319 (alteration added); *see id.* ¶ 318; Resp. 23 n.17).  This conclusion is supported by Robinhood's Form S-1, where Robinhood disclosed that its "transaction-based revenue would be impacted negatively" if any of its four biggest market maker relationships ended and it could not find a replacement market maker in a timely manner. (*Id.* ¶ 81 (quotation marks omitted)).

Still, the alleged motive for Robinhood is somewhat speculative and conclusory.  There are no factual allegations supporting the notion that Robinhood restricted trading with its forthcoming IPO in mind.  Plaintiffs essentially ask the Court to infer that Robinhood was motivated to agree to unlawfully restrict trading simply because of the timing of its forthcoming IPO.  (*See id.* ¶ 318).  Plaintiffs also ask the Court to infer that Citadel Securities wielded its influence as Robinhood's largest purchaser of PFOF to make anticompetitive demands.  (*See id.* ¶¶ 318–19).  And Plaintiffs ask the Court to infer that Robinhood could not and would not find replacement buyers for PFOF because Citadel Securities was Robinhood's largest purchaser of PFOF.  (*See id.*).  Plaintiffs' proffered motive theory thus rests on a series of inferences.

Taken together, Plaintiffs plausibly allege economic motives for why Citadel Securities and Robinhood might have entered into an anticompetitive agreement, although Robinhood's motive tenuously rests upon a series of inferences.  Plaintiffs' motive allegations weakly support an inference of a conspiracy.

*Interfirm communications.*  "[E]vidence of a high level of interfirm communications" may constitute a plus factor.  *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (alteration added; footnote call number, quotation marks, and citation omitted).  In dismissing the CCAC, the Court examined Plaintiffs' allegations of interfirm communications and concluded they weakly support an inference of a conspiracy between Robinhood and Citadel

Securities. (*See* Nov. 17, 2021 Order 44). The Amended Complaint does not add any new allegations of communications between the two entities. (*Compare* CCAC ¶¶ 296–313, 332–35, 452–53, 455, 461–63, *with* Am. Compl. ¶¶ 226–235, 239–46, 257–60, 320–22). The Court examines these allegations once more.

Embedded in the Amended Complaint are several vague and ambiguous emails between high-level executives of Robinhood and Citadel Securities and internal Robinhood emails discussing external conversations with Citadel Securities. Given their timing and overall context, these communications could be inferred to relate to the trading restrictions imposed on January 28, 2021.

On January 20, 2021, Citadel Securities's Head of Execution Services emailed Josh Drobnyk, Robinhood's Vice President of Corporate Relations and Communications, stating he was happy they "will be working together" and asking Drobnyk to "let [him] know if [they are] interested and who the main contact should be." (Am. Compl. ¶ 229 (alterations added; quotation marks omitted)). On January 25, 2021, Drobnyk replied "[w]e are on board" and copied Lucas Moskowitz, Robinhood's Deputy General Counsel, who was "going to be [Robinhood's] central point of contact[.]" (*Id.* ¶ 230 (alterations added)). Moskowitz and the Citadel Securities executive then arranged a call for the morning of January 26, 2021, the details of which are unknown. (*See id.* ¶¶ 231–33). Considering the Amended Complaint admits the details of this agreement or discussion are unknown, these emails are only relevant given their timing and participants.

Around 4:40 p.m. EST on January 27, 2021, Howard, Robinhood's COO, messaged Tenev, Robinhood's CEO, that she, along with Daniel Gallagher and Jim Swartwout, Robinhood's Chief Legal Officer and Robinhood Securities' President and CEO, respectively, would be joining "a

call with Citadel" at 5:00 p.m. that day. (*Id.* ¶ 239; *see id.* ¶ 237). Howard told Tenev she believed Citadel Securities would "make some demands on limiting [payment for order flow] across the board" but that they "won't agree to anything[.]" (*Id.* ¶ 239 (alterations added)). Tenev told Howard that although he had never met Ken Griffin, the CEO of Citadel Securities, she could mention on the call that "this would be a good time for [Tenev] to chat with [] [G]riffin[.]" (*Id.* (alterations added)). The request from a market maker to limit the order flow sent to it is not equivalent to a demand to restrict trading in certain securities; however, the timing and the involvement of high-level executives render these emails relevant.

Roughly two hours later, Swartwout received an internal message stating there was "[a]necdotal evidence that several 'very large' firms are having really bad nights too"; to which Swartwout replied, "everyone is. [Y]ou wouldnt [sic] believe the conv[ersation] we had with Citadel. [T]otal mess[.]" (*Id.* ¶ 240 (alterations added)). At 8:16 p.m., Swartwout updated a Citadel Securities employee that he was looking for "new Citadel numbers"; the employee responded that the numbers were "firming up right now in light of the follow up [sic] conversation between Gallagher and [redacted.]" (*Id.* ¶ 242 (alteration adopted; alterations added; quotation marks omitted)). Around 8:30 p.m. that night, Swartwout emailed Citadel Securities's Vice President of Business Development to offer to set up a call that night with Tenev and mentioned Tenev would like to have a discussion with Griffin at some point, given their relationship, but "[n]ot specific to this crazy issue[.]" (*Id.* ¶ 245 (alterations added); *see id.* ¶¶ 243–44). After the Citadel Securities executive asked Swartwout if Tenev would like to have the call that night, Swartout declined and said:

> Just looking for your dictated schedule and caps. I have 20 minutes until batch so whatever it is we are not going to be able to address it tomorrow given the notice. I have to say I am beyond disappointed in how this went down. It's difficult to have a partnership when these kind [sic] of things go down this way.

