No. 22-11873

IN THE

# United States Court of Appeals

FOR THE

# Eleventh Circuit

ANGEL GUZMAN, BURKE MINAHAN, CHRISTOPHER MILLER, TERELL STERLING,

*Plaintiffs-Appellants,*

v.

ROBINHOOD FINANCIAL LLC, ROBINHOOD SECURITIES, LLC,
ROBINHOOD MARKETS, INC., CITADEL LLC D.B.A. CITADEL SECURITIES,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
HONORABLE CECILIA M. ALTONAGA, CHIEF U.S. DISTRICT JUDGE
NO. 1:21-MD-02989-CMA

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES ROBINHOOD FINANCIAL LLC, ROBINHOOD SECURITIES, LLC & ROBINHOOD MARKETS, INC.

Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Samuel A. Danon
María Castellanos Alvarado
HUNTON ANDREWS KURTH LLP
333 S.E. 2nd Avenue, Suite 2400
Miami, FL 33131
(305) 810-2500

*Attorneys for Defendants-Appellees Robinhood Financial LLC,
Robinhood Securities, LLC & Robinhood Markets, Inc.*

December 14, 2022

**No. 22-11873**

**Guzman, et al. v. Robinhood Markets, Inc., et al.**

### Certificate of Interested Persons and Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rules 26.1-2 and 26.1-3, the undersigned counsel hereby certify as follows:

Defendants-Appellees Robinhood Financial LLC and Robinhood Securities, LLC are wholly owned subsidiaries of Robinhood Markets, Inc. (NASDAQ: HOOD), and no publicly-traded corporation has a 10% or greater ownership interest in Robinhood Financial LLC, Robinhood Securities, LLC or Robinhood Markets, Inc. (collectively, "Robinhood").

The following is a complete list, in alphabetical order, of interested persons:

1.  Altonaga, Cecilia M. (U.S. District Judge)
2.  Bartlit Beck LLP
3.  Burck, William A.
4.  Castellanos Alvarado, María
5.  Citadel Securities, LLC
6.  Cravath, Swaine & Moore LLP
7.  Danon, Samuel A.
8.  Fountain, Peter H.
9.  Furst, Rachel W.
10. Grossman Roth Yaffa Cohen, P.A.

No. 22-11873
**Guzman, et al. v. Robinhood Markets, Inc., et al.**

11.  Guzman, Angel

12.  Hach Rose Schirripa & Cheverie LLP

13.  Hettler, Kathryn

14.  Hoeflich, Adam L.

15.  Hunton Andrews Kurth LLP

16.  Huynh, Andrew D.

17.  Joseph Saveri Law Firm, LLP

18.  Kercher, Christopher D.

19.  LeBuhn, MacGregor

20.  Maggard, Abraham A.

21.  Miller, Christopher

22.  Minahan, Burke

23.  Orsini, Kevin J.

24.  O'Sullivan, John F.

25.  Pavsner, Seth

26.  Quinn Emanuel Urquhart & Sullivan, LLP

27.  Robinhood Financial LLC

28.  Robinhood Markets, Inc. (HOOD)

29.  Robinhood Securities, LLC

30.  Robinson, Dawson

31.  Ryan, Antony L.

32.  Saveri, Joseph R.

No. 22-11873
**Guzman, et al. v. Robinhood Markets, Inc., et al.**

33.    Schirripa, Frank R.

34.    Sterling, Terell

35.    Sukiennik, Brittany L.

36.    Williams, Steven N.

37.    Young, Christopher K.L.

**CRAVATH, SWAINE & MOORE LLP**

*/s/ Antony L. Ryan*

Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

**HUNTON ANDREWS KURTH LLP**

Samuel A. Danon (FBN 892671)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2nd Avenue, Suite 2400
Miami, FL 33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-2460
sdanon@hunton.com
mcastellanos@hunton.com

C-3 of C-4

No. 22-11873
**Guzman, et al. v. Robinhood Markets, Inc., et al.**

*Attorneys for Defendants-Appellees*
*Robinhood Financial LLC, Robinhood*
*Securities, LLC and Robinhood Markets,*
*Inc.*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Robinhood respectfully submits that oral argument is not necessary to address the issues presented by this appeal, and that this Court should affirm the District Court's dismissal with prejudice of Plaintiffs-Appellants' claims.

# **TABLE OF CONTENTS**

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement.................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF AUTHORITIES ....................................................................iv

STATEMENT OF ISSUES .......................................................................1

INTRODUCTION ..................................................................................2

STATEMENT OF THE CASE...................................................................5

    I.    Statement of Facts. ..................................................................5

        A.    The Parties....................................................................5

        B.    The Mechanics of Securities Trading. ............................7

        C.    The Unprecedented Market Volatility of January 2021. ...........8

        D.    The Events of January 28, 2021 and Onward...........................11

    II.    Course of Proceedings Below. ..................................................16

SUMMARY OF THE ARGUMENT .........................................................18

ARGUMENT .......................................................................................20

    I.    The District Court Properly Held That Plaintiffs Do Not Plausibly Allege an Agreement Between Robinhood and Citadel Securities to Restrict Trading. ...................................20

        A.    The District Court Applied the Correct Legal Standard for Pleading an Antitrust Claim.....................................21

        B.    Plaintiffs Do Not Plausibly Allege an Agreement Between Robinhood and Citadel Securities to Restrict Trading. ...........24

    II.    The District Court Properly Dismissed Plaintiffs' Claim for Failing to Plead Harm to Competition in a Relevant Market. ...........40

        A.    Plaintiffs Must Plead Harm to Competition. ...........................41

ii

B.    Plaintiffs Fail to Allege Any Harm to Competition in Their Alleged Markets. .......................................................................43

C.    The Alleged Harm Is in a Different Market or Markets. ..........45

CONCLUSION ......................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) .............................................................22, 23, 40

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) .............................................................................24

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246 (2d Cir. 1987) .............................................................................31

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................22, 40

*Associated News, Inc. v. Curtis Circulation Co.*,
   Civ. A. No. H-80-1201, 1986 WL 13791 (S.D. Tex. Dec. 4, 1986) .................30

*Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto Ins. Co.*,
   953 F.3d 707 (11th Cir. 2020) .............................................................22, 23, 40

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................passim

*Blue Shield of Virginia v. McCready*,
   457 U.S. 465 (1982)...............................................................................49, 50

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)........................................................................................49

*Brunswick Corp. v. Riegel Textile Corp.*,
   752 F.2d 261 (7th Cir. 1984) ...........................................................................49

*Bucher v. Shumway*,
   452 F. Supp. 1288 (S.D.N.Y. 1978), *aff'd mem.*, 622 F.2d 572 (2d Cir.
   1980) ...............................................................................................................47

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3d Cir. 2015) ...........................................................................37

iv

*Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*,
  710 F.2d 752 (11th Cir. 1983) ............................................................50

\*Credit Suisse Sec. (USA) LLC v. Billing*,
  551 U.S. 264 (2007)..........................................................................18

*D.A.M. v. Barr*,
  474 F. Supp. 3d 45 (D.D.C. 2020).....................................................12

*DeLong Equip Co. v. Wash. Mills Abrasive Co.*,
  887 F.2d 1499 (11th Cir. 1989) ..........................................................30

\*Duty Free Americas, Inc. v. Estée Lauder Cos.*,
  797 F.3d 1248 (11th Cir. 2015) ..........................................................42

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) ..............................................................23

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013)..................................................................24

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004) .........................................................35, 36

\*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ..................................................42, 43, 48

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
  723 F.3d 1019 (9th Cir. 2013) ............................................................44

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
  466 F.3d 961 (11th Cir. 2006) ............................................................49

\*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ..............................................................34

\*Intergraph Corp. v. Intel Corp.*,
  195 F.3d 1346 (Fed. Cir. 1999) ..........................................................45

\*Irving v. Mazda Motor Corp.*,
  136 F.3d 764 (11th Cir. 1998) ............................................................26

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) .............................................................21, 27, 43

*Kalmanovitz v. G. Heileman Brewing Co.*,
769 F.2d 152 (3d Cir. 1985) .......................................................................46, 47

*La Grasta v. First Union Sec., Inc.*,
358 F.3d 840 (11th Cir. 2004) ...........................................................................9

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir. 1996) ........................................................................42

*Loeb Industries, Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) .....................................................................50, 51

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
302 F.3d 1207 (11th Cir. 2002) .................................................................42, 48

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) .............................................................................25

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)...........................................................................23, 25, 26

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ..........................................................................31

*In re Publication Paper Antitrust Litig.*,
90 F.3d 51 (2d Cir. 2012) .................................................................................33

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018)............................................................................passim

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
917 F.3d 1249 (11th Cir. 2019) (en banc) ...................................................22, 30

*Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*,
105 F.3d 1376 (11th Cir. 1997) ........................................................................42

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ...........................................................................23

vi

*Sinaltrainal v. Coca-Cola Co.*,
   578 F.3d 1252 (11th Cir. 2009) ....................................................23, 39

*SmileDirectClub, LLC v. Tippins*,
   31 F.4th 1110 (9th Cir. 2022) ..............................................................23

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
   376 F.3d 1065 (11th Cir. 2004) ........................................40, 42, 44, 47

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993).............................................................................41

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   803 F.3d 1084 (9th Cir. 2015) .......................................................31, 35

*In re Text Messaging Antitrust Litig.*,
   782 F.3d 867 (7th Cir. 2015) ..............................................................26

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) ..........................................................28

*United Am. Corp. v. Bitmain, Inc.*,
   530 F. Supp. 3d 1241 (S.D. Fla. 2021) ...............................................30

*United States v. Curtis*,
   635 F.3d 704 (5th Cir. 2011) ..............................................................33

*United States v. Gacnik*,
   50 F.3d 848 (10th Cir. 1995) ..............................................................33

*Universal Express, Inc. v. SEC*,
   177 F. App'x 52 (11th Cir. 2006) ..................................................14, 15