(*Id.* ¶ 245 (alteration added)). Again, these emails are vague and ambiguous, and they are only relevant considering the timing and those involved.

Lastly, on January 30, 2021, a Citadel Securities executive informed Drobnyk that he "wanted to generally coordinate messaging" and copied on the email Robinhood's "[General Counsels] as an FYI and for privilege." (*Id.* ¶ 260 (alteration added); *see id.* ¶¶ 257–58). The two then arranged an "[u]rgent" phone call. (*Id.* ¶ 260 (alteration added)). Given the context of the preceding communications and the fact that this request to coordinate messaging occurred even as Robinhood continued to restrict trading in the Relevant Securities, these emails — while vague and ambiguous — do lend some credence to Plaintiffs' conspiracy theory.

Of course, Defendants must frequently communicate given their business relationship. *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 56–57 (1st Cir. 2016) (explaining that companies operating in the same market can have legitimate business reasons to communicate, and those communications do not themselves establish a plausible antitrust conspiracy). But given the timing, the players involved, and the fact that each of these emails could be inferred to relate to the trading restrictions imposed on January 28, 2021, Plaintiffs' allegations of interfirm communications are supportive of a conspiracy.

But the support is thin. Plaintiffs cite *In re Salmon*, No. 19-21551-Civ, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021), where the undersigned found interfirm and intrafirm communications supported a reasonable inference of conspiracy. (*See, e.g.*, Resp. 14). There, the plaintiffs "point[ed] to bilateral and multilateral agreements not to compete and a high level of communications among [d]efendants," including complete details of multiple meetings, such as who was in attendance, when the meetings occurred, and the contents of those communications. *In re Salmon*, 2021 WL 1109128, at *15 (alterations added). Here, Plaintiffs concede they do not

34

know what was discussed during the several calls between the Robinhood and Citadel Securities executives.

This is not necessarily fatal, for Plaintiffs do not have to plead the *contents* of the interfirm communications to move the needle closer to plausibility.  Interfirm communications can help Plaintiffs establish an "opportunity to conspire," even if "such opportunity alone is insufficient to support an inference that a conspiracy actually happened."  *Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 322 (S.D.N.Y. 2018).

Plaintiffs have alleged a sufficiently high level of interfirm communications to demonstrate an opportunity to conspire.  Allegations of *occasional* interfirm communications typically do not establish the plus factor.  *See Mayor & Council of Balt.*, 709 F.3d at 140.  Plaintiffs must allege a "high level" of interfirm communications.  *Id.* (quotation marks omitted).  A "high level" of interfirm communications contemplates multiple meetings, emails, phone calls, or other communications taking place over time.  *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015) ("[T]he complaint describes phone calls, meetings, and discussions among the various conspirators." (alteration added)); *Hendershot v. S. Glazer's Wine & Spirits of Oklahoma, LLLP*, No. 20-cv-0652, 2021 WL 3501523, at *8 (N.D. Okla. Aug. 9, 2021) ("[D]efendants communicated frequently via an industry group they created[.]" (alterations added)); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 318 (S.D.N.Y. 2021) ("Defendants share close business relationships, including common founders, interlocking membership in organizations, attending the same meetings, and promotion of each other's products and activities[.]" (alterations added and citations omitted)); *Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 169 (W.D.N.Y. 2020) (finding a "high level of interfirm communications" where the amended complaint alleged the defendants participated in

"three meetings during the Class Period that always coincided with price increase announcements").

Plaintiffs meet this standard here.  According to the Amended Complaint, at least two phone calls between Citadel Securities and Robinhood executives took place in the days leading up to January 28, 2021, the day Robinhood curtailed trading on the Restricted Securities.  (*See* Am. Compl. ¶¶ 232, 237).  The parties also exchanged numerous emails between January 20 and January 28, indicating Robinhood and Citadel Securities kept frequent contact throughout the short squeeze.  (*See id.* ¶¶ 227–233, 235).  In other words, Plaintiffs allege not just "isolated discussions" but "a 'high level' of interfirm communications."  *Mayor & Council of Balt.*, 709. F.3d at 140.

But Plaintiffs must allege more than that Robinhood and Citadel Securities communicated.  Plaintiffs have only alleged an *opportunity* to conspire; they have not connected that opportunity to a plausible inference of an actual antitrust conspiracy.  Interfirm communications, under the right circumstances, can help give rise to a plausible conspiracy claim, but not when those allegations have an "obvious alternative explanation."  *Twombly*, 550 U.S. at 567.  The Court cannot take allegations of communications, followed by allegations of a restriction, and simply fill in the blanks for Plaintiffs, particularly where it "is just as plausible, if not more so," that the communications did not form the basis of an antitrust conspiracy.  *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1093 (9th Cir. 2015).