*In re Urethane Antitrust Litig.*,
   No. 04-1616-JWL, 2013 WL 2097346 (D. Kan. May 15, 2013) .......33

## Statutes & Regulations

15 U.S.C. § 1 ...............................................................................passim

17 C.F.R. § 240.10b-10..........................................................................6

87 Fed. Reg. 10,436 .......................................................................15, 16

**Other Authorities**

Maggie Fitzgerald, *Robinhood restricts trading in GameStop, other names involved in frenzy*, CNBC (Jan. 28, 2021, 9:19 AM EST), available at *https://www.cnbc.com/2021/01/28/robinhood-interactive-brokers-restrict-trading-in-gamestop-s.html* .................................................................. 12

*Market Activity*, NASDAQ, *https://www.nasdaq.com/market-activity* ........................ 9

Robinhood Securities, LLC SEC Rule 606 Report (Apr. 29, 2021), available at *https://cdn.robinhood.com/assets/robinhood/legal/RHS%20SEC%20Rule%20606%20and%20607%20Disclosure%20Q1%202021.pdf* .................... 6

SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021 (Oct. 14, 2021), available at *https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf* ................... 15

SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021), *https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert* ......................................................... 14

*Virtual Hearing – Game Stopped?  Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide*, 117th Cong. (2021) (statement of Vladimir Tenev, Chief Executive Officer, Robinhood Markets, Inc.), *https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-20210218.pdf* ............................................................. 11

## STATEMENT OF ISSUES

1.        On January 27, 2021, trading by retail investors precipitously increased the price and volatility of stocks that had gained cult-like followings on social media, and clearinghouses imposed additional collateral requirements on brokerages, requiring $3 billion of increased collateral from Robinhood alone. Robinhood (like other non-defendant brokerages) shortly thereafter restricted their customers from buying these volatile "meme stocks."  Was it proper for the District Court, which comprehensively considered Plaintiffs-Appellants' ("Plaintiffs'") allegations and found that they did not plausibly allege an unlawful agreement between Robinhood and Citadel Securities, to consider the obvious alternative explanation that Robinhood restricted trading because its clearinghouse required it to post $3 billion in additional collateral?

2.        Plaintiffs alleged that Robinhood and Citadel Securities had a vertical relationship and operated in two markets—a downstream "No-Fee Brokerage Trading App Market" and an upstream "PFOF Market"—but they claimed harm in an unidentified third market for trading the Relevant Securities.  Was it proper for the District Court to hold that Plaintiffs failed to plausibly allege anticompetitive harm in a relevant market?

## **INTRODUCTION**

In late January 2021, the stock market experienced unprecedented levels of volatility for GameStop and other stocks (so-called "meme stocks"), garnering extensive public attention.  The meme-stock short squeeze underlying this litigation resulted in a record-breaking volume of trading activity and skyrocketing stock prices for certain stocks (which Plaintiffs define as the "Relevant Securities").  As these events unfolded, Robinhood—along with numerous other broker-dealers who are not alleged to have been part of the purported conspiracy—implemented measures designed to avoid potentially catastrophic market risk.

Specifically, in the early morning hours of January 28, 2021, Robinhood made the difficult decision to restrict purchases of the Relevant Securities on its mobile application and website after Robinhood received an unprecedented collateral call of $3 billion from the National Securities Clearing Corporation ("NSCC").  That collateral call represented a *twenty-four fold* increase from earlier in the week, and was more than four times what was required the day before.  Robinhood took these measures for the purpose of reducing the deposit requirements imposed by the NSCC.  A failure to meet those obligations could have led the NSCC to suspend the ability for all customers to trade in all securities through Robinhood.

2

Despite the logical (and actual) explanation that Robinhood imposed the challenged restrictions due to market conditions and the $3 billion NSCC collateral call, Plaintiffs instead allege that Robinhood did so as part of a clandestine illegal conspiracy with Citadel Securities to mitigate the latter's supposed losses from the short squeeze. Plaintiffs weave this tale of conspiracy together out of whole cloth, ignoring the fact that many other brokers (who Plaintiffs once alleged were part of a vast conspiracy but have since dropped from the case) similarly imposed trading restrictions on January 28, 2021. The decision below dismissing this case should be affirmed for two independent reasons.

*First*, the District Court properly dismissed the case for failure to plead the existence of an unlawful agreement. As the Court explained, "Plaintiffs do not plausibly allege that Robinhood had" a motive to enter into the alleged conspiracy, and "juxtaposed with the compelling alternative explanation for the trading restrictions—the increased collateral requirements imposed by the NSCC in response to historic market volatility—Plaintiffs' theory is speculative and implausible." (Op. 51-52.)[1] Plaintiffs had access to more than ten thousand pages of documents produced by Robinhood and Citadel Securities from the critical time period before amending their complaint multiple times, yet repeatedly failed to

_____

[1] Citations to "Op." refer to the District Court's order granting the motion to dismiss the Amended Complaint (Dkt.470).

allege even a plausible inference of conspiracy—never mind direct evidence of one.

*Second*, the District Court correctly dismissed Plaintiffs' claim for failure to plead other required elements of a Section 1 conspiracy claim. Because Plaintiffs have pleaded a vertical agreement, their claim must be analyzed under the rule of reason. As a result, they must plausibly allege that the challenged conduct harmed competition *in a relevant alleged market*. Plaintiffs allege two different markets: an upstream "PFOF" market-maker market in which Citadel Securities allegedly competes, and a downstream "No-Fee Brokerage Trading App Market" in which Robinhood allegedly competes. Plaintiffs do not allege harm to competition in either of those markets. Instead, Plaintiffs allege there was a reduction in prices for the Relevant Securities (which is not itself even a harm to competition) that took place in an undefined, separate market(s) for trading in the Relevant Securities, where Plaintiffs do not—and cannot—allege that either Defendant has market power. As the District Court correctly observed, "Plaintiffs ignore the reality of their suit: they allege that Defendants caused harm to the market for Relevant Securities, but they neglect to define that market." (Op. 52.)

This Court should affirm the District Court decision.

# STATEMENT OF THE CASE

## I. STATEMENT OF FACTS.

### A.    The Parties.

**Robinhood Financial** is a customer-facing, introducing broker-dealer through which retail investors can place commission-free trade orders.  (AAC ¶¶ 68-69.[2])  Plaintiffs allege that Robinhood participates in the "No-Fee Brokerage Trading App Market," which "consists of brokerages such as Robinhood, Charles Schwab, E*Trade, TD Ameritrade, WeBull, and others."  (*Id.* ¶¶ 312-313.) Robinhood Financial is affiliated with **Robinhood Securities**, a clearing broker that takes and processes trade orders for Robinhood Financial customers. (*Id.* ¶ 44.)  Both Robinhood Financial and Robinhood Securities are wholly owned by **Robinhood Markets**.  (*Id.* ¶ 42.)

**Citadel Securities** is a market maker.  A "market maker" is an entity that stands ready to fill orders for a particular security, and upon receiving an order from a broker, fills that order with available inventory or by sourcing liquidity from an exchange or other market venue.  (*Id.* ¶¶ 8-10.)  Citadel Securities is one of many market makers, and has numerous competitors including G1 Execution Services, Global Execution Brokers, Two Sigma Securities, LLC, Wolverine

---

[2] Citations to "AAC" refer to the Amended Consolidated Class Action Complaint (Dkt.451).

Securities, LLC and Virtu Americas, LLC.  (*Id.* ¶¶ 281, 306-307.)

Robinhood has business relationships with multiple market makers, including Citadel Securities, Virtu Americas, Two Sigma Securities, G1 Execution Services and Wolverine Securities, by which Robinhood Securities routes customer trade orders to those market makers in exchange for a fee, known as "payment for order flow" ("PFOF").  (*Id.* ¶¶ 78, 84, 319.)[3]  Other retail broker-dealers, such as Charles Schwab, E*Trade, TD Ameritrade and Webull, and clearing brokers such as Apex Clearing Corporation ("Apex"), have similar PFOF business relationships with market makers.  (*Id.* ¶ 76; SA169, SA176.)  The net amount of PFOF revenue that a broker generates is based in part on the volume of order flow it routes to different market makers.  (AAC ¶¶ 75, 221.)  This practice is long-standing and accepted by the SEC.  *See* 17 C.F.R. § 240.10b-10.  (*See also* AAC ¶¶ 79-80.)  Because Robinhood generates the majority of its revenue through receipt of PFOF from market makers (*id.* ¶ 75), Robinhood (as with other retail brokers) is able to offer commission-free trading to retail investors (*id.* ¶¶ 73, 221.) Market makers generate revenue by capturing a portion of the "spread" between

---

[3] *See also* Robinhood Securities, LLC SEC Rule 606 Report (Apr. 29, 2021), available at *https://cdn.robinhood.com/assets/robinhood/legal/RHS%20SEC% 20Rule%2060 6 %20and%20607%20Disclosure%20Q1%202021.pdf* (last accessed Dec. 13, 2022) (identifying venues to which Robinhood Securities directed order flow in January 2021).

the bid and ask prices for securities trade orders. (*Id.* ¶¶ 74, 85.)

    B.    <u>The Mechanics of Securities Trading.</u>

        Robinhood customers may use Robinhood's application to place trade orders on their own behalf. (AAC ¶¶ 6, 68.) Once a trade is placed on Robinhood's platform, and Robinhood accepts the trade order, Robinhood Financial sends the order to Robinhood Securities, which in turn routes the order to a market maker to execute the trade. (*Id*. ¶¶ 83-84.) Because Robinhood must route orders to market makers, Robinhood has ongoing business relationships with those entities that require regular communications in the ordinary course of business.

        After receiving a customer trade order from a clearing broker, such as Robinhood Securities, market makers are responsible for processing and executing the trade order on the customer's behalf. (*Id.* ¶¶ 83-84.) Market makers handle trade orders by filling purchase and sell orders with their inventory, or by routing that order to an exchange or other venue. (*Id.* ¶¶ 8-10.) After a market maker fills the order, the trade is sent to a clearing agency (also known as a clearinghouse), such as the NSCC. (*Id*. ¶ 87.) The NSCC clears cash transactions by netting securities deliveries and payments among its members and guaranteeing completion of trades even if a party defaults. (*Id*. ¶ 88.) At all relevant times, the settlement period for the clearing agency to transfer the stock to the buyer and

funds to the seller was two days.  (*Id*. ¶ 87.)