Here, the retail-driven short squeeze, driven in part by Robinhood users, had set the financial world ablaze: "several 'very large' firms [were] having really bad nights[.]"  (Am. Compl. ¶ 240 (alterations added)).  Given the PFOF relationship between Robinhood and Citadel Securities, it would be understandable for employees — even executive-level employees — at a broker and a market maker to communicate about what impact the squeeze might have on each

party's ability to fulfill its obligations. *See, e.g.*, *Int'l Constr. Prod. LLC v. Ring Power Corp.*, No. 5:20-cv-226, 2021 WL 6755717, at *8 (N.D. Fla. Dec. 23, 2021) (holding that interfirm conversation between defendant companies' "high-level executives" about plaintiff and its business partner did not give rise to a boycott conspiracy because plaintiff and its partner "injected an entirely new business model into the industry[,]" which was worthy of conversation (alteration added)). Plaintiffs' revisions to the Amended Complaint do little to advance the theory that when Robinhood and Citadel Securities communicated, they conspired to stop purchases of the Restricted Securities.

Certainly, interfirm communications between executives are a plus factor, and the communications Plaintiffs allege are relevant. But in this instance, the messages *at best* create an "equally plausible inference of mere interdependent behavior" that nevertheless "fall[s] short of a tacit agreement" to restrict trading. *Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 254 (2d Cir. 1987) (alteration added and citation omitted). The Court thus "find[s] it difficult" to infer an antitrust conspiracy. *Id.* (alteration added).

In sum, Plaintiffs' allegations of vague and ambiguous communications between Defendants only support a weak inference of a conspiracy, which does not, by itself, advance Plaintiffs' theory from possible to plausible.

*Pattern of concealment.* "[A]cts of concealment are circumstantial evidence of a conspiracy's existence[.]" *In re Urethane Antitrust Litig.*, No. 04-1616, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (alterations added; citing *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011)). To establish concealment, Plaintiffs must allege that Robinhood or Citadel Securities engaged in some affirmative "trick or contrivance tending to exclude suspicion and prevent inquiry." *Texas v. Allan Constr. Co., Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988) (quotation marks,

citation, and footnote call number omitted).  Plaintiffs argue they have plausibly alleged that Defendants engaged in a pattern of concealment, as evidenced by Defendants' vague and ambiguous emails and reliance on oral communications.  (*See* Resp. 21–22.)

The Court previously rejected this same argument because it "is not unusual for two firms in an ongoing business relationship to have conversations over the phone; and Plaintiffs admit they do not know the substance of these conversations."  (Nov. 17, 2021 Order 45).  The Court distinguished *In re Urethane Antitrust Litigation*, 913 F. Supp. 2d 1145, 1154–56 (D. Kan. 2012), a case Plaintiffs previously relied upon, given (1) the case included numerous, detailed facts suggesting concealment such as document destruction, and (2) the oral communications in that case were suspicious because the conspirators were *direct competitors*.  (*See* Nov. 17, 2021 Order 44–45).  Here, in contrast, Plaintiffs describe a handful of vague and ambiguous emails between a firm and its client.  Plaintiffs have not provided any new allegations of concealment and instead rehash the same argument with new, inapt case citations.[19]  (*See* Resp. 21–22.)

As before, "[t]he Court will not infer a conspiracy simply because two business partners chose to use phones to communicate."  (Nov. 17, 2021 Order 45 (alteration added)).  Plaintiffs do not make out a plus factor here.

*Pretextual explanations.*  Pretextual statements may constitute circumstantial evidence of a conspiracy.  *See In re McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016).  Plaintiffs

---

[19] Plaintiffs' cited cases do not provide support here.  (*See* Resp. 21–22 (citing *United States v. Siegler*, 990 F.3d 331, 339 (4th Cir. 2021) (upholding inference that the defendant knowingly participated in a drug distribution conspiracy because of the familiarity between the coconspirators and the coded language they used); *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (holding the destruction of documents may be evidence of a conspiracy); *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011) (finding statements imploring one not to go to the authorities were highly probative of a conspiracy); *Belcher v. Atl. Cap. Realty, LLC*, No. 6:08-cv-1989, 2010 WL 11507399, at *5 (M.D. Fla. Sept. 17, 2010) (no discussion of concealment); *United States v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995) (finding the concealment of explosives was evidence of a conspiracy to manufacture explosives).

renew their previously rejected contention that they have plausibly alleged that Robinhood made pretextual statements to explain the trading restrictions. (*Compare* Resp. 25, *with* Nov. 17, 2021 Order 45–47). They allege that Robinhood used the NSCC's $3 billion dollar margin call on January 28, 2021 as a pretext to impose trading restrictions to benefit Citadel Securities. (*See* Resp. 25; Am. Compl. ¶ 178). Plaintiffs offer the following three facts in support of this argument: (1) "Robinhood's executives were selling their own shares of the Relevant Securities" before the margin call; (2) "Robinhood and Citadel were engaged in heated discussions regarding the degrading market conditions" before the margin call; and (3) "Robinhood met its capital requirements" before and after January 28, 2021. (Resp. 25). The Court examines each in turn.