The two-day period between execution and settlement creates a risk that a party to the transaction will default.  (*Id*. ¶¶ 87, 90.)  A number of protections are in place to reduce this risk.  One protection key to this case is that clearing agencies require brokers, such as Robinhood Securities, to pay a deposit to the clearing agency until trades are settled.  (*Id*.)  The deposit amount is based largely on risk algorithms that calculate the amount based on, among other things, a firm's customer holdings and market volatility.  (*Id*. ¶ 90.)  To clear and settle customer transactions, brokers engaged in clearing services must satisfy the NSCC deposit requirements.  (*Id*. ¶¶ 88-90, 181.)  These deposit requirements exist to make sure that if a party defaults on a transaction during the two-day settlement period, the cash nonetheless will be available to settle a trade.  (*Id*. ¶ 88.)  This provides critical certainty and stability to the stock market and protects all investors.  (*Id*. ¶¶ 88, 90.)  If a broker fails to timely satisfy its deposit requirements, it risks being "shut down" by the NSCC.  (*Id*. ¶¶ 90, 181-182.)

C.    The Unprecedented Market Volatility of January 2021.

January 2021 was marked by a series of unprecedented market events. (AAC ¶¶ 135-137, 175-178.)  Investors—connected through social media platforms and online forums—banded together to cause "short squeezes" by buying GameStop Corp. ("GME"), AMC Entertainment Holdings, Inc. ("AMC")

8

and other stocks they perceived to be the target of short selling activity by
institutional investors (the "Relevant Securities").[4] (*Id.* ¶¶ 95-97, 132.)  Their
activity resulted in "soar[ing]" prices and "volatility" in the markets where the
Relevant Securities were traded.  (*Id.* ¶¶ 137, 144.)  For example, on January 27,
GME's price closed at $347.51 per share, a 707.6% increase from just five trading
days earlier.  (*Id.* ¶ 137.)  The trading price increase for GME is reflected in the
graph below.[5]



[4] Plaintiffs define the "Relevant Securities" as GME, AMC, Bed Bath &
Beyond Inc. ("BBBY"), Blackberry Ltd. ("BB"), Express, Inc. ("EXPR"), Koss
Corporation ("KOSS"), Nokia Corporation ("NOK"), Tootsie Roll Industries, Inc.
("TR") and Trivago N.V. ("TRVG").  (AAC ¶ 7.)

[5] *See Market Activity*, NASDAQ, *https://www.nasdaq.com/market-activity* (last
visited Dec. 13, 2022).  The Court may take judicial notice of this stock
information.  *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir.
2004) (taking judicial notice of stock information at the motion to dismiss stage).

The following chart shows the total daily trading volume for the Relevant Securities throughout the week.



On January 27, 2021, alone, U.S. equity markets experienced a record-breaking volume of activity, with 24.5 billion shares traded. (*Id.* ¶ 137.) That same day, the SEC released a statement warning of "on-going market volatility in the options and equities markets." (*Id.* ¶ 144.) The "skyrocket[ing]" and "epic price surge[s]" in the Relevant Securities were unrelated to factors that securities industry participants traditionally expect would affect stock prices (*e.g.*, earnings reports or public announcements). (*Id.* ¶¶ 136, 137.)

In the face of these unprecedented market events, Robinhood and other broker-dealers took proactive measures to mitigate market risks. For example, by January 27, 2021, Robinhood Securities increased customer margin requirements for GME to 100%—in other words, a customer was required to have

100% of the funds to pay for and hold the shares in full.  (*Id.* ¶¶ 194, 234.)  On this same day, Charles Schwab and TD Ameritrade, two other broker-dealers, also "adjusted margin requirements for certain securities and restricted certain exotic strategies usually employed by the most advanced traders."  (*Id.* ¶ 365.)

On and before January 27, Citadel Securities and Robinhood had various discussions about Robinhood's PFOF rates.  (*Id.* ¶¶ 240-245.)  None of the communications identified by Plaintiffs discuss or concern trading limitations. Instead, as Plaintiffs themselves acknowledge, the "central topic" of the conversations on January 27, 2021 was the "PFOF relationship."  (*Id.* ¶ 322.)

D.    The Events of January 28, 2021 and Onward.

The historic market volume and volatility in the Relevant Securities came to a head on January 28, 2021.  (AAC ¶¶ 198-208.)

That morning, the NSCC issued Robinhood Securities a collateral call for over $3 billion.  (*Id.* ¶ 178.)  This massive call was a tenfold increase as compared to the preceding days.  (*Id.* ¶ 262.)  The deposit requirement was $125 million on the morning of January 25, $291 million on the morning of January 26 and $282 million on the morning of January 27.[6]  Because NSCC

_____

[6] *Virtual Hearing – Game Stopped?  Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide*, 117th Cong. at 10 (2021) (statement of Vladimir Tenev, Chief Executive Officer, Robinhood Markets, Inc.), *https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-*

deposit requirements are based on market volatility and increase when the NSCC

perceives higher risk, the capital call was the direct result of the substantial

increases in trading volume and price of the Relevant Securities—in particular, on

January 27. (*Id.* ¶¶ 88, 90, 145-153, 175-178.)

Robinhood Securities received the capital call of more than $3 billion

at 5:11 AM EST on January 28. (*Id.* ¶ 178.) After internal deliberation,

Robinhood Securities made the difficult decision to impose temporary purchase

restrictions on the limited number of securities driving the volatility. (*Id.* ¶ 180.)

Robinhood Securities put in place a "position closing only" ("PCO") restriction on

stock trades and options contracts for 13 symbols—AMC, BB, BBBY, EXPR,

GME, KOSS, NOK, TR and TRVG (Plaintiffs' "Relevant Securities") (*id.* ¶ 179),

as well as four others[7]—a measure that allowed (but did not require) Robinhood

customers to exit their positions in those symbols if they wished, but restricted

---

*20210218.pdf.* The Court may take judicial notice of the approximate deposit requirements described in Mr. Tenev's testimony in the days leading up to January 28, 2021. *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 n.12 (D.D.C. 2020) (taking judicial notice of congressional testimony because it "is not subject to reasonable dispute" (quoting Fed. R. Evid. 201(b)(2))). Plaintiffs also cite Mr. Tenev's testimony to support their allegations regarding Robinhood's decision to impose limited purchase restrictions. (AAC ¶ 264.)

[7] *See* Maggie Fitzgerald, *Robinhood restricts trading in GameStop, other names involved in frenzy*, CNBC (Jan. 28, 2021, 9:19 AM EST), *available at* https://www.cnbc.com/2021/01/28/robinhood-interactive-brokers-restrict-trading-in-gamestop-s.html.

additional purchases.  (*Id.* ¶¶ 186-189.)

Following the imposition of the PCO restrictions, the NSCC eventually revised its earlier collateral call from approximately $3 billion to $733 million.  (*Id.* ¶ 183.)  Robinhood Securities then provided the cash to satisfy its revised deposit requirements a little after 9:00 AM EST, enabling Robinhood's customers to continue trading in all other securities.  (*Id.* ¶ 264.)  One of the Named Plaintiffs, Burke Minahan, elected to apply for and fund another brokerage account with Fidelity on the same day, as Fidelity did not adopt a similar restriction.  (*Id.* ¶ 30.)  Mr. Minahan purchased a share of GME on the very same day.  (*Id.*)  Robinhood Securities lifted the PCO restrictions by January 29, 2021 (*id.* ¶ 249), and removed all purchase limitations by market open on February 5, 2021 (*id.* ¶ 264).

Other brokers imposed a variety of similar restrictions the morning of January 28 in response to the unprecedented trading volume and volatility. (*Id.* ¶¶ 195, 366; SA460.)  For example, Ally, Dough, Alpaca, Public.com, SoFi, Stash, Tastyworks and Webull imposed their own temporary purchasing restrictions for a number of hours.  (AAC ¶¶ 195, 366.)  Similarly, E*Trade and Interactive Brokers imposed restrictions, and clearing brokers Apex and ETC allegedly required other brokers to impose restrictions.  (*See* SA460.)  Although Plaintiffs previously alleged that those other brokers imposed their restrictions as

13

part of a conspiracy with Robinhood and Citadel Securities, Plaintiffs abandoned that allegation below, conceding that independent commercial reasons supported the decision by other retail brokers to impose the same types of restrictions challenged in this case as the product of an unlawful conspiracy.  (AAC ¶¶ 195, 365-366; SA460-61.)

As market volatility continued, on January 30, 2021, the SEC released an investor alert and bulletin warning about the risks of short-term trading based on social media, and acknowledged that "broker-dealers may reserve the ability to reject or limit customer transactions" for "legal, compliance, or risk management reasons," and that the ability to do so "is typically discussed in the customer account agreement."  SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021) ("SEC Statement"), *https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert*.[8]  As the District Court found in dismissing the Robinhood Tranche of this MDL, Robinhood's customer agreement expressly authorized Robinhood Securities to take the actions it did.  (*See* SA527, *appeal filed*, No. 22-10669 (11th Cir.).)  In light of the ongoing volatility and to ensure that it could meet any further

---

[8] The Court may take judicial notice of the SEC Statement because it is a public record, the accuracy of which cannot reasonably be questioned.  *See Universal Express, Inc. v. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006).

extraordinary NSCC collateral calls, Robinhood Securities maintained certain stock purchasing limits (but not PCOs) on a variety of stocks between January 29 and February 5, 2021.  (AAC ¶¶ 252-255, 261-264.)