To start, Plaintiffs point to a January 26, 2021 internal chat where Swartwout informed another Robinhood executive "that Robinhood was moving GameStop to 100% margin the next day, stating 'I sold my AMC today. FYI — tomorrow we are moving GME to 100% — so you are aware.'" (Am. Compl. ¶ 234). There are two problems with this point. First, Swartwout's message related to *margin requirements*, not trading positions. Second, the allegation undermines Plaintiffs' position: that Swartwout and other Robinhood executives knew they would impose margin requirements on January 26, 2021 — before "the heated discussions" with Citadel Securities occurred on January 27, 2021 — *reinforces* the notion that Robinhood was in fact concerned about meeting the NSCC's daily margin calls. (Reply 25; *see* Am. Compl. ¶¶ 234–35).

Next, Plaintiffs emphasize the "heated discussions" themselves. (Reply 25). As a brief recap, on January 27, 2021, Howard informed Tenev that she was joining a call that evening with Swartwout and Citadel Securities, and she believed Citadel Securities would "make some demands on limiting PFOF across the board." (Am. Compl. ¶ 239). A few hours later, Swartwout emailed a Citadel Securities executive again, stating:

> Just looking for your dictated schedule and caps. I have 20 minutes until batch so whatever it is we are not going to be able to address it tomorrow given the notice. I have to say I am beyond disappointed in how this went down. It's difficult to have a partnership when these kind [sic] of things go down this way.

(*Id.* ¶ 245 (alteration added)).

Crucially, these communications do not indicate whether Citadel Securities and Robinhood executives discussed trading on January 27, 2021. A market maker's demand to reduce its purchases of PFOF from a broker is not equal to a demand that the broker impose trading restrictions on certain stocks for all retail investors. To infer that Robinhood used the January 28, 2021 margin call as pretext to impose trading restrictions on behalf of Citadel Securities is a leap.

This inference is also not reasonable because the Amended Complaint provides several indications that Robinhood was legitimately concerned about meeting its collateral requirements. As stated, Robinhood executives discussed raising margin requirements for the Relevant Securities *before* the discussions with Citadel Securities on January 27, 2021. (*See* Am. Compl. ¶ 234). And on the morning of January 28, 2021, shortly after the NSCC sent Robinhood a $3 billion margin call (*see id.* ¶ 178), Howard, Robinhood's COO, "messaged *internally* that Robinhood ha[d] a 'major liquidity issue'" (*id.* ¶ 180 (alteration and emphasis added)). In another *internal* message on January 28, 2021, Dusseault, Robinhood Financial's President and COO, said "we will navigate through this [NSCC] issue[.]" (*Id.* ¶ 182 (alteration added)). Further, other brokerages *not alleged to be part of this conspiracy* adjusted margin requirements or imposed trading restrictions on January 28, 2021. (*See id.* ¶¶ 195, 365–367). These facts render it implausible that the margin call was used as pretext simply because Robinhood and Citadel Securities engaged in some unknown discussion about PFOF — the subject of their otherwise lawful business relationship — on January 27, 2021.

Finally, Plaintiffs contend the margin call was used as pretext because Robinhood

40

continued to impose some trading restrictions even after it met its capital requirements.  (*See* Resp. 25).  As the Court previously stated, however, "the fact that Robinhood continued to impose restrictions after meeting its collateral requirements is of no moment because the trading restrictions 'reduce[d] the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC.'"  (Nov. 17, 2021 Order 46 (alteration in original)).  "It is not suspicious for Robinhood to strive to avoid higher collateral requirements."  (*Id.*).[20]

In short, Plaintiffs fail to make out a plus factor here.  Further, an examination of the Amended Complaint's allegations reveals an "obvious alternative explanation" for the trading restrictions: the increased collateral requirements imposed by the NSCC in response to unprecedented market volatility.  *Twombly*, 550 U.S. at 567.

*Market structure.*  Plaintiffs renew their argument that structural characteristics of the markets Defendants operate in render the markets "ripe for collusion."  (Resp. 24 (footnote call number omitted)).  The Court previously rejected this argument because Plaintiffs failed to coherently define the market and because the case law Plaintiffs relied on "involve[s] price-fixing conspiracies [where] the defendants utilized their market power to raise the prices of goods they sold."  (Nov. 17, 2021 Order 49 (alterations added; citations omitted)).

Plaintiffs now define two markets: an upstream market maker market and a downstream brokerage market.  (*See* Am. Compl. ¶¶ 306, 312).  They allege these markets are "defined by high barriers to entry, high fixed costs, and low variable costs[;]" and the brokerage consumers "are locked-in in the short run[.]"  (Resp. 24 (alterations added; citing Am. Compl. ¶¶ 370–92)).  The

---

[20] Plaintiffs argue "the decision to implement restrictions on purchasing only was arbitrary" because "[v]olatility is caused by both increases and decreases in a stock price."  (Resp. 25 n.20 (alteration added; emphasis omitted); *see also* Am. Compl. ¶¶ 361–62).  Why, then, would "other broker-dealers, including Ally, Dough, Public.com, SoFi, Stash, Tastyworks and Webull implement[] purchasing restrictions" but not sales restrictions?  (Am. Compl. ¶ 195 (alteration added)).