The SEC Staff subsequently conducted an investigation into the short squeeze events of January 2021.  *See* SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021 (Oct. 14, 2021) ("SEC Staff Report"), available at *https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf*.[9]  Following an extensive investigation, the SEC Staff Report provided no support for the alleged conspiracy.  SEC Staff Report, at 31-35.

The SEC also proposed a new rule in 2022 to further mitigate the risks associated with settlement by reducing the time from execution and settlement to one day.  *See* Shortening the Securities Transaction Settlement Cycle, 87 Fed. Reg. 10,436 (Feb. 24, 2022) (the "Proposed Rule").  The SEC emphasized that shortening the settlement period would have the benefit of reducing clearing agency deposit requirements.  *Id.* at 10,448.  In the release for the Proposed Rule, the SEC noted that the importance of settlement reform had been underscored by

---

[9] The Court may take judicial notice of the SEC Staff Report because it is a public record, the accuracy of which cannot reasonably be questioned.  *See Universal Express*, 177 F. App'x at 53.

the "heightened interest in certain 'meme' stocks" in January 2021, when the SEC observed "extreme" volatility under the current settlement rules led broker-dealers to adopt risk management measures, including preventing customers from trading. *Id.* at 10,437, 10,444, 10,482 & n.337.

## II.   COURSE OF PROCEEDINGS BELOW.

Numerous lawsuits against Robinhood and other retail brokers and securities market participants were filed around the country and consolidated for pretrial purposes in a multidistrict litigation captioned *In re January 2021 Short Squeeze Trading Litigation* ("MDL").[10]  The District Court organized the claims into four "tranches," appointed interim lead plaintiffs and counsel for each tranche, and ordered lead plaintiffs to file superseding complaints.  (SA001-09.)  The District Court also ordered Robinhood and other MDL defendants to produce tens of thousands of pages of documents previously produced to regulators (SA009), and gave the MDL plaintiffs an opportunity to review those documents prior to filing consolidated complaints (*id.*).

This appeal concerns the Antitrust Tranche of the MDL.  On July 27, 2021, Plaintiffs filed the original Consolidated Class Action Complaint, in which Plaintiffs asserted conspiracy claims against 13 brokers (Ally, Alpaca, Dough,

---

[10] *See, e.g.*, No. 1:21-cv-21451 (E.D.N.Y. filed Feb. 8, 2021) (Angel Guzman); No. 1:21-cv-21318 (N.D. Cal. filed Feb. 1, 2021) (Terell Sterling).

Public.com, SoFi, Tastyworks, Webull, Robinhood, E*Trade, Interactive Brokers, Apex and ETC), and one market maker, Citadel Securities.  (SA010.)[11]  Plaintiffs alleged that all of these brokers conspired with one another and with Citadel Securities.  (SA015-16.)  On August 24 and 27, 2021, Plaintiffs voluntarily dismissed their claims against eight of the broker defendants (SA146, SA284-90), leaving five brokers.  On November 17, 2021, the District Court granted Defendants' motion to dismiss without prejudice, holding that Plaintiffs had failed to plead facts "that support a plausible inference of conspiracy."  (SA476-77.)

On January 20, 2022, Plaintiffs filed the Amended Consolidated Class Action Complaint (Dkt.451).  This time, Plaintiffs' alleged conspiracy shrank further, as Plaintiffs dropped four of the five remaining broker defendants and allege a conspiracy with just two participants: Robinhood and Citadel Securities. (*Id.* ¶¶ 1-2.)

On May 13, 2022, the District Court granted Defendants' motion to dismiss Plaintiffs' third attempt to plead an antitrust conspiracy with prejudice. The court asked rhetorically, "What has changed with the latest pleading?" and responded, "Not much."  (Op. 1.)  The court concluded that "Plaintiffs fail to

---

[11] Plaintiffs filed a Corrected Consolidated Class Action Complaint (SA147) on August 23, 2021, and a partially unredacted version on September 22, 2021 (SA291).

plausibly allege the existence of an agreement to restrict trade between the Defendants" (*id.* 51), and added as a second ground for dismissal that Plaintiffs "fail to plausibly allege an unreasonable restraint of trade" because "Plaintiffs ignore the reality of their suit: they allege that Defendants caused harm to the market for Relevant Securities, but they neglect to define that market" (*id.* 52).

Defendants raised a third argument on their motion to dismiss—that Plaintiffs' antitrust claim is precluded by the federal securities laws. That is because the Supreme Court has held that securities law implicitly precludes an antitrust claim where the conduct at issue "lie[s] squarely within an area of financial market activity that the securities law seeks to regulate." *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 264 (2007). Because the District Court was already dismissing the complaint with prejudice on two other grounds, it declined to reach this third ground for dismissal. (Op. 23.)[12]

Plaintiffs appealed.

## SUMMARY OF THE ARGUMENT

The District Court's Opinion should be affirmed. The District Court correctly held that Plaintiffs do not plausibly plead an agreement between

---

[12] Plaintiffs take the position that this Court should not reach preclusion on this appeal, and state that "the argument is one for the district court to consider on remand." (Br. 5 n.6.)

Robinhood and Citadel Securities, and also failed to plead harm to competition in a relevant market.

*First*, the District Court properly concluded that Plaintiffs failed to plead plausibly any inference of an agreement. As the District Court observed, Plaintiffs identify a number of out-of-context business communications between Robinhood and Citadel Securities and make the unsubstantiated inference that Robinhood was incentivized to maintain an important business partner in advance of Robinhood's IPO. From these allegations, Plaintiffs ask the Court to make the unsupported leap to infer the existence of a conspiracy based on Plaintiffs' proposed narrative of events. But Plaintiffs have no direct evidence of an agreement between the Defendants for Robinhood to restrict trading and no circumstantial evidence that would make such an agreement plausible, as they themselves have provided the obvious plausible alternative explanation and identified numerous market participants that took similar actions for lawful commercial reasons. On appeal, Plaintiffs contend that the District Court committed legal error by considering that "obvious alternative explanation" for Robinhood's stock purchase restrictions—the outsized NSCC deposit requirement the morning of January 28, 2021. Plaintiffs are incorrect. The District Court applied the correct legal standard, as set forth in the Supreme Court's *Twombly* decision and recent decisions from this Court.

19

*Second*, the District Court correctly determined that Plaintiffs failed to plead harm to competition in a relevant market. On appeal, Plaintiffs argue that they sufficiently pleaded *antitrust injury* to pursue their Section 1 claim. That argument completely misses the basis of the District Court's order. The decision below did not turn on "antitrust injury," which is a standing requirement. Instead, it turned on the separate—and central—requirement of a Section 1 claim: pleading harm to competition in a relevant market. In the Amended Complaint, Plaintiffs allege two markets: the upstream "PFOF Market" in which Citadel Securities allegedly competes, and the downstream "No-Fee Brokerage Trading App Market" in which Robinhood allegedly competes. The harm that Plaintiffs allege, however, is to the trading prices of the Relevant Securities. That is not a competitive harm, nor is it a harm taking place in either of the markets Plaintiffs allege. As the District Court explained, "Plaintiffs ignore the reality of their suit: they allege that Defendants caused harm to the market for Relevant Securities, but they neglect to define that market." (Op. 51-52.)

## ARGUMENT

### I.    THE DISTRICT COURT PROPERLY HELD THAT PLAINTIFFS DO NOT PLAUSIBLY ALLEGE AN AGREEMENT BETWEEN ROBINHOOD AND CITADEL SECURITIES TO RESTRICT TRADING.

Plaintiffs advance two arguments to support their position that they properly pleaded a plausible conspiratorial agreement. Both are meritless.

20

*First*, Plaintiffs argue that the District Court applied the wrong legal standard. (Br. 18-22.) To the contrary, the District Court correctly applied the plausibility standard set out in case law from the Supreme Court and this Court. (*See infra* Part I.A.) *Second*, Plaintiffs argue that the District Court did not apply the plausibility standard properly to the allegations in the Amended Complaint. This is also incorrect. The District Court properly determined that Plaintiffs did not plausibly allege an agreement, especially given that Plaintiffs themselves plead facts that provide an "obvious alternative explanation." (*See infra* Part I.B.)

A.   <u>The District Court Applied the Correct Legal Standard for Pleading an Antitrust Claim.</u>

Plaintiffs first contend that the District Court "confused the *Twombly* plausibility standard and improperly weighed competing inferences that could be drawn from the facts alleged in the complaint" (Br. 25), and erred by considering "alternative explanations" for Plaintiffs' allegations (*id.* 28). Not so.

To plead a claim under Section 1 of the Sherman Act, a complaint must contain "'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement,' that is, whether the complaint 'possess[es] enough heft to show that the pleader is entitled to relief.'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Contrary to Plaintiffs' contention (Br. 22), this Court has held repeatedly that courts "may infer from the factual allegations in the

21

complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)); *see also Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto Ins. Co.*, 953 F.3d 707, 728-29 (11th Cir. 2020) (plaintiffs "offer no allegations that explain[ed] why the loss in business they allege[ed] [was] plausibly explained by steering instead of other 'obvious alternative explanation[s]'" (citation omitted)).

This Court has also explained that a Section 1 plaintiff fails to state a claim where "independent action is at least as plausible as concerted action pursuant to prior agreement," *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1267 (11th Cir. 2019) (en banc), and has affirmed the granting of a motion to dismiss where plaintiffs "offer no allegations that explain why the [result] they allege is plausibly explained by [illegal agreement] instead of other 'obvious alternative explanation[s],'" *Auto. Alignment*, 953 F.3d at 728-29 (quoting *Twombly*, 550 U.S. at 567).

The District Court correctly applied this precedent, considering whether Plaintiffs' allegations established that it was plausible to infer the existence of an unlawful conspiracy or, instead, whether those allegations simply established a "mere possibility the defendant acted unlawfully." (Op. 22 (quoting

*Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation

omitted)).)  After considering the facts alleged in the Amended Complaint and the

so-called "plus factors," the District Court determined that Plaintiffs themselves

had provided a "compelling alternative explanation for the trading restrictions—the

increased collateral requirements imposed by the NSCC in response to historic

metric volatility."  (Op. 52.)  As a result, the District Court concluded that

"Plaintiffs' theory is speculative and implausible."  (*Id.*)  This conclusion correctly

applied Supreme Court precedent directing courts to consider "obvious alternative

explanation[s]."  *Twombly*, 550 U.S. at 567; *see also Auto. Alignment*, 953 F.3d

at 728-29 (considering "obvious alternative explanations"); *Am. Dental*, 605 F.3d

at 1290 (same).