Court remains unconvinced that a plus factor exists here.

Plaintiffs once more rely on *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, in arguing that a plus factor exists under these market characteristics. (Resp. 24). Yet, as the Court previously stated, *In re High Fructose Corn Syrup Antitrust Litigation* involved price fixing among competitors. (*See* Nov. 17, 2021 Order 49). Plaintiffs present a different anticompetitive theory: a brokerage allegedly restricted output to lower prices for securities it did not buy or sell for its own accounts, all for the benefit of its market maker client. Plaintiffs have made no effort to address the distinction between this case and the price-fixing case they rely on, nor do they otherwise provide legal authority supporting the application of this plus factor to their novel anticompetitive theory. (*See* Resp. 24).

Even if the Court was convinced that this plus factor applies to Plaintiffs' novel anticompetitive theory and that Plaintiffs do not merely describe a legal oligopoly, Plaintiffs define the wrong markets, as discussed below.

*Market Behavior.* Also in reliance on *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, Plaintiffs argue for the application of a plus factor based on "evidence that the market behaved in a noncompetitive manner." (Resp. 24 (capitalization omitted)). But Plaintiffs must do more than simply allege that "market behavior is interdependent and characterized by conscious parallelism." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 322 (citations and footnote call number omitted). Here, they maintain the trading restrictions imposed by Robinhood were anticompetitive because retail customers were unable to purchase the Relevant Securities despite their desire to do so. (*See* Resp. 24–25).

This clearly falls short. Robinhood was not the only firm in the brokerage market that implemented purchasing restrictions — Ally, Dough, Public.com, SoFi, Stash, Tastyworks,

Webull, E*Trade, and Interactive Brokers all implemented purchasing restrictions on January 28, 2021; and none of these brokerages is alleged to be part of the conspiracy. (*See* Am. Compl. ¶¶ 195, 366–67). Therefore, the trading restrictions themselves do not warrant the application of a plus factor here.

* * *

To recap, Plaintiffs successfully advance two plus factors, each providing only weak support for a plausible inference of a conspiracy. The first plus factor is the common motive to conspire. Plaintiffs allege economic motives that explain why Citadel Securities and Robinhood might have conspired to restrict trading in the Relevant Securities in January 2021. Citadel Securities is alleged to have held substantial short positions in the Relevant Securities in January 2021, subjecting it to potentially massive losses considering the unprecedented increases in the stocks' prices caused by a retail trading frenzy.

Further, Robinhood allegedly acquiesced because it could not risk sustaining revenue losses right before its forthcoming IPO. The plausibility of Robinhood's motive is tenuous, however, because it rests on a series of unsubstantiated inferences. Plaintiffs ask the Court to infer that Robinhood was motivated by the forthcoming IPO simply based on the timing of the IPO, that Citadel Securities wielded its influence as Robinhood's most important client to pressure the brokerage to restrict trading, and that Robinhood could not simply turn to another market maker because Citadel Securities accounts for a large portion of Robinhood's PFOF revenue. While Plaintiffs do not bolster this theory with concrete allegations linking Robinhood's decision to impose restrictions and the IPO, they nevertheless allege economic motivations that *could* justify why both firms would benefit from an agreement to restrict trading, so this plus factor provides some support for Plaintiffs.

The second plus factor is the communications between Defendants. High-level executives at these firms exchanged several vague and ambiguous emails immediately before and after Robinhood imposed trading restrictions on the Relevant Securities on January 28, 2021. These emails set up telephone discussions between the executives, the substance of which is unknown to Plaintiffs. Certainly, these emails may be somewhat suspicious given the participants and their timing, and they indicate Defendants had an *opportunity* to conspire. But a few vague and ambiguous emails between two firms in an otherwise lawful, ongoing business relationship only provide thin support for Plaintiffs.

So, Plaintiffs have tenuously alleged conditions under which Defendants may have agreed to restrict trading. Is it conceivable that Robinhood restricted trading on January 28, 2021 at Citadel Securities's direction? Sure. But do Plaintiffs' allegations "nudge[] their claims across the line from conceivable to plausible[?]" *Twombly*, 550 U.S. at 570 (alterations added). No.

What's more, the Amended Complaint provides "an obvious alternative explanation" for the trading restrictions: the increased collateral requirements imposed by the NSCC in response to unprecedented market volatility. *Id.* at 567. Even before the allegedly contentious discussions between Robinhood and Citadel Securities on January 27, 2021, in internal messages, Robinhood executives discussed imposing margin requirements on the Relevant Securities. And on January 28, Robinhood executives sent internal messages expressing concern about the NSCC margin call and liquidity problems. Further, Ally, Dough, Public.com, SoFi, Stash, Tastyworks, Webull, E*Trade, and Interactive Brokers all imposed trading restrictions on January 28; and none of these firms is alleged to have done so on behalf of Citadel Securities.