Plaintiffs' cited authorities relating to summary judgment cast no

doubt on the District Court's analysis because the District Court did not apply a

summary judgment standard.[13]  *See Monsanto Co. v. Spray-Rite Serv. Corp.*,

465 U.S. 752, 764 (1984) (requiring plaintiff to present "evidence that tends to

---

[13] These cases simply state that a court should not apply a summary judgment
standard at the motion to dismiss stage.  *See Erie Cnty., Ohio v. Morton Salt, Inc.*,
702 F.3d 860, 868 (6th Cir. 2012) (affirming grant of motion to dismiss but noting
that "[t]he district court did not clearly distinguish between the antitrust standards
applicable on summary judgment and those that apply to a motion to dismiss"); *see
also SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1118 (9th Cir. 2022) (same);
*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015) (same).

exclude the possibility" of lawful independent conduct).  As noted, considering

plausible alternative explanations based on the facts alleged is precisely the inquiry

mandated by *Twombly*, 550 U.S. at 567.

Neither *Evergreen Partnering* nor *Anderson News* suggests otherwise.

Rather, in each of those cases, the court of appeals held that the district court erred

when it "chose among plausible alternative theories interpreting defendants'

conduct and adopted as true allegations made by defendants in weighing the

plausibility of theories put forward by the parties."  *Evergreen Partnering Grp.,*

*Inc. v. Pactiv Corp.*, 720 F.3d 33, 50 (1st Cir. 2013); *see also Anderson News,*

*L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) ("The choice between

or among plausible scenarios is one for the factfinder . . . .").  The court here did

not choose among plausible alternative theories or adopt as true any facts alleged

by Defendants.  To the contrary, the District Court held, based on the plaintiffs

own allegations, that their theory is "speculative and implausible."  (Op. 52.)

B.    Plaintiffs Do Not Plausibly Allege an Agreement Between Robinhood
      and Citadel Securities to Restrict Trading.

The District Court also properly applied the requisite pleading

standard to Plaintiffs' factual allegations.

To state a Sherman Act Section 1 claim, Plaintiffs must present either

"direct or circumstantial evidence that reasonably tends to prove that the

[defendant] and others had a conscious commitment to a common scheme designed

to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764.  Plaintiffs have
done neither.

    1.    <u>Plaintiffs Do Not Allege Direct Evidence of an Agreement to
Restrict Trading.</u>

The District Court correctly concluded that Plaintiffs "failed to allege
direct evidence of an agreement" to restrict trading of the Relevant Securities on
the Robinhood platform.  (Op. 26-27.)  On appeal, Plaintiffs assert in passing that
they "provided direct evidence of an agreement."  (Br. 23.)  Plaintiffs apparently
refer to a January 25, 2021 email, in which Josh Drobnyk of Robinhood told
Citadel Securities, "We are on board."  (AAC ¶¶ 227-230.)  This is not direct
evidence because the email says nothing about restricting trading, and in any event
Plaintiffs have waived any such argument.

*First*, the January 25 email is not direct evidence of an agreement to
restrict trading for the simple reason that it says *nothing* about restricting trading.
(*See id.*)  As the District Court observed, the proposition to which Mr. Drobnyk
agreed is "unknown."  (Op. 16.)  Plaintiffs conceded this point below.  (*See*
Dkt.459, at 9-10 ("[T]he substance of the communications is undisclosed.").)  This
is particularly significant in a case like this, where Robinhood and Citadel
Securities "must frequently communicate given their business relationship."
(Op. 34.)  Direct evidence takes the form of, for example, "a recorded phone call in
which two competitors agreed to fix prices at a certain level," *Mayor & City*

*Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013), or "an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price," *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871 (7th Cir. 2015). Plaintiffs plead nothing of the sort.

   *Second*, Plaintiffs did not argue below that they had direct evidence of an agreement, and have thus failed to preserve the argument for appeal. In their motion to dismiss, Defendants set out in Part I.A of their brief the argument that "Plaintiffs Fail To Allege Any Direct Evidence of an Agreement." (Dkt.456, at 14.) As the District Court rightly noted, "Plaintiffs [did] not argue otherwise and instead focus on whether there is circumstantial evidence of an agreement." (Op. 27.) Plaintiffs' brief in opposition to the motion to dismiss confirms that Plaintiffs did not argue they had direct evidence and provided no response to Part I.A of Defendants' brief. (*See* Dkt.459, at 7-20.) Accordingly, Plaintiffs failed to present this argument to the District Court and have waived it for appeal. *See Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir. 1998).

    2. <u>Plaintiffs Do Not Plausibly Allege Circumstantial Evidence of an Agreement to Restrict Trading.</u>

   Plaintiffs also fail to plead circumstantial evidence of a conspiracy that demonstrates "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764; (Op. 26). These

allegations must *plausibly* suggest an agreement was made. *See Jacobs*, 626 F.3d at 1332.

Plaintiffs argue that this Court may infer the existence of an agreement to restrict trading of the Relevant Securities on the Robinhood platform from purported (i) inter-firm communications, (ii) common motive, (iii) acts of concealment, (iv) market structure, (v) market behavior and (vi) pretextual explanations.[14]  Plaintiffs rely most heavily on the first two "plus factors"—a series of out-of-context communications between Robinhood and Citadel Securities, as well as a purported common motive to advance a conspiracy.  However, even after having access to thousands of relevant documents from the Defendants, Plaintiffs' cherry-picked evidence and disparate circumstantial evidence falls far short of pleading a *plausible* inference of conspiracy under any or all of these factors. (Op. 43.)  As the District Court ruled, the first two factors constitute at best only "a weak inference of a conspiracy" and are insufficient to "advance Plaintiffs' theory from possible to plausible" (Op. 37; *see also id.* 31), and the other four factors do not provide any reason whatsoever to infer a conspiracy (*id.* 38, 41, 42-43).

**Inter-Firm Communications.**  Plaintiffs' conspiracy theory rests

---

[14] As the District Court observed, Plaintiffs abandoned other "plus factors" that the District Court had rejected on Defendants' previous motion to dismiss, such as actions against unilateral self-interest, the opportunity to coordinate and collude, and government investigations.  (Op. 28 n.17.)

primarily on a series of communications cherry-picked from thousands of

documents produced by Robinhood, Citadel Securities and other defendants in the

District Court proceedings below.  But as the District Court properly concluded,

despite access to this discovery, Plaintiffs identify only "several vague and

ambiguous emails between high-level executives" of the two companies and fail to

plausibly infer "an actual antitrust conspiracy."  (Op. 32, 36.)  These

communications, the District Court determined, fail to "advance Plaintiffs' theory

from possible to plausible."  (*Id.* 37.)

   This is for good reason.  Both below and on appeal, Plaintiffs rely on

a series of communications in late January 2021 to claim that Citadel Securities

and Robinhood agreed to restrict Robinhood customers from purchasing the

Relevant Securities.  (Br. 7-8, 28-29.)  But the alleged communications—on their

face—reflect dealings in the normal course of business between Citadel Securities

and Robinhood related to the ongoing "'payment for order flow' relationship"

between Robinhood and Citadel Securities and had nothing to do with the trading

restrictions Robinhood later imposed.  (AAC ¶¶ 283, 312-313.)  Plaintiffs plead no

communications establishing that Citadel Securities even had *advance notice* of the

Robinhood restrictions on trading of any of the Relevant Securities, let alone

communications establishing that Citadel Securities was part of any agreement for

Robinhood to impose those restrictions.  *See Todorov v. DCH Healthcare Auth.*,

921 F.2d 1438, 1456 (11th Cir. 1991) ("[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy.").[15]

The District Court thus correctly noted the obvious alternative explanation for any purported uptick in communications: that "the retail-driven short squeeze, driven in part by Robinhood users, had set the financial world ablaze" and that "[g]iven the PFOF relationship between Robinhood and Citadel Securities, it would be understandable for employees—even executive-level employees—at a broker and a market maker to communicate about what impact the squeeze might have on each party's ability to fulfill its obligations." (Op. 36-37 (citations omitted).)  This obvious alternative—drawn from the contents of the very communications alleged by Plaintiffs—undercuts any notion of conspiracy.  *Twombly*, 550 U.S. at 567.

---

[15] Plaintiffs' citation to Mr. Swartwout's January 28, 2021 email at 1:41:29 AM UTC (*i.e.*, January 27, 2021 email at 8:41 PM EST) actually undermines any inference that the parties' conversations concerned a trading halt for the Restricted Securities.  In the email—discussing "dictated [order flow] schedule and caps"— Mr. Swartwout states that, "whatever it is **we are not going to be able to address it tomorrow** given the notice."  (AAC ¶ 245 (emphasis added).)  Given that Robinhood PCO'ed the Restricted Securities on the morning of January 28, 2021, this email belies Plaintiffs' conspiratorial conjecture that this email shows "Robinhood was upset that its PFOF would be limited when Citadel Securities demanded that Robinhood restrict trading to allow Citadel Securities to cover its short positions."  (*Id.* ¶ 246.)