Altogether, Plaintiffs have not plausibly alleged an agreement between Robinhood and Citadel Securities to restrict trading on January 28, 2021. For this reason, the Amended Complaint

is due to be dismissed.

    ***Unreasonable restraint on trade.***  Even if Plaintiffs plausibly alleged a conspiracy, they fail to allege an "unreasonable restraint on competition[.]"  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (alteration added; citation omitted).  "An unreasonable restraint of trade is one that harms competition in general, rather than the plaintiff, or any other competitor."  *Bitmain*, 530 F. Supp. 3d at 1266 (citing *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1069).  "In assessing whether an agreement unreasonably restrains trade such that it violates [section 1], courts generally apply one of three modes of antitrust analysis: (1) the *per se* rule, for obviously anticompetitive restraints; (2) the quick look approach, for those restraints with some procompetitive justification; or (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine."  *In re Terazosin Hyrdochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1310–11 (S.D. Fla. 2005) (alteration added; citations omitted).  "The presumption in cases brought under section 1 of the Sherman Act is that the rule-of-reason standard applies."  *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991) (citation omitted).[21]

    As explained, the Amended Complaint alleges a vertical relationship between Defendants and thus a vertical restraint on trade.  "Typically only 'horizontal' restraints — restraints 'imposed by agreement between competitors' — qualify as unreasonable *per se*."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018) (citation omitted).  By contrast, "nearly every . . . vertical

---

[21] Plaintiffs insist "it is premature for the Court to determine whether the *per se* or the rule of reason test applies at the motion[-]to[-]dismiss stage."  (Resp. 13 (alterations added); *see also id.* 28–29).  Not so. Courts routinely determine which test applies at the motion-to-dismiss stage.  *See, e.g.*, *Quality Auto Painting Ctr. of Roselle, Inc.*, 917 F.3d at 1271–72; *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333–36 (11th Cir. 2010); *In re Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d 1186, 1191–93 (9th Cir. 2015); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205–206 (4th Cir. 2002); *cf. PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417–20 (5th Cir. 2010) (using the rule of reason test at motion-to-dismiss stage); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434–37 (6th Cir. 2008) (analyzing under both the *per se* and rule of reason tests at motion-to-dismiss stage).

restraint . . . should be assessed under the rule of reason."  *Id.* at 2284 (citations omitted).  In half-heartedly arguing the *per se* rule applies here, Plaintiffs ignore well-established Supreme Court precedent establishing that "virtually all vertical agreements now receive a traditional rule-of-reason analysis."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 318 (citing *Leegin*, 551 U.S. 877; other citation and footnote call number omitted).  The Court is thus unconvinced the *per se* rule applies.

Nor is the Court convinced it should evaluate the alleged agreement under the quick look approach.  The quick look approach "fills in the continuum between *per se* analysis and the full rule of reason."  *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 510 (4th Cir. 2002) (citation omitted).  It only applies when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question have an anticompetitive effect on customers and markets."  *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999) (citation omitted). That is clearly not the case here.

First, while Plaintiffs may emphasize that Robinhood Securities and Citadel Securities operate at the same level of distribution (*see* Resp. 30 n.26), the restraint alleged is vertical, for its participants are Citadel Securities, the upstream market maker, and Robinhood, the downstream broker-dealer (*see* Am. Compl. ¶¶ 305–06, 312).  Vertical restraints do not become horizontal restraints just because one of the participants operates several lines of business, one of which is similar to that of the other participant.  *See Generac Corp.*, 172 F.3d at 977.  As this is a vertical restraint, the rule of reason analysis should apply, not the quick look.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 318 (holding that the quick look analysis applies to horizontal restraints, while vertical restraints are evaluated using the rule of reason); *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 770 (N.D. Ill. 2015) (declining to apply the quick look because a

"reasonable fact finder could not infer a horizontal agreement from these facts" (citation omitted));
*Acton v. Merle Norman Cosms., Inc.*, No. 88-cv-7462, 1995 WL 441852, at *8 (C.D. Cal. May 16, 1995) ("The 'quick look' approach . . . has not been judicially approved for analyzing the vertical nonprice restraints raised in this case[.]" (alterations added; citation omitted)).

Second, the restraint here involves a complicated scheme where one participant allegedly shut down purchases of the Restricted Securities to mitigate the other's losses, all in the face of a largely unforeseen short squeeze orchestrated by retail investors on the Internet.  In other words, this is an unusual antitrust case.  Courts do not use the quick look approach in unusual cases. Where "the circumstances of the restriction are somewhat complex," *Cal. Dental Ass'n*, 526 U.S. at 775 n.12, or the "features of the arrangement" are "unique[,]" *Cal. ex rel. Harris*, 651 F.3d 1118, 1137 (9th Cir. 2011) (alteration added), the quick look approach is inappropriate.  Accordingly, the rule of reason applies here.