Notably, the District Court dismissed claims based on these communications multiple times. After the first dismissal for failure to allege an agreement, Plaintiffs had the opportunity to add more specific evidence of communications that could support an agreement from the thousands of documents that were produced to them. They failed to do so, because no such evidence exists. Instead, they simply tried to add new gloss to the same insufficient communications. (*See, e.g.*, Op. 1 ("[The Court gave] Plaintiffs the opportunity to amend. They did so. What has changed with the latest pleading? Not much.").) But "[c]onclusory allegations of agreement or conspiracy are insufficient." *Quality Auto*, 917 F.3d at 1262; *Twombly*, 550 U.S. at 557. Put differently, a "complaint must state facts—not conclusions—that plausibly suggest a conspiracy." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1256 (S.D. Fla. 2021). This case is thus a far cry from those on which Plaintiffs rely, each of which involved robust factual allegations of inter-firm communications indicative of conspiracy not present here.[16]

---

[16] *See, e.g.*, *DeLong Equip Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1511 (11th Cir. 1989) (finding sufficient evidence of agreement on summary judgment in part because defendant made payment to price-fixing co-conspirator alleged to be share of inflated profits); *Associated News, Inc. v. Curtis Circulation Co.*, Civ. A. No. H-80-1201, 1986 WL 13791, at *6 (S.D. Tex. Dec. 4, 1986) (finding, on summary judgment, sufficient evidence of conspiracy in part because two witnesses claimed defendant agreed to deal exclusively with co-defendant).

On appeal, Plaintiffs apparently hope that this Court will accept the invitation that the District Court declined:  to "take allegations of communications, followed by allegations of a restriction, and simply fill in the blanks for Plaintiffs, particularly where it 'is just as plausible, if not more so,' that the communications did not form the basis of an antitrust conspiracy."  (Op. 36 (quoting *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1093 (9th Cir. 2015)).) The District Court appropriately rejected this approach under *Twombly* and this Court's precedent, and Robinhood respectfully submits that this Court should affirm.

**Motive to Conspire.**  A common motive to conspire can support an inference of conspiracy where "such motivation tends to exclude the possibility of independent action."  *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 259 (2d Cir. 1987); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) ("But common motive does not suggest an agreement.  Any firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors.").  Here, as the District Court concluded, Plaintiffs "did not provide sufficient motive to conspire considering Plaintiffs did not allege that Citadel Securities threatened or suggested it would end the relationship or explain why Robinhood would not simply use a different market maker if it did."  (Op. 30.)

31

Plaintiffs contend that Robinhood shared a common motive with Citadel Securities to restrict customer purchases in the Relevant Securities because "there would have been no way Robinhood could have brought the IPO to fruition if Citadel withdrew its valuable PFOF revenue." (Br. 30.) This is as speculative as it is baseless. First, Plaintiffs provide *no* factual allegations to support the notion that Robinhood's PCO restrictions were driven by its future IPO. Instead, as the District Court observed, "Plaintiffs' proffered motive theory thus rests on a series of inferences." (Op. 31.) And, as the District Court observed, Plaintiffs' underlying economic motives argument lacks any factual support whatsoever. (*Id*. 30.) There are no allegations that Citadel Securities threatened Robinhood that it would halt the parties' lucrative, ongoing PFOF business relationship absent Robinhood's acquiescence to an alleged demand to halt trading on a subset of securities. (*Id.*) There are also no allegations even suggesting that Robinhood was unable to re-route its order flow to any of the multiple other market makers with which Robinhood has a PFOF relationship in the event Citadel did withdraw. (*Id.*) The District Court was thus correct when it ruled that "Plaintiffs do not plausibly allege that Robinhood had such a motivation [to restrict trading at Citadel Securities' behest] here, and even if they had done so, economic incentive is not in itself enough for the Court to infer that Defendants actually had an unlawful agreement to restrain trade." (*Id.* 51-52.)

32

The District Court properly concluded that *none* of the remaining factors upon which Plaintiffs rely provide any support for the alleged conspiracy. (*Id.* 37-43.)

**Pattern of Concealment.**  The District Court properly rejected any argument that Defendants engaged in some kind of "pattern of concealment." (Op. 38.)  Plaintiffs essentially attempt to argue that the Court should infer a conspiracy because Defendants communicated frequently by telephone and drafted vague emails.  (Br. 32.)   But as the District Court ruled, it simply makes no sense to "infer a conspiracy simply because two business partners chose to use phones to communicate."  (Op. 38.)  Additionally, the concealment cases Plaintiffs rely on do not support their argument.  For example, *In re Urethane Antitrust Litigation* held that the destruction of documents may be evidence of conspiracy.  No. 04-1616-JWL, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013).  No such circumstances have been alleged here.  And as Plaintiffs' own parenthetical makes clear, *In re Publication Paper Antitrust Litigation* involved phone calls where "no social or personal purpose has been persuasively identified" (Br. 32).  690 F.3d 51, 65 (2d Cir. 2012).[17]  Here, by contrast, the Defendants' PFOF business relationship

---

[17] Furthermore, the conduct in the criminal conspiracy cases Plaintiffs cite was far more extreme.  *See United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011) (text message telling co-conspirator "not [to] go to the authorities"); *United States*

provided a persuasive purpose for the communications.

        **Market Structure.**  Market structure can provide circumstantial evidence of a conspiracy when the features of the market facilitate anti-competitive coordination, such as in price-fixing cases.  *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002); (Op. 41-42).  But under antitrust law, this consideration applies to "price-fixing conspiracies where the defendants utilized their market power to raise the prices of goods they sold." (Op. 41 (internal quotations and alterations omitted).)

        This is not a price-fixing case, and Plaintiffs fail to explain how the market structure inquiry from those cases could possibly support the inference of a conspiracy here.  Plaintiffs urge that Defendants' PFOF relationship creates a "substantial conflict of interest" (Br. 37)—but they cannot connect that allegation with any notion that the supposed "No-Fee Brokerage Market" is ripe for anticompetitive dealing.  Market structure factors that can give rise to the inference of a conspiracy in a price-fixing case include the presence of few sellers, a uniform product (due to standardization) and a lack of product substitutes.  *See High Fructose Corn Syrup*, 295 F.3d at 655-57.  Here, by contrast, there are numerous brokers from which customers can choose, and the retail brokerage market (if such

---

*v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995) (falsely denying knowledge of explosives hidden in basement).

a market exists) is not one with a uniform, undifferentiated product.

Plaintiffs also argue that "customers in the No-Fee Brokerage Market are 'locked in' to their respective brokerages in the short term." (Br. 38.) However, they cite no case for the proposition that high barriers to entry are sufficient to constitute circumstantial evidence of an agreement. And while they assert that "a typical Robinhood customer could not simply withdraw or transfer her funds and open a new account elsewhere because of the time and resources required to do so" (*id.*), at least one named plaintiff—Burke Minahan—opened an account with Fidelity on January 28, 2021 (the day when Robinhood first imposed the PCO restrictions). (AAC ¶ 30.)

The cases cited by Plaintiffs in support of this factor are irrelevant to the analysis here. In *Stanislaus Food Products Co. v. USS-POSCO Industries*, the court did not even consider market structure in its analysis. 2013 WL 595122, at *11 (E.D. Cal. Feb. 15, 2013), *aff'd*, 803 F.3d 1084 (9th Cir. 2015). And *In re Flat Glass Antitrust Litigation* involved price-fixing among competitors, where the court specifically explained that market structure could be considered where there is "evidence that the structure of the market was such as to make secret price fixing feasible." 385 F.3d 350, 360 (3d Cir. 2004) (citation omitted). The Court should affirm the District Court's conclusion that this "plus factor" provides no support for the alleged conspiracy.

**Market Behavior.** "[I]n analyzing this factor a court looks to evidence that the market behaved in a noncompetitive manner." *Flat Glass Antitrust Litig.*, 385 F.3d at 361 (citation omitted). As the District Court explained, the allegation that "retail customers were unable to purchase the Relevant Securities despite their desire to do so" "clearly falls short." (Op. 42.)

This "plus factor" strongly *refutes* the alleged conspiracy. As noted above, Plaintiffs originally alleged that more than a dozen retail brokers were part of a vast conspiracy to impose similar types of trading restrictions that are challenged here. (SA152-53.) Now, however, Plaintiffs have abandoned those allegations. The fact that many other brokers faced with the very same unprecedented market conditions implemented similar restrictions is market behavior that refutes, rather than supports, conspiracy. *See Twombly*, 550 U.S. at 556 n.4 (rejecting allegations of conspiracy given plausible explanation that conduct reflected "independent responses to common stimuli . . . unaided by an advance understanding among the parties" (internal citation omitted)).

Plaintiffs' assertion that the trading restrictions disrupted the "operation of supply and demand" for the relevant securities and drove down stock prices is of no moment. (Br. 38.) The same can be said for the other trading restrictions implemented at the same time in the same market conditions by entities that are not alleged to be part of the conspiracy.

36

**Pretextual Explanations.** Where statements made by a defendant are "cover for the real reason—to advance a [] conspiracy," this "plus factor" can weigh in favor of an antitrust violation. *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 411 (3d Cir. 2015). Here, the District Court properly concluded that the communications cited by Plaintiffs do not support a reasonable inference of a conspiracy. Specifically, the District Court found that "the Amended Complaint provides several indications that Robinhood was legitimately concerned about meeting its collateral requirements." (Op. 40.) These included the fact that "the trading restrictions 'reduce[d] the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC.'" (*Id.* 41 (citation omitted).)

On appeal, in addition to reiterating the arguments rejected by the District Court, Plaintiffs contend that the District Court's reference to the reduction in Robinhood's volatility multiplier is beyond the scope of the Amended Complaint. (Br. 34-35.) Not so. Plaintiffs allege in the Amended Complaint that the NSCC increased Robinhood's deposit requirements to over $3 billion on the morning of January 28 and that Robinhood put the purchase restrictions in place shortly thereafter. (AAC ¶¶ 178-179.) Indeed, Plaintiffs expressly allege that (1) shortly after receiving the margin call, Gretchen Howard messaged internally that Robinhood had a "liquidity issue" and was moving the Relevant Securities to

37

PCO (AAC ¶ 180), and (2) subsequently the "NSCC reduced Robinhood's deposit requirement by nearly half" (AAC ¶ 183). This reduction occurred because the deposit requirement incorporates calculations "largely based on risk and market volatility." (Op. 7 (citing AAC ¶ 90).) Robinhood continued the restrictions after meeting its deposit requirements that morning because, as the Court found plausible, doing so "reduce[d] the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC." (Op. 41.) And as the District Court explained, "[i]t is not suspicious for Robinhood to strive to avoid higher collateral requirements." (*Id.*)

Plaintiffs are also wrong to assert that the District Court did not adequately consider the allegation that on January 26, 2021, Robinhood executive James Swartwout posted on an internal chat that he had sold his AMC stock and that Robinhood was moving GME to 100% margin the following day. (AAC ¶ 234.) To the contrary, the District Court directly addressed this communication. (Op. 39.) As explained above, margin requirements relate to funds customers must have on hand to purchase or hold certain securities. Plaintiffs do not allege that Robinhood's decision to adjust margin requirements—a decision separate from the PCO restrictions imposed two days later—was related in any way to Citadel Securities or a purported conspiracy. The cited communication is irrelevant.