***Rule of reason.***  In applying the rule of reason, a court must ask whether the defendant "has shown that the alleged restraint has had an anticompetitive effect on the market." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016).  "[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market." *Am. Express Co.*, 138 S. Ct. at 2285 (alteration added; citation and footnote call number omitted).  "Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* (alterations adopted; citations and quotation marks omitted).  The Amended Complaint therefore "must 'identify the relevant market in which the harm occurs.'" *Bitmain*, 530 F. Supp. 3d at 1256 (citing *Jacobs*, 626 F.3d at 1336).  It does not.

Plaintiffs define two relevant product markets: the upstream PFOF Market where Citadel Securities competes with other market makers (*see* Am. Compl. ¶ 306), and the downstream No-

Fee Brokerage Trading App Market where Robinhood competes with other brokerages (*see id.* ¶ 313).  The downstream No-Fee Brokerage Trading App Market is the "consumer-facing relevant product market[.]"  (*Id.* ¶ 312 (alteration added).  Competitors in the No-Fee Brokerage Trading App Market, such as Robinhood Financial, "offer[] brokerage services to Retail Investors."  (*Id.* ¶ 68 (alteration added); *see also id.* ¶¶ 69, 305, 350–51).

According to Plaintiffs, Defendants harmed Plaintiffs "[b]y forcing the Retail Investors to sell their Relevant Securities at lower prices than they otherwise would have sold[.]"  (*Id.* ¶ 16 (alterations added)).  More specifically, Plaintiffs allege that "Defendants artificially constricted the price appreciation of the Relevant Securities and reduced the price of the Relevant Securities that Retail Investors either sold or held below the prices that they would have otherwise obtained in a competitive market free of collusion."  (*Id.*; *see also id.* ¶¶ 407).  In other words, Plaintiffs allege that Defendants caused antitrust injury by reducing the number of trades in the Relevant Securities, thereby distorting the supply and demand for the stocks and leading to their rapid price decline.  (*See id.* ¶ 354).

There is a curious gap between Plaintiffs' defined markets and the injury alleged, which is detrimental to Plaintiffs' antitrust standing.  "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (quotation marks and citation omitted).  Antitrust standing requires that Plaintiffs sustain "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Antitrust law is supposed to prevent injury to competition.  *See id.* at 488 (citation omitted).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Competition is injured if a defendant's conduct, like entering into a conspiracy to restraint trade, generates anticompetitive effects in that relevant market. *See Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1071 (citation omitted).  This can involve "adverse effects on the price, quality, or output of the relevant good or service." *N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006).

Importantly, there should be a "direct[]" connection between Plaintiffs' antitrust injury and the "alleged restraint in the relevant market[.]" *Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994) (alterations added; citation omitted).  Put another way, the harm should take place in the relevant market the plaintiff has defined. *See Am. Express Co.*, 138 S. Ct. at 2285 (citation omitted).  Here emerges the critical issue: in which market did Robinhood and Citadel Securities effectuate an unlawful restraint, and did Plaintiffs' injury flow from anticompetitive effects *in that market*?

This alleged antitrust injury certainly did not stem from any anticompetitive effects in the PFOF Market, where Citadel Securities competes to provide market maker services.  Plaintiffs do not describe any connection between Defendants' alleged agreement and competition in the PFOF market, much less that any anticompetitive effects there caused the prices of the Restricted Securities to fall.

Nor did the alleged restraint impose any anticompetitive effects in the No-Fee Brokerage Trading App Market, where Robinhood competes to provide retail brokerage services.  Plaintiffs cannot plausibly argue a restraint harmed competition there, for the agreement between Robinhood and Citadel Securities, as alleged, did not concern price, quality, or output for any other broker-dealer's services.  Plaintiffs allege Robinhood curtailed purchases of the Relevant Securities on its own platform to appease Citadel Securities.  That harmed Robinhood users.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

But to trigger the antitrust laws, a restraint must harm *competition*. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). Defendants' alleged agreement left Ally, Dough, Public.com, SoFi, Stash, Tastyworks, Webull, E*Trade, Interactive Brokers, and any other brokerage free to adopt or eschew any policy they desired with respect to the Restricted Securities — or anything else, for that matter. Further, it imposed no further restrictions on Retail Investors' ability to trade with any of Robinhood's competitors. (*See, e.g.*, Am. Compl. ¶ 30). Plaintiffs thus may not hedge their antitrust claim on anticompetitive effects in the No-Fee Brokerage Trading App Market.