Finally, Plaintiffs attempt to rely on the decision on the motion to

dismiss in the MDL's Securities Tranche of the MDL (Dkt.503), where the District Court found the allegations in a different complaint concerning Robinhood's internal communications about liquidity sufficient to plead a securities claim. (Br. 35 n.13.) The District Court explained, however, that it analyzed Robinhood's statements in two different legal contexts—here, whether the statements create the inference of an antitrust conspiracy with Citadel Securities; in the other tranche, for Robinhood's scienter on a securities claim. (Dkt.503, at 49.) Indeed, the District Court's decision in the Securities Tranche is fully consistent with the Opinion here. Regardless of whether Robinhood executives believed it had a liquidity problem on January 28, 2021, any liquidity issue provides no support for Plaintiffs' theory here, in the Antitrust Tranche, that Robinhood was acting at Citadel Securities' request to protect a supposed Citadel short position in the Relevant Securities.

* * *

The District Court correctly concluded that Plaintiffs' allegations of circumstantial evidence do not "advance Plaintiffs' theory" that Robinhood and Citadel Securities conspired for Robinhood to impose trading restrictions "from possible to plausible" (Op. 37; *see also id.* 44), as required by precedent from the Supreme Court and this Court. *See Twombly*, 550 U.S. at 570; *Sinaltrainal*, 578 F.3d at 1261. The District Court properly found that the handful of communications between the two defendants in the relevant time period were

39

consistent with discussions about their pre-existing business relationship around PFOF payments.  (Op. 31-37.)  The District Court appropriately considered the "obvious alternative explanation" for why Robinhood put the trading restrictions in place, namely the NSCC collateral call.  (*Id.* 36, 44); *see Iqbal*, 556 U.S. at 682; *Auto. Alignment*, 953 F.3d at 728-29; *Am. Dental Ass'n*, 605 F.3d at 1290.  And the District Court was right to take into account the fact that other brokers (who Plaintiffs no longer allege were part of the conspiracy) imposed similar trading restrictions, which further makes implausible Plaintiffs' theory that Robinhood acted at Citadel Securities' behest.  (Op. 40.)  The decision below should be affirmed.

## II.    THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' CLAIM FOR FAILING TO PLEAD HARM TO COMPETITION IN A RELEVANT MARKET.

Plaintiffs also fail to plead harm to competition in a relevant market. The District Court correctly held that Plaintiffs' claim, involving an alleged vertical agreement, is governed by the rule of reason.  (Op. 45-47.)  Plaintiffs do not challenge that holding.  (Br. 40 n.15.)

In a Section 1 case under the rule of reason, the plaintiff must plead "the anticompetitive effect of the defendant's conduct on the relevant market." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004).  Plaintiffs allege two relevant markets:  one in which Citadel Securities allegedly operates (the "PFOF Market"), and one in which

40

Robinhood allegedly operates (the "No-Fee Brokerage Trading App Market").

Critically, however, Plaintiffs' only theory of harm is that Defendants agreed "to

restrict purchases of the Relevant Securities and thereby drive down their share

price" (Br. 16)—an alleged harm to competition outside *either* of Plaintiffs'

proposed markets.  Accordingly, the District Court properly dismissed Plaintiffs'

Section 1 claim for failure to plead harm to competition in a relevant market.

(Op. 47-51.)

Rather than address the District Court's holding concerning their

failure to plead anticompetitive effects, Plaintiffs instead argue that they

adequately alleged that they have standing to bring their claim.  (Br. 40.)  But the

concept of "antitrust injury"—which concerns Plaintiffs' standing to bring a

private antitrust action—is a different issue from whether a plaintiff has pleaded

harm to competition in a relevant market.

A.    Plaintiffs Must Plead Harm to Competition.

The Sherman Act proscribes only conduct that "unfairly tends to

destroy competition." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458

(1993).  The Supreme Court has made clear that the first step to analyzing whether

a restraint violates Section 1 is the definition of the relevant market.  That is

because "[w]ithout a definition of the market there is no way to measure the

defendant's ability to lessen or destroy competition." *Ohio v. Am. Express Co.*,

41

138 S. Ct. 2274, 2285 (2018) (citation and internal quotations omitted); *see also Duty Free Americas, Inc. v. Estée Lauder Cos.,* 797 F.3d 1248, 1263 (11th Cir. 2015) ("To show that [a] defendant's conduct caused harm to competition, 'the plaintiff must define the relevant market and establish that the defendants possessed power in that market.'") (quoting *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1213 (11th Cir. 2002)).

Once the relevant market is defined, the plaintiff with a rule-of-reason claim has the "initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers *in the relevant market*." *Am. Express*, 138 S. Ct. at 2284; *see also Spanish Broad. Sys.*, 376 F.3d at 1071 ("Under Eleventh Circuit case law, alleged Section One agreements analyzed under the rule of reason require a plaintiff to prove [] the anticompetitive effect of the defendant's conduct *on the relevant market* . . . .") (emphasis added); *see also Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1383 (11th Cir. 1997) (same); *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) (same). Any "harms, even if real, are not 'anticompetitive' in the antitrust sense . . . [if] they do not involve restraints on trade or exclusionary conduct in 'the area of effective competition.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Am. Express*, 138 S. Ct. at 2285).

42

B.    Plaintiffs Fail to Allege Any Harm to Competition in Their Alleged
      Markets.

Plaintiffs allege the existence of two relevant markets:  the "PFOF

Market" and the "No-Fee Brokerage Trading App Market."  (AAC ¶¶ 305-315.)

Plaintiffs define the "PFOF Market" as an "upstream" market consisting of

"market makers that pay brokerage firms to route their clients' trades to that

market maker."  (*Id.* ¶ 306.)  Plaintiffs allege that Citadel Securities, among others,

competes in this market.  (*Id.*)  Plaintiffs also allege a downstream "No-Fee

Brokerage Trading App Market" consisting of "zero account-minimum, no-fee

brokerages that 1) offer a user-friendly mobile app to Retail Investors to place

orders to buy and sell stocks, exchange-traded funds (ETFs), and other securities or

investments strategies such as trading on margin or using options strategies, and

2) receive payment for order flow from market makers instead of fees from Retail

Investors."  (*Id.* ¶ 312.)  Plaintiffs allege that Robinhood competes in this market.

(*Id.* ¶ 313.)[18]  Having identified those markets, Plaintiffs must plead that "the

---

[18] Robinhood notes that Plaintiffs have manufactured these two alleged
"markets" in a transparent attempt to define markets in which Citadel Securities
and Robinhood each allegedly have market power.  An appropriate antitrust market
should be defined with reference to interchangeability and cross-elasticity of
demand.  *See Jacobs*, 626 F.3d at 1337-38.  Here, Plaintiffs do not (and cannot)
contend that there is no competition between market makers who do not pay PFOF
and those that do, or that there is no competition between Robinhood and retail
brokers who do not have "a user-friendly mobile app" (however that would be
determined).  (*See* AAC ¶¶ 305-315.)

43

challenged restraint has a substantial anticompetitive effect that harms consumers *in the relevant market*." *Am. Express*, 138 S. Ct. at 2284 (emphasis added); *see also Spanish Broad. Sys.*, 376 F.3d at 1071 (applying this requirement at the pleading stage).

This is where Plaintiffs' claim fails. As the District Court properly concluded, Plaintiffs do not allege harm to competition in *either* of their proposed markets. (Op. 49-50.) First, Plaintiffs do not allege that the purported agreement at issue reduced or had any impact on competition between Robinhood and other brokers for customers in the alleged "No-Fee Brokerage Trading App Market." Indeed, as the District Court observed, even if there had been an agreement between Defendants to limit Robinhood customers' trades in the Relevant Securities—and there was not—such agreement left *all other* brokers competing with Robinhood in the alleged "No-Fee Brokerage Trading App Market" "free to adopt or eschew any policy they desired with respect to the Restricted Securities— or anything else, for that matter." (Op. 50.) The purported agreement between Robinhood and Citadel Securities did not create anticompetitive harm because it "imposed no further restrictions on Retail Investors' ability to trade with any of Robinhood's competitors." (*Id.*); *see, e.g.*, *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1026 (9th Cir. 2013) (finding plaintiff's allegation that market for certain automotive products was highly concentrated

44

could not demonstrate anticompetitive harm because "[a] number of other manufacturers . . . serve this market and provide substitutable products").

Similarly, Plaintiffs do not allege that the supposed agreement reduced competition between Citadel Securities and other market makers for the business referred to them by clearing brokers in the alleged "PFOF Market."  Thus, Plaintiffs do not allege any conduct that "affect[s] the relevant product market, that is, the area of effective competition."  *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999) (internal quotations omitted).