The alleged anticompetitive injury occurred in entirely separate markets: the markets for the Relevant Securities. The products in question are the Relevant Securities, the prices of which were negatively affected by the trading restrictions. Plaintiffs, however, do not center their market definition around the sales of the Relevant Securities. This is not surprising, as there is an extensive body of persuasive case law holding "that transactions in a particular stock do not fall within [section] 1" of the Sherman Act. *Kalmanovitz v. G. Heileman Brewing Co., Inc.*, 769 F.2d 152, 156 (3rd Cir. 1985) (alteration added; citing *Bucher v. Shumway*, 452 F. Supp. 1288 (S.D.N.Y. 1978), *aff'd*, 622 F.2d 572 (2d Cir. 1980), *cert. denied*, 449 U.S. 841 (1980); *Schaefer v. First Nat'l Bank*, 326 F. Supp. 1186 (N.D. Ill. 1970), *appeal dismissed*, 465 F.2d 234 (7th Cir. 1972)).[22]

---

[22] The Supreme Court has stated that "the Sherman Act applies only to a 'restraint upon commercial competition in the marketing of goods or services.'" *Kalmanovitz*, 769 F.2d at 156 (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 495 (1940)). And lower courts have "observed that the purchase or sale of stock by investors does not fit easily within the definition of goods or services as used by the antitrust laws." *Id.* (footnote call number omitted; citing *Bucher*, 452 F. Supp. 1288). The court in *Kalmanovitz* held the sale of stock of a single company within the context of a takeover battle did not fall within the definition of section 1 of the Sherman Act. *See id.* In its reasoning, the *Kalmanovitz* court relied on two other lower court opinions: in *Bucher*, the court held an agreement to effectuate a tender offer was not an unreasonable restraint of trade even though it fixed the price of the company's shares to the shareholders' detriment, 452 F. Supp. at 1289; and in *Schaefer*, the court concluded the common law interpretation of "restraint of trade" never encompassed stock market manipulation and accordingly dismissed the plaintiffs' Sherman Act suit, 326 F. Supp. at 1191–92. *See Kalmanovitz*, 769 F.2d at 156. While the *Kalmanovitz* court noted "a number of cases in which the antitrust laws have been applied to the securities industry[,]" *id.* at 157 (alteration

Plaintiffs continue to reject a market definition based on the Relevant Securities in their Response but do so in vain. (*See* Resp. 38).

That Plaintiffs do not define the relevant market is fatal to their rule of reason analysis. "Regardless of whether the plaintiff alleges actual or potential harm to competition . . . , he must identify the relevant market in which the harm occurs." *Jacobs*, 626 F.3d at 1336 (alteration added; citing *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986)). This remains true even where, unlike here, a plaintiff "rel[ies] exclusively on direct evidence" of "anticompetitive effects[.]" *Am. Express Co.*, 138 S. Ct. at 2284–85 (alterations added; footnote call number omitted). Unfortunately, the Amended Complaint's failure to plausibly do so leaves Plaintiffs with little more than a garbled market theory that ignores a crucial fact: the alleged harm to competition occurred in an entirely separate market from the markets Plaintiffs define. And Plaintiffs do not even attempt to define that third, relevant market. That fatal flaw renders Plaintiffs' theory of harm unworkable.

Accordingly, the Amended Complaint is due to be dismissed.

## V.    CONCLUSION

The Amended Complaint fails for two reasons. One, Plaintiffs fail to plausibly allege the existence of an agreement to restrict trade between Defendants. Sure, Citadel Securities would have economically benefited given its short positions. But Robinhood's supposed incentive depends on the assumptions that it was motivated by its forthcoming IPO, that Citadel Securities threatened to cut off its relationship with Robinhood in exchange for the trading restrictions, and that Robinhood was unwilling to find another market maker. Plaintiffs do not plausibly allege that Robinhood had such a motivation here, and even if they had done so, economic incentive is not in

---

added; collecting cases), *Kalmanovitz*, *Bucher*, and *Schaefer* caution against the creation of a market defined by the sale of certain stocks to investors.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

itself enough for the Court to infer that Defendants actually had an unlawful agreement to restrain trade.

The only additional evidence plausibly alleged by Plaintiffs consists of vague and ambiguous emails between two entities in an otherwise lawful business relationship that, while suspicious given their timing, do little to bolster the strength of Plaintiffs' allegations. And juxtaposed with the compelling alternative explanation for the trading restrictions — the increased collateral requirements imposed by the NSCC in response to historic market volatility — Plaintiffs' theory is speculative and implausible.

Two, even if Plaintiffs did plausibly allege an agreement, they fail to plausibly allege an unreasonable restraint of trade. Plaintiffs allege a vertical restraint of trade, which must be evaluated under a rule of reason analysis and thus requires an accurate market definition — something they do not provide. Indeed, Plaintiffs ignore the reality of their suit: they allege that Defendants caused harm to the market for Relevant Securities, but they neglect to define that market. And because they do not define the market for Relevant Securities, their claim fails.

Defendants request that the Court dismiss the Amended Complaint with prejudice. (*See* Mot. 42–43). As the Court stated in the November 17 Order dismissing the CCAC, the Amended Complaint would be Plaintiffs' final opportunity. (*See* Nov. 17, 2021 Order 50). Plaintiffs do not insist otherwise, and the Court sees no reason to give Plaintiffs a fourth attempt to plead.

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Amended Antitrust Tranche Complaint **[ECF No. 456]** is **GRANTED**. The Amended Consolidated Class Action Complaint **[ECF No. 451]** is **DISMISSED**.

CASE NO. 21-2989-MDL-ALTONAGA/Torres

**DONE AND ORDERED** in Miami, Florida, this 12th day of May, 2022.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record; *Pro Se* Plaintiffs