C.    <u>The Alleged Harm Is in a Different Market or Markets.</u>

Plaintiffs' theory of harm is that Defendants' alleged conspiracy "artificially constricted the price appreciation of the Relevant Securities and reduced the price of the Relevant Securities that Retail Investors either sold or held below the prices they would have otherwise obtained in a competitive market free of collusion."  (AAC ¶ 16.)  Accordingly, as the District Court explained, "[t]he products in question are the Relevant Securities, the prices of which were negatively affected by the trading restrictions."  (Op. 50.)  As a result, the Court properly concluded that the "alleged anticompetitive injury occurred in entirely separate markets" from the ones that they allege in the Amended Complaint:  "the markets for the Relevant Securities."  (*Id.*)

A review of Plaintiffs' complaint confirms that their only theory of

harm is based on alleged price effects in the market or markets for the Relevant

Securities:

- Plaintiffs allege that Defendants "artificially constricted the price appreciation of the Relevant Securities and reduced the price of the Relevant Securities that Retail Investors either sold or held below the prices that they would have otherwise obtained in a competitive market free of collusion."  (AAC ¶ 16.)

- Plaintiffs also allege that Defendants harmed the "Plaintiffs and members of the Class" "[b]y forcing the Retail Investors to sell their Relevant Securities at lower prices than they otherwise would have sold."  (*Id.*)

- Plaintiffs further allege that "Defendants coordinated a collective shutdown of the stock brokerage market with respect to the Relevant Securities" and "[p]ursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of stocks, driving down prices in the Relevant Securities to levels that would not have been obtained, but for the conspiracy."  (*Id.* ¶ 407.)

These are all allegations that Plaintiffs got a lower price than they otherwise would

have for selling the Relevant Securities—*i.e.*, allegations of price effects in the

markets for trading the Relevant Securities.

But Plaintiffs "do not center their market definition around the sales

of the Relevant Securities."  (Op. 50.)  As the District Court noted, one reason that

Plaintiffs may have decided not to allege a market for trading the Relevant

Securities may be that such a claim would be foreclosed by the "extensive body of

persuasive case law holding 'that transactions in a particular stock do not fall

within [section] 1' of the Sherman Act."  (*Id.* (quoting *Kalmanovitz v. G. Heileman*

46

*Brewing Co.,* 769 F.2d 152, 156 (3d Cir. 1985) (citations omitted)).)[19]  Plaintiffs also do not allege—nor could they allege—that either Defendant had market power in the markets for trading the Relevant Securities, or that Robinhood even participated in those markets by buying or selling the Relevant Securities for its own account.

The mismatch between the defined markets (in which Plaintiffs allege Defendants participated and had market power) and the markets in which the alleged harm occurred (in which Plaintiffs do not allege Defendants participated or had market power) is fatal to Plaintiffs' claim because, as noted above, Plaintiffs must allege harm to competition *in a relevant market*.  *See Am. Express*, 138 S. Ct. at 2284; *Spanish Broad. Sys.*, 376 F.3d at 1071.  Plaintiffs' assertion that "it matters [] not whether there is a connection between the defined markets and where the harm occurred" (Br. 43) is directly contrary to controlling precedent from this Court and the Supreme Court.  The harm Plaintiffs allege, "even if real, [is] not 'anticompetitive' in the antitrust sense . . . [if it] do[es] not involve restraints on trade or exclusionary conduct in 'the area of effective competition.'"

---

[19] *See Kalmanovitz*, 769 F.2d at 156 (transactions "concerning the stock of a single company" do not "constitute[] trade or commerce within the meaning of § 1 of the Sherman Act"); *see also Bucher v. Shumway*, 452 F. Supp. 1288, 1290 (S.D.N.Y. 1978) (dismissing Sherman Act § 1 claim based on tender offer because "[t]he purchase and sale of shares by an investor does not fit comfortably within this definition"), *aff'd mem.*, 622 F.2d 572 (2d Cir. 1980).

*Qualcomm*, 969 F.3d at 992 (quoting *Am. Express*, 138 S. Ct. at 2285).

This Court analyzed a similar mismatch between the alleged relevant market and the claimed market power and harm in *Maris Distributing Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002).  There, the court held that a beer distributor did not establish a rule-of-reason claim where the defendant, Anheuser-Busch, had a 48% market share in the manufacture of beer, but the plaintiff alleged the anticompetitive effects occurred in the market for the purchase and sale of equity interests in beer distributorships, in which Anheuser-Busch had only a 1% to 3% market share.  *See id.* at 1211.  The court held that the "relevant market" for the plaintiff's claim was the purchase and sale of equity interests in beer distributorships, *id.* at 1213-14, and "a defendant's market share in a market other than the alleged relevant market is irrelevant," *id.* at 1215.  The same holds true here:  Citadel Securities' share in the alleged "PFOF Market" and Robinhood's share in the alleged "No-Fee Brokerage Trading App Market" are irrelevant to the markets for trading in the Relevant Securities.

Plaintiffs try to mask the market-jumping nature of their claim.  This attempt fails.  *First*, Plaintiffs contend that the "conspiracy excluded Plaintiffs from the No-Fee Brokerage Market and reduced output in that market."  (Br. 40.) "Market exclusion" cases—including those that Plaintiffs rely on—involve harm to competition caused by the exclusion of a *competitor* from the market.  (Br. 41

48

(citing *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 967-68 (11th Cir. 2006); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984)).)  Plaintiffs do not—nor could they—allege that they competed in the "No-Fee Brokerage Trading App Market."  No competitor was "excluded," so this theory of harm to competition makes no sense.

Furthermore, a "reduction in output" refers to a reduction in product volume to create an artificially high price for that product.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) ("Supracompetitive pricing entails a restriction in output.").  The product in the alleged "No-Fee Brokerage Trading App Market" is the brokerage service provided by Robinhood and other brokers.  Here, there are no allegations that the price for that brokerage service increased (nor could there be, as Robinhood's service remained free of charge to customers).  (*See, e.g.*, AAC ¶¶ 8, 69, 73.)

*Second*, Plaintiffs argue that they were the targets of the alleged scheme.  This is where Plaintiffs improperly focus on antitrust injury.  The issue is not whether Plaintiffs have standing to bring a private antitrust claim for harm to competition, but whether Plaintiffs allege competitive harm in a relevant market to begin with.  For example, Plaintiffs rely extensively on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982).  (Br. 45-46.)  But Plaintiffs lack the core allegation that the *McCready* plaintiff made—an agreement that harmed

49

competition *in the relevant market*.  In *McCready*, Blue Shield allegedly entered into an agreement with the Neuropsychiatric Society of Virginia, in which Blue Shield would reimburse its insureds for "selecting psychiatrists over psychologists for the psychotherapeutic services they required." *Id.* at 483.  The scheme enacted by Blue Shield (the insurer) and psychiatrists harmed competition in the therapy services market (in which the psychiatrists competed) by excluding psychologists who otherwise would compete with psychiatrists. *Id.*  Similarly, *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752 (11th Cir. 1983), involved a vertical arrangement that harmed competition in the construction aggregate hauling market (in which the plaintiff and defendant's subsidiary competed), as well as the construction aggregate production market (in which the defendant operated). *Id.* at 763-65.  Thus (unlike here), there *was* alleged harm to competition in the relevant market in that case. *Id*. at 779-80.  The primary question in each of those cases was whether participants in a separate market had standing to challenge conduct that was properly alleged to have harmed competition in a market in which they did not participate.  That standing question never even arises in this case because Plaintiffs are missing the threshold allegations that there was any harm to competition in the defined markets in which Robinhood and Citadel Securities each competes.

Plaintiffs also analogize their claim to *Loeb Industries, Inc. v.*

50

*Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002).  (Br. 46-48.)  But *Loeb* is not

analogous at all.  *Loeb* involved a price-fixing scheme in the linked markets for

physical copper and copper futures, where prices are "directly linked" between the

two markets.  306 F.3d at 476-77.  Sumitomo Corporation, which sold physical

copper, conspired with Global Minerals and Metals Corporation ("Global"), a

copper merchant, to artificially inflate the price of copper by (i) Sumitomo's

buying physical copper from Global and hoarding the supply, and (ii) entering into

sham agreements to buy physical copper from Global to justify Sumitomo's taking

large long positions in copper futures.  *Id.*  These actions inflated the price of

copper futures and also the "directly linked" price of physical copper, as there was

a limited supply of physical copper for short traders (Sumitomo's counterparties in

the futures market) to use to cover when the contracts came due.  *Id.*  The court

found that "the defendants' conduct was felt in two separate markets: the futures

market and the physical copper market," and the plaintiffs in *Loeb*, purchasers of

physical copper, alleged harm to competition from the rise in prices in the physical

copper market, in which Sumitomo and Global participated.  *Id.* at 483.

That is not the case with Plaintiffs' claim here.  Unlike the defendants

in *Loeb*, Robinhood is not a competitor with market power in the market where the

alleged harm was felt (here, the markets for trading in the Relevant Securities).

Rather, as Plaintiffs allege, Robinhood competes with other brokers in the "No-Fee

Brokerage Trading App Market" to provide retail brokerage services. (AAC ¶¶ 312-313.) Accordingly, the District Court's decision to dismiss for the additional reason that Plaintiffs fail to plead harm to competition in a relevant market should be affirmed.

## <u>CONCLUSION</u>

For the foregoing reasons, Robinhood respectfully submits that the District Court's Opinion should be affirmed.

Dated:  December 14, 2022

Respectfully submitted,

**CRAVATH, SWAINE & MOORE LLP**

_____
*/s/ Antony L. Ryan*

Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

**HUNTON ANDREWS KURTH LLP**

Samuel A. Danon (FBN 892671)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2nd Avenue, Suite 2400
Miami, FL 33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-2460
sdanon@hunton.com
mcastellanos@hunton.com

*Attorneys for Defendants-Appellees*
*Robinhood Financial LLC, Robinhood*
*Securities, LLC and Robinhood Markets,*
*Inc.*

53

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE-STYLE REQUIREMENTS</u>

**Type-Volume:** This brief complies with the type-volume limits of FRAP 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by FRAP 32(f) and 11th Cir. Rule 32-4, this document contains 11,617 words.

**Typeface and Type-Style:** This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.



_/s/ Antony L. Ryan_
Antony L. Ryan

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on December 14, 2022, a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served on counsel of record either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically generated notices of filing.



*/s/ Antony L. Ryan*
Antony L. Ryan